## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PALM HARBOR HOMES, INC., et al.,[1] | ) | Case No. 10-_____ (___) |
| | ) | |
| Debtors. | ) | Joint Administration Pending |
| | ) | |

### DECLARATION OF BRIAN E. CEJKA IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Brian E. Cejka, being duly sworn, deposes and says:

1.    On November 29, 2010 (the "Petition Date"), Palm Harbor Homes, Inc., a Florida corporation ("Palm Harbor") and its related debtors (collectively, the "Debtors") each commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").  I am the Chief Restructuring Officer of the Debtors.  Beginning in October 2010 and continuing through the Petition Date, I have devoted substantial amounts of time and effort working with members of the Debtors' senior management to, among other things, assist in the development of near-term projections, assist in short-term cash management activities and coordinate the Debtors' efforts to prepare for a chapter 11 filing.  As a result, I have become thoroughly familiar with the day-to-day operations and the business and financial affairs of the Debtors.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Palm Harbor Homes, Inc. (6634); Palm Harbor Albemarle, LLC (1014); Nationwide Homes, Inc. (4881); Palm Harbor Real Estate, LLC (8234); Palm Harbor GenPar, LLC (0198); and Palm Harbor Manufacturing, LP (0199).  The location of the Debtors' corporate headquarters and service address is: 15303 Dallas Parkway, Suite 800, Addison, Texas 75001.

1905666.1
CHI1:0041347/00000:1719929v15

2.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1109 of the Bankruptcy Code.

3.      I submit this Declaration (the "Declaration") to assist the Court and the other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the first day motions and applications filed in these cases (the "First Day Motions").  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtors.  If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

4.      This Declaration is divided into two sections.  Section I provides a brief description of the Debtors' current organizational structure and operations, their current financial condition and the liquidity events giving rise to these cases.  Section II sets forth those facts that are most germane to this Court's determination of the Debtors' various motions for first day relief and is intended to supplement any other declarations or affidavits submitted in direct support of such motions.

## I.
## BACKGROUND AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.      Corporate Structure

5.      Palm Harbor is a publicly traded Florida corporation whose common stock is listed on NASDAQ as Palm Harbor Homes, Inc. and has a ticker symbol of "PHHM."  Palm Harbor owns all of the stock or membership interests of each of the other above-captioned

debtors. Additionally, Palm Harbor owns all of the stock of CountryPlace Acceptance Corp.
("CountryPlace"), a non-debtor subsidiary, who in turn owns all of the stock, membership
interests and partnership interests of various non-debtor subsidiaries who offer conforming
mortgages to purchasers of site-built and factory-built homes and provide loan servicing to pools
of conforming and non-conforming mortgages and chattel loans (the "CountryPlace Business").
Similarly, Palm Harbor owns all of the stock of non-debtors Standard Casualty Co. and Standard
Ins. Agency, Inc. (who in turn owns all of the stock of non-debtor Palm Harbor Ins. Agency of
Texas) (collectively, "Standard Casualty").  Standard Casualty offers property and casualty
insurance for factory-built homes (the "Standard Casualty Business").

      **B.**      **Overview of Business Operations.**

            **1.**      **Overview**

      6.      Founded in 1977, the Debtors are a leading manufacturer and marketer of factory-
built homes in the United States.  They market nationally through vertically integrated
operations: the Debtors build and develop manufactured and modular housing, and certain of the
Debtors' non-debtor affiliates provide the purchasers of these manufactured and modular homes
with financing and insurance.  As of the Petition Date, the Debtors operated eight manufacturing
facilities in six states.  They sell their homes through a network of 54 company-owned retail
sales centers and builder locations, and also through approximately 135 independent retail
dealers, builders, and developers.  CountryPlace, a non-debtor affiliate of the Debtors, originates
loans to purchasers of the Debtors' manufactured and modular housing, and subsequently sells
these loans to investors.  Through Standard Casualty, purchasers of the Debtors' manufactured
and modular homes are offered property and casualty insurance.

      7.      The Debtors manufacture a broad range of single and multi-section manufactured
homes and modular homes under various brand names and in a variety of floor plans and price

ranges.  Although approximately 78% of the homes built by the Debtors in 2010 were multi-section/modular ranch-style homes, the Debtors also build single-section homes, split-level homes, cape code style homes, two and three story homes, and multi-family units such as apartments and duplexes.  Approximately 80% of the Debtors' manufactured homes are produced as customized to a homebuyer's specifications.  During fiscal 2010, the average retail sales price (excluding land) of the Debtors' manufactured and modular homes was approximately $67,000 and $156,000, respectively

8.      The Debtors also produce commercial modular structures, including apartment buildings, condominiums, hotels, schools, and military barracks and other housing for U.S. military troops.  Commercial buildings are constructed in the same factories and using the same assembly lines as the factories where the Debtors produce their factory-built homes.  These commercial projects are generally engineered to the purchasers' specifications, and the buildings are then transported to the customer's site in the same manner as the Debtors' homes and are crane set at the sight.

9.      The Debtors' homes are sold through a distribution network consisting of retail sales centers owned by the Debtors and through independent dealers, builders, and developers.  The Debtors' commercial buildings are sold to the U.S. government, general contractors, and developers.  The Debtors currently have 54 company-owned retail sales centers in seven states, many of which also sell used and repossessed homes.  The Debtors' independent dealer network consists of approximately 75 local dealers that market to lifestyle communities and to customers directly.  The Debtors' builder/developer network consists of approximately 60 builders and developers who typically acquire and develop the land and set a foundation for a home.  The

4

Debtors then transport the home to the site and the builder/developer's contractors lift the home with a crane onto the foundation and subsequently perform finish-out services.

10.     Completed homes are transported by independent trucking companies to either the Debtors' retail sales center (in the case of "stock orders") or to the customer's site (in the case of "retail sold orders").  Transportation costs are borne by the independent retailer.  At the home site, the homes are placed on the site, the interior and exterior seams are jointed, utility hook-ups are made and installation and finish-out services are provided.  The Debtors' associates and third parties perform the installation and finish out services on the Debtors' homes.

      **C.     Prepetition Capital Structure**

11.     Palm Harbor and Palm Harbor Manufacturing, LP, both of whom are Debtors, are parties to that certain Amended and Restated Agreement for Wholesale Financing (Finished Goods – Shared Credit Facility) with Textron Financial Corporation ("Textron") dated May 25, 2004 (as amended from time to time, the "Textron Facility").  The maximum borrowings under the Textron Facility are required to be reduced on a quarterly basis from $45 million on March 26, 2010, to $25 million after March 25, 2011 and thereafter.  The Textron Facility matures on the earlier of (i) June 30, 2012, or (ii) one month prior to the date of the first repurchase option for the holders of the 3.25% Convertible Senior Notes described below.  Interest accrues under the Textron Facility at the rate of LIBOR plus 7.00% (subject to an all-in floor of 7.50%) per year to LIBOR plus 8.25% (subject to an all-in floor of 8.75%) per year, depending on the age of the advance.  The Textron Facility is secured by a lien on substantially all of the Debtors' assets, as well as a pledge of 100% of the Debtors' equity in Standard Casualty.  As of the Petition Date, and assuming no accrued postpetition interest, the Debtors' outstanding obligations relating to the Textron Facility total not less than $34,019,991, comprised of outstanding principal of

$33,805,142, accrued but unpaid interest of $214,849, and unpaid fees, costs, and expenses thereunder in an unliquidated amount.

12.     The Debtors defaulted under the Textron Facility because they failed to reduce their outstanding borrowings under the Textron Facility to $32 million by September 24, 2010, they exceeded the maximum permissible loan-to-coverage ratio of 60% by having a ratio of approximately 70%, and the Debtor sold approximately $6.76 million of homes and failed to remit these funds to Textron.  The Debtors have received a limited waiver of the default through November 9, 2010, and an automatic extension of this limited waiver through November 26, 2010, if the aggregate amount of homes sold but as to which funds have not been remitted to Textron does not exceed $7.5 million and the Debtors have aggregate finished goods inventory equal to $46.75 million or more.

13.     In 2005, Palm Harbor Homes, Inc. issued 3.25% Convertible Senior Notes due 2024 (the "Notes") in the aggregate principal amount of $75 million in a private, unregistered offering.  Interest on the Notes is payable semi-annually in May and November.  The Notes are senior, unsecured obligations and rank equal in right of payment to all of the Debtors' existing senior and unsecured indebtedness.  Holders of the Notes are entitled to require the Debtors to repurchase all or a portion of their Notes for cash on May 15, 2011, May 15, 2014, and May 15, 2019 at a repurchase price equal to 100% of the principal amount of the Notes to be repurchased plus accrued and unpaid interest, if any.  Each $1,000 in principal amount of the Notes is convertible, at the option of the holder, at a conversion price of $25.92, or 38.5803 shares of the Debtors' common stock upon the satisfaction of certain conditions and contingencies.  The Debtors did not repurchase any notes during fiscal 2010.  The Debtors did not pay the interest payment of approximately $900,000 due on the Notes on November 15, 2010.  As of the Petition

6

Date, the Debtors' outstanding obligations relating to the Notes is approximately $53.8 million (excluding accrued and unpaid interest).

### D.    Events Leading To A Chapter 11 Filing

14.    The severity, breadth, and length of the current global economic downturn has had a significant impact on the Debtors, resulting in reduced operating performance for each of their divisions.  Indeed, the manufactured housing industry has seen a general downward decline for over a decade.  Beginning in 1999, the manufactured housing industry entered a downturn as the result of the tightening of credit standards, limited retail and wholesale financing availability, increased levels of repossessions, excessive retail inventory levels and manufacturing capacities. For instance, industry shipments of manufactured homes were approximately 348,700 in calendar year 1999, but have decreased 86% over the last ten years to 50,000 in calendar year 2009.  During this ten-year period, the Debtors' manufactured housing shipments declined 87% in keeping with this national trend.

15.    Prior to 2006, increases in manufactured housing shipments to Florida, Arizona and California were the main factor in maintaining industry shipments at approximately 130,000 per year.  In 2006, however, the dynamics fueling increased manufactured housing demand in these states changed quickly.  Site built homes in these states had experienced rapid price appreciation driven by high land costs.  As such, the increase in speculative building resulted in excess inventory.  This caused prices to fall and buyers and sellers began to postpone their home buying decisions.  It also greatly reduced the number of buyers of manufactured housing who are over 55 years of age since they typically must sell their site built home to buy a manufactured home.  Industry shipments to Florida, Arizona and California decreased approximately 43%, 41%, and 48% in calendar years 2007, 2008 and 2009, respectively.

7

16.     The Debtors' top priority for fiscal 2010 and 2011 has been cash generation and cash preservation in every area of its operations.  To achieve these goals, the Debtors, among other things: (i) reached an agreement with Textron to amend the Textron Facility to extend its expiration date until April 2011 and, in certain circumstances, extend it further through June 2012; (ii) reduced inventories by $36.8 million and receivables by $4.9 million in fiscal 2010, and reduced inventories by $2.5 million and receivables by $400,000 from March 2010 through October 2010; (iii) reduced overhead costs, resulting in a decrease in selling, general, and administrative expenses of $20.2 million in fiscal 2010 and $6.1 million in fiscal 2011 (through October, 2010); and (iv) completed a sale leaseback transaction totaling $1.1 million in cash for two of the Debtors' retail properties in fiscal 2010.  In addition, the Debtors took steps to reduce their manufacturing capacity and distribution channels and realign their operational overhead to meet current and expected demand.  Since the beginning of fiscal 2010, the Debtors closed one factory and 25 underperforming sales centers.

17.     In addition to their efforts to both generate and preserve cash, the Debtors also pursued several other strategies in 2009 and 2010 to help with its liquidity problems.  On September 15, 2009, the Debtors engaged Raymond James & Associates Inc. ("Raymond James") to act as their investment banker to assist the Debtors with financing and restructuring alternatives, and on August 30, 2010, expanded the scope of Raymond James' retention to assist the Debtors with sale and business combination alternatives.  To further allow it to assess its options, on October 15, 2010, the Debtors retained Alvarez & Marsal North America, LLC ("Alvarez") to act as its restructuring advisor.

18.     Throughout the course of 2010, the Debtors, with the assistance of Raymond James and Alvarez, explored a number of strategic alternatives to address their worsening

financial condition, including, without limitation, a restructuring of their existing indebtedness with their prepetition secured lender and holders of the Notes, raising new debt and/or equity financing, and seeking a sale of all or some of the Debtors' assets and operations. The strategic alternative process included extensive marketing whereby the Debtors and Raymond James contacted third parties to determine the extent to which any of these parties were interested in providing new financing to the Debtors, purchasing the Debtors' assets, equity or operations, or exploring other strategic alternatives. During this time, the Debtors, through Raymond James, contacted over 120 parties (including both financial and strategic parties, and holders of the Notes) regarding potential strategic alternatives. Raymond James placed no conditions on potentially interested parties with regard to bid levels, structure, financing or management in connection with the solicitation of indications of interest. All of the interested parties were provided with an opportunity to execute a confidentiality agreement. Those parties that executed a confidentiality agreement were provided substantial due diligence information concerning, and access to, the Debtors, including, but not limited to, presentations by Debtors' management, access to the Debtors' financial advisors, and access to financial, operational, and other detailed information. Thirty nine of these parties executed confidentiality agreements with the Debtors and performed due diligence. Nine of these parties participated in on-site or telephone meetings with the Debtors' management team. As a result of these marketing efforts, the Debtors received multiple term sheets from several parties relating to various strategic alternatives, including the possible sale of the Debtors' assets. Of these offers, the Debtors selected an offer made by Palm Harbor Homes, Inc., a Delaware corporation that is an affiliate of Cavco Industries, Inc. (the "Stalking Horse Purchaser" or the "Purchaser"), to acquire the Debtors pursuant to section 363 of the Bankruptcy Code. The Purchaser accordingly executed an asset purchase agreement (the

"Stalking Horse Agreement") to acquire substantially all of the Debtors' assets, including the Debtors stock in CountryPlace and Standard Casualty, conditioned on the Bankruptcy Court's entry of an order authorizing the sale of the company to the Purchaser, and subject to the entry of an order approving certain bid procedures and bid protections to apply in an auction of the Debtors' assets contemplated by the Stalking Horse Agreement.  An affiliate of Cavco Industries, Inc. has also agreed to provide the Debtors with financing to enable the Debtors to commence these bankruptcy cases and to meet their obligations during these bankruptcy cases. The Debtors have thus entered into a debtor in possession revolving credit facility with Fleetwood Homes, Inc. (the "DIP Lender"), an affiliate of Cavco Industries, Inc., to provide this financing, subject to Bankruptcy Court approval.

## II.
## FIRST DAY PLEADINGS

19.     Concurrently with the filing of their chapter 11 cases, the Debtors will be filing a number of first day motions.  The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' chapter 11 cases (the "First Day Hearing"), at which time the Court will hear the First Day Motions.  For those motions being heard at the First Day Hearing, the relief requested therein is necessary and appropriate under the circumstances as the Debtors will suffer irreparable harm if any of the relief requested is not granted."

20.     Generally, the First Day Motions have been designed to meet the goals of: (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible through the sale of the Debtors' assets; (b) maintaining the confidence and support of the Debtors' customers, employees, and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these cases.  I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each

10

of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization.  I also believe that the matters addressed in the First Day Motions are of a genuinely emergent nature, and that the relief requested in the First Day Motions is required to preserve the assets of the Debtors' estates and to maintain the Debtors' ongoing business operations.  Moreover, I believe, as further described below, that the failure to immediately address the issues set forth in the First Day Motions will have extremely adverse effects on the Debtors, their estates, and their creditors.

> **A.**     **Motion for Entry of an Order Authorizing Joint Administration of the Debtors' Related Chapter 11 Cases.**

21.     Each of the six Debtors has a case pending before this Court.  The Debtors are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code, and their operations are closely related.  I believe that joint administration of these cases is warranted and will ease the administration burden for the Court and the parties involved with these cases.

