# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PALM HARBOR HOMES, INC., <u>et al.</u>,[1] | ) | Case No. 10-_____ (___) |
| | ) | |
| Debtors. | ) | Joint Administration Pending |
| | ) | |

## MOTION FOR ENTRY OF AN INTERIM ORDER: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS; AND (III) SCHEDULING A FINAL HEARING ON THE DEBTORS' MOTION TO INCUR SUCH FINANCING ON A FINAL BASIS

Palm Harbor Homes, Inc. and its related debtors (collectively, the "<u>Debtors</u>"), as debtors and debtors-in-possession in the above-captioned cases (collectively, the "<u>Bankruptcy Cases</u>"), hereby file their Motion for Entry of an Interim Order: (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Granting Liens and Superpriority Claims; and (III) Scheduling a Final Hearing on the Debtors' Motion to Incur Such Financing on a Final Basis (the "<u>Motion</u>"). In support of this Motion, the Debtors have filed the Declaration of Brian E. Cejka in Support of Chapter 11 Petitions and First Day Pleadings (the "<u>Cejka Declaration</u>"). In further support hereof, the Debtors respectfully state as follows:

## I.
## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Palm Harbor Homes, Inc., a Florida corporation (6634); Palm Harbor Albemarle, LLC (1014); Nationwide Homes, Inc. (4881); Palm Harbor Real Estate, LLC (8234); Palm Harbor GenPar, LLC (0198); and Palm Harbor Manufacturing, LP (0199). The location of the Debtors' corporate headquarters and service address is: 15303 Dallas Parkway, Suite 800, Addison, Texas 75001.

2.     The statutory predicates for the relief requested herein are sections 105(a), 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (collectively, the "Bankruptcy Rules"), and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (collectively, the "Local Bankruptcy Rules").

## II.
## BACKGROUND

3.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court") commencing the Bankruptcy Cases.  The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of the Bankruptcy Cases, is set forth in detail in the Cejka Declaration, filed concurrently herewith and fully incorporated by reference.

4.     The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     No trustee or examiner has been appointed in the Bankruptcy Cases, and no committees have yet been appointed or designated.

## III.
## RELIEF REQUESTED

6.     To implement their strategic vision, the Debtors require immediate access to capital.  Faced with this challenge, a debt burden, and worsening financial condition, the Debtors and their advisors pursued various strategic alternatives in an effort to procure the liquidity necessary to preserve the value of the Debtors' businesses while pursuing an expedited sale of

substantially all of the Debtors' assets in order to maximize the value of the Debtors' estates. While the Debtors solicited financing from various prospective lenders, in the end, the DIP Lender (as defined herein) was the only party willing to provide financing under the circumstances on terms acceptable to the Debtors. The Debtors and the DIP Lender engaged in extensive arm's-length negotiations concerning a financing package that would facilitate the Debtors' goals and provide the Debtors with the necessary financing to effect an expedited sale of their assets. The DIP Facility (as defined herein), which was the product of those good faith negotiations and is a new financing facility, is well within the Debtors' sound business judgment. Moreover, the Textron Lenders and the Textron Agent (each as defined herein) have consented to the terms of the DIP Facility and the relief sought in this Motion, as the Textron Indebtedness (as defined herein) will be paid in full using the proceeds from the DIP Facility.

7.      The Debtors hereby move on an expedited basis for entry of an interim order (the "Interim Dip Financing Order"), substantially in the form as <u>Exhibit A</u> attached hereto, and ultimately, a final order (the "<u>Final DIP Financing Order</u>" and, together with the Interim DIP Financing Order, the "<u>DIP Orders</u>") containing the following relief:[2]

(a)      under sections 105, 361, 362, and 364(c), (d), and (e) of the Bankruptcy Code, authorizing the Debtors to obtain postpetition financing and incur debt under that certain Debtor-in-Possession Revolving Credit Agreement (the "<u>DIP Credit Agreement</u>"), by and between the Debtors and Fleetwood Homes, Inc. ( the "<u>DIP Lender</u>") in an aggregate amount not to exceed the amounts provided in the Budget (as defined herein) (the "<u>DIP Facility</u>") pursuant to and in accordance with the terms and conditions of the DIP Credit Agreement, a copy of which is attached as <u>Exhibit B</u>,[3] with the funds thereunder available for use in accordance with the budget (as amended, modified or updated in accordance with the Interim DIP Financing Order, the "<u>Budget</u>", a copy of which is attached as <u>Exhibit C</u>) and

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement, and any associated loan or collateral documents memorializing the financing thereunder with terms that substantially conform to the DIP Credit Agreement (collectively, the "DIP Facility Documents").

