| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PALM HARBOR HOMES, INC., et al.,[1] | ) | Case No. 10-____ (___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## MOTION OF THE DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING BID PROCEDURES; (B) APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (C) APPROVING THE STALKING HORSE PURCHASER'S RIGHT TO CREDIT BID; (D) APPROVING THE FORM AND MANNER OF NOTICES; (E) APPROVING THE PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES; AND (F) SETTING A SALE HEARING; AND (II) AN ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 (A) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT BY AND AMONG THE DEBTORS, AS SELLERS, AND PALM HARBOR HOMES, INC., A DELAWARE CORPORATION, AS PURCHASER, OR SUCH OTHER PURCHASE AGREEMENT(S) BETWEEN THE DEBTORS AND THE SUCCESSFUL BIDDER, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; AND (C) GRANTING RELATED RELIEF

Palm Harbor Homes, Inc., a Florida corporation, and its related debtors (collectively, the

"Debtors"), as debtors and debtors in possession in the above-captioned cases (the "Bankruptcy

Cases"), hereby file their *Motion of the Debtors for Entry of (I) an Order (A) Approving Bid*

*Procedures; (B) Approving a Break-Up Fee and Expense Reimbursement; (C) Approving the*

*Stalking Horse Purchaser's Right to Credit Bid; (D) Approving the Form and Manner of*

*Notices; (E) Approving the Procedures for the Assumption and Assignment of Contracts and*

*Leases; and (F) Setting a Sale Hearing; and (II) an Order Pursuant to 11 U.S.C. 363 and 365*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Palm Harbor Homes, Inc., a Florida corporation (6634); Palm Harbor Albemarle, LLC (1014); Nationwide Homes, Inc. (4881); Palm Harbor Real Estate, LLC (8234); Palm Harbor GenPar, LLC (0198); and Palm Harbor Manufacturing, LP (0199). The location of the Debtors' corporate headquarters and service address is: 15303 Dallas Parkway, Suite 800, Addison, Texas 75001.

*(A) Authorizing and Approving Asset Purchase Agreement by and among the Debtors, as Sellers,*
*and Palm Harbor Homes, Inc., a Delaware Corporation, as Purchaser, or Such Other Purchase*
*Agreement(s) Between the Debtors and the Successful Bidder, Free and Clear of All Liens,*
*Claims, Encumbrances and Interests; (B) Authorizing and Approving the Assumption and*
*Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and*
*(C) Granting Related Relief* (the "Bid Procedures and Sale Motion"). In support of this Bid
Procedures and Sale Motion, the Debtors have filed the Declaration of Brian E. Cejka in Support
of Chapter 11 Petitions and First Day Pleadings (the "Cejka Declaration"). In further support
hereof, the Debtors respectfully state as follows:

## I.
## Jurisdiction

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157
and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of the
Bankruptcy Cases and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and
1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363
and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"),
Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")
and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States
Bankruptcy Court for the District of Delaware (the "Local Rules").

## II.
## Background

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary
petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy
Court for the District of Delaware (the "Court") commencing the above-captioned Bankruptcy

2

Cases. The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these Bankruptcy Cases, is set forth in detail in the Cejka Declaration, filed concurrently herewith and fully incorporated by reference.[2]

4.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code

5.      No trustee or examiner has been appointed in these Bankruptcy Cases, and no committees have yet been appointed or designated.

## A.      The Debtors' Efforts to Sell Substantially All of Their Assets and Raise New Financing

6.      Throughout the course of 2010, the Debtors, with the assistance of their advisors, Raymond James & Associates, Inc. ("Raymond James") and Alvarez & Marsal North America, LLC ("Alvarez"), explored a number of strategic alternatives to address their worsening financial condition, including, without limitation, a restructuring of their existing indebtedness with their prepetition secured lender (the "Textron Lenders", and the administrative agent and arranger for the Textron Lenders, "Textron") and the holders of certain convertible senior notes (as described more fully, and defined in, the Cejka Declaration, the "Notes"), raising new debt and/or equity financing, and seeking a sale of all or some of the Debtors' assets and operations. The strategic alternative process included extensive marketing whereby the Debtors and Raymond James contacted third parties to determine the extent to which any of these parties were interested in providing new financing to the Debtors, purchasing the Debtors' assets, equity or operations, or exploring other strategic alternatives.

---

[2] Capitalized terms used but not defined in this Section II of the Bid Procedures and Sale Motion shall have the meaning ascribed to them in the Cejka Declaration.

CHI1 1730247v.3

7.        During this time, the Debtors, through Raymond James, contacted over 120 parties (including both financial and strategic parties, and holders of the Notes) regarding potential strategic alternatives. Raymond James placed no conditions on potentially interested parties with regard to bid levels, structure, financing or management in connection with the solicitation of indications of interest. All of the interested parties were given an opportunity to execute a confidentiality agreement. Those parties that executed a confidentiality agreement were provided substantial due diligence information concerning, and access to, the Debtors, including, but not limited to, presentations by Debtors' management, access to the Debtors' financial advisors, and access to financial, operational, and other detailed information. Thirty-nine of these parties executed confidentiality agreements with the Debtors and performed due diligence. Nine of these parties participated in on-site or telephone meetings with the Debtors' management team.

