## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PALM HARBOR HOMES, <u>et al.</u>,[1] | ) | Case No. 10-13850 (CSS) |
| | ) | |
| Debtors | ) | Jointly Administered |

---

**~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT FOR THE JOINT PLAN OF LIQUIDATION PROPOSED BY DEBTORS AND COMMITTEE FOR PALM HARBOR HOMES, INC. AND ITS RELATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

### <u>IMPORTANT DATES:</u>

- Voting Deadline by which Ballots or Master Ballots must be received: [_____], 2011 at 4:00 p.m. (prevailing Eastern Time)

- Deadline by which to file and serve objections to Confirmation of the Plan: [_____], 2011 at 4:00 p.m. (prevailing Eastern Time)

- Hearing on Confirmation of the Plan: [_____], 2011 at [__]:[__] p.m. (prevailing Eastern Time)

> **THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.**

David W. Wirt
Aaron C. Smith
Courtney E. Barr
LOCKE LORD BISSELL & LIDDELL LLP
111 S. Wacker Drive
Chicago, Illinois 60606-4410
Telephone: (312) 443-0485
Fax: (312) 443-0336

and

Christopher A. Ward (Del. Bar No. 3877)

Laura Davis Jones (Bar No. 2436)
Robert J. Feinstein (NY Bar No. RF-2836)
Shirley S. Cho (CA Bar No. 192616)
James E. O'Neill (Bar No. 4042)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Counsel to the Official Committee of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Palm Harbor Homes, Inc., a Florida corporation (6634); Palm Harbor Albemarle, LLC (1014); Nationwide Homes, Inc. (4881); Palm Harbor Real Estate, LLC (8234); Palm Harbor GenPar, LLC (0198); and Palm Harbor Manufacturing, LP (0199). The location of the Debtors' corporate headquarters and service address is: Alvarez & Marsal, c/o Palm Harbor Winddown; 2100 Ross Avenue, 21st Floor, Dallas, TX 75201.

Justin K. Edelson (Del. Bar No. 5002)            Unsecured Creditors
POLSINELLI SHUGHART PC
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Fax: (302) 252-0921

Co-Counsel to the Debtors

                                    Counsel to the Debtors
Dated: _____September 21.26, 2011_____

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 PM PREVAILING EASTERN TIME ON [_____], 2011 UNLESS THE PROPONENTS EXTEND THE VOTING DEADLINE. TO BE COUNTED THE VOTING AGENT MUST <u>ACTUALLY RECEIVE</u> YOUR BALLOT OR MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN, AND ANY EXHIBITS ATTACHED HERETO IS <u>HIGHLY SPECULATIVE</u> AND SUCH DOCUMENTS SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO (A) THE DEBTORS OR (B) ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.**

**TABLE OF CONTENTS**

I.    INTRODUCTION AND GENERAL BACKGROUND.............................................................................1

      A.    PURPOSE AND EFFECT OF THE PLAN .................................................................................3

      B.    OVERVIEW OF CHAPTER 11 ....................................................................................................4

      C.    SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS
            AND EQUITY INTERESTS UNDER THE PLAN ....................................................................4

      D.    ENTITIES ENTITLED TO VOTE ON THE PLAN .................................................................6

      E.    SOLICITATION PROCESS...........................................................................................................7

      F.    VOTING PROCEDURES ..............................................................................................................8

      G.    CONFIRMATION HEARING .......................................................................................................8

      H.    CONFIRMATION AND CONSUMMATION OF THE PLAN ..............................................9

      I.    RISK FACTORS .............................................................................................................................9

II.   BACKGROUND TO THESE CHAPTER 11 CASES .......................................................................10

      A.    INTRODUCTORY NOTE.............................................................................................................10

      B.    OVERVIEW OF THE DEBTORS' BUSINESS ........................................................................10

      C.    DEBT AND CAPITAL STRUCTURE OF THE DEBTORS.................................................11

III.  EVENTS LEADING UP TO CHAPTER 11 .......................................................................................12

      A.    REASONS FOR FINANCIAL DISTRESS ..............................................................................12

      B.    DESCRIPTION OF PREPETITION RESTRUCTURING EFFORTS.................................12

IV.   CHAPTER 11 CASES OF THE DEBTORS .......................................................................................13

      A.    FIRST DAY MOTIONS AND ORDERS...................................................................................13

      B.    OTHER MOTIONS AND PLEADINGS ..................................................................................16

V.    SUMMARY OF THE PLAN ....................................................................................................................20

      A.    ADMINISTRATIVE CLAIMS, 3.25% CONVERTIBLE SENIOR NOTE INDENTURE
            TRUSTEE CLAIMS, AND PRIORITY TAX CLAIMS.........................................................20

      B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY
            INTERESTS ..................................................................................................................................21

      C.    ACCEPTANCE OR REJECTION OF THE PLAN..................................................................24

      D.    MEANS FOR IMPLEMENTATION OF THE PLAN .............................................................25

      E.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................~~37~~38

      F.    PROVISIONS GOVERNING DISTRIBUTIONS .......................................................................~~38~~39

      G.    THE POST-CONSUMMATION TRUST AND THE POST-CONSUMMATION TRUST
            ADMINISTRATOR....................................................................................................................~~42~~43

      H.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
            DISPUTED CLAIMS .................................................................................................................~~47~~48

      I.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
            THE PLAN ...................................................................................................................................~~48~~49

      J.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS.......................~~49~~50

      K.    BINDING NATURE OF PLAN .................................................................................................~~52~~53

| | L. | RETENTION OF JURISDICTION | ~~52~~53 |
|---|---|---|---|
| | M. | MISCELLANEOUS PROVISIONS | ~~53~~54 |
| VI. | | CONFIRMATION PROCEDURES | ~~55~~56 |
| | A. | CONFIRMATION HEARING | ~~55~~56 |
| | B. | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | ~~56~~57 |
| | C. | RISK FACTORS | ~~60~~61 |
| | D. | CONTACT FOR MORE INFORMATION | ~~60~~61 |
| VII. | | PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | ~~60~~61 |
| | A. | GENERAL BANKRUPTCY LAW AND PLAN RELATED CONSIDERATIONS | ~~60~~61 |
| | B. | RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS | ~~62~~63 |
| | C. | DISCLOSURE STATEMENT DISCLAIMER | ~~62~~63 |
| | D. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | ~~64~~65 |
| VIII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | ~~64~~65 |
| | A. | GENERAL TAX CONSIDERATIONS | ~~64~~65 |
| | B. | FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS | ~~65~~66 |
| | C. | FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS | ~~65~~66 |
| | D. | RESERVATION OF RIGHTS | ~~68~~69 |
| IX. | | GLOSSARY OF DEFINED TERMS | ~~68~~69 |
| X. | | CONCLUSION AND RECOMMENDATION | ~~77~~78 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Joint Plan of Liquidation Proposed by Debtors and Committee For Palm Harbor Homes, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code |
| Exhibit B | Signed Disclosure Statement Order (with the Solicitation Procedures attached thereto as <u>Exhibit 1</u>) |
| Exhibit C | Corporate Structure Chart as of the Petition Date |
| Exhibit D | Liquidation Analysis |

# I.    INTRODUCTION AND GENERAL BACKGROUND

On November 29, 2010 (the "Petition Date"), each of Palm Harbor Homes, Inc. and its related Debtors, as debtors and debtors in possession (collectively, "Palm Harbor" or the "Debtors"),[2] filed voluntary petitions with the Bankruptcy Court commencing their cases under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors, together with the Official Committee of Unsecured Creditors appointed in the Debtors' Chapter 11 Cases (the "Proponents") submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims in connection with: (a) the solicitation of votes to accept or reject the *Joint Plan of Liquidation Proposed by Debtors and Committee For Palm Harbor Homes, Inc. and Its Related Debtors Under Chapter 11 of the Bankruptcy Code* (as the same may be amended from time to time, the "Plan"), which was filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and (b) the Confirmation Hearing (the "Confirmation Hearing"), which is scheduled for [_____], 2011, at [__]:[__] p.m. prevailing Eastern Time (the "Confirmation Hearing Date"). A copy of the Plan is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

The Plan is a liquidating plan. Pursuant to prior orders of the Bankruptcy Court, the Debtors have sold or will sell substantially all of their Assets. The Plan provides for the distribution of certain proceeds from such sales and the creation of a liquidating trust that will administer and liquidate all remaining property of the Debtors, including Causes of Action, not sold, transferred or otherwise waived or released before the Effective Date of the Plan. The Plan further provides for the substantive consolidation of all of the Debtors, the termination of all Equity Interests in the Debtors, the dissolution and wind-up of the affairs of the Debtors, and the transfer of any remaining Assets to the liquidating trust referred to as the "Post-Consummation Trust". The Plan also provides for distributions to certain Holders of Administrative Claims and Priority Claims and to other Claimholders and the funding of the Post-Consummation Trust.

The purpose of this Disclosure Statement is to set forth information (a) regarding the history of the Debtors, their businesses and the Chapter 11 Cases, (b) concerning the Plan and alternatives to the Plan, (c) advising the Holders of Claims and Equity Interests of their rights under the Plan and (d) assisting the Holders of Claims in making an informed judgment regarding whether they should vote to accept or reject the Plan.

By order dated [_____], 2011 (the "Disclosure Statement Order"), the Bankruptcy Court approved this Disclosure Statement, in accordance with section 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of Holders of Claims against, or Equity Interests in, the Debtors to make an informed judgment as to whether to accept or reject the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots and Master Ballots. In addition, detailed voting instructions accompany each Ballot and Master Ballot. Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballot or Master Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN**. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan and all exhibits and appendices hereto and thereto.

The Proponents will file a plan supplement (the "Plan Supplement") as early as practicable but in no event less than ten (10) Business Days prior to the Voting Deadline, or on such other date as may be established by the

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in Section X herein entitled, "Glossary of Defined Terms." To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the "Glossary of Defined Terms" are inconsistent, the definition included in the Glossary of Defined Terms shall control.

Bankruptcy Court. The Plan Supplement will contain, among other things, the list of Assumed Contracts. The Plan Supplement will only be served on counterparties whose contracts are proposed to be assumed. However, parties may obtain a copy of the Plan Supplement (i) from the Debtors' Voting and Claims Agent (a) at its website at http://www.bmcgroup.com/palmharborhomes, (b) by writing to BMC Group, Inc., Attn: Palm Harbor Homes, Inc. Claims Processing, PO Box 3020, Chanhassen, MN 55317-3020, (c) by calling (888) 909-0100, or (d) by emailing BMC-PalmHarbor@bmcgroup.com; or (ii) for a fee via PACER at http://www.deb.uscourts.gov/.

THE BOARDS OF DIRECTORS OF THE DEBTORS AND THE COMMITTEE EACH BELIEVE THAT THE PLAN PROVIDES FOR THE BEST AVAILABLE RECOVERY TO THE DEBTORS' STAKEHOLDERS. THE BOARDS OF DIRECTORS OF THE DEBTORS AND THE COMMITTEE EACH RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 3 AND 4 VOTE TO ACCEPT THE PLAN.

THE PROPONENTS ARE PROVIDING THE INFORMATION IN THIS ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT FOR THE JOINT PLAN OF LIQUIDATION PROPOSED BY DEBTORS AND COMMITTEE FOR PALM HARBOR HOMES, INC. AND ITS RELATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE TO HOLDERS OF CLAIMS IN IMPAIRED CLASSES FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

ON MARCH 4, 2011, THE BANKRUPTCY COURT ENTERED THE SALE ORDER. THE SALE ORDER APPROVED THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS PURSUANT TO THE PURCHASE AGREEMENT. THE DEBTORS AND THE PURCHASER HAVE CLOSED THE SALE CONTEMPLATED BY THE SALE ORDER.

A GLOSSARY OF DEFINED TERMS UTILIZED IN THIS DISCLOSURE STATEMENT IS SET FORTH IN SECTION X OF THIS DISCLOSURE STATEMENT. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DEFINED TERM IN THIS DISCLOSURE STATEMENT AND THE DEFINITION OF SUCH TERM IN THE PLAN, THE PLAN WILL GOVERN FOR ALL PURPOSES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE PROPONENTS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE PROPONENTS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE POST-CONFIRMATION TRUST MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER

11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE PROPONENTS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE PROPONENTS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE PROPONENTS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE PROPONENTS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE PROPONENTS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE PROPONENTS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE PROPONENTS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION VIII HEREIN, "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN."

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

A.      PURPOSE AND EFFECT OF THE PLAN

The primary purpose of the Plan is to provide for the orderly liquidation and distribution of the Assets and any other remaining Post-Confirmation Trust Assets to Holders of Allowed Claims.  Because substantially all of the Debtors' assets were sold as part of the Sale Transaction to the Purchaser, the Plan provides for the formation of the Post-Consummation Trust that will administer the Post-Consummation Trust Assets in accordance with the terms of the Plan.  The Proponents believe that the Plan provides the best recoveries possible for Holders of Allowed Claims and strongly recommend that, if such Holders are entitled to vote, they vote to accept the Plan.

IN THE EVENT VOTERS IN CLASSES 3 AND 4 DO NOT ACCEPT THIS CHAPTER 11 PLAN, THE PROPONENTS COULD ULTIMATELY PROPOSE ANOTHER PLAN OR ATTEMPT TO LIQUIDATE UNDER CHAPTER 7 OR CHAPTER 11 OF THE BANKRUPTCY CODE.

## B.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy petition date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan is the principal objective of a chapter 11 case.  The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan.  This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

## C.    SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

**THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS AND THE POTENTIAL DISTRIBUTIONS UNDER THE PLAN. THE AMOUNTS SET FORTH BELOW ARE ESTIMATES ONLY.  ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE FINAL AMOUNTS ALLOWED BY THE BANKRUPTCY COURT.  AS A RESULT OF THE FOREGOING AND OTHER UNCERTAINTIES WHICH ARE INHERENT IN THE ESTIMATES, THE ESTIMATED RECOVERIES IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE ACTUAL RECOVERIES RECEIVED.  IN ADDITION, THE ABILITY TO RECEIVE DISTRIBUTIONS UNDER THE PLAN DEPENDS UPON THE ABILITY OF THE PROPONENTS TO OBTAIN CONFIRMATION OF THE PLAN AND MEET THE CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN, AS DISCUSSED IN THIS DISCLOSURE STATEMENT.  THE RECOVERIES SET FORTH BELOW ARE PROJECTED RECOVERIES ONLY AND MAY CHANGE BASED UPON CHANGES IN THE AMOUNT OF ALLOWED CLAIMS AS WELL AS OTHER FACTORS RELATED TO THE DEBTORS' BUSINESS OPERATIONS AND GENERAL ECONOMIC CONDITIONS.  REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AGAINST AND EQUITY INTERESTS IN EACH OF THE DEBTORS.**

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Type of Claim or Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|:---:|---|---|:---:|
| 1 | Other Priority Claims | The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered. Unless otherwise agreed to by Holders of Allowed Class 1 Claims and the Post-Consummation Trust Administrator, subject to the approval of the Post-Consummation Trust Oversight Committee, each Holder of an Allowed Class 1 Claim shall receive, in full and final satisfaction of such Allowed Class 1 Claim, payment of the Allowed Class 1 Claim in full in Cash on or as soon as reasonably practicable after the Effective Date in accordance with Article VII of the Plan. | 100% |
| 2 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall be placed in a separate subclass, and each subclass will be treated as a separate Class for distribution purposes. Unless otherwise agreed to by Holders of Allowed Class 2 Claims and the Post-Consummation Trust Administrator, subject to the approval of the Post-Consummation Trust Oversight Committee, each Holder of an Allowed Class 2 Claim shall receive, in full and final satisfaction of such Allowed Class 2 Claim, on or as soon as reasonably practicable after the Effective Date in accordance with Article VII of the Plan:<br><br>(i) the collateral securing such Allowed Other Secured Claim; or<br><br>(ii) a Cash distribution in an amount equal to the value of such collateral. | 100% |
| 3 | 3.25% Convertible Senior Notes Claims | Holders of Allowed 3.25% Convertible Senior Notes Claims will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for each 3.25% Convertible Senior Notes Claim, their Pro Rata share of the available Cash and/or other consideration, including proceeds of the Post-Consummation Trust Assets. Upon the Effective Date, the 3.25% Convertible Senior Notes Claim shall be an Allowed Claim in the amount of $54,783,174.34. Any Claims filed by beneficiaries of the 3.25% Convertible Senior Notes Indenture other than the 3.25% Convertible Senior Notes Indenture Trustee shall be deemed superseded or amended by the 3.25% Convertible Senior Notes Claim. | 16.7 – 21% |

| Class | Type of Claim or Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 4 | General Unsecured Claims | Holders of Allowed General Unsecured Claims will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed General Unsecured Claims held against the Debtors, their Pro Rata share of the available Cash and/or other consideration, including proceeds of the Post-Consummation Trust Assets. The Debtors estimate that the total amount of Class 4 claims will range from $36,400,000 to $47,300,000. | 16.7 – 21% |
| 5 | Intercompany Claims | Intercompany Claims are extinguished under the Plan and Holders of Class 5 Intercompany Claims will not receive any distribution on account of such interests. | 0% |
| 6 | Equity Interests | Equity Interests in the Debtors will not receive any distribution on account of such interests. | 0% |

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and are excluded from the foregoing classification (as set forth in Article III.A of the Plan). The treatment of such Claims is described below in section V.A.

**D.     ENTITIES ENTITLED TO VOTE ON THE PLAN**

Under the Bankruptcy Code, not all holders of claims against, and equity interests in, a debtor are entitled to vote on a chapter 11 plan. Holders of Claims that are Unimpaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan. Holders of Claims or Equity Interests Impaired by the Plan and receiving no distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The Plan classifies Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or an Equity Interest to be classified in a particular Class only to the extent that the Claim or the Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of the Claim or Equity Interest qualifies within the description of a different Class.

**SUMMARY OF STATUS AND VOTING RIGHTS**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | 3.25% Convertible Senior Notes Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Deemed to Reject |
| 6 | Equity Interests | Impaired | Deemed to Reject |

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

- The Proponents are **NOT** seeking votes from the Holders of Other Priority Claims in Class 1 and Other Secured Claims in Class 2 because those Classes, and the Claims of any Holders in those Classes, are Unimpaired under the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, those Classes are deemed to have accepted the Plan.

- The Proponents are **NOT** seeking votes from the Holders of Intercompany Claims in Class 5 and Equity Interests in Class 6. Instead, the Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to Classes 5 and 6. Classes 5 and 6 are Impaired and will receive no distribution under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, Classes 5 and 6 are deemed to have rejected the Plan.

- The Proponents **ARE** soliciting votes to accept or reject the Plan from Holders of 3.25% Convertible Senior Notes Claims in Class 3 and General Unsecured Claims in Class 4 (collectively, the "Voting Classes"), because Allowed Claims in the Voting Classes are Impaired under the Plan and are expected to receive distributions under the Plan. Accordingly, Holders of Allowed Claims in the Voting Classes have the right to vote to accept or reject the Plan.

For a detailed description of the Classes of Claims and the Classes of Equity Interests, as well as their respective treatment under the Plan, please refer to Article III of the Plan.

## E.    SOLICITATION PROCESS

### 1.    Voting and Claims Agent

The Debtors have retained BMC Group, Inc. ("BMC" or the "Voting and Claims Agent") to, among other things, act as solicitation agent in connection with the solicitation of votes to accept or reject the Plan. Moreover, with respect to Holders of the 3.25% Convertible Senior Notes Claims, the Voting and Claims Agent shall deliver Ballots and accompanying instructions to the record holders of such 3.25% Convertible Senior Notes together with a Master Ballot. The record holders of the 3.25% Convertible Senior Notes include, without limitation, representatives such as brokers, banks, commercial banks, transfer agents, trust companies, dealers, or other agents or nominees (collectively, the "Voting Nominees"). The Voting and Claims Agent will provide each Voting Nominee with reasonably sufficient numbers of Solicitation packages (as defined below), including sufficient Ballots to distribute to the beneficial owners of the 3.25% Convertible Senior Notes Claims for whom such Voting Nominee acts.

### 2.    Solicitation Package

The following documents and materials will constitute the solicitation package (collectively, the "Solicitation Package"):

- a cover letter: (i) describing the contents of the Solicitation Package; (ii) explaining that the Plan Supplement will be filed on or before ten Business Days prior to the Voting Deadline; and (iii) urging the Holders in the Voting Classes to vote to accept the Plan;

- the Disclosure Statement Order (with the Solicitation Procedures, which shall be Exhibit 1 attached thereto);

- an appropriate form of Ballot or Master Ballot and instructions with respect thereto, if applicable;

- the notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

- the approved form of the Disclosure Statement (together with the Plan, which is attached as <u>Exhibit A</u> thereto) in paper format; and

## F.     VOTING PROCEDURES

### 1.     Record Date

**The Record Date is [            ], 2011, the date that the Disclosure Statement Hearing is scheduled to commence.**  The Record Date is the date on which the following will be determined: (a) the Holders of Claims (including holders of bonds, debentures, notes, and other securities) that are entitled to receive the Solicitation Package in accordance with the Solicitation Procedures; (b) the Holders of Claims that are entitled to vote to accept the Plan; (c) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that such assignee can vote as the Holder of a Claim; and (d) the identity of the Holders of Equity Interests for noticing purposes.

### 2.     Voting Deadline

**The Voting Deadline shall be 4:00 p.m. prevailing Eastern Time on [            ], 2011.**  To be counted as votes to accept or reject the Plan, all Ballots or Master Ballots must be properly executed, completed and delivered according to their applicable ballot instructions so that they are **actually received** no later than the Voting Deadline.

---

**IF A BALLOT OR MASTER BALLOT IS RECEIVED AFTER THE VOTING DEADLINE IT WILL NOT BE COUNTED UNLESS THE PROPONENTS DETERMINE OTHERWISE.**

---

**ANY BALLOT OR MASTER BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT OR MASTER BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT OR MASTER BALLOT, EACH HOLDER OF A CLAIM CERTIFIES TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS OR MASTER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS OR MASTER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS OR MASTER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.**

**IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT OR MASTER BALLOT, AS APPROPRIATE, WHEN SUBMITTING A VOTE.**

## G.     CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan filed under chapter 11 of the Bankruptcy Code.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the plan.

### 1.     Confirmation Hearing Date

The Confirmation Hearing will commence on [            ], 2011 at [    ]:[    ] p.m. prevailing Eastern Time, before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 5th Floor, Courtroom No. 6, 824 Market Street, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment

announced in open court at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

### 2. Plan Objection Deadline

The Plan Objection Deadline is 4:00 p.m. prevailing Eastern Time on [_____], 2011. All Plan Objections must be filed with the Bankruptcy Court and served on the Proponents and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline. In accordance with the Confirmation Hearing Notice filed with the Bankruptcy Court, Plan Objections or requests for modifications to the Plan, if any, must:

- be in writing;

- conform to the Bankruptcy Rules and the Local Bankruptcy Rules;

- state the name and address of the objecting Entity and the amount and nature of the Claim or Equity Interest of such Entity;

- state with particularity the basis and nature of the Plan Objection and, if practicable, a proposed modification to the Plan that would resolve such Plan Objection; and

- be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the notice parties identified in the Confirmation Hearing Notice on or prior to the Plan Objection Deadline.

The Proponents' proposed schedule will provide Entities sufficient notice of the Plan Objection Deadline, which will be at least 28 days, as required by Bankruptcy Rule 2002(b). The Proponents believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Proponents and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

> **THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

### H. CONFIRMATION AND CONSUMMATION OF THE PLAN

It will be a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article X.C of the Plan. Following Confirmation, the Plan will be consummated on the Effective Date.

### I. RISK FACTORS

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN SECTION VIII HEREIN ENTITLED, "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN."**

## II.    BACKGROUND TO THESE CHAPTER 11 CASES

### A.    INTRODUCTORY NOTE

As detailed more fully herein, on March 4, 2011, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") approved the Sale Transaction, whereby substantially all of the Debtors' assets were sold to Palm Harbor Homes, Inc., a Delaware corporation (the "Purchaser").  Following the closing of the Sale Transaction, the Debtors' estates now consist of cash, certain miscellaneous remaining assets, and causes of action against third parties.  As of the date of this Disclosure Statement, the Debtors hold cash in the amount of $21.4 million, excluding cash held in utility escrows and cash held as collateral for undrawn letters of credit.  Accordingly, the Plan contemplates that all remaining assets will be disposed of, all cash (net of expenses) will be distributed to creditors, and all administrative tasks required to complete the wind-down of the Debtors' estates and their ultimate dissolution will be completed.  In addition, the Plan sets forth how the net cash proceeds available for distribution to various creditor constituencies will be allocated and paid.