22.     I believe that jointly administering these related cases will prevent duplication of effort and unnecessary fees, will not prejudice any party, and it is in the best interests of the Debtors, their estates, and all creditors that the Debtors' cases be jointly administered for procedural purposes.  The Debtors anticipate that numerous notices, applications, motions, hearings, and orders in these cases will affect all of the Debtors.  With six debtors before this Court, each with its own case docket, the failure to administer these cases jointly would result in the filing of duplicative pleadings for each issue that arises in these cases, and the service of each of these duplicative pleadings on numerous overlapping service lists.  Joint administration of these cases will eliminate these cumbersome filings and reduce the waste and burden on judicial resources associated with the administration of these chapter 11 cases.  Joint administration will also reduce the burden on the United States Trustee in supervising these chapter 11 cases.

23.     I believe that the relief requested in this motion will not adversely affect creditors' rights, as this motion requests only administrative, and not substantive, consolidation of the Debtors' cases.  For instance, creditors must still file proofs of claim against the Debtor's estate against whom they have claims, rather than on a consolidated basis.  Indeed, the reduced costs resulting from joint administration of the Debtors' estates will enhance the rights of all creditors.

24.     Finally, in this motion, the Debtors seek authority to file the monthly operating reports required by the U.S. Trustee Operating Guidelines on a consolidated basis.  I believe that consolidated monthly operating reports will further administrative economy and efficiency and will not prejudice any party in interest.

**B.     Motion for Entry of an Order Extending Time for Debtors to File Their Schedules and Statements of Financial Affairs.**

25.     The Debtors filed their consolidated Creditors List on the Petition Date.  The Creditors List in these cases includes approximately twenty-five thousand creditors.

26.     Due to the size of the Debtors' business and relative complexity of the creditor and vendor relationships of the Debtors, the Debtors will be unable to complete their schedules of assets and liabilities ("Schedules") and statements of financial affairs ("SOFAs") by December 29, 2010.  Given the substantial burdens already imposed on the Debtors' management by the commencement of these chapter 11 cases, the limited number of employees available to collect the information, the competing demands upon such employees, and the time and attention that the Debtors must devote to the restructuring process, I believe that there is "cause" to extend the deadline to file the Schedules and SOFAs by thirty days, through and including January 28, 2011.

27.     I believe that the requested extension will enhance the accuracy of the Debtors' Schedules and SOFAs and avoid the necessity of substantial subsequent amendments.

12

C. **Motion for Order Modifying the Reporting Requirements of Bankruptcy Rule 2015.3(a).**

28.     The Debtors have twelve non-debtor affiliates, including: (1) Standard Casualty Co.; (2) CountryPlace Acceptance Corp.; (3) CountryPlace Acceptance GP, LLC; (4) CountryPlace Acceptance LP, LLC; (5) CountryPlace Mortgage, Ltd.; (6) CountryPlace Title, Ltd.; (7) CountryPlace Mortgage Holdings, LLC; (8) CountryPlace Funding; (9) CountryPlace Securitization, LLC; (10) CountryPlace Holdings, LLC; (11) Standard Insurance Agency, Inc.; and (12) Palm Harbor Insurance Agency of Texas (collectively, the "Non-Debtor Affiliates").

29.     Compliance with Bankruptcy Rule 2015.3(a) would require the Debtors to divulge confidential, proprietary information pertaining to the Non-Debtor Affiliates.  This motion requests the entry of an order, pursuant to Bankruptcy Rule 2015.3(d), modifying the reporting requirements of Bankruptcy Rule 2015.3(a) to exempt the Debtors from submitting periodic financial reports for the Non-Debtor Affiliates.

30.     In the absence of such relief, I believe that the Debtors would potentially be forced to violate the Non-Debtors Affiliates' confidentiality requirements and to divulge commercially-sensitive information.  I believe that such consequences may harm the Debtors' interests in the Non-Debtor Affiliates to the detriment of the Debtors' estates.

31.     I submit that "cause" exists for an exemption pursuant to Bankruptcy Rule 2015.3(d) because, as set forth above, compliance with Bankruptcy Rule 2015.3(a) would require the Debtors to divulge confidential, proprietary information pertaining to the Non-Debtor Affiliates.  I believe that the disclosure of this information would be detrimental not only to the Debtors and their estates, but also to the Non-Debtor Affiliates subject to the reporting requirements.  In short, I believe that making such confidential and proprietary information

13

freely accessible to every PACER subscriber would jeopardize the Debtors' prospects for a successful chapter 11 reorganization.

> **D.** **Motion for Entry of an Order (i) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (ii) Deeming Utility Providers Adequately Assured of Payment, and (iii) Establishing Procedures for Resolving Requests for Adequate Assurance of Payment.**

32.      Uninterrupted Utility Services (as defined below) are necessary to preserve the value of the Debtors' estates while the Debtors devote their efforts to the reorganization process. A disruption of the Utility Services at the Debtors' locations would likely be costly to the Debtors as the Debtors would be forced from the outset of these chapter 11 cases to focus on finding replacement Utility Providers (if available) and Utility Services, rather than focusing on their reorganization efforts.

33.      In connection with their business, the Debtors incur utility expenses in the ordinary course of business for, among other things, water and sewer, electricity, gas, telephone, data services, waste removal and other similar services (collectively, the "Utility Services") from various utility companies and other providers (the "Utility Providers").

34.      A non-exhaustive list of the Utility Providers providing Utility Services to the Debtors is attached to the motion as Exhibit B (the "Utility List"). The Debtors have exercised their best efforts to list all of their Utility Providers in Exhibit B, but it is possible that certain Utility Providers may have been omitted from this list. In the prepetition period, the Debtors paid a monthly average of approximately $450,000 to the Utility Providers for Utility Services.

35.      The Debtors seek the relief requested in this motion in order to preserve the protections that Utility Providers have under the Bankruptcy Code, while affording the Debtors an opportunity to provide and negotiate adequate protection without facing the threat of imminent termination of Utility Services.

36.     The Debtors fully intend to pay all postpetition obligations owed to the Utility

Providers in a timely manner, consistent with the ordinary course of operating their businesses

after the Petition Date, and indeed, the Debtors expect that borrowings under their postpetition

financing documents will be sufficient to pay for their postpetition Utility Services.  In fact, the

payment of postpetition Utility Services are a part of, and subject to, the terms and conditions of

the Debtors' proposed postpetition financing and the budgets related thereto.

37.     I believe, and the Debtors submit, that the Adequate Assurance Deposit (as

defined in the motion) and the Debtors' ability to make postpetition Utility Services payments in

the ordinary course of business pursuant to the terms of their postpetition financing documents,

taken together with the facts and circumstances of the Debtors' chapter 11 cases (together, the

"Proposed Adequate Assurance"), constitute sufficient adequate assurance to the Utility

Providers within the meaning of section 366 of the Bankruptcy Code.  I believe that these

protections will ensure that all Utility Providers have adequate assurance of payment throughout

these chapter 11 cases, and the Debtors believe that no other or further assurance is necessary.

38.     I believe that the Proposed Adequate Assurance gives the Utility Providers ample

assurance of payment in a well-established manner.  I further believe that the circumstances

surrounding the Debtors, including the availability of cash pursuant to their postpetition

financing, indicate that the Debtors will meet their postpetition obligations to the Utility

Providers as they come due.

39.     The Debtors propose to protect the Utility Providers further by establishing the

Adequate Assurance Procedures provided in the motion, under which any Utility Provider may

request additional adequate assurance in the event that it can demonstrate facts and

circumstances that merit additional protection.

40.    By establishing the Adequate Assurance Procedures, the Debtors seek to implement an orderly process to determine the amount of assurance of payment that is adequate. I believe, and the Debtors submit, that the mechanisms proposed in this motion strike a reasonable, common-sense balance between providing "adequate assurance of payment for utility service that is satisfactory" as set forth in section 366(c)(2) of the Bankruptcy Code, on the one hand, and the Debtors' well-recognized need to conserve cash for use in their business on the other. Without the Adequate Assurance Procedures, the Debtors could be forced to address numerous requests by Utility Providers in an unorganized manner during the critical first stages of their reorganization efforts.

41.    I also believe that the Adequate Assurance Procedures will ensure that all parties act in good faith by establishing a fair process. I think this will protect the Debtors from an attempt by a Utility Provider to delay a request until the last minute in an effort to force the Debtors to agree to its request or face cessation of essential services.

**E.    Debtors' Motion for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of Common Stock.**

42.    As of the Petition Date, the Debtors have incurred federal net operating losses of approximately $156 million, and as a result, the Debtors have a corresponding amount of net operating loss carryovers ("NOLs") under the Internal Revenue Code (as amended, the "IRC"), and $98 million in state NOLs. The Debtors have also accrued foreign tax credit and general business tax credit of approximately $46,000, as well as minimum tax credit of approximately $393,000. As a result, the Debtors currently have a corresponding amount of tax credit carryovers ("Tax Credits," and together with the NOLs, "Tax Attributes").

43.    The Tax Attributes are of significant value to the Debtors and their estates because the Debtors may use the Tax Attributes to offset their future federal income tax

obligations.  These Tax Attributes could provide the Debtors with a significant amount of U.S. income tax savings in the future.

44.    To the extent trading or transfers of the Common Stock results in an "ownership change" within the meaning of section 382 of the IRC, such trading or transfers could severely limit or even eliminate the Debtors' ability to use their Tax Attributes, which would lead to significant negative consequences for the Debtors, their estates, and the overall reorganization process.

45.    I have been informed that if too many equity holders transfer the Common Stock (as defined in this motion) prior to the effective date of a chapter 11 plan of reorganization, such transfers may trigger an ownership change.  I believe that the risk of losing even a portion of the Tax Attributes means that the Debtors need the ability to monitor, and possibly object to, changes in ownership of Common Stock.  I also believe that such ability will provide the Debtors with flexibility in operating their businesses during the pendency of these chapter 11 cases, in implementing their reorganization plan, and in maximizing their ability to reduce future federal income taxes by offsetting their post-reorganization income with the Tax Attributes.

46.    I believe that the Common Stock Trading Procedures (as defined in the motion) are necessary to protect and preserve the Debtors' valuable Tax Attributes.  In the absence of such relief, I believe that the Debtors will be exposed to the possibility of volatile and erratic trading of the Common Stock that could diminish or even eliminate the Debtors' ability to use their Tax Attributes.

47.    By establishing procedures for continuously monitoring the trading of Common Stock, I believe that the Debtors can preserve their ability to seek substantive relief at the

17

appropriate time, particularly if it appears that additional trading may jeopardize the use of their Tax Attributes.

48.    The Debtors' Tax Attributes are valuable assets of their estates that will inure to the benefit of their stakeholders and facilitate the Debtors' reorganization.  I believe that unrestricted trading in the Common Stock with no advance warning of such trades jeopardizes these assets and impairs their value for the Debtors' stakeholders at large.  I also believe that the requested relief imposes a minimal burden to achieve a substantial benefit for the Debtors and their creditors and other interested parties.  I believe that the relief sought in this motion is necessary to avoid an irrevocable limitation of the Debtor's Tax Attributes and the Debtors' resulting inability to offset future taxable income with these Tax Attributes.

49.    Absent granting the requested relief on an immediate basis, I believe that the Debtors could be irreparably harmed by the mere filing of this motion.  If the Debtors filed this motion in accordance with the usual notice procedures set forth in the Bankruptcy Rules, I believe that a flurry of trading in Common Stock could follow.  Parties holding Common Stock could rush to transfer such Common Stock before the restrictions on such trading are imposed by the Court.  I believe that such trading would put the Tax Attributes in jeopardy and would negate the Debtors' objectives in seeking this relief.

**F.    Motion for Administrative Order Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals.**

50.    The Debtors are seeking to establish an orderly and regular process for allowance and payment of interim monthly compensation and reimbursement of expenses for attorneys and professionals in these chapter 11 cases.

51.    By separate applications, the Debtors have sought authority to employ as Professionals, (i) Locke Lord Bissell & Liddell LLP as counsel for the Debtors, (ii) Polsinelli

18

Shughart PC as co-counsel for the Debtors, (iii) pursuant to sections 363 and 105 of the Bankruptcy Code, Alvarez & Marsal North America, LLC as restructuring advisor to the Debtors, and (iv) Raymond James & Associates, Inc. as investment banker for the Debtors.

52.     The Debtors may need to retain additional Professionals in connection with the continued prosecution of these chapter 11 cases.  In addition, a statutory committee of unsecured creditors may be appointed in these cases pursuant to section 1102 of the Bankruptcy Code, and if so, I believe that such committee will likely retain counsel and possibly other Professionals to represent it in these bankruptcy cases.

53.     I believe that providing notice of the fee applications in the manner described in the motion will permit the parties most active in these chapter 11 cases to review and respond to professional fees and will save the expense of undue duplication and mailing of lengthy fee applications.

54.     The Debtors will include all payments made to Professionals in accordance with the Interim Compensation Procedures in its monthly operating report.

55.     I believe that the proposed Interim Compensation Procedures (as defined in the motion) will enable the Debtors to closely monitor the costs of administration of these cases, maintain a level cash flow, and implement efficient cash management procedures.  Moreover, I believe that these procedures will also allow the Court and the key parties in interest, including the Office of the United States Trustee, to ensure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.

56.     I believe that the Debtors' chapter 11 cases present a number of complex issues that, together with the day-to-day administration of the chapter 11 cases, must be addressed by the Debtors' limited staff and resources.  In addition, I anticipate that several Professionals will

be involved in these cases.  Absent streamlined compensation procedures, I believe that the

professional fee application and review process could be exceptionally burdensome on the

Debtors, the Professionals, the Court, and other parties.

57.    In sum, I believe that the Interim Compensation Procedures will: (i) substantially

reduce the burden imposed on the Court by avoiding the need for the immediate review of

Monthly Fee Applications; (ii) enable parties in interest to more closely monitor the costs of

administration of these chapter 11 cases; (iii) diminish undue financial burdens on the

Professionals and avoid having Professionals fund the costs of the Debtors' chapter 11 cases; and

(iv) permit the Debtors to better predict and manage monthly cash costs.

58.    Based on the foregoing, I believe, and the Debtors submit that the relief requested

in the motion is necessary and appropriate, is in the best interests of the estates and creditors, and

should be granted in all respects.

**G.    Application for Entry of an Order Authorizing the Debtors to Retain and Employ BMC Group, Inc. as Claims, Noticing, and Balloting Agent as of the Petition Date.**

59.    Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f) and Local Bankruptcy

Rule 2002-1(f), the Debtors request entry of an order (the "Order") authorizing them to employ

and retain BMC Group, Inc. ("BMC") as claims, noticing, and balloting agent (the "Claims

Agent") in these chapter 11 cases, as of the Petition Date, pursuant to the terms and conditions

set forth in the engagement agreement between the Debtors and BMC dated November 15, 2010,

and attached to the application as Exhibit B (the "Services Agreement").

60.    The Debtors have thousands of creditors, potential creditors, and parties in

interest to whom certain notices will be sent.  I believe that the size of the Debtors' creditor body

20

makes it impracticable for the Clerk of the Court (the "Clerk") to undertake, without assistance, the task of sending notices to creditors and other parties in interest.

61.     In consideration of the number of anticipated claimants and other parties in interest, the nature of the Debtors' businesses, and the scope of the tasks for which the Debtors will require the assistance of a claims noticing and balloting agent, I respectfully submit that the appointment of BMC is in the best interests of the Debtors' estates, their creditors, parties in interest, and this Court.  I believe that BMC's assistance will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their reorganization efforts.

62.     Based on BMC's considerable experience in providing similar services in large chapter 11 cases, I believe that BMC is eminently qualified to serve as Claims Agent in these chapter 11 cases.  I believe that parties to these cases will benefit as a result of BMC's experience and cost-effective methods.

63.     BMC has advised the Debtors of its willingness to perform the above-described services in accordance with the terms of the Services Agreement and the guidelines promulgated by the Judicial Conference of the United States for the implementation of 28 U.S.C. § 156(c).