[3] The DIP Credit Agreement is attached hereto without its corresponding exhibits, given the volume of the document. Copies of the complete DIP Credit Agreement with exhibits will be provided to any party in interest that submits a written request to the undersigned proposed counsel for the Debtors.

the other terms set forth in the Interim DIP Financing Order;

(b) under section 364(c)(1) of the Bankruptcy Code and subject only to the Carve-Out (as defined herein), granting superpriority claims status to the claims of the DIP Lender pursuant to the terms of the Interim DIP Financing Order (collectively, the "DIP Facility Superpriority Claims");

(c) under sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, as security for the repayment of the borrowings and all other obligations arising under the DIP Facility Documents, authorizing the grant of the valid, binding, continuing, enforceable, fully perfected, and unavoidable first priority senior priming DIP liens (collectively, the "DIP Facility Liens") upon the Collateral (excluding avoidance actions), subject only to the Carve-Out and the Senior Liens;

(d) under sections 363 and 364 of the Bankruptcy Code, authorizing the use of the proceeds of the DIP Facility to, among other things, satisfy amounts owing pursuant to the Textron Facility and pay the costs and expenses set forth in the Budget and provided in the Interim DIP Financing Order;

(e) under section 362 of the Bankruptcy Code, modifying the automatic stay to the extent set forth in the Interim DIP Financing Order;

(f) pursuant to Bankruptcy Rule 4001, scheduling a preliminary hearing on this Motion and authorizing, from the entry of the Interim DIP Financing Order until the final hearing on the Final DIP Financing Order (the "Final Hearing"), among other things, the Debtors to obtain credit under the terms contained in the DIP Facility Documents; and

(g) pursuant to Bankruptcy Rule 4001, scheduling a Final Hearing on this Motion and establishing notice procedures in respect of the Final Hearing by this Court to consider entry of the Final DIP Financing Order authorizing the relief requested in this Motion on a permanent basis.

## IV.
## THE DEBTORS' PREPETITION SECURED INDEBTEDNESS

8.      Palm Harbor Homes, Inc. and Palm Harbor Manufacturing., L.P., both of whom are Debtors, are parties to that certain Amended and Restated Agreement for Wholesale Financing (Finished Goods – Wholesale Financing) dated as of June 30, 2005 by and among the Debtors, as borrowers, Textron Financial Corporation and other financial institutions from time to time parties thereto as lenders (the "Textron Lenders"), and Textron Financial Corporation (the "Textron Agent"), as Administrative Agent and Arranger (as amended, supplemented,

waived and otherwise modified from time to time, the "Textron Facility" and together with all other agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "Textron Financing Documents"), the Textron Lenders made loans and advances to and/or provided other financial accommodations to or for the benefit of the Debtors from time to time.

9.      Pursuant to the Textron Financing Documents, the Debtors were, as of the Petition Date, jointly and severally indebted to Textron in an amount not less than $34,019,991, comprised of outstanding principal of $33,805,142, accrued but unpaid interest of $214,849, and unpaid fees, costs, and expenses thereunder in an unliquidated amount (the "Textron Indebtedness").

10.      Pursuant to the Textron Financing Documents, the Debtors granted to and/or for the benefit of the Textron Lenders and the Textron Agent first priority and continuing pledges, liens and security interests on substantially all of the Debtors' assets, as well as a pledge of 100% of the Debtors' equity in Standard Casualty Co., to secure the Textron Indebtedness (collectively, the "Textron Liens").

11.      The Debtors are in default under the Textron Facility.

## V.
## THE DEBTORS' IMMEDIATE NEED FOR FINANCING

12.      As discussed in detail in the Cejka Declaration, the Debtors have an immediate need for postpetition financing in order to administer the Bankruptcy Cases, preserve and maximize the value of the Debtors' assets and estates for the benefit of creditors, and to consummate an expedited sale of substantially all of their assets.

13.      Due to the fact that virtually all of the Debtors' cash constitutes cash collateral, and substantially all of its non-cash assets are subject to the Textron Liens and security interests

of the Textron Lenders, the Debtors are currently without sufficient unencumbered funds with which to pay ongoing operating expenses necessary to administer the Bankruptcy Cases. Due to the nature and magnitude of their businesses, the Debtors' immediate access to the proposed DIP Facility is necessary in order to maintain the administration of the Bankruptcy Cases, maximize the value of the Debtors' available assets in the near-term while they pursue a sale of substantially all of their assets, and avoid immediate and irreparable harm to their estates and creditors.

14.     As a result of extensive arm's-length negotiations conducted by the Debtors and the DIP Lender, the DIP Lender has agreed and consented to provide the Debtors with the DIP Facility during the postpetition period pursuant to the terms of the DIP Facility Documents, pending the opportunity to conduct the Final Hearing. Additionally, certain holders of the Senior Liens, including the Textron Agent, have consented to the terms and conditions contained in DIP Credit Agreement and the Interim DIP Financing Order.

15.     These financial accommodations, as described below, should enable the Debtors to commence, and continue to administer, in an orderly fashion, the Bankruptcy Cases, while pursuing a sale of substantially all of their assets.