8.        As a result of the above marketing efforts, the Debtors received multiple term sheets from several parties relating to various strategic alternatives, including the possible sale of the Debtors' assets. Of these offers, the Debtors selected an offer made by Palm Harbor Homes, Inc., a Delaware corporation, which is an affiliate of Cavco Industries, Inc. (the "Stalking Horse Purchaser" or the "Purchaser"), to acquire the Debtors pursuant to section 363 of the Bankruptcy Code. The Purchaser accordingly executed an asset purchase agreement (the "Stalking Horse Agreement" or the "Agreement") to acquire substantially all of the Debtors' assets, including the Debtors' stock in (i) CountryPlace Acceptance Corp., and (ii) Standard Casualty Co. and Standard Ins. Agency, Inc. (collectively, "Standard Casualty"), conditioned on the Court's entry of an order authorizing the sale of the company to the Purchaser, and subject to the entry of an order approving certain bid procedures and bid protections to apply in an auction of the Debtors'

4

assets contemplated by the Stalking Horse Agreement. An affiliate of Cavco Industries, Inc. has also agreed to provide the Debtors with financing to enable the Debtors to commence these Bankruptcy Cases and to meet their obligations during these Bankruptcy Cases. The Debtors have thus entered into a debtor in possession revolving credit facility with Fleetwood Homes, Inc. (the "DIP Lender"), an affiliate of Cavco Industries, Inc., to provide this financing, subject to Court approval.

9.     Ultimately, the DIP Lender was unwilling to lend without reasonable certainty of a successful sale process. Therefore, one of the conditions to the Debtors' continued use of DIP financing is the pursuit of an expedited sale process. Contemporaneously herewith, the Debtors have sought entry of orders approving a postpetition financing package offered by the DIP Lender (the "DIP Facility"). Among other things, the DIP Facility requires that (a) a motion for authority to sell substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code be filed no later than three business days after the date of the DIP Facility, (b) the Debtors obtain approval of such sale motion on terms acceptable to the DIP Lender, and (c) the sale contemplated in such sale motion close by the earlier of 60 days after the Court's entry of an order approving the bid procedures or 135 days after the Petition Date (the "Sale Deadlines"). The Debtors have accordingly negotiated the Bid Procedures (as defined below) with the DIP Lender and the Stalking Horse Purchaser in order to facilitate an auction process that meets these requirements.

10.     The primary purpose of the sale process will be to provide for the sale (a "Transaction" or an "Asset Sale") involving substantially all of the Debtors' assets and operations (the "Transferred Assets") to the party that submits the highest and best offer in accordance with the Bid Procedures (as defined below).

## III.
## The Stalking Horse Agreement, Bid Procedures, Auction, and Sale

### A.    The Stalking Horse Agreement.

11.    As described above, the Debtors have been in extensive negotiations with the

Stalking Horse Purchaser regarding the terms of a possible acquisition of the Transferred Assets.

These negotiations culminated in the execution the Stalking Horse Agreement, a copy of which

is attached as **Exhibit A**.  The Stalking Horse Agreement provides that the Stalking Horse

Purchaser will pay at least $50 million plus the assumption of certain warranty and other

liabilities and executory contracts (as set forth in more detail in the Agreement) for the

Transferred Assets.  The Debtors believe that, subject to the receipt of higher and better

proposals through the Bid Procedures (as defined below), the Stalking Horse Agreement

represents the best alternative currently available to the Debtors.

### B.    The Proposed Bid Procedures and Bid Protections.[3]

12.    The bid procedures, substantially in the form attached hereto as **Exhibit B** (the

"Bid Procedures"), were developed to permit an expedited sale process, to promote participation

and active bidding, and to ensure that the Debtors receive the highest or otherwise best offer for

the Transferred Assets.  Given the Debtors' precarious cash position, the Debtors believe that the

timeline for consummating the sale process established pursuant to the Bid Procedures is in the

best interests of their estates and all parties in interest.

13.    The Bid Procedures describe, among other things, the requirements for

prospective purchasers to participate in the bidding process, the availability and conduct of due

diligence, the deadline requirements for submitting a competing bid, the method and factors for

---

[3] The summary of the Bid Procedures contained in this Bid Procedures and Sale Motion is qualified in its entirety by the Bid Procedures themselves.  To the extent of any inconsistency, the Bid Procedures shall govern.  Capitalized terms used but not otherwise defined in this Section III.B of the Bid Procedures and Sale Motion shall have the meanings set forth in the Bid Procedures.

determining qualifying bids, the criteria for selecting a successful bidder, and the payment of the Break-Up Fee and the Expense Reimbursement (each as defined below) for the benefit of the Stalking Horse Purchaser.

14.     The Break-Up Fee and the Expense Reimbursement are material inducements for, and conditions of, the Stalking Horse Purchaser's agreement to enter into the Stalking Horse Agreement. As described in detail below, the Debtors believe that the Break-Up Fee and the Expense Reimbursement are fair and reasonable and will enhance the prospects for competitive bidding with respect to the Transferred Assets.

15.     Pursuant to Local Rule 6004-1(c), a debtor filing a motion seeking approval of bidding procedures must highlight certain provisions. The following is a summary of the Debtors' proposed Bid Procedures in compliance with Local Rule 6004-1(c):

### (i)     Qualification of Bidders (Local Rule 6004-1(c)(i)(A)).

To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be determined by the Debtors to satisfy each of the following conditions:

Corporate Authority.     Written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Competing Transaction; provided, however, that, if the Bidder is an entity specially formed for the purpose of effectuating the Competing Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Competing Transaction by the equity holder(s) of such Bidder. See Bid Procedures at § III(C)(3).