### B.    OVERVIEW OF THE DEBTORS' BUSINESS

#### 1.    Summary of the Debtors' Business

Before the consummation of the Sale Transaction, the Debtors were a leading manufacturer and marketer of factory-built homes in the United States.  They marketed nationally through vertically integrated operations: the Debtors built and developed manufactured and modular housing, and certain of the Debtors' non-debtor affiliates provided the purchasers of these manufactured and modular homes with financing and insurance.  As of the Petition Date, the Debtors operated eight manufacturing facilities in six states and sold their homes through a network of 54 company-owned retail sales centers and builder locations, and also through approximately 135 independent retail dealers, builders, and developers.  CountryPlace Acceptance Corp., a non-debtor subsidiary of Palm Harbor Corp. ("CountryPlace"), and its subsidiaries originated loans to purchasers of the Debtors' manufactured and modular housing, and subsequently sold these loans to investors.  Similarly, Standard Casualty Co., a non-debtor subsidiary of Palm Harbor Homes, Inc. ("Standard Casualty") and its subsidiaries offered property and casualty insurance to purchasers of the Debtors' manufactured and modular homes.

The Debtors manufactured a broad range of single and multi-section manufactured homes and modular homes under various brand names and in a variety of floor plans and price ranges prior to the consummation of the Sale Transaction.  Although approximately 78% of the homes built by the Debtors in 2010 were multi-section/modular ranch-style homes, the Debtors also built single-section homes, split-level homes, cape code style homes, two and three story homes, and multi-family units such as apartments and duplexes.  Approximately 80% of the Debtors' manufactured homes were produced as customized to a homebuyer's specifications.  During fiscal 2010, the average retail sales price (excluding land) of the Debtors' manufactured and modular homes was approximately $67,000 and $156,000, respectively.

The Debtors also produced commercial modular structures, including apartment buildings, condominiums, hotels, schools, and military barracks and other housing for U.S. military troops prior to the consummation of the Sale Transaction.  Commercial buildings were constructed in the same factories and using the same assembly lines as the factories where the Debtors produced their factory-built homes.  These commercial projects were generally engineered to the purchasers' specifications, and the buildings were then transported to, and crane set at, the customer's site in the same manner as the Debtors' homes.

#### 2.    Directors, Executive Officers and Management Team

As of the date hereof, set forth below are the Executive Officer and Director of Palm Harbor Homes, Inc.

| Name | Position |
| --- | --- |
| Brian Cejka | Interim President, Chief Executive Officer, Chief Restructuring Officer, and Secretary |
| Truman Smith | Director |

Set forth below is a brief description of the business experience of the executive officer listed above.

Brian E. Cejka

Brian Cejka was appointed the Debtors' Chief Restructuring Officer on November 28, 2010. On April 27, 2011, he was appointed the Debtors' Interim President, Chief Executive Officer and Secretary. Mr. Cejka is a managing director of Alvarez & Marsal North America, LLC and has worked as a turnaround consultant and financial advisor for approximately 15 years. Mr. Cejka has substantial knowledge and experience serving either in senior management positions or as a restructuring advisor to large companies. In this capacity, he assists underperforming companies with stabilizing their financial condition, analyzing their operations and developing an appropriate business plan to accomplish the necessary restructuring of their operations and finances. Moreover, Mr. Cejka has extensive experience in the homebuilding industry through his role as a restructuring advisor to Kimball Hill Homes, Inc. and Champion Enterprises, Inc. Mr. Cejka has also served as a restructuring officer and Chief Financial Officer of National Energy and Gas Transmission, Inc. as well as a Chief Restructuring Officer of a privately-held, national flooring company. Mr. Cejka is 37 years old. As set forth in the Plan, Mr. Cejka shall serve as the Post-Consummation Trust Administrator.

Truman Smith

Truman Smith has been a director of the Debtors since 2008. Mr. Smith has actively managed his personal portfolio since 2005. He was the President and Chief Executive Officer of DataSpan, Inc. (formerly known as Media Recovery, Inc.) from 2001 to 2005. He also was the Vice President, Secretary and Treasurer of Capital Southwest Corporation from 1993-2001.

## C.    DEBT AND CAPITAL STRUCTURE OF THE DEBTORS

### 1.    Summary of Prepetition Indebtedness

#### a)    Prepetition Credit Facility

As of the Petition Date, Palm Harbor, Inc. and Palm Harbor Manufacturing, LP, both of whom are Debtors in these Chapter 11 Cases, were parties to that certain Amended and Restated Agreement for Wholesale Financing (Finished Goods – Shared Credit Facility) with Textron Financial Corporation (the "Prepetition Lender") dated May 25, 2004 (as amended from time to time, the "Prepetition Credit Facility"). The maximum borrowings under the Textron Facility were required to be reduced on a quarterly basis from $45 million on March 26, 2010, to $25 million after March 25, 2011 and thereafter. Interest accrued under the Textron Facility at the rate of LIBOR plus 7.00% (subject to an all-in floor of 7.50%) per year to LIBOR plus 8.25% (subject to an all-in floor of 8.75%) per year, depending on the age of the advance. The Textron Facility was secured by a lien on substantially all of the Debtors' assets, as well as a pledge of 100% of the Debtors' equity in Standard Casualty. As of the Petition Date, and assuming no accrued postpetition interest, the Debtors' outstanding obligations relating to the Textron Facility totaled not less than $34,019,991, comprised of outstanding principal of $33,805,142, accrued but unpaid interest of $214,849, and unpaid fees, costs, and expenses thereunder in an unliquidated amount. As discussed in Section IV.A below, the Debtors used the proceeds from the DIP Credit Agreement to, among other things, pay off all amounts owed under the Prepetition Credit Facility to the Prepetition Lender. As a result, Holders of Prepetition Credit Facility Claims, which have now been paid in full, will not receive or retain any property under the Plan.

#### b)    3.25% Convertible Senior Notes

In 2005, Palm Harbor Homes, Inc. issued 3.25% Convertible Senior Notes due 2024 (the "3.25% Convertible Senior Notes") in the aggregate principal amount of $75 million in a private, unregistered offering. Interest on the 3.25% Convertible Senior Notes is payable semi-annually in May and November. The 3.25% Convertible Senior Notes are senior, unsecured obligations and rank equal in right of payment to all of the Debtors' existing senior and unsecured indebtedness. Holders of the 3.25% Convertible Senior Notes are entitled to require the Debtors to

repurchase all or a portion of their Notes for cash on May 15, 2011, May 15, 2014, and May 15, 2019 at a repurchase price equal to 100% of the principal amount of the 3.25% Convertible Senior Notes to be repurchased plus accrued and unpaid interest, if any. Each $1,000 in principal amount of the 3.25% Convertible Senior Notes is convertible, at the option of the holder, at a conversion price of $25.92, or 38.5803 shares of the Debtors' common stock upon the satisfaction of certain conditions and contingencies. The Debtors did not repurchase any 3.25% Convertible Senior Notes during fiscal year 2010. The Debtors did not pay the interest payment of approximately $900,000 due on the 3.25% Convertible Senior Notes on November 15, 2010. As of the Petition Date, the Debtors' outstanding obligations relating to the 3.25% Convertible Senior Notes is approximately $54,783,174.34, which is an Allowed Claim under the Plan.

### 2. Common Stock of Palm Harbor

The common stock (the "Common Stock") of Palm Harbor Homes, Inc. was listed on NASDAQ with a ticker symbol of "PHHM." On November 30, 2010, NASDAQ suspended trading of Palm Harbor's Common Stock.

A depiction of the corporate structure of the Debtors as of the Petition Date is attached hereto as Exhibit C.

## III. EVENTS LEADING UP TO CHAPTER 11

### A. REASONS FOR FINANCIAL DISTRESS

The severity, breadth, and length of the current global economic downturn had a significant impact on the Debtors, resulting in reduced operating performance for each of their divisions. Indeed, the manufactured housing industry has seen a general downward decline for over a decade. Beginning in 1999, the manufactured housing industry entered a downturn as the result of the tightening of credit standards, limited retail and wholesale financing availability, increased levels of repossessions, and excessive retail inventory levels and manufacturing capacities. For instance, industry shipments of manufactured homes were approximately 348,700 in calendar year 1999, but have decreased 86% over the last ten years to 50,000 in calendar year 2009. During this ten-year period, the Debtors' manufactured housing shipments declined 87% in keeping with this national trend.

Prior to 2006, increases in manufactured housing shipments to Florida, Arizona and California were the main factor in maintaining industry shipments at approximately 130,000 per year. In 2006, however, the dynamics fueling increased manufactured housing demand in these states changed quickly. Site built homes in these states had experienced rapid price appreciation driven by high land costs. As such, the increase in speculative building resulted in excess inventory. This caused prices to fall and buyers and sellers began to postpone their home buying decisions. It also greatly reduced the number of buyers of manufactured housing who are over 55 years of age since they typically must sell their site built home to buy a manufactured home. Industry shipments to Florida, Arizona and California decreased approximately 43%, 41%, and 48% in calendar years 2007, 2008, and 2009, respectively.

Due to continued losses on account of reduced net sales prior to the Petition Date, the Debtors and their advisors extensively explored multiple restructuring alternatives, including the sale of all or specific portions of the Debtors' operations, a new debt or equity capital infusion and a comprehensive restructuring of the Debtors' balance sheet. Instead of proceeding outside of chapter 11, the Debtors filed these Chapter 11 Cases to continue to receive credit and sell their assets in the most efficient way possible for their creditors and estates.

### B. DESCRIPTION OF PREPETITION RESTRUCTURING EFFORTS

The Debtors' top priority for fiscal years 2010 and 2011 was cash generation and cash preservation in every area of their operations. To achieve these goals, the Debtors, among other things: (i) reached an agreement with Textron to amend the Textron Facility to extend its expiration date until April 2011, and, in certain circumstances, extend it further through June 2012; (ii) reduced inventories by $36.8 million and receivables by $4.9 million in fiscal 2010, and reduced inventories by $2.5 million and receivables by $400,000 from March 2010 through October 2010; (iii) reduced overhead costs, resulting in a decrease in selling, general, and administrative expenses of $20.2 million in fiscal 2010 and $6.1 million in fiscal year 2011 (through October, 2010); and (iv) completed a sale leaseback transaction totaling $1.1 million in cash for two of the Debtors' retail properties in fiscal year 2010. In addition, the

Debtors took steps to reduce their manufacturing capacity and distribution channels and realign their operational overhead to meet current and expected demand. Between the beginning of fiscal year 2010 and the Petition Date, the Debtors closed one factory and 25 underperforming sales centers.

In addition to their efforts to both generate and preserve cash, the Debtors also pursued several other strategies in 2009 and 2010 to help with its liquidity problems. On September 15, 2009, the Debtors engaged Raymond James & Associates Inc. ("Raymond James") to act as their investment banker to assist the Debtors with financing and restructuring alternatives, and on August 30, 2010, expanded the scope of Raymond James' retention to assist the Debtors with sale and business combination alternatives. To further allow it to assess its options, on October 15, 2010, the Debtors retained Alvarez & Marsal North America, LLC ("Alvarez") to act as its restructuring advisor.

Throughout the course of 2010, the Debtors, with the assistance of Raymond James and Alvarez, explored a number of strategic alternatives to address their worsening financial condition, including, without limitation, a restructuring of their existing indebtedness with the Prepetition Lender and holders of the 3.25% Convertible Senior Notes, raising new debt and/or equity financing, and seeking a sale of all or some of the Debtors' assets and operations.

The strategic alternative process included extensive marketing whereby the Debtors and Raymond James contacted third parties to determine the extent to which any of these parties were interested in providing new financing to the Debtors, purchasing the Debtors' assets, equity or operations, or exploring other strategic alternatives. Prepetition, the Debtors, through Raymond James, contacted over 120 parties (including both financial and strategic parties, and holders of the 3.25% Convertible Senior Notes) regarding potential strategic alternatives. Raymond James placed no conditions on potentially interested parties with regard to bid levels, structure, financing or management in connection with the solicitation of indications of interest.

All of the interested parties were provided with an opportunity to execute a confidentiality agreement. Those parties that executed a confidentiality agreement were provided substantial due diligence information concerning, and access to, the Debtors, including, but not limited to, presentations by Debtors' management, access to the Debtors' financial advisors, and access to financial, operational, and other detailed information. Thirty-nine of these parties executed confidentiality agreements with the Debtors and performed due diligence. Nine of these parties participated in on-site or telephone meetings with the Debtors' management team.

As a result of these marketing efforts, the Debtors received multiple term sheets from several parties relating to various strategic alternatives, including the possible sale of the Debtors' assets. Of these offers, the Debtors selected an offer made by Palm Harbor Homes, Inc., a Delaware corporation that is an affiliate of Cavco Industries, Inc. (the "Stalking Horse Purchaser" or the "Purchaser"), to acquire the Debtors' assets pursuant to section 363 of the Bankruptcy Code. The Purchaser accordingly executed an asset purchase agreement (as amended, the "Purchase Agreement") to acquire substantially all of the Debtors' assets, including the Debtors stock in CountryPlace and Standard Casualty, conditioned on the Bankruptcy Court's entry of an order authorizing the sale of the Debtors' assets to the Purchaser, and subject to the entry of an order approving certain bid procedures and bid protections to apply in an auction of the Debtors' assets contemplated by the Stalking Horse Agreement. An affiliate of Cavco Industries, Inc., Fleetwood Homes, Inc. (the "DIP Lender") agreed to provide the Debtors with financing to enable the Debtors to commence these bankruptcy cases and to meet their obligations during these bankruptcy cases.

## IV. CHAPTER 11 CASES OF THE DEBTORS

### A. FIRST DAY MOTIONS AND ORDERS

On the Petition Date, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of motions and applications (collectively, the "First Day Motions") seeking certain "first day" relief. The purpose of these First Day Motions was to ensure that the Debtors were able to transition into the chapter 11 process with as little disruption to their businesses as possible and to function smoothly while the Chapter 11 Cases are pending. Within a few days of the Petition Date, the Bankruptcy Court entered several orders (the "First Day Orders"), to, among other things: (i) pay prepetition wages and other benefits to the Debtors' employees; (ii) honor prepetition customer obligations and continue customer programs; (iii) fulfill prepetition obligations to shippers, warehousemen, other lien claimants and claimants entitled to priority under

section 503(b)(9) of the Bankruptcy Code; (iv) continue use of the Debtors' existing cash management system, bank accounts and business forms; (v) make tax payments to federal, state and local taxing authorities on an uninterrupted basis; (vi) fulfill prepetition obligations to certain critical vendors; and (vii) prohibit utility companies from discontinuing, altering or refusing service to the Debtors. A summary of these orders follows.

### 1.  Joint Administration

To facilitate, among other things, noticing, claims processing and voting-related matters, the Bankruptcy Court entered a First Day Order granting certain relief including authorization for the joint administration of the Debtors' Chapter 11 Cases [Docket No. 50].

### 2.  Retention of Notice and Claims Agent

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered a First Day Order approving the retention and employment of BMC Group, Inc. as Claims Noticing, and Balloting Agent to the Debtors [Docket No. 52].

### 3.  Stabilizing Operations

As more fully described below, since any interruption of the Debtors' businesses, even for a brief period, would negatively impact the Debtors' operations, customer relationships, and revenue and profits, on the Petition Date, the Debtors filed a number of First Day Motions to ensure a stabilization of operations.

### a)  Shippers and Warehousemen Claimants

In the period immediately prior to the Petition Date, the Debtors' operation of their businesses and the success of the Debtors' efforts to sell their assets depended on the transport, delivery, set-up and/or storage of the Debtors' supplies, finished goods and inventory that, in the ordinary course of business, was in the possession and control of third party shippers and warehousemen. The Debtors believed that under some state laws, such a shipper or warehouseman could have a lien on the Debtors goods they possessed, which lien would secure the charges or expenses incurred in connection with the transportation or storage of such goods. Additionally, the Debtors believed that, pursuant to section 363(e) of the Bankruptcy Code, these shippers or warehousemen, as bailees, could be entitled to adequate protection in the form of a possessory lien. As a result, the Debtors believed that certain of the shippers and warehousemen could refuse to deliver or release the goods in their possession or control if their claims were not satisfied. As such, the Debtors filed a First Day Motion seeking authorization, among other things, to pay certain prepetition claims of shippers and warehousemen. The Bankruptcy Court granted this motion by entering a First Day Order authorizing, but not directing, among other things, the Debtors to pay certain prepetition claims of shippers and warehousemen. [Docket No. 56].

### b)  Employee Compensation

By this First Day Motion, the Debtors sought authority to pay all employees their wage claims in the ordinary course of business. Additionally, among other things, the Debtors requested authority to continue all of their prepetition benefit programs, including, among others, their medical, dental and 401(k) plans, as well as certain incentive bonus plans. This relief allowed the Debtors to maintain employee morale and prevent costly distractions and retention issues. Absent the ability to honor prepetition wages, salaries, benefits, commissions and other similar employee-related programs, the Debtors would have likely suffered significant losses at a time when they needed to stabilize their operations. Without the relief requested, the Debtors believed that their employees may have sought alternative employment opportunities, perhaps with competitors of the Debtors, thereby depleting the Debtors' workforce, hindering the Debtors' ability to meet their customer obligations, and likely diminishing stakeholder confidence in the Debtors' ability to successfully reorganize. Accordingly, the Bankruptcy Court entered a series of orders authorizing, but not directing, the Debtors to pay, among other things, certain prepetition claims and obligations for (1) wages, salaries, commissions, incentive bonuses, and other compensation, (2) deductions and payroll taxes, (3) reimbursable employee expenses, and (4) employee medical and similar benefits [Docket Nos. 83, 155, 183, and 274].

c)      <u>Key Suppliers</u>

By this First Day Motion, the Debtors sought authority to pay the prepetition claims of (1) vendors and service providers relating to goods and services purchased by the Debtors in connection with a contract at Ft. Hood, (the "<u>Ft. Hood Vendors</u>"), (2) vendors who provide goods and services associated with the installation of a home pursuant to a customer's contract with the Debtors, and who may be able to place a lien on the Debtors' customers' property (the "<u>Lien Right Vendors</u>"), and (3) certain suppliers and service providers who provide the Debtors with products the Debtors use in their manufacturing and construction business (the "<u>Supply Vendors</u>" and, together with the Ft. Hood Vendors and Lien Right Vendors, the "<u>Critical Vendors</u>").  In addition, the Debtors sought in this First Day Motion the authority to enter into agreements with the Critical Vendors pursuant to which such Critical Vendors would provide the Debtors with terms that were as favorable to the Debtors as those in effect between the Debtors and the Critical Vendors prior to the Petition Date or such other trade terms as were agreed upon by the Debtors and such Critical Vendor.  Accordingly, in order to maintain their business operations, the Bankruptcy Court entered an order authorizing, but not directing, the Debtors to pay certain prepetition claims of Critical Vendors [Docket No. 152].

d)      <u>503(b)(9) Claims</u>

By this First Day Motion, the Debtors sought authority to pay the prepetition claims of certain vendors and suppliers who delivered goods to the Debtors during the twenty-day period prior to the Petition Date, but who had not received payment for such goods (the "<u>503(b)(9) Claimants</u>").  Pursuant to section 503(b)(9) of the Bankruptcy Code, claims for the value of goods received by the Debtors in the ordinary course of their business during this twenty-day period prior to the Petition Date would have been entitled to administrative claim status.  The Bankruptcy Code, however, does not specify when such claims entitled to administrative priority status as a result of section 503(b)(9) are to be paid.  The Debtors accordingly requested the authority to pay the 503(b)(9) Claimants immediately to the extent that the Debtors determined that it was necessary to ensure the uninterrupted supply of materials to the Debtors. The Bankruptcy Court entered a First Day Order granting this relief [Docket No. 57].

e)      <u>Fees and Taxes</u>

The Debtors believed that, in some cases, certain taxing authorities had the ability to exercise rights that would be detrimental to the Debtors' restructuring if the Debtors failed to meet the obligations imposed upon them to remit certain taxes and fees.  Accordingly, the Debtors sought and the Bankruptcy Court entered a First Day Order authorizing, but not directing, the Debtors to pay certain fees and taxes, including certain prepetition claims related to sales, use and franchise taxes [Docket No. 55].

f)      <u>Insurance Coverage</u>

The Debtors maintain a variety of insurance policies, including, among others, commercial excess liability, property insurance, commercial crime, commercial automotive, directors and officers, builders risk, business interruption, and workers' compensation insurance.  In order to avoid any potential lapse of coverage and the expense of acquiring new coverage, the Debtors requested authority to continue their insurance and pay prepetition premiums necessary to maintain insurance coverage.  The Bankruptcy Court entered a First Day Order granting this  requested relief [Docket No. 54].

g)      <u>Cash Management System</u>

By this First Day Motion, the Debtors requested entry of an order authorizing the Debtors to continue using their existing cash management system, bank accounts and business forms.  This relief allowed the Debtors to avoid administrative inefficiencies by maintaining the Debtors' cash management system.  The Bankruptcy Court entered an order granting the Debtors' request to, among other things, maintain their cash management system [Docket No. 51].

h)      <u>Utilities</u>

By this First Day Motion, the Debtors sought approval of procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services

and determining that the Debtors are not required to provide additional adequate assurance except as set forth in the procedures related thereto. Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' reorganization. The Bankruptcy Court granted the relief requested by this First Day Motion on an interim and final basis with respect thereto [Docket Nos. 85, 157].

        i)        <u>Customer Programs</u>

Pursuant to this First Day Motion, the Debtors sought approval to continue certain of their customer programs in the ordinary course of business and to honor prepetition commitments related to the programs. The Debtors believed that the relief requested by this First Day Motion was necessary to preserve their customer relationships and goodwill for the benefit of their estates. Accordingly, the Bankruptcy Court entered a First Day Order authorizing, but not directing, the Debtors to maintain their customer programs and honor prepetition commitments related thereto [Docket No. 84, 156].

        j)        <u>Debtor in Possession Financing and Use of Cash Collateral</u>

On the Petition Date, the Debtors filed a motion requesting interim and final authorization to enter into that certain Debtor-In-Possession Revolving Credit Agreement dated as of November 29, 2010 (the "<u>DIP Credit Agreement</u>" and all documents related thereto as incorporated therein and all collateral and ancillary documents executed in connection therewith and incorporated therein, collectively, the "<u>DIP Loan Documents</u>") by and among the Debtors and Fleetwood Homes, Inc. (the "<u>DIP Lender</u>"). The Bankruptcy Court granted the Debtors interim and final relief to enter into the DIP Credit Agreement [Docket Nos. 60, 184] (collectively, the "<u>DIP Orders</u>"). Pursuant to the DIP Credit Agreement, the DIP Lenders agreed to provide up to an aggregate principal amount of $50,000,000, which amount may be increased to $55 million if the parties elect to exercise an option to increase such principal amount, subject to the terms and conditions of the DIP Loan Documents. The DIP Credit Agreement specified that the proceeds from such facility would be used to pay off all amounts owed under the Debtors' Prepetition Credit Facility. Accordingly, shortly after entry of the DIP Orders, the Debtor used funding from the DIP Credit Agreement to pay off the $34,228,272 then owed by the Debtors to the Prepetition Lender under the Prepetition Credit Facility. The Prepetition Lender will accordingly receive no distribution under the Plan. The DIP Orders included benchmarks related to the Debtors' sale process, pursuant to which the Debtors were required to obtain approval to sell substantially all of their assets to the Purchaser within the timeframe required by the DIP Credit Agreement.

**B.**      **OTHER MOTIONS AND PLEADINGS**

In addition to the First Day Motions seeking "first day" relief, on the Petition Date or thereafter, the Debtors also filed several other significant motions and application related to the sale of the Debtors as well as certain retention and procedural motions, which are described below. Relief on account of such motions was not requested on the first day.

      **1.**      **Employment and Compensation of Advisors**

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications seeking authorization to retain and employ certain advisors. The Bankruptcy Court entered orders granting the retention of the following advisors: (a) Raymond James & Associates, Inc. as investment bankers to the Debtors [Docket No. 186]; (b) Alvarez & Marsal North America, LLC as financial advisors to the Debtors [Docket No. 146]; (c) Locke Lord Bissell & Liddell LLP as bankruptcy counsel to the Debtors [Docket No. 148]; and (d) Polsinelli Shughart PC as bankruptcy co-counsel to the Debtors [Docket No. 147]. In addition, the Debtors received authorization to retain and compensate certain professionals utilized in the ordinary course of the Debtors' businesses [Docket No. 150].

      **2.**      **Bar Date**

On January 28, 2011, the Debtors filed a motion requesting that the Bankruptcy Court establish a date by which all persons or entities other than governmental units holding a Claim, including 503(b)(9) Claimants, against any of the Debtors, subject to certain conditions set forth in the motion, be required to file proof of such claims in these

Chapter 11 Cases. The motion also requested the establishment of a separate deadline for all governmental units holding a Claim against any of the Debtors to file proof of such Claim in these Chapter 11 Cases. On February 15, 2011, the Bankruptcy Court entered an order [Docket No. 307] establishing, among other things, April 18, 2011 (the "General Bar Date") as the general claims bar date for filing Proofs of Claim in the Debtors' Chapter 11 Cases for all persons and entities other than governmental units and May 28, 2011, as the bar date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases.