64.     BMC's compensation is set forth in the Services Agreement.  The Debtors respectfully submit that such compensation is reasonable in light of the services to be performed by BMC as Claims Agent.  Furthermore, the Debtors request authorization to compensate BMC for services rendered as detailed in the application.

65.     For all of the foregoing reasons, I believe that the retention of BMC as Claims Agent is appropriate and in the best interests of the Debtors, their estates and their creditors.

**H.     Motion of the Debtors for Entry of an Order Authorizing the Debtors, *Nunc Pro Tunc* to the Petition Date, to (A) Retain Alvarez & Marsal North**

**America, LLC to Provide the Debtors a Chief Restructuring Officer and Certain Additional Personnel, and (B) Appoint Brian E. Cejka as Chief Restructuring Officer.**

66.     Beginning in October 2010 and continuing through the Petition Date, I, along with several professionals of A&M have devoted substantial amounts of time and effort working with members of the Debtors' senior management to, among other things, assist in the development of near-term projections, assist in short-term cash management activities and coordinate the Debtors' efforts to prepare for a chapter 11 filing.

67.     The Debtors chose A&M and me as a restructuring advisor and CRO (as defined in the motion), respectively, because of A&M's extensive experience providing restructuring services in reorganization proceedings and its excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States.  Moreover, the Debtors chose A&M and me because of the in-depth knowledge and familiarity that A&M had garnered regarding the Debtors and their business operations in the period leading up to the Petition Date in their role as restructuring consultants, and the belief that by continuing the existing relationship with A&M, rather than retaining a new advisory firm, the Debtors could minimize disruptions to their restructuring efforts that might otherwise arise from the appointment of a new CRO.

68.     Accordingly, effective on November 28, 2010, the Debtors and A&M entered into a second employment letter (the "Second A&M Engagement Letter"), a copy of which is attached to the motion as Exhibit C.  Pursuant to this letter, the parties have agreed that I will serve as the Debtors' CRO.  Further, A&M has agreed to provide other A&M employees ("Additional Personnel," and together with me, "A&M Professionals") as necessary to support the Debtors' existing management team in their restructuring efforts during these chapter 11 cases.

69.     In consideration of the size and complexity of their business, as well as the exigencies of the circumstances, the Debtors have determined that the services of experienced restructuring managers will substantially enhance their attempts to maximize the value of their estates.  The A&M Professionals are well-qualified to act on the Debtors' behalf given their extensive knowledge and expertise with respect to chapter 11 proceedings.

70.     Given the numerous issues which the A&M Professionals may be required to address in the performance of their services, A&M's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for such services for engagements of this nature in an out-of-court context, as well as in chapter 11, the Debtors submit that the fee arrangements set forth in the Second A&M Engagement Letter are reasonable and reflect a proper exercise of the Debtors' business judgment.

71.     The A&M Professionals have already proven to be of invaluable assistance in the Debtors' efforts in the development of near-term projections, assisting in short-term cash management activities and coordinating the Debtors' efforts to prepare for a possible chapter 11 filing.  The Debtors believe that the A&M Professionals will be able to continue to provide services that benefit the Debtors' estates and creditors.  Moreover, the preexisting relationship that A&M and I have with the Debtors ensures that the appointment of a CRO at this juncture will not disrupt the administration of these chapter 11 cases.

72.     I believe that the Debtors have been able to secure the services of the A&M Professionals during these chapter 11 cases on economic terms that are fair and reasonable and beneficial to the estates.  Moreover, the compensation arrangement provided for in the Second A&M Engagement Letter is consistent with and typical of arrangements entered into by A&M

and other restructuring consulting firms with respect to rendering similar services for clients such as the Debtors.

73.     The Debtors believe that the retention of the A&M Professionals is a sound exercise of the Debtors' business judgment and is in the best interests of all parties in interest in these chapter 11 cases.  The Debtors believe that A&M is well qualified and able to represent the Debtors in a cost effective, efficient, and timely manner.  A&M has indicated a willingness to act on behalf of the Debtors and to subject itself to the jurisdiction and supervision of the Court.

**I.      Motion for Entry of an Order Authorizing the Debtors to (i) Honor Prepetition Obligations Pursuant to Their Customer Programs; (ii) Honor Prepetition Obligations Pursuant to Their Incentive Programs; and (iii) Continue the Same in the Ordinary Course of Business.**

74.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace.  The Programs (as defined herein) offered by the Debtors are commonplace among homebuilders similar to the Debtors and form the cornerstone of the Debtors' businesses.  I believe that the Debtors must continue to offer these Programs if they are to preserve the value of their assets in anticipation of an eventual sale.

**1.      Debtors' HUD Obligations**

75.     When a traditional contractor builds a home, it builds to code dictated by state and local regulations.  This approach is not feasible for producers of manufactured homes because a single model is often shipped nationwide, frustrating any attempt to build to state or local codes. In response to the problems associated with this regime, the Department of Housing and Urban Development ("HUD") promulgated a uniform set of regulations applicable to manufactured housing producers nationwide.

24

76.     I believe that any failure to meet the HUD Obligations could cause HUD to attempt to shut down the Debtors' U.S. manufacturing operations.  I also believe that the disruption alone would cause significant harm to the Debtors and their operations, thereby reducing the going concern value of these entities and thus reducing the creditors' potential recovery.

### 2.     The Debtors' Warranty Programs

77.     The Debtors also have obligations under more traditional warranty programs (collectively, the "Warranties" and each a "Warranty") that provide coverage above and beyond that provided by the HUD Obligations.

78.     First, as part of sales process, the Debtors provide enhanced trim and detailing services (collectively, the "Trim-Out Services") on the premises of the customer's purchased home.  The Trim-Out Services are essential to the quality of the products that the Debtors sell and the maintenance of high levels of customer satisfaction and a reputation for quality.

79.     Second, the Debtors offer a standard one-year limited Warranty on all the homes that they sell.  The Warranty coverage commences when the home arrives on site, and covers defects in workmanship, including any factory-introduced failure of the structural, mechanical, electrical, plumbing, or weather-resistance systems.  The Warranty also covers appliances.  If coverage is triggered, the Debtors generally handle the warranty work themselves, but occasionally hire a third party contractor to perform the work.

80.     The warranty repair process commences when a customer, either a homeowner or a contractor/builder, contacts the manufacturing facility to make a claim.  In the vast majority of instances, the Debtors send a technician to evaluate the claim to determine if the Warranty covers the claim.  In approximately 3% of cases, the Debtors send a contractor to investigate the claim.

In very rare, emergency situations (*e.g.* a leak), a homeowner will make a repair and seek reimbursement from the Debtors.

81.     Third party contractors are selected on the basis of cost and quality of work; service managers have a number of relationships with their third party contractors.  Accordingly, the Debtors' third party contractors have developed the experience necessary to quickly and correctly repair most of the problems that arise under the Warranties.  Whenever the Debtors do not use their in-house staff to make the repair, the process is as follows:  the Debtors pre-approve the repair, then the repair is made, and only then is the party performing the repair compensated.  Since service is a precursor to payment, the Debtors believe that there are currently third party contractors holding claims for at least $370,000 for work performed prepetition under the Warranties for which they have not been compensated (collectively, the "Third-Party Claims").

82.     Third, the Debtors offer a complimentary protection plan for years two through five after a customer's purchase of a home from the Debtors, covering certain structural, mechanical, and electrical defects.  The Debtors repair certain covered defects upon a customer's request, after the customer pays a $50 deductible.

83.     In connection with determining their going-forward Warranty obligations, the Debtors calculate warranty costs by using a schedule that summarizes the number of warranty service requests by manufacturing plant, number of floors, and the cost of each call.  A 12-month history is used in the projection of Warranty reserves.  The reserve requirement is calculated on the number of homes that are still under warranty, multiplied by the number of service calls expected for those homes, multiplied by the average cost per call. The Debtors maintain a schedule that lists the number of service calls per home and the average cost of each call based on data from homes sold in the last year using data extracted from the Debtors' records.  As of

the Petition Date, Debtors have a warranty reserve of approximately $1,200,000 for pre-petition

Warranty claims, including amounts incurred in connection with the Trim-Out Services.

84.    Based on this formula, I anticipate an additional approximately $727,000 in

Warranty costs through December 24, 2010 that have accrued as of the Petition Date.  Based on

historical data, I expect that the Debtors will pay approximately $2,909,333 in warranty cash

costs through fiscal year 2011.

85.    I believe any failure to make the third-party providers whole with respect to

prepetition amounts owed to them would be to the significant detriment of the Debtors' ongoing

operations.  I also believe that the failure to pay prepetition repair claims with respect to the

Warranties will harm the Debtors' relationship with the tradesmen that they routinely use, or

with their customer base if customers are denied their promised reimbursement for repairs. In

addition, I believe that the Debtors' relations with their customers may be further strained if

third-party vendors demand payment from the homeowners or dealers for repairs normally paid

for by the Debtors, or if tradesmen attempt to place liens on the homes for the work that they

performed.

86.    I believe that any failure to meet prepetition Warranty obligations or the Trim-Out

Expenses will create a public impression that the Debtors will not honor Warranty obligations

postpetition.  Given the particularly competitive nature of this market, I believe, and the Debtors

submit that such a negative impression will significantly harm their efforts to maintain customer

and dealer good will, and therefore negatively impact their sales.  Therefore, I believe that either

a failure to honor prepetition Warranty obligations, including payment of outstanding bills to the

Debtors' third-party contractors, or to continue to offer the coverage associated with these

27

industry-standard Warranties will substantially impair the Debtors' efforts to preserve the value of their estates.

### 3.    Extended Warranty Program

87.    Further, the Debtors offer their customers the option of purchasing a five-year extended warranty (the "Extended Warranty Program").  Customers that opt to participate in the Extended Warranty Program must pay additional amounts for the coverage that it provides.  The Debtors' non-debtor affiliate, Standard Insurance ("SI"), is the insurer of the Extended Warranty Program.  The Debtors remit premiums to SI in exchange for coverage of covered claims under the Extended Warranty Program.  When a claim covered by the Extended Warranty Program arises, the Debtors repair such claim and obtain reimbursement for the claim from SI.  The Debtors do not owe any prepetition amounts to SI in connection with the Extended Warranty Program, and seek to be permitted, but not required, to continue the Extended Warranty Program in the ordinary course of business subsequent to the Petition Date.

88.    I believe that the continuation of the Extended Warranty Program is in the best interests of the Debtors' their estates and creditors.  As is the case with the Warranties, I believe that the Debtors' failure to honor its obligations under the Extended Warranty Program would create the perception that the Debtors' do not honor their warranty obligations, which would severely undermine consumer confidence, and ultimately the Debtors' sales, thereby harming the Debtors and their estates.  Further, as customers purchase the Extended Warranty Program, and SI, a non-Debtor, is responsible for amounts owing under the Extended Warranty Program, the Extended Warranty Program does not diminish the Debtors' estates.

### 4.    Debtors' Sales Incentive Program

89.    The Debtors maintain the following sales incentives programs for both the Debtors' employees and third-parties (collectively, the "Incentive Programs"):

- A dealer incentive program for the benefit of third-party dealers (the "Dealer Program"). Under the Dealer Program, the Debtors give volume incentive bonuses to high-volume dealers according to specified criteria.  As of the Petition Date, the Debtors owed approximately $625,000 pursuant to the Dealer Program;

- The Debtors maintain an incentive program for internal salespeople that awards them points based on sales, which can be redeemed for prizes such as gift cards and vacations (the "Salesperson Incentive Program").  The Salesperson Incentive Program costs the Debtors approximately $10,000 per quarter; as of the Petition Date, there was nothing owed under the Salesperson Incentive Program.

- Nationwide Homes and certain manufacturing facilities maintain a program (the "Model Home Interest Program") by which they will pay one year of model home interest reimbursement for builders that have a model home in place during the entire year per the terms of the Model Home Interest Program.  Payments are typically made either monthly or quarterly, depending on the preference of the builder.  The Debtors have paid interest of $31,000 to date under the Model Home Interest Program and estimates approximately that approximately $20,000 was due and owing as of the Petition Date under the Model Home Interest Program.

- Nationwide Homes maintains a program (the "Model Home Rebate Program") by which it pays a rebate of 1% on all purchases to approved Nationwide builders that have a Model Home in place during the entire year per the terms of the Model Home Rebate Program.  A builder must purchase in excess of $450,000 annually from Nationwide to qualify for the Model Home Rebate Program.  Payments under the Model Home Rebate Program are typically paid in a single payment in January after the program year expires.  Payments under the Model Home Rebate Program are due in January of 2011.  Nationwide estimates that it owed approximately $45,000 pursuant to the Model Home Rebate Program as of the Petition Date.

90.    I believe that as obligations under the Incentive Programs generally arise only when actual sales are consummated, the Incentive Programs generate revenue and thus inure to the benefit of the Debtors and their creditors.

### 5.    Customer Deposits

91.    In the ordinary course of business the Debtors hold deposits made by their customers to be applied to the purchase price of homes (collectively, the "Customer Deposits"). As of the Petition Date, the Debtors held Customer Deposits totaling approximately $5,952,000. The Customer Deposits are valuable mechanisms for facilitating the sale of the Debtors'

products and failure to honor the Customer Deposits would cause irreparable harm to the Debtors' relationships with their customers and ultimately their businesses.

### 6.      Customer Referral Awards

92.      The Debtors maintain a customer referral program (the "Referral Program" and amounts owing thereunder and under the Incentive Programs, collectively the "Incentives") by which the Debtors give $500 gift cards to current customers of the Debtors that refer new customers to the Debtors who ultimately purchase a home from the Debtors.  Like the Incentive Programs, the Referral Program triggers the Debtors' obligations only when it leads to a sale. Therefore, the Referral Program is revenue and cash-flow positive.  As of the Petition Date, the Debtors owed approximately $39,000 under the Referral Program.

93.      For the reasons stated above,  I believe that each of these programs — the HUD Obligations, the Warranties, the Extended Warranty Program, the Incentive Programs, the Customer Deposits, and the Referral Program (collectively, the "Programs") — are necessary to preserve going concern value of the Debtors' business operations and therefore, to maximize the value of their estates.  As a consequence, I believe, and the Debtors submit, that authorization to continue these programs is necessary to the reorganization effort.

94.      I believe that if the Debtors are prohibited from continuing the Programs consistent with their past business practices, both existing dealers and potential customers will likely lose confidence in the Debtors, the Debtors' sales will likely significantly deteriorate, and HUD may seek to shut down or otherwise limit the Debtors' operations.  As stated above, I believe that the failure to maintain sales volume will substantially impair the going-concern value of the Debtors' businesses, meaning that the damage from refusing to honor these obligations or continue these Programs far exceeds the savings associated with their suspension.

95.    As was previously stated, I believe that these Programs are critical to the Debtors' businesses because they allow the Debtors to remain competitive in the manufactured housing industry.  I believe that their continuation (including modifying existing Programs and introducing new programs that are similar in scope and expense to existing Programs) is necessary to maximize the enterprise value of the Debtors and their businesses.

96.    I believe that paying or otherwise honoring the Debtors' prepetition obligations pursuant to the Programs, and continuing the Programs postpetition, is imperative to the Debtors' going concern prospects, and thus to their successful reorganization.  I further believe that any failure to do so will alienate the Debtors' integral dealer network, third-party contractors, and their customer base.  Additionally, I believe that the highly-competitive nature of this industry will lead to severe repercussions with respect to their sale efforts should the Debtors fail to meet their obligations under these Programs.

97.    I believe that any delay in the relief sought in the motion, even to the extent of being forced to advise customers that further judicial relief is necessary, could result in the Debtors' losing a substantial portion of their customer base, diminish the value of their assets, and severely harm their prospects for a successful reorganization.