## VI.
## THE DEBTORS' DECISION TO ENTER INTO THE DIP FACILITY

16.     Leading up to the Bankruptcy Cases, the Debtors explored strategic alternatives and engaged in extensive negotiations with various parties in an effort to obtain additional liquidity. Raymond James & Associates, Inc. ("Raymond James"), the Debtors' investment banker, assisted the Debtors in that process. Prior to the Petition Date, Raymond James contacted approximately 120 parties to gauge their interest in engaging in a transaction with the Debtors, including providing postpetition financing.

17.     Given the immediacy of the Debtors' financing needs, and the existing liens on the Debtors' assets, none of the institutions contacted (other than the DIP Lender) was in a position to provide debtor in possession financing that satisfied the Debtors' needs and on terms and conditions more favorable to the Debtors than those provided by the DIP Lender.  Thus, the Debtors were unable to obtain alternative postpetition financing proposals from other lenders through credit allowable as an administrative expense or secured by liens on the Debtors' assets junior to the Textron Liens or on better terms than those provided by the DIP Lender.

18.     Faced with these circumstances, and given the inability to find other postpetition financing on terms and conditions more favorable to the Debtors than those provided by the DIP Lender, the Debtors engaged in good faith, arm's-length negotiations with the DIP Lender over the course of several weeks, which culminated in the DIP Facility, the Budget and the form of the Interim DIP Financing Order.  During the negotiations, the Debtors, with the assistance of their advisors, went to great lengths under difficult circumstances to achieve the best deal possible for themselves and their constituencies.

19.     In this extremely challenging credit market, the Debtors have been unable to find alternative or better financing on the terms and of the type and magnitude required in the Bankruptcy Cases on an unsecured basis, or without offering terms substantially similar to those provided under the DIP Facility Documents.  The Debtors ultimately decided that the proposal for debtor-in-possession financing advanced by the DIP Lender was the most favorable under the circumstances, could be documented and accessed quickly, and adequately addressed the Debtors' reasonably foreseeable liquidity needs, while maintaining the going concern value of the Debtors' businesses.  For the foregoing reasons, the Debtors respectfully submit that entry into the DIP Facility is in the best interests of their estates, creditors and other parties in interest.

**VII.**

**MATERIAL TERMS OF THE DIP FACILITY AND PROVISIONS THAT
POTENTIALLY IMPLICATE LOCAL BANKRUPTCY RULE 4001-2**

**A.      Material Terms of the DIP Facility.**

20.      The principal terms of the DIP Facility are as follows:[4]

| | |
|---|---|
| <u>DIP Borrowers</u>: | Each of the Debtors |
| <u>Lender</u>: | Fleetwood Homes, Inc. |
| Type and Amount of <br> <u>DIP Facility</u>: | The DIP Facility consists of a senior secured first priority debtor-in-possession credit facility, comprised of up to $50 million in principal amount of a new money loan, which amount may be increased to $55 million if the parties elect to exercise an option to increase such principal amount (the "<u>Supplemental Commitment</u>").  The Debtors may draw up to the full amount of the DIP Facility on an interim basis pending entry of a Final DIP Financing Order.  DIP Credit Agreement §2.01(b). |
| | The DIP Credit Agreement provides that the DIP Lender will be permitted to credit bid at a sale of the Debtors' assets in the amount owing pursuant to the DIP Credit Agreement, including and up to any amounts owing (if any) in connection with the Supplemental Commitment. |
| <u>Use of DIP Facility Proceeds</u>: | The proceeds of the DIP Facility shall be used to, among other things, pay in full the amounts owing under the Textron Facility, the DIP Lender's expenses, and fund operating expenses, capital expenditures, and other corporate expenses and similar costs incurred by the Debtors and their estates in accordance with the Budget, subject to the terms of the DIP Facility Documents and the Interim DIP Financing Order.  DIP Credit Agreement §2.02. |
| <u>Maturity</u>: | The earliest of: (i) April 15, 2011; (ii) the 15th day after entry of an order approving the sale of all or substantially all of the Debtors' assets; (iii) the date of the closing of the sale of all or substantially all of the Debtors' assets; or (iv) the date on which an Event of Default occurs (the "<u>Maturity Date</u>").  DIP Credit Agreement §§1.01, 2.05. |
| <u>Carve-Out</u>: | The DIP Facility Liens and the DIP Facility Superpriority Claims shall be subject to: (i) unpaid court and trustee fees; (ii) professional fees and expenses of the Debtors and statutory committees incurred consistent to |

---

[4]  The following description of the terms of the DIP Facility is intended solely to provide the Court and interested parties with a brief overview of the significant terms thereof.  For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Credit Agreement and the Interim DIP Financing Order. This summary is qualified in its entirety by the provisions of the DIP Credit Agreement and the Interim DIP Financing Order.  In the event that there is any conflict between this Motion and either the DIP Credit Agreement or the Order, the DIP Credit Agreement or the Interim DIP Financing Order, as applicable, will control in all respects.