Proof of Financial Ability to Perform. Written evidence that the Debtors reasonably conclude demonstrates that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under all Assumed Contracts.     Such information should include, *inter alia,* the following:

- contact names, email addresses and telephone numbers for verification of financing sources;
- evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the Competing Transaction;

7

- the Bidder's current financial statements (audited if they exist); and
- any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the Competing Transaction; provided, however, that the Debtors shall determine, in their sole discretion, in consultation with the Debtors' advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications. See Bid Procedures at § III(C)(4).

### (ii) Qualified Bids (Local Rule 6004-1(c)(i)(B)).

Each offer, solicitation or proposal (each, a "Bid") must be determined by the Debtors to satisfy each of the following conditions

Good Faith Deposit. Each Bid (other than the Bid from the Stalking Horse Purchaser) must be accompanied by a deposit to an interest bearing escrow account to be identified and established by the Debtors in an amount that is the lesser of (i) $5,000,000, or (ii) 10% of the proposed purchase price, (the "Good Faith Deposit"). See Bid Procedures at § III(C)(1).

Terms. Bids(s) must be on terms that, in the Debtors' business judgment, are higher or otherwise better than the terms of the Stalking Horse Agreement. A Bid must include executed transaction documents pursuant to which the Bidder proposes to effectuate the Competing Transaction (the "Competing Transaction Documents"). A Bid shall include a copy of the Stalking Horse Agreement marked to show all changes requested by the Bidder (including those related to purchase price). A Bid should propose a Competing Transaction involving substantially all of the Debtors' assets or operations. The Debtors shall evaluate all Bids to determine whether such Bid(s) maximizes the value of the Debtors' estates as a whole. A Bid to purchase substantially all of the Debtors' assets must propose a purchase price equal to the purchase price under the Stalking Horse Agreement, plus at least: (i) $300,000 (the "Initial Overbid"); (ii) $1,100,000, which represents the amount of the break-up fee to the Stalking Horse Purchaser (the "Break-Up Fee"); and (iii) $250,000, which represents the amount of the Expense Reimbursement (as defined below). The Competing Transaction Documents shall also identify any executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it (collectively, the "Assumed Contracts"). See Bid Procedures at § III(C)(2).

Contingencies. A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but

may be subject to the accuracy in all material respects at the closing of specified representations and warranties. See Bid Procedures at § III(C)(5).

Irrevocable. A Bid must be irrevocable until the closing of the Auction, provided, however, that if such Bid is accepted as the Successful Bid or the Backup Bid (as defined herein), such bid shall continue to remain irrevocable, subject to the terms and conditions of the Bid Procedures. See Bid Procedures at § III(C)(6).

Bid Deadline. The Debtors must receive a Bid in writing, on or before January 18, 2011, 2010 at 4:00 p.m. (prevailing Eastern time) or such later date as may be agreed to by the Debtors (the "Bid Deadline"). See Bid Procedures at § III(C)(7).

### (iii) Bid Protections (Local Rule 6004-1(c)(i)(C)).

Expense Reimbursement and Break-Up Fee. If the Stalking Horse Purchaser attends the Auction with its Bid in place, and the Stalking Horse Purchaser is outbid, and the Successful Bidder is a party other than the Stalking Horse Purchaser, the Stalking Horse Purchaser shall, without further court order, be entitled to receive (i) reimbursement of the reasonable, actual, out-of-pocket costs and expenses paid or incurred by the Stalking Horse Purchaser directly incident to, under, or in connection with the negotiation and execution of, and performance under, the Stalking Horse Agreement and the transactions contemplated thereunder (including travel expenses and reasonable fees and disbursements of counsel, accountants and financial advisors, excluding any charges for the time or services of the Stalking Horse Purchaser's employees except the Stalking Horse Purchaser's in-house corporate counsel) in an amount not to exceed $250,000 in the aggregate ("Expense Reimbursement"); and (ii) the Break-Up Fee. The Debtors shall pay or cause to be paid the Expense Reimbursement and Break-Up Fee out of the proceeds of the sale within twenty-four (24) hours of receipt of such sale proceeds, both of which shall have priority as administrative expenses in the Debtors' cases under Sections 503(6) and 507(a) of the Bankruptcy Code. See Bid Procedures at ¶ IV(I)

Minimum Overbid Increment. Any Overbid after the Auction Baseline Bid shall be made in increments of at least $100,000 (the "Minimum Overbid Increment"); provided that the Debtors shall retain the right to modify the bid increment requirements at the Auction as they may deem appropriate. Additional consideration in excess of the amount set forth in the Auction Baseline Bid may include cash, the assumption of debt or marketable securities, a credit bid under section 363(k) of the Bankruptcy Code of an allowed secured claim of Fleetwood Homes, Inc. or its assignee, other consideration as the Debtors may value in their sole discretion, or any combination thereof. See Bid Procedures at ¶ IV(B)(1).