### 3. The Committee and Its Advisors

On December 14, 2010, the Untied States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Committee"). The Committee is comprised of the following parties: American Stock Transfer & Trust Company LLC, as the 3.25% Convertible Senior Notes Indenture Trustee, AQR Absolute Return Master Account, LP c/o CNH Partners, Greenwood Capital, LP, and Atlantic Service & Supply LLC. On January 18, 2011, the Court granted authorization for the Committee to retain and employ Pachulski Stang Ziehl & Jones LLP, as counsel for the Committee [Docket No. 220]. In addition, on February 9, 2011, the Court authorized the Committee's retention and employment of Morgan Joseph LLC as financial advisors for the Committee [Docket No. 285].

### 4. Motion to Extend Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization or liquidation for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the commencement date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing chapter 11 plan. However, a court may extend these periods "for cause" upon request of a party in interest. On March 25, 2011, the Debtors filed a motion seeking to extend their exclusive period to file a plan of reorganization through May 27, 2011 and their exclusive period to solicit acceptance of such plan through June 29, 2011 [Docket No. 440]. The Bankruptcy Court granted this motion on April 18, 2011 [Docket No. 530. On May 26, 2011, the Debtors filed their second motion to extend their exclusive period to file a plan of reorganization through July 28, 2011, and their exclusive period to solicit acceptance of such plan through September 27, 2011 [Docket No. 647]. The Bankruptcy Court granted this motion on July 8, 2011 [Docket No. 756]. On July 28, 2011, the Debtors filed their third motion to extend their exclusive period to file a plan of reorganization through August 5, 2011, and their exclusive period to solicit acceptance of such plan through November 16, 2011 [Docket No. 804].

### 5. Motion to Extend Deadline To Assume or Reject Nonresidential Real Property Leases

The Debtors' ability to reject or assume unexpired, non-residential real property leases was set to expire on March 29, 2011. However, on March 28, 2011, 2011, the Debtors filed a motion seeking entry of an order granting a 60 day extension for the Debtors to assume or reject unexpired leases of nonresidential property through May 30, 2011 [Docket No. 452. The Bankruptcy Court granted this motion on April 19, 2011 [Docket No. 551]. The Debtors did not seek entry of an order extending the deadline for them to assume or reject unexpired leases of nonresidential property beyond May 30, 2011.

### 6. Sale Motion and Bid Procedures

#### a) Overview

On the Petition Date, the Debtors filed with the Bankruptcy Court the Sale Motion [Docket No. 25]. Among other things, the Sale Motion set forth procedures regarding the Debtors' solicitation of additional offers in an effort to maximize the proceeds resulting from the sale of substantially all of the Debtors' assets, culminating in an auction ("Auction") if any qualified, additional offers were obtained. The Bankruptcy Court entered an order (the "Bid Procedures Order") approving bidding procedures (the "Bid Procedures") relating to the marketing, auction, and sale of the Debtors on January 6, 2011 [Docket No. 187]. The Bid Procedures and marketing process are described in greater detail below.

b)      Sale Marketing Efforts

On September 15, 2009, the Debtors engaged Raymond James to act as their investment banker to assist the Debtors with financing and restructuring alternatives, and on August 30, 2010, expanded the scope of Raymond James' retention to assist the Debtors with sale and business combination alternatives.  Throughout the course of 2010, the Debtors, with the assistance of Raymond James and Alvarez, the Debtors' restructuring advisor, explored a number of strategic alternatives to address their financial condition, including, without limitation, a restructuring of their existing indebtedness with their prepetition secured lender and holders of certain convertible senior notes, raising new debt and/or equity financing, and seeking a sale of all or some of the Debtors' assets and operations.

The strategic alternative process included extensive prepetition marketing whereby the Debtors and Raymond James contacted third parties to determine the extent to which any of these parties were interested in providing new financing to the Debtors, purchasing the Debtors' assets, equity or operations, or exploring other strategic alternatives.  During this time, the Debtors, through Raymond James, contacted over 120 parties (including both financial and strategic parties) regarding potential strategic alternatives.  Raymond James placed no conditions on potentially interested parties with regard to bid levels, structure, financing or management in connection with the solicitation of indications of interest.  All of the interested parties were provided with an opportunity to execute a confidentiality agreement.

Those parties that executed a confidentiality agreement were provided substantial due diligence information concerning, and access to, the Debtors, including, but not limited to, presentations by the Debtors' management, access to the Debtors' financial advisors, and access to financial, operational, and other detailed information.  Thirty-nine of these parties executed confidentiality agreements with the Debtors and performed due diligence.  Nine of these parties participated in on-site or telephone meetings with the Debtors' management team.  As a result of these marketing efforts, the Debtors received multiple term sheets from several parties relating to various strategic alternatives, including the possible sale of the Debtors' assets.  Of these offers, the Debtors selected the offer made by the Purchaser to acquire substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  The Purchaser accordingly executed the Purchase Agreement to acquire substantially all of the Debtors' assets, including the Debtors' stock in CountryPlace and in Standard Casualty, which was conditioned on the Bankruptcy Court's entry of an order authorizing the sale of substantially all of the Debtors' assets to the Purchaser, and subject to the entry of an order approving the Bid Procedures and certain bid protections to apply in the Auction.

During the prepetition and postpetition period, the Debtors, through Raymond James, reached out to a total of approximately 148 potential buyers to solicit their interest in purchasing all or a subset of the Debtors' assets.  Approximately 53 of those potential buyers executed confidentiality agreements and were provided substantial due diligence information concerning the Debtors.  In addition, the Debtors published the Bid Procedures Notice (as defined in the Bid Procedures Order), as required by the Bid Procedures Order, in the Wall Street Journal on January 13, 2011.  And on January 14, 2011, the Debtors' claims agent, BMC Group, served all counterparties to the Debtors' executory contracts and unexpired leases with a Cure and Possible Assumption and Assignment Notice that set forth the Debtors' calculation of the cure amount, if any, that would be owing to such counterparty if the Debtors decided to assume or assume and assign such contract, and alerting such nondebtor party that their contract may be assumed and assigned to the Purchaser or the Successful Bidder (as defined in the Bid Procedures Order).

c)      The Bid Procedures

As noted above, on January 6, 2011, the Bankruptcy Court entered the Bid Procedures Order, approving the Bid Procedures and the bid protections provided for in the Purchase Agreement.  Under the Bid Procedures, if the Purchaser was not the prevailing bidder at the Auction, the Purchaser would be entitled to receive a break-up fee of $1.1 million plus an expense reimbursement of up to $250,000.  These provisions were extensively negotiated at arm's length and in good faith by the Debtors and the Purchaser. The Committee also required revisions to the Bid Procedures to establish minimum cash considerations, which were adopted in the Bid Procedures Order.

The Bid Procedures provided for an open, transparent sale process whereby the Debtors and Raymond James, as noted above, contacted numerous parties that they believed would have the financial resources to consummate the Sale Transaction and if necessary, provided such parties with informational packages and access to due diligence. All

interested parties were required to submit a bid in compliance with the Bid Procedures by February 24, 2011 at 5:00 p.m. prevailing Eastern Time (the "Bid Deadline").

#### d) The Auction

Prior to the Auction, the Debtors received separate bids for Standard, CountryPlace, all of the Debtors' assets with the exception of Standard and CountryPlace (these non-Standard and non-CountryPlace assets, collectively, "OpCo"), and substantially all of the Debtors' assets. Specifically, (a) NLASCO, Inc. ("National Lloyds"), Conifer Holdings, Inc. ("Conifer"), and Legacy Housing Ltd. ("Legacy") provided bids for the Debtors' equity interests in Standard (the "Standard Stock"); (b) Legacy provided a bid for the Debtors' equity interest in CountryPlace (the "CountryPlace Stock"); (c) Legacy provided a bid for the Debtors' OpCo assets; and (D) Champion Enterprises Holdings, LLC ("Champion") provided a bid for substantially all of the Debtors' assets.

At the commencement of the Auction, the Debtors announced that each of National Lloyds, Conifer, Legacy, Champion, and the Purchaser were Qualified Bidders under the Bid Procedures. The Debtors also announced that it was the determination of the Debtors and the Committee that the best manner in which to maximize value for the Debtors' assets would be to auction various of the Debtors' assets in lots first (based upon the various bids the Debtors' received for such lots) and then to compare the aggregation of those bids to offers made by the Purchaser and Champion for substantially all of the Debtors' assets. The Debtors also announced that, after consultation with the Committee, they determined that to be a Qualified Bidder, each Bidder must agree that all Backup Bids (as defined in the Bid Procedures) must remain open and irrevocable until the earlier of the date that is sixty days after entry of the Sale Order or the Closing of the Transaction with the Successful Bidder. The Debtors made other announcements as well that are set forth in the transcript of the Auction. No Bidder objected to the requirement that the Backup Bids must remain open and irrevocable for this extended period, or the other announcements made by the Debtors.

The Debtors engaged in three rounds of lot bidding: one round for the Standard Stock, one round for OpCo, and one round for the CountryPlace Stock. Once the Debtors' completed the auction of the Standard Stock, OpCo, and the CountryPlace Stock, the Debtors announced that the aggregate total of $55.55 million for the highest bids of each of the Standard Stock, OpCo, and the CountryPlace Stock constituted the highest and best offer made for substantially all of the Debtors' assets. The Debtors thus deemed these $55.55 million in aggregate bids to be the Auction Baseline Bid (as defined in the Bid Procedures) for the sale of substantially all of the Debtors' assets. The Debtors then conducted the auction of substantially all of the Debtors' assets through bulk bidding. At the conclusion of the Auction, the Debtors, in consultation with the Committee, deemed the Stalking Horse Purchaser's bid of $85,250,000 (minus the Breakup Fee and Expense Reimbursement that would have been paid to the Stalking Horse Purchaser had it not been the Successful Bidder) to be the Successful Bid (as defined in the Bid Procedures) for substantially all of the Debtors' assets. The Debtors further announced that Champion was the Backup Bidder (as defined in the Bid Procedures) for substantially all of the Debtors' assets and Champion's bid of $85,000,000 million was the Backup Bid.

#### e) Sale Hearing

On March 4, 2011, the Bankruptcy Court entered the Sale Order, authorizing the Debtors to enter into the Purchase Agreement and sell substantially all of their assets to the Purchaser. [Docket No. 354].

A.     **ADMINISTRATIVE CLAIMS, 3.25% CONVERTIBLE SENIOR NOTE INDENTURE TRUSTEE CLAIMS, AND PRIORITY TAX CLAIMS**

  1.     **Administrative Claims**

    a)     Administrative Claims

Except as otherwise provided in the Plan, subject to sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Claim, including an Allowed Fee Claim, will be paid the full amount of such Allowed Claim: (a) in Cash on or as soon as reasonably practicable after the Effective Date, or if such Claim is Allowed after the Effective Date, on or as soon as practicable after the date such Claim is Allowed; (b) upon such other terms as may be agreed upon by such Holder and the Debtors; or (c) as otherwise ordered by the Bankruptcy Court.

Except as otherwise provided in Article II.A or in Article VII.C.2 of the Plan, unless previously filed, requests for payment of Administrative Claims must be filed and served pursuant to the procedures specified in, as applicable, the Initial Administrative Claims Bar Date Order (for those Entities required to file an Administrative Claim pursuant to the Administrative Claims Bar Date Order) or the Confirmation Order (for those entities not required to file an Administrative Claim pursuant to the Initial Administrative Claim Bar Date Order), and in each case prior to the applicable Administrative Claims Bar Date. Holders of Administrative Claims that are required to by the foregoing sentence and do not File and serve such a request by the applicable Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, their Estates, the Post-Consummation Trust, and the Post-Consummation Trust Assets and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be filed and served on the Post-Consummation Trust and the requesting party by the later of (i) 180 days after the Effective Date and (ii) 180 days after the Filing of the applicable request for payment of such Administrative Claims.

    b)     Fee Claims

Retained Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Post-Consummation Trust and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 45 days after the Effective Date. Objections to any Fee Claim must be filed and served on the Post-Consummation Trust and the requesting party by the later of (x) 45 days after the Effective Date, and (y) 30 days after the Filing of the applicable request for payment of the Fee Claim. To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

  2.     **3.25% Convertible Senior Notes Indenture Trustee Claims**

On or prior to the Effective Date, the 3.25% Convertible Senior Notes Indenture Trustee shall be compensated for all of its reasonable and documented fees and expenses (including, without limitation, fees and expenses of its outside counsel) incurred prior to the Effective Date in cash in full, related to its service as the Indenture Trustee under the 3.25% Convertible Senior Notes Indenture. Any such claims shall be Allowed as an Administrative Claim.

  3.     **Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by the Post-Consummation

---

[3] The following summary is qualified in its entirety by reference to the Plan. In the event of any inconsistency between the summary provided herein and the Plan, the Plan shall control in all respects.

Trust Administrator, subject to the approval of the Post-Consummation Trust Oversight Committee, and such Holder; provided, however, that such parties may further agree to the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Post-Consummation Trust Administrator, subject to the approval of the Post-Consummation Trust Oversight Committee, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period not more than five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

## B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 1.    Administrative Claims and Priority Tax Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article III of the Plan.

### 2.    Summary

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code on a substantively consolidated basis. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or an Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Class 3 3.25% Convertible Senior Note Claims and Class 4 General Unsecured Claims, while both unsecured claims, have been separately classified in the Plan.  The Plan separately classifies these classes of claims because each of these classes of claims represent a voting interest that is sufficiently distinct from the other.  The Proponents believe that the separate classification of the Class 3 3.25% Convertible Senior Note Claims and Class 4 General Unsecured Claims is appropriate given the different legal rights and payment expectations of these two classes – specifically that Holders of Class 4 General Unsecured Claim have claims that arose from operational relationships, the provision of goods and services, and litigation, whereas the Holders of Class 3 3.25% Convertible Senior Note Claims have claims that arose from extending loans to the Debtors and subsequently holding the 3.25% Convertible Senior Notes.  Moreover, the Proponents believe that this separate classification is appropriate given the different legal requirements for solicitation and balloting of the Class 3 3.25% Convertible Senior Note Claims, which solicitation will require the use of a master ballot and solicitation through the DTC, as well as the distribution mechanics for the holders of Class 3 3.25% Convertible Senior Note Claims, which distribution will occur through the 3.25% Convertible Senior Notes Indenture Trustee .

Intercompany Claims are extinguished under the Plan, and Holders of Class 5 Intercompany Claims will not receive any distribution on account of such claims.  The Intercompany Claims that will be extinguished under the plan are a prepetition $71,241,210 payable purportedly owed by Palm Harbor Homes, Inc. to Palm Harbor Manufacturing, L.P. ("Manufacturing") and a prepetition $9,429,822 payable purportedly owed by Palm Harbor Homes, Inc. to Nationwide Homes, Inc.  ("Nationwide")  The Proponents have investigated these Intercompany Claims and believe that they have no merit, and are the result of Palm Harbor Homes, Inc. routinely making payments and incurring costs for the benefit of Manufacturing and Nationwide and the failure of Palm Harbor Homes, Inc., Manufacturing, and Nationwide to properly allocate these costs between themselves.  For instance, Palm Harbor Homes, Inc. routinely paid for the costs associated with operating the businesses of Manufacturing and Nationwide (including group insurance costs, advertising expenses, sales promotion expenses, shared overhead and management salaries, rental costs, travel costs, costs relating to financing activities, etc.).  Palm Harbor Homes, Inc., Manufacturing, and Nationwide, however, failed to include book entries allocating these expenses out to the appropriate Debtor who received the benefit of these costs.  These costs were necessary costs of doing business, and supported home construction and sales activities by Manufacturing and Nationwide.  Indeed, the Proponents have determined that some of these Intercompany Claims are a result of failing to allocate costs between the Debtors that date back fifteen to

twenty years prior to the Petition Date. The Proponents thus believe that these Intercompany Claims are subject to significant dispute and offset, and thus elimination.

<u>**Summary of Classification and Treatment of Classified Claims and Equity Interests**</u>

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | 3.25% Convertible Senior Notes Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Deemed to Reject |
| 6 | Equity Interests | Impaired | Deemed to Reject |

3. **Classification and Treatment of Claims and Equity Interests**

a) <u>Class 1   Other Priority Claims</u>

(i) *Classification:* Class 1 consists of all Other Priority Claims against the Debtors.

(ii) *Treatment:* The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered. Unless otherwise agreed to by Holders of Allowed Class 1 Claims and the Post-Consummation Trust Administrator, subject to the approval of the Post-Consummation Trust Oversight Agreement, each Holder of an Allowed Class 1 Claim shall receive, in full and final satisfaction of such Allowed Class 1 Claim, payment of the Allowed Class 1 Claim in full in Cash on or as soon as reasonably practicable after the Effective Date in accordance with Article VII of the Plan.

(iii) *Voting:* Class 1 is Unimpaired, and Holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1 Claims shall be subject to Allowance under the provisions of the Plan, including Article IX of the Plan.

b) <u>Class 2--Other Secured Claims</u>

(i) *Classification:* Class 2 consists of all Other Secured Claims against the Debtors.

(ii) *Treatment:* Each Holder of an Allowed Other Secured Claim shall be placed in a separate subclass, and each subclass will be treated as a separate Class for distribution purposes. Unless otherwise agreed to by Holders of Allowed Class 2 Claims and the Post-Consummation Trust Administrator, subject to the approval of the Post-Consummation Trust Oversight Committee, each Holder of an Allowed Class 2 Claim shall receive, in full and final satisfaction of such Allowed Class 2 Claim, on or as soon as reasonably practicable after the Effective Date in accordance with Article VII of the Plan:

(A) the collateral securing such Allowed Other Secured Claim; or

(B) a Cash distribution in an amount equal to the value of such collateral.

(iii)    *Voting:* Class 2 is Unimpaired, and Holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 2 Claims shall be subject to Allowance under the provisions of the Plan, including Article IX of the Plan.

c)    <u>Class 3 - 3.25% Convertible Senior Notes Claims</u>

(i)    *Classification:* Class 3 consists of all 3.25% Convertible Senior Notes Claims against the Debtors.

(ii)    *Treatment:* Holders of Allowed 3.25% Convertible Senior Notes Claims will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for each 3.25% Convertible Senior Notes Claim, their Pro Rata share of the available Cash and/or other consideration, including proceeds of the Post-Consummation Trust Assets. Upon the Effective Date, the 3.25% Convertible Senior Notes Claim shall be an Allowed Claim in the amount of $54,783,174.34. Any Claims filed by beneficiaries of the 3.25% Convertible Senior Notes Indenture other than the 3.25% Convertible Senior Notes Indenture Trustee shall be deemed superseded or amended by the 3.25% Convertible Senior Notes Claim.

(iii)    *Voting:* Class 3 is Impaired, and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

(iv)    *Restrictions on Recovery:* The Post-Consummation Trust shall not make distributions to Holders of Class 3 Claims until such time as all Allowed Senior Claims have been paid in full (or appropriate reserves have been established for the payment of all Allowed Senior Claims in full) or such Allowed Senior Claims have been satisfied in the manner provided for under the Plan by the Post-Consummation Trust.

d)    <u>Class 4 - General Unsecured Claims</u>

(i)    *Classification:* Class 4 consists of all General Unsecured Claims held against the Debtors.

(ii)    *Treatment:* Holders of Allowed General Unsecured Claims will receive, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed General Unsecured Claims held against the Debtors, their Pro Rata share of the available Cash and/or other consideration, including proceeds of the Post-Consummation Trust Assets.

(iii)    *Voting:* Class 4 is Impaired, and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

(iv)    *Restrictions on Recovery:* The Post-Consummation Trust shall not make distributions to Holders of Class 4 Claims until such time as all Allowed Senior Claims have been paid in full (or appropriate reserves have been established for the payment of all Allowed Senior Claims in full) or such Allowed Senior Claims have been satisfied in the manner provided for under the Plan by the Post-Consummation Trust.

e)     <u>Class 5 – Intercompany Claims</u>

     (i)     *Classification:* Class 5 consists of all Intercompany Claims.

     (ii)     *Treatment:* Class 5 Intercompany Claims are extinguished under the Plan, which provides for substantive consolidation of the Debtors, and Holders of Class 5 Intercompany Claims will not receive any distribution on account of such interests.

     (iii)     *Voting:* Class 5 is Impaired, and Holders of Class 5 Claims are not entitled to receive or retain any property under the Plan on account of Class 5 Claims. Therefore, Holders of Class 5 Claims are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan.

f)     <u>Class 6 – Equity Interests</u>

     (i)     *Classification:* Class 6 consists of all Equity Interests in the Debtors.

     (ii)     *Treatment:* Class 6 Equity Interests in the Debtors will not receive any distribution on account of such interests.

     (iii)     *Voting:* Class 6 is Impaired, and Holders of Class 6 Equity Interests are not entitled to receive or retain any property under the Plan on account of Class 6 Equity Interests. Therefore, Holders of Class 6 Equity Interests are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 6 Equity Interests are not entitled to vote to accept or reject the Plan.

**4.**     **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

**C.**     **ACCEPTANCE OR REJECTION OF THE PLAN**

**1.**     **Presumed Acceptance of Plan**

Classes 1 and 2 are Unimpaired under the Plan, and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**2.**     **Voting Classes**

Classes 3 and 4 are Impaired under the Plan, and therefore Holders of Class 3 and 4 Claims as of the Record Date shall be entitled to vote to accept or reject the Plan.

**3.**     **Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims entitled to vote to accept or reject the Plan has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

4. **Deemed Rejection of Plan**

Classes 5 and 6 are Impaired and shall receive no distribution under the Plan on account of their Claims or Equity Interests and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

5. **Cram Down**

The Proponents request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Proponents reserve the right to modify the Plan in accordance with Article XIV.C of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

D. **MEANS FOR IMPLEMENTATION OF THE PLAN**

1. **General**

The Post-Consummation Trust will satisfy its obligations under the Plan from Cash on hand as of the Effective Date, liquidation of Causes of Action, and other proceeds or consideration from the Post-Consummation Trust Assets.

2. **Substantive Consolidation**

As set forth in more detail in Article V.B of the Plan, the Plan serves as a motion by the Proponents seeking entry, pursuant to section 105 of the Bankruptcy Code, of an order authorizing, on the Effective Date, the substantive consolidation of the Estates and all of the assets and liabilities of all of the Debtors for purposes of classifying and treating all Claims under the Plan, including for voting, confirmation, and distribution purposes. Substantive consolidation will not (i) alter the state of incorporation of any Debtor for purposes of determining applicable law of any of the Causes of Action, (ii) alter or impair the legal and equitable rights of the Post-Consummation Trust Administrator to enforce any of the Causes of Action, or (iii) otherwise impair, release, discharge, extinguish or affect any of the Causes of Action or issues raised as a part thereof.

If substantive consolidation is ordered as provided in the Plan and in the Confirmation Order, then on and after the Effective Date, all Assets and liabilities of the Debtors shall be treated under the Post-Consummation Trust as though they were merged into the estate of Palm Harbor Homes, Inc. ("Parent") for purposes of treatment of and distributions on Claims. All duplicative Claims (identical in both amount and subject matter) Filed against more than one of the Debtors shall automatically be expunged so that only one Claim survives against the consolidated Debtors. All guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and/or several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors. Any alleged defaults under any applicable agreement with the Debtors arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

The United States Court of Appeals for the Third Circuit has adopted a standard for granting a request for substantive consolidation similar to the standards adopted by other circuit courts authorizing substantive consolidation. See In re Owens Corning, 419 F.3d 195, 211 (3rd Cir. 2005); Reider v. F.D.I.C. (In re Reider), 31 F.3d 1102, 1107-1108 (11th Cir. 1994); Woburn Assoc v. Kahn (In re Hemmingway Transport Inc.), 854 F.2d 1, 11-12 (1st Cir. 1992); First Nat'l Bank of El Dorado v. Giller (In re Giller), 962 F.2d 796, 798-99 (8th Cir. 1992); Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.3d 515, 518 (2d Cir. 1988); Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp), 810 F.2d 270, 276 (D.C. Cir. 1987).

In the Third Circuit, debtors seeking substantive consolidation must show that either (a) prepetition, they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity (the "Single Entity Test"), or (b) postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors (the "Hopeless Entanglement Test"). Owens Corning, 419 F.3d at 211 (emphasis added). Although only one of the two tests must be met to establish substantive consolidation, the

Proponents believe that they can satisfy both the Single Entity Test and the Hopeless Entanglement Test, and thus substantive consolidation is warranted under either of these tests.

The Proponents believe there is ample evidence to show that prior to the Petition Date, creditors of the Debtors treated them as one legal entity, thus satisfying the Single Entity Test. With the exception of certain instances where Nationwide Homes, Inc. used its check stock, all checks used to pay any indebtedness of any of the Debtors was made on check stock identifying "Palm Harbor Homes" as the payor. Creditors who received such payments would logically assume that "Palm Harbor Homes" was the entity with whom they conducted business. The Debtors also prepared and disseminated consolidated financial reports to the public, including customers, suppliers, landlords, lenders, credit rating agencies and stockholders. Furthermore, all SEC reporting that is available to the public is consolidated. Because the Debtors disseminated financial information to the public on a consolidated basis, it is highly unlikely that creditors relied on the separate identity of any Debtor in extending credit to such Debtor. This is borne out by the fact that a significant number of claims filed against the Debtors were filed against Parent, when in fact the claim should have been filed against a subsidiary Debtor. Creditors were specifically directed to file claims against the correct legal entity under the Bar Date Notice and the fact that they did not, further corroborates the fact that creditors did not understand the Debtor with which they did business. Although the analysis is still ongoing, the Debtors estimate that, for example, under a deconsolidated plan, the claims pool against Palm Harbor Manufacturing, L.P. is expected to increase approximately 25%, or $2 million.