**J.    Application for Entry of an Order Authorizing Employment and Retention of Locke Lord Bissell & Liddell LLP as Attorneys for the Debtors *Nunc Pro Tunc* to the Petition Date.**

98.    I believe that continued representation by LLBL is critical to the Debtors' efforts to effect a sale of the Debtors' assets because LLBL is extremely familiar with the Debtors' businesses and legal and financial affairs and, accordingly, is well-suited to guide the Debtors through the chapter 11 process.

99.    The Debtors desire to employ LLBL under a general retainer because of the extensive legal services that will be required in connection with the businesses of the Debtors

31

and their affiliates.  I believe that the services of attorneys under a general retainer are necessary to enable the Debtors to execute faithfully their duties as debtors in possession.  I also believe that the Retainer (defined in the application) reflect normal business terms in the marketplace.

100.    Other than as set forth above and in the Wirt Declaration (as defined in the application and attached to the application as <u>Exhibit A</u>), no arrangement is proposed between the Debtors and LLBL for compensation to be paid in these cases and no agreement or understanding exists between LLBL and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with these cases.

101.    I believe, and the Debtors submit that the engagement and retention of LLBL on the terms and conditions set forth herein and in the Wirt Declaration and the Engagement Agreement (as defined in the application and attached to the Wirt Declaration as <u>Exhibit 1</u>) is necessary and in the best interests of the Debtors, their estates, and their creditors.

**K.    Application for Entry of an Order Authorizing Retention and Employment of Raymond James & Associates, Inc. as Investment Banker to the Debtors and Debtors-in-Possession *Nunc Pro Tunc* to the Petition Date.**

102.    I believe that the compensation arrangements contained in the Engagement Letter (as defined below) inure to the benefit of the Debtors' estates as they provide the proper inducement for Raymond James to act expeditiously and prudently with respect to the matters for which it will be employed.

103.    Raymond James has been working with the Debtors since September of 2009.  In connection with this chapter 11 filing, the Debtors executed an engagement letter with Raymond James, dated as of November 22, 2010 (the "<u>Engagement Letter</u>"), and attached to the application.  The engagement will require Raymond James to act as the Debtors' exclusive investment banker with respect to, inter alia, evaluating potential sales of the Debtors' assets (a "<u>Sale Transaction</u>") and other strategic alternatives.

32

104.    Since its retention, I believe that Raymond James has worked diligently on the matters for which it was engaged and, as a result, has become uniquely situated to assist the Debtors.  I also believe that Raymond James is familiar with the books, records, financial affairs, and other data maintained by the Debtors and is well qualified to continue to provide these services to the Debtors.  Further, I believe that Raymond James is familiar with the Debtors' capital structure and material agreements and many of the potential financial and legal issues that may arise in the context of the Debtors' chapter 11 cases.  Accordingly, I believe that retaining Raymond James is an efficient and cost effective manner in which the Debtors may obtain necessary financial advisory and investment banking services.

105.    I further believe that an experienced investment bank and financial advisor such as Raymond James fulfills a critical need that complements the services offered by the Debtors' other restructuring professionals.  The Debtors desire to continue to employ Raymond James to act as the Debtors' investment banker postpetition because, among other reasons, Raymond James has substantial expertise in the restructuring of troubled companies, substantial prepetition experience advising the Debtors, and is well qualified to perform these services and represent the Debtors' interests in their Chapter 11 Cases.  Absent the retention of Raymond James as of the Petition Date, I believe that the Debtors will suffer immediate and irreparable harm because the services provided by Raymond James are necessary to an effective and efficient resolution of these bankruptcy cases.

106.    As compensation for Raymond James' services, the Debtors have agreed to pay Raymond James in accordance with the Engagement Letter, and as summarized in the application.  I believe that the fee structure outlined in the Engagement Letter and summarized in the application is consistent with the typical arrangement Raymond James and other firms enter

33

into when rendering similar services under similar circumstances, and is the product of arm's

length negotiations.  I also believe that the fee structure is reasonable, market-based and designed

to compensate Raymond James for its work in a fair and equitable manner.  Further, I believe

that the benefit of Raymond James' services cannot be measured by reference to number of

hours to be expended by Raymond James' professionals.  Accordingly, Raymond James and the

Debtors have agreed to a fee structure in anticipation that a substantial commitment of

professional time and effort will be required, and in light of this fact that (a) Raymond James'

sizable commitment to the instant matters may foreclose other opportunities that would

otherwise be available to Raymond James, and (b) the actual time commitment required by

Raymond James may vary considerably throughout the proceedings.

107.    I believe that the indemnification and contribution provisions reflected in the

Engagement Letter are customary and reasonable terms of consideration for financial advisors

such as Raymond James for proceedings both out of court and in Chapter 11.  The terms of the

Engagement Letter and the indemnification and contribution provisions therein, were fully

negotiated between the Debtors and Raymond James at arm's-length, and I believe, and the

Debtors respectfully submit that the Engagement Letter and the terms therein are customary,

reasonable, and in the best interests of the Debtors, their estates and their creditors.

**L.    Motion for an Order Authorizing Payment in the Ordinary Course of (i) Section 503(b)(9) Claims; and (ii) Certain Obligations for the Postpetition Delivery of Goods and Services.**

108.    The Debtors received numerous goods in the ordinary course business during

the twenty-day period immediately preceding the Petition Date.  The Debtors believe that

certain of the vendors and suppliers who delivered goods to the Debtors during the twenty-

day period prior to the Petition Date but have not received payment for such goods (the

"503(b)(9) Claimants") likely will seek the allowance and payment of those claims (the

34

"503(b)(9) Claims") through individual motions to this Court.  I believe that if the 503(b)(9)

Claimants file such individual motions with the Court, the Debtors and other parties in

interest will likely divert resources in these cases toward drafting, filing, prosecuting and

defending such individual motions and related responses.

109.    Under these circumstances, I believe that relief is necessary to permit the

Debtors to pay any vendor that delivered goods in the ordinary course of business within

twenty days of the Petition Date.  I estimate that the amount owing to 503(b)(9) Claimants

for goods delivered in the twenty days prior to the Petition Date is approximately

$2,250,000.

110.    Also in the ordinary course of the Debtors' business, numerous suppliers and

service providers provide the Debtors with goods and services that are integral to the

Debtors' business operations.  As of the Petition Date, the Debtors had outstanding

prepetition purchase orders (collectively, the "Purchase Orders") with certain suppliers

(collectively, the "Suppliers") for such goods and services.  As further discussed below, I

believe that delivery of goods and services by the Suppliers is critical to the continued

operation of the Debtors' businesses.

111.    As a result of the commencement of these chapter 11 cases, I believe that

Suppliers may perceive a risk that they will be treated as prepetition general unsecured

creditors for the cost of any shipments made or services provided pursuant to the Purchase

Orders.  As a result, the Suppliers may refuse to ship such goods to the Debtors or provide

such services to the Debtors unless the Debtors issue substitute postpetition purchase orders

or provide other assurances of payment.  The revised postpetition purchase orders may

include oppressive trade terms much more onerous on the Debtors than the terms in existing

Purchase Orders.  Most troubling, I believe that some Suppliers may refuse to do business with the Debtors after the Petition Date due to the failure to honor the existing Purchase Orders, thereby forcing the Debtors to find alternate suppliers with only minimal resources.

112.    I also believe that issuing substitute purchase orders on a postpetition basis would be administratively burdensome, time-consuming, and counterproductive to the Debtors' reorganization.  Such a requirement imposed by the Suppliers — or other requests for assurance of payment — inevitably will lead to delays in the Debtors' receipt of goods and services, ultimately resulting in the disruption of the Debtors' businesses and hindering the Debtors' ability to continue with operations.  I believe that any such disruption of the Debtors' operations would have a negative impact on the value of the Debtors' estates as a whole.

113.    Under these circumstances, I believe that the relief sought in the motion is needed to permit the Debtors to pay for the timely delivery of goods and uninterrupted provision of services from the Suppliers pursuant to the Purchase Orders.  I further believe that the relief requested in the Motion is essential to the Debtors' efforts to maintain and maximize the value of their assets.  Further, it is my belief that the Suppliers' and 503(b)(9) Claimants' delivery of goods and services is critical to the continued operation of the Debtors' businesses, and that the relief requested in the Motion is necessary to maintain a steady and dependable flow of goods from various suppliers.

114.    In order for their business to continue running as smoothly as possible, I believe that the Debtors will need to continue purchasing goods from a broad range of unaffiliated, third-party vendors on payment and other terms that are equally or more favorable than those terms available to the Debtors prior to the Petition Date.  I also believe

36

that other creditors will not be prejudiced by payment of certain 503(b)(9) claims prior to plan confirmation because of the reasons detailed in the motion.  Further, I believe that providing the Debtors with a tool to assist them in securing more favorable trade terms will help all creditors as it will allow the Debtors to more efficiently and effectively operate their business.

115.    Additionally, I believe that any prejudice suffered by those section 503(b)(9) Claimants who are required to wait until the conclusion of these Cases to receive payment of their allowed 503(b)(9) Claims is minimal at best.  Conversely, it is my belief that to require all 503(b)(9) claimants to have each of their claims adjudicated separately would needlessly waste estate resources — whereas allowing the Debtors to accelerate payment of only certain allowed 503(b)(9) Claims will not only ensure that the Debtors receive the breathing spell intended by the Bankruptcy Code, but will also ensure that creditors will receive equality of treatment with respect to their recovery.  For the foregoing reasons, I believe that the relief proposed in this Motion is appropriate and in the best interest of the Debtors and all creditors.

116.    I believe that the Debtors' relationship with their Suppliers is so essential that it is important to give the Suppliers the utmost reassurance that their valid claims will be given administrative expense priority status, and that they will continue to be paid by the Debtors in the ordinary course of business.  I also believe that any attempt by the Suppliers to interrupt goods in transit will create unanticipated supply shortages and potential work stoppages detrimental to the going concern value of the Debtors' business.

117.    Absent the relief requested in this motion, it is my belief that the Debtors would be required to expend substantial time and resources convincing Suppliers of the

Debtors' authority to make certain payments, reissuing Purchase Orders, and/or establishing the Debtors' right to retain the goods supplied under the Purchase Orders. The disruption in the supply of goods and services to the estate could significantly hinder the Debtors' operations and subject the Debtors to tremendous expense. Without the goods and services supplied through the Purchase Orders, I believe that the Debtors' businesses would rapidly deteriorate, and the Debtors opportunity to preserve the value of their assets would be jeopardized.

118.    Given the nature and scale of the Debtors' operations, the volume of goods and services consumed in the Debtors' operations, and the potential impact of any interruption in the flow of goods and services to the Debtors, I believe that the Debtors have a clear need to honor the Purchase Orders from the Suppliers.

**M.    Motion for Entry of an Order (i) Authorizing the Debtors to Pay Prepetition Sales, Use, Income, Property and Other Taxes and Governmental Charges; (ii) Authorizing the Debtors to Pay Prepetition Fees; and (iii) Directing the Banks and Financial Institutions to Honor and Process the Payment of Such Amounts.**

119.    In the ordinary course of their business, the Debtors incur various sales, use, income, property and other taxes and other similar governmental charges detailed herein (collectively, the "Taxes") as required by the respective federal, state or local taxing or other regulatory, governmental, or taxing authorities (the "Taxing and Regulatory Authorities"). The Taxes include without limitation the following:

(a)    Sales taxes in connection with homes and other products sold, and use taxes in connection with, among other things, items consumed at the Debtor's manufacturing facilities, offices, and other facilities (collectively, "Sales and Use Taxes");

(b)    Income, "minimum" taxes (assessed under some circumstances where the Debtors report losses or no income), gross receipt taxes, and franchise taxes (collectively, "Income and Franchise Taxes");

38

(c)      Property taxes on the Debtors' real and personal property ("<u>Property Taxes</u>"); and

(d)      Other miscellaneous taxes and governmental charges imposed by Taxing and Regulatory Authorities.

120.     In the ordinary course of their business, the Debtors incur various permitting, licensing, and other fees (the "<u>Fees</u>"), including without limitation the following:

(a)      Licensing fees required for manufacturing ("<u>Manufacturing Licensing Fees</u>"). These fees include: fees required to comply with regulations of the United States Department of Housing and Urban Development ("<u>HUD</u>") including "HUD label"[2] fees; and state licenses and fees required by various states. Manufacturing Licensing Fees also include bond and permit premiums and association dues as required by state and federal licensing requirements;

(b)      Inspection fees ("<u>Manufacturing Inspection Fees</u>") required by federal law to confirm compliance (through in-plant inspections) with HUD regulations and standards;

(c)      Engineering design approval fees ("<u>Engineering Design Approval Fees</u>") required under federal law to approve designs;

(d)      Licensing fees required for retail sales ("<u>Retail Licensing Fees</u>").  These fees include licensing fees required for retail sales centers.  Retail Licensing Fees also include bond premiums and association fees as required under licensing requirements; and

(e)      Installation notice fees and associated expenses ("<u>Installation Notice Fees</u>") required by some states in connection with required installation by licensed installers.

121.     In some cases, Taxes are paid in arrears once incurred or collected by the Debtors. However, certain jurisdictions require the Debtors to remit estimated sales and use taxes and similar collections on a periodic basis during the month or quarter in which sales are made.  The Debtors or the Taxing and Regulatory Authority then "trues up" any deficiency or surplus on the date on which the taxes are actually due.

---

[2] This refers to the labeling required by federal law to be affixed to manufactured homes demonstrating compliance with HUD regulations.

122.    The Debtors believe that they are substantially current on all of their Taxes and Fees that have become due as of the Petition Date.  The only obligations outstanding represent Taxes and Fees that may have accrued, but are not yet legally due or have not yet been billed.  In many instances there may be a lag between the time when the Debtors incur an obligation to pay the Taxes and Fees and the date such Taxes and Fees become due and payable under applicable laws or regulations.  Therefore there may be claims against the Debtors for Taxes and Fees that have accrued but remain unpaid as of the Petition Date, and for certain other Taxes and Fees that will come due during the pendency of these cases.

123.    By this motion, the Debtors seek authority, in their discretion, to pay, (i) any prepetition Taxes and Fees that have accrued, but were not yet due and owing or were not paid in full, as of the Petition Date, and (ii) any prepetition Taxes and Fees that arose prior to the Petition Date that become due and owing during the pendency of these cases in the ordinary course of business.

124.    The Debtors estimate that as of the Petition Date, their accrued and unpaid liabilities for Taxes and Fees in the aggregate do not exceed approximately $2,720,000, calculated as follows:

- Sales and Use Taxes that do not exceed approximately $725,000;

- Income and Franchise Taxes that do not exceed approximately $365,000;

- Property Taxes that do not exceed approximately $1,500,000;

- Manufacturing Licensing Fees that do not exceed approximately $45,000;

- Manufacturing Inspection Fees that do not exceed approximately $10,000;

- Engineering Design Approval Fees that do not exceed approximately $50,000;

- Retail Licensing Fees that do not exceed approximately $12,000; and

- Installation Notice Fees that do not exceed approximately $13,000.

125.    In addition to the foregoing, state sales tax audits are ongoing in the states of Alabama and Florida, and it is possible that the Debtors may owe additional prepetition Sales and Use Taxes as a result of such audits.  In this Motion, the Debtors request authority to pay additional prepetition amounts that may become due as a result of these audits.  The Debtors are using a preliminary estimate of $500,000.00 for additional amounts that may become due as a result of these audits.[3]

126.    Some Taxes and Fees either have not been paid or have been paid through checks and/or wires that may or may not have been presented or cleared as of the Petition Date. Accordingly, the Debtors seek entry of an order authorizing and directing their banks and financial institutions to honor prepetition checks and wires issued by the Debtors in payment of prepetition Taxes and Fees that, as of the Petition Date, have not cleared or been transferred.  In addition, to the extent the Debtors have not yet sought to remit payment with respect to certain Taxes and Fees, the Debtors seek entry of an order authorizing, but not directing, the issuance of checks or providing for other means of payment as necessary to pay the Taxes and Fees.