the Budget; (iii) Professional Fees incurred subsequent to the delivery of the Carve-Out Notice (as those terms are defined in the Interim DIP Financing Order) (collectively, the "Carve-Out").  DIP Credit Agreement §2.13.

| | |
|---|---|
| Interest Rate: | 7% per annum on the Base Commitment and 12% on the Supplemental Commitment based on a 365/366-day year and actual days elapsed.  All interest on the outstanding principal balance of the DIP Facility shall be calculated monthly and shall be payable, at the option of the Debtors, either: (a) in cash, monthly in arrears on the first business day of each calendar month (the "Interest Payment Date"); or (b) by the addition of such amount of interest to the then-outstanding principal amount of the Loan on such Interest Payment Date; provided that, at maturity or upon any prepayment of the DIP Facility (whether in whole or in part), all interest then-outstanding shall be payable prior to giving effect to any payment of principal.  DIP Credit Agreement §2.09. |
| Default Rate: | After the occurrence, and during the continuance, of an Event of Default, the interest rate applicable to the DIP Facility shall bear interest at a rate that is 12% per annum.  DIP Credit Agreement §2.09. |
| DIP Fees: | n/a |
| DIP Lender Professional Fees: | The Debtors agree to pay the Lenders' professional fees incurred in connection with the preparation and enforcement of the DIP Facility Documents.  DIP Credit Agreement §9.05. |
| Post-Petition Administrative Claim: | For all of the Obligations, the DIP Lender is granted, subject only to the Carve-Out and the Senior Liens, the DIP Facility Superiority Claims, which claims shall, pursuant to section 364(c)(1) of the Bankruptcy Code, be allowed administrative expenses of the Debtors' estates that shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtors and over all administrative expenses or charges against property arising in the Debtors' chapter 11 cases or any superseding chapter 7 cases, including without limitation those specified in Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1113.  DIP Credit Agreement §2.13. |
| Post-Petition Lien: | As security for the DIP Facility Superiority Claims, pursuant to sections 362, 363(c), 363(d), and 363(e) of the Bankruptcy Code, the Debtors shall grant to the DIP Lender valid, binding and enforceable DIP Facility Liens, mortgages and/or security interests in all of the Debtors' presently owned or hereafter acquired property and assets, whether such property and assets were acquired before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and the proceeds and products thereof (the "Collateral").  Notwithstanding the foregoing, the DIP Facility Liens |

shall be subject to: (i) the Senior Liens and (ii) the Carve-Out; and the Collateral shall not include causes of action brought pursuant to Bankruptcy Code sections 502(d), 544, 547, 548, 549, 550 and 553 and recoveries upon such causes of action. The DIP Facility Liens shall not be subject to any lien that is avoided and which would otherwise be preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551. The DIP Lender shall not be subject to the equitable doctrines of "marshaling" or any similar claim or doctrine with respect to any Collateral. DIP Credit Agreement §2.13.

Financial Covenants:

The Debtors, at their expense, shall (a) continue to keep the Collateral fully insured, and (b) pay any and all undisputed pre-petition and post-petition taxes, assessments and governmental charges with respect to the Collateral, in both cases as provided under the DIP Facility Documents. DIP Credit Agreement §5.06(b).

Financial Reports:

The Debtors shall provide the DIP Lender with: (i) audited financial statements and balance sheets; (ii) quarterly financial statements; (iii) monthly financial statements; (iv) Budgets; (v) weekly statements as to financial condition and other financial data; and (v) Performance Trigger Reports, all as specified in the DIP Facility. All written reports provided by the Debtor to the DIP Lender shall be complete and correct in all material respects. DIP Credit Agreement §5.01.

Expiration Date:

The Debtors' authorization to obtain loans, advances and/or other financial accommodations from the DIP Lender shall be in effect for the period commencing with the Closing Date through the earlier of: (i) the Business Day immediately prior to the Maturity Date; (ii) the date in which the DIP Lender's Commitments under the DIP Credit Agreement terminate (the "Expiration Date"). DIP Credit Agreement §2.08.

Borrowing Conditions:

The conditions to all credit extensions include, but are not limited to, the compliance of the Debtors with all terms of the DIP Facility Documents and the lack of any default occurring thereunder, the Debtors' provision of certain documents, and the entry of certain orders by this Court, and compliance with the Budget. DIP Credit Agreement §3.01.