9

### (iv) Modification of Bidding and Auction Procedures (Local Rule 6004-1(c)(i)(D))

Additional Procedural Rules. The Debtors may announce at the Auction modifications or amendments to the procedural rules that are reasonable under the circumstances (e.g., the amount of time to make subsequent Overbids, whether a non-conforming Bid constitutes a Qualified Bid) for conducting the Auction so long as such rules are not inconsistent with these Bid Procedures. See Bid Procedures at ¶ IV(D).

### (v) Closing with Alternative Backup Bidders (Local Rule 6004-1(c)(i)(E))

Back-Up Bidder. Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid(s) at the Auction, as determined by the Debtors, in the exercise of their business judgment, shall be required to serve as a backup bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern time) on the date that is twenty (20) days after entry of the Sale Order (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder. Following entry of the Sale Order, if the Successful Bidder fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Successful Bidder, the Debtors may designate the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction, with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit, if any, shall be forfeited to the Debtors' estates, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder. The closing date to consummate the transaction with the Backup Bidder shall be no later than ten (10) days after the date that the Debtors provide notice (the "Notice") to the Backup Bidder that the Successful Bidder failed to consummate an approved Transaction and that the Debtors desire to consummate the transaction with the Backup Bidder. The deposit, if any, of the Backup Bidder shall be held by the Debtors until the earlier of two (2) business days after (a) the closing of the Transaction with the Successful Bidder or (b) the Outside Backup Date, provided however, that in the event the Successful Bidder does not consummate the transaction as described above and the Debtors provide the Notice to the Backup Bidder, the Backup Bidder's deposit shall be held until the closing of the transaction with the Backup Bidder. In the event that the Debtors fail to consummate a transaction with the Backup Bidder as described above, the Backup Bidder's deposit shall be forfeited to the Debtors' estates, and the Debtors specifically reserve the right

10

to seek all available damages from the defaulting Backup Bidder. See Bid Procedures at ¶ IV(C).

## C. **The Auction and Sale.**

16. If one or more Qualified Bid(s) is received by the Bid Deadline (other than the Stalking Horse Agreement), the Debtors will conduct an auction (the "Auction") to determine the highest and best Qualified Bid. This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, *inter alia*, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities and/or executory contracts or unexpired leases, if any; (iii) the ability of the Qualified Bidder to close the proposed Transaction; (iv) the proposed closing date and the likelihood, extent and impact of any potential delays in closing, including owing to regulatory uncertainty; (v) any purchase price adjustments; (vi) the impact of the Transaction on any actual or potential litigation; and (vii) the net after-tax consideration to be received by the Debtors' estates (collectively, the "Bid Assessment Criteria"). If no Qualified Bid (other than the Stalking Horse Agreement) is received by the Bid Deadline, the Debtors may determine not to conduct the Auction. The Debtors seek authority from the Court to schedule the Auction on a date as further described in the Bid Procedures.

## IV.
## Relief Requested

17. The Debtors respectfully request the entry of (I) an Order (A) Approving Bid Procedures; (B) Approving a Break-Up Fee and Expense Reimbursement; (C) Approving the Stalking Horse Purchaser's Right to Credit Bid; (D) Approving the Form and Manner of Notices; (E) Approving the Procedures for the Assumption and Assignment of Contracts and Leases; and (F) Setting a Sale Hearing (the "Bid Procedures Order"); and (II) an Order Pursuant to 11 U.S.C. 363 and 365 (A) Authorizing and Approving Asset Purchase Agreement by and among the

11

Debtors, as Sellers, and Palm Harbor Homes, Inc., a Delaware Corporation, as Purchaser, or

Such Other Purchase Agreement(s) Between the Debtors and the Successful Bidder, Free and

Clear of All Liens, Claims, Encumbrances and Interests; (B) Authorizing and Approving the

Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in

Connection Therewith; and (C) Granting Related Relief (the "Sale Order").

## V.
## Basis for Relief

**A.** **The Bid Procedures Are Appropriate and in the Best Interests of the Debtors, Their Estates and Their Creditors**

    **i.** **The Proposed Notice of the Bid Procedures and the Sale Process Is Appropriate**

18.    The Debtors seek to sell the Transferred Assets through an Auction and Asset

Sale. The Debtors and Raymond James have already conducted an extensive prepetition

marketing process. Moreover, the Debtors have developed a list of Contact Parties who will

receive a copy of the Information Package (as defined in the Bid Procedures). The list of

Contact Parties was specifically designed to encompass those parties whom the Debtors believe

may be potentially interested in pursuing a Transaction and whom the Debtors reasonably

believe may have the financial resources to consummate a Transaction. The Bid Procedures are

designed to elicit bids from one or more parties and to encourage a robust auction of the

Transferred Assets, thus maximizing the value for the Debtors' estates and their creditors.

19.    Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify

creditors of the proposed sale of the Transferred Assets, including a disclosure of the time and

place of any auction, the terms and conditions of a sale, and the deadline for filing any

objections.