The Proponents also believe that disentangling the affairs of the Debtors would likely be so burdensome as to be prohibitive and likely would adversely affect creditors, and thus the Hopeless Entanglement Test is satisfied. The Debtors repeatedly engaged in intercompany lending (often with little or no documentation), shared raw materials, shared personnel, and entered into cross-guaranties. Moreover, despite the fact that each of the Debtors are independent legal entities, certain of which had their own facilities, the Debtors generally operated as a single enterprise with a central payment system and central cash management system.

The Debtors' central cash management system – which was not memorialized in any writing - illustrates the extent of entanglement between the Debtors. For instance, prepetition, Palm Harbor Homes, Inc. routinely made payments for the benefit of the other Debtors. The Debtors effectively operated out of a single operating account, with funds and funding costs routinely comingled. This resulted, initially, as the appearance of large intercompany balances owed by one of the Debtors to another Debtor. The Debtors have determined that these intercompany balances were not accurate because they were not properly set off by other amounts owed to or by the various Debtors. Under substantive consolidation, these intercompany balances would be automatically eliminated.

As further evidence of the Debtors' entanglement, Palm Harbor Homes, Inc. and the other Debtors shared overhead, management, accounting, and other related expenses. This shared overhead, management, accounting and other related expenses were not properly allocated among each of the Debtors who each benefitted from these services. Rather, all costs associated with these services remained obligations of Palm Harbor Homes, Inc. Moreover, Palm Harbor Homes, Inc. owns, directly or indirectly, all or a majority of the stock or membership interests in each of the other Debtors and the Debtors shared common directors and officers. As demonstrated by the foregoing, the Debtors operated and were regarded as a consolidated enterprise. Indeed, disentangling their affairs is simply not possible and, even if it was, would be an extremely expensive endeavor which could significantly negatively impact the Cash available for distributions to the Debtors' creditors. Substantive consolidation will result in the elimination of at least 27 duplicate and intercompany claims totaling approximately $82 million as well as obviating the need for the Debtors to reclassify claims that were filed against the wrong Debtor. Accordingly, the consolidation of the Debtors' estates is proper under the Hopeless Entanglement Test.

The following discussion sets forth the position of certain objecting creditors on the substantive consolidation issue. It is not the position of the Proponents.

        a)        Objectors' Position

On September 7, 2011, certain creditors (the "Subsidiary Creditors") of certain of the non-Palm Harbor Homes, Inc. Debtors (the "Debtor Subsidiaries") filed an objection (the "Objection") to the entry of an order approving this Disclosure Statement. The full text of the Objection and its exhibits may be accessed free of charge at http://www.bmcgroup.com/palmharborhomes. In essence, the Objection principally asserts that the Plan's proposal to substantively consolidate the Debtors' estates for purposes of distribution is not permissible under the applicable legal standards in the Third Circuit. The Subsidiary Creditors further assert that were the Debtors' estates not substantively consolidated, recoveries for creditors of the Debtor Subsidiaries would be substantially greater than as anticipated

under the Plan. See Objection, Section III.A.1. The Subsidiary Creditors also assert that the Plan is not confirmable because it separately classifies General Unsecured Claims and 3.25% Convertible Senior Note Claims (Objection, Section III.A.2) is improper, and fails to afford creditors of certain Debtor Subsidiaries better treatment than they allegedly would receive in a Chapter 7 liquidation (Objection, Section III.A.3). In the Objection, the Subsidiary Debtors allege that the following facts support their assertion that substantively consolidating the Debtors is inappropriate:

• The Subsidiary Creditors assert that they collectively hold almost $5 million in unsecured claims against the Debtors and that substantive consolidation proposed under the Plan will impermissibly result in significant value being upstreamed from the Debtor Subsidiaries to Palm Harbor Homes, Inc., which is the holding company of the Debtor Subsidiaries. Each of the Debtors is a separate legal entity.

• Prior to the Sale Transaction, Palm Harbor Homes, Inc. was also the holding company of other non-debtor subsidiaries (the "Non-Debtor Subsidiaries") including, (i) CountryPlace, which, along with its subsidiaries, originated loans to purchasers of the Debtor' manufactured and modular housing, and subsequently sold these loans to investors, and (ii) Standard Casualty, which, along with its subsidiaries, offered property and casualty insurance to purchasers of the Debtors' manufactured and modular homes.

• In 2005, Palm Harbor Homes, Inc. issued the 3.25% Convertible Senior Notes in the aggregate principal amount of $75 million in a private, unregistered offering. The 3.25% Convertible Senior Notes were the sole obligation of the Palm Harbor Homes, Inc. and were not guaranteed by any of the Debtor Subsidiaries or Non-Debtor Subsidiaries. The 3.25% Convertible Senior Notes are structurally subordinated to the claims of creditors against the Debtor Subsidiaries. In other words, because the 3.25% Convertible Senior Notes were obligations of Palm Harbor Homes, Inc. only, the Holders of Allowed 3.25% Convertible Senior Notes Claims could not look to the assets of the Debtor Subsidiaries for payment unless and until all of the creditors of the Debtor Subsidiaries were paid in full. This fact was disclosed by Palm Harbor Homes, Inc. in its public filings with the Securities and Exchange Commission (the "SEC"), before the 3.25% Convertible Senior Notes were issued. The prospectus for the 3.25% Convertible Senior Notes stated this as well.

• On or about January 27, 2011, each Debtor filed its own individual Schedules and Statements of Financial Affairs, signed under penalty of perjury. According to the Schedules, two of the Debtor Subsidiaries, Nationwide and Manufacturing, had assets that were potentially valued in an amount that was significantly greater than their potential liabilities. According to the Schedules and Statements, Palm Harbor Homes, Inc. had potential liabilities that were significantly greater than the estimated value of its assets, including owing approximately $71 million to Manufacturing and $9.5 million to Nationwide; Palm Harbor Homes, Inc. had total, net intercompany balances owing to its subsidiaries of more than $145 million; all of the intercompany balances between Palm Harbor Homes, Inc. and the Debtor Subsidiaries were in favor of the Debtor Subsidiaries (except for Debtor Palm GenPar, LLC, which owed Palm Harbor Homes, Inc. $8,727); and Palm Harbor Homes, Inc., Manufacturing and Debtor Palm Harbor Albermarle, LLC are subject to numerous claims of unknown liability relating to numerous pre-petition lawsuits, with multiple defendants, brought against those Debtors – however, Nationwide is apparently not a party to those lawsuits. The Subsidiary Creditors also asserted erroneously in their objection that Debtor Nationwide had no secured debt and was not a party to, nor had any liability with respect to, the Prepetition Credit Facility; in fact, Nationwide was obligated on the prepetition Textron secured debt and the DIP Facility and pledged its assets to secure such obligations.

• On the Petition Date, the Debtors filed several "first-day" motions, which were supported by the Declaration of Brian Cejka [Docket No. 3] (the "First Day Declaration"), the Chief Restructuring Officer of the Debtors. In the First Day Declaration, Mr. Cejka disclosed that the Debtors used a centralized cash management system and frequently engaged in "intercompany transactions and transfers among themselves." While the Debtors indicated that they "maintain records of all fund transfers and can ascertain, trace and account for Intercompany Transactions," the Debtors and their professionals could not make the same representation with respect to pre-petition transactions as well as the reliability of the historic intercompany balances reflected in the Debtors' prepetition books and records. Thus, throughout the Debtors' chapter 11 cases, the Debtors routinely reported post-petition intercompany transfers by and between ~~Palm Harbor Homes, Inc.~~ Parent and its various Debtor and Non-Debtor Subsidiaries in its regularly filed monthly operating reports (the "MORs") as it was able to keep a running account of the Debtors' intercompany activity. The MORs also included a balance sheet for each Debtor entity that was based upon the historic figures reflected in the Schedules.

The Subsidiary Creditors assert in their Objection that taking into account intercompany claims at their stated amounts, ~~Debtor Palm Harbor Homes, Inc.~~ Parent appears to be hopelessly insolvent, while certain Debtor Subsidiaries appear to have had more than sufficient assets to pay their creditors in full. The Subsidiary Creditors also assert that certain Debtor Subsidiaries are shown to be solvent even without consideration of the intercompany claims. Thus, the Subsidiary Creditors oppose substantive consolidation because they believe that recoveries to the Subsidiary Debtors would be higher under a deconsolidated plan. The Plan Proponents disagree with all of these assertions as well as the factual assumptions which are the premises for the Subsidiary Creditors' Objection, as discussed below.

> b) The Proponents Believe that Substantive Consolidation Will Lead to Higher Recoveries for Unsecured Creditors

For several reasons, the Debtors and the Committee believe that a plan of liquidation that effects substantive consolidation of all of the Debtors' estates is appropriate under applicable law and in the best interests of all unsecured creditors. The Debtors, the Committee and their respective advisors devoted significant time before the Plan was filed to analyzing whether one or more of the six Debtor estates should be substantively consolidated under the Plan. The Plan Proponents and their advisors considered the facts in light of the applicable legal standards and concluded that substantive consolidation is justified insofar as, among other things, the Debtors were operated historically along business line not by legal entity; creditors likely were not reliant on the separateness of the legal entities; and that the cost of (i) untangling the Debtors' operations, and (ii) reconstructing as much as two decades of accounting to determine an accurate statement of intercompany balances would substantially erode creditors' recovery. The analysis performed by the Plan Proponents validates their conclusion that substantive consolidation is in the best interests of all creditors, and negates the Subsidiary Creditors' argument that creditors of certain Debtor Subsidiaries would fare better, is summarized below.

The Proponents' conclusion is amply supported by the analysis they undertook, which addressed the many difficulties associated with any effort to parse out the Debtors' assets and liabilities in an effort to present the six Debtor estates' financial picture on a nonconsolidated basis.

Today, the only meaningful asset in the Debtors' estate is cash on hand, derived from the proceeds of the sale of substantially all of the Debtors' assets to Cavco (net of the amount used to repay the DIP loan, for which all Debtors were liable). In order to determine the range of recoveries to creditors of each of the Debtors' estates on a standalone basis, this cash would have to be allocated among the various Debtors' estates in some fair and appropriate manner. Similarly, the administrative liabilities of the Debtors' chapter 11 cases, including professional fees, U.S. Trustee fees and perhaps most significantly, the DIP loan, would have to be assigned to the appropriate Debtor entities. Both of these allocations require assumptions and judgment calls, as (1) the Debtors' assets were sold in bulk to Cavco, and (ii) there is no ready way to allocate the DIP loan or professional fees among the six Debtor estates, as all Debtor entities were liable on the full DIP loan balance, and no effort was made (or required) to separately charge each of the six Debtors for an allocated share of their services rendered. There is a third large variable in this analysis, which is how to treated the claims reflected by the historic intercompany balances that were included in the Debtors' Schedules, particularly in light of evidence that those balances are grossly inaccurate. In performing its analysis, rather than undertake a costly and time-consuming forensic exercise that would have eroded creditor recoveries, delayed confirmation, and nonetheless might produce a result that was not 100% accurate in any event, the Plan Proponents considered the range of outcomes assuming that these intercompany claims were (1) 100% accurate, (2) partially invalid, and (3) 100% inaccurate such that they should be disregarded in their entirety. As demonstrated by the range of outcomes set out in the various hypothetical scenarios presented below, the results varied significantly, but in nearly every case, unsecured creditors fared no better and in many cases fared much worse than projected under the Plan, leading the Plan Proponents to support substantive consolidation pursuant to the Plan.

The Objectors' position is flawed primarily because they assert that Nationwide and Manufacturing hold intercompany claims against Parent in the amounts stated in the Schedules and therefore have considerable value. However, the historic figures contained in the Debtors' Schedules for intercompany claims are grossly inaccurate. The Intercompany Claims that will be extinguished under the Plan are a prepetition $71,241,210 payable purportedly owed by ~~Palm Harbor Homes, Inc. ("~~ Parent ~~")~~ to Palm Harbor Manufacturing, L.P. ("Manufacturing") and a prepetition $9,429,822 payable purportedly owed by Parent to Nationwide Homes, Inc. ("Nationwide"). This is in addition to approximately $65,000,000 of Intercompany Claims between the Debtors and the Non-Debtors (Standard Insurance and Country Place Acceptance) which were extinguished as part of the sale to Cavco. The Proponents have investigated these Intercompany Claims and believe that they have no merit, and are the result of Parent routinely making payments and incurring costs for the benefit of Manufacturing and Nationwide and the failure of Parent,

Manufacturing, and Nationwide to properly allocate these costs between themselves. For instance, Parent routinely paid for the costs associated with operating the businesses of Manufacturing and Nationwide (including group insurance costs, advertising expenses, sales promotion expenses, shared overhead and management salaries, rental costs, travel costs, costs relating to financing activities, etc.) Parent, Manufacturing, and Nationwide, however, failed to include book entries allocating these expenses out to the appropriate Debtor who received the benefit of these costs. These costs were necessary costs of doing business, and supported home construction and sales activities by Manufacturing and Nationwide. Indeed, the Proponents have determined that some of these Intercompany Claims are a result of bookkeeping errors that date back fifteen to twenty years prior to the Petition Date. The Proponents thus believe that these Intercompany Claims are subject to significant dispute and offset, and hence elimination.

In order to present the analysis the Plan Proponents undertook, the following charts were prepared projecting the recoveries by creditors of each of the six Debtors' estates on a deconsolidated basis, employing assumptions as to the three key variables: (1) allocation of the sale proceeds among the six estates, (2) allocation of the DIP loan and administrative obligations generally across the six estates, and (3) assigning an allowed amount of intercompany claims. Applying these various assumptions, creditors of the six Debtor estates would be projected to receive various levels of recovery expressed as a percentage of their projected allowed claim amounts. All of these projections are conjectural as they make assumptions about a host of variables, including the total amount of allowed claims at each Debtor and assumption in respect of the three key variables noted in the preceding sentence, and therefore creditors are advised that actual recoveries could and likely would vary considerable from these scenarios, which are presented to illustrate the Plan Proponents analytical processes in determining ultimately to propound a plan that provides for substantive consolidation.

(i) <u>Allocation Assumptions</u>

(a) <u>Asset Allocation Assumptions</u>

The Debtors received $83.9 million of gross sale proceeds from the sale of the company (including its two Non-Debtor Subsidiaries) to Cavco on account of the Debtors' business, which comprises the vast majority of assets for distribution to unsecured creditors. Under a deconsolidated scenario, such cash needs to be allocated across the various entities.

The Debtors, however, operated along division lines as opposed to separate legal entities. The Debtors, moreover, did not maintain deconsolidated audited financial statements for each legal entity that would enable the Proponents to assign values to the assets by legal entity. The Asset Purchase Agreement with Cavco did not set forth asset allocations and to the Debtors' knowledge, Cavco has not yet allocated its purchase price post-closing, but even if it had done so, its allocation would not be binding on the estates and might be driven by tax or other motivations that would not necessarily assist in the analysis of true asset valuation. Therefore, the Proponents utilized an allocation of values to specific entities that is based on the carrying value of specific assets (accounts receivable, inventory, personal property and equipment) that was sold to Cavco, using the values listed on the Debtors' books and records as of March 2011.

The Debtors held separate auctions for the sale of the stock of their Non-Debtor Subsidiaries, Standard Casualty and CountryPlace. Therefore, the amount of the proceeds to be allowed to the Non-Debtor Subsidiaries is static at $23.550 million, which reflect the amount bid for the Non-Debtor Subsidiaries in their respective auctions. Based on the above assumptions, the gross sale proceeds, as well as cash on hand, restricted cash on hand, and customer deposits were allocated among the six debtors and two non-Debtor subsidiaries as follows:

| Parent | Manufacturing | Nationwide | Albermarle | GenPar, LLC | RE, LLC | Non-Debtors |
|---|---|---|---|---|---|---|
| $59,047* | $9,082 | $7,286 | $946 | N/A | N/A | $23,550 |

*in 000's

(b) <u>Administrative Liability Allocation</u>

The largest administrative claim that would need to be allocated amongst the various Debtor entities is the DIP Credit Agreement Claim ($45.3 million) plus other expenses payable at closing, including customer deposits payable to Cavco, property taxes, insurance, deposit escrow, and other miscellaneous items, the liability for which was

not allocated on a Debtor-by-Debtor basis.   Rather, all of the Debtors were jointly and severally liable under the DIP loan.  Similarly, all of the Debtors (including Nationwide) were liable on the prepetition secured Textron debt which was prepaid by the DIP loan.  To the Proponents' knowledge,  Cavco would only extend postpetition financing if all of the Debtors were jointly and severally liable under the DIP, which is customary.

Accordingly, if a deconsolidated plan were to be filed for each Debtor, the DIP Credit Agreement Claim would need to be allocated across the various estates.   There are arguably many ways to conduct such an exercise, e.g., ratably across the estates, or ratably in proportion to each estate's assets, or liabilities, or revenues.   The methodology employed by the Plan Proponents in the analysis set forth below is to allocate the total DIP liability among the six estates and the non-Debtors whose assets were sold based on the same formula to calculate allocable sale proceeds, i.e., the book value of assets at each entity that served as security and collateral for loan.  Under this method, the DIP liability is allocated as follows:

| Parent | Manufacturing | Nationwide | Albermarle | GenPar, LLC | RE, LLC | Non-Debtors |
|---|---|---|---|---|---|---|
| ($32,305*) | ($6,817) | ($5,469) | ($710) | N/A | N/A | N/A |

*in 000's

It is worth noting that subsumed within the DIP liability, or at least the more than $10 million of additional post-petition secured borrowings, are the significant administrative costs incurred by the Debtors during the chapter 11 cases, most notably Professional Fees, executive compensation, incentive bonuses and administrative overhead, which is not readily allocable among the different Debtors' estates.  Certain administrative expenses were more readily known to the Plan Proponents and were directly charged to the appropriate Debtor entity.

Further, the allocation of liabilities of filed proofs of claims in the three scenarios below does not take into account the amount of claims that were improperly filed against the Parent, but are really liabilities against the subsidiary Debtors.  As discussed, this analysis is ongoing and could substantially negatively impact recoveries of the subsidiary Debtors even more than indicated in the three scenarios below.

(c)        **Intercompany Claims**

The third component of endeavoring to project creditor recoveries under a deconsolidated plan is determining the value of intercompany receivables and payables.  In a deconsolidated plan, intercompany receivables are not cancelled, but would survive as an unsecured claim against the entity from which funds were owed.  As discussed, the Debtors' scheduled intercompany claims are inaccurate and only captured value that was unstreamed by the Debtor subsidiaries to Parent, but did not capture all of the value provided by the Parent to the Debtor subsidiaries.  The Proponents believe that this intercompany flow of funds, without proper allocation amongst legal entities, occurred for 15 to 20 years prior to the Petition Date, rendering the historic numbers inherently unreliable.

Without a costly and time-consuming forensic accounting analysis, it would not be possible to develop a more reliable computation of the intercompany balances, and even then, given the absence of reconciliation of these amounts for as much as two decades, an accurate picture might never be recreated, while the cost of such an endeavor would erode creditor recoveries and substantially delay confirmation of a plan and distributions to creditors thereunder.  Moreover, any effort to pursue this approach could be challenged by litigation and there is no assurance as to how the Court would ultimately rule on a dispute over the proper amount of the intercompany claims.

With these caveats, for the purpose of analyzing deconsolidation of the estates vs. substantive consolidation, the Committee utilized three assumptions regarding the intercompany claims listed in the Schedules:  (i) the scheduled intercompany claims would be deemed wholly valid; (ii) the scheduled intercompany claims would be deemed partially valid; and (iii) the scheduled intercompany claims would be deemed wholly invalid.

In order to ascertain an amount of prepetition intercompany claims that could potentially be valid, the Debtors and their advisors did an analysis of the Debtors' corporate cash expenses for the prior five years prior to the Petition Date.  As part of this analysis, the Debtors and their advisors concluded that the Debtors under-allocated corporate expenses from the Parent to its subsidiaries.  Upon completion of this five year "look-back" analysis, the Debtors believe that the Parent under-allocated approximately $21.9 million of expenses to Manufacturing, and approximately $11.5 million to Nationwide.  After considering this under-allocation, the intercompany claim by Manufacturing against the Parent is reduced from approximately $71 million to approximately $49 million, and the

intercompany claim by Nationwide against the Parent of approximately $9 million is more than completely offset. In the various scenario analyses that follow, the Proponents assumed in Scenario 2 that the scheduled intercompany claims are partially valid based on this five year "look-back" analysis.

Summary of Post-Petition Intercompany Allocations

As previously discussed, the corporate overhead and other expenses were historically recorded at Parent and were not allocated to the Debtor subsidiaries that relied on these services to operate their businesses. In order to properly allocate the corporate overhead and other expenses to the appropriate legal entities that benefitted from the services during the postpetition period, several adjustments were necessary, including:

•       Recognition of intercompany transactions (excluding corporate overhead allocations) through March 2011 – cash receipts and disbursements in the Debtors' cash management system were evidenced by intercompany balances between the Debtors to reflect amounts that were collected and paid by Parent on behalf of the Debtor subsidiaries. Pursuant to the cash management system, deposits were swept to Parent if they were received into the Debtor subsidiary accounts and Parent made all the disbursements on account of the Debtor subsidiaries. Post-petition, these transactions were accounted for through the use of the intercompany accounts to keep track of the advances and borrowings between the entities.

•       Estimate of April 2011 intercompany transactions (excluding corporate overhead allocations) – a further adjustment was necessary to reflect the balances as of the April 22, 2011 Cavco transaction closing date because during the month of April 2011, there was a substantial increase in the amount of borrowings by the Debtor subsidiaries due to a reduction in customer collections and an increase in vendor payables becoming due. In order to account for the increased borrowings, the Substantive Consolidation Analysis estimated the ending intercompany borrowings based on the final drawn DIP Facility balance and allocated the amounts to the Debtors based on the carrying value of specific assets (consistent with the allocation methodology described above).

•       True-up of overhead and other cost allocations – an additional adjustment was necessary in order to properly align the overhead and other costs with the legal entity that benefitted from the services. The overhead expenses were primarily driven by the volume of activity at each of the Debtors, and, as a result, were allocated to the Debtors based on each Debtor's pro-rata share of revenue during the post-petition period. This adjustment has the impact of reclassifying expenses from Parent to the Debtor subsidiaries since these transactions had not previously been allocated to the Debtor subsidiaries in the debtors' books and records.

**(ii)     Various Outcomes**

Applying the above assumptions on asset allocation of the sale proceeds and allocation of the major items of administrative liability (DIP Credit Agreement Claim, amongst others), the range of outcomes for unsecured creditors varies significantly when you also factor in the three potential outcomes regarding intercompany claims as highlighted below. Importantly, the analyses below are included for informational purposes only in connection with the substantive consolidation discussion, and not for any other purpose under the Disclosure Statement or Plan, including the projections under each of the Class of Claims as set forth in other places in the Disclosure Statement. The information contained in the below analyses is based on March 2011 financial information. However, the Proponents believe that even if they were to utilize information that is more current, the analysis below will not change materially, nor would it impact the Proponents' recommendation that substantive consolidation is in the best interests of all unsecured creditors.