127.    The Debtors believe that payment of the Taxes and Fees is critical to the Debtors' continued, uninterrupted operations.  Nonpayment of Taxes may cause Taxing and Regulatory Authorities to take precipitous action, including, but not limited to, filing liens, assessing interest and penalties, preventing the Debtors from conducting business in the applicable jurisdictions, and seeking to the lift the automatic stay, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.

---

[3] This amount is set forth as an estimate only for purposes of the relief requested in this Motion.  The Debtors do not concede that any amount is due or owing under any audits.  The Debtors reserve all rights to challenge and contest any Taxes and/or Fees that may be asserted by Taxing Authorities as a result of such audits.

128.    Additionally, a failure to obtain or maintain the requisite permits, licenses, and the like through nonpayment of Fees could cause the Debtors' entire manufacturing operation to grind to a halt if the state and local authorities requiring such Fees attempt to shut down the Debtors' operations for a failure to stay current on these obligations.

129.    Also, the Debtors understand that nonpayment of the Taxes and Fees could result in certain states holding the Debtors' responsible officers personally liable in certain circumstances for unpaid sales and use taxes.  To the extent that any such Taxes and Fees remain unpaid by any of the Debtors, their officers could be subject to civil liability or criminal prosecution during the pendency of these chapter 11 cases.  The possibility of any such lawsuit or criminal prosecution would distract the Debtors and their officers in their effort to implement a successful reorganization strategy.

130.    The Debtors believe that payment of the Taxes and Fees is necessary to the Debtors' effective reorganization.  In particular, the Debtors believe that the payment of the Taxes and Fees is necessary in order to preserve the value of the Debtors' estates, as well as avoiding the cost and expense of adverse actions or litigation being instituted regarding the Taxes and Fees.

131.    Also, the Debtors believe that, among other things, their successful reorganization will require good standing with the states in which they do business and a complete devotion of effort by their officers and directors to these cases.  Given that the Debtors operate in several different jurisdictions, the Debtors interact with a significant number of Taxing and Regulatory Authorities.  If any of the Taxing and Regulatory Authorities attempt to exercise certain remedies against the Debtors, it could have the devastating effect of distracting the attention of the Debtors' management and professionals away from the important task of the Debtors'

successful reorganization.  Further, the failure to pay certain Taxes and Fees may result in the officers and directors of the Debtors being personally liable in certain circumstances.  The possible administrative and legal action, and claims against the Debtors and their officers and directors, would divert critical resources of the Debtors away from these estates and cause immediate and irreparable harm to the Debtors and their estates.

> **N.      Motion for Entry of an Order Authorizing Retention and Payment of Professionals Utilized by Debtors in the Ordinary Course of Business.**

132.      The Debtors customarily retain the services of various attorneys, appraisers, engineers, inspectors, and other professionals in matters arising in the ordinary course of their businesses, unrelated to these chapter 11 cases (the "Ordinary Course Professionals").  An initial list of Ordinary Course Professionals is attached as Exhibit 1 to the proposed order submitted with the motion.

133.      The Debtors believe that the retention of the Ordinary Course Professionals and the payment of interim compensation on the basis set forth in the motion is in the best interests of the Debtors' estates.  While generally the Ordinary Course Professionals with whom the Debtors have previously dealt wish to provide services to the Debtors on an ongoing basis, many might be unwilling to do so if they are able to be paid on a regular basis only through a cumbersome, formal application process.  If the Debtors lose the expertise, experience, and institutional knowledge of these Ordinary Course Professionals, the estates undoubtedly will incur significant and unnecessary expenses, as the Debtors will be forced to retain other professionals without similar background and expertise.  Therefore, the Debtors believe that it is in the best interests of the Debtors' estates to avoid any disruption in the professional services required in the day-to-day operation of the Debtors' business.

> **O.      Motion for Entry of an Order Providing that any Creditors' Committee Appointed in These Cases is Not Required to Provide Access to Confidential**

43

**Information of the Debtors or to Privileged Information.**

134.     The Debtors anticipate that it could be necessary or desirable, if an official

creditors' committee ("Creditors' Committee") is appointed, for the Debtors to share various

confidential and other non-public proprietary information (the "Confidential Information") with

a Creditors' Committee.  Because of the sensitive nature of this information, the Debtors

understand that Creditors' Committees typically execute confidentiality agreements or similar

arrangements restricting the use of this information.

135.     The Debtors believe that the relief requested is necessary to prevent harm to the

Debtors or cause undue burden with respect to the reorganization process.  The Debtors operate

in a competitive industry.  The dissemination of the Debtors' Confidential Information to parties

who are not bound by any confidentiality agreement with the Debtors could be disastrous for the

Debtors and, ultimately, the creditors in these cases.  If the Debtors' general creditors could

require a Creditors' Committee to give them access to Confidential Information in the possession

of the Creditors' Committee, such information easily could become public.

136.     The public dissemination of the Debtors' Confidential Information would cause

serious harm to the Debtors' estates. Among other things, the Debtors' business strategies,

pricing, costs, marketing, commercial information, trade secrets, proprietary information, and

intended initiatives could become known to the Debtors' competitors.  Other sensitive company

information such as compensation levels and employee information could harm morale and even

violate federal and state privacy laws.

137.     If there were a risk that Confidential Information given by the Debtors to a

Creditors' Committee could be disclosed to any creditor, the Debtors may be strongly

discouraged from giving Confidential Information to a Creditors' Committee (pursuant to a

confidentiality agreement) in the first place.  In fact, the Debtors could conclude that it could not

44

give any such information to a Creditors' Committee for fear of the substantial adverse impact that would result from such disclosure.

### P.   Motion for Entry of an Order Authorizing Debtors to Pay Certain Prepetition Claims of Shippers and Warehousemen.

138.   The Debtors' operation of their businesses and the success of the Debtors' efforts to sell their assets depend on the transport, delivery, set-up and/or storage of the Debtors' supplies, finished goods and inventory that, in the ordinary course of business, are presently in the possession and control of the Debtors' Shippers and Warehousemen (each as defined below). The Debtors supply and delivery system depends on the use of reputable common carriers, shippers, truckers, and freight forwarders (collectively, the "Shippers"), as well as third-party warehousemen who store the Debtors' goods at warehouses and storage facilities (the "Warehousemen").

139.   The Debtors produce manufactured housing that is sold via nationwide network of dealers. Due to the highly localized nature of the Debtors' associated shipping needs, the process is primarily managed on a plant-by-plant basis.

140.   The Debtors engage the Shippers to ship, transport, store, and deliver materials and supplies to the Debtors at their various facilities and deliver and/or set-up the Debtors' finished products to customers nationwide. The Debtors contract with Warehousemen to store finished goods.

141.   Prior to the Petition Date, the Debtors would fulfill their product delivery requirements primarily by purchasing products and materials produced by suppliers, which then were transported to the Debtors' facilities and warehouses. After the Debtors use the goods to create the manufactured homes, they employ Shippers to transport their finished products directly to customers or to third-party warehouses for storage. Accordingly, in the ordinary

45

course of business, Shippers and Warehousemen regularly have possession and control of the

Debtors' materials, supplies, and equipment, as well as finished manufactured homes produced

by the Debtors and intended for delivery to their customers.  The Debtors expect that, as of the

Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices for

goods that, (i) are being stored as of the Petition Date, (ii) are being delivered or were delivered

to the Debtors prior to the Petition Date, or (iii) are being delivered or were delivered to, and/or

set-up for, the Debtors' customers prior to the Petition Date (collectively, the "Shipping and

Warehousing Claims").  Based on the Debtors' review of their books and records as of the

Petition Date, and the projected amount of invoices that the Debtors anticipate receiving

following the Petition Date for services rendered by the Shippers and Warehousemen prior to the

Petition Date, the Debtors estimate that the aggregate prepetition amount of the Shipping and

Warehousing Claims is approximately $650,000.

     142.     A material disruption along the path of the Debtors' supply and distribution chain,

would immediately impact the Debtors' ability to: maintain control over their goods and

inventory, collect on receivables relating to the fulfillment of customer orders for manufactured

homes in transit or stored at warehouse, and successfully operate and complete a sale of their

businesses.  It is likely that if prepetition invoices remain unpaid, (i) certain Shippers will

withhold delivery of the Debtors' supplies and products and may refuse to ship outright, and (ii)

Warehousemen may prevent access to the Debtors' products.  Either of these two potential

punitive self-help measures would severely disrupt the Debtors' operations and curtail their

ability to maximize value for the benefit of all parties in interest in these chapter 11 cases.

     143.     The Debtors wish to avoid any disruption in their supply and distribution chain

and, thus, are seeking authority to pay the prepetition amounts necessary to cause their Shippers

and Warehousemen to continue transporting, storing, distributing, setting-up and delivering the Debtors' products and supplies.  Such parties could potentially assert administrative and/or secured claims with respect to the Debtors' property in their possession.  Additionally, the value of goods in the possession of the Shippers and Warehousemen and the potential injury to the Debtors if the goods are not released are likely to greatly exceed the amount of such Shipping and Warehousing Claims.  Specifically, absent the relief requested in this Motion, the Debtors would be required to expend substantial time and limited resources (i) convincing Shippers and Warehousemen of the Debtors' authority to make certain payments, (ii) establishing the Debtors' right to obtain the goods, (iii) contesting or litigating reclamation demands, and (iv) enforcing the Debtors' rights with respect to goods in transit, all of which will substantially drain resources that otherwise could be used to the benefit of the Debtors' estates and their creditors.  I thus believe that it is necessary and essential to the value of the Debtors' estates that they be permitted to make payments on account of certain Shipping and Warehousing Claims.

Q.     **Motion for Entry of an Order (i) Authorizing Payment of Wages and Employee Benefits: (ii) Modifying the Automatic Stay to Permit Employees to Proceed with Claims Under the Workers' Compensation Programs, and (iii) Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations**

144.     In the ordinary course of their business, the Debtors incur payroll and various other obligations and provide other benefits to their employees for the performance of services. As of the Petition Date, the Debtors employed approximately 1,500 employees, the vast majority of which are full-time employees, with some employees salaried and others paid on an hourly basis (collectively, the "Employees").

145.     The Debtors have costs and obligations with respect to the Employees relating to the period prior to the Petition Date.  Certain of these costs and obligations are outstanding and

47

due and payable, while others will become due and payable in the ordinary course of the Debtors' business after the Petition Date.

### a.    Wage Obligations

146.    Prior to the Petition Date and in the ordinary course of business, the Debtors typically paid obligations relating to wages, salary and compensation for the Employees (collectively, the "Wage Obligations") through direct deposits into Employees' accounts on a semi-monthly (paid on the 15th and last day of each month), bi-weekly (paid every other Friday), or weekly basis (paid every Friday), depending on the Employee's status. The Debtors' current estimated weekly gross payroll (including tax and other withholding and Performance Payments and commissions) is approximately $1,150,000. Following the Debtors' customary payroll schedule, the next payroll is due to be paid on November 30, 2010 for employees paid on a semi-monthly basis, December 3, 2010 for employees on a bi-weekly basis, and December 3, 2010 for employees paid on a weekly basis; the Debtors will pay such postpetition Wage Obligations.

147.    The Debtors have issued paychecks to Employees due to be paid on November 30, 2010. However, the Debtors believe that not all such paychecks have been cashed yet, and seek permission to direct the Banks (as defined herein) to honor such paychecks.

148.    The Debtors seek to be authorized, but not required, to pay any outstanding Wage Obligations due and owing up to $1,150,000.

### b.    Commission Obligations

149.    The Debtors' revenues come primarily from selling homes and related transactions. To maximize their sales and collections, the Debtors employ sales employees in their retail, manufacturing, and nationwide divisions (collectively, the "Sales Employees") who develop and cultivate relationships with customers and potential customers. As is typical for employees in sales, a portion of the Sales Employees' compensation is tied to the sales they

48

generate.  Accordingly, the Sales Employees are entitled to receive commissions (collectively, the "Commission Obligations") under various sales commission programs (collectively, the "Commission Programs").  Some of the Sales Employees receive commissions in addition to a salary.  Others receive a small fixed salary and their compensation is largely in the form of commissions.  The Commission Obligations include a periodic "draw," paid at the same time as payroll is paid, which constitutes an advance against expected commissions.

150.    On a prepetition basis, the Debtors estimate that Sales Employees had earned approximately $450,000 in Commission Obligations through the Petition Date that have not yet been paid.

151.    The Sales Employees are responsible for generating the vast majority of the Debtor's revenue and have historically been paid compensation under the Commission Programs in the ordinary course of business.

### c.    Performance Payments

152.    The Debtors maintain, in the ordinary course of their business, programs (collectively, the "Incentive Programs") that provide Employees with monetary incentives based on factors such as sales, profitability, or performance, depending on the nature of the Employee's work and the corresponding Incentive Program.  The Incentive Programs are designed to provide market-competitive cash performance payments (collectively, the "Performance Payments") to Employees based on performance.  Performance Payments paid under the program are paid on a weekly, monthly, or quarterly basis, depending on the specific Incentive Program.

153.    The Incentive Programs are summarized as follows:

Manufacturing Performance Payments:

Weekly Production and Technician Performance Payments – Production line workers and technicians are paid a week in arrears for

49

Performance Payments earned based on plant specific calculations. This Performance Payment is included in weekly gross wages.

Quality Performance Payments – Line workers eligible for Performance Payments are paid monthly, the month after they are calculated. Each facility creates specific targets that lead to plant wide efficiency, safety, and customer satisfaction. Associates earn Performance Payments based on actual performance. Examples of targets would be the division consumer satisfaction index ("CSI") score; reductions in scrap and/or rework from prior performance; and current warranty expenditures relative to prior performance. The amount of such Performance Payments owing pre-petition is approximately $20,000.

Supervisor Performance Payments – Salaried managers, who are not eligible for the quarterly incentive plan (described below), are paid a monthly Performance Payment that is tied to plant production and profitability. These Performance Payments are paid on the 15th of the month after they are earned. Some examples of the managers that are paid these Performance Payments are the cost accountants, assistant purchasing manager, engineering manager, etc. The amount of such Performance Payments owing pre-petition is approximately $138,000.

Retail Performance Payments:

Retail General Managers earn Performance Payments based on 30% of an adjusted gross profit for their individual sales centers. Sales managers also earn Performance Payments based on profitability. Office managers earn Performance Payments based on property insurance sales and CSI scores. General managers, sales managers and office managers receive Performance Payments after all the deals from a given month have been funded. The amount of such Performance Payments owing pre-petition is approximately $500,000.

Quarterly Performance Payments (individuals from Corporate, Manufacturing and Retail) – Paid on the 15th of the month following a quarter-end:

Manufacturing – Plant senior management Performance Payments are tied to plant profitability and/or performance to established benchmarks for fixed costs and marginal contribution. The amount of such Performance Payments owing pre-petition is approximately $535,000.

Retail - Regional Vice President Performance Payments are based on five key areas: (i) profitability of the entire region (manufacturing and retail); (ii) CSI score (retail only); (iii) the number of home sales financed by non-Debtor subsidiary CountryPlace Mortgage; (iv) the total unit sales in the region; and (iv) customer service metrics. The amount of such Performance Payments owing pre-petition is approximately $140,000.

154.    On a prepetition basis, the Debtors estimate that Employees had earned approximately $1,333,000 in Performance Payments through the Petition Date that have not yet been paid.

### d.    Reimbursable Expenses

155.    The Employees and the members of the Debtors' board of directors incur various expenses (collectively, the "Reimbursable Expenses") in the discharge of their ordinary duties. Specifically, the Debtors reimburse Employees for a variety of business expenses, including without limitation, travel and meal expenses and general expenses incurred for the Debtors' benefit.  Because these expenses are incurred as part of their official duties and in furtherance of the Debtors' business, the Employees and directors are reimbursed in full after submission of appropriate documentations to the Debtors' accounting department.  Expenses are reimbursed on a rolling basis.