Events of Default:

The Events of Default are set forth in Paragraph 14 of the Interim DIP Financing Order and include: (a) any material default, violation, or breach of any of the terms of the Interim DIP Financing Order by the Debtors; (b) the occurrence of the Termination Date (as defined in the Interim DIP Financing Order), maturity, termination, expiration, or non-renewal of the Interim DIP Financing Order or the DIP Credit Agreement as provided for herein or in the DIP Facility Documents; (c) conversion of the Bankruptcy Cases to one or more cases under chapter 7 of the Bankruptcy Code; (d) the appointment of a trustee in the Bankruptcy Cases; (e) the appointment of an examiner in the Bankruptcy Case; (f) the dismissal of the Bankruptcy Cases; (g) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending the Interim DIP Financing Order without the express prior written consent of the DIP Lender; (h) the filing of a plan of

reorganization by any of the Debtors; (i) any other security interest, lien, claim or encumbrance is granted that is *pari passu* with or senior to the claims of the DIP Lender; (j) the entry of an order granting relief from the Automatic Stay of section 362 of the Bankruptcy Code to the holder or holders of any security interest or lien in any Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any assets of any of the Debtors; (k) any sale or other disposition of all or substantially all of the Collateral other than the sale contemplated by the *Motion of the Debtors for Entry of (I) an Order (A) Approving Bid Procedures; (B) Approving a Break-Up Fee and Expense Reimbursement; (C) Approving the Stalking Horse Purchaser's Right to Credit Bid; (D) Approving the Form and Manner of Notices; (E) Approving the Procedures for the Assumption and Assignment of Contracts and Leases; and (F) Setting a Sale Hearing; and (II) an Order Pursuant to 11 U.S.C. §§ 363 and 365 (A) Authorizing and Approving Asset Purchase Agreement by and among the Debtors, as Sellers, and Palm Harbor Homes, Inc., a Delaware Corporation, as Purchaser, or Such Other Purchase Agreement(s) Between the Debtors and the Successful Bidder, Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (C) Granting Related Relief;* (l) failure to obtain approval of the Final DIP Financing Order in a form acceptable to the DIP Lender; and (m) an Event of Default under and as defined in the DIP Facility Documents.  Interim DIP Financing Order, ¶ 14; DIP Credit Agreement §7.01.

Rights and Remedies
Upon Event of Default or the
<u>Expiration Date:</u>

Upon the occurrence of an Event of Default: (a) the DIP Lender shall have no obligation to make any further loans, advances and/or other financial accommodations to the Debtors; (b) subject in all respects to the Carve-Out and the Senior Liens, the payment of any and all Obligations of the Debtors to the DIP Lender shall be immediately due and payable; and (c) the DIP Lender shall, after giving notice of five business days to the parties listed in the Interim DIP Financing Order, shall have the right, free of the restrictions of section 362 of the Bankruptcy Code or under any other section of the Bankruptcy Code, to exercise contractual, legal and equitable rights and remedies as to the Credit Documents and as to all or such part of the Collateral as the DIP Lender shall elect.  Interim DIP Financing Order, ¶ 13; DIP Credit Agreement §7.02.

## B.    Highlighted Provisions Under Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2.

### 1.    Bankruptcy Rule 4001.

21.    The provisions described in Bankruptcy Rule 4001(b)(1)(B)(i)-(iv), to the extent

applicable, are set out at the following sections of the Interim DIP Financing Order:

(a) <u>Name of Each Entity with an Interest in the Cash Collateral</u>. n/a

(b) <u>Purposes for the Use of Cash Collateral</u>. n/a

(c) <u>Material Terms, including Duration, of the Use of Cash Collateral</u>. n/a

(d) <u>Liens, Cash or Other Adequate Protection Provided</u>. n/a

22. The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi), to the extent applicable, are set out at the following sections of the Interim DIP Financing Order:

(a) <u>Grant of Priority or a Lien on Property of the Estate under section 364(c) or (d)</u>. Interim DIP Financing Order, ¶ 5.

(b) <u>Adequate Protection or Priority for a Claim that Arose before the Commencement of the Case</u>. n/a

(c) <u>Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Case</u>. Interim DIP Financing Order, ¶ D(iv), (v).

(d) <u>Waiver or Modification of the Automatic Stay</u>. Interim DIP Financing Order, ¶ 13.

(e) <u>Waiver or Modification of Authority to File a Plan, Seek an Extension of Time in which the Debtor has the Exclusive Right to File a Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit</u>. n/a

(f) <u>Establishment of Deadlines for Filing a Plan of Reorganization, for Approval of a Disclosure Statement, for a Hearing on Confirmation or Entry of a Confirmation Order</u>. n/a

(g) <u>Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien</u>. Interim DIP Financing Order, ¶11.

(h) <u>Release, Waiver or Limitation on any Claim or Cause of Action Belonging to the Estate</u>. n/a

(i) <u>Indemnification of Any Entity</u>. n/a

(j) <u>Release, Waiver or Limitation on Rights under Section 506(c)</u>. Interim DIP Financing Order, ¶ 6

(k) <u>Liens Granted on Claims Arising Under Chapters 5 or 7</u>. n/a

### 2. Local Bankruptcy Rule 4001-2

23. Local Bankruptcy Rule 4001-2 requires that certain provisions contained in the Interim DIP Financing Order and the DIP Facility be highlighted and that the Debtors provide justification for the inclusion of such highlighted provisions. The Debtors believe that the following provisions of the Interim DIP Financing Order and the DIP Facility are required to be identified in accordance with Local Bankruptcy Rule 4001-2 and that such provisions are justified and necessary in the context and circumstances of these cases. If a provision of Local Bankruptcy Rule 4001-2 is not discussed below, it means that the Interim DIP Financing Order or the DIP Facility does not contain a provision that triggers disclosure under that rule.