20.     Therefore, the Debtors will serve this Bidding Procedures and Sale Motion on all Notice Parties (as defined herein). Within two business days of the entry of the Bid Procedures Order, the Debtors (or their agents) shall serve a notice substantially in the form attached hereto as Exhibit C (the "Sale Notice") that will provide notice of the terms, dates and deadlines relating to the Bidding Procedures, the Auction, the Sale Hearing and contract assignment procedures upon: (a) the United States Trustee for the District of Delaware; (b) the United States Attorney for the District of Delaware; (c) the Internal Revenue Service; (d) the Securities and Exchange Commission; (e) the Debtors' thirty largest unsecured creditors on a consolidated basis; (f) counsel to the Committee (if one is appointed); (g) counsel to the DIP Lender and the Stalking Horse Purchaser; (h) counsel to Textron, the Debtors' prepetition lender; (i) each of the Debtors' cash management banks; (j) all persons or entities known to be asserting a lien on any of the Transferred Assets; (k) all persons or entities known to have expressed an interest in acquiring any of the Transferred Assets; and (l) all persons or entities who have requested notice pursuant to Bankruptcy Rule 2002. Additionally, within two business days of the entry of the Bid Procedures Order, the Debtors (or their agents) shall serve a notice in substantially the form as that appearing in Exhibit D (the "Creditor Notice") upon all of the parties set forth on the Debtors' creditor matrix who were not served with a Sale Notice. Finally, the Debtors propose to publish the notice attached hereto as Exhibit E (the "Bid Procedures Notice") once in the *USA Today* within five business days after entry of the Bid Procedures Order.

21.     The Debtors believe that the foregoing notice is sufficient to provide effective notice of the Bid Procedures, the Auction, the Asset Sale and the Sale Hearing to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates.

13

Accordingly, the Debtors respectfully request that the Court find that the proposed notice

procedures set forth in this Motion are sufficient, and that no other or further notice of the Bid

Procedures, Auction, Asset Sale or Sale Hearing is required.

## ii. The Bid Procedures Are Appropriate and Will Maximize Value

22. Bid procedures should be approved when they provide a benefit to the debtor's

estate by maximizing the value of the debtor's assets. See In re Edwards, 228 B.R. 552, 361

(Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and

fair public sale designed to maximize value for the estate.").

23. The paramount goal in any proposed sale of property of the estate is to maximize

the proceeds received by the estate. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339

(3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's

assets"); Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery, 330 F.3d 548,

573 (3d Cir. 2003) (same); Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.), 107

F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to

enhance the value of the estate at hand").

24. To that end, courts uniformly recognize that procedures to enhance competitive

bidding are consistent with the goal of maximizing the value received by the estate and therefore

are appropriate in the context of bankruptcy transactions. See In re O'Brien Envtl. Energy, Inc.,

181 F.3d 527, 537 (3d Cir. 1999); see also Official Comm. of Subordinated Bondholders v.

Integrated Res. Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding

procedures "encourage bidding . . . maximize the value of the debtor's assets").

25. The Debtors believe that the Bid Procedures will establish the parameters under

which the value of the Transaction may be tested at the Auction. The Bid Procedures will

14

increase the likelihood that the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

26.     The Debtors also believe that the Bid Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Transferred Assets. The Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a Transaction. The Debtors believe that the Bid Procedures will encourage bidding, that they are consistent with other procedures previously approved by courts in this and other districts and that the Bid Procedures are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. See, e.g., In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537; see also In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. July 14, 2007); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007); In re Three A's Holdings, L.L.C., Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006).

27.     Thus, the Bid Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances because the Bid Procedures are designed to maximize the value to be received by the Debtors' estates.

### iii.     The Initial and Subsequent Overbids Are Appropriate

28.     One important component of the Bid Procedures is the "overbid" provision. Once the Debtors determine the Auction Baseline Bid and hold the Auction, all subsequent Overbids must be made in increments of at least $100,000 more than the Auction Baseline Bid (the "Initial Minimum Overbid") and then continue in minimum increments of at least $100,000; provided that the Debtors shall retain the right to modify the bid increment requirements at the Auction.

15

29.     The Debtors believe that such Initial Minimum Overbid is reasonable under the circumstances, and will enable the Debtors to maximize the value for such the Transferred Assets while limiting any chilling effect in the marketing process.  The overbid increment is also consistent with such increments previously approved by courts in this District.  See In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (approving $750,000 increment); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007) (approving $500,000 increment); In re Three A's Holdings, L.L.C., Case No. 06-10886 (BLS) (Bankr D. Del. Sept. 7, 2006) (approving $500,000 increment).

### iv.     The Expense Reimbursement and the Break-Up Fee Are Reasonable and Appropriate

30.     The Expense Reimbursement and the Break-Up Fee are (i) reasonable and appropriate, including in light of the size and nature of the Transaction and the efforts that have been or will be expended by the Stalking Horse Purchaser notwithstanding that the proposed Transaction is subject to higher or otherwise better offers for the Transferred Assets; (ii) were negotiated by the parties at arm's length and in good faith; (iii) are necessary to ensure that the Stalking Horse Purchaser will continue to pursue its proposed acquisition of the Transferred Assets; and (iv) are commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Purchaser by increasing the likelihood that the Debtors will receive the best possible value for the Transferred Assets.  The Expense Reimbursement and Break-Up Fee also induced the Staking Horse Purchaser to submit a bid that will serve as a minimum floor bid on which the Debtors, their creditors and other bidders may rely.  The Debtors have determined that pursuing the Transaction is in the best interests of the Debtors, their creditors and their estates, and therefore submit that agreeing to the Expense Reimbursement and the Break-Up Fee represents an appropriate exercise of the Debtors' business judgment.