# Scenario 1- Assuming Intercompany Claims are Valid

| | Palm Harbor Homes, Inc. | Palm Harbor Manu., LP | Nationwide Homes, Inc. | Palm Harbor Albe., LLC | Palm Harbor GenPar, LLC | Palm Harbor RE, LLC | Non-Debtor Entities |
|---|---|---|---|---|---|---|---|
| **SOURCES OF CASH:** | | | | | | | |
| Sales Proceeds net of Expense Reimbursement | $43,037 | $9,082 | $7,286 | $946 | NA | NA | $23,550 |
| Ending Cash on Hand | 5,411 | NA | NA | NA | NA | NA | NA |
| Customer Deposits | 1,270 | NA | NA | NA | NA | NA | NA |
| Letters of Credit - Restricted Cash | 9,330 | NA | NA | NA | NA | NA | NA |
| **Total Sources of Cash at Closing** [1] | **$59,047** | **$9,082** | **$7,286** | **$946** | **NA** | **NA** | **$23,550** |
| **USES OF CASH:** | | | | | | | |
| Total Cash Distributions at Closing | ($37,932) | ($7,167) | ($8,390) | ($720) | $0 | NA | NA |
| Total Postpetition Intercompany Borrowings and Corporate Overhead Allocations [2] | $5,790 | ($4,067) | ($1,711) | ($12) | NA | NA | NA |
| Total Restricted Cash Related Disbursements | (8,770) | NA | NA | NA | NA | NA | NA |
| Total Vendor & Other Liabilities | (2,024) | (3,261) | (1,127) | NA | NA | NA | NA |
| Total Employee Related Liabilities | (1,564) | (1,147) | (167) | (3) | NA | NA | NA |
| Total Insurance Liabilities | (595) | (820) | (97) | NA | NA | NA | NA |
| Total Tax Liabilities | (875) | (185) | (148) | (19) | NA | NA | NA |
| Total Professional Fees Liabilities | (2,704) | (1,132) | (277) | (27) | 0 | NA | NA |
| Cost of Wind Down | (1,959) | (820) | (201) | (20) | 0 | NA | NA |
| **Total Uses of Cash** (Secured and Administrative Claims) [1] | **($50,633)** | **($18,599)** | **($12,119)** | **($801)** | **$0** | **NA** | **NA** |
| **Amount of Admin Solvency / Insolvency** | **$8,414** | **($9,517)** | **($4,833)** | **$144** | **$0** | **NA** | **$23,550** |
| **REMAINING VALUE AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| **Cash Available for Distribution:** | **$8,414** | **NM** | **NM** | **$144** | **$0** | **NA** | **$23,550** |
| Adjustment for Equity Value of Wholly Owned Subs | $23,550 | NA | NA | NA | NA | NA | ($23,550) |
| **Distributable Cash Value** | **$31,964** | **NA** | **NA** | **$144** | **$0** | **NA** | **NA** |
| Estimated 3rd Party Unsecured Claims | 115,000 | 8,032 | 3,993 | 27 | 9 | 9 | NA |
| Palm Harbor Manu Intercompany | 71,241 | NA | NA | NA | NA | NA | NA |
| Nationwide Homes Intercompany | 9,430 | NA | NA | NA | NA | NA | NA |
| **Total Unsecured Claims Filed** | **$195,671** | **$8,032** | **$3,993** | **$27** | **$9** | **$9** | **NA** |
| **Recovery to Unsecured Creditors** (prior to impact of Intercompany Claims) | **16.3%** | **0.0%** | **0.0%** | **533.0%** | **2.0%** | **0.0%** | **NA** |
| **Funds Available to 3rd Party Unsecured by Estate** (after impact of Intercompany Claims) | **$18,903** | **$2,121** | **NA** | **$27** | **$0** | **NA** | **NA** |
| **Total Recovery to 3rd Party Unsecured Creditors** (after impact of Intercompany Claims) | **16.4%** | **26.4%** | **0.0%** | **100.0%** | **2.0%** | **0.0%** | **0.0%** |

(1) For the purposes of analyzing a Deconsolidated Plan, the various assets and liabilities of the Debtors must be allocated to a specific legal entity. Certain of these amounts are known and easily allocable to a specific Debtor entity, whereas the remainder of the figures (e.g. purchase price and DIP balance) were allocated to each legal entity based upon a selected methodology related to the proportion of total assets and/or liabilities held within each of the Debtors' respective estates. The methodology for allocating the Debtors' assets and liabilities to each legal entity materially impacts the recovery available to unsecured creditors within each estate.

(2) Reflects estimated intercompany borrowings between the debtors during the chapter 11 postpetition period. The amounts are based on direct intercompany borrowings through March 2011, an estimate of direct intercompany borrowings for the April 2011 period as well as an allocation of corporate overhead expenses incurred during the chapter 11 period that were not previously allocated to the debtor subsidiaries.

## Scenario 2 – Assuming Intercompany Claims are Partially Valid

| | Palm Harbor Homes, Inc. | Palm Harbor Manu., LP | Nationwide Homes, Inc. | Palm Harbor Albe., LLC | Palm Harbor GenPar, LLC | Palm Harbor RE, LLC | Non-Debtor Entities |
|---|---|---|---|---|---|---|---|
| **SOURCES OF CASH:** | | | | | | | |
| Sales Proceeds net of Expense Reimbursement | $43,037 | $9,082 | $7,286 | $946 | NA | NA | $23,550 |
| Ending Cash on Hand | 5,411 | NA | NA | NA | NA | NA | NA |
| Customer Deposits | 1,270 | NA | NA | NA | NA | NA | NA |
| Letters of Credit - Restricted Cash | 9,330 | NA | NA | NA | NA | NA | NA |
| **Total Sources of Cash at Closing** [1] | **$59,047** | **$9,082** | **$7,286** | **$946** | **NA** | **NA** | **$23,550** |
| **USES OF CASH:** | | | | | | | |
| Total Cash Distributions at Closing | ($37,932) | ($7,167) | ($8,390) | ($720) | $0 | NA | NA |
| Total Postpetition Intercompany Borrowings and Corporate Overhead Allocations [2] | $5,790 | ($4,067) | ($1,711) | ($12) | NA | NA | NA |
| Total Restricted Cash Related Disbursements | (8,770) | NA | NA | NA | NA | NA | NA |
| Total Vendor & Other Liabilities | (2,024) | (3,261) | (1,127) | NA | NA | NA | NA |
| Total Employee Related Liabilities | (1,564) | (1,147) | (167) | (3) | NA | NA | NA |
| Total Insurance Liabilities | (595) | (820) | (97) | NA | NA | NA | NA |
| Total Tax Liabilities | (875) | (185) | (148) | (19) | NA | NA | NA |
| Total Professional Fees Liabilities | (2,704) | (1,132) | (277) | (27) | 0 | NA | NA |
| Cost of Wind Down | (1,959) | (820) | (201) | (20) | 0 | NA | NA |
| **Total Uses of Cash** (Secured and Administrative Claims) [1] | **($50,633)** | **($18,599)** | **($12,119)** | **($801)** | **$0** | **NA** | **NA** |
| **Amount of Admin Solvency / Insolvency** | **$8,414** | **($9,517)** | **($4,833)** | **$144** | **$0** | **NA** | **$23,550** |
| **REMAINING VALUE AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| **Cash Available for Distribution:** | **$8,414** | **NM** | **NM** | **$144** | **$0** | **NA** | **$23,550** |
| Adjustment for Equity Value of Wholly Owned Subs | $23,550 | NA | NA | NA | NA | NA | ($23,550) |
| **Distributable Cash Value** | **$31,964** | **NA** | **NA** | **$144** | **$0** | **NA** | **NA** |
| Estimated 3rd Party Unsecured Claims | 115,000 | 8,032 | 3,993 | 27 | 9 | 9 | NA |
| Palm Harbor Manu Intercompany | 49,329 | NA | NA | NA | NA | NA | NA |
| Nationwide Homes Intercompany | NA | NA | NA | NA | NA | NA | NA |
| **Total Unsecured Claims Filed** | **$164,329** | **$8,032** | **$3,993** | **$27** | **$9** | **$9** | **NA** |
| **Recovery to Unsecured Creditors** (prior to impact of Intercompany Claims) | **19.5%** | **0.0%** | **0.0%** | **533.0%** | **2.0%** | **0.0%** | **NA** |
| **Funds Available to 3rd Party Unsecured by Estate** (after impact of Intercompany Claims) | **$22,486** | **$78** | **NA** | **$27** | **$0** | **NA** | **NA** |
| **Total Recovery to 3rd Party Unsecured Creditors** (after impact of Intercompany Claims) | **19.6%** | **1.0%** | **0.0%** | **100.0%** | **2.0%** | **0.0%** | **0.0%** |

(1) For the purposes of analyzing a Deconsolidated Plan, the various assets and liabilities of the Debtors must be allocated to a specific legal entity. Certain of these amounts are known and easily allocable to a specific Debtor entity, whereas the remainder of the figures (e.g. purchase price and DIP balance) were allocated to each legal entity based upon a selected methodology related to the proportion of total assets and/or liabilities held within each of the Debtors' respective estates. The methodology for allocating the Debtors' assets and liabilities to each legal entity materially impacts the recovery available to unsecured creditors within each estate.

(2) Reflects estimated intercompany borrowings between the debtors during the chapter 11 postpetition period. The amounts are based on direct intercompany borrowings through March 2011, an estimate of direct intercompany borrowings for the April 2011 period as well as an allocation of corporate overhead expenses incurred during the chapter 11 period that were not previously allocated to the debtor subsidiaries.

# Scenario 3 – Assuming Intercompany Claims are Invalid

| | Palm Harbor Homes, Inc. | Palm Harbor Manu., LP | Nationwide Homes, Inc. | Palm Harbor Albe., LLC | Palm Harbor GenPar, LLC | Palm Harbor RE, LLC | Non-Debtor Entities |
|---|---|---|---|---|---|---|---|
| **SOURCES OF CASH:** | | | | | | | |
| Sales Proceeds net of Expense Reimbursement | $43,037 | $9,082 | $7,286 | $946 | NA | NA | $23,550 |
| Ending Cash on Hand | 5,411 | NA | NA | NA | NA | NA | NA |
| Customer Deposits | 1,270 | NA | NA | NA | NA | NA | NA |
| Letters of Credit - Restricted Cash | 9,330 | NA | NA | NA | NA | NA | NA |
| **Total Sources of Cash at Closing** [1] | **$59,047** | **$9,082** | **$7,286** | **$946** | **NA** | **NA** | **$23,550** |
| **USES OF CASH:** | | | | | | | |
| Total Cash Distributions at Closing | ($37,932) | ($7,167) | ($8,390) | ($720) | $0 | NA | NA |
| Total Postpetition Intercompany Borrowings and Corporate Overhead Allocations [2] | $5,790 | ($4,067) | ($1,711) | ($12) | NA | NA | NA |
| Total Restricted Cash Related Disbursements | (8,770) | NA | NA | NA | NA | NA | NA |
| Total Vendor & Other Liabilities | (2,024) | (3,261) | (1,127) | NA | NA | NA | NA |
| Total Employee Related Liabilities | (1,564) | (1,147) | (167) | (3) | NA | NA | NA |
| Total Insurance Liabilities | (595) | (820) | (97) | NA | NA | NA | NA |
| Total Tax Liabilities | (875) | (185) | (148) | (19) | NA | NA | NA |
| Total Professional Fees Liabilities | (2,704) | (1,132) | (277) | (27) | 0 | NA | NA |
| Cost of Wind Down | (1,959) | (820) | (201) | (20) | 0 | NA | NA |
| **Total Uses of Cash** (Secured and Administrative Claims) [1] | **($50,633)** | **($18,599)** | **($12,119)** | **($801)** | **$0** | **NA** | **NA** |
| **Amount of Admin Solvency / Insolvency** | **$8,414** | **($9,517)** | **($4,833)** | **$144** | **$0** | **NA** | **$23,550** |
| **REMAINING VALUE AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| **Cash Available for Distribution:** | **$8,414** | **NM** | **NM** | **$144** | **$0** | **NA** | **$23,550** |
| Adjustment for Equity Value of Wholly Owned Subs | $23,550 | NA | NA | NA | NA | NA | ($23,550) |
| **Distributable Cash Value** | **$31,964** | **NA** | **NA** | **$144** | **$0** | **NA** | **NA** |
| Estimated 3rd Party Unsecured Claims | 115,000 | 8,032 | 3,993 | 27 | 9 | 9 | NA |
| Palm Harbor Manu Intercompany | NA | NA | NA | NA | NA | NA | NA |
| Nationwide Homes Intercompany | NA | NA | NA | NA | NA | NA | NA |
| **Total Unsecured Claims Filed** | **$115,000** | **$8,032** | **$3,993** | **$27** | **$9** | **$9** | **NA** |
| **Recovery to Unsecured Creditors** (prior to impact of Intercompany Equity) | **27.8%** | **0.0%** | **0.0%** | **533.0%** | **2.0%** | **0.0%** | **NA** |
| **Funds Available for 3rd Party Unsecured by Estate** (after impact of Intercompany Equity) | **$32,082** | **NA** | **NA** | **$27** | **$0** | **NA** | **NA** |
| **Total Recovery to 3rd Party Unsecured Creditors** (after impact of Intercompany Equity) | **27.9%** | **0.0%** | **0.0%** | **100.0%** | **2.0%** | **0.0%** | **0.0%** |

(1) For the purposes of analyzing a Deconsolidated Plan, the various assets and liabilities of the Debtors must be allocated to a specific legal entity. Certain of these amounts are known and easily allocable to a specific Debtor entity, whereas the remainder of the figures (e.g. purchase price and DIP balance) were allocated to each legal entity based upon a selected methodology related to the proportion of total assets and/or liabilities held within each of the Debtors' respective estates. The methodology for allocating the Debtors' assets and liabilities to each legal entity materially impacts the recovery available to unsecured creditors within each estate.

(2) Reflects estimated intercompany borrowings between the debtors during the chapter 11 postpetition period. The amounts are based on direct intercompany borrowings through March 2011, an estimate of direct intercompany borrowings for the April 2011 period as well as an allocation of corporate overhead expenses incurred during the chapter 11 period that were not previously allocated to the debtor subsidiaries.

c)       The Proponents Support Substantive Consolidation

After careful and extensive analysis, the Proponents have concluded that the Debtors' assets and liabilities are so scrambled that separating them is prohibitive and will result in harm to unsecured creditors.  As demonstrated above, to project what creditors might receive under a deconsolidated plan, one would have to apply numerous, subjective assumptions regarding the allocation of asset values and liabilities and intercompany claims, which depending upon the set of assumptions applied, could lead to drastically different outcomes for unsecured creditors in the various estates, some better, some markedly worse.  Indeed, in several scenarios, Subsidiary Creditors would not receive <u>any</u> distributions.  Without an extensive, time-consuming and costly forensic reconstruction of the Debtors' books and records dating back two decades, better answers cannot be provided and ultimately given the nature of the variables perhaps no truly scientific allocation of assets and liabilities among the estates could be established, propounding a plan providing for substantive consolidation is, in the Proponents' opinion, superior to attempting to propound and confirm deconsolidated plans.  Thus, after careful consideration of the facts and the applicable law, the Proponents support substantive consolidation, which will lead to a projected recovery of ~~16.7~~17% to 21% for allowed general unsecured creditors.

3.       **Post-Consummation Trust**

a)       Establishment of the Post-Consummation Trust

On or prior to the Effective Date, the Debtors, on their own behalf and on behalf of the Beneficiaries, will execute the Post-Consummation Trust Agreement and will take all other steps necessary to establish the Post-Consummation Trust pursuant to the Post-Consummation Trust Agreement.

Upon the Effective Date, (a) the members of the board of directors or managers, as the case may be, and all officers of each of the Debtors shall be deemed to have resigned; and (b) each of the Debtors shall cause all its Assets and the Assets of its Estate to be transferred to the Post-Consummation Trust. In connection with the transfer of their Assets, any attorney-client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Post-Consummation Trust will vest in the Post-Consummation Trust and its representatives, and the Debtors and the Post-Consummation Trust are authorized to take all necessary actions to effectuate the transfer of such privileges.

Upon transfer of the Assets, the Debtors and their officers and directors shall have no further duties or responsibilities in connection with the implementation of the Plan.

b)       Dissolution of the Debtors

On the Effective Date, the Debtors shall be deemed dissolved under applicable State law for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith.

c)       Appointment of the Post-Consummation Trust Administrator

On the Effective Date and in compliance with the provisions of the Plan, the Post-Consummation Trust Administrator will be appointed in accordance with the Post-Consummation Trust Agreement and the Post-Consummation Trust will be administered by the Post-Consummation Trust Administrator in accordance with the Post-Consummation Trust Agreement.

4.       **Further Actions**

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan will be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders or the Debtors' boards of directors.  On and after the Effective Date, the Post-Consummation Trust is authorized and directed to issue, execute and deliver the agreements, documents, and distributions contemplated by the Plan.

5.      **Sources of Cash for Plan Distributions**

All Cash necessary for the Post-Consummation Trust to make payments pursuant to the Plan shall be obtained from the Post-Consummation Trust Assets.

6.      **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII of the Plan, all Claims, Equity Interests, mortgages, deeds of trust, liens or other security interests against the property of any Estate shall be fully released and deemed satisfied in exchange for the treatment provided under the Plan.

7.      **Exemption from Certain Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to: (a) the creation of any mortgage, deed of trust, lien or other security interest; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any transaction occurring under the Plan.

8.      **Cancellation of 3.25% Convertible Senior Notes and Equity Interests**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates and other documents evidencing the 3.25% Convertible Senior Notes, the Equity Interests and the Intercompany Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released and cancelled.  On the Effective Date, except to the extent otherwise provided in the Plan, any indenture relating to any of the foregoing, including the 3.25% Convertible Senior Notes Indenture, shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be fully released and cancelled.  Notwithstanding the foregoing provisions of Article V.H. of the Plan and anything else contained in the Plan, the 3.25% Convertible Senior Notes Indenture shall continue in effect solely for the purposes of and to the extent necessary to allow the 3.25% Convertible Senior Notes Indenture Trustee to make distributions under the Plan to Holders of Allowed 3.25% Convertible Senior Notes  Claims.  For the avoidance of doubt, nothing in the Plan shall waive, release, or impair any rights, claims or interests, if any, that the 3.25% Convertible Senior Notes Indenture Trustee may have under the 3.25% Convertible Senior Notes Indenture or otherwise to the recovery and/or reimbursement of its fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors), to the extent unpaid by the Post-Consummation Trust Administrator under Article VII.C.2, from any distribution under the Plan, whether such rights, claims or interests are in the nature of a charging lien or otherwise, all of which rights, claims and interests expressly are preserved subject to satisfaction by the Post-Consummation Trust Administrator under Article VII.C.2 of the Plan.  Except as otherwise provided in the Plan, upon cancellation of the 3.25% Convertible Senior Notes Indenture, the 3.25% Convertible Senior Notes Indenture Trustee shall be relieved of any obligations as Indenture Trustee under the 3.25% Convertible Senior Notes Indenture.

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

    **1.** **Assumption and Rejection of Executory Contracts and Unexpired Leases**

        a)     <u>Rejection of Executory Contracts and Unexpired Leases</u>

Each Executory Contract or Unexpired Lease shall be deemed automatically rejected in accordance with the provisions of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory or Unexpired Lease:

        (i)     has previously been assumed by the Debtors by Final Order of the Bankruptcy Court;

        (ii)     is a Retained Contract;

        (iii)     is not an Assigned Contract and has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date which order becomes a Final Order after the Effective Date;

        (iv)     is the subject of a motion to assume or reject pending as of the Effective Date; and

        (v)     is a D&O Liability Insurance Policy; provided that such Executory Contracts and Unexpired Leases shall be treated as set forth in Article VI.C of the Plan.

    **2.** **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

**Notwithstanding anything to the contrary provided in the Plan, all Proofs of Claim arising from the rejection (if any) of Executory Contracts or Unexpired Leases must be Filed within 30 days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claim are not timely Filed will be forever barred from assertion against the Debtors, their Estates and property or the Post-Consummation Trust, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article XI.F of the Plan. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article XI.F of the Plan.**

    **3.** **Assumption of D&O Insurance Policies**

As of the Effective Date, the Debtors or the Post-Consummation Trust shall be deemed to have assumed the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code, to the extent prepaid and provided that the Post-Consummation Trust shall have no obligation to fund premiums or any other alleged costs associated with the D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, upon Confirmation of the Plan the Debtors or the Post-Consummation Trust shall have no indemnity obligations except to the extent of the coverage and insurance proceeds available under the D&O Liability Insurance Policies, but such limited indemnity obligation will be deemed and treated as an Executory Contract that has been assigned to the Post-Consummation Trust for which no Proof of Claim need be Filed.

    **4.** **Modifications, Amendments, Supplements, Restatements or Other Agreements**

Unless otherwise provided by the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interest.

Amendments, supplements, restatements or other modifications to Executory Contracts or Unexpired Leases executed by the Debtors during the pendency of the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claim arising in connection therewith.

**5.      Reservation of Rights**

Nothing contained in the Plan or Plan Supplement shall constitute an admission by the Debtors that any such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor or the Post-Consummation Trust has any liability thereunder.

**F.      PROVISIONS GOVERNING DISTRIBUTIONS**

**1.      Distributions on Account of Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan or as may be ordered by the Bankruptcy Court, and subject to the establishment of appropriate Disputed Claims Reserve, all distributions with respect to Claims that are Allowed Claims as of the Effective Date and that are not Assumed Liabilities shall be made by the Post-Consummation Trust as set forth in the Plan.  As described in Article VIII of the Plan, the Post-Consummation Trust shall make distributions on the Effective Date or as soon as reasonably practicable thereafter to the respective Beneficiaries pursuant to the Plan on account of Allowed Claims.

**2.      Distributions on Account of Claims Allowed After the Effective Date**

a)      Payments and Distributions on Disputed Claims

Notwithstanding any provision in the Plan to the contrary, except as otherwise agreed by the Post-Consummation Trust Administrator subject to the consent of the Post-Consummation Trust Oversight Committee, no partial payments and no partial distributions will be made with respect to a Disputed Claim until the resolution of any such disputes by settlement or Final Order.  Once Allowed, the Holder of such Allowed Claim that was a Disputed Claim will receive such payments and distributions to which that Holder is then entitled under the Plan.  If a distribution to such Allowed Claim Holder's applicable Class has already occurred, then the Post-Consummation Trust Administrator shall make any necessary catch-up payments to the Holder of such Allowed Claim Holder within a reasonable amount of time after such Disputed Claim becomes an Allowed Claim.  In the event Claims require adjudication or other resolution, the Post-Consummation Trust reserves the right to, or shall upon an order of the Bankruptcy Court, establish appropriate reserves for potential payment of any such Claims.

**3.      Delivery and Distributions and Undeliverable or Unclaimed Distributions**

a)      Delivery of Distributions in General

Except as otherwise provided in the Plan, the Post-Consummation Trust Administrator shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Post-Consummation Trust's books and records as of the date of any such distribution; provided, however, that if such Holder Files a Proof of Claim, the address identified by the Proof of Claim shall be the address for such distribution, and the manner of delivery for such distributions shall be determined at the discretion of the Post-Consummation Trust, as applicable.  Nothing in the Plan shall require or be deemed to require the Post-Consummation Trust to attempt to locate any Holder of an Allowed Claim.

Distributions to Holders of 3.25% Convertible Senior Notes shall be made by the Post-Consummation Trust to the 3.25% Convertible Senior Notes Indenture Trustee, as Distribution Agent for the 3.25% Convertible Senior Notes Claims, which, in turn, shall make such distributions to the applicable Holders either through DTC or, in the case of Claims held directly by the Holder thereof, through the 3.25% Convertible Senior Notes Indenture Trustee subject to its rights, claims and interests, under the 3.25% Convertible Senior Notes Indenture or otherwise to the recovery and/or reimbursement of its fees, costs and expenses (including the fees, costs and expenses of counsel and

financial advisors) from any distribution under the Plan, whether such rights, claims or interests are in the nature of a charging lien or otherwise. All distributions to Holders of Allowed 3.25% Convertible Senior Notes Claims shall be governed by the Plan and the 3.25% Convertible Senior Notes Indenture. Except as otherwise provided in the Plan, after the Post-Consummation Trust Administrator delivers such distribution to the 3.25% Convertible Senior Notes Indenture Trustee, neither the Post-Consummation Trust nor the Post-Consummation Trust Administrator or its professionals shall be deemed liable for any Claims or Causes of Action by Holders of 3.25% Convertible Senior Notes Claims arising out of or relating to such distribution. Notwithstanding any provisions in the Plan to the contrary, the 3.25% Convertible Senior Notes Indenture shall continue in effect to the extent necessary to (a) allow the 3.25% Convertible Senior Notes Indenture Trustee to receive and make distributions pursuant to the Plan on account of the 3.25% Convertible Senior Notes Claims, (b) exercise its charging liens against any such distributions and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions. No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

b)     <u>Distributions by Distribution Agents</u>

The Post-Consummation Trust Administrator shall have the authority, subject to the approval of the Post-Consummation Trust Oversight Committee, to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan. The Post-Consummation Trust shall pay to the Distribution Agent all reasonable and documented fees and expenses of the Distribution Agent without the need for any approvals, authorizations, actions or consents. The Distribution Agent shall submit detailed invoices to the Post-Consummation Trust for all fees and expenses for which the Distribution Agent seeks reimbursement and the Post-Consummation Trust shall pay those amounts that it, subject to the approval of the Post-Consummation Trust Oversight Committee, deems reasonable, and shall object in writing to those fees and expenses, if any, that the Post-Consummation Trust deems unreasonable. Except as otherwise set forth above for the 3.25% Convertible Senior Notes Indenture Trustee, as a condition to serving as a Distribution Agent, a Distribution Agent must (a) affirm its obligation to facilitate the prompt distribution of any documents, (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan, and (c) waive any right or ability to setoff, deduct from, or assert any lien or encumbrance against the distributions required under the Plan that are to be distributed by such Distribution Agent.

After the Effective Date, the 3.25% Convertible Senior Notes Indenture Trustee shall be compensated by the Post-Consummation Trust for its reasonable and documented fees and expenses for making distributions pursuant to the Plan and shall be indemnified by the Post-Consummation Trust for any loss, damage, claim, liability, cost or expense incurred in the absence of any negligence or bad faith on the part of the 3.25% Convertible Senior Notes Indenture Trustee, solely if such loss, damage, claim, liability, cost, or expense arises out of or is in connection with the performance of its duties as Distribution Agent under the Plan, including the reasonable costs and expenses of defending itself against any claim of liability from the Holders of 3.25% Convertible Senior Notes Claims resulting from the performance of its duties as Distribution Agent under the Plan. Such compensation and reimbursement to the 3.25% Convertible Senior Notes Indenture Trustee made after the Effective Date shall be made by the Post-Consummation Trust Administrator on behalf of the Post-Consummation Trust without the need for filing any application or request with, or approval by, the Bankruptcy Court, but subject only to review for reasonableness by the Post-Consummation Trust Administrator.