156.    Reimbursable Expenses are paid by the Employees using cash or personal credit cards and the costs of these Reimbursable Expenses are reimbursed to Employees once it is determined that the charges are for legitimate reimbursable business expenses.  Although it is difficult for the Debtors to determine the amount of Reimbursable Expenses outstanding at any particular time, the Debtors estimate that approximately $231,000 in Reimbursable Expenses remain outstanding as of the Petition Date.

157.    The Reimbursable Expenses were all incurred as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed.

### e.    Payroll Taxes

158.    The Debtors are required by law to withhold from the Wage Obligations amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").  In addition, the Debtors are required to make matching payments from their own funds on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").  The Debtors request the authority to pay these Payroll Taxes in the ordinary course of business.

159.    The Debtors remit most of the Payroll Taxes to the Taxing Authorities the business day after they are collected, but certain Payroll Taxes are due on a quarterly basis.  As of the Petition Date, the Debtors were current on their Payroll Taxes obligations due the business day after they are collected, but have a prepetition balance of approximately $250,438 owed for certain Payroll Taxes due on a monthly, quarterly, or annual basis to federal, state and local Taxing Authorities.  The Debtors seek authority to pay these prepetition, outstanding quarterly Payroll Taxes in the ordinary course of business.

### f.    Payroll Software Fee

160.    The Debtors administer their own payroll and payroll tax systems.  In so doing, they utilize the computer program Ultipro Ultimate Software.  The Debtors have an agreement with the manufacturer of Ultipro ("Ultipro") to provide certain services.  The Debtors make an annual payment of $72,500 (the "Payroll Software Fee") to Ultipro on or before July 1 of each

year for the period from July 1 to June 30 of the following year.  The Debtors accordingly are not indebted to Ultipro as of the Petition Date.

### g.    Employee Benefits

161.    In the ordinary course of business, the Debtors have established various benefit plans and policies for their Employees, which can be divided into the following categories (collectively, the "Employee Benefits"): (1) medical, dental, vision, life and accidental death and dismemberment insurance, and disability insurance (collectively, the "Health and Welfare Plans"); (2) paid time off plans, including vacation and sick days (collectively, the "PTO Plans"); (3) the 401(k) plan (the "401(k) Plan"); (4) the Stock Plan (as defined herein); and (5) the Tuition Plan (as defined below).

162.    The Debtors deduct specified amounts from the Employees' wages in connection with certain of the Employee Benefits, such as life insurance, disability insurance, medical insurance and 401(k) Plan contributions.

### 1.    Health and Welfare Plans

163.    The Debtors sponsor several Health and Welfare Plans to provide benefits to Employees, including, without limitation, medical, dental, vision, life, accidental death and dismemberment insurance, and disability insurance (the "Basic Healthcare Package").

164.    The Debtors offer a Basic Healthcare Package to all of their full-time Employees. Medical, pharmacy, dental and vision plans are self-funded up to $200,000.  However, the Debtors have retained the following administrators, as applicable, for self-funded plans, insurers, a stop-life insurer, and consultants: (i) Tower Life ("Tower"); (ii) Scott & White ("S&W"); (iii) Vision Service Plan ("VSP"); (iv) Standard Insurance ("SI"); (v) Symetra ("Symetra"); (vi) Ellis Consultants ("Ellis"); and (vii) USI Texas ("USI" and with Tower, S&W, VSP, SI, Symetra, and Ellis, collectively, the "Insurance Professionals").

165.    The Debtors have a self-insured group health plan covering medical, dental, vision, and prescription drugs (the "Medical Plan").  The Debtors self-insure their Employees up to $200,000; claims above that are insured by Symetra.  The Debtors have retained the third-party administrators (collectively, the "Administrators") Tower (medical and dental), S&W and Ellis (prescription drugs), and VSP (vision) to administer various portions of the Medical Plan.  The Debtors make payments to the Administrators that the Administrators use to satisfy claims under the Medical Plan.  USI provides the Debtors with actuarial and consulting services in connection with the Medical Plan.  The Debtors pay approximately $720,000 a month on claims under the Medical Plan.  The Debtors owe approximately $1,279,000 in unpaid claims that have not yet been asserted under the Medical Plan as of the Petition Date.  The Debtors owe the Insurance Professionals approximately $250,000 as of the Petition Date for premiums and fees for services rendered.  The Debtors seek permission to pay such prepetition amounts.  Further, payments to claimants under the Medical Plan and to the Insurance Professionals will become due in the ordinary course of business each month subsequent to the Petition Date.  The Debtor seeks permission to pay such claims and fees in the ordinary course of business.

166.    The Debtors maintain basic life insurance for certain of their full-time Employees in addition to accidental death and dismemberment coverage (collectively, the "Life Insurance Plans").  Specifically, the Debtors offer the following:

- The Debtors maintain basic life and accidental death and dismemberment coverage for their salaried and hourly Employees.  These plans are insured by SI, the Debtors' non-Debtor affiliate.  Each month, the Debtors pay premiums to SI one month in arrears.  Accordingly, the Debtors owe approximately $18,800 to SI as of the Petition Date.  Further, the Debtors intend to pay premiums to SI subsequent to the Petition Date for post-petition insurance coverage.

54

- Both salaried and hourly Employees are permitted to purchase voluntary life insurance coverage offered by SI. The Debtors collect premiums (the "Held Premiums") from Employees' paychecks for remittance to SI. As of the Petition Date, the Debtors were indebted to SI for premiums in the amount of $9,300 relating to the Life Insurance Plans and retained the Held Premiums to pay such premiums to SI.

167. The Debtors also maintain long- and short-term disability insurance plans for salaried and hourly employees (collectively, the "Disability Plans"). Specifically, the Debtors offer the following:

- The Debtors maintain a short-term disability insurance plan for salaried Employees. This plan is self-insured and self-funded. As of the Petition Date, three salaried Employees were on short-term disability, and the Debtors owed approximately $6,500 in accrued future benefits to such disabled Employees.

- The Debtors maintain a long-term disability insurance plan for salaried Employees. This plan is insured by SI. Each month, the Debtors pay premiums to SI one month in arrears. Accordingly, the Debtors owe approximately $8,175 to SI as of the Petition Date. Further, the Debtors intend to pay premiums to SI subsequent to the Petition Date for post-petition insurance coverage.

- Hourly Employees and other Employees (on a supplemental basis) are permitted to purchase short- or long-term disability insurance offered by SI. The Debtors collect Held Premiums from Employees' paychecks for remittance to SI. As of the Petition Date, the Debtors were indebted to SI, in the amount of approximately $18,500, for premiums relating to the Disability Plans and retained the Held Premiums to pay such premiums to SI.

168. The Debtors seek authority to pay prepetition amounts totaling $62,000 owing in connection with the Life Insurance Plans and the Disability Plans and from the Held Premiums and continue to make such payments in the ordinary course of business.

## 2. Paid Time Off Benefits

169.    Under the PTO Plans, full-time Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation.  The Employees earn their annual vacation days based on their status (*e.g.* salaried or non-salaried) and length of service.  Generally, under the Debtors' vacation policy, vacation time is accrued over time.  As of the Petition Date, the Debtors estimate that the cash value of the Employees' accrued vacation time was approximately $1,410,000.  Generally, this amount is not a current cash payment obligation as to Employees and as such, most Employees will receive their vacation time as paid time off in the ordinary course of business (and not as a cash payment).  However, the Debtors pay earned but unused vacation allowance at the time of the Employee's termination.  The Debtors seek approval to pay such amounts in the ordinary course of business.

170.    Hourly Employees receive personal days after one year of continuous service.  Unused personal days are paid out at the end of the year.  It is impossible to determine at this point how many personal days will remain unused at the end of the year.  However, the Debtors seek authority to pay amounts owing in connection with unused personal days in the ordinary course of business.

171.    In addition, salaried Employees are entitled to take paid time off in the form of sick leave, which accrues at the rate of ½ day per month.  Sick days are not cashed out when Employees are terminated.  The Debtors also administer other paid time off programs for holidays, military duty, jury duty, and bereavement.  The Debtors are not aware of any accrued and unpaid obligations relating to these programs.

### 3.    401(k) Plan

172.    The Debtors sponsor the 401(k) Plan, through which participating Employees can elect to withhold a portion of their wages (the "401(k) Contributions") to contribute toward a 401(k) plan.  Fidelity Investments (the "401(k) Manager") administers the 401(k) Plan.  On a

56

monthly basis, the Debtors remit the 401(k) Contributions to the 401(k) Manager for application to the appropriate Employee's 401(k) Plan.

173.    The 401(k) Manager charges the Debtors approximately $20,000 per quarter to administer the 401(k) Plan.  As of the Petition Date, the Debtors owe the 401(k) Manager approximately $12,500 in unpaid fees.  Further, as of the Petition Date, the Debtors owed approximately $270,000 in 401(k) Contributions and 401(k) loan repayments to the 401(k) Manager for the Employees' benefit.

### 4.    Stock Incentive Plan

174.    In 2009, the Debtors created a stock incentive plan (the "Stock Plan") in order to reward certain Employees (collectively, the "Stock Plan Participants") and provide them with incentives.  The Stock Plan provides for the issuance of 1,217,040 shares of stock options (collectively, the "Options") with respect Debtor Palm Harbor Homes, Inc. ("PHH") to the Stock Plan Participants.  Pursuant to the Stock Plan, 243,408 share options vest on September 8 of each of 2010, 2011, 2012, 2013, and 2014.  Under the Stock Plan, each Stock Plan Participant has the right to purchase shares of PHH at $3.02.  Thus, pursuant to the Stock Plan, 973,632 of the Options vest subsequent to the Petition Date.

### 5.    Tuition Reimbursement Plan

175.    The Debtors sponsor a Tuition Reimbursement Plan (the "Tuition Plan") by which they reimburse Employees up to 100% of the cost of tuition and books, provided certain requirements are met.  The Debtors initially reimburse Employees 50% of the covered costs upon the completion of the covered course.  The Debtors reimburse the remaining 50% after the Employee has been employed with a Debtor for a year after obtaining the degree for which the Employee seeks reimbursement.  As of the Petition Date, the Debtors owed approximately $123,000 to eligible Employees under the Tuition Plan.  Further, the Debtors seek permission to,

57

in their discretion, make payments to qualifying Employees under the Tuition Plan after the Petition Date in the ordinary course of business.

>       **h.       Workers' Compensation Program**

176.    Under the laws of the various states in which they operate, the Debtors are required to maintain for their Employees workers' compensation coverage for claims arising from or related to their employment with the Debtors (the "Workers' Compensation Program"). In Texas, the Debtors self-insure the Workers' Compensation Program.  Additionally, the Debtors currently maintain their Workers' Compensation Program with National Union Fire (Chartis), Illinois National Insurance (Chartis), and Illinois National Company (Chartis) (collectively, the "Workers' Compensation Insurers") as insurers.

177.    Pursuant to the Workers' Compensation Program, the Debtors pay to the Workers' Compensation Insurer premiums that are calculated using the Debtors' payroll and historic loss rates (the "Workers' Compensation Premiums").  The Debtors project that, as of the Petition Date, the Debtors have accrued approximately $278,700 in prepetition amounts due as Workers' Compensation Premiums, and seek authority to, in their discretion, pay such Workers' Compensation Premiums.  Further, the Debtors seek to be authorized, but not be required to continue to pay the Workers' Compensation Premiums that accrue subsequent to the Petition Date in the ordinary course of business.

178.    As the Debtors self-insure certain portions of the Workers' Compensation Program, Employee/claimants assert claims against the Debtors.  As of the Petition Date, the Debtors were aware of certain open compensation claims, including claims against the Debtors, as self-insurers, under the Workers' Compensation Program (collectively, the "Workers' Compensation Claims").  The holders of the Workers' Compensation Claims may pursue such

claims against the Debtors, as self-insurers, and/or the Workers' Compensation Insurers. Such claims against the Debtors total approximately $2,075,000 as of the Petition Date.

179.     The continued best efforts of the Employees is essential to the Debtors' reorganization prospects. I believe that the payment, in the Debtors' discretion, of prepetition amounts owing in connection with the Wage Obligations, Commission Obligations, Performance Payments, Reimbursable Expenses, Payroll Taxes, the Payroll Software Fee, the Employee Benefits and the Workers' Compensation Premiums is essential to retaining Employees and keeping morale high. Similarly, I believe that continuance of such programs in the ordinary course of business, in the Debtors' discretion is vitally important for maintenance of the Debtors' businesses, and will inure to benefit of the Debtors, their estates, and their creditors.

**R.      Motion for Entry of an Order (i) Authorizing Maintenance of Existing Bank Accounts; (ii) Authorizing Use of Existing Business Forms; (iii) Authorizing Use of Cash Management System; (iv) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis with Respect to the Debtors' Deposit Practices; and (v) Authorizing the Continuation of, and Granting Superpriority Status to, Certain Intercompany Claims**

**a.      Continued Use of Bank Accounts**

180.     Prior to the commencement of these chapter 11 cases, in the ordinary course of their businesses, the Debtors maintain a number of bank accounts, which are utilized to collect funds for their operations and to pay operating and administrative expenses in connection therewith. A table summarizing the structure of the bank accounts (collectively, the "<u>Bank Accounts</u>") is attached as <u>Exhibit A</u> to the Motion and a list of the Bank Accounts is attached as <u>Exhibit B</u> to the Motion. As illustrated in <u>Exhibits A</u> and <u>B</u> to the Motion and as discussed in greater detail below, the Bank Accounts currently consist of bank accounts maintained with several banks, primarily Wells Fargo Bank (collectively, the banks at which the Bank Accounts are maintained are the "<u>Banks</u>").

181.    I believe that all of the Bank Accounts are in financially stable banking institutions.  In addition, I believe that all of the Bank Accounts are in banking institutions with FDIC insurance (up to an applicable limit, if any, per Debtor per financial institution).

182.    I believe that a waiver of the U.S. Trustee's requirement that the prepetition Bank Accounts be closed and that new post-petition bank accounts be opened is necessary.   If enforced in these cases, such a requirement would cause enormous disruption in the Debtors' businesses and would impair the Debtors' efforts to reorganize and pursue other alternatives to maximize the value of their estates.  Indeed, as explained in more detail below, the Bank Accounts comprise an established cash management system that the Debtors need to maintain in order to ensure smooth collections and disbursements in the ordinary course.

**b.        Continued Use of Business Forms**

183.    The Debtors currently have correspondence forms, business forms (including, without limitation, letterhead, purchase orders, and invoices), and checks existing immediately prior to the Petition Date, that do not refer to the Debtors' status as debtors in possession.

184.    I believe that most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the notoriety of these cases, the press releases issued by the Debtors, and additional other press coverage.  Moreover, each of the Debtors' vendors will receive direct notice of the commencement of these cases.

185.    I believe that changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtors' estates and disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.  For these reasons, I believe that the Debtors should be authorized to use existing checks and business forms without being required to place the label "Debtor In Possession" on each.

**c.        Continued Use of Cash Management System**

186.    The cash management procedures utilized by the Debtors constitute ordinary, usual, and essential business practices and are similar to those used by other major corporate enterprises. The cash management system facilitates cash forecasting and reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the various bank accounts required to effect the collection, disbursement, and movement of cash.  The Debtors' cash management system is described below.

187.    The Debtors' are affiliated separate legal entities.  When the Debtors receive cash payments, they typically deposit them in accounts held by debtor Palm Harbor Homes, Inc. ("PHH"), as described in Exhibit A, most notably, the corporate concentration account (the "Concentration Account").

188.    Additionally, certain of the Debtors maintain other accounts (all identified on Exhibit A and Exhibit B to the Motion) as follows:

- Collection accounts used to deposit payments from third-parties;

- Payroll account used to facilitate payroll payments.  This account is funded from the Concentration Account;

- Accounts used to facilitate payment of accounts payable;

- Accounts used to collect accounts receivable;

- Wire accounts used solely for the purposes of incoming and outgoing wires; these accounts are funded as necessary from the operating accounts and the proceeds in such accounts from incoming wires are transferred to the operating accounts;

- Depository accounts to hold the proceeds from sales of discrete real estate parcels;

- Restricted use trust accounts mandated by state law;

- A Utility Deposit Account pursuant to the Debtors' motion to provide adequate assurance to utility providers and a DIP Control Account pursuant to the DIP Credit Agreement; and

- Various other accounts listed on <u>Exhibit A</u> and <u>Exhibit B</u> to the Motion.