#### (i) Local Bankruptcy Rule 4001-2(a)(i)(B)

24. Local Bankruptcy Rule 4001-2(a)(i)(B) requires a movant to identify provisions that bind the estates or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least 75 days from the entry of the order and the creditors' committee, if formed, at least 60 days from the date of its formation to investigate such matters. Del. Bankr. L.R. 4001-2(a)(i)(B).

25. The Interim DIP Financing Order provides that:

> iv. As of the Petition Date and immediately prior to giving effect to the Interim DIP Financing Order, (a) the Textron Financing Documents are valid and binding agreements and obligations of the Debtors and are enforceable against the Debtors in accordance with their terms, (b) the Textron Liens (i) constitute valid, binding, enforceable and perfected first priority security interests and liens, subject only to the liens permitted under the Textron Financing Documents, if any, and (ii) are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (c) the Textron Indebtedness constitutes the legal, valid and binding obligations of the Debtors, and the Textron Indebtedness, and any amounts paid at any time to the Textron Lenders on

account thereof or with respect thereto, are not subject to (i) any objection, offset, defense or counterclaim of any kind or nature, or (ii) avoidance, reduction, disallowance, impairment, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (d) no claims exist against the Textron Lenders or the Textron Agent under any contract or tort (including, without limitation, lender liability) theories of recovery or pursuant to section 105 or chapter 5 of the Bankruptcy Code;

v. The Debtors have waived, discharged and released any right they may have to challenge any of the Textron Indebtedness and the Textron Liens, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the Textron Lenders, the Textron Agent and/or any of their respective affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors and employees in connection therewith.

Interim DIP Financing Order, ¶ D(iv), (v).

26. The Interim DIP Financing Order further provides that:

Any Committee and any other party in interest shall have 20 days from the date of entry of this Interim DIP Financing Order (or such longer period as the Committee or any party in interest may obtain from the Court for cause shown before the expiration of such period) to commence a contested matter or an adversary proceeding against the Textron Lenders or the Textron Agent (a "Challenge") for the purpose of (1) challenging the validity, extent, priority, perfection, enforceability and non-avoidability of the Textron Lenders' pre-petition claims and/or Liens against the Debtors ("Lien Challenge"), (2) seeking to avoid or challenge (whether pursuant to chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtors to or for the benefit of the Textron Lenders prior to the Petition Date ("Payment Challenge"), and/or (3) seeking damages or equitable relief against the Textron Lenders or the Textron Agent arising from or related to the pre-petition business relationship among the Debtors and the Textron Lenders or the Textron Agent, including without limitation "equitable subordination", "lender liability" and/or "deepening insolvency" claims and causes of action ("Damage Challenge"). The Committee is granted standing to commence such a proceeding. Any other party in interest shall have 15 days (or a longer period for cause shown to the Court before the expiration of such period) from the date of entry of this Interim DIP Financing Order to move this Court for an order

granting it standing to commence a Challenge. All parties in interest, including without limitation any Committee, that fail to act in accordance with the time periods set forth in the preceding sentences of this paragraph shall be, and hereby are, barred forever from commencing a Challenge. The foregoing is without prejudice to any and all of the Textron Lenders' or the Textron Agent's legal and equitable claims, counterclaims, defenses and/or rights of offset and setoff in response to any such Challenge, all of which are reserved, and the foregoing shall in no event revive, renew or reinstate any applicable statute of limitations which may have expired prior to the date of initiation of such Challenge. Nothing contained herein shall limit the Court's ability to fashion an appropriate remedy should the Court determine, by entry of a final order and judgment no longer subject to appeal, a Challenge in favor of the party seeking the Challenge. In the event that a Challenge is asserted, the party asserting the Challenge must notify counsel for the Textron Agent and Textron Lender, counsel for the DIP Lender and counsel for the Debtors of such Challenge within one (1) business day after taking any action to assert the Challenge. During the pendency of such Challenge, the Textron Agent shall retain any and all amounts paid to it pursuant to this Interim DIP Financing Order. Upon entry of a final non-appealable order as to a successful Lien Challenge in whole or in part, Textron's Agent within one (1) business day shall pay directly to the DIP Lender such amount, which reflects the overpaid amount on the asserted secured portion of the Textron Indebtedness. Upon entry of a final non-appealable order as to a successful Payment Challenge or a successful Damage Challenge, Textron's Agent within one (1) business day shall pay the amount(s) awarded in such Payment Challenge or Damage Challenge directly to the Debtors, which payment shall immediately become the DIP Lender's Collateral and immediately subject to the DIP Facility Liens as established herein. For the sake of clarity, the forgoing shall be dispositive only as to the Debtors and the Textron Lender and the Textron Agent in the event of a successful Challenge; notwithstanding the forgoing, nothing in this section 9 shall limit the remedy that Textron may seek or a court of competent jurisdiction may impose in this regard.