31.     Bankruptcy courts have approved bidding incentives, including traditional expense reimbursement provisions, under the business judgment rule, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See e.g., In re Integrated Res., 147 B.R. at 662 (approving termination fee plus reimbursement of expenses); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking"). The Debtors submit that the Expense Reimbursement and the Break-Up Fee are reasonable, are legitimately necessary to convince the Stalking Horse Purchaser to go forward with the Transaction, and that agreeing to the Expense Reimbursement and the Break-Up Fee represents a valid exercise of the Debtors' business judgment.

### v.     The Proposed Notice Procedures for the Assumed Contracts and the Identification of Related Cure Amounts Are Appropriate

32.     As part of the Motion, the Debtors also seek authority under sections 105(a) and 365 to assume and assign the Assumed Contracts to the Successful Bidder. The Bid Procedures specify the process by which the Debtors will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for Contract Counterparties to Assumed Contracts to file and serve Cure or Assignment Objections.

33.     Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assumed Contract, at the closing of the Transaction, the Successful Bidder shall cure those defaults under the Assumed Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by (a) payment of the undisputed cure amount (the "Cure Amount") and/or (b) reserving amounts with respect to any disputed cure amounts.

17

**B.** **Approval of the Proposed Sale Transaction Is Appropriate and in the Best Interests of the Estates**

**i.** **The Sale of the Transferred Assets is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment**

34.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not specify a

standard for determining when it is appropriate for a court to authorize the use, sale or lease of

property of the estate, courts routinely authorize sales of a debtor's assets if such sale is based

upon the sound business judgment of the debtor. See Meyers v. Martin (In re Martin), 91 F.3d

389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del.

1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 174 (D. Del. 1991).

35.     Courts typically consider the following factors in determining whether a proposed

sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b)

whether adequate and reasonable notice of the sale was given to interested parties; (c) whether

the sale will produce a fair and reasonable price for the property; and (d) whether the parties

have acted in good faith. See In re Delaware & Hudson Ry. Co., 124 B.R. at 176; In re Phoenix

Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

36.     A sound business purpose for the sale of a debtor's assets outside the ordinary

course of business may be found where such a sale is necessary to preserve the value of assets

for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Pennsylvania,

Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).

37.     Furthermore, "[w]here the debtor articulates a reasonable basis for its business

decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not

entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants and/or

18

Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

38. The value of the Transferred Assets will be tested through the Auction conducted pursuant to and according to the Bid Procedures. Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

39. Thus, the Debtors submit that the Stalking Horse Agreement or, as the case may be, a sale agreement with the Successful Bidder(s), will constitute the highest or otherwise best offer for the Transferred Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Transferred Assets through an Auction process and subsequently to enter into the Stalking Horse Agreement with the Stalking Horse Purchaser or, alternatively enter into a sale agreement with the Successful Bidder(s), will be a valid and sound exercise of the Debtors' business

judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court make a finding that the proposed sale of the Transferred Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

ii. **Sale Provisions Highlighted Pursuant to Local Rule 6004-1(b)(iv).[4]**

40. Pursuant to Local Rule 6004(b)(iv)(C), a sale motion must highlight any provisions pursuant to which an entity is being released or claims against any entity are being waived or otherwise satisfied. The Sale Order provides that certain claims against the Debtors and/or the Purchaser are barred or otherwise waived. See Sale Order, ¶¶ 21, 22 and 25.

41. Pursuant to Local Rule 6004(b)(iv)(E), a sale motion must highlight any deadlines for the closing of the proposed sale or deadlines that are conditions to closing the proposed transaction. As set forth above, the Debtors are subject to the Sale Deadlines under the DIP Facility, among which include the condition that the Transaction contemplated by this Bid Procedures and Sale Motion close by the earlier of 60 days after the Court's entry of the Sale Order or 135 days after the Petition Date.

42. Pursuant to Local Rule 6004(1)(b)(iv)(J), a sale motion must highlight whether, if the debtor proposes to sell substantially all of its assets, the debtor will retain or have reasonable access to its books and records to enable it to administer its bankruptcy case. The Stalking Horse Agreement provides that the Debtors shall have reasonable access to their books and records. Stalking Horse Agreement, § 5.8.

43. Pursuant to Local Rule 6004-1(b)(iv)(L), a sale motion should highlight any provision limiting the proposed purchaser's successor liability. Paragraph 22 of the proposed

---

[4] If a provision of Local Rule 6004-1(b)(iv) is not discussed in this section, it means that the provisions governing the sale of the Transferred Assets do not contain a provision that triggers disclosure under that rule.

CHI1 1730247v.3

Sale Order provides that the Stalking Horse Purchaser shall not have any successor liability related to the Debtors or the Transferred Assets.

44. Pursuant to Local Rule 6004-1(b)(iv)(N), a sale motion must highlight any provision by which the debtor seeks to allow credit bidding pursuant to Bankruptcy Code section 363(k). The Bidding Procedures allow the Stalking Horse Purchaser to credit bid the full amount of the DIP Lender's claim pursuant to any Overbid in connection with each round of bidding at the Auction. See Bidding Procedures, § IV(b)(1).