In the event the Post-Consummation Trust objects to all or any portion of the fees and expenses to be reimbursed in a Distribution Agent's invoice, including those of the 3.25% Convertible Senior Notes Indenture Trustee, the Post-Consummation Trust and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Post-Consummation Trust and such Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

c)     <u>Record Date for Distributions</u>

Unless otherwise set forth in the Confirmation Order, the Debtors shall not establish a record date for distributions to Holders of 3.25% Convertible Senior Notes Claims. Distributions to Holders of such Claims held through DTC shall be made by means of book-entry exchange through the facilities of DTC in accordance with the customary practices of DTC, as and to the extent practicable, and the Record Date shall not apply. In connection with

such book-entry exchange, the Post-Consummation Trust Administrator will provide information to the 3.25% Convertible Senior Notes Indenture Trustee, which 3.25% Convertible Senior Notes Indenture Trustee shall convey to DTC to effect distributions on a Pro Rata basis as provided under the Plan with respect to such 3.25% Convertible Senior Notes Claims.

d)      <u>Minimum Distributions</u>

Notwithstanding anything in the Plan to the contrary, the Post-Consummation Trust shall not be required to make distributions or payments on account of an Allowed Claim of less than $50.00 and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar, with half dollars or less being rounded down.

If, at any time, the Post-Consummation Trust hold only de minimis Assets such that the costs of distribution (after reserving for Post-Consummation Trust expenses) exceeds the distribution amount in the sole discretion of the Post-Consummation Trust Administrator, the Post-Consummation Trust Administrator may, subject to the consent of the Post-Consummation Trust Oversight Committee, distribute remaining Assets to charity.

e)      <u>Undeliverable Distributions and Unclaimed Property</u>

If any distribution to a Holder of an Allowed Claim made in accordance with the Plan is returned to the Post-Consummation Trust or their Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Post-Consummation Trust or their Distribution Agent, as applicable, are notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder without interest within a reasonable amount of time at the discretion of the Post-Consummation Administrator. Undeliverable and unclaimed distributions shall remain in the possession of the Post-Consummation Trust; <u>provided that</u> such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the earlier to occur of (x) 30 days after the final distribution; or (ii) 90 days after the distribution is returned as undeliverable or the date of issuance of check (in the case of an unclaimed distribution). After such date, the distribution on account of such claim shall be released and forever barred, and the Cash, including interest earned thereon, if any, shall be distribution in accordance with the terms of the Plan.

4.      <b>Compliance with Tax Requirements/Allocations</b>

In connection with the Plan, to the extent applicable, the Debtors and the Post-Consummation Trust shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Post-Consummation Trust and its Distribution Agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Post-Consummation Trust reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

In connection with the Plan and Distributions made pursuant to the Plan, neither the Post-Consummation Trust Administrator nor any of his representatives shall be obligated for the withholding of any applicable taxes. Rather, it is the Beneficiaries' obligation to pay any taxes that might be due on account of the Distributions.

No holder of an Allowed Class 3 or Class 4 Claim will receive a Distribution to which it may be entitled to under the Plan unless and until such time as such holder has provided the Post-Consummation Trust Administrator with an appropriate tax-payer identification number or other information reasonably requested by the Post-Consummation Trust Administrator. Any holder of an Allowed Claim that does not provide the

Post-Consummation Trust Administrator with an appropriate tax payer identification number or other information reasonably requested by the Liquidating Trustee within ninety (90) days after a request in writing shall be deemed to have forfeited its Claim for any Distribution and shall be forever barred and enjoined from asserting any such Claim for any Distribution against the Debtor and its Estate, the Post-Consummation Trust Administrator, the Post Consummation Trust, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its and their property. In such cases, any Cash otherwise reserved for such Distribution shall become the property of the Post-Consummation Trust free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of the Plan and the Post-Consummation Trust Agreement.

### 5. Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class at that time. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 6. Setoffs

#### a) By the Post-Consummation Trust

The Post-Consummation Trust may withhold (but not setoff except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Post-Consummation Trust may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Post-Consummation Trust may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Post-Consummation Trust may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, setoff or recoup against such Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Post-Consummation Trust may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff or recoupment nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Post-Consummation Trust of any such claims, equity interests, rights and Causes of Action that the Debtors or the Post-Consummation Trust may possess against any such Holder, except as specifically provided in the Plan.

#### b) By Non-Debtors

Unless otherwise stipulated in writing by the Debtors (before the Effective Date) or by the Post-Consummation Trust (after the Effective Date), or asserted pursuant to a timely filed Proof of Claim or as expressly provided for by the terms of the agreement underlying any timely filed Proof of Claim, any party against whom a claim or counterclaim is asserted by the Debtors' Estates (an "Estate Claim") must assert or must have asserted any setoff rights, right of subrogation, or recoupment of any kind against such Estate Claim at the time it answers such Estate Claim, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred; provided, however that nothing in the Plan shall limit the assertion of such right of setoff, subrogation or recoupment via an amended or supplemental pleading to the extent permitted by Rule 15 of the Federal Rules of Civil Procedure and/or Rule 7015 of the Federal Rules of Bankruptcy Procedure. Notwithstanding the foregoing, nothing in the Plan shall affect the setoff rights of any taxing authority.

7. **Surrender of Canceled Instruments or Securities**

On the Effective Date, or as soon thereafter as is reasonably practicable, as a condition precedent to receiving any distribution on account of its Allowed Claim, each record Holder of a 3.25% Convertible Senior Notes Claim shall surrender such 3.25% Convertible Senior Note to the 3.25% Convertible Senior Notes Indenture Trustee, provided, however, that if a claimant is a Holder of a 3.25% Convertible Senior Note for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC, then the 3.25% Convertible Senior Notes Indenture Trustee may waive the requirement of surrender and the Debtors, Post-Consummation Trust, the Post-Consummation Trust Administrator and the 3.25% Convertible Senior Notes Indenture Trustee shall seek the cooperation of DTC to provide appropriate instructions to the 3.25% Convertible Senior Notes Indenture Trustee. In the 3.25% Convertible Senior Notes Indenture Trustee's sole discretion, if no surrender of a 3.25% Convertible Senior Note occurs and a claimant does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the 3.25% Convertible Senior Notes Indenture Trustee, that such 3.25% Convertible Senior Note was lost, then no distribution may be made to any such claimant whose Claim is based on a 3.25% Convertible Senior Note.

## G. THE POST-CONSUMMATION TRUST AND THE POST-CONSUMMATION TRUST ADMINISTRATOR

### 1. Establishment of the Post-Consummation Trust

The Post-Consummation Trust shall be established and shall become effective on the Effective Date. The Post-Consummation Trust, acting through the Post-Consummation Trust Administrator under the supervision and direction of the Post-Consummation Trust Oversight Committee, shall be authorized to exercise and perform the rights, powers and duties held by the Debtors and their Estates, including without limitation the authority under section 1123(b)(3) of the Bankruptcy Code, to provide for the prosecution, settlement, adjustment, retention and enforcement of claims and interests of the Estate, including but not limited to the Causes of Action, and the authority to exercise all rights and powers under sections 506(c), 544-551, 1106, 1107 and 1108 of the Bankruptcy Code. The Debtors and the Post-Consummation Trust Administrator will establish the Post-Consummation Trust on behalf of the Beneficiaries pursuant to the Post-Consummation Trust Agreement and the Plan, with the Beneficiaries to be treated as the grantors and deemed owners of the Post-Consummation Trust Assets. The Post-Consummation Trust will accept and hold the Assets as Post-Consummation Trust Assets in the Post-Consummation Trust for the benefit of the Beneficiaries, subject to the Plan and the Post-Consummation Trust Agreement. All Distributions to the Holders of Allowed Claims shall be from the Post-Consummation Trust Assets.

### 2. Assets to the Post-Consummation Trust

The Post-Consummation Trust shall hold and administer the following Assets and proceeds thereof under the supervision and direction of the Post-Consummation Trust Oversight Committee:

a) The Assets of the Debtors, including, but not limited to the Causes of Action for liquidation and distribution in accordance with the Plan;

b) Any Disputed Reserves to be administered in accordance with the Plan and the Post-Consummation Trust Agreement; and

c) All other all of their rights, title and interests in property of the Debtors and their Estates, and each of the, which shall be transferred by the Debtors to the Post-Consummation Trust on the Effective Date for liquidation and distribution in accordance with the Plan, notwithstanding any prohibition on assignment under non-bankruptcy law.

### 3. Distribution; Withholding

The Post-Consummation Trust will make distributions to its Beneficiaries as provided by the Plan and pursuant to the Post-Consummation Trust Agreement. The Post-Consummation Trust may withhold from amounts

distributable to any Entity any and all amounts, determined in the Post-Consummation Trust Administrator's sole discretion, for purposes of satisfying applicable law, regulation, rule, ruling, directive or other governmental requirement.

**4. Duration of the Post-Consummation Trust**

The Post-Consummation Trust will terminate as soon as practicable, but in no event later than the fifth anniversary of the Effective Date; provided that, no more than 30 days prior to such termination, the Bankruptcy Court, upon motion by the Post-Consummation Administrator, may extend the term of the Post-Consummation Trust for a finite period if such an extension is necessary to liquidate the Post-Consummation Trust Assets or to complete any distribution required by the Plan. Multiple extensions may be obtained so long as Bankruptcy Court approval is obtained no more than 30 days prior to the expiration of each extended term.

**5. Post-Consummation Trust Administrator**

a) Appointment

On the Effective Date, Brian Cejka of Alvarez & Marsal North America, LLC shall be the Post-Consummation Trust Administrator. Prior to the Effective Date, Mr. Cejka was the Debtors' Chief Restructuring Officer. The appointment of the Post-Consummation Trust Administrator shall be effective as of the Effective Date. Successor Post-Consummation Trust Administrator(s) shall be appointed as set forth in the Post-Consummation Trust Agreement.

b) Term

Unless the Post-Consummation Trust Administrator resigns, is terminated, or dies earlier, the Post-Consummation Trust Administrator's term shall expire upon the termination of the Post-Consummation Trust pursuant to the Post-Consummation Trust Agreement.

c) Powers and Duties

The Post-Consummation Trust Administrator shall have the rights and powers set forth in the Plan and in the Post-Consummation Trust Agreement including, but not limited to, the powers of a debtor-in-possession under Bankruptcy Code sections 1107 and 1108. The Post-Consummation Trust Administrator shall be governed in all things by the terms of the Post-Consummation Trust Agreement and the Plan. Without limitation, the Post-Consummation Trust Administrator shall, in accordance with the terms of the Plan and the Post-Consummation Trust Agreement:

(i) administer, sell, liquidate, or otherwise dispose of all of the Post-Consummation Trust Assets in accordance with the terms of the Plan and Post-Consummation Trust Agreement;

(ii) take all actions necessary to wind down the affairs of the Debtors consistent with the Plan and applicable non-bankruptcy law;

(iii) file final federal, state, foreign and, to the extent applicable, local, tax returns, and, to the extent necessary, pay such Taxes from the Post-Consummation Trust Assets;

(iv) represent the Debtors' Estates and the Post-Consummation Trust before the Bankruptcy Court and other courts of competent jurisdiction with respect to matters concerning the Post-Consummation Trust;

(v) seek the examination of any entity under and subject to the provisions of Bankruptcy Rule 2004;

(vi)        comply with applicable orders of the Bankruptcy Court and any other court of competent jurisdiction over the matters set forth in the Plan;

(vii)        comply with all applicable laws and regulations concerning the matters set forth in the Plan;

(viii)        exercise such other powers as may be vested in the Post-Consumption Trust pursuant to the Post-Consumption Trust Agreement, the Plan, or other Final Orders of the Bankruptcy Court;

(ix)        execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Post-Consumption Trust consistent with the Plan and the Post-Consumption Trust Agreement;

(x)        provide periodic reporting to the Post-Consumption Trust Oversight Committee; and

(xi)        stand in the shoes of the Debtors for all purposes.

The Post-Consumption Trust Administrator shall obtain the approval of the Oversight Committee prior to taking any action regarding any of the following matters:

(i)        the commencement of any Cause of Action or Claim Objection by thePost-Consumption Trust;

(ii)        The settlement, compromise, withdrawal, dismissal or other resolution of any (i) Claims or Objections to Claims by the Liquidating Trust where the amount set forth in the Claim exceeds $20,000 of the amount set forth in the Liquidating Trust's books and records as being owed pursuant to such Claim; and (ii) Cause of Action by the Liquidating Trust if the amount sought to be recovered in the complaint or other document initiating such Cause of Action exceeds $20,000;

(iii)        The sale, transfer, assignment, or other disposition of any non-Cash Post-Consumption Trust Assets having a valuation in excess of $10,000;

(iv)        The abandonment of any non-Cash Post-Consumption Trust Assets that have a valuation of at least $20,000;

(v)        The borrowing of any funds by the Post-Consumption Trust or pledge of any portion of the Post-Consumption Trust Assets;

(vi)        The exercise of any right or action set forth in the Plan or the Post-Consumption Trust Agreement that expressly requires approval of the Post-Consumption Trust Oversight Committee;

(vii)        The amount and timing of distributions from the proceeds of the Post-Consumption Trust Assets;

(viii)        The employment, retention, or replacement of one or more attorneys, accountants, auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert witnesses, consultants, and advisors as necessary to discharge the duties of the Post-Consumption Trust Administrator under the Plan and this Post-Consumption Trust Agreement if the proposed professional will be paid over $10,000 in the aggregate;

(ix)        The establishment or setting of the Disputed Reserves or any other reserves in aid of distribution and opening, maintaining and administering bank accounts as necessary to discharge the duties of the Post- Consumption Trust Administrator under the Plan and the Post-Consumption Trust Agreement; or

(x)     The payment of costs of the Post-Consummation Trust, including professional fees, costs, and expenses as set forth in the Plan, subject to the approval of the Post-Consummation Trust Oversight Committee if any proposed payment is in excess of $10,000.

In the event that the Post-Consummation Trust Administrator cannot take any action, including, without limitation, the prosecution of any Causes of Action or the objection to any Claim, by reason of an actual or potential conflict of interest, the Post-Consummation Trust Oversight Committee acting by a majority shall be authorized to take any such action(s) in his place and stead, including without limitation, the retention of professionals (which may include professionals retained by the Post-Consummation Trust Administrator) for such purpose of taking such actions.

## 6.      Fees and Expenses

Except as otherwise provided in the Plan, compensation of the Post-Consummation Trust Administrator and the costs and expenses of the Post-Consummation Trust Administrator shall be paid from the Post-Consummation Trust Assets subject to approval of the Post-Consummation Trust Oversight Committee.

The Post-Consummation Trust Administrator shall pay, without further order, notice, or application to the Bankruptcy Court, the reasonable fees and expenses of the Post-Consummation Trust professionals, as necessary to discharge the Post-Consummation Trust Administrator's duties under the Plan and the Post-Consummation Trust Agreement, provided, however that for any invoices over $10,000, the Post-Consummation Trust Oversight Committee shall have first approved the payment of such invoices.

## 7.      Investment Powers

The powers of the Post-Consummation Trust Administrator to invest any Cash that is held by the Post-Consummation Trust or in any of the Reserves created by the Plan, other than those powers reasonably necessary to maintain the value of the assets and to further the Post-Consummation Trust's liquidating purposes, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary liquid investments, such as treasury bills.

## 8.      Federal Income Taxation of the Post-Consummation Trust

The Post-Consummation Trust will be established for the primary purpose of liquidating its assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Post-Consummation Trust.  The Debtors will have no reversionary or further interest in, or with respect to, the Post-Consummation Trust Assets or the Post-Consummation Trust upon their transfer of the Post-Consummation Trust Assets.  For all federal income tax purposes, the Beneficiaries of the Post-Consummation Trust will be treated as grantors and owners thereof and it is intended that the Post-Consummation Trust be classified as a liquidating trust under 26 C.F.R. § 301.7701-4 and that the Post-Consummation Trust is owned by the Beneficiaries.  Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution of an undivided interest in the Post-Consummation Trust Assets and then contributed such interests to the Post-Consummation Trust.  Accordingly, the Post-Consummation Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Post-Consummation Trust Assets, make timely distributions to the Beneficiaries pursuant to the Plan, and not unduly prolong its duration.  The Post-Consummation Trust will not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Post-Consummation Trust Agreement.  The Post-Consummation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Beneficiaries treated as grantors and owners of the Post-Consummation Trust.

9. **Preservation of Rights of Action**

a) <u>Maintenance of Causes of Action</u>

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Post-Consummation Trust shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Actions, including, but not limited to, those Causes of Action identified in the Plan Supplement, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including in an adversary proceeding filed in one or more of the Chapter 11 Cases.

Except as otherwise provided in the Plan, Purchase Agreement or Confirmation Order, any claims, rights and Causes of Action that the Debtors may hold against any Entity shall vest in the Post-Consummation Trust on the Effective Date and the Post-Consummation Trust shall have the exclusive right and authority to institute, prosecute, abandon, settle or compromise any and all such claims, rights and Causes of Action without the consent or approval of any party and without any further order of the Bankruptcy Court, but subject to the prior consent of the Post-Consummation Trust Oversight Committee if such matter is in excess of $20,000.

b) <u>Preservation of All Causes of Action Not Expressly Sold, Settled or Released</u>

Unless a claim or Cause of Action against a Holder of a Claim or an Equity Interest or other Entity was acquired by the Purchaser pursuant to the Purchase Agreement (and is not an Excluded Asset) or is expressly waived, abandoned, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such claim or Cause of Action for later action by the Post-Consummation Trust (including claims and Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been expressly released in the Plan (and for the avoidance of doubt, the Debtor Release) or any other Final Order (including the Confirmation Order).  In addition, the Post-Consummation Trust reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a plaintiff, defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits except where such claims or Causes of Action have been released in the Plan or any other Final Order (including the Confirmation Order).

10. **Insurance**

The Post-Consummation Trust may maintain customary insurance coverage for the protection of Entities serving as administrators and overseers of the Post-Consummation Trust on and after the Effective Date.

11. **Disputed Claims Reserve**

The Post-Consummation Trust Administrator will maintain, in accordance with the Post-Consummation Trust Administrator's powers and responsibilities under the Plan and the Post-Consummation Trust Agreement, a Disputed Claims Reserve(s) to the extent necessary in aid of distributions to ensure that all Claims within the same Class receive the same treatment provided for under the Plan.  The Post-Consummation Trust Administrator will distribute such amounts as provided in the Plan on account of such Disputed Claims when such Disputed Claims become Allowed Claims.

12. **Exculpation; Indemnification**

The Post-Consummation Trust Administrator, the Post-Consummation Trust, professionals retained by the Post-Consummation Trust and their representatives will be exculpated and indemnified pursuant to the terms of the Post-Consummation Trust Agreement.

## H. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### 1. Resolution of Disputed Claims

#### a) Prosecution of Claims Objections

Except as otherwise set forth in the Plan, the Post-Consummation Trust shall have the exclusive authority to File objections to, and settle, compromise, withdraw or litigate to judgment objections to any and all Claims. Except as otherwise set forth in the Plan, from and after the Effective Date, the Post-Consummation Trust may settle, compromise or withdraw objections to any Disputed Claim without approval of the Bankruptcy Court or notice to any party.

#### b) Claims Estimation

Subject to Article IX.A.1 of the Plan, after the Effective Date, the Post-Consummation Trust, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law, and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Post-Consummation Trust have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Debtors and the Post-Consummation Trust, as applicable, may elect to pursue additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Post-Consummation Trust may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Except as required by section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 20 days after the date on which such Claim is estimated. Each of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

#### c) Deadline to File Objections to Claims

Any objections to Claims, other than Administrative Claims, shall be Filed no later than the Claims Objection Bar Date.

### 2. Claims Allowance

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no distribution shall be made on account of any Claim that has not been deemed Allowed. Except as expressly provided by the Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Post-Consummation Trust will have and shall retain after the Effective Date any and all rights and defenses that the Debtors had with respect to any Claim as of the Petition Date.

### 3. Disallowance of Claims

EXCEPT AS OTHERWISE AGREED TO BY THE POST-CONSUMMATION TRUST, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED

DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

### 4. Amendments to Claims

On or after the Effective Date, except as otherwise provided in the Plan, a Claim may not be re-Filed or amended without the prior authorization of the Bankruptcy Court, the Debtors or the Post-Consummation Trust, as applicable, and any such re-Filed or amended Claim shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

### 5. Claims Register

Any Claim that has been paid or satisfied, Allowed, or disallowed, may be adjusted or expunged on the Claims Register by the Post-Consummation Trust without a Claims objection or without any further notice or action, order, or approval of the Bankruptcy Court. The Claims Agent shall be authorized to reflect any adjustments to the Claim Register at the direction of the Post-Consummation Trust Administrator. Beginning on the end of the first full calendar year after the Effective Date, the Post-Consummation Trust shall File a list of all Claims that have been adjusted to the Claims Register during such prior year.

## I. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1. Conditions Precedent to Confirmation

It shall be a condition precedent to Confirmation of the Plan that:

(a) all provisions, terms and conditions in the Plan are approved in the Confirmation Order; and

(b) the proposed Confirmation Order shall be in form and substance acceptable to the Proponents; provided that the Proponents may seek an expedited hearing before the Bankruptcy Court to address any objections to such order.

### 2. Conditions Precedent to Consummation

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan:

(a) the Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto shall be acceptable to the Proponents;

(b) the Confirmation Order shall have been entered and become a Final Order in form and substance satisfactory to the Proponents. The Confirmation Order shall provide that, among other things, the Debtors or the Post-Consummation Trust, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including entering into, implementing and consummating the contracts, instruments, releases, leases or other agreements or documents created in connection with or described in the Plan, including the implementation of the Post-Consummation Trust;

(c) all documents and agreements necessary to implement the Plan, including the Post-Consummation Trust Agreement, shall have (i) satisfied (or the Proponents shall have waived) all conditions precedent to such documents and agreements becoming effective pursuant to the terms of such documents or agreements, (b) been tendered for delivery, and (ii) been effected or executed;

(d)       all actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

### 3.        Waiver of Conditions

The conditions precedent to Confirmation of the Plan and to Consummation of the Plan set forth in Article X of the Plan may be jointly waived by the Proponents without notice, leave or order of the Bankruptcy Court or any formal action other than by proceeding to confirm or consummate the Plan.

### 4.        Effect of Non Occurrence of Conditions to Consummation

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall: (a) constitute a waiver or release of any claims by, or Claims against, or Equity Interests in, the Debtors; (b) prejudice in any manner the rights of the Proponents, any Holders or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Proponents, any Holders or any other Entity in any respect.

## J.       SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1.        Compromise and Settlement

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan takes into account and conforms to the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant to the Plan.  The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (a) in the best interests of the Debtors, their estates and all Holders of Claims, (b) fair, equitable and reasonable, (c) made in good faith, and (d) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  In addition, the allowance, classification and treatment of Allowed Claims take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist between the Debtors, on the one hand, and the Debtor Releasees, on the other hand and, as of the Effective Date, any and all such Causes of Action are settled, compromised and released pursuant to the Plan.  The Confirmation Order shall approve the releases by all Entities of all such contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant to the Plan.

In accordance with the provisions of the Plan, and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (a) the Post-Consummation Trust may, in its sole and absolute discretion, compromise and settle Claims against the Debtors and (b) the Post-Consummation Trust may, in its respective sole and absolute discretion, compromise and settle Causes of Action against other Entities.

### 2.        Debtor Release

**UPON SIX MONTHS AFTER THE EFFECTIVE DATE, IF THE POST CONFIRMATION TRUST HAS NOT INSTITUTED AN ACTION AGAINST THE DEBTOR RELEASEES, FOR GOOD AND VALUABLE CONSIDERATION (INCLUDING FOR SERVICES PERFORMED BY THE DEBTORS' DIRECTORS AND OFFICERS DURING THESE CHAPTER 11 CASES), THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE DEBTORS (IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS AND DEBTORS IN POSSESSION) WILL BE DEEMED TO RELEASE FOREVER, WAIVE, AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES (OTHER THAN THE RIGHTS OF THE DEBTORS TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES, AND**

OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER THE PLAN, AND LIABILITIES ARISING AFTER THE EFFECTIVE DATE IN THE ORDINARY COURSE OF BUSINESS) WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE THAT ARE BASED IN WHOLE OR PART ON ANY ACT OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCES IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE DEBTORS, TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE (OR THE DATE OF RESIGNATION OF AN OFFICER OR DIRECTOR, IF EARLIER), THE CHAPTER 11 CASES OF THE DEBTORS, THE NEGOTIATION AND FILING OF THE PLAN, THE DISCLOSURE STATEMENT OR ANY PRIOR PLANS OF REORGANIZATION, THE FILING OF THE CHAPTER 11 CASES RELATING TO THE DEBTORS, THE PURSUIT OF CONFIRMATION OF THE PLAN OR ANY PRIOR PLANS OF REORGANIZATION, THE CONSUMMATION OF THE PLAN, THE ADMINISTRATION OF THE PLAN, OR THE PROPERTY TO BE LIQUIDATED AND/OR DISTRIBUTED UNDER THE PLAN THAT COULD HAVE BEEN ASSERTED BY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES, AGAINST THE DEBTOR RELEASEES, PROVIDED, HOWEVER, THAT THIS RELEASE SHALL NOT EXTEND TO OR COVER ANY ACTS OR OMISSIONS THAT ARISE FROM GROSS NEGLIGENCE, WILFUL MISCONDUCT, OR FRAUD. FOR THE AVOIDANCE OF DOUBT, THE RELEASES GRANTED IN ARTICLE XI.B OF THE PLAN SHALL NOT EXTEND TO OR COVER ANY DIRECTORS OR OFFICERS OF THE DEBTORS WHO WERE NOT DIRECTORS OR OFFICERS OF THE DEBTORS AS OF THE PETITION DATE, OR ANY OF THE DEBTORS' SHAREHOLDERS OR EQUITY INTEREST HOLDERS WHO ARE NOT DEBTOR RELEASEES.