189.    The operation of the Debtors' business requires that the cash management system (modified as discussed above) continue during the pendency of these chapter 11 cases.  I believe that requiring the Debtors to adopt a new, segmented cash management system at this early and critical stage of these cases would be expensive, would create unnecessary administrative problems, and would likely be much more disruptive than productive.  Any such disruption could have an adverse impact upon the Debtors' ability to reorganize.  Therefore, I believe that the Debtors should be permitted to maintain their current cash management system, as being in the best interests of the Debtors' estates.

### d.    Waiver of 11 U.S.C. §345(b)

190.    The Bank Accounts are held at some of the strongest financial institutions in the United States, including Wells Fargo.  Further, a corporate surety that may be obtained to guarantee the safety of funds in the Bank Accounts would not have significantly greater financial strength than the Banks.

191.    Accordingly, I believe that it is in the best interest of the Debtors and their estates to waive the requirements of 11 U.S.C. §345(b) on an interim basis.

### e.    Affording Superpriority Status to Intercompany Claims

62

192.    In the ordinary course of business, the Debtors engage in limited intercompany transactions and transfers amongst themselves.  These include, without limitation, the following (collectively, the "Intercompany Transfers"):

> •    *Trade receivables and trade payables.*  In the ordinary course of business, certain Debtors generate cash and deposit such cash in the accounts of PHH or another Debtor.  PHH or another Debtor also makes payments to third-parties on behalf of other Debtors' indebtedness.  Such Intercompany Transfers permit a centralized cash management system, and all the attendant efficiencies.

193.    The Intercompany Transactions are made between and among the Debtors in the ordinary course of the companies' business as part of their cash management system.  The Debtors maintain records of all fund transfers and can ascertain, trace and account for Intercompany Transactions.  If these transactions were to be discontinued, the respective Debtor engaged in the transaction, the Debtors' cash management system, and related administrative controls would be disrupted, all to the detriment of the Debtors.

194.    In light of the efficiencies of the Debtors' centralized cash management system, and the delays and expenses associated with altering such system, I believe that it is in the best interest of the Debtors and their estates to permit the continuance of the Intercompany Transfers, and to confer superpriority administrative claim status on the Intercompany Transfers.

**f.    Transactions Between the Debtors and non-Debtor Affiliates**

195.    In the ordinary course of business, Debtor Palm Harbor Homes, Inc. ("PHH") engages in monthly transactions (collectively, the "Transactions") with its non-Debtor affiliates Standard Insurance ("SI") and Countryplace Mortgage, Ltd. ("CPM" and with SI, collectively the "Transaction Parties") by which PHH incurs certain obligations to the Transaction Parties and the Transaction Parties incur certain obligations to PHH.  Generally, the Transaction Parties owe PHH more than PHH owes the Transaction Parties.  As of the Petition Date, SI and PHH

were not indebted to each other, while CPM had an approximate net indebtedness of $770,000 to PHH.

196.    I believe that PHH's continuance of the Transactions is in the best interests of the Debtors' estates because it permits PHH to maintain synergies with its non-Debtor affiliates and the Transactions result in a net payment to PHH and its estate (subject to the terms and conditions of the DIP Credit Agreement and its related documents, as described below), inuring to the benefit of PHH's creditors.

**S.      Motion for Entry of an Order (i) Authorizing the Debtors to Continue Prepetition Insurance Coverage Policies and Practices; (ii) Continuing Bond Coverage and (iii) Directing Banks to Honor All Payments Related Thereto**

**a.      The Insurance Programs**

197.    In connection with the operation of their businesses, the Debtors currently maintain numerous insurance policies and programs providing coverage for, among other things, the following: commercial excess liability, property insurance, commercial crime, commercial automotive liability, D&O, builders risk, business interruption, and workers' compensation (collectively, the "Insurance Programs").  The Debtors' Insurance Programs are maintained with several different insurance carriers (the "Insurance Carriers") and include, but are not limited to, those Insurance Programs identified on Exhibit A to the Motion.

198.    The Insurance Programs are essential to the preservation of the value of the Debtors' business, property, and assets.  In many cases, insurance coverage such as that provided by the Insurance Programs is required by the diverse regulations, laws, and contracts that govern the Debtors' commercial activities.  Moreover, section 1112(b)(4)(C) of the Bankruptcy Code provides that a "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.  11 U.S.C. §

64

1112(b)(4)(C). Further, the Guidelines of the Office of the United States Trustee for the District of Delaware require debtors to maintain insurance coverage throughout their chapter 11 cases.

199.    The annual premiums for the Debtors' current Insurance Programs total approximately $2,600,000. Certain of the insurance programs (collectively, the "Financed Programs") are financed through premium financing programs. As of the Petition Date, the Debtors believe that they are current on all payment obligations currently due and owing with respect to the Financed Programs. However, the Debtors estimate that $328,178.70 will become due and owing with respect to the Financed Programs after the Petition Date, with approximately $54,696.45 coming due each month.

200.    Premiums for other Insurance Programs are paid to the Insurance Carriers pursuant to an installment schedule. With respect to premiums paid on installment schedules for existing policies, the Debtors estimate that approximately $278,700 (collectively, the "Installment Payments") is owing as of the Petition Date, with approximately $46,450 coming due each month.

201.    Lastly, there is a policy, issued by Lumbermen's Underwriting Alliance (No. 315246) with a premium of $702,195. As of the Petition Date, the Debtor owed $416,230 in unpaid premium with respect to this policy that will accrue postpetition for postpetition coverage (the "Outstanding Amount").

202.    Pursuant to certain of its liability and property Insurance Programs, the Debtors are required to pay various deductibles (the "Insurance Deductibles"). Under the majority of the liability and property Insurance Programs, the Insurance Carrier pays claims directly to the claimant and then seeks reimbursement from the Debtors for the Insurance Deductible; in certain instances, the Debtors will pay the deductible amount directly to the claimant. As of the Petition

Date, the Debtors owed approximately $2,879,800 in Insurance Deductibles, including amounts owing in connection with workers' compensation insurance.

203.    The Debtors employ an insurance broker, McQueary Henry Bowles Troy, L.L.P. (the "Broker"), to assist with the procurement and negotiation of the Insurance Programs.  The Debtors pay the Broker an annual fee of $275,000 for their services (the "Broker Fee").  As of the Petition Date, the Debtors owed $136,500 of the Broker Fee to the Broker for future, postpetition services.

### b.    Bonds

204.    In the ordinary course of business, the Debtors procure bonds (collectively, the "Bonds"), including without limitation, mortgage bonds, modular bonds, sales tax bonds, and manufactured home bonds, for the benefit of third-party beneficiaries.  State and local laws often require the Debtors to purchase the Bonds.  The Bonds are thus vital for the maintenance of the Debtors' businesses.  As of the Petition Date, the Debtors believe that they have paid all premiums due and owing on the Bonds.  However, the Debtors seek permission to renew the Bonds or, as necessary, procure new Bonds postpetition in the ordinary course of their business.

205.    I believe that the maintenance of the Insurance Programs and the Bonds is essential to the protection of the Debtors' property, and thus to their reorganization.  Both sound business judgment and, in certain instances, federal, state, and local law, require the continuance of the Insurance Programs and the Bonds.

### T.    Motion for Entry of an Order Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors

206.    The Debtors retain relationships with several vendors, specifically, the Ft. Hood Vendors, the Lien Right Vendors, and the Supply Vendors (as those terms are defined herein)

(collectively, the "Critical Vendors") that are essential to the maintenance of the Debtors'
businesses.

207.    The Debtors have determined that, now that they are operating in chapter 11,
combined with the general economic climate and financial conditions of their Critical Vendors,
the payment of the Claims (as defined herein) is vital to the Debtors' continuing business
operations.  In this regard, the Debtors used the following criteria to identify potential Critical
Vendors whose Claims are of such a nature that payment thereof is in the best interests of the
Debtors and their estates: (i) whether the Critical Vendors are Ft. Hood Vendors (as defined
herein); (ii) whether the Critical Vendors have the legal right to assert valid Trade Liens (as
defined herein); and (iii) whether the Critical Vendors are Supply Vendors.  Vendors were
identified as Supply Vendors if they met the following criteria:

> i.    whether the Building Materials (as defined herein) may be purchased only
> from certain "sole source vendors";
>
> ii.    whether quality control or Building Material specifications contained in
> the applicable building codes or the Debtors' contracts with their customers
> prevent the Debtors from obtaining the Building Materials from reasonably
> available alternative sources;
>
> iii.    whether the Debtors receive advantageous pricing and other terms that
> they risk losing if they delay the payment of prepetition Claims (as defined
> herein) and as a result are forced to change Critical Vendors; or
>
> iv.    whether the Critical Vendors' business operations could be jeopardized if
> their prepetition Claims are not timely paid.

208.    I believe that the failure to pay the Claims would result in: (i) a disruption in the
Ft. Hood Project, discussed below; (ii) the Critical Vendors filing Trade Liens (as defined
herein); (iii) the Debtors' inability to obtain necessary Building Materials for their manufacturing
operations; (iv) severe negative effects on the Debtors' customers; and (v) temporary closure of
the manufacturing facilities operated by the Debtors.  Any temporary closures would likely

prevent the Debtors from satisfying customer orders and the Debtors would risk that their customers would look to the Debtors' competitors to fulfill their orders.

209.    The Debtors have undertaken a thorough review of their accounts payable and ongoing operations to identify the Critical Vendors and the amount of Claims.  As of the Petition date, the Debtors estimate that the Claims aggregate approximately $4,750,000, which represents approximately 23% of the total amount of vendor claims against the Debtors.

### a.    Fort Hood Vendor Claims

210.    Among the various projects of the Debtors, Palm Harbor Homes, Inc. ("PHH Inc.") has been engaged as a subcontractor among a hierarchy of contract-counterparties under a prime contract with the Department of Army Corps of Engineers (the "Ft. Hood Contract"). Under the Ft. Hood Contract, PHH Inc. has already started a three-story permanent barracks for the Ft. Hood military base, with approximately 1/3 of the building completed.  PHH Inc. estimates that the revenues under this contract will be approximately $13.6 million, comprising the next three months of production for the Austin factory.  PHH Inc. estimates that the prepetition claims (collectively, the "Ft. Hood Vendor Claims") of vendors and service providers that supplied goods and services relating to the Ft. Hood Contract is in the aggregate approximately $2,150,000.

211.    The Debtors propose to pay certain prepetition claims of vendors and service providers (collectively, the "Ft. Hood Vendors") relating to goods and services purchased by PHH Inc. in connection with the Ft. Hood Contract.  It is essential that the commencement of PHH Inc.'s chapter 11 case does not interfere with its operation or cause any delays with the various production deadlines that PHH Inc. is subject to under the Ft. Hood Contract.

1905666.1

212.    I believe that the payment of the Ft. Hood Vendor Claims will help preserve and enhance the value of the Debtors' estates and benefit the economic stakeholders in these cases. Present estimates indicate that this project will generate significant earnings and, therefore, is in the best interests of their estates to perform this project in a timely and professional manner. The Payment of the Ft. Hood Vendor Claims will therefore not harm but benefit the Debtors' estates.

213.    PHH Inc. is subject to certain risks if it does not pay the Fort Hood Vendors on a timely basis. For example, the government counterparty under the prime contract may invoke certain federal regulations that permit it to reduce or suspend payments to PHH Inc. until the Ft. Hood Vendors are paid. More importantly, failing to pay suppliers and subcontractors could cause manufacturing to cease all together – jeopardizing the schedule of deadlines and harming the entire project. Thus, the payment of the Ft. Hood Vendor Claims ensures that PHH Inc. will continue to receive the full amount of each installment payment due under the Ft. Hood Contract. The failure of PHH Inc. to complete this project will cause the prime contractor to incur substantial economic claims for liquidated damages.

214.    I believe that the payment of the Ft. Hood Vendor Claims will help avoid any delays caused by the Ft. Hood Vendors no longer willing to conduct business with PHH Inc. The payment of the Ft. Hood Vendor Claims will help ensure that PHH Inc. continues to receive its Building Materials (as defined herein) and services on a timely basis and on the same or better terms, not to mention that the actual amount of the Ft. Hood Vendor Claims is *de minimis* relative to the revenues under the contract. Thus, the payment of the Ft. Hood Vendor Claims is essential to preservation of PHH Inc.'s business operations and will ultimately inure to the benefit of all parties in interest in these chapter 11 cases.

215.    Moreover, the Ft. Hood Contract is the fourth project that PHH Inc. has completed with the Army Corps of Engineers and I believe that the Debtors' performance under the Ft. Hood Contract will play a material part in determining whether they are engaged to provide additional building projects for the military in the future.

### b.    Lien Right Vendor Claims

216.    The Debtors retain local vendors (collectively, the "Lien Right Vendors") to provide goods and services associated with the installation of a home pursuant to a customer's contract with the Debtors.  The services that the Lien Right Vendors provide include, but are not limited to, site work, foundations, wells, septic systems, driveways, decks, porches, skirting, heating and air conditioning systems, utility hookups, and interior finish out.  The Debtors estimate that the prepetition claims of the Lien Right Vendors (collectively, the "Lien Right Vendor Claims") are in the aggregate approximately $2,100,000.

217.    I believe that the payment of the Lien Right Vendor Claims is in the best interests of the Debtors' businesses and estates.  The Lien Right Vendors provide necessary services to the Debtors and their customers.  Many contractors who are qualified to undertake the manufactured home installation on site have left the market due to a sharp reduction in deliveries of manufactured homes.  There are only a few choices that remain available as alternative qualified contractors who can manage the installation process of the Debtors' unique products. Further, to the extent work has been completed on a customer's home, if unpaid, these contractors may be in a position to place a Trade Lien on this property pursuant to state law. Liens on customer's property, if unsettled, could result in state action to revoke the Debtors' retailer, brokers and installers licenses in Texas and/or similar licenses in other states.

218.    Simply put, customers will not continue to purchase homes from the Debtors if they are not properly installed or title is potentially clouded by Trade Liens.  Payment of the Lien Right Vendor Claims is thus essential to the continuation of the Debtors' businesses and will benefit the Debtors' estates and creditors.

### c.    Supply Vendor Programs

219.    The Debtors use a variety of products in their manufacturing and construction process, including lumber, plywood, drywall, steel, floor coverings, insulation, exterior siding, doors, windows, roofing materials, plumbing and electrical fixtures and hardware, finishing materials, and other specialty components, as well as certain services (collectively, the "Building Materials") that are purchased from suppliers and service providers (collectively, the "Supply Vendors" and with the Ft. Hood Vendors and the Lien Right Vendors, collectively, the "Critical Vendors").  The Debtors' business model enables them to produce a lower cost product because all aspects of the manufacturing process are tightly controlled.  For example, the construction occurs on an assembly line and is not affected by adverse weather that can cause delays or damage Building Materials.  This controlled environment enables the Debtors to use the Building Materials in a more efficient manner, resulting in a higher production rate and less Building Material waste.  These production levels also permit the Debtors to purchase Building Materials in greater quantities and at a reduced cost.

220.    To maintain these efficiencies, the Debtors' manufacturing process, like that of conventional on-site builders, is dependent upon a steady supply of Building Materials from vendors and other service providers.  The business relationships that the Debtors have developed with these vendors and service providers have enabled them to negotiate competitive rates and a level of certainty that the Building Materials will be delivered in accordance with the various

71

deadlines of the Debtors' projects.  If the Debtors' supply of Building Materials is interrupted or

if the Debtors are forced to purchase Building Materials at higher costs, assuming they can be

efficiently obtained in the necessary geographic locations, it will likely slow or even stop their

operations and hinder their ability to produce a low cost, affordable product and meet scheduled

delivery deadlines.