Interim DIP Financing Order ¶ 9.

27.     The DIP Facility proceeds will be used in part to satisfy the Debtors' obligations to the Textron Lenders under the Textron Facility. However, the Committee and other parties-in-interest will maintain the right, discussed above, to assert a Challenge with respect to the

Textron Lenders and the Textron Liens. To the extent that the Challenge is successful, and upon entry of a final and non-appealable judgment sustaining the Challenge, the Textron Lenders will be subject to disgorging the proceeds received from the Debtors under the DIP Facility to the extent of the challenged amount.

28. Local Bankruptcy Rule 4001-2(a)(i)(B) provides that, in instances when parties-in-interest are given less than seventy-five (75) days to investigate a prepetition lien, this Court will only enter an order binding the estate and other parties-in-interest with respect to the validity, perfection, or amount of a secured creditors' prepetition lien in "extraordinary circumstances." Del. Bankr. L.R. 4001-2(b).

29. Here, extraordinary circumstances warrant the relief sought by the Interim DIP Financing Order. The Textron Lenders refused to provide DIP financing on terms acceptable to the Debtors. The DIP Lender will only extend the DIP Facility to the Debtors if it is granted senior liens as security for the DIP Facility. However, the Textron Lenders refused to consent to the priming of the Textron Liens unless they were paid in full immediately, and the Textron Liens were subject to a Challenge for only twenty days subsequent to the entry of the Interim DIP Financing Order.

30. Simply put, the DIP Facility is necessary for the Debtors' reorganization prospects, and the DIP Facility can only be obtained on terms acceptable to the DIP Lender with the Textron Lenders' consent; a condition of such consent is the Challenge period contained in the Interim DIP Financing Order. Absent such Challenge period, the Debtors will have no cash to operate their businesses, and they will quickly be forced to shut down, thereby destroying their going concern value, to the detriment of all parties, most notably the Debtors' creditors. Thus,

an extraordinary circumstance – the necessity of the DIP Facility to the Debtors' reorganization and sale efforts – warrant the entry of the Interim DIP Financing Order.

### (ii)     **Local Bankruptcy Rule 4001-2(a)(i)(C)**

31.     Local Bankruptcy Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, without notice, of the estates' rights under section 506(c) of the Bankruptcy Code. The Interim DIP Financing Order provides for a waiver of the Debtors' section 506(c) claims against the DIP Lender only upon entry of the Final DIP Financing Order:

> Subject to entry of the Final DIP Financing Order, neither the Collateral, the DIP Lender, nor the Textron Lenders shall be subject to surcharge, pursuant to sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, by the Debtors or any other party in interest without the prior written consent of the DIP Lender and no such consent shall be implied from any other action, inaction, or acquiescence by such parties in this proceeding, including but not limited to, the funding of the Debtors' ongoing operations by the DIP Lender. The "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

Order ¶ 6.

32.     As the effectiveness of this waiver will be delayed until the entry of the Final DIP Financing Order, the Debtors respectfully submit that parties in interest will have an opportunity to be heard and, as such, the waiver will not be "without notice."

### VIII.
### BASIS FOR RELIEF REQUESTED

33.     The preservation of value of the Debtors' businesses and the success of the Debtors' sale efforts hinge upon obtaining access to sufficient postpetition financing. The Debtors' ability to conduct an expedited sale successfully depends heavily upon the immediate approval of this Motion. The Debtors' request authorization to obtain advances under the

proposed DIP Facility Documents. The Debtors intend to use such proceeds to, among other things, fund their operations and effect the sale of all or substantially all of their assets.

34. As set forth above, the DIP Facility is the only financing available in an amount to and under the terms required by the Debtors at this time. The Debtors have been unable to procure sufficient financing: (a) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code; (b) solely as an administrative expense under sections 364(a) and (b) of the Bankruptcy Code; or (c) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c) of the Bankruptcy Code. Thus, based on the foregoing and for the reasons set forth below, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code and their proposed grant of adequate protection to the Textron Lenders is appropriate.

**A.** **The Debtors' Satisfy The Requirements For Obtaining Financing Under Section 364(c) Of The Bankruptcy Code.**

35. Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to superpriority administrative expense status, (b) secured by a lien on otherwise unencumbered property, or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority or secured solely by junior liens on the debtor's assets. See 11 U.S.C. § 364(c); In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), modified on other grounds, 75 B.R. 553 (debtor seeking unsecured credit

under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

36.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

    a)     the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

    b)     the credit transaction is necessary to preserve the assets of the estate; and

    c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

Ames Dep't Stores, 115 B.R. at 37-39; see also In re St. Mary Hosp., 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); Crouse Group, Inc., 71 B.R. at 549.