45. Pursuant to Local Rule 6004-1(b)(iv)(O), a sale motion must highlight any provision whereby the debtor seeks relief from the ten-day stay imposed by Bankruptcy Rule 6004(h). As explained in further detail below, to maximize the value received for the Transferred Assets, the Debtors seek to close the Transaction as soon as possible after the Sale Hearing. Accordingly, the Debtors have requested that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d). See Sale Order, ¶ 29.

### iii. The Sale of the Transferred Assets Free and Clear of Claims and Interests Is Authorized by Section 363(1) of the Bankruptcy Code

46. The Debtors further submit that it is appropriate to sell the Transferred Assets free and clear of all claims and interests (collectively, the "Claims and Interests") pursuant to section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Transferred Assets, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

(a) applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(b) such entity consents;

21

(c)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

47.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

48.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Transferred Assets "free and clear" of all Claims and Interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); Citcorp Homeowners Servs., Inc. v. Eliot (In re Eliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met).

49.     The Debtors believe that one or more of the tests of section 363(f) of the Bankruptcy Code will be satisfied with respect to the transfer of the Transferred Assets pursuant to the Stalking Horse Agreement or, as the case may be, an agreement with the Successful Bidder. In particular, the Debtors believe that at least section 363(f)(2) of the Bankruptcy Code will be met in connection with the Transaction because each of the parties holding liens on the

22

Transferred Assets, if any, will consent, or absent any objection to this Bid Procedures and Sale Motion, will be deemed to have consented to, the sale and transfer of the Transferred Assets.

50.     Any lienholder also will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtors for the sale of the Transferred Assets to the Stalking Horse Purchaser or, as the case may be, to the Successful Bidder, in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. Accordingly, section 363(f) of the Bankruptcy Code authorizes the sale and transfer of the Transferred Assets free and clear any such Claims and Interests.

### iv.     The Transferred Assets and Assigned Contracts Should Be Sold Free and Clear of Successor Liability

51.     The Sale Order provides that the Purchaser shall not have any successor liability related to Seller or the Transferred Assets to the maximum extent permitted by law. See Sale Order, ¶ 22. Extensive case law exists providing that claims against a winning bidder are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a buyer.

52.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000). In the case of In re Trans World Airlines. Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modem cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of

23

the property.'" Id. at 289 (citing 3 Collier on Bankruptcy 363.06[1]). As determined by the

Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-82 (4th Cir. 1996), a case

cited approvingly and extensively by the Third Circuit in Folger, the scope of section 363(f) is

not limited to *in rem* interests. Thus, the Third Circuit in Folger stated that Leckie held that the

debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise

would have arisen under federal statute." Folger, 209 F.3d at 258.

53.     Courts have consistently held that a buyer of a debtor's assets pursuant to a

section 363 sale takes free from successor liability resulting from pre-existing claims. See The

Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind.

1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest

that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Co. v.

Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988)

(channeling of claims to proceeds consistent with intent of sale free and clear under section

363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D.

Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII

employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53

B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest

permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In

re All Am. of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims

precluded on successor doctrine in a sale of assets free and clear); WBQ P'ship v. Virginia Dept.

of Medical Assistance Services (In re WBQ P'ship), 189 B.R. 97, 104-05 (Bankr E D. Va. 1995)

24

(Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[5]

54. The purpose of an order purporting to authorize the transfer of the Transferred Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against the Purchaser or, as the case may be, the Successful Bidder. Under section 363(f) of the Bankruptcy Code, the Purchaser or, as the case may be, the Successful Bidder is entitled to know that the Transferred Assets are not infected with latent claims that will be asserted against the Purchaser or the Successful Bidder after the proposed transaction is completed.

55. Accordingly, consistent with the above-cited case law, the order approving the sale of the Transferred Assets should state that the Purchaser or, as the case may be, the Successful Bidder is not liable as a successor under any theory of successor liability, for Claims or Interests that encumber or relate to the Transferred Assets.

      **v.    The Stalking Horse Purchaser or the Successful Bidder is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the Transfer and Sale of the Transferred Assets Does Not Violate Section 363(n) of the Bankruptcy Code**

56. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

---

[5] Even courts concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority. See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of liens poses no impediment to such a sale, as such authority is implicit in the court's equitable power when necessary to carry out the provisions of title 11).

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts Dairies of Pennsylvania, Inc. held that:

> [t]he requirement that a [buyer] act in . . . good faith speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [Proposed Buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citation omitted).

57. As such, a party would have to show fraud or collusion between the Purchaser or, as the case may be, the Successful Bidder and the Debtors or other Bidders to demonstrate a lack of good faith. See Kabro Assocs. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films, 57th, Inc., 1997 WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

58. The Purchaser and the Debtors have engaged in thorough arm's length negotiations over the terms of the Stalking Horse Agreement. Similarly, in the event someone other than the Purchaser is the Successful Bidder, by the time of execution of an agreement is executed by the Debtors and the Successful Bidder, the Debtors and the Successful Bidder will have engaged in thorough arm's length negotiations over the terms of such agreement. In addition, both the Purchaser and any Successful Bidder will have complied with the terms and conditions of the Bid Procedures Order.

59. Moreover, in this case, there will be absolutely no fraud or improper insider dealing of any kind. The Debtors will ensure that the Stalking Horse Agreement or, as the case

26

may be, an agreement with the Successful Bidder, does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and, as a result, the Purchaser or any Successful Bidder should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code. Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Stalking Horse Agreement or, as the case may be, an agreement with the Successful Bidder, reached with the Successful Bidder was at arm's length and is entitled to the full protections of section 363(m) of the Bankruptcy Code. The Debtors will submit evidence at the Sale Hearing to support these conclusions.