3. **Exculpation**

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, THE DEBTORS, THE POST-CONSUMMATION TRUST ADMINISTRATOR, THE POST-CONSUMMATION TRUST, THE COMMITTEE, THE MEMBERS OF THE COMMITTEE (SOLELY IN THEIR CAPACITY AS SUCH), AND ANY OF THE FOREGOING PARTIES' RESPECTIVE PRESENT OR FORMER MEMBERS, OFFICERS, DIRECTORS, EMPLOYEES, ADVISORS, ATTORNEYS, REPRESENTATIVES, FINANCIAL ADVISORS, INVESTMENT BANKERS, AGENTS OR OTHER PROFESSIONALS AND ANY OF SUCH PARTIES' SUCCESSORS AND ASSIGNS, SOLELY IN THEIR CAPACITIES AS SUCH, SHALL NOT HAVE OR INCUR ANY CLAIM, ACTION, PROCEEDING, CAUSE OF ACTION, AVOIDANCE ACTION, SUIT, ACCOUNT, CONTROVERSY, AGREEMENT, PROMISE, RIGHT TO LEGAL REMEDIES, RIGHT TO EQUITABLE REMEDIES, RIGHT TO PAYMENT, OR CLAIM (AS DEFINED IN BANKRUPTCY CODE SECTION 101(5)), WHETHER KNOWN, UNKNOWN, REDUCED TO JUDGMENT, NOT REDUCED TO JUDGMENT, LIQUIDATED, UNLIQUIDATED, FIXED, CONTINGENT, MATURED, UNMATURED, DISPUTED, UNDISPUTED, SECURED, OR UNSECURED AND WHETHER ASSERTED OR ASSERTABLE DIRECTLY OR DERIVATIVELY, IN LAW, EQUITY, OR OTHERWISE TO ONE ANOTHER OR TO ANY CLAIMHOLDER OR INTEREST HOLDER, OR ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE AGENTS, EMPLOYEES, REPRESENTATIVES, ADVISORS, ATTORNEYS, OR AFFILIATES, OR ANY OF THEIR SUCCESSORS OR ASSIGNS, FOR ANY ACT OR OMISSION ORIGINATING OR OCCURRING ON OR AFTER THE PETITION DATE THROUGH AND INCLUDING THE EFFECTIVE DATE (OR THE DATE OF RESIGNATION OF AN OFFICER OR DIRECTOR, IF EARLIER) IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE DEBTORS, THE CHAPTER 11 CASES OF THE DEBTORS, THE NEGOTIATION AND FILING OF THE PLAN, THE DISCLOSURE STATEMENT OR ANY PRIOR PLANS OF REORGANIZATION, THE FILING OF THE CHAPTER 11 CASES OF THE DEBTORS, THE PURSUIT OF CONFIRMATION OF THE PLAN OR ANY PRIOR PLANS OF REORGANIZATION, THE CONSUMMATION OF THE PLAN, THE ADMINISTRATION OF THE PLAN, OR THE PROPERTY TO BE LIQUIDATED AND/OR DISTRIBUTED UNDER THE PLAN.

4. **Indemnification**

Except as otherwise provided in the Plan or any contract, instrument, release, or other agreement or document entered into in connection with the Plan, any and all indemnification obligations that the Debtors have pursuant to a

contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document, or applicable law shall be rejected as of the Effective Date, to the extent executory. Nothing in the Plan shall be deemed to release the Debtors' insurers from any claims that might be asserted by counter-parties to contracts or agreements providing the indemnification by and of the Debtors, to the extent of available coverage.

### 5. Injunction

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT: (1) HAVE BEEN RELEASED PURSUANT TO ARTICLE XI.B OF THE PLAN, (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE XI.C OF THE PLAN, (3) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE XI.D OF THE PLAN (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE XI.D OF THE PLAN), ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE POST-CONSUMMATION TRUST) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE POST-CONSUMMATION TRUST) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM OR ENCUMBRANCE OF ANY KIND AGAINST ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE POST-CONSUMMATION TRUST) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE POST-CONSUMMATION TRUST) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE POST-CONSUMMATION TRUST) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES RELEASED OR SETTLED PURSUANT TO THE PLAN.**

### K. BINDING NATURE OF PLAN

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS, NOTWITHSTANDING WHETHER ANY SUCH HOLDERS DID NOT VOTE TO ACCEPT OR REJECT THE PLAN, VOTED TO REJECT THE PLAN OR WERE DEEMED TO REJECT THE PLAN.

## L.     RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as legally permissible, including jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim;

2.     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.     resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom;

4.     resolve any issues related to the Chapter 11 Cases (including any matters adjudicated in the Chapter 11 Cases);

5.     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Post-Consummation Trust after the Effective Date; provided that the Post-Consummation Trust shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, the Post-Consummation Trust and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement, the Post-Consummation Trust Agreement, or the Disclosure Statement;

8.     resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, the Sale Order, the Sale Transaction or the Post-Consummation Trust;

9.     issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

10.     enforce Article XI.A, Article XI.B, Article XI.C, and Article XI.D of the Plan;

11.     enforce the injunction set forth in Article XI.E of the Plan;

12.     resolve any cases, controversies, suits or disputes with respect to any Debtor Release, Exculpation, Indemnification or other provisions contained in Article XI of the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

13.     enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

14.     resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan, the Sale Transaction or the Disclosure Statement; and

15.     enter an order concluding the Chapter 11 Cases.

## M.     MISCELLANEOUS PROVISIONS

### 1.     Dissolution of the Committee

Upon Effective Date, the Committee shall dissolve, and the Committee Members shall be released and discharged from all rights and duties arising from or related to their participation on the Committee in the Chapter 11 Cases; provided, however, that the Committee and their respective Retained Professionals shall be retained with respect to applications Filed pursuant to sections 330 and 331 of the Bankruptcy Code. This provision shall not impair the rights of Committee Members under section 503(b)(3)(F) of the Bankruptcy Code.

### 2.     Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid prior to the closing of the Chapter 11 Cases when due or as soon as reasonably practicable thereafter. The Post-Consummation Trust Administrator shall file all required post-confirmation reports for any open Chapter 11 Cases until such cases are closed.

### 3.     Modification of Plan

Effective as of the date of the Plan and subject to the limitations and rights contained in the Plan: (a) the Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Proponents or the Post-Consummation Trust, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 4.     Revocation of Plan

The Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Proponents revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant thereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity, (ii) prejudice in any manner the rights of the Proponents, or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Proponents.

### 5.     Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 6.     Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the Filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by a Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) any Debtor with respect to the Holders of

Claims or Equity Interests or other Entity; or (b) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

7.      **Section 1146 Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax, document recording tax, conveyance fee, intangibles or similar tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

8.      **Further Assurances**

The Debtors, the Committee or the Post-Consummation Trust, as applicable, and all Holders of Claims receiving distributions under the Plan and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

9.      **Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted, provided that any such alteration or interpretation must be in form and substance acceptable to the Debtors; provided further that the Proponents may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing. Notwithstanding any such order by the Bankruptcy Court providing for such alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

10.     **Service of Documents**

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by overnight mail to:

Alvarez & Marsal North America, LLC
c/o Palm Harbor Winddown
2100 Ross Avenue, 21st Floor
Dallas TX 75201


with copies to:

David W. Wirt
Aaron C. Smith
Courtney E. Barr
LOCKE LORD BISSELL & LIDDELL LLP
111 S. Wacker Drive
Chicago IL 60606-4410

Any pleading, notice or other documents required by the Plan to be served on or delivered to the Committee shall be sent by overnight mail to:

> Laura Davis Jones
> Robert J. Feinstein
> PACHULSKI STANG ZIEHL & JONES LLP
> 919 North Market Street, 17th Floor
> Wilmington, DE 19899-8705

**11.     Filing of Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## VI.     CONFIRMATION PROCEDURES

**A.     CONFIRMATION HEARING**

The Confirmation Hearing will commence on [_____], 2011 at [__:__] p.m. prevailing Eastern Time.

The Plan Objection Deadline is [__:00] p.m. prevailing Eastern Time on [_____], 2011.

All objections to the Plan must be filed with the Bankruptcy Court and served on the Proponents and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

The Proponents' proposed schedule will provide Entities sufficient notice of the Plan Objection Deadline, which will be at least 28 days, as required by Bankruptcy Rule 2002(b).  The Proponents believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Proponents and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

> **THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

Following the Disclosure Statement Hearing, the Debtors will publish the Confirmation Hearing Notice, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline and the date that the Confirmation Hearing is first scheduled, in one or more of the following publications: *USA Today* or the National Edition of *The Wall Street Journal* on or before [_____], 2011 to provide notification to those Entities that may not receive notice by mail.

Plan Objections must be served on all of the following parties:

| | |
|---|---|
| David W. Wirt | Christopher A. Ward (Del. Bar No. 3877) |
| Aaron C. Smith | Justin K. Edelson (Del. Bar No. 5002) |
| Courtney E. Barr | POLSINELLI SHUGHART PC |
| LOCKE LORD BISSELL & LIDDELL LLP | 222 Delaware Avenue, Suite 1101 |
| 111 S. Wacker Drive | Wilmington, Delaware  19801 |
| Chicago, Illinois  60606-4410 | Telephone: (302) 252-0920 |

Telephone: (312) 443-0485                              Fax: (302) 252-0921
Fax: (312) 443-0336

*Co-Counsel to the Debtors*

Laura Davis Jones
Robert J. Feinstein
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Fax: (302) 652-4400

*Counsel to the Committee*

## B.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Proponents believe that: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (2) the Proponents have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, in addition to others, as applicable, the Proponents believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Proponents, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

## 1.    Best Interests of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the Debtors were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtors' assets if their chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Debtors would incur as a result of the ineffectiveness associated with replacing existing management and professionals in a chapter 7 case.

To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the Debtors' Chapter 11 Cases were converted to a chapter 7 case and the assets of such Debtors' estates were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed and consummated.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as compensation of counsel and another professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 cases, litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In these cases, notwithstanding the difficulty in quantifying recoveries to Holders of Allowed Claims, as described below, the Proponents believe that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Proponents believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

## 2.    Liquidation Analysis

The Debtors have liquidated substantially all of their assets through the Sale Transaction with the Purchaser. The Debtors believe that liquidation under chapter 11 is more beneficial to the Holders of Claims than a liquidation under chapter 7 because the Plan allows the Debtors' Remaining Assets to be promptly administered by the Post-Consummation Trust. To that end, the Plan provides that all Remaining Assets will vest in and be transferred to the Post-Consummation Trust. The Post-Consummation Trust Administrator will distribute the proceeds from the Remaining Assets to the Holders of Allowed Claims in accordance with the priorities set forth in the Plan, and any additional proceeds from sales of Remaining Assets would be distributed on a pro rata basis to the unsecured claimants. Attached as Exhibit D to this Disclosure Statement is a liquidation analysis (the "Liquidation Analysis"). As set forth in the Liquidation Analysis, if these cases were to be converted to chapter 7 cases, the proceeds from sales of Remaining Assets would remain unchanged, but the Debtors' estates would incur the additional costs of a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. These costs would reduce

potential distributions to unsecured creditors on a dollar for dollar basis. Conversion also would likely delay the liquidation process and the ultimate distribution, if any, to unsecured creditors. Accordingly, the Proponents believe that holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases.

### 3. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the Debtors' liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan clearly complies with this requirement because all of the Debtors' remaining assets will be distributed to creditors pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the estates will no longer exist to be subject to future reorganization or liquidation. Since no further reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the financial feasibility requirement. The Proponents believe that sufficient funds will exist to make all payments required by the Plan.

### 4. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired equity interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by equity interest holders that hold at least two-thirds in amount of the allowed equity interests of such class, counting only those equity interests that actually voted to accept or reject the plan. Thus, a class of equity interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

The Claims in Classes 1 and 2 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and their votes will not be solicited.

The Claims in Classes 3 and 4 are Impaired under the Plan. These Classes will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The members of Classes 5 and 6 are Impaired under the Plan and will not receive a distribution under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, the members of Classes 5 and 6 are deemed to reject the Plan and their votes will not be solicited.

### 5. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it if the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be

confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

a)    No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank *(e.g.,* classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

b)    Fair and Equitable Test

This test applies to classes of different priority and status *(e.g.,* secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

*Secured Claims:* The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

*Unsecured Claims:* The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

*Equity Interests:* The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

If any Impaired Class rejects the Plan, the Proponents reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Proponents will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan and any exhibits thereto or the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Proponents submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Proponents believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## C.      RISK FACTORS

Prior to deciding whether and how to vote on the Plan, each Holder of a Claim should consider carefully all of the information in this Disclosure Statement and should particularly consider the Risk Factors described in Section VIII, "Plan-Related Risk Factors and Alternatives to Confirmation and Consummation of the Plan."

## D.      CONTACT FOR MORE INFORMATION

Any interested party desiring further information about the Plan should contact legal counsel to the Debtors by writing to Locke Lord Bissell & Liddell LLP, 111 S. Wacker Drive, Chicago, Illinois 60606-4410, Attention: David W. Wirt, Aaron C. Smith, and Courtney E. Barr, or by calling (312) 443-0700, or counsel to the Committee by writing to Pachulski Stang Ziehl & Jones, LLC, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705, Attention: Laura Davis Jones, Robert J. Feinstein, Shirley S. Cho, and James E. O'Neill..

## VII.      PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**THE IMPLEMENTATION OF THE PLAN IS SUBJECT TO A NUMBER OF RISKS, INCLUDING THOSE ENUMERATED BELOW. PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT AND OTHER DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.**

## A.      GENERAL BANKRUPTCY LAW AND PLAN RELATED CONSIDERATIONS

### 1.      Parties in Interest May Object to the Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Proponents believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created certain Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.      Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Proponents intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Proponents may seek to accomplish an alternative chapter 11 plan or may be forced to liquidate under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3.      The Proponents May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is

contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the Solicitation Procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the Solicitation Procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

The Confirmation and Consummation of the Plan also are subject to certain other conditions. No assurance can be given that these conditions will be satisfied.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Equity Interests would ultimately receive in respect of their Claims and Equity Interests. It is possible that any alternative could provide Holders of Claims with less than they would have received pursuant to the Plan. Moreover, an inability to confirm the Plan could result in an extended chapter 11 proceeding.

The Proponents, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.

### 4. Nonconsensual Confirmation - "Cramdown"

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

Although the Proponents believe that the Plan will meet such tests, the Proponents cannot be certain that the Bankruptcy Court would reach the same conclusion. If the Bankruptcy Court does not confirm the Plan, the Proponents may pursue one of the following alternatives: (a) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (b) dismissal of the Chapter 11 Cases, or (c) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### 5. Proponents May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Proponents and the Post-Consummation Trust reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6. Risk of Nonoccurrence of the Effective Date

Although the Proponents believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 7. Risk Affecting Potential Recoveries of Holders of Claims in Voting Classes

The Proponents cannot state with any degree of certainty what recovery will be available to Holders of Claims in Voting Classes. Three unknown factors make certainty impossible. First, the Proponents cannot know, at this time, how much money will remain after paying all Allowed Claims which are senior to the Claims of Holders in the Voting Classes. Second, the Proponents cannot know with any certainty, at this time, the number or size of Claims in the Voting Classes which will ultimately be Allowed. Third, the Proponents cannot know with certainty, at this time, the number or size of Claims in Classes senior to the Voting Classes, or Claims that are unclassified, which will ultimately be Allowed.

## B. RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS

**The financial information contained in this Disclosure Statement has not been audited.** In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

## C. DISCLOSURE STATEMENT DISCLAIMER

### 1. Information Contained Herein Is for Soliciting Votes

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

### 2. This Disclosure Statement Was Not Reviewed or Approved by the Securities and Exchange Commission

This Disclosure Statement was not filed with the Commission under the Securities Act or applicable state securities laws. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3. This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections or other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 4. No Legal or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5. **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Committee, the Post-Consummation Trust, Holders of Allowed Claims or Equity Interest or any other parties in interest.

6. **Failure to Identify Litigation Claims or Projected Objections**

**NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO CLAIM IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT. MOREOVER, THE DEBTORS OR THE POST-CONSUMMATION TRUST, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE LITIGATION CLAIMS AND PROJECTED OBJECTIONS TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.**

7. **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors, the Committee, or the Post-Consummation Trust (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

8. **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Proponents have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Proponents have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9. **Potential Exists for Inaccuracies, and the Proponents Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Proponents have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Proponents nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Proponents may subsequently update the information in this Disclosure Statement, the Proponents have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10. **No Representations Outside the Disclosure Statement are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.

D. **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Proponents believe that the Plan affords the Holders of Claims the potential for a better realization on the Debtors' assets than a chapter 7 liquidation, and therefore, is in the best interests of such Holders. If, however, the Plan is not confirmed, the theoretical alternatives include (a) formulation of an alternative plan or plans of liquidation

under chapter 11, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### 1. Alternative Plan(s) of Liquidation

If the requisite acceptances are not received or if the Plan is not confirmed, the Proponents could attempt to formulate and propose a different plan or plans of liquidation.

With respect to an alternative liquidation plan, the Proponents have explored various other alternatives in connection with the negotiation process involved in the formulation and development of the Plan. The Proponents believe that the Plan enables creditors to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

### 2. Liquidation Under Chapter 7

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In a case under chapter 7 of the Bankruptcy Code, a trustee would be appointed to promptly liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against the Debtors.

The Proponents believe that in a liquidation under chapter 7 of the Bankruptcy Code, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, would cause a substantial diminution in the value of the Estates. The assets available for distribution to Holders of Claims and Equity Interests would be reduced by such additional expenses.

### 3. Dismissal of the Chapter 11 Cases

If the Plan is not confirmed, the Proponents or other parties in interests may seek dismissal of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code. Without limitation, dismissal of the Chapter 11 Cases would terminate the automatic stay and might allow certain creditors to foreclose on their liens. Accordingly, the Proponents believe that dismissal of the Chapter 11 Cases would reduce the value of the Debtors' remaining assets.

### VIII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.    GENERAL TAX CONSIDERATIONS

The following discussion is a summary of certain material federal income tax consequences expected to result from the Consummation of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Equity Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations. This discussion does not address aspects of federal income taxation that may be relevant to a particular Holder of a Claim or Equity Interest subject to special treatment under federal income tax laws (such as foreign taxpayers, broker dealers, banks, thrifts, insurance companies, financial institutions, regulated investment companies, real estate investment trusts and pension plans and other tax exempt investors), and does not discuss any aspects of state, local or foreign tax laws. Furthermore, this summary does not address all of the federal income tax consequences that may be relevant to a Holder of a Claim or Equity Interest, such as the potential application of the alternative minimum tax.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the Plan.

No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to the Holders of Claims or Equity Interests with respect to the federal income tax consequences described herein.

Accordingly, the following summary of certain federal income tax consequences of the Plan is for informational purposes only and is not a substitute for careful tax planning or advice based upon the individual circumstances pertaining to a particular Holder of a claim or interest. Each Holder of a claim or interest is strongly urged to consult with its own tax advisors regarding the federal, state, local and other tax consequences of the Plan.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## B.      FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

The Sale Transaction constituted a taxable sale of the Transferred Assets. The Debtors will recognize either a gain or a loss on the Sale Transaction equal to the difference between: (i) the fair market value of the Sale Proceeds and the Assumed Liabilities; and (ii) the Debtors' adjusted basis in the Transferred Assets. The Debtors expect that gain, if any, as a result of the Sale Transaction will be offset by net operating losses carried forward from prior tax periods. Similarly, the sales pursuant to the LaGrange Sale Order and the Linwood Sale Order constituted taxable sales of the assets sold pursuant thereto.  The Debtors will recognize either a gain or loss on each of these transactions equal to the difference between: (i) the fair market value of the proceeds of each of these sales; and (ii) the Debtors' adjusted basis in the assets sold pursuant to these orders.  The Debtors expect that gain, if any, as a result of the sales approved by these orders will be offset by net operating losses carried forward from prior tax periods.

## C.      FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

### 1.      Consequences to Holders of Claims

Pursuant to the Plan, Class 1 Other Priority Claims, Class 2 Other Secured Claims, Class 3 3.25% Convertible Senior Notes Claims, and Class 4 General Unsecured Claims against the Debtors will be surrendered for Cash, collateral securing such Claim, or for their pro-rata share of the Post-Consummation Trust Assets (the "Recovery Shares"). This will be treated as a taxable exchange under IRC Section 1001. Accordingly, Holders of such Claims should recognize gain or loss equal to the difference between: (a) the fair market value of any Cash, collateral, or Recovery Shares received in exchange for such Claims; and (b) the Holder's adjusted basis, if any, in such Claims. Such gain or loss should be capital in nature so long as such Claims are held as capital assets (subject to the "market discount" rules described below) and should be long term capital gain or loss if such Claims were held for more than one year. To the extent that a portion of the Cash, collateral, or Recovery Shares received in exchange for such Claims is allocable to accrued but untaxed interest, the Holder may recognize ordinary income. See the section entitled "Accrued But Untaxed Interest" below.

The fair market value of the Recovery Shares is contingent in part on the outcome of certain Chapter 5 Claims and Causes of Action included in the Post-Consummation Trust. It is therefore plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of any recoveries under Chapter 5 Claims or other Causes of Action included in the Recovery Shares. The federal income tax consequences of an open transaction are uncertain and highly complex, and a Holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

a)      Accrued But Untaxed Interest

To the extent that any amount received under the Plan by a Holder is attributable to accrued but untaxed interest, such amount should be taxable to the Holder as ordinary interest income, if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, a Holder may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by Debtor.

The extent to which amounts received by a Holder will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S. federal income tax purposes. However, the IRS could take the position that the consideration received by a Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

b)      Market Discount

Holders who exchange Claims for Cash or Recovery Shares may be affected by the "market discount" provisions of the sections 1276 through 1278 of the IRC. Under these rules, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by a Holder (unless the Holder elected to include market discount in income as it accrued).

c)      Receipt of Interests in the Post-Consummation Trust

The Post-Consummation Trust shall be established on the Effective Date and is currently anticipated to exist as a grantor trust for the benefit of certain creditors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Post-Consummation Trust Administrator), pursuant to Treasury Regulation Section 1.671-1(a) and/or Treasury Regulation Section 301.7701-4(d) and related regulations, the Post-Consummation Trust Administrator is expected to designate and file returns for the Post-Consummation Trust as a "grantor trust" and/or "liquidating trust" and therefore, for federal income tax purposes, the Post-Consummation Trust's taxable income (or loss) should be allocated pro rata to its beneficiaries.

Holders of Claims that receive a beneficial interest in the Post-Consummation Trust will be required to report on their U.S. federal income tax returns their share of the Post-Consummation Trust's items of income, gain, loss, deduction and credit in the year recognized by the Post-Consummation Trust. This requirement may result in Holders being subject to tax on their allocable share of the Post-Consummation Trust's taxable income prior to receiving any cash distributions from the Post-Consummation Trust.

Any assets held by the Post-Consummation Trust on account of creditors holding Disputed Claims shall be treated as held in trust by the Post-Consummation Trust as fiduciary for the benefit of such holders (each such trust referred to as a "Disputed Claims Reserve").

With respect to each Disputed Claims Reserve, under section 468B(g) of the Internal Revenue Code, amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax. In general, Treasury Regulations sections 1.468B-1 et seq. would tax such a reserve as a "qualified settlement fund" and thus subject such reserve to a separate entity level tax.

The Post-Consummation Trust is expected to (i) treat each Disputed Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim in the class of Claims to which such reserve relates, in accordance with the trust provisions of the IRC, and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties shall report consistently with such treatment. Accordingly, the Post-Consummation Trust as a fiduciary for Holders of Disputed Claims will report as subject to a separate entity level tax any amounts earned by the Disputed Claims Reserves, except to the extent such earnings are distributed by such fiduciary during the same taxable year. In such event, any amount earned by a Disputed Claims Reserve that is distributed to a Holder during the same taxable year will be includible in such Holder's gross income.