221.    As of the Petition Date, some of the Debtors' vendors and service providers hold

claims for payment due on account of Building Materials supplied to the Debtors (collectively,

the "Supply Vendor Claims" and with the Ft. Hood Vendor Claims and the Lien Right Vendor

Claims, collectively, the "Claims").  The total of the Supply Vendor Claims is in the aggregate

approximately $500,000.

222.    As detailed above, maintaining the goods and services provided by the Critical

Vendors is vital to the Debtors' continuing business operations and the success of these chapter

11 cases.  In addition, and as also detailed above, the Debtors have conducted an extensive

analysis and review of the Debtors' immediate trade needs and supplier base and have concluded

there is a significant risk that the Critical Vendors will cease doing business with the Debtors

unless their Claims are paid.  Should any Critical Vendors stop supplying goods or services to

the Debtors, or choose to significantly downgrade the Debtors' trade terms, the Debtors'

businesses would be adversely affected as a result of, among other things, the Debtors' inability

to produce and deliver their manufactured homes and army personnel housing.  This, in turn,

could result in lost goodwill with their customers and customer dissatisfaction.  Further, the

filing of Trade Liens would severely damage the Debtors' reputation and relationship with their

customers, whose homes would be subject to encumbrances.  Accordingly, I believe that the

amount of the Claims pales in comparison to the likely damage to the Debtors' businesses and

estates of the Claims are not paid.  In light of the foregoing, I believe that payment of the Claims

is plainly in the best interests of the Debtors' estates and creditors.

> **U.**      **Motion for Entry of an Interim Order: (i) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code; (ii) Granting Liens and Superpriority Claims; and (iii) Scheduling a Final Hearing on the Debtors' Motion to Incur Such Financing on a Final Basis**

223.      The Debtors' prepetition capital structure and current financial situation is

summarized above.  See ¶¶ 11-18.  As discussed above, the Debtors have almost no

unencumbered assets, are in default under the Textron Facility, and require an immediate

infusion of capital in order to continue running their businesses.

224.      Leading up to these chapter 11 cases, the Debtors explored strategic alternatives

and engaged in extensive negotiations with various parties in an effort to obtain additional

liquidity.  Raymond James assisted the Debtors in that process.  Prior to the Petition Date,

Raymond James contacted approximately 120 parties to gauge their interest in engaging in a

transaction with the Debtors, including providing postpetition financing.

225.      Given the immediacy of the Debtors' financing needs, and the existing liens on

the Debtors' assets, none of the institutions contacted (other than the DIP Lender) was in a

position to provide debtor in possession financing that satisfied the Debtors' needs.  Thus, the

Debtors were unable to obtain alternative postpetition financing proposals from other lenders

through credit allowable as an administrative expense or secured by liens on the Debtors' assets

junior to the Textron's liens pursuant to the Textron Facility or on better terms than those

provided by the DIP Lender.

226.      Faced with these circumstances, and given the inability to find other postpetition

financing, the Debtors engaged in good faith, arm's-length negotiations with the DIP Lender

over the course of several weeks, which culminated in that certain Debtor-in-Possession

Revolving Credit Agreement (the "<u>DIP Credit Agreement</u>"), by and between the Debtors and the DIP Lender.  During the negotiations, the Debtors, with the assistance of their advisors, went to great lengths under difficult circumstances to achieve the best deal possible for themselves and their constituencies.

227.    The DIP Facility consists of a senior secured first priority debtor-in-possession credit facility, comprised of up to $50 million in principal amount of a new money loan, which amount may be increased to $55 million if the parties elect to exercise an option to increase such principal amount (the "<u>Supplemental Commitment</u>").  The Debtors may draw up to the full amount of the DIP Facility on an interim basis pending entry of a Final DIP Financing Order. The DIP Credit Agreement provides that the DIP Lender will be permitted to credit bid at a sale of the Debtors' assets in the amount owing pursuant to the DIP Credit Agreement, including and up to any amounts owing (if any) in connection with the Supplemental Commitment.

228.    In an extremely challenging credit market for companies in similar situations and financial circumstances as the Debtors, the Debtors have been unable to find alternative or better financing on the terms and of the type and magnitude required in these chapter 11 cases on an unsecured basis, or without offering terms substantially similar to those provided under the DIP Credit Agreement and related documents.  The Debtors ultimately decided that the proposal for debtor-in-possession financing advanced by the DIP Lender was the most favorable under the circumstances, could be documented and accessed quickly, and adequately addressed the Debtors' reasonably foreseeable liquidity needs, while maintaining the going concern value of the Debtors' businesses.

229.    To implement their strategic vision, the Debtors require immediate access to capital.  Faced with this challenge, a debt burden, and worsening financial condition, the Debtors

and their advisors pursued various strategic alternatives in an effort to procure the liquidity necessary to preserve the value of the Debtors' businesses while pursuing an expedited sale of substantially all of the Debtors' assets in order to maximize the value of the Debtors' estates. While the Debtors solicited financing from various prospective lenders, in the end, the DIP Lender was the only party willing to provide financing under the circumstances on terms acceptable to the Debtors.  The Debtors and the DIP Lender engaged in extensive arm's-length negotiations concerning a financing package that would facilitate the Debtors' goals and provide the Debtors with the necessary financing to effect an expedited sale of their assets.  I believe that the DIP Credit Agreement, which was the product of those good faith negotiations and is a new financing facility, is well within the Debtors' sound business judgment.

230.    I believe that in order to implement the Debtors' strategy of selling substantially all of their assets, they need access to immediate cash.  I believe that the Debtors aggressively sought strategic partners in order to reorganize their businesses, and that the DIP Lender was the only party willing to provide capital to the Debtors on acceptable terms.  I believe that the DIP Lender and the Debtors negotiated in good-faith and at arm's length, the results of which are embodied in the DIP Credit Agreement and related documents.  Further, I believe that the terms of the DIP Credit Agreement, including but not limited to the Debtors' agreement to pay the DIP Lender's professional fees (DIP Credit Agreement §9.05), were essential to the DIP Lender's willingness to enter into the DIP Credit Agreement and provide the DIP Facility.

231.    I believe that the DIP Credit Agreement is in the best interests of the Debtors and their estates, and will preserve the going-concern value of the Debtors pending the sale of substantially all of their assets, thereby inuring to the benefit of the Debtors and their creditors. Due to the nature and magnitude of their businesses, I believe that the Debtors' immediate access

to the proposed DIP Facility is necessary in order to maintain the administration of the

Bankruptcy Cases, maximize the value of the Debtors' available assets in the near-term while

they pursue a sale of substantially all of their assets, and avoid immediate and irreparable harm

to their estates and creditors.

**V.      Motion of the Debtors for Entry of (I) an Order (a) Approving Bid Procedures; (b) Approving a Break-Up Fee and Expense Reimbursement; (c) Approving the Stalking Horse Purchaser's Right to Credit Bid; (d) Approving the Form and Manner of Notices; (d) Approving the Procedures for the Assumption and Assignment of Contracts and Leases; and (f) Setting a Sale Hearing; and (II) an Order Pursuant to 11 U.S.C. §§ 363 and 365 (a) Authorizing and Approving Asset Purchase Agreement By and Among the Debtors, as Sellers, and Palm Harbor Homes, Inc., a Delaware Corporation, as Purchaser, or Such Other Purchaser Agreement(s) Between the Debtors and the Successful Bidder, Free and Clear of All Liens, Claims, Encumbrances and Interests; (c) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (c) Granting Related RElief[4]**

232.      Throughout the course of 2010, as explained above, the Debtors, through

Raymond James, contacted over 120 parties (including both financial and strategic parties, and

holders of the Notes) regarding potential strategic alternatives to address their worsening

financial condition, including, without limitation, a sale of all or some of the Debtors' assets and

operations.  As a result of the above marketing efforts, and after evaluating offers from several

parties, the Debtors selected an offer made by the Stalking Horse Purchaser (as defined in the

Motion) to acquire the Debtors pursuant to section 363 of the Bankruptcy Code.  The Stalking

Horse Purchaser accordingly executed the Stalking Horse Agreement to acquire substantially all

of the Debtors' assets, which is conditioned on the Court's entry of an order authorizing the sale

of the Debtors to the Stalking Horse Purchaser, and subject to the entry of an order approving

certain bid procedures and bid protections to apply in an auction of the Debtors' assets

---

[4]  The motion shall be referenced herein as the "Bid Procedures and Sale Motion".  Capitalized terms used but not defined in this Section II.V shall have the meaning ascribed to them in the Bid Procedures and Sale Motion.

contemplated by the Stalking Horse Agreement.  The DIP Lender, an affiliate of Cavco

Industries, Inc., has also agreed to provide the Debtors with financing to enable the Debtors to

commence these Bankruptcy Cases and to meet their obligations during these Bankruptcy Cases.

The Debtors have thus entered into a debtor in possession revolving credit facility with the DIP

Lender to provide this financing, subject to Court approval.

233.    Ultimately, the DIP Lender was unwilling to lend without reasonable certainty of

a successful sale process.  Therefore, one of the conditions to the Debtors' continued use of DIP

financing is the pursuit of an expedited sale process.  Contemporaneously herewith, the Debtors

are seeking entry of orders approving a postpetition financing package offered by the DIP Lender

(the "DIP Facility").  Among other things, the DIP Facility requires that (a) a motion for

authority to sell substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy

Code be filed no later than three business days after the date of the DIP Facility, (b) the Debtors

obtain approval of such sale motion on terms acceptable to the DIP Lender, and (c) the sale

contemplated in such sale motion close by the earlier of 60 days after the Court's entry of an

order approving the bid procedures or 135 days after the Petition Date.  The Debtors have

accordingly negotiated the bid procedures (the "Bid Procedures") with the DIP Lender and the

Stalking Horse Purchaser in order to facilitate an auction process that meets these requirements.

234.    The primary purpose of the sale process will be to provide for the sale (a

"Transaction" or an "Asset Sale") involving substantially all of the Debtors' assets and

operations (the "Transferred Assets") to the party that submits the highest or otherwise best offer

in accordance with the Bid Procedures.

235.    As described above, the Debtors have been in extensive negotiations with the

Stalking Horse Purchaser regarding the terms of a possible acquisition of the Transferred Assets.

These negotiations culminated in the execution the Stalking Horse Agreement.  The Stalking Horse Agreement provides that the Stalking Horse Purchaser will pay at least $50 million plus the assumption of certain warranty and other liabilities and executory contracts (as set forth in more detail in the Agreement) for the Transferred Assets.  The Debtors believe that, subject to the receipt of higher or otherwise better proposals through the Bid Procedures, the Stalking Horse Agreement represents the best alternative currently available to the Debtors.

236.    The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline requirements for submitting a competing bid, the method and factors for determining qualifying bids, the criteria for selecting a successful bidder, and the payment of the Break-Up Fee and the Expense Reimbursement for the benefit of the Stalking Horse Purchaser.

237.    The Break-Up Fee and the Expense Reimbursement are material inducements for, and conditions of, the Stalking Horse Purchaser's agreement to enter into the Stalking Horse Agreement.  As described in detail below, the Debtors believe that the Break-Up Fee and the Expense Reimbursement are fair and reasonable and will enhance the prospects for competitive bidding with respect to the Transferred Assets.

238.    The Debtors seek to sell the Transferred Assets through an Auction and Asset Sale.  The Debtors and Raymond James have already conducted an extensive prepetition marketing process.  Moreover, the Debtors have developed a list of contact parties who will receive a copy of the Information Package (as defined in the Bid Procedures).  The list of contact parties was specifically designed to encompass those parties whom the Debtors believe may be potentially interested in pursuing a Transaction and whom the Debtors reasonably believe may have the financial resources to consummate a Transaction.  The Bid Procedures are designed to

elicit bids from one or more parties and to encourage a robust auction of the Transferred Assets, thus maximizing the value for the Debtors' estates and their creditors.

239.    The Debtors believe that the notice provisions described in the Bid Procedures and Sale Motion are sufficient to provide effective notice of the Bid Procedures, the Auction, the Asset Sale and the Sale Hearing to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates.

240.    The Debtors believe that the Bid Procedures will establish the parameters under which the value of the Transaction may be tested at the Auction.  The Bid Procedures will increase the likelihood that the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

241.    The Debtors also believe that the Bid Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Transferred Assets.  The Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a Transaction.  The Debtors believe that the Bid Procedures will encourage bidding, that they are consistent with other procedures previously approved by courts in this and other districts and that the Bid Procedures are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

242.    The Debtors believe that the Initial Minimum Overbid is reasonable under the circumstances, and will enable the Debtors to maximize the value for such the Transferred Assets while limiting any chilling effect in the marketing process.

1905666.1

243.    The Debtors believe that the Expense Reimbursement and the Break-Up Fee are (i) reasonable and appropriate, including in light of the size and nature of the Transaction and the efforts that have been or will be expended by the Stalking Horse Purchaser notwithstanding that the proposed Transaction is subject to higher or otherwise better offers for the Transferred Assets; (ii) were negotiated by the parties at arm's length and in good faith; (iii) are necessary to ensure that the Stalking Horse Purchaser will continue to pursue its proposed acquisition of the Transferred Assets; and (iv) are commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Purchaser by increasing the likelihood that the Debtors will receive the best possible value for the Transferred Assets.  The Debtors believe that the Expense Reimbursement and Break-Up Fee also induced the Stalking Horse Purchaser to submit a bid that will serve as a minimum floor bid on which the Debtors, their creditors and other bidders may rely.  The Debtors have determined that pursuing the Transaction is in the best interests of the Debtors, their creditors and their estates, and therefore submit that agreeing to the Expense Reimbursement and the Break-Up Fee represents an appropriate exercise of the Debtors' business judgment.

244.    The value of the Transferred Assets will be tested through the Auction conducted pursuant to and according to the Bid Procedures.  Consequently, the Debtors believe that the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

245.    The Debtors submit that the Stalking Horse Agreement or, as the case may be, a sale agreement with the Successful Bidder(s), will constitute the highest or otherwise best offer for the Transferred Assets, and will provide a greater recovery for the Debtors' estates than

80

would be provided by any other available alternative.  As such, the Debtors' believe that their determination to sell the Transferred Assets through an Auction process and subsequently to enter into the Stalking Horse Agreement with the Stalking Horse Purchaser or, alternatively enter into a sale agreement with the Successful Bidder(s), is a valid and sound exercise of their business judgment.

246.    The Purchaser and the Debtors have engaged in thorough arm's length negotiations over the terms of the Stalking Horse Agreement.  Similarly, in the event someone other than the Purchaser is the Successful Bidder, by the time of execution of an agreement is executed by the Debtors and the Successful Bidder, the Debtors and the Successful Bidder will have engaged in thorough arm's length negotiations over the terms of such agreement.  In addition, both the Purchaser and any Successful Bidder will have complied with the terms and conditions of the Bid Procedures Order.

247.    Moreover, in this case, there will be absolutely no fraud or improper insider dealing of any kind.  The Debtors will ensure that the Stalking Horse Agreement or, as the case may be, an agreement with the Successful Bidder, does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and, as a result, the Purchaser or any Successful Bidder should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code.

248.    The Debtors' believe that their assumption and assignment of the Assumed Contracts to the Successful Bidder will meet the business judgment standard and satisfy the requirements of section 365 of the Bankruptcy Code.  The Debtors' believe that the transactions contemplated by the Stalking Horse Agreement will provide significant benefits to the Debtors' estates.  Because the Debtors may not be able to obtain the benefits of the Stalking Horse

81

Agreement or, as the case may be, an agreement with the Successful Bidder, without the assumption of the Assumed Contracts, the assumption of these Assumed Contracts is undoubtedly a sound exercise of the Debtors' business judgment.

249.    To maximize the value received for the Transferred Assets, the Debtors seek to close the Transaction as soon as possible after the Sale Hearing.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed on November 29, 2010

By:____/s/ Brian E. Cejka_____
Name: Brian E. Cejka
Title: Chief Restructuring Officer