37.     While the Debtors were in the process of negotiating the terms of the DIP Facility, the Debtors and Raymond James also attempted to identify other sources of postpetition financing to determine whether they could obtain debtor in possession financing on better terms. Based on current capital market conditions and discussions with potential lenders, the Debtors and Raymond James determined that postpetition financing on an unsecured basis or on a junior priority basis would be unobtainable. Moreover, without postpetition financing, the Debtors would be unable to operate their businesses as a going-concern, which would significantly impair the value of the Debtors' assets and limit their ability to repay their debts and liabilities. Finally, as set forth above, given the Debtors' circumstances and the volatile conditions and lack of liquidity in the capital markets, the Debtors believe that the terms of the DIP Facility are fair, reasonable, and adequate, all as more fully set forth herein. Further, the terms of the DIP Credit Agreement, including but not limited to the Debtors' agreement to pay the DIP Lender's professional fees, were essential to the DIP Lender's willingness to enter into the DIP Credit Agreement and provide the DIP Facility.

**B. Approval Of The DIP Facility On An Interim Basis Is Necessary To Prevent Immediate And Irreparable Harm.**

38. Bankruptcy Rule 4001(c)(2) govern the procedures for obtaining authorization to obtain postpetition financing. Under Bankruptcy Rule 4001(c)(2), during the 14-day period after the debtor files a motion to obtain postpetition financing, the court may approve the motion to the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2).

39. Also, to the extent that the Debtors are seeking authority to sell, use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003 provides that the Court may only grant such relief to the extent it is necessary to avoid "immediate and irreparable harm." Id. 6003(b).

40. In examining requests for interim relief under the "immediate and irreparable harm" standard, courts apply the same business judgment standard applicable to other business decisions. See, e.g., Ames Dep't Stores, 115 B.R. at 36. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. Id.

41. Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis. As described in detail above and in the Cejka Declaration, the Debtors need to obtain access to liquidity under the DIP Facility in order to, among other things, satisfy their working capital and operational needs and preserve the going concern value of the Debtors' estates. Funding these expenditures is necessary to the Debtors' ability to preserve and maintain their values for the benefit of all parties in interest pending an expedited sale of the Debtors' assets.

42.     Accordingly, under the circumstances, entry of the Interim DIP Financing Order is necessary to prevent immediate and irreparable harm to the estates and, therefore, is warranted under the requirements of the Bankruptcy Rules.

**C.     Modification Of The Automatic Stay Provided Under Section 362 Of The Bankruptcy Code Is Appropriate Under The Circumstances.**

43.     Paragraph 13 of the Interim DIP Financing Order provides that the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted to permit the DIP Lender to, upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement), exercise all rights and remedies provided for in the DIP Facility Documents.

44.     Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Facility and the proposed DIP Orders.

## IX.
## REQUEST FOR FINAL HEARING

45.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is no later than thirty (30) days following the Petition Date.

## X.
## REQUEST FOR WAIVER OF STAY

46.     The Debtors further seek a waiver of any stay of the effectiveness of the Interim DIP Financing Order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth above, the DIP Facility is essential to prevent irreparable damage to the

Debtors' operations, value and ability to conduct a sale of substantially all of their assets. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 10-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## XI.
## NOTICE

47.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the Internal Revenue Service; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Debtors' thirty largest unsecured creditors on a consolidated basis; (v) counsel to the DIP Lender; (vi) each of the Debtors' cash management banks; (vii) counsel for the Textron Lenders; (viii) counsel for Virgo Service Company, LLC; and (ix) the Securities and Exchange Commission.  Notice of this Motion will be served in accordance with Local Bankruptcy Rule 9013-1(m).  In light of the nature of the relief requested, and the exigent circumstances of these cases, the Debtors submit that no further notice is necessary.

## XII.
## NO PRIOR REQUEST

48.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the Interim DIP Financing Order, in substantially the same form as that attached as Exhibit A, granting the relief requested herein; and (ii) provide such other relief as the Court deems appropriate and just.

[remainder of page left intentionally blank]

Dated: Wilmington, Delaware
   November 29, 2010

Respectfully submitted,


LOCKE LORD BISSELL & LIDDELL LLP
David W. Wirt (Pro Hac Vice Motion Pending)
Aaron C. Smith (Pro Hac Vice Motion Pending)
Courtney E. Barr (Pro Hac Vice Motion Pending)
111 S. Wacker Drive
Chicago, Illinois  60606-4410
Telephone: (312) 443-0700
Fax: (312) 443-0336

-and-

POLSINELLI SHUGHART PC

   /s/  Christopher A. Ward
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware  19801
Telephone: (302) 252-0920
Fax: (302) 252-0921

PROPOSED COUNSEL FOR THE DEBTORS