### vi.    Assumption and Assignment of the Assumed Contracts Is Authorized by Section 365 of the Bankruptcy Code

60.     Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —

(A)     cures or provides adequate assurance that the trustee will promptly cure, such default . . .;

(B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

27

61. The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superceded in part by 11 U.S.C. § 1113).

62. Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. See In re Decora Indus., Inc., 2002 WL 32332749, at *8 (D. Del. 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp., 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); see also Phar Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).[6]

63. In the present case, the Debtors' assumption and assignment of the Assumed Contracts to the Successful Bidder will meet the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Stalking Horse Agreement will provide significant benefits to the Debtors' estates. Because the Debtors may not be able to obtain the benefits of the Stalking Horse Agreement or, as the case may be, an agreement with the Successful Bidder, without the

---

[6] Further, "[n]othing in the Code suggests that the debtor may not modify its contracts when all parties to the contracts consent." In re Network Access Solutions, Corp., 330 B.R. at 74 (citations omitted). While "[s]ection 363 of the Bankruptcy Code allows a debtor to . . . modify contracts . [t]o the extent they are outside the ordinary course of business, court approval is necessary." Id. Regardless, "[t]here is ... no discernable difference in the notice requirements or standard for approval under section 363 or 365." Id.

28

assumption of the Assumed Contracts, the assumption of these Assumed Contracts is undoubtedly a sound exercise of the Debtors' business judgment.

64. Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

65. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

66. Counterparties to Assumed Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders. Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts as set forth herein should be approved.

29

67.     To assist in the assumption, assignment and sale of the Assumed Contracts, the

Debtors also request that the Sale Order approving the sale of the Transferred Assets provide that

anti-assignment provisions in the Assumed Contracts shall not restrict, limit or prohibit the

assumption, assignment and sale of the Assumed Contracts and are deemed and found to be

unenforceable anti-assignment provisions within the meaning of section 365(f) of the

Bankruptcy Code.

68.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired

leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or
> unexpired lease of the debtor, or in applicable law, that prohibits,
> restricts, or conditions the assignment of such contract or lease, the
> trustee may assign such contract or lease under paragraph (2) of
> this subsection . . . .

11 U.S.C. § 365(f)(1).

69.     Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates

provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired

lease. See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F.

3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from

permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when

to do so will effectuate the purposes of section 365") cert. denied, 522 U.S. 1148 (1998). Section

365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy

Code by prohibiting enforcement of any clause creating a right to modify or terminate the

contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway

Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy Code prohibits

enforcement of any lease clause creating right to terminate lease because it is being assumed or

30

assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

70. Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. See In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in In re Mr. Grocer., Inc., the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

### vii. Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

71. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign and executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that any order approving the Stalking Horse Agreement or, as the case may be, a

31

sale agreement with the Successful Bidder, and assumption and assignment of the Assumed Contracts be effective immediately by providing that the ten-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

72.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, the leading treatise on bankruptcy suggests that the ten-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bankruptcy ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, Collier suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

73.     To maximize the value received for the Transferred Assets, the Debtors seek to close the Transaction as soon as possible after the Sale Hearing.  Accordingly, the Debtors respectfully request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## VI.
## No Prior Request

74.     No prior motion for the relief requested herein has been made to this or any other court.

## VII.
## Notice

75.     The Debtors have provided this Bid Procedures and Sale Motion and notice hereof to: (i) the United States Trustee for the District of Delaware; (ii) the United States

32

Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Securities and Exchange Commission; (v) the Debtors' thirty largest unsecured creditors on a consolidated basis; (vi) counsel to the Committee (if one is appointed); (vii) counsel to the DIP Lender and the Stalking Horse Purchaser; and (viii) counsel to Textron (collectively, the "Notice Parties"). The Debtors will provide notice of this Bid Procedures and Sale Motion and the hearing hereon to (in addition to the Notice Parties): (a) each of the Debtors' cash management banks; (b) all persons or entities known to be asserting a lien on any of the Transferred Assets; (c) all persons or entities known to have expressed an interest in acquiring any of the Transferred Assets; (d) all persons or entities who have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court: (a) enter the Bid Procedures Order, the form of which is attached as **Exhibit F**; (b) enter the Sale Order, the form of which is attached as **Exhibit G**; and (c) grant such other and further relief as is just and proper.

Dated: Wilmington, Delaware       Respectfully submitted,
       November 29, 2010

                                 LOCKE LORD BISSELL & LIDDELL LLP
                                 David W. Wirt (Pro Hac Vice Motion Pending)
                                 Aaron C. Smith (Pro Hac Vice Motion Pending)
                                 Courtney E. Barr (Pro Hac Vice Motion Pending)
                                 111 S. Wacker Drive
                                 Chicago, Illinois 60606-4410
                                 Telephone: (312) 443-0700
                                 Fax: (312) 443-0336

-and-

POLSINELLI SHUGHART PC

_/s/ Christopher A. Ward_
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Fax: (302) 252-0921

PROPOSED COUNSEL FOR THE DEBTORS

CHI1 1730247v.3