Distributions (net of tax previously paid) from a Disputed Claims Reserve will be made to Holders of Disputed Claims when such claims are subsequently Allowed and to Holders of previously Allowed claims when any Disputed Claims are subsequently disallowed.

Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the right to receive and of the receipt (if any) of property from the Post-Consummation Trust and each Holder of a Disputed Claim is urged to consult its tax advisor regarding the potential tax treatment of the Disputed Claim Reserve, distributions therefrom, and any tax consequences to such Holder relating thereto.

2.      **Consequences to Holders of Equity Interests**

Holders of Class 6 Equity Interests that are cancelled in the Plan will be allowed a worthless stock deduction (unless such Holder has previously claimed a worthless stock deduction with respect to such Equity Interests and assuming that the taxable year that includes the Plan is the same taxable year in which such stock first became worthless) in an amount equal to the Holder's adjusted basis in the Equity Interests. A worthless stock deduction is a deduction allowed to a Holder of a corporation's stock for the taxable year in which such stock becomes worthless. If the Holder held Equity Interests as a capital asset, the loss will be treated as a loss from the sale or exchange of such capital asset.

3.      **Information Reporting and Backup Withholding**

Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY

DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**D.      RESERVATION OF RIGHTS**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Section IX and the other tax related sections of the Plan prior to the date by which objections to Confirmation of the Plan must be filed and served.

## IX.      GLOSSARY OF DEFINED TERMS

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (e) unless otherwise stated, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware, without giving effect to the principles of conflict of laws thereof.

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      *"3.25% Convertible Senior Notes"* means the 3.25% Convertible Senior Notes due 2024, issued by Palm Harbor Homes, Inc. pursuant to the 3.25% Convertible Senior Notes Indenture.

2.      *"3.25% Convertible Senior Notes Claim"* means the Claim filed by the 3.25% Convertible Senior Notes Indenture Trustee regarding Claims arising under the 3.25% Convertible Senior Notes Indenture, which has been designated as Claim Number 1151 on the Claims Register.

3.      *"3.25% Convertible Senior Notes Indenture"* means that certain indenture, dated as of May 11, 2004, among Palm Harbor Homes, Inc., as issuer, and American Stock Transfer & Trust Company, as trustee, as the same may have been amended from time to time.

4.      *"3.25% Convertible Senior Notes Indenture Trustee"* means American Stock Transfer & Trust Company.

5.        *"Administrative Claim"* means any Claim for costs and expenses of administration of the Estates under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the respective Estates and operating the businesses of the Debtors; (b) Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of Title 28 of the United States Code, 28 U.S.C. §§ 1911-30; and (d) Claims arising under section 503(b)(9) of the Bankruptcy Code.

6.        *"Administrative Claims Bar Date"* means, except as otherwise provided in the Plan, (a) July 18, 2011 for those Entities required to File an Administrative Claim pursuant to the Initial Administrative Claims Bar Date Order, and (b) the first Business Day that is 45 days following the Effective Date for all Entities that were not required to File an Administrative Claim pursuant to the Initial Administrative Claims Bar Date Order.

7.        *"Affiliate"* has the meaning set forth at section 101(2) of the Bankruptcy Code.

8.        *"Allowed"* means with respect to Claims: (a) any Claim proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Bankruptcy Code or Final Order of the Bankruptcy Court a Proof of Claim is or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan; provided, however, that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, provided further, however, that a Claim may be deemed Allowed at any time in the sole discretion of the Post Consummation Trust Administrator without regard to the passage of the applicable Claims Bar Date.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Post-Consummation Trust and without further notice to or action, approval or order of the Bankruptcy Court. An "Allowed" Claim will not include interest on such Claim from and after the Petition Date, other than as permitted under the Bankruptcy Code, for purposes of computing distributions under the Plan.

9.        *"Assets"* means all tangible and intangible asset of every kind and nature of the Debtors and their Estates, and all proceeds thereof, existing as of the Effective Date.

10.      *"Assigned Contracts"* means those Executory Contracts and Unexpired Leases assumed by the Debtors and assigned to the Purchaser pursuant to the Purchase Agreement.

11.      *"Assumed Liabilities"* has the meaning set forth in the Purchase Agreement.

12.      *"Auction"* has the meaning set forth in the Bid Procedures.

13.      *"Ballots"* means the ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

14.      *"Bankruptcy Code"* means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

15.      *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the order of the United States District Court for the District of Delaware, the United States District Court for the District of Delaware.

16.      *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. § 2075 and the general, local and chambers rules of the Bankruptcy Court.

17.      *"Beneficiaries"* means the Holders of Claims that are to be satisfied through post-Effective Date distributions from the Post-Consummation Trust as provided herein.

18.     *"Bid Procedures"* means those certain Bid Procedures attached as <u>Exhibit A</u> to the Bid Procedures Order.

19.     "Bid Procedures Order" means that certain Order (a) Approving Bid Procedures; (b) Approving a Break-Up Fee and Expense Reimbursement; (c) Approving the Stalking Horse Purchaser's Right to Credit Bid; (d) Approving the Form and Manner of Notices; (e) Approving the Procedures for the Assumption and Assignment of Contracts and Leases, and (f) Setting a Sale Hearing entered by the Bankruptcy Court in the Chapter 11 Cases on January 6, 2011 [Docket No. 187].

20.     *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined by Bankruptcy Rule 9006(a)).

21.     *"Cash"* means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks and Cash Equivalents.

22.     *"Cash Equivalents"* means equivalents of Cash in the form of readily marketable securities or instruments issued by an Entity, including readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's rating of "P2" or better, or equivalent rating of any other nationally recognized rating service, or interest bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or capital of not less than one hundred million dollars ($100,000,000) having maturities of not more than one year, at the then generally prevailing rates of interest for like amounts and like periods.

23.     *"Causes of Action"* means all actions, causes of action, Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, through and including the Effective Date, including Chapter 5 Claims.

24.     *"Chapter 5 Claims"* means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, and 553(b) of the Bankruptcy Code.

25.     *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

26.     *"Claim"* means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

27.     *"Claims Bar Date"* means, as applicable, (a) the General Bar Date, (b) the Government Claims Bar Date, (c) the Administrative Claims Bar Date, or (d) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims.

28.     *"Claims Objection Bar Date"* means, as applicable: (a) 180 days after the Effective Date; or (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court or the relevant parties for objecting to such Claims or as extended by appropriate further order of the Bankruptcy Court.

29.     *"Claims Register"* means the official register of Claims maintained by the Voting and Claims Agent.

30.    *"Class"* means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

31.    "*Collateral*" means any property or interest in property of the estate of any Debtors subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code or applicable law.

32.    *"Committee"* means the official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases on December 14, 2010, pursuant to section 1102 of the Bankruptcy Code, comprising the Committee Members, and as the same may have been reconstituted from time to time.

33.    *"Committee Members"* means the current members of the Committee, namely: (a) American Stock Transfer & Trust Company LLC, as 3.25% Convertible Senior Notes Indenture Trustee; (b) AQR Absolute Return Master Account, LP c/o CNH Partners; (c) Greenwood Capital, LP; and (e) Atlantic Service & Supply LLC.

34.    *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article X hereof having been (a) satisfied or (b) waived pursuant to Article X.C of the Plan.

35.    *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

36.    *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

37.    *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

38.    *"Consummation"* means the occurrence of the Effective Date.

39.    *"Cure Claim"* means a Claim based upon a default by one or more of the Debtors on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors under sections 365 or 1123 of the Bankruptcy Code.

40.    *"D&O Liability Insurance Policies"* means, collectively, all insurance policies for directors' and officers' liability maintained by the Debtors as of the Petition Date, including, but not limited to, the Directors & Officers and Corporate Liability Insurance Policy between Allied World National Assurance Company and the Debtors (Policy No. 0305-4457), the Excess Insurance Policy between Continental Casualty Company and the Debtors (Policy No. 287313860), as the same may have been extended from time to time.

41.    *"Debtor"* means one of the Debtors in its individual capacity as a debtor and as a debtor in possession in these Chapter 11 Cases.

42.    *"Debtor Release"* means the release given by the Debtors to the Debtor Releasees as set forth in Article XI.B of the Plan.

43.    *"Debtor Releasees"* means (i) the directors and officers of the Debtors as of the Petition Date and through and including the Effective Date, but only in their capacity as directors and officers of the Debtors; (iii) any member of the Committee as of the Petition Date in their capacity as a member of the Committee; and (iii) any of the representatives, agents, officers, directors, employees, advisors, attorneys or other Professionals of the foregoing or of the Debtors, but only in their representative capacity on behalf of the Debtors.

44.    *"Debtors"* means, collectively, Palm Harbor Homes, Inc., Palm Harbor Albemarle, LLC, Nationwide Homes, Inc., Palm Harbor Real Estate, LLC, Palm Harbor GenPar, LLC, and Palm Harbor Manufacturing, LP.

45.        *"Debtors in Possession"* means, collectively, the Debtors, as debtors in possession in these Chapter 11 Cases.

46.        *"DIP Credit Agreement"* means that certain Debtor-in-Possession Revolving Credit Agreement dated November 29, 2010, by and between the DIP Lender and the Debtors, as the same may be amended, modified, ratified, extended, renewed, restated or replaced.

47.        *"DIP Credit Agreement Claim"* means any Claim against the Debtors arising under or related to the DIP Credit Agreement.

48.        *"DIP Lender"* means Fleetwood Homes, Inc., as lender under the DIP Credit Agreement.

49.        *"DIP Order"* means the Final DIP Financing Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed.R.Bankr.P. 2002, 4001, and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, and (II) Granting Liens and Superpriority Claims [Docket No. 184] entered by the Bankruptcy Court on January 6, 2011 and as amended from time to time, that, among other things, approves the DIP Credit Agreement.

50.        *"DIP Sale Proceeds"* means Sale Proceeds equal to the total amount of all DIP Credit Agreement Claims.

51.        *"Disclosure Statement"* means this ~~First~~Second Amended Disclosure Statement for the Joint Plan of Liquidation Proposed by Debtors and Committee for Palm Harbor Homes, Inc. and its Related Debtors Under Chapter 11 of the Bankruptcy Code, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law.

52.        *"Disclosure Statement Hearing"* means that certain hearing at which the Bankruptcy Court determined, among other things, the Disclosure Statement provides Holders of Claims entitled to vote to accept or reject the Plan with adequate information within the meaning of section 1125 of the Bankruptcy Code.

53.        *"Disputed Claim"* means, with respect to any Claim, any Claim that is not yet Allowed, not set forth on the Debtors' Schedules, or is the subject of an objection by the applicable Claims Objection Deadline.

54.        *"Disputed Claims Reserve"* means a reserve for any distributions set aside by the Post-Consummation Trust Administrator subject to approval of the Post-Consummation Trust Oversight Committee on account of contingent or Disputed Claims.

55.        *"Distribution Agent"* means any Entity or Entities chosen by the Post-Consummation Trust Administrator subject to the terms of the Post-Consummation Trust Agreement to make or facilitate distributions provided by the Plan.  With respect to distributions made on account of 3.25% Convertible Senior Notes Claims, the Disbursing Agent shall be the 3.25% Convertible Senior Notes Claims Indenture Trustee or agent or designee thereof.

56.        *"DTC"* means the Depository Trust Company.

57.        *"Effective Date"* means the day that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article X.B of the Plan have been (i) satisfied, or (ii) waived pursuant to Article X.C of the Plan.

58.        *"Entity"* means an entity as defined in section 101(15) of the Bankruptcy Code.

59.        *"Equity Interest"* means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including

any Claim subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising therefrom; provided, however, that Equity Interest does not include any Intercompany Interest.

60. *"Estate"* means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

61. *"Excluded Assets"* has the meaning set forth in the Purchase Agreement.

62. *"Exculpation"* means the exculpation provision set forth in Article XI.D of the Plan.

63. *"Executory Contract"* means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code that has not previously been rejected by the Debtors in these Chapter 11 Cases.

64. *"Fee Claim"* means a Claim under sections 328, 330(a), 331, 363 or 503 of the Bankruptcy Code for legal, financial, advisory, accounting and other services and reimbursement of expenses rendered prior to the Effective Date by any Retained Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by a Final Order.

65. *"File"* or *"Filed"* means file, filed or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

66. *"Final Order"* means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek *certiorari* or move for a new trial, reargument or rehearing has expired and no appeal or petition for *certiorari* or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which *certiorari* was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

67. *"General Bar Date"* means April 18, 2011.

68. *"General Unsecured Claim"* means any unsecured Claim against any Debtor that is not an Administrative Claim, Fee Claim, Priority Tax Claim, Other Priority Claim, 3.25% Convertible Senior Notes Claim, Section 510(b) Claim, or Intercompany Claim.

69. *"Government Claims Bar Date"* means May 28, 2011.

70. *"Holder"* means an Entity holding a Claim or an Equity Interest.

71. *"Impaired"* means any Claim in an Impaired Class.

72. *"Impaired Class"* means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

73. *"Indemnification"* means the indemnification provision set forth in Article XI.E of the Plan.

74. *"Indemnified Parties"* means, collectively, the Debtors and each of their respective current and former officers, directors and employees, each in their respective capacities as such.

75. *"Initial Administrative Claims Bar Date Order"* means the Order Establishing an Administrative Claim Bar Date for Filing Proofs of Administrative Claim and Approving Form, Manner and Sufficiency of Notice Thereof entered by the Court on June 3, 2011 [Docket No. 668].

76.     *"Intercompany Claim"* means any Claim of a Debtor against another Debtor.

77.     *"Intercompany Interest"* means an equity interest in a Debtor held by another Debtor or an equity interest in a Debtor held by an Affiliate of a Debtor.

78.     *"LaGrange Sale Order"* means the Order Granting Motion for an Order, Pursuant to §§ 105 and 363 of the Bankruptcy Code (i) Authorizing the Sale of Manufacturing Facility Free and Clear of Liens, Claims, Encumbrances and Other Interests and (ii) Granting Related Relief entered by the Court on February 15, 2011 [Docket No. 308] in which the Bankruptcy Court, among other things, authorized the Debtors to sell a manufacturing facility located in LaGrange, Georgia to VSP Logis, Inc. for $1,050,000.

79.     *"Linwood Sale Order"* means the Order Granting Motion for an Order, Pursuant to §§ 105 and 363 of the Bankruptcy Code (i) Authorizing the Sale of Property Free and Clear of Liens, Claims, Encumbrances and Other Interests and (ii) Granting Related Relief entered by the Court on April 18, 2011 [Docket No. 531] in which the Bankruptcy Court, among other things, authorized the Debtors to sell two parcels of real property, one located in Linwood, North Carolina and another located in Florence, South Carolina to Select Homes, Inc. for $253,890.

80.     *"Local Bankruptcy Rules"* means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware

81.     *"Master Ballots"* means the master ballots accompanying the Disclosure Statement upon which certain record holders of 3..25% Convertible Senior Notes receive from their respective beneficial owners of 3.25% Convertible Senior Notes, which master ballots shall be completed in accordance with the Solicitation Procedures and actually received by the Voting and Claims Agent on or before the Voting Deadline.

82.     *"Lien"* has the meaning set forth in section 101(37) of the Bankruptcy Code.

83.     *"Other Priority Claim"* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

84.     *"Other Secured Claim"* means any Claim that is secured by a Lien on Collateral to the extent of the value of the Holder of the Claim's interest in such Collateral.

85.     *"Palm Harbor Homes, Inc."* means Debtor Palm Harbor Homes, Inc., a Florida corporation.

86.     *"Person"* means a person as defined in section 101(41) of the Bankruptcy Code.

87.     *"Petition Date"* means November 29, 2010, which is the date that the Debtors commenced the Chapter 11 Cases.

88.     *"Plan"* means the Joint Plan of Liquidation Proposed by Debtors and Committee for Palm Harbor Homes, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code, as amended, supplemented or modified from time to time, and including the Plan Supplement, which is incorporated therein by reference.

89.     *"Plan Objection"* means those certain objections to the Confirmation of the Plan Filed with the Bankruptcy Court and served on the Debtors, and certain other parties, on or before Plan Objection Deadline, in accordance with the Disclosure Statement Order.

90.     *"Plan Supplement"* means the compilation of documents and forms of documents, schedules and exhibits to be Filed prior to the Confirmation Hearing, as amended, supplemented or modified from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules including the Post-Consummation Trust Agreement.

91.     *"Post-Consummation Trust"* means that certain trust to be created on the Effective Date in accordance with the provisions of Article VIII of the Plan and the Post-Consummation Trust Agreement.

92.     *"Post-Consummation Trust Administrator"* means Brian Cejka of Alvarez & Marsal North America, LLC, to be retained as of the Effective Date, as the fiduciary responsible for implementing the applicable provisions of the Plan and administering the Post-Consummation Trust in accordance with the Plan and the Post-Consummation Trust Agreement, and any successor appointed in accordance with the Post-Consummation Trust Agreement, subject to the oversight and direction of the Post-Consummation Trust Oversight Committee. As appropriate, references to the Post-Consummation Trust Administrator shall include any Distribution Agent appointed pursuant to the terms of the Plan or the Post-Consummation Trust Agreement.

93.     *"Post-Consummation Trust Agreement"* means that certain trust agreement in form and substance attached to the Plan as Exhibit A that, among other things, (a) establishes and governs the Post-Consummation Trust, (b) sets forth the powers, duties and responsibilities of the Post-Consummation Trust Administrator and the Post-Consummation Trust Oversight Committee, and (c) provides for the liquidation and distribution of proceeds of the Post-Consummation Trust Assets.

94.     *"Post-Consummation Trust Assets"* means all Assets of the Debtors as of the Effective Date, including but not limited to, the Causes of Action, any Excluded Assets that have not been divested or abandoned by the Debtors as of the Effective Date, and all other property of the Debtors and their Estates, and each of them, which shall be transferred by the Debtors to the Post-Consummation Trust on the Effective Date.

95.     *"Post-Consummation Trust Oversight Committee"* means the committee comprised of each of the Committee Members with the supervisory powers set forth in the Plan and the Post-Consummation Trust Agreement over the Post-Consummation Trust.

96.     "*Prepetition Credit Facility*" means the Amended and Restated Agreement for Wholesale Financing (Finished Goods – Shared Credit Facility) dated May 25, 2004, as the same may have been amended from time to time, between Palm Harbor Homes, Inc. and Palm Harbor Manufacturing, LP, as borrowers, and the Prepetition Lender, as lender.

97.     *"Prepetition Credit Facility Claims"* means any Claim against the Debtors arising under or related to the Prepetition Credit Facility.

98.     *"Prepetition Lender"* means Textron Financial Corporation.

99.     *"Priority Tax Claim"* means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

100.    *"Proof of Claim"* means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

101.    *"Pro Rata"* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class, provided, however that with respect to Holders of Allowed 3.25% Convertible Senior Notes Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 4, the term Pro Rata means the proportion that an Allowed Claim in each such Class bears to the aggregate amount of all Allowed Claims in Class 3 and Class 4.

102.    *"Proponents"* mean the Debtors and the Committee.

103.    *"Purchase Agreement"* means that certain Amended and Restated Asset Purchase Agreement by and among the Debtors and the Purchaser, dated as of March 1, 2011, as approved by the Sale Order.

104.    *"Purchaser"* means Palm Harbor Homes, Inc., a Delaware corporation.

105.    *"Record Date"* means the close of business on [_____], 2011.

106.    *"Retained Contracts"* means those Executory Contracts and Unexpired Leases to be assumed by the Debtors, which Retained Contracts shall be set forth in the Plan Supplement.

107.    *"Retained Professional"* means any Entity either (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with section 327 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

108.    *"Sale Motion"* means the Motion of the Debtors for Entry of (I) an Order (A) Approving Bid Procedures; (B) Approving a Break-Up Fee and Expense Reimbursement; (C) Approving the Stalking Horse Purchasers Right to Credit Bid; (D) Approving the Form and Manner of Notices; (E) Approving the Procedures for the Assumption and Assignment of Contracts and Leases; and (F) Setting a Sale Hearing; and (II) an Order Pursuant to 11 U.S.C. § 363 and 365 (A) Authorizing and Approving Asset Purchase Agreement by and among the Debtors, as Sellers, and Palm Harbor Homes, Inc., a Delaware Corporation, as Purchaser, or Such Other Purchase Agreement(s) Between the Debtors and the Successful Bidder, Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (C) Granting Related Relief [Docket No. 25] filed by the Debtors on November 29, 2011.

109.    *"Sale Order"* means that certain Order Pursuant to 11 U.S.C. §§ 363 and 365 (A) Authorizing and Approving Asset Purchase Agreement By and Among the Debtors, as Sellers, and Palm Harbor Homes, Inc., a Delaware Corporation, as Purchaser, Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (C) Granting Related Relief [Docket No. 354] entered by the Bankruptcy Court on March 4, 2011 that, among other things, approved the Sale Transaction with the Purchaser.

110.    *"Sale Proceeds"* means all Cash proceeds of (a) the Sale Transaction, and (b) the sales authorized by the Bankruptcy Court in the LaGrange Sale Order and the Linwood Sale Order.

111.    *"Sale Transaction"* means that transaction between the Debtors and the Purchaser as set forth in the Purchase Agreement.

112.    *"Schedules"* mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms as the same may have been amended, modified or supplemented from time to time.

113.    *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as amended, or any similar federal, state or local law.

114.    *"Securities Exchange Act"* means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78nn, as amended.

115.    *"Senior Claims"* means and includes any (a) Administrative Claims; (b) Fee Claims, (c) Priority Tax Claims; (d) Other Priority Claims; and (e) Other Secured Claims.

116.    *"Solicitation Package"* has the meaning set forth in section I.E.2 hereof.

117.    *"Solicitation Procedures"* are those solicitation procedures approved by the Bankruptcy Court and attached to the Disclosure Statement Order.

118.    *"Transferred Assets"* shall have the meaning set forth in the Purchase Agreement.

119.    *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

120.    *"Unimpaired"* means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

121.    *"Unimpaired Class"* means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

122.    *"Voting and Claims Agent"* means BMC Group, Inc.

123.    *"Voting Deadline"* means [_____], 2011, at 4:00 p.m. (prevailing Eastern Time), which is the date and time by which all Ballots must be received by the Voting and Claims Agent, or such other date and time as may be established by the Bankruptcy Court.

## X.    CONCLUSION AND RECOMMENDATION

We believe that confirmation of the Plan is preferable to the alternatives described above because it provides the greatest distributions and opportunity for distributions to certain Holders of Claims against the Debtors. In addition, any alternative to confirmation of the Plan could result in extensive delays and increased administrative expenses.

Accordingly, we urge all Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. prevailing Eastern Time on [_____], 2011.

Dated: September 21,26, 2011

Respectfully submitted,

Palm Harbors Homes, Inc.,                                    Official Committee of Unsecured Creditors of Palm Harbor
Palm Harbor Albemarle, LLC,                                 Homes, Inc., et al.
Nationwide Homes, Inc.,
Palm Harbor Real Estate, LLC,
Palm Harbor GenPar, LLC, and
Palm Harbor Manufacturing, LP


  /s/ Brian E. Cejka                                            /s/ Todd Pulvino
Name: Brian E. Cejka                                        Todd Pulvino,
Title: Their Chief Restructuring Officer                Solely In His Capacity As Chair Of The Committee, And Not in
                                                                      any Individual Capacity


Presented by:

David W. Wirt (Admitted Pro Hac Vice)                  Laura Davis Jones (Bar No. 2436)
Aaron C. Smith (Admitted Pro Hac Vice)               Robert J. Feinstein (NY Bar No. RF-2836)
Courtney E. Barr (Admitted Pro Hac Vice)             Shirley S. Cho (CA Bar No. 192616)
LOCKE LORD BISSELL & LIDDELL LLP                   James E. O'Neill (Bar No. 4042)
111 S. Wacker Drive                                            PACHULSKI STANG ZIEHL & JONES LLP
Chicago, Illinois  60606-4410                               919 North Market Street, 17th Floor
Telephone: (312) 443-0485                                  P.O. Box 8705
Fax: (312) 443-0336                                            Wilmington, DE 19899-8705 (Courier 19801)
                                                                      Telephone:  (302) 652-4100
and                                                                 Facsimile:  (302) 652-4400

Christopher A. Ward (Del. Bar No. 3877)              Counsel to the Official Committee of
Justin K. Edelson (Del. Bar No. 5002)                  Unsecured Creditors
POLSINELLI SHUGHART PC

222 Delaware Avenue, Suite 1101
Wilmington, Delaware  19801
Telephone: (302) 252-0920
Fax: (302) 252-0921

Co-Counsel for the Debtors

Document comparison by Workshare Professional on Monday, September 26, 2011 4:52:18 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://CHIDM0003/CHI1/1772462/11 |
| Description | #1772462v11<CHI1> - Palm Harbor - Disclosure Statement |
| Document 2 ID | interwovenSite://CHIDM0003/CHI1/1772462/12 |
| Description | #1772462v12<CHI1> - Palm Harbor - Disclosure Statement |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 49 |
| Deletions | 39 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 88 |