# <u>Compendium of Unpublished Opinions</u>

1. <u>In re Century Glove, Inc.</u>, Nos. 90-400, 90-401, 1993 WL 239489 (D. Del. Feb. 10, 1993)

2. <u>In re Columbia Gas Sys., Inc.</u>, Nos. 91-803, 91-804, 1995 WL 404892 (Bankr. D. Del. June 16, 1995)

3. <u>In re FF Holdings Corp.</u>, Nos. 98-37, 98-38, 1998 U.S. Dist. LEXIS 10741 (D. Del. Feb. 17, 1998)

4. <u>In re Kaiser Aluminum Corp.</u>, No 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006)

5. <u>In re Kmart Corp.</u>, No. 02-02474, 2006 WL 952042 (Bankr. N.D. Ill. Apr. 11, 2006)

6. <u>In re Lapworth</u>, No. 97-34529, 1998 WL 767456 (Bankr. E.D. Pa. Nov. 3, 1998)

7. <u>In re Magnatrax Corp.</u>, No. 03-11402, 2003 WL 22807541 (Bankr. D. Del. Nov. 17, 2003)

8. <u>In re Middlebrook Pharms., Inc.</u>, No. 10-11485, 2010 Bankr. LEXIS 5859 (Bankr. D. Del. Dec. 20, 2010)

9. <u>In re Movie Gallery, Inc.</u>, No. 10-30696, 2010 Bankr. LEXIS 5778 (Bankr. E.D. Va. Oct. 29, 2010)

10. <u>In re PC Liquidation Corp.</u>, No. 05-89022-288, 2006 Bankr. LEXIS 4638 (Bankr. E.D.N.Y. Nov. 13, 2006)

11. <u>In re WorldCom, Inc.</u>, No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003)

**In re Century Glove, Inc.**

**Nos. 90-400, 90-401, 1993 WL 239489 (D. Del. Feb. 10, 1993)**



Not Reported in F.Supp., 1993 WL 239489 (D.Del.)
**(Cite as: 1993 WL 239489 (D.Del.))**

C

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
In re CENTURY GLOVE, INC.
Appellant: First American Bank of New York.
In re SOUTHWEST GLOVES AND SAFETY
EQUIPMENT, INC.
Appellant: First American Bank of New York.

Civ. A. Nos. 90–400–SLR, 90–401–SLR.
Feb. 10, 1993.

Peter J. Walsh, Bayard, Handelman & Murdoch,
P.A., Wilmington, DE, for appellant.

Eduard F. von Wettberg, III, P. Clarkson Collins,
Jr., and Mary M. Johnston, Morris, James, Hitchens
& Williams, Wilmington, DE, for appellees/debt-
ors.

James L. Patton, Jr., and Janet Z. Charlton, Young,
Conaway, Stargatt & Taylor, Wilmington, DE, for
committee of unsecured creditors.

MEMORANDUM OPINION
SUE L. ROBINSON, District Judge.

*1 This case comes before the Court upon ap-
peals from the Order of the bankruptcy court for
the District of Delaware (the "bankruptcy court")
confirming the reorganization plans of two debtors,
Century Glove, Inc. ("Century") (Case No. 85–438)
and Southwest Glove & Safety Equipment, Inc.
("Southwest") (Case No. 85–439).

Both debtors filed Chapter 11 petitions on
November 14, 1985. The bankruptcy court con-
firmed their plans for reorganization in an Order
dated June 7, 1990. Two appeals by the same cred-
itor, First American Bank of New York ("FAB"),
have been consolidated in the present action before
this Court.[FN1]

I. JURISDICTION

FAB contends that this Court has jurisdiction
to hear this case pursuant to 28 U.S.C. sections
1334 and 158. (D.I. 8 at 1) See Century Glove Inc.
v. First American Bank of New York, 860 F.2d 94,
97–98 (3d Cir.1988). "The Court, however, must
make its own assessment to determine whether ap-
pellate jurisdiction exists." In re Columbia Gas Sys-
tem, Inc., 146 B.R. 106 (D.Del.1992).

Section 158(a) of title 28 of the United States
Code provides in pertinent part as follows:

The district courts of the United States shall have
jurisdiction to hear appeals from final judgments,
orders, and decrees, and, with leave of the court,
from interlocutory orders and decrees, of bank-
ruptcy judges entered in cases and proceedings
referred to the bankruptcy judges under section
157 of this title....

28 U.S.C. § 158(a). "In bankruptcy cases, the
courts accord 'finality' a somewhat flexible prag-
matic definition." In re Columbia Gas System, 146
B.R. at 110 (citing In re Taylor, 913 F.2d 102, 104
(3d Cir.1990)).

In the case at bar, the Court finds that the June
7, 1990 Order approving confirmation constituted a
final order for purposes of section 158. Accord-
ingly, this Court has jurisdiction over FAB's appeal.

II. STANDARD OF REVIEW

The findings of fact of the bankruptcy court are
reversible only if clearly erroneous. Bankruptcy
Rule 8013; In re Delaware & Hudson Railway Co.,
124 B.R. 169, 178 (D.Del.1991) (citing In re
Spada, 903 F.2d 971, 975 (3d Cir.1990)). "Thus, a
reviewing court will affirm the bankruptcy court's
findings unless 'on the entire evidence [the court] is
left with the definite and firm conviction that a mis-
take has been committed.' " In re Delaware & Hud-
son, 124 B.R. at 178 (citing United States v. United
States Gypsum Co., 333 U.S. 364, 395 (1948)).
Conclusions of law are freely reviewable de novo.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 239489 (D.Del.)
**(Cite as: 1993 WL 239489 (D.Del.))**

*In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 1447 (3d Cir.1986). When findings of fact are based on an incorrect legal standard, those findings are subject to plenary review on appeal." *First American Bank of New York v. Century Glove, Inc.,* 81 B.R. 274 (D.Del.1988), *aff'd in part, Century Glove, Inc. v. First American Bank,* 860 F.2d 94 (3d Cir.1988).

## III. ADEQUATE DISCLOSURE REQUIREMENTS

Appellant FAB first challenges the bankruptcy court's failure to require debtors to prepare new disclosure statements and to resolicit their modified final plan for reorganization [FN2] in accordance with Code sections 1125 [FN3] and 1127. [FN4] FAB argues that the confirmation hearing should have been postponed pending full compliance with the adequate disclosure provision of the Code. According to FAB, debtors should have been required to prepare new disclosure statements "[g]iven all the developments and changes which occurred in the intervening four year period" [between the time of the original disclosure statements in December 1986 and the time of the confirmation hearing in June 1990]. (D.I. 8 at 78) [FN5]

**\*2** The Court finds that FAB lacks standing to assert its contention of inadequate disclosure. FAB, in its reply brief, seeks to rebut debtors' standing challenge by relying on *Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir.1988). FAB explains that a creditor has the right to appeal the confirmation of a plan if it "might do better ... under alternative plans." *Id.* at 642. (D.I. 16 at 22) FAB asserts that since it might do better under an alternate plan, it is an "aggrieved person" for the purposes of the standing analysis.

FAB, however, fails to address the second aspect of the standing analysis which was extensively discussed in *Kane. See Singleton v. Wulff* 428 U.S. 106, 112 (1976) ("standing involves [a] two-step inquiry; first, whether [the] litigant has been sufficiently injured and second, whether he is the proper proponent of the rights he seeks to assert") (*cited in*

*Kane,* 843 F.2d at 642). Even assuming FAB has been sufficiently injured (i.e., it might do better under an alternate plan), it has failed to establish or even address the issue of whether it may assert the rights of others. It is important to note that FAB's challenge to the adequacy of the debtors' disclosure is limited to the rights of creditors in other classes. "FAB nowhere asserts that *it* was not aware of the alleged facts which FAB claims required new disclosure and a new vote." (D.I. 13 at 38) The following statements made by FAB at a hearing before the bankruptcy court clearly reflect that FAB's disclosure arguments were made solely for the benefit of other creditors and not for itself:

> There's no question but that the debtor has altered its business arrangements.... *We have heard testimony* by Mrs. Modlin that this is all good for the debtors. *We have heard testimony* by Mrs. Modlin as to why the debtor has legitimate excuses for not having achieved the projections it has suggested. *We have heard testimony* by Mrs. Modlin that all of this is good for the debtor. *But only the people in this courtroom have heard that explanation. None of the creditors have,* and it is not for the debtor and, indeed, I suggest that it is not for the court to tell the creditors what is good for them. It is for the creditors to make their own judgment based upon a total disclosure.

(D.I. 13 at 29–30, D.I. 13A, B–11 at 79–80 (emphasis added))

Generally, "litigants in federal court are barred from asserting the constitutional and statutory rights of others in an effort to obtain relief for injury to themselves." *Kane v. Johns–Manville Corp.,* 843 F.2d at 643 (citing *Warth v. Seldin,* 422 U.S. 490, 499, 509 (1975)). "Though this limitation is not dictated by the Article III case or controversy requirement, the third-party standing doctrine has been considered a valuable prudential limitation, self-imposed by the federal courts." *Id.* The court in *Kane* explained why prudential concerns are relevant to a bankruptcy proceeding:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 239489 (D.Del.)
**(Cite as: 1993 WL 239489 (D.Del.))**

**\*3** Bankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party even though that other party is present in the proceedings and is capable of representing himself. Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan. In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights.

*Id.* at 644.

Thus, although the *Kane* court initially concluded that the creditor/appellant was "aggrieved" by the plan, it went on to also conclude that creditor/appellant Kane lacked standing to raise the rights of other creditors. For instance, the court noted that

Kane may not assert the rights of present claimants who he contends were given inadequate notice of the June 1986 hearing at which the special Class–4 voting procedures were adopted. Those Class–4 creditors are in the proceedings and could have objected to the Plan if they had wanted to, but they did not. In fact, the overwhelming majority of Class 4 voted in favor of the Plan. It is not for Kane to insist that other Class–4 members should have received more notice than what apparently satisfies them.

*Id.* at 645. Similarly, in the present case, appellees note that "[n]one of the creditors for whom FAB is showing such solicitude has demanded new disclosure or a new vote." (D.I. 13 at 40, D.I. 13A, B–11 at 88–90) Indeed, the unsecured creditors' committee actually agreed that no new vote or disclosure was necessary and that confirmation was appropriate. (D.I. 13 at 40; D.I. 13A, B–11 at 88–90, B–12 at 166) [FN6] Their agreement was evidenced, *inter alia,* in a brief which was submitted in support of the confirmation plan. (D.I. 12 at

1)

Even if it were assumed that FAB has standing to assert the rights of other creditors, the Court rejects its substantive argument concerning disclosure. When a confirmation plan is modified, Code section 1127(c) requires that all modifications satisfy the adequacy-of-disclosure requirements of Code section 1125. "This does not necessarily mandate the preparation of a new disclosure statement and resolicitation of the plan, however." *In re American Solar King Corp.,* 90 B.R. 808, 823 (Bankr.W.D.Tex.1988) (citing H.R.Rep. No. 595, 95th Cong, 1st Sess. 411 (1977)). "Further disclosure occurs only when and to the extent that the debtor intends to solicit votes from previously dissenting creditors or when the modification materially and adversely impacts parties who previously voted for the plan." *Id.*

In the case at bar, the debtors did not intend to solicit votes from previously dissenting creditors after the original plan was modified.[FN7] Moreover, the modifications at issue did not materially and adversely impact any creditors who previously voted for the Plan. Specifically, at a hearing concerning the modified plans, Judge Balick held the following:

**\*4** I view the issue as being one, whether there is the need, in light of the time delay and some change in circumstances with respect to the mode of operation of the business, for an additional disclosure statement to be filed and the full solicitation procedure and vote. Based on the examination of the amendments to the plan and noting the plan only to indicate that one section only has been modified and that one section deals with the treatment of First American Bank and is headed with the number 3.5, there is no change in the treatment of any other interested parties in the plan. Consequently, I feel there is no need for another solicitation and will not direct one.

There's been opportunity here for both the PBGC and FAB to obtain additional information

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 239489 (D.Del.)
**(Cite as: 1993 WL 239489 (D.Del.))**

with respect to questions they may have had with respect to the operation of the business, and the testimony has been unrefuted that the change *will not act adversely and, in fact, may increase the benefits to all concerned ....*

(D.I. 13A at 95 (emphasis added)) The Court affirms the bankruptcy court's determination that additional disclosure was not warranted under the above circumstances.

## IV. APPELLANT FAB'S OBJECTIONS TO THE FINAL PLAN

Appellant FAB also contends that the Plan itself failed to meet several of the standards for confirmation set forth in 11 U.S.C. § 1129.[FN8] Specifically, appellant's objections to the Plan raise the following issues:

(A) Whether the bankruptcy court erred when it held that the Plan satisfied the good faith requirement of Code section 1129(a)(3).

(B) Whether the bankruptcy court erred when it held that the Plan's classification of creditor provisions did not violate Code sections 1129(a)(1) and 1122.

(C) Whether the bankruptcy court erred when it held that the Plan satisfied the "best interests of creditors" test of Code section 1129(a)(7).

(D) Whether the bankruptcy court erred when it held that the Plan did not violate the Absolute Priority Rule.

## A. SECTION 1129(a)(3) —GOOD FAITH REQUIREMENT

A court may only confirm a plan for reorganization if, *inter alia,* the "plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The "requirement of good faith must be viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start." *In re Sun Country Devel-*

*opment, Inc.,* 764 F.2d 406, 408 (5th Cir.1985). Moreover, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *Id.*

In the present case, FAB asserts two claims as evidence of a lack of good faith so as to bar confirmation under Code section 1129(a)(3): 1) the payment of unsecured creditors from a "speculative" adversary proceeding; and 2) the adequacy of notice to creditors about amendments to scheduling plans. The Court finds both claims to be without merit, since neither claim "go[es] to whether the purpose of [Century's] proposed plan is to reorganize or whether the plan has a reasonable hope of success." *Id.*

(1) Adversary Proceeding

**\*5** Under the Plan, unsecured creditors with claims over $350 were given the choice of accepting payment of $350 or awaiting the outcome of an adversary proceeding instituted by debtor Century against FAB. The adversary proceeding was filed on February 12, 1986 against FAB and two former officers of Century. With respect to FAB, Century alleges a lender liability claim and seeks to recover at least $5,000,000 dollars. FAB has filed a motion to dismiss the "adversary proceeding." Although this motion is fully briefed, the bankruptcy court has not yet decided it.

FAB contends that the Plan's treatment of unsecured creditors who rejected the $350 payment lacks good faith since their recovery hinges upon a "speculative" and "bogus" adversary proceeding. (D.I. 8 at 79–80) FAB focuses upon the fact that, as of June, 1990, "Century ha[s] done absolutely nothing in three and one-half years following the voting to realize any value out of the Adversary Case." (D.I. 16 at 32)

Even if this claim by FAB went to the relevant "good faith" issue as to whether the Plan has a reasonable hope of success, the Court does not agree that this aspect of the Plan lacks good faith. Debtors

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

correctly point out that the unsecured creditors were fully informed of the risks relating to the adversary proceeding through the Disclosure Statement and other communications. For instance the Disclosure Statement provides the following:

> The $5,000,000 sum demanded by the debtor as damages was derived internally without the assistance of an economist or other expert, ... FAB ... believe[s] that the $5,000,000 damage claim is wholly speculative....

(D.I. 9, A–3 at 9) Moreover, Century, in a letter dated January 13, 1987, informed its general unsecured creditors of the following:

> Regarding the lawsuits, none of the parties ha[s] conducted any discovery or advanced beyond the initial pleadings. The lawsuits may ultimately prove to have little or no value ... [U]nder the Amended Plan those creditors with claims over $350 will receive payment only if the lawsuits are successful. And, the lawsuits may not be successful....

(D.I. 13 at 50–51) The above statements exemplify the debtors' good faith effort to fully disclose the risks associated with the adversary proceeding.

(2) Adequate Notice

FAB also contends that the Plan lacks good faith since Century failed to notify certain creditors that it had amended its Schedule of Claims to list certain claims as disputed and since Century failed to notify such creditors that if they did not file a proof of claim by the bar date, under 11 U.S.C. § 1111(a), they would lose their claim and their right to vote. (D.I. 8 at 82–89) Even if FAB's claim went to the relevant issue under section 1129(a)(3) as to whether "the plan has a reasonable hope of success," the Court finds that FAB does not have standing to bring this claim.

Although FAB, in its reply brief, concedes that "its due process rights were [not] violated," it contends that "[a]ny creditor willing to prosecute an appeal, subject to applicable ethical considerations, should be able to obtain review of whether a debtor has proposed a plan in good faith." (D.I. 16 at 24) FAB argues that "Century did not meet its burden of 'good faith' ... One element of that lack of 'good faith' was the Debtors' attempt to slip an amended schedule 'under the door' without allowing adequate notice and response by creditors." (D.I. 13 at 24)

**\*6** Whether FAB's notice challenge is under the guise of section 1129(a)(3) or not, the claim boils down to an argument concerning the rights of other creditors to receive adequate notice of amendments to debtor's schedule of lists. For the same reasons as noted in the preceding section, the Court finds that FAB lacks standing to challenge the rights of other creditors in this context.

B. CLASSIFICATION OF CLAIMS

FAB also challenges the Plan on the ground that it failed to comply with Code section 1129(a)(1), which requires compliance with other applicable provisions of the Code. (D.I. 8 at 89) The specific provision FAB takes issue with is 11 U.S.C. § 1122 concerning the classification of claims or interests. Code section 1122(a) provides in pertinent part that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class." 11 U.S.C. § 1122(a). Although FAB concedes that all similar claims do not have to be placed in one class, it argues that this section "does not give a debtor *carte blanche* to classify claims any way it chooses...." (D.I. 8 at 90). Specifically, FAB challenges that separate classification of FAB, BTNY and Thrift [FN9] from the claims of the general unsecured creditors "was arranged for the obvious purpose of enhancing Century's chances of obtaining acceptance of Century's plan." [FN10]

The Court first finds that FAB lacks standing to challenge the separate classification of BTNY and Thrift. Debtors correctly note that Thrift voted to accept the Century Plan and that BTNY did not object to the confirmation and chose not to join in the

present appeal. (D.I. 13 at 62) (citing *Kane, 843 F.2d at 644* ("For similar reasons, Kane may not assert the rights of present claimants who he contends were given inadequate notice of the June 1985 hearing.... Those Class–4 Creditors are in the proceeding and could have objected to the plan if they had wanted to, but they did not."); *In re Evans Products Co., 65 B.R. 870, 875* ("It defies logic to allow the debtors and equity interest holders to raise the right of creditors in order to challenge the overall Plan, when those creditors do not wish those rights to be raised....")).

The Court also finds that FAB may not challenge the separate classification of its own unsecured deficiency claim. FAB contends that its unsecured claim should be grouped together with the general unsecured creditors since "FAB is treated exactly the same as the creditors in Class VIII—all unsecured non-priority creditors are treated equally by participating in the 'proceeds' of the Adversary Case." (D.I. 16 at 42) However, FAB fails to point out that its interests are in direct conflict with the Class VIII general unsecured creditors who do not accept $350. Debtor/Appellees correctly argue the following with respect to this conflict of interest:

> Under Century's Plan, the Class VIII creditors who do not accept $350, and BTNY's and Thrift's unsecured claims will be paid out of the proceeds of the Adversary Proceeding in which FAB is a defendant. It is in FAB's obvious interest to defeat the Adversary Proceeding or at least to minimize the damages recovered therein, thereby ensuring the Class VIII creditors and BTNY and Thrift get little or nothing. Accordingly, FAB's interests are not the same as—and indeed conflict with—the interests of the Class VIII creditors, B[T]NY and Thrift.

**\*7** (D.I. 13 at 66)

Against this background, the bankruptcy court determined that the separate classification of FAB from the other creditors holding security as well as from the trade creditors was "not violative of *sec-*

*tion 1122,* in that FAB is in a unique position from both of those classes of creditors." (D.I. 13A at 179) This Court agrees.

## C. BEST INTEREST OF CREDITORS TEST

FAB next argues that the plan fails the "best interest of creditors" test as set forth in Code *section 1129(a)(7).* (D.I. 8 at 97–106) *Section 1129(a)(7)* requires that the bankruptcy court find that each creditor in a class has either (1) accepted the plan; or (2) will receive value under the plan that is not less than the amount the creditor would receive if the estate of the debtor were liquidated under Chapter 7.

FAB contends, *inter alia,* that the administrative expenses should not have been included in the liquidation analysis and that the anticipated recovery from the adversary proceeding should have been included. However, FAB did not raise either of these objections at the time of the confirmation hearing.

The court in *Kane v. Johns–Manville Corp.* was faced with a similar situation in which an extensive liquidation analysis was submitted and was unopposed at the confirmation hearing, but was later challenged on appeal. *Kane,* 843 F.2d 636. The court noted that the bankruptcy judge had accepted the proof submitted "that all creditors and equity holders would receive substantially more under the Plan than they would have received" in a Chapter 7 liquidation. *Id. at 649.* The court went on to hold that such findings were not clearly erroneous. *Id.*

Similarly, in the case as bar, the debtors presented a liquidation analysis at the confirmation hearing. At the hearing, FAB failed to make any arguments concerning the ability of the liquidation plan to pass the "best interests of creditors test." Accordingly, this Court finds that Judge Balick's acceptance of the estimates presented at the confirmation hearing was not clearly erroneous.

## D. ABSOLUTE PRIORITY RULE

Generally, Code section 1129(a)(8) provides

that all impaired classes must accept the plan in order for it to be confirmed. Code section 1129(b)(1), however, provides an exception to that rule: a plan may still be approved if it does not discriminate unfairly, and if it is fair and equitable with respect to each impaired class of claims or interests which did not accept the plan. Code section 1129(b)(2), which codifies the absolute priority rule, defines the meaning of "fair and equitable" as it pertains to certain classes. With respect to unsecured classes, section 1129(b)(2)(B) states that a claim is fair and equitable if unsecured classes are to "receive the full value of their allowed claim, or, alternatively, all junior claims receive no distribution under the plan." *In re Route 37 Business Park Assoc.,* 146 B.R. 640, 645 (D.N.J.1992). Thus, under the absolute priority rule, dissenting classes of unsecured creditors must be paid in full before any junior claim or interest can receive or retain any property.

**\*8** Generally, administrative claims enjoy the highest priority under 11 U.S.C. § 507(a)(1). Code section 1129(a)(9)(A) requires that such claims must be paid in full unless the holder of the claim agrees "to a different treatment of such claim." In the present case, Mrs. Modlin [FN11] agreed to different treatment. Specifically, she agreed to relinquish her administrative claims in exchange for a new class of stock of the reorganized debtor corporations.

FAB asserts that the debtors' "Plans violate the absolute priority rule by the provision whereby a new class of stock will be created and issued to an insider of the Debtors in exchange for the relinquishment of an, as yet, unallowed administrative claim." (D.I. 8 at 108) Debtors respond by noting that FAB "never argues, and cannot argue, that Mrs. Modlin is a junior class to the dissenting unsecured creditors. Instead, FAB asserts that the absolute priority rule is violated because Mrs. Modlin is an 'insider of the Debtors.' " (D.I. 13 at 77–78, citing D.I. 8 at 108)

Thus, the initial issue before this Court is whether Mrs. Modlin is an equity security holder of

either debtor or whether her position is limited to that of an administrative claim holder. FAB, in its reply brief, concedes that Mrs. Modlin is not an equity security holder of either debtor. (D.I. 16 at 45) However, FAB asserts that the Court should look to her co-ownership of the majority of the stock of Tamarack, the parent corporation of Century. FAB argues that Mrs. Modlin and her husband are "surrendering their equity interest in Century under the plan," and thus she is giving up "one form of equity for another." (D.I. 16 at 46)

The Court, however, agrees with debtors' explanation of Mrs. Modlin's interest in Tamarack as it relates to the present case:

Mrs. Modlin is a minority stockholder of Tamarack, a company which holds stock in the Debtor. But this ownership does not make her an "equity security holder" of Century or Southwest as defined by the Code. Under 11 U.S.C. § 101(16) "equity security holder" is defined as being a "*holder of an equity security of the debtor.*" Indeed, a stockholder of a parent company is not a party in interest in the bankruptcy of the subsidiary. *E.g., In re O.P.M. Leasing Services, Inc.,* 21 B.R. 983, 986 (S.D.N.Y.1981). The Bankruptcy Court has ruled in this case that 'insofar as Tamarack is the holding company, stockholders of Tamarack cannot be considered [parties] in interest of Century." (B–8 at 40–41).

(D.I. 13 at 79 n. 40 (emphasis added)) The Court finds that since Mrs. Modlin is not an equity security holder of either debtor, the absolute priority rule does not apply. Her only claims at issue are administrative claims which enjoy a senior position to the unsecured creditors. [FN12]

## V. CONCLUSION

For the foregoing reasons, the Order of the bankruptcy court confirming debtors' Plans of reorganization is affirmed. An Order consistent with this Memorandum Opinion shall issue.

FN1. An Order of consolidation was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 239489 (D.Del.)
**(Cite as: 1993 WL 239489 (D.Del.))**

entered by this Court on September 17, 1990. FAB's appeal primarily focuses on the Century plan; however, "most of the issues involved in this appeal run to both plans." (D.I. 8 at 2)

FN2. Debtors filed an original plan for reorganization in August 1986. Subsequently, certain changes were made with respect to the treatment of FAB's claims. As a result, in August, 1987, debtors filed the "final plan" for reorganization which was termed the Second Modified First Amended Plan of Reorganization. All future references to the "original plan" pertain to the first plan filed in August 1986 and all future references to the "Plan" or the "final plan" pertain to the August 1987 filing.

FN3. 11 U.S.C. § 1125(b) requires the following:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

Section 1125(a)(1) defines what constitutes "adequate information" in a disclosure statement as the following:

'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the

debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan; ...

FN4. Section 1127(c) provides that the "proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified." 11 U.S.C. § 1127(c).

FN5. FAB specifically challenges that the disclosure to creditors was inadequate for the following reasons:

(1) The final plans for reorganization which substituted the original plans contained "complex provisions with respect to FAB's claim and involved the surrender of a plant and other property to FAB. The bankruptcy court did not require disclosure of the final plans to creditors.

(2) The fact that the adversary case, which was deemed the "most substantial asset" had gone nowhere in over three years.

(3) The liquidation analysis based on May 1986 facts was performed at a time when debtors' cash position was much lower. "In June 1990 that figure had grown to $1,070,000 ..."

(4) The amendments to the original plan "effectively deny most creditors any rights under the Plan."

(D.I. 8 at 74–77)

FN6. Debtors point out another important

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

reason why FAB should not have standing to assert the rights of other creditors:

> Finally, there is a direct conflict of interest between FAB and the unsecured creditors. The source of payment for most of the unsecured creditors is the proceeds of a lawsuit in which FAB is a defendant. It is therefore in FAB's interest that these creditors receive nothing or that the Debtors be liquidated which would encourage the same result.

(D.I. 13 at 58)

FN7. FAB and the Pension Benefit Guaranty Corporation ("PBGC") were the only creditors to object to confirmation and PBGC's objection was withdrawn as part of a settlement with the debtors. (D.I. 13 at 32 n. 15)

FN8. All future references to "Code section" refer to title 11 of the United States Code.

FN9. The specific terms of Century's Third Plan provided for five classes of noninsider impaired claims:

> (1) Class V, consisting of the secured claim of FAB;

> (2) Class VI, consisting of the secured claims of BTNY and Thrift;

> (3) Class VIII, consisting of general unsecured creditors with claims greater than $350;

> (4) Class IX, consisting of the unsecured claim of FAB; and

> (5) Class X, consisting of the unsecured claims of BTNY and Thrift.

(D.I. 8 at 91)

FN10. Specifically, FAB argues that the debtor's classification scheme was created to meet the requirement of Code § 1129(a)(10) which requires that at least one class of noninsider, impaired claimants accept the proposed plan. (D.I. 8 at 90)

FN11. Mrs. Modlin has a Class I administrative claim against the debtor for past services rendered in the amount of $675,000 for Century and $270,000 for Southwest. (D.I. 13 at 80)

FN12. FAB also raises the issue of the infusion-of-new capital exception to the absolute priority rule. This issue is moot in light of the Court's determination that the absolute priority rule does not apply to the present case.

D.Del.,1993.
In re Century Glove, Inc.
Not Reported in F.Supp., 1993 WL 239489 (D.Del.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**In re Columbia Gas Sys., Inc.**

**Nos. 91-803, 91-804, 1995 WL 404892 (Bankr. D. Del. June 16, 1995)**



Not Reported in B.R., 1995 WL 404892 (Bkrtcy.D.Del.)
**(Cite as: 1995 WL 404892 (Bkrtcy.D.Del.))**

**H**

Only the Westlaw citation is currently available.

United States Bankruptcy Court, D. Delaware.
In re The COLUMBIA GAS SYSTEM, INC., Debtor.
In re COLUMBIA GAS TRANSMISSION CORPORATION, Debtor.

Bankruptcy Nos. 91-803, 91-804.
June 16, 1995.

Robert S. Brady, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Laurence Greenwald, Stroock & Stroock & Lavan, New York City, for debtors.

Michael P. Morton, Wilmington, DE, David I. Herbst, Holleb & Coff, Chicago, IL, for CNG Producing Co. and Total Minatome Corp.

Douglas A. Shachtman, Wilmington, DE, for Cabot Oil & Gas Corp.

Mark Minuti, Saul Ewing Remick & Saul, Wilmington, DE, for ALAMCO, Inc.

Jeoffrey L. Burtch, Cooch & Taylor, Wilmington, DE, for Official Committee of Equity Sec. Holders.

John D. Demmy, Morris, James, Hitchens & Williams, Wilmington, DE, for New Bremen Corp. and New ULM Gas, Ltd.

Stephen M. Miller, Smith Katzenstein & Furlow, James L. Marketos, Lane & Mittendorf, Washington, DC, for Seneca/Upshur.

Kevin Gross, Rosenthal, Monhait & Gross, Wilmington, DE, Larry J. Nyhan, David M. Schiffman, Sidley & Austin, Chicago, IL, for Official Committee/Unsecured Creditors of TCo.

Thomas Herlihy, III, Herlihy, Harker & Kavanaugh, Wilmington, DE, Michael P. Kessler, Weil, Gotshal & Manges, Houston, TX, for EX-XON Corp.

COURT'S RULING ON MOTION OF COLUMBIA GAS TRANSMISSION CORPORATION AND THE COLUMBIA GAS SYSTEM, INC. FOR ENTRY OF AN ORDER APPROVING PRODUCER SETTLEMENT

HELEN S. BALICK, Bankruptcy Judge.

**\*1** THE COURT: Columbia Gas System and Columbia Gas Transmission moved this Court to approve a settlement of TCo's objections to certain producer-creditor claims. CG and TCO also moved for a deferral of further proceedings in the claims estimation process.

The settlement motion is brought pursuant to Sections 105 and 502 of the Bankruptcy Code, and Bankruptcy Rule 9019 and seeks approval of the agreement relating to sixteen claims that were filed in an aggregate amount of nearly $10 billion. The settlement would allow those claims in an aggregate amount of only $1,327,362,353. These sixteen claims represent approximately 80 percent by dollar amount of the producer claims against TCo. A schedule attached to the second amended TCo plan filed June 14, 1995 also contains proposed settlement amounts to the remaining producers.

For this Court to approve the settlement, TCo must show that the settlement is fair and equitable. The record must be sufficient to allow the Court to assess the wisdom of the proposed compromise. Relevant factors to consider in evaluating the settlement include the probability of success in the claims litigation, complexity of litigation, expense, inconvenience and delay attending to the litigation, interests of creditors, and the extent to which the settlement is truly the product of arm's length bargaining and not of fraud and collusion.

Several objections have been raised in opposition to this settlement motion. This Court has already rejected the arguments relating to the pre-

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

matureness of this motion at the June 5 hearing. The objectors argue that the disclosure statement and plan contain insufficient information to evaluate the settlement and that the plan may not be confirmable. This is neither a disclosure, nor a plan confirmation hearing. The record established yesterday is sufficient to rule on the settlement motion.

Considering TCo's burden to show that the settlement is fair and equitable, the claims litigation is very complex, as indicated by the appointment of a claims mediator, and the duration of the Boston proceedings, which have already consumed two-and-one-half years, and are only at the recalculation phase of the estimation procedures. The mediator still needs to issue a final recommendation for the resolution of generic issues. It appears that the generic phase of the process will not be completed until late 1995. Following the submission of recalculated claims, the mediator will still have to address contract-specific issues and recommend allowed amounts for each non-settled claim. Without this settlement, the claims mediation process will likely continue for three to five years. The additional expense to the estate if these sixteen claims are not settled will be enormous. The likely duration of such continued litigation would be significantly long.

As exemplified by the testimony of John Beerbower in settling with the sixteen producers, TCO has considered the effect of several major legal issues that will affect the range of outcomes for producer claims. These include take-or-pay issues, price deficiency issues, life of reserve issues, and the appropriate discount rate to be applied to future producer gas revenues. TCo has generated numbers to portray a dollar range of possible outcomes under the more likely litigation scenarios. These numbers represent a range of reasonable litigation outcomes. The settlement, as detailed in Debtors' Exhibit 2, provides for allowance levels that represent compromises well within the range of these reasonable litigation outcomes. The TCo creditors' committee has also presented its views on a range of lit-

igation outcomes, which the Court also finds to be reasonable. It is particularly significant, that despite the differences in these two sets of ranges, which were prepared by parties with differing interests, the settlement numbers fall within both ranges, and do so at the lower end of those ranges.

**\*2** As indicated by the testimony of John Beerbower, the settlements were negotiated at arm's length and in good faith.

The settlement is in the best interest of the estate. The savings in time and money to the estate by the settlement of these claims is substantial. The settlement is also having a beneficial carryover effect, in that it is encouraging other producers to settle, further reducing costs and enhancing the prospects of a consensual plan. The settlement is in the best interest of the unsecured creditors. In addition to the reasons just mentioned, the settlement will enhance the possibility of distribution before year's end.

Furthermore, the Court finds the settlement specifically benefits the non-settling producer creditors. By reducing the universe of the claims at issue in the claims mediation process, that process can only become more streamlined and efficient. The non-settling producers can liquidate their claims more cheaply and receive distribution faster.

The objectors also argue relatedly that this settlement is part of a creeping or de facto plan. This is not a de facto plan. The settlement is conditioned upon confirmation of a plan subject to all of the processes and safeguards of the Bankruptcy Code and Rules. There are no distributions prior to confirmation. TCo is entitled to enter into conditional settlements prior to a confirmation hearing. The applicable law does not support the objectors' position on the de facto plan argument in the circumstances here.

The objectors also argue that the settlement is discriminatory, that the settlement offers to the present non-settling producers may be for a lower

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

percentage than the sixteen settling producers. Relatedly, the objectors insist that the settlement formula should be disclosed. The Court finds these arguments to be red herrings. While TCo has offered to settle the remaining non-settled producer claims, and while any such effort is encouraged, TCo is under no obligation to settle all claims prior to the plan confirmation hearing.

If TCo and a producer ultimately do not settle a claim, the producer retains its rights to seek the full amount of its filed proof of claim, which in each case is higher than any settlement offer. As to the treatment of claims within the same class, that is a confirmation issue.

The objectors suggest that the settlement is not feasible, in that the debtors will have insufficient cash to fund the settlement or to pay the claims of non-settling producers. While this settlement fixes the amount of the allowed claims of the sixteen producers, they will be paid only upon confirmation of a plan and in accordance with the terms of that plan. Feasibility of the plan is a confirmation issue.

The objectors question the propriety of the debtors settling with TCo's largest producer creditors. To the Court, it makes eminent sense to attempt to do so, as this process can result in the formation of a building block to a consensual plan of reorganization, which should be the goal of every Chapter 11 proceeding.

**\*3** In conclusion, the Court finds each objection, including the objection to the Exxon-UPR-Koch agreement, to be without merit, and each is overruled. The motion to approve the producer settlement is granted.

The debtors have also requested a deferral of the claims estimation procedures until after this Court's ruling on the settlement motion. The Court is sympathetic to the concern of the non-settling producers that further delay could be used as negotiation leverage. The debtors do not object to the non-settling producers having a role in recommending procedures to the Court to be followed in liquidating the remaining claims, and the Court agrees that they should have such a role, along with the claims mediator, TCo, and the TCo creditors' committee. No other official committee need participate in that recommendation process.

The claims mediator has set June 30 as the deadline for filing recalculated claims. After that date, the mediator and other interested parties will know the universe of remaining objected-to claims. As soon as possible thereafter, the above-mentioned parties in the claims estimation process are instructed to convene concerning revising procedures, if revisions are appropriate, and to fully cooperate in doing so. The Court will grant a short deferral to allow these talks to take place. The Court will not tolerate an unreasonable delay in any recommendation of implementation of revised procedures.

The proceedings are deferred through July 21, 1995. I have prepared and will now sign an order in accordance with my remarks.

*ORDER*

AND NOW, June 16, 1995, following hearing on the Motion of Columbia Gas Transmission Corporation and The Columbia Gas System, Inc. For Entry of an Order Approving Producer Settlement, and for the reasons stated in open court,

IT IS ORDERED THAT:

1. The Motion as it relates to requesting approval of the producer settlement is GRANTED.

2. The Motion as it relates to deferral of the claims estimation procedures is GRANTED only to the following extent. As soon as possible after June 30, 1995, the claims mediator, TCo, the TCo creditors' committee, and any non-settling producer creditor who wishes to participate, shall convene to discuss revising procedures if revisions are appropriate, and to fully cooperate in doing so. The proceedings are deferred through July 21, 1995.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 1995 WL 404892 (Bkrtcy.D.Del.)
**(Cite as: 1995 WL 404892 (Bkrtcy.D.Del.))**

Bkrtcy.D.Del.,1995.
In re Columbia Gas System, Inc.
Not Reported in B.R., 1995 WL 404892
(Bkrtcy.D.Del.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**In re FF Holdings Corp.**

**Nos. 98-37, 98-38, 1998 U.S. Dist. LEXIS 10741 (D. Del. Feb. 17, 1998)**



**IN RE FF HOLDINGS CORPORATION and FARM FRESH, INC., Debtor.**

**Chapter 11, Case No. 98-37 and 98-38-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1998 U.S. Dist. LEXIS 10741*

**February 17, 1998, Decided**

**SUBSEQUENT HISTORY:** Application granted by, Costs and fees proceeding at, Objection overruled by *In re FF Holdings Corp., 2006 U.S. Dist. LEXIS 27522 (D. Del., May 9, 2006)*

**DISPOSITION:** [*1] Debtors' Disclosure Statement approved. The Plan is confirmable in all respects, except for the provisions pertaining to releases and punitive damages.

**COUNSEL:** Richard Beck, Esquire and Joanne B. Wills, Esquire of KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP, Wilmington, Delaware. Robert A. Baime, Esquire and Joel H. Levitin, Esquire of DECHERT PRICE & RHOADS, New York, New York. Attorneys for Debtors and Debtors-in-Possession.

Michael D. Debaecke, Esquire of COOCH AND TAYLOR, Wilmington, Delaware. Of counsel: James J. Burns, Esquire and R. Hart Lee, Esquire of WILLIAMS, MULLEN, CHRISTIAN & DOBBINS, P.C., Richmond, Virginia. Attorneys for Crestar Bank, as Indenture Trustee.

Laura Davis Jones, Esquire, S. David Peress, Esquire, and Brendan Linehan Shannon, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware. Attorneys for First Bank National Association, Indenture Trustee.

Michael B. Joseph, Esquire and Theodore J. Tacconelli,

Esquire of FERRY & JOSEPH, Wilmington, Delaware. Jerrold G. Weinberg, Esquire and Barry W. Spear, Esquire of WEINBERG & STEIN, Norfolk, Virginia. Attorneys for Sea Fin Holding Corporation.

Michael B. Joseph, Esquire and Theodore [*2] J. Tacconelli, Esquire of FERRY & JOSEPH, Wilmington, Delaware. David A. Greer, Esquire of HOFHEIMER NUSBAUM, P.C., Norfolk, Virginia. Attorneys for John Knox Limited Partnership.

Gregory M. Sleet, Esquire, United States Attorney, and Ellen W. Slights, Esquire, Assistant United States Attorney, of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware. Attorneys for the United States of America.

Theodore J. Tacconelli, Esquire of FERRY & JOSEPH, Wilmington, Delaware. Barton Nachamie, Esquire of TODTMAN, NACHAMIE, HENDLER & SPIZZ, P.C., New York, New York. Attorneys for Buckroe Associates, Chuchland Farm Fresh Associates, Commonwealth Associates, Commonwealth Associates/York County L.L.C. and Summit Realty, L.L.C.

**JUDGES:** Joseph J. Farnan, Jr., Chief Judge.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION**

*OPINION*

February 17, 1998

Wilmington, Delaware

**Joseph J. Farnan, Jr., Chief Judge.**

Presently before the Court are two applications by FF Holdings Corporation ("Holdings") and Farm Fresh, Inc. ("Farm Fresh") (collectively, "the Debtors") seeking the Court's approval of the Debtors' disclosure statement (the "Disclosure Statement") dated November 26, 1997 [*3] and confirmation of the Debtors' joint plan of reorganization (the "Plan") dated January 7, 1998. In response to the Debtors' application for approval of the Disclosure Statement, the Debtors received four objections. Objections were filed by Edith Poetzshke (D.I. 92), Crestar Bank, as Indenture Trustee, (D.I. 101) and First Bank National Association, as Indenture Trustee (D.I. 105). The fourth objection was a protective objection filed by Carol Martin, Sharon A. Barish and Opal Bowman (D.I. 106).

In response to the Debtors' application seeking confirmation of the Plan, the Debtors received six objections. The objections were filed by The Fresh Market, Inc. (D.I. 89), the United States (D.I. 98), John Knox Limited Partnership ("John Knox") (D.I. 99), Sea Fin Holding Corporation ("Sea Fin") (D.I. 100), Crestar Bank, as Indenture Trustee, (D.I. 101) and First Bank National Association, as Indenture Trustee (D.I. 105). Additionally, a protective objection to the Plan was filed by Carol Martin, Sharon A. Barish, and Opal Bowman (D.I. 106), and a Response to Debtors' Motion to Assume and Assign Certain Non-Residential Real Estate Leases was filed by Buckroe Associates, Chuchland Farm Fresh [*4] Associates, Commonwealth Associates/New York County, L.L.C. and Summit Realty L.L.C. (D.I. 102).

On Monday, February 9, 1998, the Court held a hearing on the Debtors' applications. At the hearing, the Protective Objection to Disclosure Statement and Joint Plan filed by Carol Martin, Sharon A. Barish and Opal Bowman (D.I. 106) was resolved in accordance with a stipulation that was placed on the record. Likewise, the Objection to Confirmation of the Plan filed by The Fresh Market, Inc. (D.I. 89) was also resolved on the record. Following the hearing, First Bank National Association filed a Notice of Dismissal dated February 13, 1998, in which it voluntarily dismissed its objection pursuant to

*Federal Rule of Civil Procedure 41*, made applicable to these proceedings by *Bankruptcy Rule 7041*. With these three matters resolved, the Court will address the remaining objections to the Disclosure Statement and the Plan.

**BACKGROUND**

Farm Fresh, a Virginia Corporation, is a wholly owned subsidiary and the sole asset of Holdings, a Delaware Corporation. Farm Fresh is engaged in the retail food industry, and prior to bankruptcy, operated forty-seven supermarkets in three different formats [*5] in the State of Virginia. At the time of the bankruptcy filings, Farm Fresh employed approximately 5,200 people and, in 1996, generated sales in excess of $ 761.5 million.

As a result of increased competition within the retail food industry and an anticipated inability to pay interest on the 14.25% Senior Notes due in 2002, issued by Holdings, the Debtors hired Donaldson Lufkin & Jenrette Securities Corporation ("DLJ") to assist in the exploration of strategic alternatives, including a possible sale of substantially all of the assets of Farm Fresh. As a result of these efforts, Farm Fresh, Richfood, and FF Acquisition negotiated and executed an asset purchase agreement (the "Purchase Agreement"). Under the terms of the Purchase Agreement, FF Acquisition would buy and Farm Fresh would sell substantially all of the operating assets of Farm Fresh, in return for a cash payment in excess of $ 250 million (less the value of certain assumed capital leases and subject to certain adjustments), certain warrants to purchase 1.5 million shares of stock in Richfood at a fixed price, and the assumption by FF Acquisition of certain liabilities of Farm Fresh. The Purchase Agreement is expressly [*6] contingent upon, among other things, the confirmation of a plan of reorganization, and an Effective Date for the plan of no later than March 5, 1998.

Described briefly, the Plan proposed by the Debtors in their instant applications contemplates consummation of the Purchase Agreement and distribution of the proceeds thereof, together with the proceeds of a liquidation of any residual assets of Farm Fresh to the creditors and interest holders of Farm Fresh and Holdings. The Plan is expressly contingent upon, among other things, the consummation of the Purchase Agreement.

Currently, the Debtors anticipate that, under the Plan, the holders of administrative claims, priority claims, tax claims, and all secured claims, along with all employees, and most trade creditors, will receive cash payments equal to the full value of such claims. [1] The Debtors also anticipate that the holders of Farm Fresh's Senior Notes, holders of Farm Fresh's Convertible Subordinated Debentures [2], and holders of general unsecured claims against Farm Fresh, will receive a cash payment equal to greater than 90% of the value of their claim. While the Plan provides for a procedure for distribution to the holders [*7] of Farm Fresh Common Stock, Holdings Notes, general unsecured claims against Holdings, Holdings Preferred Stock and Holdings Common Stock, the Debtors do not anticipate any distributions to these holders under the Plan.

> 1   Pursuant to the Court's Order Authorizing Farm Fresh to Pay Pre-Petition Wages, Salaries and Benefits, to Reimburse Pre-Petition Employee Business Expenses, and to Pay Other Pre-Petition Employee Benefits and the Court's Order Authorizing the Payment of Pre-Petition Trade Claims and Honoring Customer Returns of Pre-Petition Merchandise under Certain Terms and Conditions, Farm Fresh is currently making payments to its employees and to trade creditors, who extend credit to Farm Fresh throughout the pendency of these cases on the same terms as were made pre-petition.
>
> 2   Due to the Subordination Provisions within the Convertible Subordinated Debentures, however, all distributions that are allocated to satisfying the claims of holders of Convertible Subordinated Debentures will instead be distributed to holders of the Senior Notes. As a result of this contractual provision, the Debtors anticipate that the holders of Convertible Subordinated Debentures will not receive any distribution under the Plan.

[*8] Prior to filing their bankruptcy cases, Farm Fresh solicited acceptances and rejections of the above-described Plan. At the close of the solicitation period, Farm Fresh received a sufficient amount and number of acceptances to allow the Court to confirm the Plan.

On January 7, 1998 (the "Petition Date"), the Debtors filed their voluntary petitions for bankruptcy under Chapter 11. On this same date, the Debtors also filed the Plan and the Disclosure Statement that are the subject of the instant applications.

## DISCUSSION

### I. The Disclosure Statement

Pursuant to the provisions of *Section 1126(b)(2) of the Bankruptcy Code*, a holder of a claim or interest that has accepted or rejected a proposed plan of reorganization prior to the commencement of a case will be deemed to have accepted or rejected the plan if the acceptance or rejection was solicited after disclosure to the holder of adequate information as defined in *Section 1125(a) of the Bankruptcy Code. Section 1125(a)* describes the term "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition [*9] of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgement about the plan . . ." *11 U.S.C. § 1125(a).*

Two objections have been raised to the adequacy of the Disclosure Statement. The first objection was raised in a pro se letter filed by Edith Poetzchke, and the second objection was raised by Crestar Bank, as trustee (the "Convertible Trustee") under the indenture dated March 1, 1985, as amended and supplemented, relating to the Farm Fresh, Inc., 7 1/2% convertible subordinated debentures due 2010 (the "Debentures"), on behalf of the holders of unconverted Debentures (the "Unconverted Debenture Holders").

Regarding Ms. Poetzchke's objection, the Court has reviewed the objection and finds that the very contents of Ms. Poetzchke's letter evidence that she clearly understood what her rights would be under the plan, specifically, that she would not be receiving any distribution. As such, the Court finds that Ms. Poetzchke's objection relates more to confirmation of the Plan than to a lack of adequate disclosure. Accordingly, the Court will overrule Ms. Poetzchke's [*10] objection.

Likewise, the Court has reviewed Crestar's objection to the Disclosure Statement and finds that the objection can be more appropriately addressed as an objection to the Plan, rather than an objection to the adequacy of the Disclosure Statement. However, the Court does find that the Disclosure Statement satisfies the requirements of

*Section 1125(a)*. Regardless of the ultimate legality of the classification of claimants and the release provisions, the Court finds that the Disclosure Statement clearly sets forth the manner in which the various classes of claimants will be treated and accurately and candidly discloses the release provisions. Accordingly, the Court will overrule the objections to the Disclosure Statement.

## II. The Plan

Several parties have objected to the confirmation of the Plan. Because some parties raise multiple objections, for ease of discussion, the Court will approach these objections in terms of the issues they raise.

### A. *Classification of Claimants*

The interested parties in this bankruptcy litigation raise two objections relating to the issue of classification of claimants. First, the Convertible Trustee objects to the Plan on the ground [*11] that it is improper to classify Debenture Holders who have converted differently from those who have not yet done so. Second, Sea Fin and John Knox object to the Plan on the ground that it is improper to classify the Trade Claims separately from the claims of other general unsecured creditors.

#### 1. The Debenture Holders

Under the terms of the Plan, the Debenture Holders who exercised their conversion rights prior to the Petition Date are included with the claims of general unsecured Creditors in Class 3C, while the claims of the Debenture Holders who did not convert are included in Class 3A. The Plan further provides that Class 3C claimants are projected to receive a distribution estimated at 90.23% of the amount of their allowed claims, after conversion, [3] and that a $ 750,000 fund would be established in which the Class 3C holders would share equally, free of the claims of Senior Note Holders. [4] Although Class 3A holders are also projected to receive a cash distribution estimated at 90.23% of the amount of their allowed claims under the Plan and Disclosure Statement, the Plan and Disclosure Statement further provide that this distribution will not be paid to the Class 3A claimants, [*12] because of the subordination provisions of the Indenture, until Class 3B claimants (the Senior Note Holders) are paid in full. Accordingly, all funds otherwise due Class 3A claimants will ultimately be paid to the Senior Noteholders, and it is likely that the Class 3A claimants will receive nothing.

3 The Debtors estimate that this percentage will equal approximately 50 cents and a fraction on the dollar in the face amount of the bonds. (Tr. at 6).
4 Senior Note Holders are defined as the holders of "senior indebtedness", which is debt incurred by the Debtors other than the subordinated debt such as the Debentures.

In its objection, the Convertible Trustee contends that the Plan unfairly discriminates between Class 3A and Class 3C claimants. According to the Convertible Trustee, there is no difference between the Class 3A claimants and the Class 3C claimants, except for the fact that the Class 3C claimants exercised their right to convert before the Petition Date, and therefore, the two groups of [*13] claimants should be treated similarly. In response, the Debtor contends that it is not only acceptable to provide different classification for Debenture Holders who have converted and those who have not, but that it is also mandated by *Section 1122(a)*.

In pertinent part, *Section 1122(a)* provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class." *11 U.S.C. § 1122(a)*. A proper determination of what claims are "substantially similar" focuses on the nature of the claim. As the Bankruptcy Court for the Northern District of New York described, the "primary analysis centers upon the legal attributes of the claims and not upon the status or circumstances of the claimant. Emphasis is not upon the holder so much as it is upon that which is held." *In re Northeast Dairy Cooperative Federation, Inc., 73 B.R. 239, 250 (Bankr. N.D.N.Y. 1987)*.

Consistent with the requirements of *Section 1122(a)*, courts considering the issue of discriminatory classification have concluded that unfair discrimination occurs where a plan "gives unequal treatment to creditors who are similarly [*14] situated regarding legal rights and priority." *Corestates Bank v. United Chemical Technologies, 202 B.R. 33, 47 (E.D. Pa. 1996)*. As with the *Section 1122(a)* inquiry, this inquiry focuses on the legal attributes or the nature of the claim, rather than on the claimants themselves.

In this case, the Court finds that the plan does not unfairly discriminate and that the different classification of Debenture Holders is appropriate. The nature of the claims of the Debenture Holders varies significantly depending on whether a holder has exercised its right to

convert. Where a holder has converted, the subordination provisions of the indenture in favor of Senior Note Holders cease to exist. However, by the express terms of the indenture governing the Convertible Subordinated Debentures, there is no exception from the subordination provisions after the filing of a bankruptcy petition. (Indenture § 1402; Disclosure Statement at 10). Accordingly, a holder's rights to payment, the Debtors' obligations to that holder and the holder's remedies and rights vary significantly depending on whether or not the holder has converted. Because the Court finds that the Class 3A and Class 3C claimants [*15] are not similarly situated regarding their legal rights or priority and that the nature of the claims held by Class 3A and Class 3C claimants are not substantially similar, the Court finds that the different classifications are not unfairly discriminatory, and that the different classifications are appropriate under *Section 1122(a)*.

2. Sea Fin and John Knox

Both Sea Fin and John Knox (the "Landlords") are lessors of non-residential real property under unexpired leases with the Debtor. Under the terms of the Plan, the Debtors are to reject both of these leases. However, both leases are currently in default for non-payment or rent and failure to make certain repairs. As such, the Landlords hold unsecured claims comprised of, among other things, debts arising from the non-payment of rent and lease rejection damages.

Under the terms of the Plan, the Landlords claims are classified as general unsecured claims in Class 3C and are to receive an estimated payment of 90.23%. However, Trade Claims are to receive 100% on their claims. The Landlords object to this classification, claiming that it is unfair and discriminatory for the Debtors to classify trade claims separately from landlord [*16] rejection claims because both claims are essentially general unsecured claims.

Numerous courts have held that separate classification and treatment of necessary trade claims from other unsecured creditors is acceptable if the separate classification is justified by a "reasonable purpose," legitimate basis, or necessary business objective. *See e.g. In re Jersey Medical Center, 817 F.2d 1055, 1061 (3d Cir. 1987)* (holding that classification of claims or interests must be reasonable and recognizing reasonableness of distinguishing trade creditors' claims); *In re One Times Square Assoc. Ltd. Partnership, 159*

*B.R. 695, 703 (Bankr. S.D.N.Y. 1993)* (permitting separate classification of substantially similar unsecured claims where there is "reasonable basis for doing so or, in other words, when the decision to separately classify does not offend one's sensibility of due process and fair play"). In addition, courts have recognized the important role that the cooperation of trade creditors plays in the reorganization process, and on this basis, have found separate classification and treatment of such vital creditors to be reasonable. *See e.g. In re Richard Buick, Inc., 126 B.R.* [*17] *840, 852 (E.D. Pa. 1991); In re AG Consultants Grain Div., Inc., 77 B.R. 665, 673 (Bankr. N.D Ind. 1987).*

In this case, the Court recognized the importance of the Trade Creditors to the Debtors when it entered the Order Authorizing the Payment of Pre-Petition Trade Claims and Honoring Customer Returns of Pre-Petition Merchandise Under Certain Term and Conditions, on the Petition Date. By the terms of this Order, the Court authorized Farm Fresh to pay its Trade Creditors in full in the ordinary course of business throughout the pendency of the bankruptcy cases. The Order rested on the Court's finding that the Trade Creditors were vital to the Debtors' reorganization process. The Court finds this same justification to be sufficient to warrant the different classification the Debtor proposes, and therefore, the Court finds the classification to be reasonable. Accordingly, the Court will overrule the objections of the Landlords on the unfair and discriminatory classification issue. [5]

> 5 Additionally, the Court notes that the treatment between the Trade Creditors and the other unsecured creditors is not grossly disparate, such as to raise the notion of unfairness. Indeed, the unsecured creditors will receive 90% of the full value of their claim, while the Trade Creditors will receive 100%.

[*18] B. *The Releases*

The United States and the Convertible Trustee object to the releases set forth in Article IX of the Plan (the "Releases"). The Debtors maintain that these Releases are necessary to ensure the finality of these cases and the financial security of the Debtors' estate.

In part, Section 9.5(a) of the Plan provides for a

complete release, satisfaction, and

discharge of any and all claims of any kind or nature arising on or prior to the Effective Date against the Debtors or the Assets and any and all claims arising out of or related to Claims or Interests that any Releasing Party has or may have against any Person who at the effective Date is, or at the Petition Date was, an Affiliate of the Debtors or any Holder of an Allowed Claim or Allowed Interest (including without limitation, the Old Credit Agreement Banks and the DIP Facility Lenders) or any member of the Committee or any present or former shareholders, directors, officers, employees agents, advisors attorneys professional persons, and representatives of the Debtors, each such Affiliate, each such Holder, and each such member of the Committee and their respective heirs, representatives, successors, [*19] and assigns in whatever capacity . . .

(Plan at § 9.5(a)).

Additionally, Section 9.6 of the Plan permits the Debtors, on their own behalf, and derivatively to release any claims against present or former shareholders, directors, officers, employees, advisors, attorneys, professional persons or representatives of the Debtors and their respective heirs, representatives, successors, and assigns from all liability based on any acts or omissions related to past service with, for, or on behalf of the Debtors or their affiliates. (Plan at § 9.6). Based on the language of Section 9.6, holders of claims and interests against the Debtors will be foreclosed from pursuing derivative claims.

Based on the representations made at the hearing, it is the Court's understanding that the objections of the United States in this regard have been resolved. The Debtors have agreed to carve out the claims of the United States, and therefore, these provisions will not affect any claims of the United States. With this matter resolved, the Court will address the remaining objection to the Releases filed by Crestar.

Crestar's objection to the Releases is two-fold. First, Crestar contends [*20] that the creditors have not consented to the Releases. Second, Crestar contends that

the creditors have not received any consideration for the Releases.

Numerous courts, including this Court, have recognized that there are no *per se* prohibitions against releases. *See e.g. In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992); In re Continental Airlines,* C.A. No. 93-252-SLR (D. Del. Mar. 16, 1995). However, where, as here, releases are non-consensual, they are looked upon disfavorably and are only approved under extraordinary circumstances. *HHL Financial Services, et al.,* No. 97-398-SLR, Memorandum and Order at 3 (Sept. 29, 1997).

Although the Court approved the releases in *Continental Airlines,* the circumstances were quite extraordinary. In that case, the reorganization plan was substantially consummated by the time of the appeal, and the objecting bondholders had received some consideration. *See HHL Financial Services, et al.,* No. 97-398-SLR, at 3 (discussing exceptional circumstances in *Continental Airlines).*

However, in the instant case, the Plan has yet to be confirmed and the creditors have not received any consideration for [*21] the Releases. *See In re Lowenschuss, 67 F.3d 1394, 1400-02 (9th Cir. 1995)* (finding plan unconfirmable as a matter of law where third party releases lacked consideration). This Court has previously recognized that there is no legal precedent for approving broad releases of this magnitude in the absence of some consideration given to the nonconsenting third parties or other extraordinary circumstances. *HHL Financial Services, et al.,* No. 97-398-SLR, at 4.

Moreover, of particular concern to the Court in this case is that many of the creditors subjected to the Releases will not be receiving any disbursement of any kind under the Plan. Under these circumstances, the Court finds it particularly unjust to force these creditors to surrender any potentially valuable causes of action they may have against the Debtors, its representatives, and its affiliates.

While the Court appreciates the Debtors' concern regarding finality, under the circumstances present here, the Court finds it insufficient to overcome the injustices that could result from the Court's approval of such broad, non-consensual releases. Accordingly, the Court will sustain the objection of the Convertible Trustee to [*22] the Releases.

## C. *Exclusion of Attorneys Fees*

Sea Fin and John Knox object to the Plan on the grounds that the Plan excludes attorney's fees from the definition of Allowed Claims. However, based upon the colloquy at the hearing, the Court understands that this objection was resolved as a result of the Debtors' recognition that attorneys' fees should be treated as a component of the claim. (Tr. at 96). Accordingly, the Court will treat this objection as withdrawn.

## D. *Exclusion of Punitive Damages*

Sea Fin also objects to the Plan on the grounds that it excludes Punitive Damages from the definition of Allowed Claims. Sea Fin has filed a $ 10 million lawsuit against Farm Fresh, $ 5 million of which is a claim for punitive damages. (Tr. At 112).

The Bankruptcy Code neither prohibits nor mandates the allowance of punitive damage claims in a plan of reorganization. *In re Allegheny International, Inc., 106 B.R. 75, 78 (W.D. Pa. 1989).* However, courts have the equitable power to limit or disallow punitive damages claims where the claims would frustrate the debtor's reorganization. *See In re A.H. Robins Company, Inc., 89 B.R. 555 (E.D. Va. 1988).*

In this case, however, [*23] the Court believes that it would be premature to disallow all punitive damage claims against the Debtors. There are only two claimants with punitive damage claims against the estate, and neither of these claims has been liquidated. (Tr. 114). Moreover, the Debtors do not contend that allowance of these punitive damage claims would significantly hamper their reorganization efforts. Accordingly, the Court will sustain Sea Fin's objection to the exclusion of punitive

damages in the Plan.

## E. *Response to Debtors' Motion To Assume And Assign Certain Non-Residential Real Estate Leases*

Although not lodged as a formal objection to the Plan, the Court entertained the concerns of Churchland Farm Fresh Associates, Commonwealth Associates, Summit Realty, LLC, Buckroe Associates, and Commonwealth Associates/York County L.L.C. (the "Landlords") presented in their Response to Debtors' Motion To Assume And Assign Certain Non-Residential Real Estate Leases. Particularly, these Landlords were concerned with the time frame in which the Debtors would cure defaults and otherwise comply with the requirements of *11 U.S.C. § 365(b)*. During the hearing, the Debtors maintained that such action would [*24] be taken promptly upon confirmation of the Plan. In response, the Landlords requested that the Court clarify the meaning of the term "promptly." The Court, however, is satisfied that the Debtors understand that promptly means that the obligation will be fulfilled as soon as practicable within the context of the execution of the Plan.

## CONCLUSION

For the reasons discussed, the Debtors' Disclosure Statement will be approved. In addition, the Court finds the Plan to be confirmable in all respects, except for the provisions pertaining to releases and punitive damages. In accord with these rulings, the Court requests the Debtors to submit a revised Order Approving Disclosure Statement, Confirming Debtors' Joint Plan Of Reorganization, And Approving Asset Purchase Agreement.

**In re Kaiser Aluminum Corp.**

**No 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006)**

Not Reported in B.R., 2006 WL 616243 (Bkrtcy.D.Del.)
**(Cite as: 2006 WL 616243 (Bkrtcy.D.Del.))**



Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. Delaware.
In re: KAISER ALUMINUM CORPORATION, a
Delaware corporation, et al., Debtors.

No. 02–10429(JKF), 7312.

Feb. 6, 2006.

Ian Connor Bifferato, Bifferato, Gentilotti, Biden & Balick, Daniel J. Defranceschi, Jason M. Madron, Kimberly D. Newmarch, Michael Joseph Merchant, Paul Noble Heath, John Henry Knight, Richards, Layton & Finger, Megan Nancy Harper, Patrick Michael Leathem, Morris, James, Hitchens & Williams LLP, James L. Patton, Sharon M. Zieg, Young, Conaway, Stargatt & Taylor, Michael F. Bonkowski, Wilmington, DE, Marc T. Foster, Richard F. Rescho, Law Offices of Christopher E. Grell, Oakland, CA, Patricia Williams Prewitt, Locke Liddell & Sapp LLP, Houston, TX, for Debtors.

FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF KAISER ALUMINUM CORPORATION, KAISER ALUMINUM & CHEMICAL CORPORATION AND CERTAIN OF THEIR DEBTOR AFFILIATES, AS MODIFIED

FITZGERALD, Bankruptcy J.

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | FINDINGS OF FACT | 7 |
| | A. JURISDICTION AND VENUE | 7 |
| | B. MODIFICATIONS TO THE PLAN | 8 |
| | C. COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE | 9 |
| | 1. Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code | 9 |
| | 2. Section 1129(a)(2)—Compliance with Applicable Provisions of the Bankruptcy Code | 17 |
| | 3. Section 1129(a)(3)—Proposal of the Plan in Good Faith | 17 |
| | 4. Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable | 18 |
| | 5. Section 1129(a)(5)—Disclosure of Identity of Proposed Management | 19 |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy

    6. Section 1129(a)(6)—Approval of Rate Changes ............ 20

    7. Section 1129(a)(7)—Best Interests of Holders of Claims and Interests ............ 20

    8. Section 1129(a)(8)—Acceptance of the Plan by Each Impaired Class ............ 20

    9. Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code ............ 21

    10. Section 1129(a)(10)—Acceptance By at Least One Impaired, Non–Insider Class ............ 22

    11. Section 1129(a)(11)—Feasibility of the Plan ............ 23

    12. Section 1129(a)(12)—Payment of Bankruptcy Fees ............ 23

    13. Section 1129(a)(13)—Retiree Benefits ............ 23

    14. Section 1129(b)—Confirmation of the Plan Over the Nonacceptance of Impaired Classes ............ 24

    15. Section 1129(d)—Purpose of Plan ............ 25

    D. THE ASBESTOS PI TRUST AND THE ASBESTOS PI CHANNELING INJUNCTION COMPLY WITH SECTION 524(g) OF THE BANKRUPTCY CODE ............ 26

    1. The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code ............ 26

    2. The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code ............ 27

3. The Extension of the Asbestos PI Channeling Injunction to Third Parties Is Appropriate ... 29

4. Entry of the Asbestos PI Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants ... 32

E. THE SILICA, CTPV AND NIHL PI CHANNELING INJUNCTIONS AND THE CHANNELED PI INSURANCE ENTITY INJUNCTION EACH SATISFY THE REQUIREMENTS OF SECTION 105(a) OF THE BANKRUPTCY CODE ... 33

F. SATISFACTION OF CONDITIONS TO CONFIRMATION ... 39

G. SUBSTANTIVE CONSOLIDATION ... 42

II.  CONCLUSIONS OF LAW ... 43

A. JURISDICTION AND VENUE ... 43

B. MODIFICATIONS TO THE PLAN ... 44

C. EXEMPTIONS FROM SECURITIES LAWS ... 44

D. EXEMPTIONS FROM TAXATION ... 45

E. COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE ... 45

F. COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE ... 45

G. OBJECTIONS TO THE PLAN ... 45

1. The Insurers' Objections ... 45

2. Law Debenture's Objection ... 46

3. Other Objections ... 46

H. TRANSFER OF BOOKS AND RECORDS TO THE FUNDING ... 46

Not Reported in B.R., 2006 WL 616243 (Bkrtcy.D.Del.)
**(Cite as: 2006 WL 616243 (Bkrtcy.D.Del.))**

VEHICLE TRUST AND RETENTION
OF KACC'S FORMER COUNSEL

I. APPROVAL OF THE RE-
LEASES PROVIDED UNDER THE
PLAN
47

J. ASSUMPTIONS, ASSUMP-
TIONS AND ASSIGNMENTS AND
REJECTIONS OF EXECUTORY CON-
TRACTS AND UNEXPIRED LEASES
47

INTRODUCTION

**\*1** WHEREAS, Kaiser Aluminum Corporation ("KAC"), Kaiser Aluminum & Chemical Corporation ("KACC"), Akron Holding Corporation, Kaiser Aluminum & Chemical Investment, Inc., Kaiser Aluminium International, Inc., Kaiser Aluminum Properties, Inc., Kaiser Aluminum Technical Services, Inc., Kaiser Bellwood Corporation, Kaiser Micromill Holdings, LLC, Kaiser Texas Micromill Holdings, LLC, Kaiser Sierra Micromills, LLC, Kaiser Texas Sierra Micromills, LLC, Oxnard Forge Die Company, Inc., Alwis Leasing LLC, Kaiser Center, Inc., KAE Trading, Inc. ("Kaiser Trading"), Kaiser Aluminum & Chemical Investment Limited (Canada), Kaiser Aluminum & Chemical of Canada Limited (Canada), Kaiser Bauxite Company ("KBC"), Kaiser Center Properties, Kaiser Export Company and Texada Mines Ltd. (Canada) (collectively, the "Reorganizing Debtors" and, as reorganized entities after emergence, the "Reorganized Debtors"), twenty-two of the above-captioned debtors and debtors in possession, proposed the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates, dated September 7, 2005, as modified (as it may be further modified, the "Plan"); FN1

FN1. Unless otherwise specified, capitalized terms and phrases used herein have the meanings assigned to such terms and phrases in the Plan. The rules of interpretation set forth in Section 1.2.a of the Plan shall apply to these Findings of Fact and Conclusions of Law (the "Findings and Conclusions"). In addition, in accordance with Section 1.1 of the Plan, any term used in the Plan or these Findings and Conclusions that is not defined in the Plan or herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

A copy of the Plan (without the exhibits thereto) is attached to the Confirmation Order as Exhibit A and incorporated herein by reference.

WHEREAS the Court, on September 8, 2005, entered its Order (A) Approving Proposed Disclosure Statement, (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Plan of Reorganization and (C) Scheduling a Hearing on Confirmation of Proposed Joint Plan of Reorganization and Approving Related Notice Procedures (D.I.7320) (the "Disclosure Statement Order"), by which the Court, among other things, approved the Reorganizing Debtors' proposed disclosure statement (the "Disclosure Statement"), established procedures for the solicitation and tabulation of votes to accept or reject the Plan and scheduled a hearing to consider Confirmation of the Plan for January 9, 2006 at 9:00 a.m., to be continued on January 10, 2006 if necessary (the "Confirmation Hearing");

WHEREAS affidavits of service executed by Kathleen M. Logan with respect to the mailing of notice of the Confirmation Hearing and solicitation materials in respect of the Plan in accordance with the Disclosure Statement Order (collectively, the "Affidavits of Service") and were filed with the Court on September 19,

Not Reported in B.R., 2006 WL 616243 (Bkrtcy.D.Del.)
**(Cite as: 2006 WL 616243 (Bkrtcy.D.Del.))**

2005 (D.I.7390–93), October 14, 2005 (D.I.7514, 7516, 7522–26) and November 10, 2005 (D.I.7686);

WHEREAS the Affidavit of Andrew Novak (D.I.7773) (the "Publication Affidavit") was filed with the Court on November 21, 2005, regarding the publication of the Notice of (A) Deadline for Casting Votes to Accept or Reject Proposed Joint Plan of Reorganization, (B) Hearing to Consider Confirmation of Proposed Joint Plan of Reorganization and (C) Related Matters in certain magazines and newspapers as set forth in the Disclosure Statement Order;

WHEREAS, Logan & Company, Inc., the Court-appointed solicitation and tabulation agent in respect of the Plan, filed the Declaration of Kathleen M. Logan Certifying the Methodology for the Tabulation of Votes on, and the Results of Voting with Respect to, the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates (D.I.7812) (the "Voting Declaration") on November 29, 2005, attesting to the results of the tabulation of the properly executed and timely received Ballots for the Plan as follows:

**\*2** *Subclass 2A Claimants.* The Reorganizing Debtors received 279 acceptances out of 286 votes from holders of Claims under Subclass 2A (Senior Note and 7–3/4% SWD Revenue Bond Convenience Claims), with Subclass 2A claimants who voted in favor of the Plan holding Claims in the amount of $2,317,000 for voting purposes, such acceptances being 97.55 percent in number and 97.07 percent in principal amount of all ballots received from holders of Subclass 2A Claims (Voting Decl. ¶¶ 18–19);

*Subclass 2B Claimants.* The Reorganizing Debtors received 530 acceptances out of 571 votes from holders of Claims under Subclass 2B (Other Convenience Class Claims) with Subclass 2B claimants who voted in favor of the Plan holding Claims in the amount of $2,289,307 for voting purposes, such acceptances being 92.82 percent in number and 92.49 percent in principal amount of all ballots received from holders of Subclass 2B Claims (Voting Decl. ¶¶ 18–19);

*Class 4 Claimants.* The Reorganizing Debtors received 1 acceptance out of 1 vote from holders of Claims under Class 4 (Canadian Debtor PBGC Claims) with Class 4 claimants who voted in favor of the Plan holding Claims in the amount of $616,000,000 for voting purposes, such acceptances being 100 percent in number and 100 percent in principal amount of all ballots received from holders of Class 4 Claims (Voting Decl. ¶¶ 18–19);

*Class 5 Claimants.* The Reorganizing Debtors received 197,820 acceptances out of 198,127 votes from holders of Claims under Class 5 (Asbestos Personal Injury Claims) with Class 5 claimants who voted in favor of the Plan holding Claims in the amount of $993,949,450 for voting purposes, such acceptances being 99.84 percent in number and 99.97 percent in principal amount of all ballots received from holders of Class 5 Claims (Voting Decl. ¶¶ 18–19);

*Class 6 Claimants.* The Reorganizing Debtors received 296 acceptances out of 296 votes from holders of Claims under Class 6 (CTPV Personal Injury Claims) with Class 6 claimants who voted in favor of the Plan holding Claims in the amount of $296 for voting purposes, such acceptances being 100 percent in number and 100 percent in principal amount of all ballots received from holders of Class 6 Claims (Voting Decl. ¶¶ 18–19);

*Class 7 Claimants.* The Reorganizing Debtors received 1,764 acceptances out of 1,773 votes from holders of Claims under Class 7 (NIHL Personal Injury Claims) with Class 7 claimants who voted in favor of the Plan holding Claims in the amount of $1,764 for voting purposes, such acceptances being 99.49 percent in number and 99.49 percent in principal amount of all ballots received from holders of Class 7 Claims (Voting Decl. ¶¶ 18–19);

*Class 8 Claimants.* The Reorganizing Debtors received 2,667 acceptances out of 2,674 votes from holders of Claims under Class 8 (Silica Personal Injury Claims) with Class 8 claimants who voted in favor of the Plan holding Claims in the amount of $2,667 for voting purposes, such acceptances being 99.74 percent

Not Reported in B.R., 2006 WL 616243 (Bkrtcy.D.Del.)
**(Cite as: 2006 WL 616243 (Bkrtcy.D.Del.))**

in number and 99.74 percent in principal amount of all ballots received from holders of Class 8 Claims (Voting Decl. ¶¶ 18–19);

**\*3** *Subclass 9B Claimants.* The Reorganizing Debtors received 345 acceptances out of 372 votes from holders of Claims under Subclass 9B (Other Unsecured Claims) with Subclass 9B claimants who voted in favor of the Plan holding Claims in the amount of $1,153,864,132 for voting purposes, such acceptances being 92.74 percent in number and 99.26 percent in principal amount of all ballots received from holders of Subclass 9B Claims (Voting Decl. ¶¶ 18–19);

WHEREAS objections to Confirmation of the Plan (collectively, the "Objections") were filed by (a) the official committee of retired employees (the "Retirees' Committee") (D.I.7699), (b) the United States of America, on behalf of the Internal Revenue Service (the "IRS") (D.I.7705), (c) the Comptroller of Public Accounts of the State of Texas (the "Texas Comptroller") (D.I.7706), (d) Law Debenture Trust Company of New York ("Law Debenture") (D.I.7707), (e) the Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities ("Clark") (D.I.7711), (f) Santown Limited Partnership ("Santown") (D.I.7714), (g) the United States Trustee (the "U.S. Trustee") (D.I.7715), (h) Elizabeth Black (D.I.7743), (i) Patty Greiner (D.I.7830) and (j) certain insurance companies (collectively, the "Insurers") (D.I.7834, 7836, 7839, 7840, 7843, 7847, 7851, 8046);

WHEREAS the Objections of the Retirees' Committee, the IRS, the Texas Comptroller and Santown were each resolved prior to the Confirmation Hearing;

WHEREAS the United States Department of Justice, on behalf of certain federal agencies, raised an informal Objection to Confirmation of the Plan, which was resolved by the parties by the inclusion of certain language in the Confirmation Order;

WHEREAS Sherwin Alumina, L.P. filed a reservation of rights and conditional Objection to Confirmation of the Plan (D.I.8033), which it withdrew at the Confirmation Hearing;

WHEREAS the U.S. Trustee withdrew its Objection (D.I.7960);

WHEREAS the Objection of Santown was resolved by the inclusion of certain language in the Confirmation Order;

WHEREAS the Creditors' Committee filed a Pre–Hearing Brief in Support of the Plan (D.I.7961) (the "Creditors' Committee's Brief") and a reply to Sherwin's conditional objection (D.I.8056), the Reorganizing Debtors filed a memorandum of law in support of Confirmation of the Plan and in response to certain of the Objections (D.I.7967) (the "Memorandum of Law") and a reply to Sherwin's conditional objection to the Plan (D.I.8068), the Reorganizing Debtors and the official committee of asbestos claimants (the "Asbestos Committee") filed a joint memorandum of law in response to the Insurers' Objections (D.I.7966) (the "Joint Response") and Anne M. Ferazzi, the legal representative for future silica and coal tar pitch volatile claimants (the "Silica and CTPV Representative"), and Martin J. Murphy, the legal representative for future asbestos claimants (the "Asbestos Representative"), each filed a joinder to the Joint Response (D.I.7962, 7968);

**\*4** WHEREAS the Insurers filed three replies (D.I.8057, 8058, 8060) in support of their Objections;

WHEREAS the declarations of Edward F. Houff (D.I.8066), Blake O'Dowd (D.I.8067), Anne M. Ferazzi (D.I.8063) and Martin J. Murphy (D.I.8065) were submitted in support of the Plan (collectively, the "Declarations") and received into evidence without objection, and although all parties and participants were afforded an opportunity to conduct cross-examination at the hearing, no one elected to do so (Tr. of Jan. 9, 2006 Hr'g at 20–24);

WHEREAS the Court has reviewed the Plan, the Disclosure Statement, the Disclosure Statement Order, the Voting Declaration and the Declaration of Kathleen M. Logan filed on January 6, 2006 (D .I. 8097), the Affidavits of Service, the Publication Affidavit, the Objections, the Memorandum of Law, the Joint Response, the Creditors' Committee's Brief, the Insurers' replies in fur-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ther support of their Objections, the Declarations and the other papers before the Court in connection with the Confirmation of the Plan;

WHEREAS the Court heard the statements of counsel in support of and in opposition to Confirmation at the Confirmation Hearing, as reflected in the record made at the Confirmation Hearing;

WHEREAS the Court has considered all evidence presented at the Confirmation Hearing;

WHEREAS the Court has taken judicial notice of the papers and pleadings on file in these chapter 11 cases;

WHEREAS the Court, after due deliberation and for sufficient cause, finds that the evidence admitted in support of the Plan at the Confirmation Hearing is persuasive and credible;

NOW, THEREFORE, the Court hereby enters the following Findings of Fact and Conclusions of Law with respect to Confirmation of the Plan . FN2

FN2. These Findings and Conclusions constitute the Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable herein by Bankruptcy Rules 7052 and 9014. Any finding of fact shall constitute a finding of fact even if it is referred to as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is referred to as a finding of fact. Citations to the Bankruptcy Code and Rules are to the sections and rules as numbered and in effect prior to October 17, 2005.

I. FINDINGS OF FACT.

A. JURISDICTION AND VENUE.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has jurisdiction to enter a final order with respect thereto, except to the extent of the requirements of Section 524(g) of the Bankruptcy Code for issuance or affirmance of the Confirmation Order by the United States District Court for the District of Delaware (the "District Court").

B. MODIFICATIONS TO THE PLAN.

The Reorganizing Debtors filed three sets of modifications to the Plan, which are set forth in: (a) the Motion for Entry of Stipulation and Agreed Order Regarding Plan Modifications and Potential Confirmation Objections by Certain Insurance Companies (D.I.7659) (the "First Modifications"); (b) the Motion for Entry of an Order (I) Approving Settlement with Sherwin Alumina, L.P. and (II) Authorizing Related Modifications to Second Amended Joint Plan of Reorganization (D.I.7796) (the "KBC Modifications"); and (c) the Amended Notice of Filing of Third Modification to the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates (D.I.7965) (the "Third Modifications" and, together with the First Modifications and the KBC Modifications, the "Modifications"). The Court approved the First Modifications pursuant to the Stipulation and Agreed Order entered on November 15, 2005 (D.I.7718). On December 19, 2005, the Court approved the KBC Modifications (D.I.7993), but directed the Reorganizing Debtors to serve on general unsecured creditors in Subclass 9B a notice describing the impact of the KBC Modifications on Subclass 9B creditors and providing such creditors with an opportunity to object to confirmation of the Plan on the basis that the Plan includes the KBC Modifications and providing those creditors who timely submitted a vote in Subclass 9B to accept the Plan with an opportunity to change their votes. On December 21, 2005, the Reorganizing Debtors filed their Notice of Filing and Service on Holders of Subclass 9B General Unsecured Claims of Notice of: (A) Modifications to Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates, as Modified; and (B) Deadline for Changing Previous Votes on Plan and Objecting to Modifications Filed by Kaiser Aluminum Corporation (D.I.8002). On December 27, 2005, the Reorganizing

Debtors filed the affidavit of Kathleen M. Logan (D.I.8027) (the "KBC Affidavit of Service"), evidencing service of the KBC Modifications Notice on Subclass 9B creditors, which took place on December 21 and December 22, 2005. No objections to the KBC Modifications have been filed. And on January 6, 2006, the Reorganizing Debtors filed the Declaration of Kathleen M. Logan (D.I.8097) (the "Voting Change Declaration"), evidencing that no creditor who timely submitted a vote in Subclass 9B to accept the Plan elected to change such vote. Accordingly, the Modifications, including the KBC Modifications, may be approved as part of the confirmation process. (*See* Tr. of Jan. 9, 2006 Hr'g at 30.)

C. COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

1. Section 1129(a)(1) —Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.

**\*5** The Plan complies with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code. (Houff Decl. ¶¶ 39–49.) The Plan fully complies with each requirement of section 1123(a) of the Bankruptcy Code. (Houff Decl. ¶ 43.) Article II of the Plan designates fifteen classes of Claims and Interests. (Plan art. II; Houff Decl. ¶ 43.) Section 3.2 of the Plan specifies that Classes 1, 3, 10 and 15 are not impaired under the Plan. (Plan § 3.2; Houff Decl. ¶ 43.) Section 3.3 of the Plan specifies that Claims and Interests in Classes 2, 4, 5, 6, 7, 8, 9, 11, 12, 13 and 14 are impaired and describes the treatment of each such Class. (Plan § 3.3; Houff Decl. ¶ 43.) Further, the treatment of each Claim or Interest within a Class is the same as the treatment of each other Claim or Interest in such Class, unless the holder of a Claim or Interest agrees to less favorable treatment on account of its Claim or Interest. (Houff Decl. ¶ 43.)

a. Sections 1122 and 1123(a)(1)-(4)—Classification and Treatment of Claims and Interests.

i. The Plan constitutes a separate plan of reorganization for each of the Reorganizing Debtors. The Plan meets the classification requirements of section 1122(a)

of the Bankruptcy Code. Article II of the Plan classifies Claims and Interests into fifteen separate categories. (Plan art. II; Houff Decl. ¶ 43.) In particular, Article II of the Plan segregates into separate Classes Unsecured Priority Claims (Class 1), Convenience Claims (Class 2), Secured Claims (Class 3), Canadian Debtor PBGC Claims (Class 4), Asbestos Personal Injury Claims (Class 5), CTPV Personal Injury Claims (Class 6), NIHL Personal Injury Claims (Class 7), Silica Personal Injury Claims (Class 8), General Unsecured Claims (Class 9), Canadian Debtor Claims (Class 10), Intercompany Claims (Class 11), KAC Old Stock Interests (Class 12), Kaiser Trading Old Stock Interests (Class 13), KACC Old Stock Interests (Class 14) and Other Old Stock Interests (Class 15). (*Id.*) The groupings reflect the diverse characteristics of those Claims and Interests, and the legal rights under the Bankruptcy Code of each of the holders of Claims or Interests within a particular Class are substantially similar to other holders of Claims or Interests within that Class. (Houff Decl. ¶¶ 39–42.)

ii. Due to their entitlement to priority status under section 507 of the Bankruptcy Code, Unsecured Priority Claims have been separately classified in Class 1. (Plan § 2.1; Houff Decl. ¶ 40.) In accordance with section 1122(b) of the Bankruptcy Code, Convenience Claims (consisting of every unsecured claim, except any Claim in respect of 6–1/2% RPC Revenue Bonds or Senior Subordinated Notes, that falls below the applicable threshold amount) have been separately classified in Class 2 for administrative convenience. (Plan § 2.2; Houff Decl. ¶ 40.) Specifically, Subclass 2A (Senior Note and 7–3/4% SWD Revenue Bond Convenience Claims) includes all Senior Note Claims and 7–3/4% SWD Revenue Bond Claims for which the stated principal amount of the securities underlying the allowed amount of each such Claim is either equal to or less than \$15,000, and Subclass 2B includes all Unsecured Claims other than Senior Note Claims, 7–3/4% SWD Revenue Bond Claims, 6–1/2% RPC Revenue Bonds and Senior Subordinated Note Claims for which (a) with respect to 7.60% SWD Revenue Bond Claims, the stated principal amount of the securities underlying the allowed amount of each such Claim is either equal to or

less than $30,000 or (b) with respect to any such Claim other than a 7.60% SWD Revenue Bond Claim, the allowed amount of such Claim is equal to or less than $30,000. (*Id.*)

**\*6** iii. Based on their secured status, Secured Claims have been separately classified in Class 3. (Plan § 2.3; Houff Decl. ¶ 41.) Unsecured Claims in Class 4 (Canadian Debtor PBGC Claims) and Class 10 (Canadian Debtor Claims) have been separately classified because such Claims have been asserted against the Canadian Debtors, which are not being substantively consolidated with the other Reorganizing Debtors for purposes of implementing the Plan, and the Plan classifies the Canadian Debtor PBGC Claims separately from the other Canadian Debtor Claims based on the fact that the PBGC Claims are allowed against each of the Reorganizing Debtors and are receiving the treatment negotiated in the PBGC Settlement Agreement. (Plan § 2 .4; Houff Decl. ¶ 41.) Asbestos Personal Injury Claims, CTPV Personal Injury Claims, NIHL Personal Injury Claims and Silica Personal Injury Claims have been separately classified in, respectively, Classes 5, 6, 7 and 8 due to the distinctive bases for such claims. (Plan § 2.5–2.8; Houff Decl. ¶ 41.) Moreover, due to their unique nature, Class 11 Intercompany Claims have been classified separately from the Class 9 general Unsecured Claims. (Plan § 2.9, 2.11; Houff Decl. ¶ 41.)

iv. Finally, the four Classes of Interests are comprised of (a) the Interests and Claims in respect of the KAC Old Stock (Class 12), (b) the Interests and Claims in respect of the Old Stock of Kaiser Trading (Class 13), (c) the Interests and Claims in respect of the Old Stock of KACC (Class 14) and (d) the Interests in any Debtor other than the Interests in Classes 12, 13 or 14 (Class 15). (Plan § 2.12–2.15; Houff Decl. § 42.) The Interests in the Debtors have been segregated into these four Classes according to the differing nature of such Interests. (Houff Decl. ¶ 42.)

b. Section 1123(a)(5)—Adequate Means for Implementation of the Plan.

i. Article IV of the Plan and various other provisions of the Plan provide adequate means for the Plan's implementation, including: (a) except as otherwise

provided in the Plan and subject to the Restructuring Transactions, the continued corporate existence of the Reorganizing Debtors and the vesting of assets in the Reorganized Debtors under Section 4.1 of the Plan; (b) the consummation of the Restructuring Transactions in connection with Section 4.2 of the Plan; (c) the creation of, and transfer of certain assets to, the Funding Vehicle Trust for the benefit of the PI Trusts and the appointment of the Funding Vehicle Trustees according to Section 5.1 of the Plan; (d) the creation of the PI Trusts, the transfer of certain assets to the Asbestos PI Trust and the Silica PI Trust and the appointment of the PI Trusts' respective Trustees and Trust Advisory Committees, as detailed in Sections 5.2 through 5.5 of the Plan; (e) the issuance of New Common Stock in Reorganized KAC for distribution in satisfaction of certain Claims under Section 4.3.d of the Plan; (f) the preservation of rights of action by, and release of certain rights of action against, the Reorganized Debtors, as described in Section 4.5 of the Plan; (g) the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases to which any Reorganizing Debtor is a party, as stated in Article VI of the Plan; (h) the cancellation of the Senior Note Indentures and the discharge of obligations thereunder, subject to certain rights of the Indenture Trustees that will remain in effect, as detailed in Section 4.12 of the Plan; and (i) the substantive consolidation of KAC, KACC, Akron Holding Corporation, Kaiser Aluminum & Chemical Investment, Inc., Kaiser Aluminium International, Inc., Kaiser Aluminum Properties, Inc., Kaiser Aluminum Technical Services, Inc., Bellwood, Kaiser Micromill Holdings, LLC, Kaiser Texas Micromill Holdings, LLC, Kaiser Sierra Micromills, LLC, Kaiser Texas Sierra Micromills, LLC, Oxnard Forge Die Company, Inc., Alwis Leasing LLC, Kaiser Center, Inc., Kaiser Trading, Kaiser Center Properties and Kaiser Export Company, as provided in Sections 1.1(195), 9.1 and 9.2 of the Plan. (Plan art. VI, §§ 4.1, 4.2, 4.3.d, 4.5, 4.12, 5.1, 5.2–5.5, 1.1(195), 9.1, 9.2; Houff Decl. ¶ 44.) In accordance with the KBC Modifications, the Plan also provides for the substantive consolidation of KBC with the Substantively Consolidated Debtors solely for the limited purpose of treating any Unsecured Claims against KBC as Claims in Subclass 9B for purposes of distributions to be made under the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2006 WL 616243 (Bkrtcy.D.Del.)
**(Cite as: 2006 WL 616243 (Bkrtcy.D.Del.))**

Plan. (KBC Modification at 2; Houff Decl. ¶ 44.)

c. Section 1123(a)(6)—Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.

**\*7** Section 4.3.a(i) of the Plan provides that the Certificates of Incorporation of Reorganized KAC, Reorganized Kaiser Trading and each other Reorganized Debtor will, among other things, prohibit the issuance of nonvoting equity securities to the extent required under section 1123(a) of the Bankruptcy Code. (Plan § 4.3.a(i); Houff Decl. ¶ 45.) This prohibition is reflected in Article IV, Section 1 of the Amended and Restated Articles of Incorporation of Reorganized KAC and the Amended and Restated Articles of Incorporation of Reorganized Kaiser Trading, which are Plan Exhibits 4.3a(i) and (ii). (Plan Ex. 4.3a(i), 4.3a(ii); Houff Decl. ¶ 45.)

d. Section 1123(a)(7)—Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders and Public Policy.

i. The Plan ensures that the selections of the officers and directors of Reorganized KAC, Reorganized Kaiser Trading and the other Reorganized Debtors is consistent with the interests of creditors and equity security holders and with public policy. (Houff Decl. ¶ 46.) Sections 1.1(176) and 4.3.b of the Plan provide that the initial board of directors for Reorganized KAC will be comprised of the following: (a) the chief executive officer; (b) four persons designated by the USW; and (c) five persons designated by the Search Committee. (Plan § 1.1(176), 4.3.b; Houff Decl. ¶ 46.) The Search Committee consisted of two persons designated by the Reorganizing Debtors, two persons designated by the Creditors' Committee and one person designated jointly by the Asbestos Committee, the Asbestos Representative and the Silica and CTPV Representative. (Plan § 1.1(176); Houff Decl. ¶ 46.) Accordingly, nine of the ten initial directors of Reorganized KAC were selected by creditor representatives or a committee the majority of which is comprised of creditor representatives. (Houff Decl. ¶ 46.) In addition, Section 4.3.b of the Plan provides that the initial members of the board of directors and initial officers of Reorganized Kaiser

Trading will be selected jointly by the Asbestos Committee, the Asbestos Representative and the Silica and CTPV Representative. (Plan § 4.3.b; Houff Decl. ¶ 46.)

ii. In light of the foregoing, the manner of selection of the initial directors, managers, trustees and officers of the Reorganized Debtors, as set forth in the certificates of incorporation and bylaws or similar constituent documents of the applicable Reorganized Debtor and applicable state law, are consistent with the interests of the holders of Claims and Interests and public policy.

e. Section 1123(b)(1)-(2)—Impairment of Claims and Interests and Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases.

In accordance with section 1123(b)(1) of the Bankruptcy Code, Article III of the Plan provides for the impairment of certain classes of Claims and Interests, while leaving other Classes unimpaired. (Plan art. III; Houff Decl. ¶ 47.) The Plan thus modifies the rights of the holders of certain Claims and Interests and leaves the rights of others unaffected. (Houff Decl. ¶ 47.) In accordance with section 1123(b)(2) of the Bankruptcy Code, Article VI of the Plan provides for the assumption, assumption and assignment or rejection of certain Executory Contracts and Unexpired Leases to which the Reorganized Debtors are parties; *provided, however,* that the Debtors or Reorganized Debtors reserve the right, at any time prior to the Effective Date, to add or delete any Executory Contract or Unexpired Lease to be assumed, assumed and assigned or rejected to or from the applicable exhibit to the Plan. (Plan art. VI; Houff Decl. ¶ 47.)

f. Section 1123(b)(3)—Retention, Enforcement and Settlement of Claims Held by the Debtors.

**\*8** In accordance with section 1123(b)(3) of the Bankruptcy Code, Section 4.5 of the Plan provides for the retention and enforcement of possible claims or causes of action by the Reorganized Debtors. (Plan § 4.5; Houff Decl. ¶ 47.)

g. Section 1123(b)(5)—Modification of the Rights of Holders of Claims.

Article III of the Plan modifies or leaves unaf-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

fected, as the case may be, the rights of holders of each class of Claims and Interests. (Plan art. III; Houff Decl. ¶ 47.)

h. Section 1123(b)(6)—Other Provisions Not Inconsistent with Applicable Provisions of the Bankruptcy Code.

In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code, including: (a) the provisions of Article VII of the Plan governing distributions on account of Allowed Claims; (b) the provisions of Article V of the Plan providing for (i) the creation of the Funding Vehicle Trust and the PI Trusts and (ii) the appointment of the Funding Vehicle Trustees and the PI Trusts' respective Trustees and Trust Advisory Committees; (c) the provisions of Article VIII of the Plan establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; (d) the provisions of Article XII of the Plan regarding the release of Claims, the termination of Interests and injunctions against certain actions; (e) the provisions of Article IX of the Plan regarding the substantive consolidation of certain of the Reorganizing Debtors; and (f) the provisions of Article XIII of the Plan regarding retention of jurisdiction by the Court over certain matters after the Effective Date. (Plan art. V, VII, IX, XII, XIII; Houff Decl. ¶ 48.)

i. Section 1123(d)—Cure of Defaults.

Article VI of the Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. (Plan art. VI.) Additionally, in accordance with Section 3.2.b of the Plan, certain Claims will be Reinstated. (Plan § 3.2.b.) All Cure Amount Claims and Reinstated Claims will be determined in accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established herein or, to extent applicable, any separate orders of the Court.

2. Section 1129(a)(2) —Compliance with Applicable Provisions of the Bankruptcy Code.

The Reorganizing Debtors have complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018. The Disclosure Statement and the procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018 and the Disclosure Statement Order. (Houff Decl. ¶¶ 50–51.) Consistent with Section 14.2 of the Plan, the Debtors, the Reorganized Debtors, the DIP Lenders, the Indenture Trustees, the Creditors' Committee, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, the PBGC, and the Retirees' Committee and their respective directors, managers, trustees, officers, employees, agents, members and professionals, as applicable, have all acted in "good faith," within the meaning of section 1125(e) of the Bankruptcy Code.

3. Section 1129(a)(3) —Proposal of the Plan in Good Faith.

**\*9** The Reorganizing Debtors proposed the Plan in good faith and not by any means forbidden by law. In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the formulation of the Plan. (*See* Houff Decl. ¶¶ 18–37, 55; O'Dowd Decl. ¶¶ 4–7; Murphy Aff. ¶ 15–17; Ferrazi Decl. ¶ 25.) Based on the evidence presented at the Confirmation Hearing, the Court finds and concludes that the Plan has been proposed with the legitimate and honest purpose of reorganizing the business affairs of each of the Reorganizing Debtors and maximizing the returns available to creditors. (Houff Decl. ¶ 54; O'Dowd Decl. ¶ 8.) Consistent with the overriding purpose of chapter 11 of the Bankruptcy Code, the Plan is designed to allow the Reorganizing Debtors to reorganize by resolving certain pending disputes and proceedings and providing the Reorganized Debtors with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and capital resources and to fund necessary capital expenditures and otherwise conduct their businesses. (Houff Decl. ¶ 37; O'Dowd Decl. ¶ 8–10.) Moreover, the Plan itself and the arms' length negoti-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ations among the Reorganizing Debtors, the Creditors' Committee, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, the PBGC, the Retirees' Committee, the Unions and the Debtors' other constituencies leading to the Plan's formulation, as well as the overwhelming support of creditors for the Plan, provide independent evidence of the Reorganizing Debtors' good faith in proposing the Plan. (Houff Decl. ¶ 36; Voting Decl. at 6.)

4. Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable.

a. In accordance with section 1129(a)(4) of the Bankruptcy Code, all fees to which parties may be entitled in connection with the Bankruptcy Cases, including Professionals' Fee Claims, are subject to the approval of the Court (Houff Decl. ¶ 56.) Section 3.1 of the Plan provides for the payment of Allowed Administrative Claims, including Professionals' Fee Claims, and makes all such payments subject to Court approval and the standards of the Bankruptcy Code. (Plan § 3.1.a; Houff Decl. ¶ 56.) The Court has authorized the interim payment of the fees and expenses incurred by Professionals in connection with the Bankruptcy Cases. (*See* Revised Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (D.I.1122) at 6; Houff Decl. ¶ 56.) All such fees and expenses, however, remain subject to final review for reasonableness by the Court. (*Id.*)

b. In connection with the foregoing, Article XIII of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan. (Plan art. XIII; Houff Decl. ¶ 56.)

5. Section 1129(a)(5)—Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy.

**\*10** In the Disclosure Statement, Notice of Filing by Debtors and Debtors in Possession Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates of Certain

Information Regarding the Initial Board of Directors of Reorganized Kaiser Aluminum Corporation in Accordance with the Second Amended Joint Plan of Reorganization and Section 1129(a)(5) of the Bankruptcy Code (D.I.7651) and Exhibit 4.3.b to the Plan, the Reorganizing Debtors have disclosed all necessary information regarding the Reorganized Debtors' officers and directors, including their names, ages, positions, affiliations and qualifications and, for the officers of Reorganized KAC, who may constitute insiders, the compensation paid or to be paid.<sup>FN3</sup> (Houff Decl. ¶ 57.) In addition, the names of the individuals expected to serve as the initial directors and officer of Reorganized Kaiser Trading have been disclosed in the Notice of Filing By Debtors and Debtors in Possession Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates of Certain Information Regarding the Initial Board of Directors of Reorganized Kaiser Trading in Accordance with the Second Amended Joint Plan of Reorganization and Section 1129(a)(5) of the Bankruptcy Code (D.I.8042), dated December 29, 2005. (*Id.*) The appointment or continuance of the proposed directors and officers is consistent with the interests of the holders of Claims and Interests and with public policy.

> FN3. As noted on the record at the Confirmation Hearing, a director designated by the USW, George Becker, has asked to be replaced but has agreed to serve until his replacement has been identified. (*See* Tr. of Jan. 9, 2006 Hr'g at 17.)

6. Section 1129(a)(6)—Approval of Rate Changes.

The Debtors' current businesses do not involve the establishment of rates over which any regulatory commission has or will have jurisdiction after Confirmation. (Houff Decl. ¶ 59.)

7. Section 1129(a)(7) —Best Interests of Holders of Claims and Interests.

With respect to each impaired Class of Claims or Interests for each Reorganizing Debtor, each holder of a Claim or Interest in such impaired Class has accepted or is deemed to have accepted the Plan or, as demonstrated by the liquidation analyses included as Exhibit II to the

Disclosure Statement, will receive or retain under the Plan on account of such Claim or Interest property of a amount, as of the Effective Date, that is not less than the value such holder would receive or retain if the Reorganizing Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. (Houff Decl. ¶¶ 60–61; O'Dowd Decl. ¶¶ 12–20.)

8. Section 1129(a)(8)—Acceptance of the Plan by Each Impaired Class.

a. Pursuant to section 1129(a)(8) of the Bankruptcy Code, all classes of Claims and Interests, other than Subclass 9A and Classes 12 and 14, have either accepted the Plan or are unimpaired. (Houff Decl. ¶ 62; Voting Decl. at 6.) Specifically, Subclasses 2A, 2B and 9B and Classes 4, 5, 6, 7 and 8, the only classes entitled to vote on the Plan, each overwhelmingly voted to accept the Plan. (*Id.*) Classes 1, 3, 10 and 15 are unimpaired under the Plan and, therefore, are deemed to have accepted the Plan. (Plan § 3.2; Houff Decl ¶ 62; Disclosure Statement Order ¶ H.) In addition, although the holders of Class 11 Claims will receive or have received the treatment set forth in the Intercompany Claims Settlement and holders of Class 13 Claims and Interests will receive or retain no property on account of their Claims and Interests, as applicable, the holders of Claims and Interests in Classes 11 and 13 are deemed to have accepted the Plan pursuant to its express terms because those classes are comprised solely of the Reorganizing Debtors and the Other Debtors. (Plan § 3.3.h, 3.3.j; Houff Decl. ¶ 62; Disclosure Statement Order ¶ H.) Accordingly, section 1129(a)(8) of the Bankruptcy Code has been satisfied with respect to all Classes of Claims and Interests other than Subclass 9A and Classes 12 and 14. (Houff Decl. ¶ 62.)

**\*11** b. Under the Plan, holders of Claims and Interests in Subclass 9A, Class 12 or Class 14 will receive or retain no property on account of their Claims and Interests. (Plan § 3.3.g, 3.3.i, 3.3.k; Houff Decl. ¶ 63.) Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, Subclass 9A and Classes 12 and 14 are deemed to have rejected the Plan. (*Id.*) Nonetheless, as explained in Section I.C.14 below, the Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code necessary to obtain confirmation of the Plan, notwithstanding the deemed rejection of the Plan by Subclass 9A and Classes 12 and 14.

9. Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.

a. The Plan also meets the requirements regarding the payment of Administrative Claims, Priority Claims and Priority Tax Claims, as set forth in section 1129(a)(9) of the Bankruptcy Code. (Houff Decl. ¶ 64.)

b. Section 3.1.a(i) of the Plan provides that, subject to certain Bar Dates and unless otherwise agreed by the holder of an Administrative Claim and the applicable Reorganizing Debtor or Reorganized Debtor, all Allowed Administrative Claims will be paid in full in cash: (a) on the Effective Date or (b) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes allowed by a Final Order or a Stipulation of Amount and Nature of Claim. (Plan § 3.1.a(i); Houff Decl. ¶ 64.) Pursuant to Plan Section 3.1.a(iii), Administrative Claims based on liabilities incurred by a Reorganizing Debtor in the ordinary course of its business—including Administrative Trade Claims and Administrative Claims of governmental units for Taxes, including Tax audit Claims related to tax years commencing after the Petition Date, and Allowed Administrative Claims arising from the contracts and leases of the kind described in Section 6.6 of the Plan—will be paid by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims. (*Id.*) Section 3.1.a(iv) of the Plan provides that, unless otherwise agreed by the DIP Lenders, pursuant to the DIP Financing Facility, Allowed Administrative Claims under or evidenced by the DIP Financing Facility will be paid in full in Cash on or before the Effective Date. (Plan § 3.1.a(iv); Houff Decl. ¶ 64.)

c. Section 3.1.b(i) of the Plan provides that, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Reorganizing Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim

will receive, in full satisfaction of its Priority Tax Claim, deferred Cash payments over a period not exceeding six years from the date of assessment of such Priority Tax Claim on the terms set forth in the Plan. (Plan § 3.1.b(i); Houff Decl. ¶ 65.) In addition, section 3.1.b(i) of the Plan permits the Reorganized Debtors to pay any Allowed Priority Tax Claim, or any remaining balance of such Priority Tax Claim, in full at any time on or after the Effective Date, without premium or penalty. (*Id.*)

10. Section 1129(a)(10)—Acceptance By at Least One Impaired, Non–Insider Class.

**\*12** As indicated in the Voting Declaration and as reflected in the record of the Confirmation Hearing, at least one Class of Claims that is impaired under the Plan has voted to accept the Plan, determined without including the acceptance by any insider, with respect to all Reorganized Debtors under the Plan. (Voting Decl. at 6; Houff Decl. ¶ 66.)

11. Section 1129(a)(11)—Feasibility of the Plan.

Although the Reorganizing Debtors' businesses operate in highly competitive industries and markets, and although it is impossible to predict with certainty the precise future profitability of the Reorganizing Debtors' businesses or the industries and markets in which the Reorganizing Debtors operate, as demonstrated by the Reorganizing Debtors' financial projections contained in the Disclosure Statement and the evidence in the record, Confirmation of the Plan is not likely to be followed by the liquidation of, or the need for further financial reorganization of the Reorganizing Debtors, the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan. (Disclosure Statement at 195; Houff Decl. ¶ 67–69; O'Dowd Decl. ¶ 21–28.) Upon the Effective Date, the Reorganized Debtors will have sufficient operating cash and liquidity to meet their financial obligations and to fund ongoing business operations. (O'Dowd Decl. ¶ 28; Houff Decl. ¶ 32.)

12. Section 1129(a)(12)—Payment of Bankruptcy Fees.

Section 3.1.a(ii) of the Plan provides for the payment in full in Cash on or before the Effective Date of the fees due to the U.S. Trustee, in accordance with section 1129(a)(12) of the Bankruptcy Code. (Plan §

3.1.a(ii); Houff Decl. ¶ 70.)

13. Section 1129(a)(13)—Retiree Benefits.

The Plan satisfies the requirements of 1129(a)(13) of the Bankruptcy Code, which requires that a plan provide for the payment of retiree benefits, as such benefits may have been modified pursuant to section 1114 of the Bankruptcy Code. (Houff Decl. ¶ 71 .) The Plan continues the implementation of certain settlement agreements, which, among other things, modified retiree benefits pursuant to section 1114 of the Bankruptcy Code. (Houff Decl. ¶ 71; O'Dowd Decl. ¶ 6(b); Disclosure Statement at 48–50.) Pursuant to Section 3.1.a.(vi) of the Plan, on the Effective Date, Reorganized KAC will contribute (a) to the Union VEBA 11,439,900 shares of New Common Stock plus cash equal to the initial contributions, if any, and (b) to the Salaried VEBA 1,940,100 shares of New Common Stock plus cash equal to the initial VEBA contributions, if any. (Plan § 3.1.a(vi); Houff Decl. ¶ 71.) Thereafter, Reorganized KAC will make the applicable profit-sharing contributions to the Union VEBA and the Salaried VEBA. (*Id.*)

14. Section 1129(b)—Confirmation of the Plan Over the Nonacceptance of Impaired Classes.

a. Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan may be confirmed notwithstanding that Subclass 9A and Classes 12 and 14 are impaired and deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. 11 U.S.C. § 1129(b)(1). First, the Plan satisfies the "fair and equitable" requirements of section 1129(b)(2)(C) with respect to Subclass 9A because: (a) no holder of any Claim or Interest that is junior to the Senior Subordinated Note Claims of creditors in Subclass 9A will receive or retain any property under the Plan on account of such junior claim or interest; and (b) as evidenced by the valuations and estimates contained in the Disclosure Statement, no Class of Claims or Interests senior to the Senior Subordinated Note Claims in Subclass 9A will receive more than full payment on account of the Claims or Interests in such Class. (*See* Plan art. III; Houff Decl. ¶ 72.) The Plan also satisfies the standards of section 1129(b) with respect to Classes 12 and 14 be-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

cause: (a) no Claim or Interest junior to, as applicable, the KAC Old Stock Interests in Class 12 or the KACC Old Stock Interests in Class 14 will receive or retain any property under the Plan on account of such junior Claim or Interest; and (b) as evidenced by the valuations and estimates contained in the Disclosure Statement, no Class of Claims or Interests senior to, as applicable, the KAC Old Stock Interests in Class 12 or the KACC Old Stock Interests in Class 14 will receive more than full payment on account of the Claims or Interests of such Class. (*Id.*)

**\*13** b. Second, under the circumstances of these cases, the Plan does not unfairly discriminate against the holders of Claims in Subclass 9A or the holders of Interests in Classes 12 and 14. The Senior Subordinated Note Claims in Subclass 9A are legally distinct from other Claims and Interests and are properly classified in a separate Subclass in light of the contractual subordination provisions contained in the Senior Subordinated Indenture. (Plan § 3.3.g; Houff Decl. ¶ 73.) In fact, no distributions can be made to holders of Senior Subordinated Note Claims because, in accordance with the contractual subordination provisions of the Senior Subordinated Note Indenture, the aggregate amount of consideration that would otherwise be payable to the holders of Senior Subordinated Note Claims must be distributed to holders of Allowed Senior Note Claims, who, pursuant to the 7–3/4% SWD Revenue Bond Settlement, agreed to share a portion of such consideration with holders of Allowed 7–3/4% SWD Revenue Bond Claims. (*Id.*) Likewise, the KAC Old Stock Interests and the KACC Old Stock Interests in Classes 12 and 14, respectively, are legally distinct from other Claims and Interests and are properly classified in separate classes. (Plan § 3.3.i, 3.3.k; Houff Decl. ¶ 73.) Equity interests, the KAC Old Stock Interests and the KACC Old Stock Interests are not entitled to any distributions unless all creditors of KAC and KACC are satisfied in full or otherwise agree, and no such agreement exists. (Houff Decl. ¶ 73.) Accordingly, the requirements of section 1129(b) are satisfied with respect to Subclass 9A and Classes 12 and 14.

15. Section 1129(d)—Purpose of Plan.

The principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act, and there has been no request filed by any governmental unit asserting such avoidance.

D. THE ASBESTOS PI TRUST AND THE ASBESTOS PI CHANNELING INJUNCTION COMPLY WITH SECTION 524(g) OF THE BANKRUPTCY CODE.

The Plan comports with the Bankruptcy Code's requirements for issuance of an injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect of asbestos-related claims or demands against the Reorganized Debtors.

1. The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code.

a. The Asbestos PI Channeling Injunction is to be implemented in connection with the establishment of the Asbestos PI Trust and is essential to the Plan and the Reorganizing Debtors' reorganization efforts. (Houff Decl. ¶ 104.)

b. Pursuant to Section 5.2 of the Plan, on the Effective Date, the Asbestos PI Trust will assume all liability and responsibility for all Asbestos Personal Injury Claims. (Plan § 5.2.e; Houff Decl. ¶ 81; Murphy Aff. ¶ 20.) As set forth in the Disclosure Statement and reflected in the record of the Confirmation Hearing, as of the Petition Date, approximately 104,000 unresolved Asbestos Personal Injury Claims were pending against Reorganizing Debtor KACC. (Disclosure Statement at 67; Houff Decl. ¶ 81.)

**\*14** c. Section 5.2 of the Plan provides that the Asbestos PI Trust will be funded in part by the securities of two of the Reorganized Debtors under the Plan: (i) 94 percent of the common stock of Kaiser Trading, one of the Reorganizing Debtors under the Plan and (ii) the *pro rata* distribution of New Common Stock in Reorganized KAC on account of the Asbestos PI Trust's interests in 70.5 percent of the KFC Claim (which is an Allowed General Unsecured Claim in Subclass 9B). (Plan § 5.2.d; Houff Decl. ¶ 82.) As a result, with respect to Reorganized Kaiser Trading, the Asbestos PI Trust will own a majority of Reorganized Kaiser Trading's com-

mon stock and, with respect to Reorganized KAC and Reorganized KACC, the Asbestos PI Trust will own a majority of the common stock of a subsidiary. (Houff Decl. ¶ 83.) Additionally, as set forth in Exhibits 4.3.a(i) and 4.3.a(ii) to the Plan, the Asbestos PI Trust will also have all rights to receive dividends or other distributions on account of the Asbestos PI Trust's ownership of the securities in Kaiser Trading and Reorganized KAC described above. (Plan Ex. 4.3.a(i), 4.3.a.(ii); Houff Decl. ¶ 82.)

d. Section 5.2 of the Plan also provides that the Asbestos PI Trust will use its assets to pay and satisfy Asbestos Personal Injury Claims in accordance with the Plan, the PI Trust Funding Agreement and the Asbestos PI Trust Agreement. (Plan § 5.2.a(i); Houff Decl. ¶ 84.)

2. The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code.

a. As set forth in the Disclosure Statement and reflected in the record of the Confirmation Hearing, between 1970 and the Petition Date, approximately 247,000 asbestos-related personal injury lawsuits were asserted against KACC, and approximately 104,000 Asbestos Personal Injury Claims remained unresolved as of the Petition Date. (Houff Decl. ¶ 87; Disclosure Statement at 67.) The Reorganizing Debtors' asbestos-related liabilities arise from former operations of KACC, almost entirely from KACC's former Kaiser Refractories division. (*Id.*) Based on the long latency period of asbestos-related diseases and the substantial number of asbestos-related personal injury lawsuits that had been asserted in the past and that remained unresolved on the Petition Date, KACC will likely be subject to substantial future Demands for payment arising from the same conduct or events that gave rise to the Asbestos Personal Injury Claims. (Houff Decl. ¶ 87.)

b. Moreover, due to the long latency period for asbestos-related diseases and the substantial number of asbestos-related personal injury lawsuits that had been asserted in the past and that remained unresolved on the petition date, the Reorganizing Debtors are unable to determine the actual amounts, numbers and timing of future Demands against KACC in respect of alleged asbestos-related personal injuries. (Houff Decl. ¶ 87.)

c. If the holders of asbestos-related Demands are able to pursue such Demands outside of the Asbestos Distribution Procedures, the holders of such Demands would have to liquidate their claims through settlements or the tort system on an individual basis, which, because of the vagaries inherent in litigation, could produce inconsistent awards. (Houff Decl. ¶ 89; Murphy Aff. ¶ 24.) Moreover, with ever-diminishing funds available to pay asbestos-related Demands, there is a risk that Demands would initially all be paid in full as they are settled or liquidated in the tort system but that, at some point in the future, Demands would go unsatisfied. (Houff Decl. ¶ 89.) Accordingly, the pursuit of asbestos-related Demands against KACC outside the Asbestos Distribution Procedures contemplated by the Plan would likely threaten the Plan's purpose to deal equitably with Asbestos Personal Injury Claims, including future asbestos-related Demands. (Houff Decl. ¶ 89.)

**\*15** d. Further, as part of the confirmation process in these cases, the Reorganizing Debtors included the terms of the Asbestos PI Channeling Injunction, including provisions therein barring actions against any Protected Party, in both the Plan and the Disclosure Statement. (Plan § 1.1(36); Disclosure Statement at 115; Houff Decl. ¶ 90.) The Reorganizing Debtors also designated a separate class, Class 5 under the Plan, for all Asbestos Personal Injury Claims, and of the holders of Asbestos Personal Injury Claims in Class 5 that voted, 99.84 percent of such holders voted in favor of the Plan. (Plan § 2.5; Voting Decl. at 6; Houff Decl. ¶ 90.)

e. Also, as set forth in Section 5.2.a(i) of the Plan, the Asbestos PI Trust will pay Asbestos Personal Injury Claims in accordance with the Asbestos Distribution Procedures, which contain mechanisms that provide reasonable assurance that the Asbestos PI Trust will value, and be in a financial position to pay, present Asbestos Personal Injury Claims and future asbestos-related Demands that involve similar claims in substantially the same manner. (Plan § 5.2.a(i); Houff Decl. ¶ 91–92; Murphy Aff. ¶ 28–29.)

3. The Extension of the Asbestos PI Channeling Injunction to Third Parties Is Appropriate.

a. Sections 1.1(36) and 10.2 of the Plan contem-

plates that the Asbestos PI Channeling Injunction will be extended to protect the following:

i. any entity that, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of the Reorganizing Debtors, the Other Debtors, the Reorganized Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor) (Plan § 1.1(161)c; Houff Decl. ¶ 94.a); and

ii. any entity that, pursuant to the Plan or after the Effective Date, makes a loan to any of the Reorganizing Debtors, the Reorganized Debtors, the Other Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust or to a successor to, or transferee of any of the respective assets of, the Reorganizing Debtors, the Other Debtors, the Reorganized Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust (but only to the extent that liability is asserted to exist by reason of such entity's becoming such a lender or to the extent any pledge of assets made in connection with such a loan is sought to be upset or impaired) (Plan § 1.1(161)d; Houff Decl. 94.b).

b. The Plan also provides that the Asbestos PI Channeling Injunction will bar certain actions against any Protected Party. (Houff Decl. ¶ 95.) Each Protected Party under the Plan is either identifiable from the definition or is a member of an identifiable group. (See Plan § 1.1(161); Houff Decl. ¶ 95.) In addition to the groups identified in paragraphs 3.a.i and 3.a.ii above, the Reorganizing Debtors, the Reorganized Debtors and the other Kaiser Companies, the Plan defines Protected Party to include the following—

**\*16** i. as to Channeled Personal Injury Claims, each Settling Insurance Company; and

ii. each entity to the extent he, she or it is alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on any Reorganizing Debtor, Other Debtor, Reorganized Debtor or PI Trust on account of Channeled Personal Injury Claims by reason of one or more of the following:

a) such entity's ownership of a financial interest in any Reorganizing Debtor, Other Debtor or Reorganized Debtor or any past or present affiliate (collectively, "Affiliates") or predecessor in interest (collectively, "Predecessors") of any of the foregoing;

b) such entity's involvement in the management of any Reorganizing Debtor, Other Debtor, Reorganized Debtor, Affiliate or Predecessor;

c) such entity's service as a director, officer, employee, accountant (including an independent certified public accountant), advisor, attorney, investment banker, underwriter, consultant or other agent of any Reorganizing Debtor, Other Debtor, Reorganized Debtor, Affiliate or Predecessor or any entity that owns or at any time has owned a financial interest in any Reorganizing Debtor, Other Debtor or Reorganized Debtor, Affiliate or Predecessor; or

d) such entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Reorganizing Debtor, Other Debtor, Reorganized Debtor, Affiliate or Predecessor or any entity that owns or at any time has owned a financial interest in any Reorganizing Debtor, Other Debtor, Reorganized Debtor, Affiliate or Predecessor.

(Plan § 1.1(161); Houff Decl. ¶ 95.)

c. Accordingly, consistent with section 524(g)(4)(A)(ii) of the Bankruptcy Code, the Asbestos PI Channeling Injunction bars actions against third parties only where such parties are alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the Debtors by reason of:

i. the third party's ownership of a financial interest in any Reorganizing Debtor, Other Debtor, Reorganized Debtor, or past or present affiliate or predecessor in interest of any Reorganizing Debtor, Other Debtor or Reorganized Debtor;

ii. the third party's involvement in the management of the Debtors or a predecessor in interest to one or more of the Debtors or service as an officer, director or

employee of (i) the Debtors, (ii) a past or present affiliate of the Debtors, (iii) a predecessor in interest to the Debtors, or (iv) an entity that owned a financial interest in the Debtors or their past or present affiliates or predecessors in interest;

iii. the third party's provision of insurance to the Debtors or a related party; or

iv. the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtors or a related party. (Houff Decl. ¶ 96.)

d. The extension of the Asbestos PI Channeling Injunction to third parties is consistent with the Bankruptcy Code. Consistent with section 524(g)(4)(A)(ii) of the Bankruptcy Code, the Asbestos PI Channeling Injunction bars actions against third parties only where such parties are alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on, the Debtors.

4. Entry of the Asbestos PI Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants.

**\*17** a. The Reorganizing Debtors, on behalf of the Protected Parties, are contributing $13 million plus the PI Insurance Assets to the Funding Vehicle Trust. (Plan §§ 1.1(151), 5.1.d(i); Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) The Asbestos PI Trust will be entitled to receive from the Funding Vehicle Trust 94 percent of the cash received by the Funding Vehicle Trust net of expenses of the Funding Vehicle Trust and certain amounts payable pursuant to the Plan and the PI Trust Funding Agreement to the other PI Trusts. (Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) The PI Insurance Assets are comprised of "the rights to receive proceeds from Included PI Trust Insurance Policies in respect of Channeled Personal Injury Claims" as well as "any Cash paid or to be paid pursuant to settlement agreements with any PI Insurance Company entered into prior to the Effective Date in respect of Included PI Trust Insurance Policies and allocable to payment of Channeled Personal Injury Claims." (Plan § 1.1(145); Houff Decl. ¶ 98.) The Debtors have received approximately $14 million in cash

from settlements consummated with certain Insurance Companies prior to 2005 regarding coverage for Channeled Personal Injury Claims. (Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) In addition, in 2005 the Reorganizing Debtors reached settlements, for an aggregate of more than $375 million, payable over time, but subject to certain termination conditions, with certain other insurance companies. (*Id.*) The face value of the Included PI Trust Insurance Policies for which a settlement has not yet been reached aggregates more than $1 billion. (*Id.*)

b. In addition, the Reorganizing Debtors are contributing to the Asbestos PI Trust 94 shares of common stock of Reorganized Kaiser Trading, which constitutes 94 percent of the outstanding equity interest in such entity, and 70.5 percent of the KFC Claim in accordance with the Intercompany Claims Settlement. (Plan § 5.2.d; Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) In light of the substantial contributions to be made to the Asbestos PI Trust on behalf of the Protected Parties, entry of the Asbestos PI Channeling Injunction, and the naming of the Protected Parties therein, is fair and equitable with respect to persons that might subsequently assert future asbestos-related Demands.

E. THE SILICA, CTPV AND NIHL PI CHANNELING INJUNCTIONS AND THE CHANNELED PI INSURANCE ENTITY INJUNCTION EACH SATISFY THE REQUIREMENTS OF SECTION 105(a) OF THE BANKRUPTCY CODE.

1. In conjunction with the resolution of the Reorganizing Debtors' Silica, CTPV, and NIHL tort liabilities and the establishment of the PI Trusts, the Plan provides for the issuance of (a) the Silica PI Channeling Injunction, (b) the CTPV PI Channeling Injunction and (c) the NIHL PI Channeling Injunction, which will enjoin certain suits, claims, and actions against Protected Parties. (Houff Decl. ¶ 100; Ferazzi Decl. ¶ 35.) The issuance of the Silica, CTPV and NIHL PI Channeling Injunctions and the extension of those injunctions to nondebtor Protected Parties are essential to the implementation of the Plan and the resolution of the Debtors' tort liabilities, including the resolution of asbestos-related liabilities. (Houff Decl. ¶ 100; Ferazzi Decl. ¶ 39.) Addi-

tionally, the Plan provides for a Channeled PI Insurance Entity Injunction. (Plan § 12.2.c; Houff Decl. ¶ 100.) The Channeled PI Insurance Entity Injunction enjoins all entities (except the Funding Vehicle Trust, the PI Trusts or the Reorganized Debtors) that hold or assert, now or in the future, a Channeled Personal Injury Claim from taking any actions to collect or recover on such a claim against a PI Insurance Company. (*Id.*) The Channeled PI Insurance Entity Injunction will not be issued for the benefit of any PI Insurance Company and no PI Insurance Company will be a third-party beneficiary of the Channeled PI Insurance Entity Injunction. (Plan § 12.2.c; Houff Decl. ¶ 100.) The Channeled PI Insurance Entity Injunction does not relieve any nondebtor third party of liability and is necessary solely to facilitate the Plan's provisions for the satisfaction of Channeled Personal Injury Claims. (Houff Decl. ¶ 100.)

**\*18** 2. The channeling injunctions and each PI Trust's portion of the total funding to be provided to the PI Trusts under the Plan were the product of extensive negotiations among the Debtors, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, counsel for certain present holders of Silica Personal Injury Claims, counsel for certain present holders of CTPV Personal Injury Claims and counsel for certain present holders of NIHL Personal Injury Claims. (Houff Decl. ¶ 101; Ferazzi Decl. ¶¶ 24–25; Murphy Aff. ¶¶ 15–16.) The success of these negotiations is evidenced by the overwhelming support for the Plan by holders of Channeled Personal Injury Claims. (Voting Decl. at 6; Houff Decl. ¶ 101.) No creditor or holder of a Channeled Personal Injury Claim has objected to the Silica, CTPV and NIHL PI Channeling Injunctions or the extension of those injunctions to the non-debtor Protected Parties. (Houff Decl. ¶ 101.) In addition, holders of Silica and NIHL Personal Injury Claims voted in favor of the Plan by more than 99 percent in both number and amount of claims voted and 100 percent of the holders of CTPV Personal Injury Claims that cast a Ballot voted to accept the Plan. (Voting Decl. at 6; Houff Decl. ¶ 101.)

3. There is a shared identity of interests between the Reorganizing Debtors and the Protected Parties. (Houff

Decl. ¶ 102 .) In addition to the Settling Insurance Companies, the nondebtor Protected Parties generally include affiliates of the Reorganizing Debtors, predecessors in interest of the Debtors, entities that currently own or formerly owned a financial interest in the Reorganizing Debtors, past or present directors, officers, employees, professionals or agents of the Debtors or their affiliates and entities that were involved in a financial transaction affecting the financial condition of the Reorganizing Debtors or their affiliates. (Plan § 1.1(161); Houff Decl. ¶ 102.) There is a shared identity of interests between the Reorganizing Debtors and these nondebtor Protected Parties because a lawsuit against any of these non-debtor parties seeking to hold them liable in respect of the Reorganizing Debtors' alleged liability for a Channeled Personal Injury Claim would either give rise to some form of claim for indemnity against the Reorganizing Debtors or deplete the Reorganizing Debtors' insurance coverage. (Houff Decl. ¶ 102.)

4. The Silica PI Trust, the CTPV PI Trust and the NIHL PI Trust will be funded through substantial financial and other contributions by or on behalf of the nondebtor Protected Parties. (Houff Decl. ¶ 103.) The Silica PI Trust will be funded by 6 percent of the stock of Reorganized Kaiser Trading, 4.5 percent of the KFC Claim and 6 percent of the PI Insurance Assets minus expenses and certain other amounts. (Houff Decl. ¶ 103; Ferazzi Decl. ¶¶ 31–32.) The CTPV PI Trust will receive the lesser of $8,488,000 or an amount based on the number of allowed present CTPV Claims. (Houff Decl. ¶ 103; Ferazzi Decl. ¶ 33.) The NIHL PI Trust will receive a minimum of $19,512,000 and may receive additional amounts depending on the number of allowed CTPV Claims and other factors. (Houff Decl. ¶ 103.) There were extensive negotiations among the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, counsel for certain holders of present Silica Personal Injury Claims, certain holders of present CTPV Personal Injury Claims and certain holders of NIHL Personal Injury Claims regarding the allocation of the PI Trust Assets and the NIHL PI Trust. (*Id.; Ferazzi Decl.* ¶¶ 24–25; Murphy Aff. ¶¶ 15–16.)

**\*19** 5. The channeling injunctions are essential to the implementation of the Plan and the resolution of the Reorganizing Debtors' tort liabilities. (Houff Decl. ¶ 104; Ferazzi Decl. ¶ 39.) Present and future silica claimants and most asbestos injury claimants have recourse to the Reorganizing Debtors' products liability insurance coverage, and CTPV, NIHL and certain asbestos injury claimants have recourse to the Reorganizing Debtors' premises insurance coverage. (Houff Decl. ¶ 104.) For this reason, among others, the Silica, CTPV and NIHL Channeling Injunctions are necessary to address all of the Reorganizing Debtors' mass tort liabilities on an equitable basis. (*Id.*) In the absence of the PI Channeling Injunctions, the holders of Silica, CTPV and NIHL Personal Injury Claims could litigate their claims in the tort system and separately pursue the available insurance coverage, which would not only result in inconsistent awards among similarly situated claimants (*e.g.,* similarly situated silica claimants) but also the depletion of insurance coverage, which must be shared among various types of personal injury claimants, in favor one or more of these tort creditor groups. (*Id.; Ferazzi Decl.* ¶ 38.) Similarly, the Channeled PI Insurance Entity Injunction is necessary to preserve the PI Trust Assets and to protect the Funding Vehicle Trust so that it can pursue the insurance coverage litigation and negotiate settlements with insurers for the benefit of the PI Trusts and all holders of Channeled Personal Injury Claims. (*Id.*) Absent the Channeled PI Insurance Entity Injunction, individual claimants could separately assert claims against PI Insurance Companies, thereby depleting the available insurance that must be shared among the PI Trusts and impeding the Funding Vehicle Trusts' ability to negotiate settlements. (*Id.*)

6. As noted above, the Debtors have received approximately $14 million in cash from settlements consummated with certain Insurance Companies prior to 2005 regarding coverage for Channeled Personal Injury Claims. (Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) In addition, in 2005 the Reorganizing Debtors reached settlements, for an aggregate of more than $375 million, payable over time, but subject to certain termination conditions, with certain other insurance companies. (*Id.*) Pur-

suant to the Plan, these settlement proceeds will be contributed to the Funding Vehicle Trust for the benefit of the PI Trusts. (Plan § 5.1.d.) Each of the PI Channeling Injunctions is essential in obtaining the substantial funds these settlements provide for the benefit of the PI Trusts and to facilitate any additional potential settlements with other insurance companies. (Houff Decl. ¶ 105; Ferazzi Decl. ¶ 37.)

7. The Classes impacted by the issuance of the channeling injunctions have voted overwhelmingly in support of the Plan. (Voting Decl. at 6; Houff Decl. ¶ 106.) No creditor or holder of a Channeled Personal Injury Claim objected to the channeling injunctions or the extension of those injunctions to the non-debtor Protected Parties, and holders of Silica, CTPV and NIHL Personal Injury Claims have voted overwhelming in favor of the Plan. (*Id.*) One hundred percent of CTPV Personal Injury Claims (Class 6) and over 99 percent of NIHL Personal Injury Claims (Class 7) and Silica Personal Injury Claims (Class 8), both in amount of Claims and in number of Claim holders that cast Ballots, have voted to accept the Plan. (*Id.*) Additionally, the Reorganizing Debtors fully disclosed the scope of the proposed channeling injunctions and described in detail the entities that would be protected by the injunctions. (Houff Decl. ¶ 106; Disclosure Statement at 114–19; Ferazzi Decl. ¶ 38.)

**\*20** 8. The Plan establishes trust distribution procedures ("TDPs") for each of Silica, CTPV and NIHL claims. (Plan § 5.3.a, 5.4.a, 5.5.a; Houff Decl. ¶ 107; Ferazzi Decl. ¶¶ 40, 58.) The TDPs provide for the equitable treatment of all present and future claimants. (Houff Decl. ¶ 107; Ferazzi Decl. ¶¶ 40, 58.) The TDPs establish procedures for processing and paying Channeled Personal Injury Claims on an impartial, first-in-first-out basis, with the intention of paying all claimants over time as equivalent a share as possible of the value their claims. (Houff Decl. ¶ 107; Ferazzi Decl. ¶¶ 44, 60.) Once liquidated, each Channeled Personal Injury Claim will be paid by the appropriate trust. (Houff Decl. ¶ 107.)

9. Furthermore, the distribution procedures for each of these Classes of Channeled Personal Injury Claims

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

permit the holder of such a Claim, including an Indirect Channeled Personal Injury Claim, to institute a lawsuit in the tort system against the applicable PI Trust, subject to certain conditions, procedures and limitations set forth in the applicable distribution procedures, if the dispute cannot be resolved in non-binding arbitration. (Houff Decl. ¶ 108; Plan Ex. 1.1(34) § 5.11; Plan Ex. 1.1(66) § 5.7; Plan Ex. 1.1(129) § 5.7; Plan Ex. 1.1(186) § 5.11.) Each of the PI Trust's distribution procedures contemplate that non-settling claimants that litigate their claims in the tort system may present any judgment obtained to the applicable PI Trust for payment. (Houff Decl. ¶ 108; Plan Ex. 1.1(34) § 7.7; Plan Ex. 1.1(66) § 7.7; Plan Ex. 1.1(129) § 7.7; Plan Ex. 1.1(186) § 7.7.) The funding of the PI Trusts and the allocation of those funds were the result of extensive negotiations among the Debtors, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, counsel for certain holders of present Silica Personal Injury Claims, counsel for certain holders of present CT-PV Personal Injury Claims and counsel for certain holders of NIHL Personal Injury Claims. (*Id.*) Thus, the Plan not only provides the necessary mechanisms for paying Claims in each of the Classes of Channeled Personal Injury Claims (including separate trusts, trustees, and distribution procedures), but also implements an allocation of funds to each of the PI Trusts that is adequate and fair.

10. For all the foregoing reasons, the issuance of the Silica, CTPV and NIHL Channeling Injunctions and the Channeled PI Insurance Entity Injunction, as well as the treatment of Silica, CTPV and NIHL Personal Injury Claims, including future silica and CTPV Demands, is appropriate under the Bankruptcy Code.

F. SATISFACTION OF CONDITIONS TO CONFIRMATION.

1. Section 10.1 of the Plan contains conditions precedent to Confirmation that must be satisfied or duly waived pursuant to Section 10.3 of the Plan. The conditions precedent set forth in Sections 10.1.a. through 10.1.c of the Plan have been satisfied.

**\*21** 2. Concerning the establishment of the Funding Vehicle Trust, the PI Trusts and issuance of the PI Channeling Injunctions, the Court specifically finds:

a. The PI Channeling Injunctions are to be implemented in connection with the establishment of the PI Trusts (Plan art. V; Houff Decl. at 38–52);

b. As of the Petition Date, certain of the Reorganizing Debtors had been named as defendants in personal injury or wrongful death damage actions seeking recovery for damages in respect of Channeled Personal Injury Claims (Houff Decl. ¶ 87; Disclosure Statement at 67);

c. On the Effective Date, each PI Trust shall assume the liabilities of the Reorganizing Debtors with respect to applicable Channeled Personal Injury Claims (Plan §§ 5.2.e, 5.3.e, 5.4.d, 5.5.d);

d. The Asbestos PI Trust will be funded in part by 94 percent of the common stock of Kaiser Trading, and all rights to receive dividends or other distributions on account of such common stock (Plan § 5.2.d; Houff Decl. ¶ 98; Murphy Aff. ¶ 22);

e. The Silica PI Trust will be funded in part by 6 percent of the common stock of Kaiser Trading, and all rights to receive dividends or other distributions on account of such common stock (Houff Decl. ¶ 103; Ferazzi Decl. ¶¶ 31);

f. Each PI Trust will use its assets or income to pay applicable Channeled Personal Injury Claims (Plan §§ 5.2.a(i), 5.3.a(i), 5.4.a(i), 5.5.a(i));

g. The Reorganizing Debtors are likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims, the CTPV Personal Injury Claims and the Silica Personal Injury Claims, that are addressed by the respective PI Channeling Injunctions (Houff Decl. ¶ 87; Ferazzi Decl. ¶ 38);

h. The actual amounts, numbers and timing of future Demands cannot be determined (Houff Decl. ¶ 88, Ferazzi Decl. ¶ 22);

i. Pursuit of Channeled Personal Injury Claims, including Demands, outside the procedures prescribed by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands (Houff Decl. ¶ 89; Ferazzi Decl. ¶ 38);

j. The terms of the PI Channeling Injunctions, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement (Plan §§ 1.1(36), (68), (131), (188), (161); Disclosure Statement at 114–19.)

k. Other than with respect to NIHL Personal Injury Claims, which do not include Demands, pursuant to Court orders or otherwise, each PI Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of applicable Channeled Personal Injury Claims or other comparable mechanisms that provide reasonable assurance that such Trust will value, and be in a financial position to pay, applicable present Channeled Personal Injury Claims and future Channeled Personal Injury Claims and Demands that involve similar Claims in substantially the same manner (Houff Decl. ¶¶ 91–93, 107; Murphy Aff. ¶ 28; Ferazzi Decl. ¶¶ 57, 63);

**\*22** l. Each of the Asbestos Representative and the Silica and CTPV Representative was appointed by this Court as part of the proceedings leading to the issuance of the respective PI Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in such Injunction, and transferred to and assumed by the applicable PI Trust (Murphy Aff. ¶ 5; Ferazzi Decl. ¶ 1);

m. The inclusion of each Reorganizing Debtor or beneficiary within the protection afforded by the respective PI Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against each such Reorganized Debtor or beneficiary in light of the benefits provided, or to be provided, to the applicable PI Trust on behalf of such Reorganized Debtor or such beneficiary (Houff Decl. ¶ 98–99; Ferazzi Decl. ¶ 39);

n. The Plan complies with section 524(g) of the Bankruptcy Code in all respects (Houff Decl. at 38–46; Tr. of Jan. 9, 2006 Hr'g at 124);

o. The transfer of rights to proceeds from the Included PI Trust Insurance Policies to the Funding Vehicle Trust for the benefit of the PI Trusts is valid and enforceable and transfers such rights under the Included PI Trust Insurance Policies as the Reorganizing Debtors may have, subject to any and all PI Insurer Coverage Defenses. (Tr. of Jan. 9, 2006 Hr'g at 58, 60–68, 86–88, 91, 110–12.) The discharge and release of the Reorganizing Debtors and Reorganized Debtors from all Claims, and the injunctive protection provided to the Reorganizing Debtors, Reorganized Debtors and Protected Parties with respect to Demands as provided in the Plan, these Findings and Conclusions and the Confirmation Order shall not affect the liability of any PI Insurance Company except (i) to the extent that any such insurance company is also a Settling Insurance Company or (ii) that all PI Insurer Coverage Defenses are preserved; and

p. The PI Channeling Injunctions are essential to the Plan and the Reorganizing Debtors' reorganization efforts (Houff Decl. ¶ 104; Ferazzi Decl. ¶ 39).

G. SUBSTANTIVE CONSOLIDATION.

There are no pending objections to (i) the substantive consolidation of the Substantively Consolidated Debtors or (ii) the substantive consolidation of the Estates of KBC and the Substantively Consolidated Debtors solely in order to treat any Unsecured Claims against KBC as Claims in Subclass 9B for purposes of distributions to be made under the Plan, as set forth in the KBC Modifications. Substantive consolidation as provided under Article IX of the Plan, as modified, is solely for the purpose of implementing the Plan, including for purposes of voting, Confirmation and distributions to be made under the Plan. (Plan § 9.1.) The proposed substantive consolidation of the Substantively Consolidated Debtors is consistent with the Intercompany Claims Settlement, section 5 of which specifically permitted the substantive consolidation of certain of the Debtors. (Houff Decl. ¶ 75.) Moreover, all of the Substantively Consolidated Debtors are interrelated companies operating under KAC and KACC, which entities

are the Substantively Consolidated Debtors' ultimate parent companies for tax and business purposes, and the deemed substantive consolidation will promote efficiency and decrease costs in the implementation of the Plan. (*Id.*) In addition, with respect to the substantive consolidation of KBC with the Substantively Consolidated Debtors solely in order to treat any Unsecured Claims against KBC as Claims in Subclass 9B for purposes of distributions to be made under the Plan, the only two creditors of KBC's estate, the PBGC and Sherwin, have specifically consented to the provisions regarding the limited substantive consolidation of KBC with the Substantively Consolidated Debtors. (Houff Decl. ¶ 76.) Furthermore, notice of the KBC Modifications and an opportunity to object thereto and to change the creditor's vote on the Plan was given to all known creditors in Subclass 9B of the Plan. (KBC Aff. of Serv. ¶ 3.) No creditor objected to the KBC Modifications, and no creditor who timely submitted a vote in Subclass 9B to accept the Plan elected to change such vote. (Voting Change Decl. ¶ 5.) In the absence of any creditor objection to the deemed substantive consolidation, and in light of the overwhelming creditor support for the Plan, the deemed substantive consolidation of the Substantively Consolidated Debtors and the limited substantive consolidation of the Estates of KBC and the Substantively Consolidated Debtors is consensual. And for the foregoing reasons, the substantive consolidation provided for in the Plan, as modified, is in the best interests of the Reorganizing Debtors' Estates and creditors.

## II. CONCLUSIONS OF LAW.

### A. JURISDICTION AND VENUE.

**\*23** The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Reorganizing Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code. Venue of the Reorganization Cases in the United States Court for the District of Delaware was proper as of the Petition Date, pursuant to 28 U.S.C. § 1408, and continues to be proper.

### B. MODIFICATIONS TO THE PLAN.

The Modifications (1) do not adversely change, in any material respect, the treatment under the Plan of any Claims or Interests, (2) comply in all respects with Bankruptcy Rule 3019 and (3) to the extent the KBC Modifications do not comply with Bankruptcy Rule 3019, they comply with section 1127(d) of the Bankruptcy Code. (Tr. of Jan. 9, 2006 Hr'g at 30.) Accordingly, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims that have accepted or are conclusively presumed to have accepted the Plan as filed on September 8, 2005 are deemed to have accepted the Plan, as modified by the Modifications.

### C. EXEMPTIONS FROM SECURITIES LAWS.

1. Pursuant to section 1125(e) of the Bankruptcy Code, the Reorganizing Debtors' transmittal of solicitation materials, their solicitation of acceptances of the Plan and their offering, issuance and distribution of the New Common Stock pursuant to the Plan are not, and will not be, governed by or subject to any otherwise applicable law, rule or regulation governing the solicitation of acceptance of a plan of reorganization or the offer, issuance, sale or purchase of securities.

2. Pursuant to section 1145(a)(1) of the Bankruptcy Code, the offering, issuance and distribution of the New Common Stock pursuant to the Plan, including without limitation Section 7.8.e thereof, are, and will be, exempt from section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer or underwriter of, or broker or dealer in, a security.

3. Pursuant to, and to the fullest extent permitted under, section 1145 of the Bankruptcy Code, the resale of any New Common Stock will be exempt from section 5 of the Securities Act and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer or underwriter or, or broker or dealer in, a security.

### D. EXEMPTIONS FROM TAXATION.

Pursuant to section 1146(c) of the Bankruptcy Code

, the issuance, transfer or exchange of any security contemplated by the Plan, or the making or delivery of any instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

E. COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.

As set forth in Section I.C above, the Plan complies in all respects with the applicable requirements of section 1129 of the Bankruptcy Code.

F. COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE.

**\*24** As set forth in Section I.D above, the Plan complies in all respects with the applicable requirements of section 524(g) of the Bankruptcy Code.

G. OBJECTIONS TO THE PLAN.

1. The Insurers' Objections.

The Insurers object to the Reorganizing Debtors' transfer of their rights to proceeds from the Included PI Trust Insurance Policies to the Funding Vehicle Trust for the benefit of the PI Trusts and also argue that the manner in which the Asbestos PI Trust will be funded under the Plan does not comply with the funding requirements under section 524(g) of the Bankruptcy Code. As referenced above, the Court concludes that the transfer of rights to proceeds from the Included PI Trust Insurance Policies to the Funding Vehicle Trust for the benefit of the PI Trusts is valid and enforceable and transfers such rights under the Included PI Trust Insurance Policies as the Reorganizing Debtors may have, subject to any and all PI Insurer Coverage Defenses. (Tr. of Jan. 9, 2006 Hr'g at 58, 60–68, 86–88, 91, 110–12.) Section 1123(a)(5) of the Bankruptcy Code expressly permits the transfer of the Reorganizing Debtors' rights to proceeds from the Included PI Trust Insurance Policies under the Plan and preempts any anti-assignment provisions of the Included PI Trust Insurance Policies. (Tr. of Jan. 9, 2006 Hr'g at 110–12.) Additionally, the Court concludes that, as discussed above, the Plan complies with the funding requirements of section 524(g). (Tr. of Jan. 9, 2006 Hr'g at 123–24.) Accordingly, the Court finds that the Insurers' Objections

should be overruled. (Tr. of Jan. 9, 2006 Hr'g at 88, 91, 111–12, 124.)

2. Law Debenture's Objection.

Law Debenture's Objection is overruled for the reasons the Court articulated on the record at the Confirmation Hearing and on the record at the May 2, 2005 hearing relating to confirmation of the Alumina Subsidiary Plans. (Tr. of Jan. 9, 2006 Hr'g at 40–41, 43, 46–48, 51–55; Tr. of Jan. 10, 2006 Hr'g at 27–31; Tr. of May 2, 2005 Hr'g at 47–49, 53–57.)

3. Other Objections.

The Court concludes that all other objections to the Plan not otherwise withdrawn at or prior to the Confirmation Hearing should be overruled for the reasons the Court articulated on the record at the Confirmation Hearing (see Tr. of Jan. 9, 2006 Hr'g at 32, 33, 35–37) and/or set forth in the Reorganizing Debtors' Memorandum of Law in support of confirmation of the Plan.

H. TRANSFER OF BOOKS AND RECORDS TO THE FUNDING VEHICLE TRUST AND RETENTION OF KACC'S FORMER COUNSEL.

Plan Section 5.1(d)(ii) provides that Reorganized KACC will transfer the books and records of the Debtors that pertain to Channeled Personal Injury Claims to the Funding Vehicle Trust, which may re-transfer or supply copies of such books and records to the PI Trusts. In addition, the Funding Vehicle Trust may retain the professional services of KACC's former counsel. The transfer of these materials is essential to implementation of the Funding Vehicle Trust and the preservation of its assets. (Houff Decl. ¶ 78.) The transfer of books and records from the Reorganizing Debtors to the Funding Vehicle Trust and its retention of KACC's former counsel shall not waive or destroy any privilege pertaining to such books, records and professional services. The Reorganizing Debtors and the Funding Vehicle Trust and PI Trusts share common if not identical legal interests, and the surrender of any privileged documents or the retention of former counsel does not terminate or waive any privileges related to those interests.

I. APPROVAL OF THE RELEASES PROVIDED UN-

DER THE PLAN.

**\*25** The releases set forth in Section 4.5 of the Plan, including the releases of nondebtor parties pursuant to the general releases in Section 4.5(b), are (a) integral to the terms, conditions and settlements contained in the Plan, (b) appropriate in connection with the Reorganization of the Reorganizing Debtors and (c) supported by reasonable consideration. In light of all of the circumstances, the releases in Section 4.5 of the Plan are fair to the releasing parties.

J. ASSUMPTIONS, ASSUMPTIONS AND ASSIGN-MENTS AND REJECTIONS OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

Each pre- or post-Confirmation assumption, assumption and assignment or rejection of an Executory Contract or Unexpired Lease pursuant to Article VI of the Plan, including any pre- or post-Confirmation assumption, assumption and assignment or rejection effectuated as a result of any amendment to Exhibits 6.1 of 6.3 to the Plan, as contemplated by Article VI of the Plan, shall be legal, valid and binding upon the applicable Debtor or Reorganized Debtor and all nondebtor parties to such Executory Contract or Unexpired Lease, all to the same extent as if such assumption, assumption and assignment or rejection had been effectuated pursuant to an appropriate authorizing order of the Court entered before the Confirmation Date under section 365 of the Bankruptcy Code.

Bkrtcy.D.Del.,2006.
In re Kaiser Aluminum Corp.
Not Reported in B.R., 2006 WL 616243 (Bkrtcy.D.Del.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**In re Kmart Corp.**

**No. 02-02474, 2006 WL 952042 (Bankr. N.D. Ill. Apr. 11, 2006)**

Not Reported in B.R., 2006 WL 952042 (Bkrtcy.N.D.Ill.)
**(Cite as: 2006 WL 952042 (Bkrtcy.N.D.Ill.))**



Only the Westlaw citation is currently available.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.
In re KMART CORPORATION, et al., Debtors.

Bankruptcy No. 02 B 02474.
Adversary Nos. 04 A 00126, 04 A 00094, 04 A
00087, 04 A 02898, 04 A 00158, 04 A 02775, 04 A
02865, 04 A 02785, 04 A 02874, 04 A 02102, 04 A
02436, 04 A 02005, 04 A 02479, 04 A 00145, 04 A
01970, 04 A 02072, 04 A 02118, 04 A 02395.
April 11, 2006.

William J. Barrett (Barack Ferrazzano
Kirschbaum), Attorneys for Kmart.

Bradford Dempsey, Lawrence Bass (Holme Roberts
& Owen LLP); Damon E. Dunn (Levin & Funk-
house); and Dara Sahebjami, Wilson P. Funkhouser
(Funkhouser Vegosen Liebman & Dunn Ltd), At-
torneys for Quebecor, Quebecor Printing Richmond
Inc., Quebecor World, Inc.

George P. Apostolides (Arnstein & Lehr LLP), At-
torneys for Superior Graphics, Inc.

Kurt M. Carlson (Tishler & Wald Ltd); David M.
Neff (DLA Piper Rudnick Gray Cary U.S. LLP),
Attorneys for Rhodes Inc.

Deborah M. Gutfeld (DLA Piper Rudnick Gray
Cary U.S. LLP), Attorneys for Rhodes Inc. and
MGA Entertainment.

Michael L. Bray, Evans L. King, Jr. (Steptoe &
Johnson PLLC), Attorneys for Ogden Newspaper
Group.

Stephan W. Milo, Marshall H. Ross (Wharton Ald-
hizer & Weaver PC), Attorneys for Dan Dee Inter-
national, Ltd.

Kelly A. McCloskey, Michael C. Moody (O'Rourke
McCloskey & Moody), Attorneys for Asian Source
Enterprise LLC.

Jon C. Vigano, William E. Meyer, Jr. (Schiff
Hardin), Attorneys for Le Yuan Kuo Enterprise Co.
Ltd., El Dia Inc., & Primera Hora.

Michael S. DeLeo (Eisenhower & Carlson, PLLC),
Attorneys for Mullally International Inc.

Frances Gecker, Joseph Frank, Micah R. Krohn
(Frank/Gecker LLP), Attorneys for Belo Corp.

Matthew E. Wilkins, Attorney for Plattsburgh Press
Republican, Arkansas Democrat Gazette, Inc., CBA
Industries, Evening News, Inc., NYP Holdings, Inc.

U.S. Trustee, Trustee or Other Attorneys.

### *MEMORANDUM OPINION*

SUSAN PIERSON SONDERBY, Bankruptcy
Judge.

**\*1** This matter is before the court on numerous
motions to dismiss the adversary complaints filed
by Debtor Kmart Corporation in Adversary Pro-
ceedings Nos. 04 A 00126, 04 A 00094, 04 A
00087, 04 A 02898, 04 A 00158, 04 A 02775, 04 A
02865, 04 A 02785, 04 A 02874, 04 A 02102, 04 A
02436, 04 A 02005, 04 A 02479, 04 A 00145, 04 A
01970, 04 A 02072, 04 A 02118, and 04 A 02395,
seeking to recover payments made to its "Critical
Vendors," all as more fully set forth below.

*Background.*<sup></sup>FN1

> FN1. The parties contend that the court
> may take judicial notice of all matters in
> the record of Kmart's underlying bank-
> ruptcy case without converting these mo-
> tions under Fed.R.Civ.P. 12(b)(6) to mo-
> tions for summary judgment. (*See, e.g.,*
> Chicago Sun–Times Brief, at 3 (citing,
> *inter alia, Henson v. CSC Credit Services,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

29 F.3d 280, 284 (7th Cir.1994)). In ac-
cordance with the parties' requests, the
facts set forth herein include matters which
are of record in this bankruptcy case. Also
included are other matters of public record
susceptible to judicial notice.

On January 22, 2002, Kmart Corporation and
thirty-seven of its subsidiaries and affiliates filed
voluntary Chapter 11 petitions in this court. Upon
motion presented that same day, the cases were
consolidated for administrative purposes.

Among the many other "first day" motions was
a request for authority to obtain secured postpeti-
tion financing. An interim order was entered on
January 22, 2002, authorizing borrowings of up to
$1.15 billion and scheduling a final hearing for
March 6, 2002. On that date, a final financing order
was entered authorizing borrowings of up to $2 bil-
lion (the "DIP Financing Order").

The most controversial of the "first day" mo-
tions was Kmart's "Motion for Order Under 11
U.S.C. § 105(a) Authorizing the Payment of Prepeti-
tion Claims of Certain Critical Trade Vendors"
(the "Critical Vendor Motion"). In that motion,
Kmart sought authority to pay the prepetition
claims of certain vendors deemed critical to the un-
interrupted functioning of its business operations:
1) Fleming Companies, Inc., 2) Handleman Com-
pany, 3) egg and dairy vendors, and 4) "certain
newspapers, printers, paper suppliers and other
vendors who supply goods and services related to
the Debtors' advertising program." (Critical Vendor
Motion, at 8). Kmart asserted that the proposed
payments were "vital" to the success of its reorgan-
ization efforts and offered in support the affidavit
of Charles C. Conaway, Kmart's then chief execut-
ive officer.

Capital Factors, Inc., one of Kmart's creditors,
opposed the request and cross-examined Conaway
at the hearing on the Critical Vendor Motion (the
"Critical Vendor Hearing"). At the conclusion of
the hearing, the court allowed the motion, and an

order was entered (the "Critical Vendor Order")
providing that the Debtors were "authorized, but
not directed, in the reasonable exercise of their
business judgment, to pay all, a portion or none of
the prepetition claims" of vendors in the four cat-
egories described above. The Critical Vendor Order
further required Debtors to undertake "appropriate
efforts" to cause the vendors to enter into "Trade
Agreements" calling for the same trade terms that
the vendors had historically provided to Kmart
("Customary Trade Terms") or other favorable
terms agreed to by the parties.[FN2]

> **FN2.** The Trade Agreements were also to
> provide, *inter alia,* that the vendors would
> refrain from asserting reclamation claims
> or liens for prepetition debts.

Capital Factors appealed the Critical Vendor
Order, as well as three other orders authorizing
payment of certain categories of prepetition claims,[FN3]
to the district court. As no order staying the
payments was entered, Kmart proceeded to make
the payments (the "Critical Vendor Payments") of
the prepetition claims of those vendors (the
"Critical Vendors") it deemed critical to its reor-
ganization efforts.[FN4]

> **FN3.** The three additional orders were the
> "Order Under 11 U.S.C. § 105(a) Author-
> izing the Payment of Prepetition Claims of
> Certain Liquor Vendors," the "Order Pur-
> suant to 11 U.S.C. §§ 105(a) and 363 Au-
> thorizing Payment of Prepetition Obliga-
> tions Necessary to Obtain Imported Mer-
> chandise," and the "Order Pursuant to 11
> U.S.C. §§ 105(a) and 363 Authorizing the
> Debtors to Honor Reimbursement Obliga-
> tions to Issuers of Pre–Petition Letters of
> Credit Issued for the Benefit of the Debt-
> ors' Foreign Vendors." The term "Critical
> Vendor Order" will hereafter refer, as ne-
> cessary, to all four of the orders appealed.

> **FN4.** The term "Critical Vendor Pay-
> ments," as used herein, also includes those

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

payments made pursuant to the three additional orders that Capital Factors appealed, and the term "Critical Vendors" includes the recipients of payments under all four orders. The term "Critical Vendor Claims," as used herein, refers to the prepetition claims of the Critical Vendors, to the extent paid pursuant to the Critical Vendor Order.

**\*2** While the appeals were pending, Kmart also proceeded with the negotiation and formulation of its reorganization plan. Kmart filed its plan and disclosure statement on January 24, 2003. Thereafter, a First Amended Joint Plan of Reorganization was filed (the "First Amended Plan") together with an accompanying disclosure statement (the "Disclosure Statement"). On February 26, 2003, an order was entered approving the Disclosure Statement and setting the hearing on confirmation of the First Amended Plan for April 14, 2003. Kmart thereafter served notice of the confirmation hearing on creditors and parties in interest, together with—where required—copies of the Disclosure Statement, the First Amended Plan, and, if applicable, appropriate ballots.

The Disclosure Statement advised that Kmart planned to waive its "Avoidance Claims" with certain exceptions, one of which was for Avoidance Claims pending on the effective date of the plan. "Avoidance Claims" was defined to include, *inter alia,* preference actions under § 547, fraudulent transfer actions under § 548, and actions to recover postpetition transfers under § 549 of the Bankruptcy Code. A lengthy description of the analysis of potential preference recoveries, prepared by Debtors in connection with the waiver of Avoidance Claims and the justification therefor, was set forth at pages 101 through 104 of the Disclosure Statement.

The Critical Vendor program was discussed in a different part of the Disclosure Statement. On page 23, Kmart warned that if the Critical Vendor Order was reversed on appeal, the estates may hold

claims against certain recipients of the Critical Vendor Payments for recovery of the amounts received. That risk materialized on April 8, 2003, when the district judge signed a memorandum opinion and order finding, *inter alia,* that the bankruptcy court did not have "either the statutory or equitable power to authorize the pre-plan payment of prepetition unsecured claims...." *Capital Factors, Inc. v. Kmart Corp.,* 291 B.R. 818, 823 (N.D.Ill.2003).

The district court's reversal of the Critical Vendor Order was entered on the docket on April 10, 2003, just two business days before the commencement of the confirmation hearing. Kmart, in addition to filing a notice of appeal to the Seventh Circuit, immediately prepared an amendment to its plan to provide for the retention of recovery actions against the Critical Vendors. Specifically, Kmart carved out an additional exception to the waiver of Avoidance Claims in Section 7.14 of the plan for "Avoidance Actions under Section 549 of the Bankruptcy Code with respect to the matters subject to that certain case captioned *Capital Factors, Inc. v. Kmart Corporation,* Case No. 02 C 1264 (N.D.Ill.2002) ..." (the "Plan Modification").[FN5] The language of the Plan Modification was set forth in ¶ 55 of Kmart's proposed findings of fact and conclusions of law regarding confirmation, which were attached to and referenced in its memorandum of law in support thereof (the "Confirmation Brief"). Kmart served the Confirmation Brief on April 10, 2003 via UPS Next Day Air on all parties listed on the Master Service List in this case and mailed it to the parties listed on the 2002 List.[FN6]

> FN5. The revised retention provision reads in full as follows:

> 7.14 *Preservation of Causes of Action.* In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in this Plan with respect to the Kmart Creditor Trust, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained

Actions, except that the Debtors shall and do hereby waive all Avoidance Claims as of the Effective Date (other than Avoidance Actions under Section 549 of the Bankruptcy Code with respect to the matters subject to that certain case captioned *Capital Factors, Inc. v. Kmart Corporation,* Case No. 02 C 1264 (N.D.Ill.2002)); *provided, however,* that such waiver does not include Avoidance Claims against Persons who are parties to Causes of Action involving the Debtors and are pending on the Effective Date, nor does it include Causes of Action against any Persons who may be the subject, at any time, of Trust Claims. The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), and will not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

FN6. The 2002 List included all parties who had filed a notice of appearance or request for notice in this case. The Master Service List included, *inter alia,* the United States Trustee, committee counsel, counsel to the pre- and post-petition lenders, and all parties who had been placed on that list pursuant to the written request procedures established in this court's "Order Pursuant to 11 U.S.C. §§ 102 and 105(a), Bankruptcy Rules 2002(m) and 9007, and Local Rules 101, 400, and 402 Establishing Omnibus Hearing Dates and Certain Notice, Case Management and Administrative Procedures"

(as amended from time to time, the "Procedures Order"). Under the Procedures Order, notice to parties who had requested and obtained placement on the Master Service List was more comprehensive than notice to 2002 List parties.

**\*3** On the same day, Capital Factors filed an emergency motion to stay the confirmation hearing and for the entry of orders directing return of the Critical Vendor Payments. Capital contended, *inter alia,* that because the district judge had "remanded" for further proceedings consistent with his opinion, this court was required to "immediately enter appropriate orders to compel the return of the monies paid...." (Emergency Motion of Capital Factors, at 2–3). Capital also argued that the confirmation hearing should be continued to allow for the entry and enforcement of such orders and for a resolicitation of votes.FN7

> FN7. According to Capital Factors, continuance of the confirmation hearing would allow parties in interest "to assess the impact of the returned funds upon the Plan's proposed treatment of unsecured claims and to vote on an amended plan." (Emergency Motion of Capital Factors, at 3). In its Supplemental Objection to Confirmation, Capital stated, *inter alia,* that "the holders of critical vendor repayment claims must be given an opportunity to vote on any amended plan." (Supplemental Objection, at 2).

Another emergency motion was filed by Dean Foods Company, one of the Critical Vendors, seeking leave to file an objection to the Plan Modification and to adjourn the hearing on confirmation of the plan. According to Dean, the "drastic modification" to Section 7.14 of the Plan constituted a material change in the plan's treatment of the Critical Vendors' claims, i.e., from what was "in effect" administrative expense treatment pursuant to the Critical Vendor Order to treatment as general unsecured claims. Dean therefore contended that the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

modified plan should not be deemed accepted by creditors who had previously accepted the plan until after notice and hearing as to whether the Plan Modification adversely changed the treatment of their claims within the purview of Bankruptcy Rule 3019. (Emergency Motion of Dean Foods, at 2, 4).

Kmart filed an omnibus response to the emergency motions and objections of Capital Factors and Dean Foods, and the court heard arguments at the confirmation hearing not only by Capital, Dean, and Kmart, but also by Handleman Company, another Critical Vendor, who also urged that the Critical Vendors needed additional time to review the proposed modification to the plan. After argument, the court ruled that the notice of hearing already given was adequate for purposes of Bankruptcy Rule 3019 and that the Critical Vendors need not be "designated" under that rule for purposes of any additional notice. The court further ruled that the Plan Modification did not adversely change the treatment of the claims of creditors under the plan. Finally, the court rejected Capital Factors' contention that the district court's "remand" for consistent proceedings required the immediate entry of orders directing return of the moneys paid or a stay of the confirmation hearing. The court found that the district judge's reversal merely required that Kmart preserve in its plan the right to recover the Critical Vendor Payments by initiation of separate adversary proceedings with concomitant due process safeguards. (April 14, 2003 Transcript, at 220–25).

The confirmation hearing proceeded over the next few days, and on April 22, 2003, Kmart ultimately reached a settlement with Capital Factors which, after disclosure and argument at the confirmation hearing, was approved by the court. The settlement, which resolved Capital's objections to confirmation, provided, *inter alia,* for expedited resolution of the various claims asserted by Capital, for dismissal by Capital of its appeal of an order relating to the Debtors' surety program, and for Capital's participation in 15% of recoveries from Critical Vendors under §§ 549 and 550 of the Bankruptcy

Code, with such participation to be at least $500,000 and not to exceed $2 million. (April 22, 2003 Transcript, at 220–25).

**\*4** Confirmation of the plan as modified (hereafter, the "Plan") was ultimately approved on April 22, 2003, and the court's "Findings of Facts, Conclusions of Law, and Order under §§ 1129(a) and (b) and Fed.R.Bankr.P. 3020 Confirming the First Amended Joint Plan of Reorganization of Kmart Corporation and its Affiliated Debtors and Debtors in Possession, as Modified" (the "Confirmation Order") was entered on the docket on April 23, 2003. The Plan became effective on May 6, 2003.

Under the Plan, certain classes of claims, including Class 5, were to be receive distributions of common stock. Class 5 consisted of all "Trade Vendor/Lease Rejection Claims," defined to include claims "arising as a result of ... retail merchandise or services provided by trade vendors or service providers...." Plan, § 1.153. A total of 31,945,161 shares of common stock in the reorganized company were allocated to this class, which Kmart estimated in its Disclosure Statement to be approximately 37% of all such stock to be issued under the plan.[FN8]

> **FN8.** Class 5 would also share pro rata with certain other classes in Trust Recoveries, i.e., proceeds received by the Kmart Creditor Trust from the prosecution or settlement of "Trust Claims." Trust Claims consisted of actions relating to the subject matter of certain investigations into alleged accounting irregularities and malfeasance by members of Kmart's management.

The Plan further provided that a reserve was to be created for potential distributions on disputed or contingent claims, after allowance (the "Distribution Reserve"). Plan, § 9.8(b). The Distribution Reserve was to include a portion of the common stock allocated to creditors under the Plan, and the amount of the reserve was to be adjusted from

time to time. Kmart has filed a number of "Notices of Intent to Modify Distribution Reserve," indicating in each instance the percentage of shares in the Distribution Reserve being released and the resulting increase in the percentage of allocated shares that are available for distribution.[FN9]

> FN9. For example, the notice filed on December 4, 2003 announced that 40% of the shares remaining in the Distribution Reserve would be released, resulting in 70% of the allocated shares being available for distribution. The most recent of these notices, filed on January 13, 2006, announced a release of 10% of the remaining shares, resulting in 95% of the allocated shares being available.

Not long after the Plan was confirmed, Kmart filed its first actions for recovery of Critical Vendor Payments. In May, 2003, Kmart filed an action against Meridian Retail, Inc., and in June, it filed an action against Handleman Company. The bulk of the actions, however, were filed in January of 2004. At that time, the Seventh Circuit had not yet ruled on the appeal of the Critical Vendor Order, and the statute of limitations for the § 549 actions was about to expire.[FN10] Accordingly, on or about January 26, 2004, Kmart filed actions against hundreds of recipients of Critical Vendor Payments. The complaints were for the most part substantially identical, each containing a count seeking avoidance and recovery under §§ 549 and 550 of the Bankruptcy Code and a second count seeking recovery under § 105.

> FN10. An action to avoid a transfer under § 549 "may not be commenced after the earlier of-(1) two years after the date of the transfer sought to be avoided; or (2) the time the case is closed or dismissed." 11 U.S.C. § 549(d).

The Seventh Circuit ultimately affirmed the district court's reversal of the Critical Vendor Order on February 24, 2004. The Court held, *inter alia,*

that § 105 does not provide authority to make full payment of only certain of the prepetition claims in a class. *In re Kmart Corp.,* 359 F.3d 866, 871 (7th Cir.2004), *reh'g and reh'g en banc denied* (May 6, 2004); *cert. denied, 543 U.S. 986, 995 (2004).* The Court further found that the order could not be sustained under § 503, which deals with administrative expenses, or under § 364(b), which authorizes the debtor to obtain credit "but has nothing to say about how the money will be disbursed or about priorities among creditors." *Id.* at 872. While the Court indicated that § 363(b)(1) was "more promising" as a source of authority for payment of prepetition debts—at least where the record establishes certain foundational requirements, including the prospect of benefit to the disfavored creditors—the Court held that it need not decide that issue, as the record made at the Critical Vendor Hearing in this case was inadequate in any event. *Id.* at 872–74.

**\*5** After the Seventh Circuit's decision, in May of 2004, this court entered its "Order Granting Motion for Approval of Case Management Procedures and for Extension of Time to Effect Service of Summons and Complaints" (the "Case Management Order") to govern the hundreds of actions against Critical Vendors that Kmart had filed in this case (the "Critical Vendor Actions"). That order fixed June 10, 2004 as the deadline for filing motions to dismiss, and it further required Kmart, upon the expiration of that period, to prepare and file a report listing separately those motions raising matters having general applicability to all or many defendants (as labeled in the Case Management Order, the "General Defense Motions") and those motions raising individual issues (the "Special Defense Motions"). Defendants were allowed to join in any General Defense Motion, in lieu of preparing their own, by filing a notice of joinder by June 24, 2004. Pursuant to the Case Management Order, briefing of the General Defense Motions was completed by October, 2004, and a status hearing was held on November 16, 2004. Oral arguments on the General Defense Motions were heard on January 31, 2005.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Thereafter, on March 22, 2005, one of the defendants, Vertis, Inc ., presented a motion to "clarify" the Confirmation Order and Plan. Vertis alleged in the motion that Kmart and Sears Roebuck & Co. had entered into an agreement for a merger anticipated to take place on or about March 24, 2005, calling for the formation of a newly organized Delaware corporation to be named Sears Holding Corporation. Vertis further alleged that as a result of the merger, the common stock designated in the Plan for distribution to Class 5 creditors, i.e., Kmart common stock,[FN11] would cease to exist. Although each share of Kmart stock outstanding as of the effective time of the merger would be converted into the right to receive one share of Sears Holding Corporation common stock, those Kmart shares that were still owned by Kmart at the time of the merger would, according to Vertis, be canceled, without any right of conversion. It was therefore Vertis' position that Kmart's action for return of its Critical Vendor Payment would have to be dismissed, as Kmart would no longer be able to satisfy—in Kmart common shares rather than shares of Sears Holding Corporation—the claim to which Vertis would become entitled under § 502(h) of the Bankruptcy Code upon return of the Critical Vendor Payment.[FN12] The motion sought a "clarification of the consideration that will be available to Class 5 Trade Vendor/Lease Rejection Claimholders, under the terms of the Confirmed Plan, following the effective date of the proposed ... Merger...." (Motion to Clarify, at 8).

FN11. More specifically, under the Plan, the shares allocated for distribution to Class 5 are shares of "New Holding Company Common Stock." Plan, § 1.152. "New Holding Company Common Stock" is defined in § 1.97 as "... the shares of common stock of New Holding Company authorized under *Article 7.8* of this Plan and under the articles of incorporation of New Holding Company." In § 1.96, "New Holding Company" is defined as "a corporation to be created pursuant to the terms

of this Plan, or, in the discretion of Kmart's board of directors after consultation with the Creditors' Committees, a Reorganized Debtor, to hold 100% of the New Operating Company Common Stock on and after the Effective Date." Vertis alleges that Kmart Holding Corporation is the entity defined in the Plan as "New Holding Company." Vertis Amendment, at 5, n. 4.

FN12. Section 502(h) gives a transferee of property that is recovered under § 550 a prepetition claim for the amount recovered. Specifically, it provides that a "claim arising from the recovery of property under section ... 550 ... shall be determined, and shall be allowed ... or disallowed ... the same as if such claim had arisen before the date of the filing of the petition." 11 U.S.C. § 502(h).

Vertis also requested entry of an order requiring Kmart to dismiss the action against it as moot on the first business day following the close of Kmart common stock at or above $134.61 per share. Vertis explained that the Class 5 stock distribution to which it would become entitled under § 502(h) upon return of the full amount of its Critical Vendor Payment was 53,490 shares.[FN13] According to Vertis, the stock was trading, at the time the motion was written, at approximately $132.50 per share. If the stock reached $134.61, the value of Vertis' stock distribution on the § 502(h) claim would exceed the amount of the Critical Vendor Payment sought to be recovered by Kmart.[FN14] Vertis contended that the action would then be moot.[FN15] Alternatively, Vertis requested that Kmart be required to distribute to Vertis, within one business day of Vertis' payment on any judgment or upon voluntary payment of the full amount of the Critical Vendor Payment, the stock to which it would be entitled under § 502(h).

FN13. Under the Plan, a Class 5 claimant's pro rata share of the stock to be distributed to that class was calculated by multiplying

the total number of shares to be distributed, i.e., 31,945,161 shares, by a fraction, the numerator of which is the amount of the claimant's Class 5 claim and the denominator of which is the total of Class 5 claims. Plan, at § 5.5. Since the Critical Vendor Action against Vertis sought approximately $7.2 million, and the total claims in Class 5 were estimated in the Disclosure Statement to be $4.3 billion, Vertis calculated its pro rata distribution as 53,490 shares, i.e., 31,945,161 shares X ($7,200,000/ $4,300,000,000).

FN14. At $134.61 per share, 53,490 shares would have a value of $7,200,288.90.

FN15. Vertis believed that the action would then have no benefit to Kmart, because Vertis would be receiving more than what it paid to Kmart pursuant to any judgment. Vertis, however, overlooked the fact that Kmart would not be distributing cash in exchange for Vertis' payment; it would merely be distributing its own stock.

**\*6** Vertis' motion to clarify was denied without prejudice, and on April 5, 2005, Vertis filed an amendment and supplement to its motion to dismiss (the "Vertis Amendment"). The Vertis Amendment raises only the first of the contentions made in the motion to clarify, i.e., that the action must be dismissed because Kmart common stock—the designated currency for distributions to Class 5 under the Plan—no longer exists.

Kmart filed its response to the Vertis Amendment on May 4, 2005, and Vertis filed its reply on May 13, 2005. The matter was thereafter taken under advisement. Although Vertis ultimately reached a settlement with Kmart, several of the defendants that joined in the Vertis Amendment have not. Accordingly, the argument pressed in the Vertis Amendment is one of the grounds for dismissal raised herein.

The other grounds are those asserted in the General Defense Motions (and joinders) filed in Critical Vendor Actions that remain pending.[FN16] The Movants primarily contend: 1) that the Critical Vendor Payments may not be avoided under § 549 because the payments were authorized at the time they were made; 2) that § 105 does not provide an independent cause of action for recovery of the payments; 3) that Kmart's current attempt to secure avoidance and recovery is barred by the doctrine of judicial estoppel; 4) that the defendants are not bound by the Plan Modification; and 5) that Kmart failed to retain the § 549 actions in its Plan.

FN16. Since the entry of the Case Management Order, hundreds of the Critical Vendor Actions have settled, including many of those in which General Defense Motions or joinders were filed.

## DISCUSSION
### *Avoidance of the Critical Vendor Payments under § 549 of the Bankruptcy Code.*

Movants[FN17] contend that Kmart cannot recover under § 549 because the transfers of the Critical Vendor Payments were authorized by this court. Section 549 provides in relevant part:

FN17. The term "Movants" refers in this opinion to one or more of the defendants who have filed General Defense Motions (or joinders) in adversary proceedings that remain pending.

[T]he trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and

(2) (A) that is authorized only under section 303(f) or 542(c) of this title; or

(B) that is not authorized under this title or by the court.

According to Movants, the Critical Vendor Order

Not Reported in B.R., 2006 WL 952042 (Bkrtcy.N.D.Ill.)
**(Cite as: 2006 WL 952042 (Bkrtcy.N.D.Ill.))**

insulates their payments from avoidance notwithstanding the subsequent reversal of that order by the district court and the Seventh Circuit. Movants rely on the "plain meaning" doctrine, urging that recovery is prohibited because the transfers were "authorized" at the time they were made.

Movants' singular focus on the word "authorized" is both inappropriate and unavailing. The plainness of statutory language is determined not only by reference to the language itself, but also by reference to the specific context in which it is used and the broader context of the statute as a whole. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Movants' interpretation of § 549(a)(2)(B) does not comport with other provisions of the Bankruptcy Code and does violence to the statutory scheme.

The court first notes, however, that even Movants' ostensibly "literal" reading of § 549(a)(2)(B) fails to account for all the language used in that provision.[FN18] Under the statute as written, recovery from a Movant is only precluded if the transfer "*is* ... authorized under this title or by the court" (emphasis added). Movants do not even attempt to address this use of present tense; indeed, they urge repeatedly in their briefs that the transfers in this case "*were*" authorized by the court. (*See, e.g.,* Chicago Sun–Times Brief, at 11, 12, and 16).

> FN18. As Movants correctly assert, " '[i]t is a fundamental rule of statutory interpretation that all words in a statute must be given equal meaning and must be interpreted in light of the others.' " (*See, e.g.,* Chicago Sun–Times Brief, at 11–12, quoting from *United States v. Michalek,* 54 F.3d 325, 335 (7th Cir.1995)).

**\*7** Read naturally, in accordance with its ordinary and customary meaning, the language "a transfer ... that is ... authorized under [the Bankruptcy Code]" refers to an existing statutory authorization (as does the parallel language in subparagraph (B),

concerning authorization under § 303(f) or 542(c)), and not merely to a transfer that was authorized under the Code at the time it was made. The same verb, supporting the additional phrase "or by the court," most naturally carries the same perspective.[FN19] Again, although Movants urge a "strict language" approach, they fail to address or offer any explanation for the language actually used by Congress.

> FN19. Movants' attempt to sever the word "authorized" from the word "is" is particularly inappropriate here, because the word "authorized" is used in this provision as an integral part of the verb phrase "is ... authorized" (and not as a stand-alone adjective). When a past participle (such as "authorized") is used alone, it functions as an adjective; however, when it is used with an auxiliary verb (such as "is") to form a verb phrase, it is considered part of the verb. *See, e.g.,* John E. Warriner, *English Grammar and Composition* 42 (1982); *see also The American Heritage Book of English Usage* 25 (1996). An intervening adverb (here, the word "not") does not change this construction. *See id.* at 46. In the passive voice (such as that used in subsection (2) of § 549(a)), "the main verb is always a past participle and ... the tense is expressed by an appropriate form of [the auxiliary verb] *be.*" Warriner, *supra,* at 154 (emphasis in original). Here, the tense expressed by the auxiliary verb is the present tense.

> The Supreme Court has noted that while it "does not review congressional enactments as a panel of grammarians," neither does it "regard ordinary principles of English prose as irrelevant to a construction of those enactments." *Flora v. U.S.,* 362 U.S. 145, 150, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960). Congress' use of verb tense is considered significant in

construing statutes. *See, e.g., United States v. Wilson,* 503 U.S. 329, 333, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992).

The court further notes that pursuant to § 1 of the Dictionary Act, 1 U.S.C. § 1 *et seq.,* "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise ... words used in the present tense include the future as well as the present ..."; they do not include the past. Nothing in the context of the statute here indicates otherwise; the language of § 549(a)(2)(B) describes in present tense a category of postpetition transfers that may be avoided, i.e., those that "[are] not authorized." The transfers to the Critical Vendors, made pursuant to an order now reversed, are in that category.

Far more importantly, however, Movants' purportedly literal interpretation is at odds with the rest of the statute. Their construction of § 549(a)(2)(B) would have the effect of insulating all court-authorized postpetition transfers against reversal on appeal (i.e., whenever a stay was not obtained preventing the transfer), even though no specific provision authorizes that extraordinary protection. Where Congress intends such a result, it knows how to craft and include appropriate language. Such language is in fact included in both §§ 363 and 364 of the Bankruptcy Code. For example, § 364(e) provides:

The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).[FN20] As the Seventh Circuit noted in *Kmart,* 359 F.3d at 869, nothing comparable to this provision is included in the Code with respect to postpetition payments on prepetition claims.

FN20. Similarly, § 363(m) provides as follows:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

Movants resort to legislative history, arguing, *inter alia,* that the purpose of § 549 is to protect those dealing with the debtor in good faith. (*See, e.g.,* Washington Post Brief, at 7, citing Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93–137, Part I at 191–92 (1973)). The plain meaning as espoused above is wholly consistent with this legislative purpose; the provision provides protection to all transferees under court orders, whether erroneously entered or not, that are not subsequently reversed. Indeed, the very cases cited by Movants demonstrate that § 549(a)(2)(B) operates to prevent collateral attack where the order authorizing the transfer, though erroneously entered, remains in full force and effect.

Movants cite, for example, *In re Knudson,* 929 F.2d 1280 (8th Cir.1991), *rehearing denied,* 943 F.2d 877 (8th Cir.1991), where the trustee attempted to avoid a security interest in inventory that had been granted, prior to conversion of the case to Chapter 7, in a stipulation approved by order of the bankruptcy court. The Eighth Circuit held that the security interest could not be avoided, because it

was protected under § 549(a)(2)(B). 943 F.2d at 878. Unlike the Critical Vendor Order in this case, however, the order in *Knudson* had never been reversed or otherwise vacated. *See* 929 F.2d at 1287. The trustee argued instead that the order was void for lack of due process. *Id.* at 1286. The Eighth Circuit rejected the voidness contention, finding that the notice requirements relied upon by the trustee were inapplicable. The Court went on to observe that even if the order had been entered erroneously (e.g., if the consideration for the security interest was inadequate under state law), the transfer would nonetheless be protected under § 549(a)(2)(B). 943 F.2d 878. Nothing in the facts of the case or in the Court's opinion, however, suggests that a transfer is protected where court authorization has been reversed.

**\*8** The same is true of *Vogel v. Russell Transfer, Inc.,* 852 F.2d 797 (4th Cir.1988), also cited by Movants. There again, the trustee sought to avoid security interests granted postpetition with court approval. The Fourth Circuit found the transfers protected under § 549(a)(2)(B), *id.* at 800, and nothing in the facts of the case suggests that the order authorizing the transfers was ever reversed.

Predictably, Movants have been unable to locate a single case where recovery was denied under § 549(a)(2)(B) because of a reversed authorization. Indeed, counsel for the Movants FN21 conceded at oral argument that "the closest case" he could find was *In re Crivello,* 134 F.3d 831 (7th Cir.1998), a decision involving the interpretation of §§ 327(a) and 328(c) of the Bankruptcy Code. In *Crivello,* a law firm employed pursuant to § 327(a) as counsel for the debtor in possession had failed to disclose, prior to entry of the employment order, numerous prior connections with the debtor and insiders. The order was never appealed, but when the connections were finally disclosed in connection with a subsequent hearing on the firm's fee applications and the objections of the United States Trustee thereto, the bankruptcy court revoked the employment order and denied all fees requested. On appeal, the law

firm argued that despite the dual prerequisites to employment set forth in § 327(a), i.e., that a professional person be disinterested and hold no interest adverse to the estate, § 328(c) grants the bankruptcy court discretion to allow fees even where these dual requirements have not been met. The United States Trustee, however, contended that since the grant of discretion in § 328(c) applies only as to persons "employed under section 327," it has no application where fees are sought by a professional whose employment was erroneous, i.e., as a result of undisclosed connections and conflicts of interest.

> FN21. Counsel for Knight–Ridder Corporation and certain other newspaper companies stated at oral argument that he was speaking, as to the § 549 argument, on behalf of the other Movants as well. (January 31, 2005 transcript, at 25).

The Seventh Circuit framed "the *critical* question" as "whether a bankruptcy court *must* deny fees when it subsequently learns that a professional never should have been employed under § 327(a) in the first place or whether it has *discretion* to deny fees." *Id.* at 836 (emphasis in original). The Court found that the plain language of § 328(c) provided the answer, as it vests the bankruptcy court with discretion to award or deny fees if "at *any* time during ... employment" a professional person does not meet the dual requirements of § 327(a),—i.e., including at the *onset* of the engagement (ergo, an erroneous employment). *Id.* at 837.

The Movants here rely principally on the Seventh Circuit's distinction in *Crivello* between orders that are void and those that are merely erroneous or invalid, and the Court's holding that the phrase "employed under section 327" does not require a valid employment order. *Id.* at 838–39. Again, however, the ruling was based on the plain language of § 328(c), effectively granting discretion even where the employment order is invalid, as well as a desire to synthesize and harmonize §§ 327(a) and 328(c). The Court explained:

**\*9** Unlike the [United States] Trustee's interpretation [requiring a valid employment order as a prerequisite to the discretion granted in § 328(c) ], our reading of the Bankruptcy Code ensures symmetry between §§ 327(a) and 328(c) ... The [United States] Trustee would like to use § 328(c) to question collaterally whether a professional should be employed. Section 328(c) does not govern whether a court should employ an interested person; § 327(a) provides the Code's response.

*Id.* at 839. Accordingly, in order to "give[ ] full effect to both § 327 and § 328," the Court held that even the entry of an invalid employment order under § 327(a) "trigger[s] the bankruptcy court's discretion under § 328(c)." *Id.* at 838.

For obvious reasons, *Crivello* has little or nothing to say about Movants' contentions in this case. The Court was attempting to harmonize two companion provisions, one of which granted in "plain language" a power of discretion to the bankruptcy court that clearly applied to invalid employment situations. *Id.* at 837. The Court noted that if the United States Trustee questioned that "allocation of power," his argument was more appropriately addressed to Congress. *Id.* at 838. The Court further noted that the allocation of discretionary power to the bankruptcy court was in recognition that bankruptcy courts are courts of equity. *Id.* Since even an interested professional may provide services that are beneficial to the estate, it is appropriate for the bankruptcy court to first weigh the equities before denying fees for postpetition services that counsel is obligated by an order to provide. *Id.*

Here, of course, there is no companion provision to consider or harmonize, and the language used in § 549(a)(2)(B) is different from that used in § 328(c).FN22 There are also no allegations of unpaid postpetition goods or services (which could be raised in any event as an affirmative defense in this action). Most importantly, however, there is no clause effectively dictating the application of § 549(a)(2)(B) to an invalid, revoked order.FN23 Al-

though the *Crivello* court noted the distinction between orders that are void and those that are merely invalid, its observations cannot be divorced from the context in which they were made; the employment order under § 327(a) could be considered effective without excusing the breach of that provision's dual qualification requirements, because any retrospective penalty necessary to carry out the objectives of the statute could still be enforced under § 328(c).FN24

> FN22. Unlike § 549(a)(2)(B), where the past participle "authorized" is used as part of the verb phrase "*is* authorized," § 328(c) uses the past participle "employed" as an adjective, i.e., "a professional person employed under section 327."

> FN23. Again, as discussed above, § 549(a)(2)(B) *will* operate to protect transfers under orders that, while erroneous, have never been reversed or otherwise vacated.

> FN24. The Court stated:

> > "Our interpretation allows § 327(a) to act prospectively as a prerequisite for employment by signaling those professionals who fail to satisfy its dual requirements that they will be disqualified. *Once professionals have cleared that threshold, § 328(c) remains as a retroactive penalty for those professionals whose retention under § 327(a) was improper* or who fail to satisfy § 327(a) requirements while working for the estate...."

> > 134 F.3d at 839 (emphasis added).

Movants cite other cases, even less apropos, that distinguish between void and voidable orders,FN25 and they urge that the Seventh Circuit itself stated in *Kmart* that the Critical Vendor Order was not "void." (*See* Jan. 31, 2005 transcript, at 29

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(citing *Kmart,* 359 F.3d at 870)). According to Movants, that statement in the *Kmart* opinion is "dispositive" in this proceeding.

FN25. *See, e.g., Trook v. Lafayette Bank and Trust Co.,* 581 N.E.2d 941 (Ind.Ct.App.1991), where an order appointing a bank as guardian had been entered without notice to the incompetent, Mrs. Trook, and upon her subsequent petition, the order was vacated. The bank then filed its final guardianship account, showing that it had authorized the expenditure of $28,855.31 of Trook's funds. Trook objected to the accounting and sought to charge the bank personally with these expenditures, which the bank had made for Trook's benefit and on her behalf. The appellate court found that since the notice defect was waivable, the order appointing the bank as guardian was voidable, and not void *ab initio.* The "significance of this classification [was] that some form of guardianship existed" before the order of appointment was vacated,—i.e., a *de facto* guardianship. *Id.* at 946.

Significantly, the order in *Trook* did not create a *de jure* guardianship during the period the order was in effect. The order merely gave the bank a defense to personal liability for all expenditures that, being reasonable, would have been approved in any event had the appointment been valid. The court explained that a de facto guardian who " 'acts in good faith and discharges the duties which would have rested upon him if he had been a legal guardian ... is entitled to charge proper expenditures against the funds in his hands.' " *Id.* at 948 (quoting from *Kelly v. Kelly,* 297 P. 470, 473 (Mont.1931)). The court further noted: "In so concluding, we acknowledge that the guardian is not blameless in failing

to discover the defect in its appointment.... Nevertheless, we 'will not lend [our] aid to hold them personally liable for doing the very things that the court declares to have been done in the best interest of the [ward], and for [whom] they were presuming to act.' " *Trook,* 581 N.E.2d at 948 (quoting from *Jessup v. Jessup,* 46 N.E. 550, 553 (Ind.Ct.App.1897)). Again, the "voidable" order of appointment in *Trook* did not create a *de jure* guardianship but merely provided the bank with a defense against Trook's effort to hold it personally liable for the disbursements made on her behalf.

Similarly, in *Laird v. Vogel,* 334 So.2d 650 (Fla.Dist.Ct.App .1976) (from which the *Trook* quote relied on by Movants is taken), summary judgment was awarded in an unlawful detainer action, together with an order for possession, in favor of a tax sale purchaser. The judgment and order were later rescinded, but not until after the purchaser had taken possession of the property, and the owner's belongings had been removed, resulting in damage. In a suit brought by the owner against the tax sale purchaser and her attorney (who was also the owner's former counsel), the appellate court held that the defendants' actions did not give rise to personal liability for the damages claimed, because they had proceeded under an order of the court and a presumptively valid tax deed. *Id.* at 651. Thus, in both *Trook* and *Laird,* parties who had taken action in reliance on an invalid order were protected against personal liability for damages resulting from such actions; they were able to assert the order as an affirmative defense, in whole or in part, to liability.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Here, of course, it was Debtor Kmart who, in reliance on the Critical Vendor Orders, paid out the funds at issue to Movants. Movants nonetheless claim that they took action in 'reliance' on the Critical Vendor Orders, *e.g.,* by providing customary trade terms postpetition. While Movants may not be precluded from asserting any damages based thereon as an affirmative defense in this proceeding, the cited authorities clearly do not support Movants' position that they are entitled to retain all the funds which Kmart, in reliance on the Critical Vendors Order, paid out to them from the assets of this estate. Indeed, Movants do not discuss any of the facts of the cited cases but merely rely on general statements, out of context, concerning the effect of "voidable" judgments or orders. *See also Chapin v. Hulse,* 599 N.E.2d 217 (Ind.Ct.App.1992) (another factually inapposite case cited by Movants for the same purpose). Interestingly, in *Chapin,* the appellate court noted that invalid judgments are normally classified as merely 'voidable' to promote the goal of finality of judgments "*where a party has assented to the error ... by failing to perfect an appeal ...* " *Id.* at 222 (emphasis added).

**\*10** Remarkably, Movants fail to recite—much less find "dispositive"—any of the other statements and pronouncements made in the *Kmart* opinion, particularly those made in rejecting the appellants' contentions under the doctrine formerly known as "equitable mootness." [FN26] Certain of the appellants had argued that the appeal should have been dismissed by the district court because effective judicial relief was no longer available. They contended, *inter alia,* that they had detrimentally relied on the Critical Vendor Order and that confirmation of Kmart's plan of reorganization constituted a comprehensive change in circumstances warranting dismissal of the appeal. (*See, e.g.,* Brief for Appellant Knight–Ridder, Inc., filed in the appeal before the Seventh Circuit, at 13, *et seq.*) In addition, an amicus brief was filed by one of the vendors, urging "mootness" based, *inter alia,* on the very contentions made here about the "plain language" of § 549(a)(2)(B). [FN27]

> FN26. As noted by the district court, "[t]he Seventh Circuit in *UNR* 'banish[ed] the term "equitable mootness" from the (local) lexicon,' 20 F.3d at 769, because it is misleading: '[t]here is a big difference between *inability* to alter the outcome (real mootness) and *unwillingness* to alter the outcome ("equitable mootness")." " *Capital Factors, Inc. v. Kmart Corp.,* 291 B.R. 818, 823 (N.D.Ill.2003) (quoting from *In re UNR Industries, Inc.,* 20 F.3d 766, 769 (7th Cir.1994) (emphasis in original)).

> FN27. Meridian Retail, Inc. filed a motion for leave to file an amicus brief, stating that the brief (which was "conditionally" filed with the Motion) would draw the court's attention to two arguments that had escaped consideration by the appellants, i.e., that the appeal was moot under specific provisions of the Bankruptcy Code, including § 549(a)(2)(B), and that the Critical Vendor Payments could be authorized as, in effect, premiums necessary to induce creditors to extend postpetition credit. (Motion of Meridian Retail, Inc. For Leave to File a Brief *Amicus Curiae,* at 2, 4–5). Capital Factors filed a response opposing the filing of the amicus brief, urging, *inter alia,* that the § 549(a)(2)(B) argument was not ripe for review and that the remaining arguments were largely duplicative of the appellants' briefs. The Seventh Circuit ordered Meridian, which had already been sued by Kmart under § 549, to file a supplement to its motion stating why it believed its interests were not already ad-

equately represented by the appellants. In its supplement, Meridian argued certain factual distinctions between it and the appellants, as well as the omission by the appellants of "certain critical arguments," including "mootness under Section 549(a)(2)(B) ..." The Seventh Circuit entered an order allowing Meridian to file a portion of its brief, specifically including the § 549 argument. In the brief as filed, Meridian cited *Knudson, Vogel,* and other cases relied upon by Movants here (discussed above), urging that under the plain meaning of § 549(a)(2)(B), a postpetition transfer, once "authorized" by the court, cannot be unwound unless the order was stayed pending appeal. (Motion of Meridian Retail, Inc. For Leave to File a Brief *Amicus Curiae,* at 7–11).

The Seventh Circuit held that it was not too late to recover the funds paid pursuant to the Critical Vendor Order. Not only did the Court reject the appellants' contentions concerning detrimental reliance, but it also noted that Kmart's plan provided for the filing of adversary proceedings "to recover the preferences that the critical vendors have received," i.e., the § 549 actions provided for in the Plan Modification. *Kmart,* 359 F.3d at 870. [FN28] The Court stated:

> FN28. Because of their obvious effect, courts often refer to § 549(a) transfers as postpetition "preferences." *See, e.g., In re D.J. Management Group, Inc.,* 164 B.R. 831, 836 (Bankr.W.D.N.Y.1994); *In re James B. Downing & Co.,* 74 B.R. 906, 910 n. 5 (Bankr.N.D.Ill.1987); *In re Skye Marketing Corp.,* 11 B.R. 891, 899 (Bankr.E.D.N.Y.1981); *In re Blaine Richards & Co., Inc.,* 10 B.R. 424, 428 (Bankr.E.D.N.Y 1981).

Appellants insist that, by the time [the district court] acted, it was too late. Money had changed hands and, we are told, cannot be refunded. But why not? Reversing preferential transfers is an ordinary feature of bankruptcy practice, often continuing under a confirmed plan of reorganization. ... If the orders in question are invalid, then the critical vendors have received preferences that Kmart is entitled to recoup for the benefit of all creditors. ... Several provisions of the Code do forbid revision of transactions completed under judicial auspices. For example, the DIP financing order ... is sheltered by 11 U.S.C. § 364(e) .... Nothing comparable anywhere in the Code covers payments made to pre-existing, unsecured creditors, whether or not the debtor calls them "critical." Judges do not invent missing language. *Id.* at 869. The Court concluded that the vendors had failed to establish that "any language in the Code" blocked future attempts to recover the preferential transfers on account of their prepetition debts. *Id.* at 870.

These statements by the *Kmart* court were not dicta, but constituted an essential part of the Court's ruling on issues that required disposition prior to reaching the merits. Movants who were not parties to the appeal may not be *formally* bound by these rulings, but they nonetheless "must accept the precedential effect of [the Court's] decision." *Id.* at 871. Although this court has concluded independently that the Critical Vendor Order, now reversed, fails to shield the transfers from recovery under § 549(a)(2)(B), the *Kmart* opinion provides additional precedent, the force of which cannot seriously be questioned.

**\*11** Movants next attempt to circumvent this problem and fit within the statutory language by contending that the transfers were separately authorized in the DIP Financing Order,—an order that was never appealed and remains in full force and effect. According to Movants, "[t]he authority conferred by the final DIP Financing Order ... constitutes express authority to make the Critical Vendor Payments and satisfies both the plain language and purpose of Section 549." (*See, e.g.,* Chicago Sun–Times Brief, at 13).

Movants point to language contained in ¶ 6(a) of the DIP Financing Order, which provides in relevant part as follows:

6. *Authorization To Incur Post–Petition Financing and Enter into the Loan Documents.*

(a) The Documents ... are hereby approved. The Borrower is authorized to borrow, obtain letters of credit and incur overdrafts and related liabilities pursuant to the DIP Credit Agreement ... up to an aggregate of $2.0 billion (exclusive of the amount of such overdrafts and related liabilities), in accordance with the terms of the DIP Credit Agreement ..., which shall be used for (i) making the First Day Order Payments, (ii) general corporate purposes, including providing working capital for the Borrower and the Guarantors and (iii) payment of any related transactions costs, fees and expenses, in accordance with the DIP Credit Agreement.

Relying on this provision, Movants essentially invite the court to conclude that the "dedicated and earmarked nature of the borrowings" established "express authority" to make the Critical Vendor Payments. (*See, e.g.,* Chicago Sun–Times Brief, at 13).

Such a conclusion, however, is not supported by the language, purpose, or intent of the order, all of which are directed toward an authorization to borrow. Moreover, even putting aside the Seventh Circuit's admonition that § 364(b) "has nothing to say about how [funds borrowed by a debtor in possession] will be disbursed," *Kmart,* 359 F.3d at 872, Movants' contention further stumbles on the language of the DIP Financing Order itself. The order defines First Day Order Payments as "the payment of such pre-petition claims *as may be permitted by the Court pursuant to the 'first day' orders* that have been consented to by the Post–Petition Agent and the Initial Banks." (DIP Financing Order, at 2; emphasis added). Contrary to Movants' contentions, the financing order contains no separate and independent authorization for the Critical Vendor Pay-

ments, but merely refers back to the Critical Vendor Orders themselves for the requisite court authority. Movants thus fare no better under the DIP Financing Order in their quest to prevent avoidance under § 549.

**Recovery under § 105 of the Bankruptcy Code.**

Count II of the Critical Vendor Complaints, designated "For Avoidance and Recovery Pursuant to 11 U.S.C. § 105," seeks "avoidance" of the Critical Vendor Payments pursuant to § 105 and judgment for the full amount of the payments plus interest and costs .[FN29] The count alleges that "[s]ince the [Critical Vendor] Order has been reversed, it would be contrary to the Bankruptcy Code and inequitable for Defendant to be permitted to retain the Payment and thereby be paid in full on its pre-petition claim when all other unsecured creditors were not paid in full." Movants respond by contending, *inter alia,* that there is no private right of action under § 105 of the Bankruptcy Code. (*See, e.g.,* Chicago Sun–Times Brief, at 16–18).

FN29. Section 105(a) of the Bankruptcy Code provides as follows:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

**\*12** The private right of action issue has often been discussed in bankruptcy cases in connection with alleged violations of the discharge injunction and the filing of inflated secured claims. *See, e.g., Walls v. Wells Fargo Bank, N.A.,* 276 F.3d 502 (9th Cir.2002); *Pertuso v. Ford Motor Credit Co.,* 233 F.3d 417 (6th Cir.2000); *Holloway v. Household Automotive Finance Corp.,* 227 B .R. 501

(N.D.Ill.1998); *In re Knox,* 237 B.R. 687 (Bankr.N.D.Ill.1999); *In re Lenior,* 231 B.R. 662 (Bankr.N.D.Ill.1999). In *Knox,* for example, the defendant secured creditor had filed a proof of claim in Knox's Chapter 13 case, listing the secured portion of the claim as the entire balance due, notwithstanding that the balance included unmatured interest (in contravention of § 502(b)(2)) and exceeded the value of the collateral (in contravention of § 506(a)). Knox objected to the claim, and an order was entered requiring the bifurcation of the claim into secured and unsecured portions, with the secured claim limited to the value of the collateral, and with no claim for unmatured interest.

Knox subsequently filed an adversary proceeding, as a purported class action on behalf of herself and others allegedly harmed by the secured creditor's practice of filing such inflated claims. One count was premised upon § 105 and sought injunctive relief to stop the creditor's practice, sanctions for the alleged wrongful conduct, an order compelling the creditor to amend its claims, a refund of overpayments and expenses, and an award of attorney's fees. Upon a motion to dismiss this count, the court first noted that an exercise of the § 105 power must ordinarily be tied to another specific section of the Bankruptcy Code. *Id.* at 699–700. The court then applied the four-part test of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to determine whether a private right of action existed, i.e.,

> (1) whether the plaintiff is a member of a class for whose especial benefit the statute was enacted; (2) whether there is any explicit or implicit indication of congressional intent to create or deny a private remedy; (3) whether a private remedy would be consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law.

*Knox,* 237 B.R. at 700 (citing *Allison v. Liberty Sav.,* 695 F.2d 1086, 1088 (7th Cir.1982)), in turn citing *Cort v. Ash,* 422 U.S. at 78). The *Knox* court

noted that in the application of the test, "the four factors are not equally weighted; the central inquiry is whether Congress intended to create a private right of action." *Knox,* 237 B.R. at 700; *see also Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). The court found that no private right of action existed under § 105, noting that "very adequate and effective remedies" were already available through the Code and Rules to redress the alleged improper claims filings, *e.g.,* through sanctions under Rule 9011. The court added that "[m]ost courts ... address[ing] the issue have determined that no private remedy or private right of action is created by § 105," *Knox,* 237 B.R. at 700, citing, *inter alia, Holloway v. Household Automotive Finance Corp.,* 227 B.R. 501 (N.D.Ill.1998); *In re Simmons,* 224 B.R. 879 (Bankr.N.D.Ill.1998), and *In re Costa,* 172 B.R. 954 (Bankr.E.D.Cal.1994).

**\*13** After these decisions were rendered, similar issues were raised in a number of appellate court cases. In *Bessette v. Avco Financial Services, Inc.,* 230 F.3d 439 (1st Cir.2000), the Chapter 7 debtor had executed a reaffirmation agreement with Avco Financial Services, a secured creditor, but the agreement was never filed with the court as required by § 524 of the Bankruptcy Code, and it also failed to meet certain other requirements of that provision. The debtor subsequently brought an action in the district court for the district in which her bankruptcy case had been filed, purportedly as a class action, seeking damages against Avco for violation of the discharge injunction of § 524, relying primarily on the theory that § 524 provides a private right of action.[FN30] She contended in the alternative that the district court was authorized to grant relief via § 105(a). *Id.* at 443.[FN31]

> FN30. The court noted elsewhere that the debtor contended the reaffirmation agreement was void and unenforceable and that she was therefore entitled to restitution. *Bessette,* 230 F.3d at 444.

> FN31. She also brought a state law claim

for unjust enrichment and later amended her complaint to add claims under the Racketeer Influenced Corrupt Organizations Act. *Bessette,* 230 F.3d at 443.

Avco disputed that a private right of action was available under § 524 and urged instead that the proper remedy was contempt. The First Circuit, noting a division among the courts on the private right of action issue, saw "no reason to jump into the fray with the complex analysis required by *Cort v. Ash* when a remedy is readily and expressly available through ... § 105(a)." *Bessette,* 230 F.3d at 444. The Court held that while § 105 "does not itself create a private right of action, ... a court may invoke § 105(a) 'if the equitable remedy utilized is demonstrably necessary to preserve a right elsewhere provided in the Code,' ... so long as the court acts consistent with the Code and does not alter the Code's distribution of other substantive rights." *Id.* at 444–45 (quoting from *Noonan v. Secretary of Health & Human Servs. ( In re Ludlow Hosp. Soc'y, Inc.),* 124 F.3d 22, 28 (1st Cir.1997)). Since § 105 provides a bankruptcy court "with statutory contempt powers, in addition to whatever inherent contempt powers the court may have," the Court held that § 524 is enforceable through a contempt proceeding under § 105. *Bessette,* 230 F.3d at 445. The Court also reversed the district court's ruling that the debtor could only bring her claims in the court that issued the original discharge order, noting that a "district court sitting in bankruptcy is similarly authorized to invoke its equitable powers under § 105 when necessary to carry out the provisions of the Bankruptcy Code." *Bessette,* 230 F.3d at 446.

A similar set of facts was presented to the Sixth Circuit in *Pertuso v. Ford Motor Credit Co.,* 233 F.3d 417 (6th Cir.2000). Again, the Chapter 7 debtors had entered into a reaffirmation agreement with a secured creditor, Ford Motor Credit Company, and the agreement was never filed with the court. The debtors remained current on their payments to Ford both before and after the discharge was entered. Thereafter, they filed a purported class ac-

tion against Ford in the district court for the Eastern District of Michigan (their bankruptcy had been filed in the Rhode Island bankruptcy court), alleging that Ford routinely solicited reaffirmation agreements, failed to file them with the court, and (notwithstanding that such agreements are unenforceable) used them to collect substantial sums from members of the purported class. Debtors argued, *inter alia,* that § 524 impliedly creates a private right of action for violation of that provision and, alternatively, that § 524 is enforceable through § 105.

***14** The Sixth Circuit applied the four-factor test of *Cort v. Ash* (as modified by *Touche Ross,* 442 U.S. at 575) and held that § 524 does not impliedly create a private right of action. As for § 105, the Court questioned the breadth of the holding in *Bessette,* i.e., that § 524 could be enforced by a district court through § 105 without bringing a contempt proceeding in the bankruptcy court. The Sixth Circuit referenced its earlier (unpublished) ruling in *Kelvin v. Avon Printing Co., Inc.,* 1995 WL 734481 (6th Cir.1995) (i.e., that § 105 cannot be invoked to remedy breaches of § 363) and held:

> To the extent that *Bessette* may be in tension with *Kelvin,* we adhere to the latter case. Section 105 undoubtedly vests bankruptcy courts with statutory contempt powers, but it "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law...."

*Pertuso,* 233 F.3d at 423 (quoting from *U.S. v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986)).

These issues were presented to the Seventh Circuit in *Cox v. Zale Delaware, Inc.,* 239 F.3d 910 (7th Cir.2001). In *Cox,* a former Chapter 7 debtor who had signed a reaffirmation agreement that was never filed with the court brought a purported class action in the district court, long after his bankruptcy case was closed. The suit sought rescission of the agreement and restitution of all amounts paid to the secured creditor after discharge. The district court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

referred the suit to the bankruptcy court, which ultimately dismissed the action on the ground that § 524(c) does not create a private right of action. *Id.* at 912–13. The district court affirmed that dismissal.

On appeal, the Seventh Circuit noted that both the district and bankruptcy courts in *Cox,* as well as the Sixth Circuit in *Pertuso,* had inappropriately emphasized that the Supreme Court is reluctant to imply private rights of action in federal statutes. *Cox,* 239 F.3d at 913. The Seventh Circuit found that emphasis "misplaced" because the "private rights of action that the [Supreme] Court is reluctant to read into federal statutes are rights to obtain damages for statutory violations remediable by public agencies." *Id.* at 913–14. Cox was not seeking damages, and § 524(c) is enforceable only by private parties. *Id.* at 914.

The Court then noted that a statute (such as § 524(c)) that makes a contract void and unenforceable renders the contract rescindable, and rescission can be had even after full performance on both sides (Cox having already paid the secured creditor in full). *Id.* The Court nonetheless found the rescission remedy "hokey," characterizing Cox's action as both a frivolous and a nuisance suit.[FN32] It went on to conclude that a contempt proceeding in the bankruptcy court that issued the discharge injunction was the sole remedy for violation of § 524(c),[FN33] "agreeing with the result in *Pertuso* though without endorsing its analysis of private rights of action." *Cox,* 239 F.3d at 917.[FN34] *See also In re Joubert,* 411 F.3d 452, 455–56 (3d Cir.2005) (sole remedy for alleged § 506(b) violation was contempt proceeding in bankruptcy court, and not private right of action under § 105(a), agreeing with "decisions holding that § 105(a) does not authorize separate lawsuits as a remedy for bankruptcy violations"); *Walls,* 276 F.3d at 506 (violations of § 524 may not be independently remedied through § 105 absent contempt proceeding in bankruptcy court).

FN32. The remedy was "frivolous" (since the payments Cox sought to recoup were

actually voluntary, "having only to do with the debtor's desire to retain his property and nothing to do with an unenforceable promise to pay") and had only nuisance value (since its net expected worth to Cox was negative). *Cox,* 239 F.3d at 915–16.

FN33. The Court reminded, however, that if Cox had been sued by the secured creditor before he had paid the debt in full, he could have interposed § 524(c) as a defense, as an alternative to seeking contempt sanctions in the bankruptcy court (provided that he was prepared to lose the property in foreclosure). "But once he has paid the debt in full and is not in jeopardy of being sued, affirmative relief can be sought only in the bankruptcy court that issued the discharge." *Cox,* 239 F.3d at 917.

FN34. The Court considered the "remedial scheme of section 524 itself," noting that a contempt proceeding in the bankruptcy court (i.e., the "remedy *authorized* by section 524(a)(2))" had the advantage of placing responsibility for enforcement of the discharge order in the issuing court. If the creditor's breach of the filing requirement of § 524(c) was deliberate, he could be held in contempt and restitution (of any payments made involuntarily) could be ordered, together with a reasonable attorney's fee. *Cox,* 239 F.3d at 915–16.

**\*15** The Seventh Circuit in *Cox* did not specifically discuss § 105 or whether it can serve as the basis for a separate and independent suit to enforce other provisions of the Code.[FN35] However, the Court has made it clear in many other decisions, including the *Kmart* opinion itself, that the equitable power granted by § 105 is limited; it is a power to implement rather than override and does not give a bankruptcy judge " 'free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness....' " *Kmart,* 359 F.3d at 871 (quoting from *In re Chicago, Milwaukee, St.*

*Paul & Pacific R.R.,* 791 F.2d 524, 528 (7th Cir.1986)). In *In re Fesco Plastics Corp., Inc.,* 996 F .2d 152 (7th Cir.1993), the Court stated that § 105(a)

> FN35. The Court merely observed that a bankruptcy judge's power to determine civil contempt "is explicitly conferred by Fed.R.Bankr.9020(b)," adding a "see also" reference to § 105. *Cox,* 239 F.3d at 916–17. It also noted that "[a] court retains jurisdiction to enforce its injunctions." *Id.* at 917.

delineates the limited equitable power of bankruptcy courts.... Under [ § 105(a) ], a court may exercise its equitable power only as a means to fulfill some *specific* Code provision .... see *In re Lapiana,* 909 F.2d 221, 224 (7th Cir.1990) ("We deprecate flaccid invocations of 'equity' in bankruptcy proceedings.").

*Fesco Plastics,* 996 F.2d at 154 (emphasis added; certain citations omitted). "By the same token," however, when a specific section "addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code." *Id.* (citations omitted).

The Court explained these principles in *Disch v. Rasmussen,* 417 F.3d 769 (7th Cir.2005). There, the bankruptcy court had revoked a discharge order, even though the debtor's conduct did not meet the grounds for revocation specifically enumerated in § 727(d). The bankruptcy court relied on its equitable authority under § 105(a), finding that revocation was necessary to prevent manifest injustice and to carry out the primary provisions of the Code, particularly § 727(a) (specifying the grounds for denial of discharge). The court relied in the alternative on Bankruptcy Rule 9024, on the theory that the discharge had resulted from the court's own mistake. *Id.* at 774.

The Seventh Circuit, though affirming on the basis of Rule 9024, rejected the bankruptcy court's reliance on § 105(a). The Court explained that des-

pite the "open-ended language" of that section, there are limited circumstances in which it should be used:

> Otherwise, there is a real risk that more particular restrictions found throughout the Code would amount to nothing, because the court could always use the residual equitable authority of § 105(a). For that reason, this court has ... warned that a judge does not have "free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be" ....
>
> ...
>
> The bankruptcy court here took the position that ... it was acting to enforce a specific Code provision, § 727(a), not to achieve a reshuffling of the equities in a manner contrary to the provisions of the Code. But this ignores the fact that Bankruptcy Rule 4004 structures the way in which a claim under § 727(a) must be presented. If § 105(a) offered a way around [those] restrictions, then the rule might as well not exist. Similarly, such a broad interpretation of § 105(a) would make the list of grounds for revoking a discharge found in § 727(d) meaningless; anything not in the list could come in through the back door of § 105(a).

*16 Id.* at 777 (citations omitted). For these and other reasons, it is widely recognized that § 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code ...," 2 Collier on Bankruptcy ¶ 105.01[2] (15th ed. rev.2005), and does not constitute "a roving commission to do equity." *U.S. v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986); *see also In re Jamo,* 283 F.3d 392, 403 (1st Cir.2002) ( § 105 does not provide "a roving writ").

Here, §§ 549 and 550 provide a remedy for the recovery of post-petition transfers that meet the specifications set forth by Congress. There is no indication of any intent to authorize another remedy

for recovery under § 105(a). To hold that such a separate and independent action exists under § 105(a) would amount to a clear act of legislation by this court. Again, as succinctly stated by the Seventh Circuit, § 105(a) "is a means to enforce the Code rather than an independent source of substantive authority." *In re UAL Corp.,* 412 F.3d 775, 778 (7th Cir.2005) (citing *Kmart,* 359 F.3d at 871).

Indeed, Kmart acknowledges that § 105 is not a source of substantive rights but urges that it is invoked here merely to "implement relief that might be available under Sections 549 and 550 ... or to implement the Seventh Circuit's ruling in *Capital Factors.*" (*See* Kmart Brief, at 21; January 31, 2005 transcript, at 68).

As for §§ 549 and 550, Kmart needs no assist from § 105; together these two sections provide a comprehensive remedy for obtaining the "avoidance" ( § 549 ) and "recovery" ( § 550 ) of postpetition transfers.

As for "implementation" of the Seventh Circuit's decision, it is not at all clear what Kmart means. The Seventh Circuit did not remand the critical vendor "contested matter" FN36 for further proceedings implementing its decision. Indeed, it is interesting to note that although the district judge stated that he was "remand[ing] for further proceedings consistent with [his] opinion," *Capital Factors,* 291 B.R. at 824–25, FN37 a Seventh Circuit motions panel characterized the 'remand' label a "misnomer." In an order denying Capital Factors' motion to dismiss the appeal for lack of a "final" order (based on the 'remand' language), the motions panel stated:

> FN36. The proceeding initiated by Kmart's filing of the Critical Vendor Motion was a "contested matter" within the purview of Fed.R . Bankr.P. 9014. Although a contested matter is not a separate lawsuit requiring service of a summons and complaint, it is governed by many of the same procedural rules that govern adversary pro-

ceedings (which, in turn, incorporate many of the Federal Rules of Civil Procedure).

> FN37. The district judge, unconvinced that the bankruptcy court lacked power to simply order the moneys returned, stated: "It is not evident that Kmart will have to sue to recover the payments, and in fact, Kmart cites no cases indicating that the bankruptcy court would not have the power to order the return of the monies paid." *Capital Factors, Inc. v. Kmart Corp.* 291 B.R. 818, 824 (N.D.Ill .2003), *aff'd,* 359 F.3d 866 (7th Cir.2004).

[T]he district judge did not direct the bankruptcy judge to conduct any further proceedings concerning the validity of the payments made to the critical vendors....

The district judge's use of "remand" appears to be a misnomer. [He] recognized that the bankruptcy is ongoing, and that the disapproval of these payments would have consequences, such as the filing of adversary proceedings to recover the payments as preferential transfers. Strictly speaking, however, the recognition that one judicial ruling will lead to the commencement of new litigation (and each adversary proceeding is effectively a separate lawsuit) does not make a decision non-final. Unless there is something more to do in *this* contested matter, the district judge's decision brings to a close a discrete phase of the bankruptcy. And, as far as we can see, this contested matter is over.

**\*17** *See* Order of May 30, 2003, at 2 (emphasis in original). FN38 This court's ruling on Capital Factors' emergency motion to stay the confirmation hearing was essentially to the same effect, i.e., that the district judge did not remand for further proceedings in the critical vendor contested matter. (*See* April 14, 2003 transcript, at 223–24). Nothing has transpired in the interim to change this court's view.

FN38. The panel noted that "[l]ike any other decision by a motions panel, ... this resolution [would be] open to reconsideration at the merits stage if additional circumstances bearing on its resolution [came] to light." *Id.*

If Kmart is instead referring to "implementation" of the Seventh Circuit's decision via a new and independent action (which of course it must be, since these are all adversary proceedings), then in addition to the inherent difficulties discussed above concerning independent suits under § 105, Kmart simply fails to provide any clues as to what that action might be,FN39 —much less whether it was even retained in Kmart's plan of reorganization.

FN39. Movants posit that Kmart may be attempting to assert some sort of unjust enrichment claim, since it alleges in Count II that it would be "inequitable" for Movants to retain their payments in light of the Seventh Circuit's decision. Kmart has made clear, however, that it is "not seek [ing] recovery ... under a state-law 'unjust enrichment' theory...." *See* Kmart Brief, at 21, n. 12.

Accordingly, the court concludes for all the foregoing reasons that Count II should be dismissed for failure to state a claim upon which relief may be granted.

### The Doctrine of Judicial Estoppel.

Movants contend that dismissal of the Critical Vendor Adversaries is required under the doctrine of judicial estoppel, and they assert essentially two arguments in support. First, they urge that because Kmart successfully asserted in its Critical Vendor Motion that payment of the Critical Vendor Claims was "vital" to its successful reorganization, Kmart's current attempt to secure avoidance and recovery of those payments constitutes a "clearly inconsistent" position. Movants state, *inter alia:* "Kmart alleged that it needed the benefits from its Critical Vendor

Motion to reorganize, a position it may not now renounce." (*See* Chicago Sun–Times Brief, at 23–24). According to Movants, Kmart now asserts an "opposite" position in order to gain an unfair advantage through "double recovery," having already received the benefit of the favorable credit terms provided by Movants (and Movants having foregone opportunities to favor other customers or exercise other rights as creditors). *Id.*

Second, Movants contend that Kmart is barred from asserting that recovery of the Critical Vendor Payments will "benefit" the estate (as required under § 550 of the Bankruptcy Code), because Kmart "admitted" in its Disclosure Statement that "waiver of avoidance actions was of greater benefit to the estate than any recovery that might be generated from the prosecution of the avoidance actions." ( *See, e.g.,* Washington Post Brief, at 7–8). With respect to this second argument, Movants also contend, more generally, that Kmart seeks "to either renounce or forget the representations made to creditors and this Court throughout the bankruptcy case." *Id.* at 9. According to Movants, any argument that recovery will benefit the estate is "clearly inconsistent with the position [Kmart] advanced in the Disclosure Statement, at the Confirmation Hearing and throughout its entire bankruptcy case, including at the hearing [on the Critical Vendor Motion]." *Id.* at 8–9.

**\*18** The Supreme Court had occasion to elaborate upon the purpose and contours of the judicial estoppel doctrine in *New Hampshire v. Maine,* 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). There, the State of New Hampshire brought an action against the State of Maine, seeking to establish a portion of the interstate boundary in the Piscataqua River region. In a prior dispute between the two states over lobster fishing rights in 1977, the Court had entered a consent judgment fixing the "lateral marine boundary" in that region, i.e., the boundary in the marine waters off the coast of the two states, from the "closing line of Portsmouth Harbor" seaward, in a southeasterly direction. *Id.* at

746. In the later litigation, New Hampshire sought to establish the *inland* river boundary, i.e., from the mouth of Portsmouth Harbor westward to the river's headwaters. *Id.* A 1740 decree by King George II had located the Piscataqua River boundary at the "Middle of the River." In the 1977 litigation, the parties agreed that this term meant the middle of the river's main channel of navigation, and the Court (declining to adopt a Special Master's report that rejected the parties' view in favor of the geographic middle) approved the states' proposed interpretation based on the facts and the law and directed entry of the consent decree. *Id.* at 747, 752. In the later litigation concerning the *inland* river boundary, the State of New Hampshire argued for a different meaning of "Middle of the River"—one which would place the boundary along the Maine shore, thereby giving New Hampshire sovereignty over the entire river and all of Portsmouth Harbor. *Id.* at 747–48.

The Court held that New Hampshire was barred by the doctrine of judicial estoppel from asserting the contrary position. Under that doctrine, a party who " 'assumes a certain position in a legal proceeding, and succeeds in maintaining that position, ... may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.' " *Id.* at 749 (quoting from *Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895)). The Court noted that while it had not had occasion previously to discuss the doctrine elaborately, other courts had uniformly recognized that

its purpose is "to protect the integrity of the judicial process," *Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 598 (C.A.6 1982), by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *United States v. McCaskey,* 9 F.3d 368, 378 (C.A.5 1993). See ... *Scarano v. Central R. Co.,* 203 F.2d 510, 513 (C.A.3 1953) (judicial estoppel prevents parties from "playing 'fast and loose with the

courts' " ... ). Because the rule is intended to prevent "improper use of judicial machinery," ... judicial estoppel "is an equitable doctrine invoked by a court at its discretion." ...

**\*19** *New Hampshire,* 532 U.S. at 749–50 (certain citations omitted). Although the circumstances under which the doctrine may be invoked are "probably not reducible to any general formulation of principle," several factors "typically inform the decision." *Id.* at 750 (internal quotation marks and citations omitted). First, the later position must be "clearly inconsistent" with the earlier position. *Id.* (citing, *inter alia, United States v. Hook,* 195 F.3d 299, 306 (7th Cir.1999)). Second, courts inquire whether the party to be estopped succeeded in persuading the first court to accept its earlier position, "so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled' " (thereby posing a threat to judicial integrity). *Id.* at 750–51 (quoting from *Edwards,* 690 F.2d at 599). The third factor is whether the party asserting an inconsistent position would gain an unfair advantage or impose an unfair detriment on the other party if not estopped. *Id.* at 751 (citations omitted).

Applying these factors, and guided by the purpose of the doctrine, the Court found that equity required barring New Hampshire's inconsistent position concerning the definition of "Middle of the River." The Court stated:

Having convinced this Court to accept one interpretation of "Middle of the River," and having benefited from that interpretation, New Hampshire now urges an inconsistent interpretation to gain an additional advantage at Maine's expense. Were we to accept New Hampshire's latest view, the "risk of inconsistent court determinations" ... would become a reality. We cannot interpret "Middle of the River" in the 1740 decree to mean two different things along the same boundary line without undermining the integrity of the judicial process.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Id.* at 755 (citations omitted).<sup>FN40</sup>

> FN40. Rejecting New Hampshire's suggestion that the parties had merely settled the prior litigation through the consent decree without the judicial endorsement necessary to give rise to judicial estoppel, the Court noted, *inter alia,* that it had made a determination in the prior suit that "[t]he consent decree 'reasonably invest[ed] imprecise terms with definitions that give effect to [the 1740] decree'...." *New Hampshire,* 532 U.S. at 752–53.

The Seventh Circuit, addressing a judicial estoppel contention pre-*New Hampshire* in *Ogden Martin Systems of Indianapolis, Inc. v. Whiting Corp.,* 179 F.3d 523 (7th Cir.1999), espoused a comparable view of the purpose and contours of the doctrine. There, Ogden had entered into a contract with Whiting whereby Whiting was to construct, deliver, and assemble two cranes at Ogden's premises. Several years after the installation, an accident at Ogden's plant revealed construction defects, resulting in substantial damage. Ogden, however, waited almost six years before filing a diversity suit in federal court, and Whiting moved to dismiss based on the Indiana UCC's four-year statute of limitations for transactions involving the sale of goods. In response, Ogden contended that the construction of the cranes constituted an improvement to real property (giving rise to a longer statute of limitations) and that Whiting should be judicially estopped in any event from claiming that the contract was a transaction in goods. In a prior unrelated suit, Whiting had argued that a plaintiff, injured by a Whiting crane installed by a third party more than twenty years earlier, was subject to the Illinois ten-year statute of repose for injuries arising from improvements to realty.

**\*20** In affirming the district court's dismissal of the suit, the Seventh Circuit first noted:

> Judicial estoppel serves "to protect the courts from being manipulated by chameleonic litigants

who seek to prevail, twice, on opposite theories." *Levinson v. United States,* 969 F.2d 260, 264 (7th Cir.1992); *see also Ladd v. ITT Corp.,* 148 F.3d 753, 756 (7th Cir.1998) ("[T]he purpose of the doctrine ... is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant.").

*Ogden,* 179 F.3d at 527; *see also Chevariat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1428 (7th Cir.1993) (while alternative pleading is permitted, party cannot "equivocate" after first suit goes to judgment; doctrine thus "raises the cost of lying" by forcing party to choose one position irrevocably). The Court then considered: 1) whether the later position was clearly inconsistent; 2) whether the facts at issue were the same in both cases; and 3) whether the party to be estopped had convinced the first court to adopt its position. *Id.*

Although the contracts in both cases predominantly involved transactions in goods, the Seventh Circuit found that Whiting's position was not clearly inconsistent with its position in the earlier suit, articulating the difference as follows:

> The simple fact that the present suit requires a determination of whether a contract between a buyer and a seller involved a transaction in goods and the [prior] court ... was required to make a legal determination regarding the nature of a crane twenty years after its installation (largely without reference to the contractual relationship ... ) provides a sufficient ground to distinguish the positions taken by Whiting in these cases.

*Id.* at 528. The Court went on to note that while judicial estoppel serves to prevent manipulative parties from prevailing twice on opposite theories, it should not be used to "hamstring a litigant" when his current position is not "clearly inconsistent with a prior position or when the facts of the two cases at issue are not identical." *Id; see also Ezekiel v. Michel,* 66 F.3d 894, 904–05 (7th Cir.1995) (government's prior successful contention that fully-trained, private physicians working under

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

contract with government agencies were independent contractors was not inconsistent with later contention that resident physician completing specialty medical training at VA hospital was federal employee); *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.,* 910 F.2d 1540, 1548–49 (7th Cir.1990) (prior successful contention that limousine company's dispatcher never *obtained* an ownership interest in company was consistent with later contention that dispatcher had been *promised* such an interest; however, prior successful contention that company had not authorized and did not *know* about dispatcher's competing side business was inconsistent with later claim in securities fraud suit based on failure of company's principals to *disclose* such business).

   **\*21** The Seventh Circuit made it clear in *In re Cassidy,* 892 F.2d 637, 641–42 (7th Cir.1990), that the doctrine of judicial estoppel applies to questions of law as well as fact. There, an attorney charged with filing fraudulent tax returns had urged the Court, in an earlier appeal from a Tax Court judgment, to decide whether his tax obligations had been discharged in bankruptcy. The Seventh Circuit acquiesced and addressed the issue, but ruled that the taxes were nondischargeable. *Id.* at 639. The attorney then filed a complaint in the bankruptcy court seeking a new ruling on dischargeability, contending that the Tax Court had been without jurisdiction to determine the scope of the discharge. *Id.* On appeal from a dismissal of that complaint, the Seventh Circuit held that while its prior ruling of nondischargeability had no preclusive effect,[FN41] the attorney was nonetheless barred from relitigating the issue on grounds of judicial estoppel. *Id.* at 640–41. Emphasizing that the doctrine is intended to prevent the perversion of the judicial process, the Court explained that the attorney would not be allowed to urge the Court to address the issue of dischargeability and then, after an adverse ruling, argue in a later appeal that it should not have been addressed. *Id.* at 641. The Court explained:

   FN41. The Court explained that since the

Tax Court was indeed without jurisdiction to determine dischargeability, the appellate court's discussion of it was necessarily dictum.

Cassidy's maneuverings were clearly intended to delay the inevitable day of reckoning, and in maneuvering he is trying to whipsaw this court. That is exactly the evil that the doctrine of judicial estoppel was meant to avoid. *Id.* The Court cautioned, however, that the doctrine is equitable in nature, and it should therefore not be used

where it would work an injustice, such as where the former position was the product of inadvertence or mistake, *Hamilton v. Zimmerman,* 37 Tenn. (5 Sneed) 39, 48 (1857); *Johnson Serv. Co. v. TransAmerica Ins. Co.,* 485 F.2d 164, 175 (5th Cir.1973) ("the rule looks toward cold manipulation and not an unthinking or confused blunder"); or where there is only an appearance of inconsistency between the two positions but both may be reconciled.

*Id.* at 642 (certain citations omitted). In *Chevariat,* 11 F.3d at 1428, for example, where the later position may have been based on new information, the Court stated: "At least where there is no issue of double recovery ..., if the court in the second suit is satisfied that the position adopted in the first suit was clearly wrong yet had been advanced in good faith ..., the court is not required to apply the doctrine of judicial estoppel."

   This latter point is nicely illustrated by the Seventh Circuit's post-*New Hampshire* decision in *Jarrard v. CDI Telecommunications, Inc.,* 408 F.3d 905 (7th Cir.2005). Though "likely" dictum, *see id.* at 914, the Court's discussion is pointedly relevant here. Jarrard had been injured while on the job, and although he was treated for some of his injuries, he did not receive certain additional treatments and therapy that his employer (and the employer's third party administrator) believed were unnecessary. *Id.* at 907–08. Ultimately, his employer applied to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2006 WL 952042 (Bkrtcy.N.D.Ill.)
**(Cite as: 2006 WL 952042 (Bkrtcy.N.D.Ill.))**

Indiana Worker's Compensation Board for an adjustment of claim, seeking to foreclose additional benefits, and Jarrard soon thereafter filed his own application with the Board. *Id.* at 908.

**\*22** Years later, Jarrard filed with the Board a third-party complaint sounding in tort, alleging, *inter alia,* that his employer and the third party administrator had acted in bad faith in seeking an adjustment of his claim before the Board. *Id.* The relevant Indiana statute in effect at the time the complaint was filed granted the Board exclusive jurisdiction over independent tort claims relating to the adjustment of claims process. However, the acts giving rise to Jarrard's third-party complaint had occurred prior to the statute's effective date. The defendants filed a motion to dismiss, contending that because the statute did not apply retroactively, the Board did not have jurisdiction over the third party complaint (i.e., Jarrard would have to file suit in state court). The Board agreed, dismissing the third party claim, and ultimately entered a final worker's compensation award. *Id.*

Several years later, Jarrard filed a diversity suit in federal court against the same defendants, alleging tortious acts in the adjustment of claims process. This time, the defendants moved to dismiss on the basis of a position diametrically opposed to the one they had taken before the Board, i.e., that only the *Board* has jurisdiction of such suits. *Id.* at 909. In the interim, two Indiana appellate courts had held that the statute granting the Board exclusive jurisdiction was indeed to be applied retroactively, *id.* at 909–10 (citing *Samm v. Great Dane Trailers,* 715 N.E.2d 420 (Ind.Ct.App.1999); *Borgman v. State Farm Ins. Co.,* 713 N.E.2d 851 (Ind.Ct.App.1999)); accordingly, the defendants contended that Jarrard could only bring his suit before the Board—and not as a diversity action in federal court. *Jarrard,* 408 F.3d at 909. The district court granted the motion to dismiss, and the Seventh Circuit affirmed.

In evaluating Jarrard's judicial estoppel contention, the Court discussed four factors that are relev-

ant to the inquiry, i.e., whether the later position is clearly inconsistent, whether the party prevailed on the earlier position, whether the party would gain an unfair advantage or impose an unfair detriment on the other party if not estopped, and whether the operative facts remain the same. *Id.* at 914–15. The Court noted that "considering these factors alone," Jarrard's judicial estoppel argument seemed fairly persuasive. *Id.* at 915. However, when viewed in light of "the strong antifraud purposes animating the doctrine," judicial estoppel was clearly inapplicable:

> ... [T]he position the defendants took before the Board—that the Board did not have jurisdiction because the statute was not retroactive—was a fair reading of the statute. The defendants were well within their rights to advocate this interpretation in good faith, and the Board agreed with that interpretation. The law changed in the interim.... As a consequence, the defendants argued a position in federal court opposite from the one taken before the Board. There is nothing fraudulent or otherwise untoward about this shift, even though the results ended up being favorable to the defendants in each instance.

> **\*23** ... [T]he defendants' change in position resulted from circumstances outside their control—namely, a change in controlling state law....

> In sum, the defendants' arguments, though facially inconsistent, were not an attempt to play "fast and loose" with the court, and thus the broad antifraud purpose of judicial estoppel does not come into play here.

> *Id.*

It is clear from the foregoing precedents that the doctrine of judicial estoppel has no application in the present case. In fact, Movants' contentions founder on the very first factor, i.e., the existence of a clear inconsistency between Kmart's current and former positions. Movants direct the court's attention to Kmart's statements in the Critical Vendor

Motion that payment of the Critical Vendor Claims was "vital" to its successful reorganization (*see* Chicago Sun–Times Brief, at 20–21); yet Movants point to nothing inconsistent—much less "clearly inconsistent"—in the current suit. Instead, they vaguely assert that Kmart seeks to "renounce" its earlier position. *Id.* at 24. Movants' obvious inability to articulate the purportedly inconsistent position with any greater specificity is understandable; Kmart has not alleged, or even intimated, that the Critical Vendor Payments were anything but essential to its reorganization effort. Indeed, Kmart would have no reason to make such an allegation in the present suit, because it would be wholly irrelevant to an action under § 549, which merely requires that the payments, whether vital or not, be unauthorized.

Movants, unable to pinpoint an inconsistent *position* in the present suit, resort to arguing that the recovery actions *themselves* are inconsistent with Kmart's prior assertions on the Critical Vendor Motion. (*See, e.g.,* Chicago Sun–Times Brief, at 22 ("Kmart's Recovery Actions Are Clearly Inconsistent ...")) They appear to contend that the inconsistency lies in the mere pursuit of the payments, regardless of the basis of the new action or any position taken therein.[FN42] There may be situations where the mere filing of an action may be barred by judicial estoppel, as in *Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d 208 (1st Cir.1987), where a party was estopped from prosecuting a cause of action that it had previously persuaded a court it would not pursue. This is not such a situation. Kmart, in obtaining entry of the Critical Vendor Order, did not assert that it would forego a later recovery action under § 549; indeed, the order had not even been *entered* yet, much less appealed and reversed. Moreover, there is no inconsistency between Kmart's prior assertions that the payments were necessary and that such an order was authorized by statute, and its current request—after reversal of that order—for recovery of the payments as not authorized by the court.[FN43]

FN42. *See also* January 31, 2005 Transcript, at 78 (where Movants' counsel states: "[T]he whole concept of the suit is give us that money back which we promised you, Your Honor, through our motion and through our witness was necessary. What can be more of a repudiation?" (emphasis added))

FN43. Movants also point to Kmart's use of the word "inequitable" in Count II of Kmart's complaint, which seeks recovery under § 105. As discussed above, that count is being dismissed for failure to state a claim upon which relief may be granted. The court nonetheless notes that Kmart's use of the term "inequitable" does not give rise to any inconsistency with Kmart's former position on the Critical Vendor Motion, and Movants again fail to describe the purported inconsistency. Kmart merely alleges that "[s]ince the [Critical Vendor Order] has been reversed, it would be contrary to the Bankruptcy Code and inequitable for Defendant to be permitted to retain the Payment...." The allegation is premised on the reversal of the order, an event transpiring after the Critical Vendor Hearing, and is in no way inconsistent with Kmart's prior assertions that the vendors were vital to its reorganization effort.

Accordingly, even though Kmart prevailed at the Critical Vendor Hearing,[FN44] the doctrine of judicial estoppel does not apply with respect to the assertions made and positions taken by Kmart in obtaining entry of the Critical Vendor Order.

FN44. While Kmart's "winning" the right to pay *out* of its coffers nearly $300 million as a result of the Critical Vendor Hearing might well seem like a Pyrrhic victory, it nonetheless constitutes "prevailing" for purposes of applying the judicial estoppel doctrine, even though the Critical Vendor Order was ultimately re-

versed. *See Carnegie v. Household International, Inc .,* 376 F.3d 656, 660 (7th Cir.2004); *see also Cassidy,* 892 F.2d at 641. Kmart did succeed in persuading this court that the continued support of the vendors was vital to its reorganization effort, and it received certain benefits as a result of the entry of the order, including continued provision of goods and services on favorable terms. (It is worth noting, however, that while this constitutes "winning twice," it is hardly a case—as urged by Movants—of *double* recovery. *See Chevariat,* 11 F.3d at 1427–28, suggesting that "double recovery" involves the situation where a party has not only "won" (which appears to be all that is ordinarily required in this regard for judicial estoppel purposes) but has already been fully compensated, and considering whether judicial estoppel should be applied in that context even where inconsistent positions result merely from carelessness or inadvertence.)

**\*24** As for Movants' additional contention that Kmart is barred from asserting "benefit" to the estate for purposes of recovery under § 550 of the Bankruptcy Code, they fail once again to set forth any "clear inconsistency." They rely largely on the following excerpt from Kmart's Disclosure Statement concerning the Plan's waiver of preference and other avoidance claims:

Although such waiver entails the release of the value of potential preference recoveries, the Debtors believe that the reorganized business will derive more value in the form of, among other things, go-forward credit support from trade vendors and service providers, than if the Debtors retained and prosecuted Avoidance Claims. This go-forward value inures to the benefit of all creditors under the Plan insofar as solid trade credit support will assist in improving cash flow and cementing business relationships which enhance the value of the reorganized enterprise as a whole.

The Debtors therefore believe that waiver of the Avoidance Claims is in the collective best interests of all stakeholders.

(Disclosure Statement, at 103). According to Movants, Kmart's current claim that recovery of the Critical Vendor Payments will benefit the estate is inconsistent with its previous representation that Kmart would benefit more from waiving "Avoidance Claims," thereby ensuring the "go-forward credit support" of its vendors.

While the above passage makes reference not only to the release of preference recoveries but also to the waiver of "Avoidance Claims" (defined to include actions under § 549), its primary thrust deals with preferences under § 547 of the Bankruptcy Code. Indeed, the passage follows and concludes a lengthy discussion, analysis, and quantification of the estate's potential preference recoveries. Movants nonetheless urge that Kmart "enumerated the cost-benefit analysis it undertook" in deciding that waiver would yield more value to the estate ( *see* Washington Post Brief, at 8); however, the financial analysis set forth in this section of the Disclosure Statement relates entirely to estimates of preference claims and defenses.

Moreover, Critical Vendor Payments were specifically addressed in another part of the Disclosure Statement. In the section describing the Critical Vendor Program, Kmart included a warning that it may pursue recovery of Critical Vendor Payments in the event that the Critical Vendor Order was reversed. (Disclosure Statement, at 23)

Finally, the court notes that Kmart's statements concerning "*more* value" from a waiver than from a prosecution of claims is consistent in any event with (and indeed acknowledges that) prosecution would provide some benefit to the estate. Under the circumstances, if there *is* an inconsistency lurking in Kmart's assertions of benefit, it is a far cry from the "clear inconsistency" contemplated by the doctrine of judicial estoppel.

More importantly, Kmart did not "prevail" with respect to the assertions made in its Disclosure Statement. It merely obtained entry of an order approving the Disclosure Statement "as containing adequate information within the meaning of Section 1125(a)" of the Bankruptcy Code. (*See* "Order Approving (I) Disclosure Statement; (II) Record Date, Voting Deadline and Procedures for Temporary Allowance of Certain Claims; (III) Procedures for Filing Objections to Plan; (IV) Solicitation Procedures for Confirmation; and (V) Hearing Date to Consider Confirmation of the Plan" (the "Order Approving Disclosure Statement"), at 2). In obtaining that order, Kmart simply persuaded the court that the Disclosure Statement met the informational standards of § 1125; the order did not constitute judicial endorsement of the many assertions made in the Disclosure Statement.

**\*25** Movants similarly contend that Kmart's current assertion of benefit is inconsistent with the position it advanced at the confirmation hearing,[FN45] and they cite to an exhibit to Kmart's Confirmation Brief (setting forth in chart form the objections to confirmation and Kmart's responses), which contains language nearly identical to the Disclosure Statement passage quoted above. For the reasons just stated with respect to that passage, there is no inconsistency between Kmart's current assertions of benefit and those made in the exhibit to its Confirmation Brief. And again, even *assuming* that Kmart had argued at the confirmation hearing that it would benefit more from waiving than from prosecuting Critical Vendor suits, it did not *prevail* with respect to any such assertion. Kmart never obtained judicial endorsement of a plan waiving the right to bring the Critical Vendor Actions; Kmart prevailed only *after* the plan was modified to retain that right.

> FN45. Movants also make a sweeping reference to positions advanced "throughout [Kmart's] entire bankruptcy case." They fail to provide, however, any specifics.

It is clear, then, that consideration of the fore-

going "factors" counsels against application of the judicial estoppel doctrine in this case. Moreover, when those factors are evaluated in light of the doctrine's purpose, its inapplicability becomes unmistakable. The "antifraud policy that animates the doctrine" ( *Carnegie,* 376 F.3d at 660) is not engaged here at all. Kmart has not tried to mislead the court, "... 'deliberately changing positions according to the exigencies of the moment.' " *New Hampshire,* 532 U.S. at 749. Its current position is based upon the reversal of the Critical Vendor Order—not upon "simple expediency." ( *Jarrard,* 408 F.3d at 915).

Movants attempt to surmount this obvious problem by casting a sinister spin on Kmart's institution of the Critical Vendor Actions. Notwithstanding that these suits were filed by reorganized Kmart, whose shareholders include creditors that received stock under Kmart's Plan, Movants allege that recovery is sought by Kmart's "new owners" (Washington Post Brief at 2, 3, and 5) "for their own benefit and that of one creditor," Capital Factors (Chicago Sun–Times Brief, at 1, 11). They assert that the new owners "have chosen to renege on the deals that Kmart made with its critical vendors in Kmart's darkest hour." (Chicago Sun–Times Brief, at 1). According to Movants, Kmart unscrupulously chose to sue rather than return to this court for an evidentiary hearing on the propriety of the Critical Vendor Payments.[FN46] Movants claim that the institution of these suits is nothing more than "opportunistic maneuvering" (Washington Post Brief, at 10), Kmart having filed them "[o]nly after receiving the benefits from the Critical Vendors' performance, including a successful reorganization ..." (Chicago Sun–Times Brief, at 23)

> FN46. Movants assert that Kmart could actually have sought another hearing in this court, after reversal of the Critical Vendor Order, to create a new evidentiary record in support of that order based on the "road map" purportedly laid out by Judge Easter-

brook under § 363. (January 31, 2005 Transcript, at 14, 17, 24, 78). Movants' assertion is patently meritless; the Seventh Circuit's decision that "the critical-vendors order cannot stand" concluded the Critical Vendor contested matter. *Kmart,* 359 F.3d at 874.

It was not, however, "[o]nly after receiving the benefits" from Critical Vendors that Kmart filed these suits; it was after the Critical Vendor Order was reversed over a year later. It is not as though Kmart "envisag[ed] a succession of suits in which a change in position would be advantageous," *Carnegie,* 376 F.3d at 660,—zealously seeking authority to make the Critical Vendor Payments while furtively planning to recoup them after appeal and reversal!

**\*26** Even in *Jarrard,* where the defendants' position actually *was* clearly inconsistent—indeed, the diametric opposite from that previously asserted—the Court concluded that because of the interim change in the law, there was "nothing fraudulent or otherwise untoward" about the defendants' shift. *Jarrard,* 408 F .3d at 915. The Court explained:

> There is more to the doctrine than the prevention of the sort of flip-flop of which Jarrard complains. Judicial estoppel is intended to protect the courts from the litigatory shenanigans that would result if parties could, without limitation or consequence, swap litigation positions like hats in successive cases based on simple expediency or self-benefit. Judicial estoppel shields the courts from being the instrument of such misconduct.

> *Id.*

There are no "litigatory shenanigans" here, Movants' unfounded innuendo to the contrary notwithstanding. Kmart has filed actions that were specifically retained in its plan of reorganization. While Movants regard such filing as "exploiting" the reversal of the Critical Vendor Order

(Washington Post Brief, at 9), Kmart regards it as implementing that reversal. (Kmart Brief, at 17, 21). These are, after all, the very recovery actions that the Seventh Circuit discussed in rejecting the Critical Vendors' "mootness" contentions on appeal. *Kmart,* 359 F.3d at 869–70. Under the circumstances, the filing of such suits can hardly be considered an " 'improper use of judicial machinery.' " *New Hampshire,* 532 U.S. at 749–50 (internal citations omitted).

Again, judicial estoppel is intended to prevent the perversion of the judicial process. There is no perversion here. Indeed, application of the doctrine under the circumstances of this case would itself amount to such a perversion.

### The Adequacy of the Retention Provision and of the Hearing Under Bankruptcy Rule 3019.

Movants contend that Kmart did not effectively retain the Avoidance Claims described in the Plan Modification and that Movants are not bound by that modification in any event, but only by the "express waiver" purportedly set forth in the Disclosure Statement and First Amended Plan.

Putting aside the fact that the First Amended Plan was never confirmed, there simply was no express waiver of the claims asserted in the Critical Vendor Actions. As indicated above, the Disclosure Statement advised that Kmart planned to waive its "Avoidance Claims" with certain exceptions. In that section concerning the waiver of Avoidance Claims and in justification therefor, the Debtors included a lengthy description of the analysis of potential preference recoveries under § 547 of the Bankruptcy Code. Movants rely largely on that section of the Disclosure Statement, notwithstanding its focus on preferences, and ignore the section specifically addressing the Critical Vendor program, which was contained in an entirely different part of the Disclosure Statement. There, Kmart warned that if the Critical Vendor Order was reversed on appeal, the estates could hold claims for recovery of the Critical Vendor Payments. Under the circumstances, it can hardly be said that there was any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

waiver here—whether express or implicit—of the right to file the Critical Vendor Actions. *See, e.g., In re Midway Airlines, Inc.,* 383 F.3d 663, 671 (7th Cir.2004) ("waiver is an intentional relinquishment of a known right").

**\*27** As for Movants' contentions concerning the Plan Modification, the court first notes that § 1127 of the Bankruptcy Code, which addresses modifications to a Chapter 11 plan, provides that the proponent of a plan may modify it at any time before confirmation. 11 U.S.C. § 1127(a). If the modification is proposed after voting has been completed, then the acceptances or rejections will be deemed to apply to the plan as modified, unless the creditor changes his vote within a time fixed by the court. 11 U.S.C. § 1127(d). If there is a resolicitation of votes, Bankruptcy Rule 2002 provides that creditors must be given twenty days' notice of the voting deadline. Fed.R.Bankr.P.2002(a)(5).

Resolicitation, however, is not always required. Bankruptcy Rule 3019, which implements § 1127, provides as follows:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

As acknowledged by Movants, this rule provides a "safe harbor" exception to resolicitation if the requirements set forth therein are satisfied. ( *See* Chicago Sun–Times Brief, at 29). In other words, if the court finds, after hearing on proper and adequate notice, that the modification does not adversely change the treatment of claims, then reso-

licitation is not required.

This court so found at the confirmation hearing, in connection with its ruling on the emergency motions and objections filed by Capital Factors and Dean Foods. As indicated above, Capital, in seeking an adjournment of the confirmation hearing, had contended not only that the district court's "remand" required the immediate entry of orders directing return of the Critical Vendor Payments but also that a resolicitation of votes was required. According to Capital, the additional cash that would be recovered in the Critical Vendor Actions required a resolicitation of Class 5 creditors to allow them to reassess the provisions calling for distributions in common stock. (Emergency Motion of Capital Factors, at 2). Dean Foods likewise sought an adjournment, contending, *inter alia,* that the Plan Modification adversely changed the treatment of the Critical Vendor Claims and that the court therefore "should not deem the Plan as accepted by all creditors who previously accepted the Plan until after notice and hearing." (Emergency Motion of Dean Foods, at 4). Dean further contended that sufficient notice of any adverse change hearing under Rule 3019 had not been given. (*See* April 14, 2003 Transcript, at 168–69).

**\*28** Again, the court ruled that the notice of hearing already given was adequate for purposes of Bankruptcy Rule 3019 and that the Critical Vendors need not be "designated" under that rule for purposes of any additional notice. The court further ruled that the Plan Modification did not adversely change the treatment of the claims of creditors under the plan. (April 14, 2003 Transcript, at 220–22).

Movants here attempt to resurrect and re-argue the adverse change in treatment and notice issues, claiming they are not bound by the court's prior ruling because they did not receive notice of the hearing on change in treatment required by Rule 3019. As stated in one of the briefs:

> ... Kmart failed to bring the proposed modification within the safe-harbor afforded by Bank-

ruptcy Rule 3019 because it failed to provide Defendants and other affected creditors with the notice and an opportunity to be heard required by the Rule on whether the modification adversely changed the treatment of Defendants' and other creditors' claims.

(Chicago Sun–Times Brief, at 29).

Rule 3019, however, only requires notice to the trustee, the committees, and any entities designated by the court. Movants are clearly not the trustee (i.e., Kmart, the debtor in possession) FN47 or any committee appointed under the Code, and since the court did not designate any additional entities for purposes of notice, there was no violation of the rule.

FN47. *See* 11 U.S.C. § 1107(a).

Compliance with the notice requirements of the rule, however, does not necessarily dispose of due process issues. *See, e.g., In re Walker,* 149 B.R. 511, 514 (Bkrtcy.N.D.Ill.1992). In this regard, the court first notes that the hearing on adverse change in treatment took place at the hearing on confirmation of the Plan. None of the Movants contend that they failed to receive notice of the confirmation hearing. Indeed, the affidavits and certificates of service filed in this case indicate that Movants were so notified. Courts have recognized that modifications may be proposed a very short time prior to—and in appropriate circumstances even at—the confirmation hearing and that the hearing on adverse change in treatment under Rule 3019 may be combined with the hearing on confirmation of the plan. *See, e.g., In re Sweetwater,* 57 B.R. 354, 358 (D.Utah 1985); *see also In re Eagle–Picher Industries, Inc.,* 203 B.R. 256, 278 (S.D.Ohio 1996); *In re Dow Corning Corp.,* 237 B.R. 374, 379 (Bankr.E.D.Mich.1999).

The court also notes that the purpose of Rule 3019 is to facilitate post-voting modifications while protecting a creditor's right to change his vote where a modification adversely changes the treat-

ment of his claim. Here, however, the Critical Vendor Claims, having been paid, could not have been voted in the first instance. Indeed, certain of the Movants openly acknowledge this in their briefs. The Ogden defendants, for example, urge that they "did ... [not] get to vote on confirmation of the plan ... because [their] prepetition claims were satisfied with Kmart's Critical Vendor Payments." (Brief of the Ogden Defendants, at 15). FN48

> FN48. *See also* Brief for Appellant Knight–Ridder, Inc., filed in the appeal before the Seventh Circuit, at 16 ("Upon the payment of their prepetition claims, the Majors were no longer creditors entitiled ... to vote on the plan of reorganization"). Knight–Ridder's request for relief was joined by, *inter alia,* Belo Corporation (one of the Movants herein) in Knight–Ridder's brief. *Id.* at 2–3.

**\*29** However, even if Movants had rights as creditors with respect to their Critical Vendor Claims, there was no adverse change in the treatment of such claims and no due process violation in any event. Any conceivable claim they might have held with respect to amounts paid pursuant to the Critical Vendor Order FN49 would be in Class 5, i.e., the Trade Vendor/Lease Rejection Claims. Under the First Amended Plan, as transmitted with the Disclosure Statement, Class 5 claimants (including any partially paid Critical Vendors who may have voted the unpaid portion of their prepetition claims) would receive, as discussed above, their pro rata shares of stock and of Trust Recoveries. Under the final confirmed Plan, they would likewise receive their pro rata shares of stock and of Trust Recoveries. And looking beyond the direct treatment of their claims to any indirect consequences of the Plan Modification, the only differences would be the additional cash obtained by reorganized Kmart upon recovery of the Critical Vendor Payments and the possible creation of § 502(h) claims arising therefrom. While the § 502(h) claims would tend to

reduce, to a small extent, the pro rata portion of shares received by each Class 5 creditor, the additional cash recoveries giving rise to such claims would tend to enhance the value of the reorganized enterprise.

> FN49. The only conceivable claim with respect to amounts paid pursuant to the Critical Vendor Order would be a claim under § 502(h) of the Bankruptcy Code. Even assuming such a claim exists prior to recovery by the estate under § 550, it would be at best contingent and could not be voted unless actually filed and allowed.

Movants, recognizing the weakness of their position, attempt to manufacture an adverse change in treatment by characterizing the payment of their Critical Vendor Claims as founded on provisions in the plan. They contend that they enjoyed " 'paid in full in cash' treatment" of their Critical Vendor Claims by virtue of the waiver of Avoidance Claims in the First Amended Plan. Based on that faulty premise, they then argue that the Plan Modification altered their "treatment" by "changing $300 million in cash payments" to at most Class 5 claims "paid only in part, and in stock." (Chicago Sun–Times Brief, at 26, 30). FN50

> FN50. Dean Foods made a similar argument in its emergency motion to adjourn the confirmation hearing. Dean contended that the Plan Modification "adversely change[d] the treatment of the [Critical Vendor Claims] from what was, in effect, administrative expense treatment, to what could be general unsecured treatment." (Emergency Motion of Dean Foods, at 4).

This purported change in 'plan treatment' (i.e., "cash in full a year earlier vs. a percentage distribution of stock at some indeterminate time in the future," *id.*) is, of course, a fiction, and Movants created that fiction to serve as the foundation for their due process argument. They are well aware, however, that the Critical Vendor Claims, having

been paid "at the inception of the case pursuant to the Critical Vendor Order," *id.,* were not "treated" in provisions of the plan. Movants find it necessary to manufacture an adverse change in treatment of their claims because in reality, the Plan Modification affected their interests as defendants, not as creditors. *See* discussion, *infra,* at 55; *see also* 9 Collier on Bankruptcy ¶ 2002.03 (15th ed. rev.2005) (although all creditors are entitled to the prescribed notices of hearings on disclosure statements and plans, "other parties in interest, such as defendants in lawsuits brought by the debtor, who have not requested notice, may be omitted").

**\*30** Nonetheless, Movants received notice of the hearing on confirmation and of Kmart's right to modify the plan at any time prior to or as a result of that hearing. *See* 11 U.S.C. § 1127(a); *see also* Order Approving Disclosure Statement, Exhibit B, ¶ 1. The Disclosure Statement upon which Movants claim they relied explicitly warned that in the event of reversal, Kmart could hold claims for recovery of the Critical Vendor Payments. That risk materialized on the eve of confirmation, resulting in the retention of these actions in the Plan Modification.

Accordingly, to the extent that these issues even require disposition, the court once again rejects Movants' due process contentions as well as their assertion that the Plan Modification "adversely change[d] the treatment" of the Critical Vendor Claims within the purview of Bankruptcy Rule 3019. The court further rejects, for essentially the same reasons, any separate due process contention concerning the adequacy of notice to Movants—whether as creditors or as parties in interest—of the Plan Modification itself or the opportunity to object thereto.

Movants further contend, however, that these actions are barred under principles of res judicata, because Kmart failed in any event to effectively retain them in its Plan. They contend, *inter alia,* that the reservation clause "fails to meet the notice and disclosure functions of Section 1123(b)(3) " (Washington Post Brief, at 12), which authorizes

the inclusion in Chapter 11 plans of provisions for the retention and enforcement of claims and interests belonging to the debtor or the estate. According to Movants, they "had no notice of Kmart's intention to preserve [these adversary proceedings] in the Plan." (*Id.*) They attempt to distinguish their situation from that of the defendants in *Kmart Corp. v. Intercraft Co.,* 310 B.R. 107 (Bankr.N.D.Ill.2004), where this court held that Kmart had effectively retained the right to bring preference actions on or prior to the Plan's Effective Date. Movants note that the exception to the waiver of Avoidance Claims relied on in that case (i.e., for actions pending on the Effective Date of the Plan) was "set forth in the Plan and Disclosure Statement transmitted to creditors prior to the Confirmation Hearing ...," whereas the exception relied upon here was only included in the subsequent Plan Modification. (Washington Post Brief, at 11). The court first notes that to the extent § 1123(b)(3) serves a disclosure and notice function, that notice "is directed towards the estate's creditors, not the potential defendants on the reserved claims." *Intercraft,* 310 B.R. at 120 (citing *In re Goodman Bros. Steel Drum Co., Inc.,* 247 B.R. 604, 608 (Bankr.E.D.N.Y.2000)). The court has explained the nature and purpose of that disclosure by quoting from *Harstad v. First American Bank,* 39 F.3d 898 (8th Cir.1994), as follows:

> Creditors have the right to know of any potential causes of action that might enlarge the estate—and that could be used to increase payment to the creditors. Even if, as the [debtors] claim, they gave notice of such claims by indicating in their disclosure that the availability of such claims was being investigated, the creditors are entitled to know if the debtor intends to pursue the preferences in post-confirmation actions. Compliance with § 1123(b)(3) gives notice of that intent. Only then are creditors in a position to seek a share of any such recoveries, contingent though they may be, and to have the mechanics of the preference-sharing spelled out in the plan. Creditors are in no position to do so if they are

not on notice that the debtor retains the power to pursue recovery.

**\*31** *Intercraft,* 310 B.R. at 120 (quoting from *Harstad,* 39 F.3d at 902).

But even putting aside the fact that the notice and disclosure function of § 1123(b)(3) is directed at creditors, any notice and disclosure required with respect to the Movants (including any Movant holding a prepetition balance), was satisfied in the circumstances of this case. As discussed above, the Disclosure Statement upon which Movants claim they relied explicitly warned that in the event of reversal, Kmart could hold claims for recovery of the Critical Vendor Payments. When that risk materialized on the eve of confirmation, the plan was modified to provide for the retention of such recovery actions. Again, Movants were on notice of the confirmation hearing and of Kmart's right to modify the plan at any time prior to or as a result of that hearing. In these circumstances, Movants cannot contend that they "had no notice of Kmart's intention to preserve [these adversary proceedings] in the Plan" or that they "had no reason to believe that Kmart would change its position at the Confirmation Hearing." (Washington Post Brief, at 12). Accordingly, there is no res judicata bar to these suits based on a failure of any notice and disclosure required by § 1123(b)(3).

Movants press two additional bases for the application of res judicata. They contend first that the exception of these § 549 actions from the waiver of Avoidance Claims in Section 7.14 of the Plan did not result in an effective reservation of claims. Movants rely on the fact that Section 7.14 begins by reserving "Retained Actions," which is defined in the Plan to exclude Avoidance Claims. They then argue that even though the section goes on to waive Avoidance Claims and to expressly except from that waiver these § 549 actions, the reservation was ineffective because the definition of "Retained Actions" excluded Avoidance Claims in the first instance. (*See* Washington Post Brief, at 10–11).

Not Reported in B.R., 2006 WL 952042 (Bkrtcy.N.D.Ill.)
**(Cite as: 2006 WL 952042 (Bkrtcy.N.D.Ill.))**

An identical argument was made in *Intercraft,* though with respect to a different exception from the Avoidance Claims waiver, i .e., the exception for actions pending on the Effective Date of the Plan. This court rejected that argument as "patently unreasonable," analogizing the Plan to a contract and finding the parties' intent to reserve the claims to be unmistakable. *Intercraft,* 310 B.R. at 125. For the reasons set forth in *Intercraft,* the court rejects the same contention made here.

Movants' final basis for a res judicata bar—that the language of the reservation clause itself is vague and ambiguous—merits little discussion. As indicated above, the Plan Modification added an exception to the waiver of Avoidance Claims for "Avoidance Actions under Section 549 of the Bankruptcy Code with respect to the matters subject to that certain case captioned *Capital Factors, Inc. v. Kmart Corporation,* Case No. 02 C 1264 (N.D.Ill.2002)...." According to Movants, this language "fails to satisfy the requirements of *D & K Properties* " (Chicago Sun–Times Brief, at 33), a Seventh Circuit decision which held that a retention provision must, *inter alia,* specifically identify the cause of action to be retained. *See D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York,* 112 F.3d 257, 261 (7th Cir.1997). In *D & K,* the clause relied on as a retention clause was actually a provision identifying the party responsible for enforcing the debtor's claims after confirmation. It provided simply that the disbursing agent "shall enforce all causes of action existing in favor of the Debtor and the Debtor in Possession." *Id.* at 259. The Seventh Circuit, while opining that this clause was not effective to reserve the claim in question, did not conclude precisely what level of specificity would be required. In a later decision construing § 1123(b)(3), the Court made it clear that plan provisions identifying causes of action by type or category can effectively avoid the res judicata bar. *See Matter of P.A. Bergner & Co.,* 140 F.3d 1111, 1117 (7th Cir.1998), *cert. denied,* 525 U.S. 964, 119 S.Ct. 409, 142 L.Ed.2d 332 (1998).

**\*32** The above-quoted language specifying the category of claims reserved here is clear, and Movants' assertion that it is "unintelligible, vague, and insufficiently specific" under *D & K* is disingenuous at best. (Chicago Sun–Times Brief, at 33). Movants pretend to be confused as to whether the language refers only to Critical Vendors who were actual parties to the appeal. The language, however, refers to avoidance actions relating to the "matters" subject to the Capital Factors appeal. Those "matters" concerned the validity *vel non* of the Critical Vendor Order itself, and these avoidance actions against Movants—premised as they are on the reversal of that order—clearly relate to, and indeed result from, the matters that were on appeal.

In short, there is no merit to any of the res judicata contentions advanced by Movants.

### The Vertis Amendment and Other Arguments Made in the Motions to Dismiss.

In the Vertis Amendment, Movants contend that Kmart should not be allowed to continue prosecution of these actions because it can no longer satisfy—in the shares designated for distribution to Class 5 under the Plan—any § 502(h) claims that may arise in the event that Kmart prevails. According to Movants, the only consideration which can be distributed in satisfaction of allowed Class 5 claims is New Holding Company Common Stock, and since that stock no longer exists, these actions must be dismissed regardless of the merits of Kmart's claims under §§ 549 and 550 of the Bankruptcy Code.

Central to Movants' argument is the assertion that the New Holding Company Common Stock no longer exists. Movants assert that the stock has been canceled and/or converted into shares of Sears Holding Corporation common stock. (Vertis Reply, at 3 ("cancel[ed] and/or convert[ed], and at 4 ("cancel[ed]"); *see also* Vertis Amendment, at 5–6 ("converted"). In support of its assertion that the stock no longer exists, Movants cite, *inter alia,* to the Form 8–K filed by Sears on November 18, 2004.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Kmart, on the other hand, asserts that the shares initially reserved for Class 5 creditors were placed into a segregated account at Equiserve on the Effective Date of the Plan and at the time of the merger, such shares "remain[ed] issued and outstanding, although now held as shares in 'Sears Holdings Corporation.' " (Kmart Response to Vertis Amendment, at 4–5). According to Kmart, Kmart Holding Corporation was the "dominant party, or essentially the survivor" in the merger. In support, Kmart cites excerpts from a proxy statement sent to Kmart and Sears shareholders. Kmart adds that although it was the dominant party to the merger, the new holding company "adopted the more recognized and regarded 'Sears' name." (*Id.* at 4).

Kmart thus disputes certain of the facts asserted in the Vertis Amendment. Moreover, it urges that the Amendment is more in the nature of a defective motion for summary judgment on an affirmative defense, rather than a motion to dismiss. (*See* Kmart Response to Vertis Amendment, at 5). Vertis responds that the Amendment is brought under Rule 12(b)(6) and cites a Second Circuit decision for the proposition that an affirmative defense is appropriate for such a motion "when all relevant facts necessary to decide the affirmative defense are found in the record of the proceedings." (Vertis Reply, at 1, n. 2; citing *Day v. Moscow,* 955 F.2d 807, 811 (2d Cir.1992), *cert. denied,* 506 U.S. 821, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992) (involving dismissal on res judicata grounds)). Our own Court of Appeals, in reversing the dismissal of an antitrust complaint based on a statute of limitations defense, clearly expressed the standard in our circuit:

**\*33** The district court found, not a defect in the *claim,* but the presence of an affirmative defense. See Fed.R.Civ.P. 8(c). Orders under Rule 12(b)(6) are not appropriate responses to the invocation of defenses, for plaintiffs need not anticipate and attempt to plead around all potential defenses. Complaints need not contain *any* information about defenses and may not be dis-

missed for that omission....

Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6).

*Xechem, Inc. v. Bristol–Myers Squibb Co.,* 372 F.3d 899, 901 (7th Cir.2004) (citations omitted; emphasis in original).

Under any standard, the Vertis Amendment does not warrant dismissal of Kmart's complaints. In ruling on a motion to dismiss, a court reviews the complaint, exhibits attached to the complaint, and supporting briefs. *See, e.g., Thompson v. Illinois Dept. of Professional Regulation,* 300 F.3d 750, 753 (7th Cir.2002). While a court may also take judicial notice of matters of public record in appropriate circumstances without converting the motion to one for summary judgment, *Anderson v. Simon,* 217 F.3d 472, 474–75 (7th Cir.2000), and may even consider documents attached to the motion if they are referenced in the complaint and central to the plaintiff's claim, *Venture Associates Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431 (7th Cir.1993), the factual matters raised in the Vertis Amendment require more. The only document attached to the Vertis Amendment is a news release, and it is not referenced in Kmart's complaint or central to the claims made therein. The same is true of the documents attached to Kmart's response, and any attempt to fill the gaps in this case through judicial notice would be wholly inappropriate.

The court notes, finally, that while the merits of the Vertis Amendment are doubtful (based on basic principles of contract construction) even without regard to any factual dispute, the court is not inclined to dispose of the issues raised therein in the current procedural posture of this case.

As for the remaining arguments made by Movants in their briefs, little needs to be said. Cer-

tain of the contentions, including detrimental reliance, equitable estoppel, and recoupment, are fact-intensive defenses inappropriate for disposition at this time. Movants also assert that these actions will benefit only reorganized Kmart, and not the "estate" as required by § 550, and that Kmart is without standing to pursue the actions because it is "no longer a debtor in possession" with the "rights, powers, functions or duties of a trustee." (Action Performance Brief, at 7). As this court held in *Intercraft,* however, the indirect benefit that any recovery will provide to Kmart's former unsecured creditors, now shareholders, is sufficient to satisfy the benefit requirement of § 550. *See Intercraft,* 310 B.R. at 126–27. Moreover, Kmart has standing, notwithstanding its lack of debtor in possession status, by virtue of the Plan provisions authorizing the retention and enforcement of these actions by the reorganized entity or any successor post-confirmation. *See* § 1123(b)(3); *see also In re Texas General Petroleum Corp.,* 52 F.3d 1330, 1334–35 (5th Cir.1995); *In re Sweetwater,* 884 F.2d 1323, 1326–27 (10th Cir.1989).

**\*34** Certain Movants contend that the payments they received are not recoverable because Kmart, through the Critical Vendor Motion, the Critical Vendor Order, and the payments made pursuant thereto, effected an assumption of the prepetition contracts with such Movants and a cure of defaults thereunder. Not only, however, does assumption of a contract require court approval pursuant to § 365 of the Bankruptcy Code, the Critical Vendor Order in this case specifically provided as follows:

> Nothing contained in this order shall be deemed to constitute an assumption or rejection of any executory contract or agreement between the Debtors and a Critical Vendor or to require the Debtors to make any of the payments authorized herein.

(Critical Vendor Order, ¶ 8).

Finally, certain of the Movants contend that these actions are "equitably moot" or that the Crit-

ical Vendor Payments are shielded from recovery because they were validly made pursuant to §§ 363(b) or 364. The court rejects these contentions in accordance with the principles espoused and disposition made by the Seventh Circuit in *In re Kmart,* 359 F.3d 866 (7th Cir.2004). Any and all remaining arguments are meritless and/or inappropriate for disposition on these motions.

### CONCLUSION

For all of the reasons set forth above, the court denies the General Defense Motions (and joinders), including the Vertis Amendment, filed in the Critical Vendor Actions listed in the caption of this memorandum opinion, except to the extent that they seek dismissal of the claim made by Kmart in Count II for avoidance and recovery pursuant to § 105 of the Bankruptcy Code. As to Count II, the court grants said motions and joinders. This opinion constitutes the court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052. A separate order will be entered pursuant to Bankruptcy Rule 9021.

Bkrtcy.N.D.Ill.,2006.
In re Kmart Corp.
Not Reported in B.R., 2006 WL 952042 (Bkrtcy.N.D.Ill.)

END OF DOCUMENT

**In re Lapworth**

**No. 97-34529, 1998 WL 767456 (Bankr. E.D. Pa. Nov. 3, 1998)**

Not Reported in B.R., 1998 WL 767456 (Bkrtcy.E.D.Pa.)
**(Cite as: 1998 WL 767456 (Bkrtcy.E.D.Pa.))**



Only the Westlaw citation is currently available.

United States Bankruptcy Court, E.D.
Pennsylvania.
In re George R. LAPWORTH, Debtor.

No. 97–34529DWS.
Nov. 2, 1998.
As Amended Nov. 3, 1998.

Gregory R. Noonan, Esquire, King of Prussia, Counsel for Debtor.

Angel Luis Franqui, Esquire, Philadelphia, Counsel for L. Cantor, Trustee.

Dave P. Adams, Esquire, Office of the U.S. Trustee, Philadelphia, United States Trustee.

## MEMORANDUM OPINION

SIGMUND, Bankruptcy J.

**\*1** Before the Court is the request of the debtor George Lapworth for confirmation of his Fourth Amended Plan of Reorganization (the "Plan") and the objection of L. Cantor, Trustee, a secured creditor ("Creditor") thereto. Creditor raises thirteen separate objections to the Plan, including that it is neither feasible nor fair and equitable. However, in the course of receiving the evidence on confirmation, I noted an impediment to confirmation not raised by either Creditor or the United States trustee. Debtor has been making post-petition interest payments to an unsecured creditor in violation of the Bankruptcy Code and without disclosing the existence of such payments in his Disclosure Statement or Plan. Because I cannot find that the proponent of the Plan complied with the applicable provisions of the Code, 11 U.S.C. § 1129(a)(2), and that the Plan provides "the same treatment for each claim or interest of a particular class," 11 U.S.C. § 1123(a)(4), or that the Plan is feasible, 11 U.S.C. § 1129(a)(11), and fair and equitable, § 1129(b)(1), confirmation is denied.

## BACKGROUND

On January 20, 1997, George Lapworth ("Debtor") filed this Chapter 11 case. As he had received a discharge of his debts within six years in a prior Chapter 7 case, this reorganization was intended to deal with a number of parcels of real estate he owns and the liens on those properties. That is presumably the reason that he has only two unsecured creditors: the Pennsylvania Higher Education Assistance Agency ("PHEAA") and Robert Worton ("Worton"), both of whom made loans to the Debtor.[FN1]

During this bankruptcy, Debtor has been successful in selling one property to reduce some of the secured debt and reaching agreements with all but one of his secured creditors about the treatment of their claims. These agreements are memorialized in the Plan and for the most part, contemplate that Debtor will sell all his properties but one in which the Debtor's wife operates her child care business. In that connection, he sought and I approved listing agreements with brokers.

Debtor's problems stem from his relationship with Creditor. While the Creditor is nominally Linda Cantor, Trustee, in actuality the obligation is to a group of individuals connected by blood, marriage and/or partnership to David Cantor, the prime tenant in a property owned by Debtor at 8136 Ardleigh Street, Philadelphia (the "Ardleigh Property"). Creditor purchased the mortgage loan on the Property on September 12, 1996 and shortly thereafter made demand on the tenants to pay rent directly to it. In an adversary proceeding filed by Debtor,[FN2] he is seeking to reduce Creditor's secured claim by the rents that were due to be paid[FN3] from the time of the Creditor's execution. Under the Plan, Debtor proposes to pay Creditor the monthly instalment amount set forth in the mortgage note, namely $987.05, plus an amortization of arrearages, if any, over sixty months.[FN4] Creditor objects to its treatment under the Plan contending that its claim is understated and exceeds the value

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 1998 WL 767456 (Bkrtcy.E.D.Pa.)
**(Cite as: 1998 WL 767456 (Bkrtcy.E.D.Pa.))**

of its interest in the Ardleigh property which secures it when real estate taxes are taken into consideration. Real estate taxes are approximately $23,000. The only evidence of value of the Ardleigh property was the Debtor's testimony that he had received an offer of $140,000 to purchase it from David Carroll which was not consummated. Exhibit L–17.

**\*2** The Plan proposes to pay the two unsecured creditors 100% of their allowed claims in quarterly payments of $1,298.46 over eight years. The claims in this class aggregate $26,000. While the Plan is silent as to any interest being paid, it would appear from the amortization schedule that an interest component is included in the payment to this class. According to Worton's ballot accepting the Plan, the unpaid principal of his loan is $13,000. As noted above, Debtor has been making monthly interest payments of $162.50 to Worton during his Chapter 11 case.FN5 Assuming that such payments were made each month, Worton received $3,250 ($162.50 x 20 months) to date during this bankruptcy case. These payments were not disclosed in the Disclosure Statement although an examination of the operating statements attached as an exhibit would have revealed same. PHEAA neither voted for or against the Plan, and therefore the unsecured class has accepted the Plan.

The Plan also provides for the payment of the various "secured" creditors although on closer examination, it appears that at least one of these creditors is actually undersecured and possibly unsecured. Stewart Title Guaranty Co. ("Stewart"), the Class 6 claimant, has a claim of $65,000 which is represented to be non-dischargeable in Debtor's Chapter 7 case. While Stewart's mortgaged asset was sold during Debtor's prior bankruptcy case, it obtained a judgment which is a lien on the Ardleigh and two Johnson Street properties junior to the mortgagees and taxing authorities. During his testimony, Debtor acknowledged that there is no equity in the Johnson Street properties above the mortgages thereon. Thus, Stewart has no secured in-

terest in the Johnson Street properties. Taking Debtor's value of $140,000 for the Ardleigh Property, it is unlikely that there is much, if any equity after the tax liens of $20,000 and the mortgages of Creditor and CoreStates Bank, the second mortgagee, to which its judgment lien could attach.FN6 Nonetheless, Stewart is separately classified as secured in the full amount of its claim to receive payments of $600 per month based on a twenty year amortization at 8% with a five year balloon. I cannot discern from the Plan or Disclosure Statement whether Stewart's 8% interest on its unsecured claim is a more favorable treatment than the unstated amount of interest provided by the payments scheduled for the unsecured claims classified in Class 9. Not surprisingly, Stewart has consented to the Plan. Since the Plan and Disclosure Statement do not disclose Stewart's unsecured claim, the other unsecured creditors could not challenge the possibly more favorable treatment accorded to Stewart.

DISCUSSION

In order to be confirmed, a plan must comply with the requirements of § 1129(a). 11 U.S.C. § 1129(a). *See In re Adkisson Village Apartments of Bradley County, Ltd.,* 133 B.R. 923, 925 (Bankr.S.D.Ohio 1991) ("The provisions of § 1129(a) of the Bankruptcy Code are mandatory and the Court must find that all have been met prior to confirming a proposed plan of reorganization."). Thus, even absent an objection, the plan proponent has the burden of showing, and the bankruptcy court has the duty to ensure, that the requirements of § 1129(a) are met. *In re Union Meeting Partners,* 165 B.R. 553, 574 (Bankr.E.D.Pa.1994), *aff'd,* 52 F.3d 317 (3d Cir.1995); *In re Lakeside Global II. Ltd.,* 116 B.R. 499, 505 (Bankr.S.D.Tex.1989); *In re Texaco Inc.,* 84 B.R. 889, 891 (Bankr.S.D.N.Y.1988). *See also Big Shanty Land Corporation v. Comer Properties, Inc.,* 61 B.R. 272, 280 (N.D.Ga.1985) (regardless of whether objection to confirmation was filed, bankruptcy court had independent duty to ensure that plan was submitted in good faith in accordance with § 1129(a)(3)); *In re Toy & Sports Warehouse, Inc.,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 1998 WL 767456 (Bkrtcy.E.D.Pa.)
**(Cite as: 1998 WL 767456 (Bkrtcy.E.D.Pa.))**

37 B.R. 141, 149 (Bankr.S.D.N.Y.1984) (even if no objections are filed, plan must comply with all of the requirements of Chapter 11 as stated in Code § 1129(a)(1).").

**\*3** In this case, Creditor has filed multiple objections to the Plan. However, it did not raise, and could not because it was unaware of, the violation of § 1129(a) I will first address. One of the requirements of § 1129(a) is that the proponent of the plan must comply "with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). Debtor did not.

Pursuant to § 502(b)(2), unsecured creditors are generally not entitled to receive post-petition interest on their claims. *See* 11 U.S.C. § 502(b)(2). *See also In re Carter,* 220 B.R. 411, 414 (Bankr.D.N.M.1998) ("Generally, where a debtor is insolvent, unsecured creditors in a Chapter 11 proceeding are not entitled to payment of post-petition interest on their claims."); *In re McMurray,* 218 B.R. 867, 870 (Bankr.E.D.Tenn.1998) (pursuant to § 502(b)(2), "[p]ayment of postpetition interest on prepetition unsecured claims is prohibited"); *In re Chiapetta,* 159 B.R. 152, 158–59 (Bankr.E.D.Pa.1993) ( "One of the general rules of bankruptcy is that unsecured creditors are generally not entitled to receive post-petition interest on their allowed claims."). No exception to this general rule has been shown to apply here. Accordingly, by making interest payments to Worton, Debtor has violated § 502(b).

I recognize that not every violation of the Code should compel denial of confirmation. *In re Landing Associates, Ltd.,* 157 B.R. 791, 810 (Bankr.W.D.Tex.1993) (confirmation not denied where maintenance of prepetition bank accounts and payment of prepetition creditors therefrom and unauthorized use of cash collateral remedied by closing of account and repayment of unauthorized expenditures). *But see Cothran v. United States,* 45 B.R. 836, 837 ( S.D.Ga.1984) (unauthorized use of cash collateral precludes confirmation under § 1129(a)(2)). However, where as here, the violation has not been cured nor has it been disclosed in the court-approved Disclosure Statement upon which another similarly classified creditor relied, § 1129(a)(2) has not been satisfied.

The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2). H.R.Rep. No, 595, 95th Cong., 1st Sess. 412 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 126 (1978). The adequacy of disclosure is an essential element for plan confirmation embodied in the § 1129(a)(2) confirmation requirement. *In re Sierra–Cal,* 210 B.R. 168, 176 (Bankr.E.D.Cal.1997) (where disclosure statement did not disclose potentially avoidable transfers against affiliates, information was inadequate under § 1125 and plan could not be confirmed under § 1129(a)(2)). By not disclosing that he had made post-petition interest payments to Worton, Debtor misrepresented the treatment of Worton's claim. Debtor did not explain why his Disclosure Statement or Plan failed to deal with this issue, and I thus make no finding that the omission was deliberate or intending to mislead creditors. However, mislead it may have done since without knowing what payments had been made to Worton, the other unsecured creditor, PHEAA, could not make an informed decision on whether to support the Plan. It is possible that PHEAA, which neither voted for or against the Plan, would still have been silent in the face of the preferential treatment given to Worton. However, unless full disclosure has been provided, the Debtor is not entitled to secure confirmation of his Plan.

**\*4** Furthermore, since Debtor made post-petition, pre-confirmation payments to one unsecured creditor (Worton) and not to the other (PHEAA), and may be paying post-confirmation interest on one unsecured claim at 8% (Stewart) and at some other rate on the others (Class 9–Worton and PHEAA), his Plan violates 11 U.S.C. § 1123(a)(4) which states, in pertinent part: "[A] plan shall ... provide the same treatment for each claim or interest of a particular class [.]" He has masked

this defect by not recognizing the interest payments to Worton and classifying Stewart's claim as fully secured.

I also am unable to make a determination under § 1129(b)(2)(A)(i)(II) that Creditor shall receive "on account of its secured claim deferred cash payments totaling at least the amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest" in the Ardleigh Property. As Creditor voted to reject the Plan, confirmation can only be secured under the cram down provisions of § 1129(b). The Plan merely provides that Debtor shall commence payments of $987.05 as provided in the original loan documents and will cure the arrearage, if any, by installments payments over five years. This information is inadequate to find that the cramdown provisions have been satisfied. The Plan is silent as to whether the arrearage will be paid with interest. Absent the payment of interest, Creditor will not receive the value of its interest as of the effective date of the Plan. *Federal Home Loan Mortgage Corp. v. Bugg (In re Bugg),* 172 B.R. 781, 785 (E.D.Pa.1994) ("Present value is calculated by applying an interest rate to the unpaid balance of the amount due under the claim.); *In re Dilts,* 126 B.R. 470, 472 (Bankr.W.D.Pa.1991) (where plan proposes to pay a secured creditor in installments, interest must be added to the payments so that the present value of the future stream of payments is equal to the amount of the creditor's secured claim). Moreover, since the amount of the arrearage is unknown, I cannot determine whether the plan is feasible under § 1129(a)(11).[FN7] As I am not presently confirming this Plan, I need not resolve these and other objections raised by Creditor at this time. It may be that given the opportunity, Debtor could remedy the above defects. However, it remains to be determined whether the Debtor should be given an opportunity to propose his Fifth Amended Plan. [FN8] On the one hand, Debtor has reached agreement with all of his secured creditors other than Creditor and appears to have a clear plan for dealing with these debts through the sale of properties

and payment out of future earnings of him and his wife. Unsecured creditors are to be paid 100% of their claims with interest. The adversary proceeding against Creditor is ready for trial. On the other hand, the Debtor has not indicated any intention to address the improper post-petition payments made to Worton even though I expressed my dismay to him and his counsel more than once. Accordingly, I will schedule a hearing to determine the future of this chapter 11 case at which time I will hear from the Debtor, the U.S. Trustee and any creditor wishing to be heard.

**\*5** An Order consistent with the foregoing Memorandum Opinion shall issue.

### ORDER

AND NOW, this 2nd day of November, 1998, upon consideration of the request of the debtor George Lapworth for confirmation of his Fourth Amended Plan of Reorganization (the "Plan") and the objection thereto of L. Cantor, Trustee, a secured creditor ("Creditor"), and after notice and hearing and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby ORDERED that Confirmation is DENIED. A hearing will be held on November 17, 1998 at 9:30 a.m. in the Robert N.C. Nix, Sr. Federal Courthouse, 2nd flr., 900 Market Street, Courtroom # 3, Philadelphia, Pennsylvania 19107 to consider the future of this Chapter 11 case and whether a further reorganization plan may be filed.

FN1. I surmise that the PHEAA loan was not dischargeable in the Chapter 7 case. There was no information on the Worton loan which presumably was extended between the Chapter 7 and Chapter 11 cases.

FN2. Discovery is complete and the adversary proceeding is to be set for trial after pretrial briefs are filed.

FN3. The tenant, in addition to Carroll, is

Cafette Corp. which owns a restaurant owned by Carroll's wife. Apparently some portion of the rents have not been collected so that the mortgage indebtedness has not been reduced.

FN4. Debtor and Creditor disagree on the amount that it owed, an issue raised by the pending adversary case. Creditor claims it is owed $ $88,705.53 plus legal fees and court costs for a total of $93,813.19. Objection ¶ 1. Debtor contends that the debt is $60,000. Debtor's counsel, however, advised me that I need not determine the disputed claim issue in order to confirm Debtor's Plan, and no evidence was presented on this issue.

FN5. While the note was not introduced into evidence, it would appear that interest is charged at the rate of 15% per annum.

FN6. Using Debtor's disputed value of the Creditor claim of $60,000 plus CoreStates secured claim of $40,000 and the tax liens of $23,000, the liens total $123,000. Depending on the outcome of the adversary proceeding, the value of Ardleigh may be found to be less and/or the Creditor's claim to be greater, thus wiping out any lien on Ardleigh for Stewart.

FN7. I had assumed when Debtor's counsel stated that the Plan could be confirmed without liquidation of Creditor's claim that the evidence would establish Debtor's ability to make installment payment of the arrearage at the highest value claimed by Creditor should such payment be necessary. This proof was not forthcoming.

FN8. The docket of this case evidences Debtor's repeated unsuccessful efforts at preparing a disclosure statement that could be approved. Each time he was given additional time to try again. One prior plan, the

Second Amended Plan, was scheduled for confirmation on June 29, 1998. Recognizing it to be unconfirmable, Debtor sought and was given the opportunity he requested to file another plan.

### AMENDED ORDER

And now, this 3rd day of November, 1998, upon consideration of the request of the debtor George Lapworth for confirmation of his Fourth Amended Plan of Reorganization (the "Plan") and the objection thereto of L.Cantor, Trustee, a secured creditor ("Creditor"), and after notice and hearing and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby ORDERED that Confirmation is DENIED. A hearing will be held on NOVEMBER 23, 1998 at 9:30 A.M., in the Robert N.C. Nix, Sr. Federal Courthouse, 2nd flr., 900 Market Street, Courtroom #3, Philadelphia, Pennsylvania 19107 to consider the future of this Chapter 11 case and whether a further reorganization plan may be filed.

Bkrtcy.E.D.Pa.,1998.
In re Lapworth
Not Reported in B.R., 1998 WL 767456 (Bkrtcy.E.D.Pa.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

**In re Magnatrax Corp.**

**No. 03-11402, 2003 WL 22807541 (Bankr. D. Del. Nov. 17, 2003)**

Not Reported in B.R., 2003 WL 22807541 (Bkrtcy.D.Del.)
**(Cite as: 2003 WL 22807541 (Bkrtcy.D.Del.))**



Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. Delaware.
In re: MAGNATRAX CORPORATION, et. al., Debtors.

No. 03–11402(PJW).
Nov. 17, 2003.

Alfred Villoch, III, Edmon L. Morton, Joel A. Waite, Matthew Barry Lunn, Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, for Debtor.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER UNDER 11 U.S.C. § 1129(a) AND (b) AND FED. R. BANKR. P. 3020 CONFIRMING THE FIFTH AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION OF MAGNATRAX CORPORATION AND *ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE*

WALSH, Bankruptcy J.

RECITALS

**\*1** WHEREAS, on September 17, 2003, MAGNATRAX Corporation ("*MAGNATRAX* ") FN1, and its direct and indirect subsidiaries, as debtors and debtors in possession (collectively with MAGNATRAX, the " *Debtors* "), filed the *Debtors' Fifth Amended and Restated Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code,* dated September 17, 2003 (as transmitted to parties in interest, and as subsequently amended, modified or supplemented, including by this Order, the "*Plan* ") FN2 with the Bankruptcy Court;

> FN1. A complete list of the Debtors and their respective case numbers is attached hereto as Exhibit "A."

> FN2. Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan. Any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is used in title 11 of the United States Code, 11 U.S.C. §§ 101 – 1330 (as amended, the "Bankruptcy Code") or the Federal Rules of Bankruptcy Procedure (the " *Bankruptcy Rules* "), shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

WHEREAS, on September 17, 2003, the Debtors filed the Fifth Amended and Restated Disclosure Statement for MAGNATRAX Debtors' Fifth Amended and Restated Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated September 17, 2003 (as transmitted to parties in interest, the "*Disclosure Statement* ") with the Bankruptcy Court;

WHEREAS, hearings having been held before the Bankruptcy Court on August 19, 2003 and September 5, 2003, on notice to all creditors, stockholders and other parties in interest to the Magnatrax Reorganization Cases to consider approval of the Disclosure Statement;

WHEREAS, on September 17, 2003, the Bankruptcy Court entered an order (the "*Solicitation Order* ") that, among other things, (a) approved the Disclosure Statement under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, (b) established October 28, 2003, as the date for the commencement of the hearing to consider confirmation of the Plan (the "*Confirmation Hearing* "), (c) approved the form and method of notice of the Confirmation Hearing (the "*Confirmation Hearing Notice* "), and (d) established certain procedures for soliciting and tabulating votes with respect to the Plan;

WHEREAS, on October 15, 2003, the Bankruptcy Court entered an order (the "*Adjourned Confirmation Hearing Order* ") that, among other things, (a) adjourned the Confirmation Hearing to November 13, 2003 (as adjourned, hereinafter referred to as the "Confirmation Hearing"), (b) extended the Voting Deadline to November 6, 2003, and the Objection Deadline to November 3, 2003, and (c) approved the form and method of notice of the adjourned Confirmation Hearing (the " *Adjourned Confirmation Hearing*

Not Reported in B.R., 2003 WL 22807541 (Bkrtcy.D.Del.)
**(Cite as: 2003 WL 22807541 (Bkrtcy.D.Del.))**

*Notice* ");

WHEREAS, in accordance with the provisions the Solicitation Order, the Debtors, by letters dated November 3, 2003 and November 7, 2003, consented to extending the Voting Deadline to November 11, 2003 for holders of Class 6 Claims;

WHEREAS, as evidenced by the Certificate of Service of Jeffrey S. Stein, Assistant Vice President employed by The Garden City Group, Inc. sworn to on or about October 1, 2003 (the "*Solicitation Certificate*") filed with the Bankruptcy Court, on September 24, 2003, (a) the Disclosure Statement, the Plan, the Solicitation Order, the Confirmation Hearing Notice, the letter from the Debtors to creditors entitled to vote, the letter from the Official Committee of Unsecured Creditors (the "*Creditors Committee*") and a Ballot and return envelope were transmitted to all known holders of Claims in Classes 6, 7, 8 and 9, in accordance with the Solicitation Order dated September 17, 2003 and Bankruptcy Rule 3017, and (b) the Disclosure Statement, the Plan, a Notice of Non–Voting Status, the Confirmation Hearing Notice and the Solicitation Order dated September 17, 2003 were transmitted to all known holders of Claims and Equity Interests in Classes 1, 2, 3, 4, 5, 10, 11, 12, 13, 14 and 15, in accordance with the Solicitation Order and Bankruptcy Rule 3017;

**\*2** WHEREAS, as evidenced by the certificate of publication of Mike Henley, Principal Clerk of the Publisher of *The Wall Street Journal,* sworn to on September 25, 2003 (the "*Publication Certificate*"), filed with the Bankruptcy Court, the Confirmation Hearing Notice was published in *The Wall Street Journal* (National Edition) on September 25, 2003;

WHEREAS, as evidenced by the Affidavit of Service of Gina M. Ziegler, Senior Project Manager employed by The Garden City Group, Inc. sworn to on or about November 5, 2003 (the "*Adjourned Hearing Certificate*") filed with the Bankruptcy Court, the Adjourned Confirmation Hearing Notice was transmitted on October 16, 2003, to all known holders of Claims in Classes 6, 7, 8 and 9, and to all known holders of Claims and Equity Interests in Classes 1, 2, 3, 4, 5, 10,

11, 12, 13, 14 and 15;

WHEREAS, on October 30, 2003, the Debtors filed the Plan Supplement containing certain of the Plan Documents, which, as set forth in the affidavit of service filed with the Bankruptcy Court (the "*Plan Supplement Affidavit*"), was served upon (a) the Office of the United States Trustee for the District of Delaware, (b) counsel for Canadian Imperial Bank of Commerce as Administrative Agent for the Senior Lenders, (c) counsel for Canadian Imperial Bank of Commerce as Administrative Agent for the DIP Lenders, (d) counsel for the Committee and (e) all parties having filed a notice of appearance and request for service herein in accordance with Bankruptcy Rule 2002;

WHEREAS, the Debtors having filed on November 12, 2003, the Declaration of Jeffrey S. Stein of the Garden City Group, Inc. Certifying the Methodology for the Tabulation of Votes On and Results of Voting with respect to the Fifth Amended and Restated Joint Plan of Reorganization of MAGNATRAX Corporation, et al., sworn to on November 12, 2003, attesting and certifying the method and results of the ballot tabulation for the Classes of Claims (Classes 6, 7, 8 and 9) entitled to vote to accept or reject the Plan (as supplemented thereafter, the "*Voting Report*");

WHEREAS, objections or purported objections to confirmation of the Plan having been filed and served by (a) the Office of the United States Trustee, (b) the United States, on behalf of its Internal Revenue Service, (c) St. Paul Fire and Marine Insurance Company, (d) Highland Capital Management, L.P., as collateral manager for Highland Legacy, Ltd., Pam Capital Funding, L.P. and ML CBO IV (Cayman), Ltd., (e) Fowler Energy Corporation, and (f) Vicwest Corporation (collectively, the "Objections");

WHEREAS, the Objections have either (a) been withdrawn or partially resolved on the terms and conditions (i) set forth in stipulations "so ordered" by the Court, (ii) described on the record of the Confirmation Hearing, (iii) set forth in this Order, or (iv) set forth in the Plan Modification (as defined herein) (collectively, the "*Resolved Objections*"), or (b) been overruled by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2003 WL 22807541 (Bkrtcy.D.Del.)
**(Cite as: 2003 WL 22807541 (Bkrtcy.D.Del.))**

the Bankruptcy Court at the Confirmation Hearing;

**\*3** WHEREAS, on November 12, 2003, the Debtors filed the Affidavit of Joseph M. Ahearn in Support of Confirmation of the Debtors' Fifth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "*Ahearn Affidavit* ");

WHEREAS, on November 12, 2003, the Debtors filed a memorandum of law in support of confirmation of the Plan and in response to the Objections (the "*Confirmation Memorandum* ");

WHEREAS, the Committee has selected Richard M Kipperman to serve as the Litigation Trustee under the Litigation Trust Agreement;

WHEREAS, the U.S. Required Lenders have determined that (a) Allen M. Capsuto shall remain the chief financial officer of the Debtors, (b) the chief executive officer of Reorganized Magnatrax shall be selected by the initial Board of Directors of Reorganized Magnatrax, and (c) that such initial Board shall be comprised of Howard Brod Brownstein, Jack Hatcher, Kevin McShea, Ronald D. Rothberg, Francis M. Scricco, Donald E. Thomas and, when appointed, the new chief executive officer;

WHEREAS, the Debtors having filed with the Bankruptcy Court on November 12, 2003, the Modification to Debtors' Fifth Amended and Restated Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated November 12, 2003 (the "Plan Modification");

WHEREAS, the Confirmation Hearing was held on November 13, 2003;

NOW, THEREFORE, based upon the Bankruptcy Court's review of the Voting Report, the Ahearn Affidavit, the Confirmation Memorandum, and upon (a) all the evidence proffered or adduced at, memoranda and Objections filed in connection with, and arguments of counsel made at, the Confirmation Hearing; and (b) the entire record of the Magnatrax Reorganization Cases; and after due deliberation thereon and good cause appearing therefor:

FINDINGS OF FACT AND CONCLUSIONS OF LAW
FN3

FN3. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr.P. 7052.

IT IS HEREBY FOUND AND DETERMINED THAT:

A. *Exclusive Jurisdiction; Venue; Core Proceeding* 28 U.S.C. §§ 157(b)(2), 1334(a), 1408 and 1409). The Bankruptcy Court has jurisdiction over the Magnatrax Reorganization Cases pursuant to sections 157 and 1334 of title 28 of the United States Code. Venue is proper pursuant to sections 1408 and 1409 of title 28 of the United States Code. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and the Bankruptcy Court has exclusive jurisdiction to enter a final order determining whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

B. *Judicial Notice.* The Bankruptcy Court takes judicial notice of the contents of the docket of the Magnatrax Reorganization Cases maintained by the Clerk of the Bankruptcy Court and/or its duly-appointed agent, including, but not limited to, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Magnatrax Reorganization Cases, including, but not limited to, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation of the Plan.

**\*4** C. *Burden of Proof.* The Debtors have satisfied the burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of evidence.

D. *Transmittal and Mailing of Materials; Notice.* As evidenced by the Solicitation Certificate and Publication Certificate filed with the Bankruptcy Court, (1) the Disclosure Statement, the Plan, the Ballots, the Solicitation Order, and the Confirmation Hearing Notice have been given to all known holders of Claims in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Classes 6, 7, 8 and 9, (2) the Disclosure Statement, the Plan, the Notice of Non–Voting Status, the Confirmation Hearing Notice and the Solicitation Order have been given to all known holders of Claims and Equity Interest in Classes 1, 2, 3, 4, 5, 10, 11, 12, 13, 14 and 15, and (3) the Confirmation Hearing Notice has been published in The Wall Street Journal, in compliance with the notice procedures set forth in the Solicitation Order and the Bankruptcy Rules, and such transmittal and service was adequate and sufficient, and also served was the United States Trustee's Office, District Director of the IRS, all state and local taxing authorities in the states in which the Debtors conduct business and otherwise in compliance with the Bankruptcy Rules. In addition, as evidenced by the Adjourned Hearing Certificate and the Plan Supplement Affidavit filed with the Bankruptcy Court, the service of the Adjourned Confirmation Hearing Notice and the Plan Supplement was adequate under the circumstances and no other or further notice is or shall be required.

E. *Voting.* Based on the record before this Court, votes to accept and reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Order.

F. *Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).* The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code. Specifically:

(i) *Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1)).* The Plan designates thirteen (13) Classes of Claims and two (2) Classes of Equity Interests. The Claims or Equity Interests placed in each Class are substantially similar to other Claims or Equity Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims or Equity Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(ii) *Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).* Article II of the Plan specifies that Classes 1, 2, 3, 4, 5 and 14 are unimpaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(iii) *Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).* Article II of the Plan specifies that Classes 6, 7, 8, 9, 10, 11, 12, 13 and 15 are impaired under the Plan and Article III of the Plan specifies the treatment of Claims in Classes 6, 7, 8, 9, 10, 11, 12 and 13 and Equity Interests in Class 15, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

**\*5** (iv) *No Discrimination (11 U.S.C. § 1123(a)(4)).* The Plan provides for the same treatment by the Debtors for each Claim or Equity Interest in each respective Class unless the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(v) *Implementation of Plan (11 U.S.C. § 1123(a)(5)).* The Plan and the various documents, instruments and agreements set forth in the Plan Supplement and all other Plan Documents provide adequate and proper means for the Plan's implementation, including, but not limited to, (1) the substantive consolidation of the Debtors to the extent set forth in the Plan, (2) the Exit Credit Facility, (3) the New Term Loan Facility, (4) the Litigation Trust Agreement, and (5) the New Stock Option/Purchase Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

(vi) *Prohibition of Issuance of Non–Voting Equity Securities (11 U.S.C. § 1123(a)(6)).* Section 4.5 of the Plan provides that the Amended Certificate of Incorporation of Reorganized Magnatrax and the Amended By-laws of Reorganized Magnatrax will include provisions (1) creating the New Common Stock and the New Preferred Stock, (2) to the extent necessary or appropriate, stating any restrictions on the transfer of the New Common Stock or the New Preferred Stock, (3) to the extent necessary or appropriate, effectuating the provisions of the Plan, and (4) such other provisions as may be agreed by the Magnatrax Debtors and the U.S. Required

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Lenders. The Amended Certificate of Incorporation of Reorganized Magnatrax and the Amended By-laws of each Reorganized Magnatrax Debtor will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, a provision prohibiting the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.

(vii) *Designation of Officers, Directors or Trustees (11 U.S.C. § 1123(a)(7))*. Sections 4.14 and 4.21(a) of the Plan and the representations on the record of the Confirmation Hearing with respect to the manner of selection of the initial Board of Directors and Officers of Reorganized Magnatrax and the Litigation Trustee are consistent with the interests of creditors, equity security holders, and public policy in accordance with section 1123(a)(7) of the Bankruptcy Code.

(viii) *Additional Plan Provisions (11 U.S.C. § 1123(b))*. The Plan's provisions are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

(ix) *Bankruptcy Rule 3016(a)*. The Plan is dated and identifies the Debtors as proponents of the Plan, thereby satisfying Bankruptcy Rule 3016(a).

G. *Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2))*. The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code. Specifically:

**\*6** (i) The Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under Section 1121(a) of the Bankruptcy Code.

(ii) The Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court.

(iii) The Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Order in transmitting the Plan, the Disclosure Statement, the Ballots, and related documents and notices and in soliciting and tabulating votes on the Plan.

H. *Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))*. The Debtors have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. The Debtors' good faith is evident from the facts and records of the Magnatrax Reorganization Cases in its totality, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Magnatrax Reorganization Cases. The Plan is the result of extensive arm's-length negotiations among the Debtors, the Senior Lenders, the Creditors' Committee and other parties in interest.

I. *Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))*. Any payment made or to be made by any of the Debtors for services or for costs and expenses in or in connection with the Magnatrax Reorganization Cases, or in connection with the Plan and incident to the Magnatrax Reorganization Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable, and all payments made or to be made to professionals retained by order of the Bankruptcy Court will be, as set forth in Section 11.4 of the Plan, subject to review and approval by the Bankruptcy Court upon final application under section 330, 331 or 503(b) of the Bankruptcy Code thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

J. *Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5))*. The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code. As indicated above, the Debtors have disclosed the identity of the persons proposed to serve as initial directors or officers of the Reorganized Magnatrax Debtors after confirmation of the Plan and the identity of the person proposed to serve as the initial Litigation Trustee. In addition, the appointment to, or continuance in, such offices of such persons is consistent with the interests of holders of Claims against and Equity Interests in the Debtors and with public policy. Each director, officer or manager shall serve from and after the Effective Date pursuant to the terms of the certificates of incorporation or other con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

stituent documents of the Reorganized Magnatrax Debtors and applicable state corporation law.

K. *No Rate Changes (11 U.S.C. § 1129(a)(6)).* After confirmation of the Plan, the Reorganized Magnatrax Debtors' businesses will not involve rates established or approved by, or otherwise subject to, any governmental regulatory commission. Thus, section 1129(a)(6) of the Bankruptcy Code is not applicable in the Magnatrax Reorganization Cases or with respect to the Plan.

**\*7** L. *Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).* The Plan satisfies section 1129(a)(7) of the Bankruptcy Code. The Liquidation Analysis attached to the Disclosure Statement as Exhibit "G" and other evidence proffered or adduced at the Confirmation Hearing, including the Ahearn Affidavit, (1) are persuasive and credible, (2) have not been controverted by other persuasive evidence or have not been challenged, (3) are based on reasonable and sound assumptions, (4) produce a reasonable estimate of the liquidation values upon conversion of the Magnatrax Reorganization Cases to cases under chapter 7 of the Bankruptcy Code, and (5) establish that each holder of an impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

M. *Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).* Classes 4, 5 and 14 of the Plan are Classes of unimpaired Claims and Equity Interests that are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Classes 6, 7, 8 and 9 have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code. Classes 10, 11, 12, 13 and 15 are not entitled to receive or retain any property under the Plan and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Although section 1129(a)(8) has not been satisfied with respect to the five deemed rejecting Classes (Classes 10, 11, 12, 13 and 15) (collectively, the

"Rejecting Classes"), the Plan is confirmable because the Plan satisfied section 1129(b) of the Bankruptcy Code with respect to the Rejecting Classes. See paragraph "S," below.

N. *Treatment of Administrative Expense, Priority Tax and Other Priority Claims (11 U.S.C. § 1129(a)(9)).* The treatment of Allowed Administrative Expense Claims, Allowed Other Priority Claims and Allowed Priority Tax Claims pursuant to Sections 3.2, 3.3 and 3.4 of the Plan, respectively, satisfies the requirements of sections 1129(a)(9)(A), (B) and (C) of the Bankruptcy Code, respectively.

O. *Acceptance By Impaired Classes (11 U.S.C. § 1129(a)(10)).* At least one impaired Class under the Plan has voted to accept the Plan in requisite numbers and amounts, without the need to include any acceptance of the Plan by any insider, thus satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code.

P. *Feasibility (11 U.S.C. § 1129(a)(11)).* The Reorganized Magnatrax Debtors' Projected Financial Information contained in Exhibit "H" to the Disclosure Statement and the evidence proffered or adduced at the Confirmation Hearing (1) are persuasive and credible, (2) have not been controverted by other persuasive evidence or have not been challenged, (3) are based on reasonable and sound assumptions, (4) establish that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Magnatrax Debtors, and (5) after giving effect to the Plan and the Exit Credit Facility, the Reorganized Magnatrax Debtors will be solvent, *i.e.,* the value of their assets will exceed their liabilities and will be adequately capitalized, thus satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

**\*8** Q. *Payment of Statutory Fees (11 U.S.C. § 1129(a)(12)).* All fees payable under section 1930 of title 28 of the United States Code (the "Quarterly Fees") have been paid or will be paid pursuant to Section 11.2 of the Plan by the Reorganized Magnatrax Debtors on or before the Effective Date. Accordingly, the Plan sat-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2003 WL 22807541 (Bkrtcy.D.Del.)
**(Cite as: 2003 WL 22807541 (Bkrtcy.D.Del.))**

isfies section 1129(a)(12) of the Bankruptcy Code.

R. *Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).* Based on the provisions of Section 4.18 of the Plan, the requirements of section 1129(a)(13) of the Bankruptcy Code are satisfied.

S. *Fair and Equitable; No Unfair Discrimination ( 11 U.S.C. § 1129(b)).* The Rejecting Classes are impaired Classes of Claims or Equity Interests which are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code because the holders of such Claims or Equity Interests will not receive or retain any property under the Plan on account of their respective Claims or Equity Interests. These are the only Classes which have not accepted, or have been deemed not to have accepted, the Plan. The Magnatrax Debtors presented uncontroverted evidence at the Confirmation Hearing, and the Bankruptcy Court hereby finds, that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each of the Rejecting Classes, as required by section 1129(b)(1) of the Bankruptcy Code. Specifically, holders of Claims in Classes 10 and 11 are subordinated to the holders of Claims in Class 6 and therefore are not entitled to receive or retain any property under the Plan since holders of Class 6 Claims will not be paid in full. Further, with respect to each Rejecting Class, the holder of any Claim or Equity Interest that is junior to the Claims or Equity Interests in such Rejecting Class will not receive or retain any property under the Plan on account of such junior Claim or Equity Interest.

T. *Principal Purpose of the Plan (11 U.S.C. § 1129(d)).* The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, as amended, and no Governmental Unit has requested that the Bankruptcy Court not confirm the Plan pursuant to section 1129(d) of the Bankruptcy Code.

U. *Modifications to the Plan.* The Plan Modification does not adversely change the treatment of any other Claims or Equity Interests. Accordingly, pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Disclosure of the Plan Modification on the Record at the Confirmation Hearing constitutes due and sufficient notice thereof under the circumstances of the Magnatrax Reorganization Cases.

V. *Assumption.* Article VII of the Plan governing the assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(a) and (b) of the Bankruptcy Code. The assumption of those executory contracts and unexpired leases to be assumed on the Effective Date in accordance with the Plan is in the best interest of the applicable Debtor party to such contracts or leases, its estate, and all parties in interest in the Magnatrax Reorganization Cases. The Plan and this Confirmation Order each adequately provides for the timely payment of cure amounts in Cash in accordance with section 365(b)(1) of the Bankruptcy Code.

*\*9* W. *Rejection.* The executory contracts and unexpired leases of the Magnatrax Debtors listed on the Schedule of Rejected Executory Contracts are burdensome and, as such, the rejection thereof as of the occurrence of the Effective Date is in the best interest of the applicable Magnatrax Debtor party to such contracts or leases, its estate, and all parties in interest in the Magnatrax Reorganization Cases. In no event and under no circumstances shall rejection of the contracts and leases on the Schedule of Rejected Executory Contracts occur or be deemed to have occurred prior to occurrence of the Effective Date.

X. *Substantive Consolidation.* No creditor of any of the Debtors will be prejudiced by the substantive consolidation of the Magnatrax Reorganization Cases to the extent set forth in the Plan; such substantive consolidation will benefit all creditors of the Debtors.

Y. *Satisfaction of Confirmation Requirements.* The Plan satisfies the requirements for confirmation set forth in section 1129(a) and (b) and of the Bankruptcy Code.

Z. *Satisfaction of Conditions to Confirmation.* The conditions to confirmation set forth in Section 8.1 of the Plan have been satisfied, waived or will be satisfied by entry of this Confirmation Order.

AA. *Good Faith Solicitation (11 U.S.C. § 1125(e)).* Based upon the record before the Court, the Magnatrax Debtors and their agent have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

BB. *Releases.*

(i) The Senior Lenders have valid, enforceable and perfected Liens on all or substantially all of the assets of the Debtors.

(ii) The value of the Collateral securing the Claims of the Senior Lenders, on a going concern basis, is less than the Allowed Claims of the Senior Lenders. As a result, general unsecured creditors are not legally entitled to any recovery under the Plan.

(iii) In consideration for the releases provided in Section 4.11 of the Plan and to achieve a consensual plan of reorganization, the Senior Lenders have agreed to permit a distribution to general unsecured creditors of value otherwise distributable to the Senior Lenders and to waive any recovery on account of the Senior Lenders' Deficiency Claims as described in the Ahearn Affidavit, the Confirmation Memorandum and the Response of Canadian Imperial Bank of Commerce, as Administrative Agent for the Senior Lenders and the DIP Lenders, to the Objections to the Releases and Injunctions Contained in the Debtors' Fifth Amended and Restated Plan of Reorganization.

(iv) Furthermore, the DIP Lenders and the DIP Agent have been instrumental to the Debtors' reorganization efforts and their successful emergence from chapter 11. Obtaining a sufficient debtor-in-possession financing facility was necessary to preserving the assets of the Debtors' estates. Without such financing, the Debtors would have been unable to continue operating

postpetition and would have been forced to convert their cases to chapter 7. Due to the fragile nature of the relationship among the Debtors and their dealers, builders and customers, there would have been an immediate and significant loss of value of the Debtors' businesses if shipments stopped and builders were forced to find new sources of product in order to complete their ongoing and future jobs. The Debtors believe that any significant interruption in supply would have caused major, and likely permanent, damage to their customer network. Therefore it was of paramount importance that a post-petition financing facility of sufficient magnitude be obtained to maintain operations at their prepetition capacities, thereby eliminating any disturbances in the supply/distribution chain to customers. The DIP Facility in the amount of $20 million provided by the DIP Lenders and the DIP Agent has enabled the Debtors to achieve this goal, and the result is the preservation of the significant value of the Debtors.

**\*10** (v) The Creditors' Committee conducted a thorough investigation as to potential causes of actions against, *inter alia,* the Senior Lenders and officers and directors of Magnatrax. Based on such investigation, the willingness of the Senior Lenders to provide a distribution to general unsecured creditors and in order to achieve a consensual plan of reorganization, the Creditors' Committee agreed to support a plan of reorganization that provides releases for, among others, the Prepetition U.S. Agent, the Senior Lenders, the DIP Agent, and the DIP Lenders and the Debtors' officers and directors. The Class 9 Ballot on its face provided general unsecured creditors clear and unambiguous notice of the releases being furnished to the Prepetition U.S. Agent, the Senior Lenders, the DIP Agent and the DIP Lenders and other Released Parties.

(vi) The Debtors, the Prepetition U.S. Agent, the Senior Lenders and the Creditors' Committee acknowledge and agree that the officers and directors of Magnatrax have made substantial contributions to the reorganization process, including but not limited to: (i) stabilizing the operations of Magnatrax, and (ii) negotiating a consensual plan of reorganization.

(vii) The Debtors, the Prepetition U.S. Agent, the

Senior Lenders, the DIP Agent and the DIP Lenders and the Creditors' Committee acknowledge and agree that the releases are an integral part of the settlement embodied in the Plan, are necessary and essential to the reorganization that is the subject of the Plan and are fair and are supported by fair and valuable consideration.

CC. *Transfers of Property.* The transfers of the Assigned Causes of Action to the Litigation Trust in accordance with Section 4.21 of the Plan (1) are or shall be legal, valid and effective transfers of such causes of action, (2) vest or shall vest the Litigation Trust with such causes of action free and clear of all Liens, charges, Claims or encumbrances, except as expressly provided in the Plan or this Confirmation Order, and (3) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable nonbankruptcy law. It is the Debtors' intent that the Litigation Trust be classified as a "liquidating trust" under section 301.7701–4 of the Treasury Regulations promulgated under the Internal Revenue Code and that the Litigation Trust is owned by the Trust Beneficiaries.

DD. *Retention of Jurisdiction.* The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article X of the Plan and section 1142 of the Bankruptcy Code.

EE. *Exit Credit Agreement.* The credit extended in the Exit Credit Agreement was the result of arms-length negotiations conducted in good faith. The credit extended in the Exit Credit Agreement has been made to solvent Borrowers, after giving effect to the Plan, for reasonably equivalent value in an arm's-length transaction. In light of the good-faith, arm's-length negotiations between the parties, the pre-funding commitment fees and deposits paid by or on behalf of the Borrowers are reasonable and necessary and made by solvent Borrowers, after giving effect to the Plan, for reasonably equivalent value. The liens, covenants, and protections afforded to the Exit Facility Agent and the Exit Facility Lenders in the Exit Credit Agreement are reasonable and necessary for the Borrowers to obtain credit under the Exit Credit Agreement and were not given to the Exit Facility Agent and the Exit Facility Lenders for any improper purpose. The liens and security interests

granted to Exit Facility Agent and the Exit Facility Lenders in the Exit Credit Agreement are senior to all other liens and security interests. The Exit Credit Agreement and the Exit Facility Lenders are extending the credit under the Exit Credit Agreement in reliance on the terms of this Confirmation Order and the Exit Credit Agreement.

**\*11** FF. In consideration for the Debtors commitment to enter into a settlement agreement with the Canadian Magnatrax Debtors pursuant to which the Debtors will withdraw their claims (including claims of Black Raven) filed in the Canadian Magnatrax Reorganization Cases, Vicwest has agreed to withdraw its Objection.

DECREES

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, DECREED AND DETERMINED THAT:

1. *Plan Modification.* The Plan Modification meets the requirements of sections 1127(a) and (c) of the Bankruptcy Code and does not adversely change the treatment of the Claim of any creditor or Equity Interest or any holder thereof within the meaning of Bankruptcy Rule 3019, and no further disclosure, solicitation or voting is required. All references to the Plan shall be to the Plan as modified by the Plan Modification.

2. *Confirmation.* The Plan is approved and confirmed under section 1129 of the Bankruptcy Code. The documents contained in the Plan Supplement and all other Plan Documents are incorporated by reference into and are an integral part of the Plan and this Confirmation Order. All references to the Plan shall hereby be deemed to refer to the Plan, the documents contained in the Plan Supplement and all other Plan Documents. The Debtors and all parties in interest are authorized and directed to carry out, and comply with, the provisions of the Plan and the Plan Documents, and to take all action reasonably necessary to effectuate the Plan, the documents contained in the Plan Supplement and all other Plan Documents.

3. *Objections.* All Objections that have not been withdrawn, waived, or settled, and all reservations of rights pertaining to Confirmation of the Plan included

therein, are overruled on the merits.

4. *Plan Supplement; Other Plan Documents.* The forms, terms and provisions of each of the documents contained in the Plan Supplement, any other Plan Documents and any amendments, modifications, or supplements to any Plan Document, all documents and agreements related thereto or to consummation and implementation of the Plan and any other documents or agreements introduced into evidence by the Magnatrax Debtors at the Confirmation Hearing (including all exhibits and attachments thereto and documents referred to therein), and the execution, delivery, and performance thereof by the Reorganized Magnatrax Debtors, are authorized and hereby approved, including, but not limited to, (a) the cancellation of all Magnatrax Equity Interests, (b) the issuance of New Common Stock and New Preferred Stocks, if any, to be issued upon conversion of the New Convertible Notes, (c) the New Term Loan Facility, (d) the New Term Notes and the Class 9 Notes, (e) the adoption of the New Stock Option/Purchase Plan, (f) the Exit Credit Facility, (g) the Amended Certificate of Incorporation, (h) the Amended By–Laws, and (i) the New Stockholders Agreement. After entry of this Confirmation Order, the Magnatrax Debtors and the Reorganized Magnatrax Debtors are authorized and empowered in accordance with Sections 11.6 and 11.7 of the Plan and this Confirmation Order to make any and all modifications, amendments or supplements to any and all documents included as part of the Plan Supplement, or to any other Plan Documents consistent with the Plan and the Plan Documents. Each document contained in the Plan Supplement and each of the other Plan Documents shall constitute a legal, valid, binding and authorized obligation of the respective parties thereto, enforceable in accordance with its terms.

**\*12** 5. *Retention of Jurisdiction.* Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of this Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Magnatrax Reorganization Cases and the Plan to the fullest extent permitted by law, including, but not limited to, jurisdiction over

those items and matters set forth in Article X of the Plan and any motion to approve the sale(s) of assets of Windsor Door, Incorporated (including assets of its subsidiaries) and Republic Builders Products Company, and any related transactions, and any matters arising in connection with such sales.

6. *New Stock Option/Purchase Plan.* Reorganized Magnatrax shall adopt the New Stock Option/Purchase Plan on the Effective Date. The solicitation of votes on the Plan shall be deemed a solicitation of the holders of New Common Stock for approval of the New Stock Option/Purchase Plan for purposes of sections 162(m) and 422 of the Internal Revenue Code of 1986, as amended.

7. *Litigation Trust.* Pursuant to Section 4.21 of the Plan, on the Effective Date, the Reorganized Magnatrax Debtors will transfer and assign, or cause to be transferred and assigned, to the Litigation Trust, all their right, title and interest in and to the Assigned Causes of Action. The transfers of the Assigned Causes of Action by the Debtors to the Litigation Trust pursuant to Section 4.21 of the Plan and this Confirmation Order (a) are or shall be legal, valid and effective transfers of the Assigned Causes of Action, (b) vest or shall vest the Litigation Trust with good title to such Assigned Causes of Action free and clear of all Liens, charges, Claims or encumbrances except as expressly provided in the Plan or this Confirmation Order, (c) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable nonbankruptcy law, and (d) do not and shall not subject the Litigation Trust or the Litigation Trustee to any liability by reason of such transfers under the Bankruptcy Code or applicable nonbankruptcy law, including, but not limited to, any laws affecting successor or transferee liability.

8. *Litigation Trustee.* Richard M Kipperman shall be, and hereby is, approved as the initial Litigation Trustee.

9. *Officers and Directors.* Allen M. Capsuto shall continue as the chief financial officer of the Magnatrax Debtors, the chief executive officer of Reorganized Magnatrax shall be selected by the initial Board of Directors of Reorganized Magnatrax, and such initial

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Board shall be comprised of Howard Brod Brownstein, Jack Hatcher, Kevin McShea, Ronald D. Rothberg, Francis M. Scricco, Donald E. Thomas and, when appointed, the new chief executive officer.

10. *Intercreditor Agreement To Be Entered into On The Effective Date.* Subject to the terms of the Intercreditor Agreement to be entered into on the Effective Date by and among the Exit Facility Agent on behalf of the Exit Lenders, the Term Loan Agent on behalf of the Term Loan Lenders, the Noteholders Collateral Agent on behalf of the Noteholders, the Borrowers and other Credit Parties (capitalized terms having the respective meanings ascribed to them in the Intercreditor Agreement), the liens and security interest granted under or in respect of the New Term Loans, The New Term Facility and the Convertible Notes shall be perfected immediately upon the occurrence of the Effective Date without the necessity of any other or further act or instrument of any kind or nature.

**\*13** 11. *Plan Classification Controlling.* The classifications of Claims and Equity Interests for purposes of the distributions to be made under the Plan shall be governed solely by the terms of the Plan.

12. *Binding Effect.* Pursuant to section 1141(a) of the Bankruptcy Code, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and except as otherwise provided in the Plan or this Confirmation Order, the Plan and its provisions (including the documents contained in the Plan Supplement and all other Plan Documents and all exhibits to and all other documents and agreements executed pursuant to the Plan, the documents contained in the Plan Supplement and all other Plan Documents) and this Confirmation Order shall be binding on (i) the Magnatrax Debtors, (ii) the Reorganized Magnatrax Debtors, (iii) the Litigation Trustee, (iv) the Disbursing Agent, (v) any entity acquiring or receiving property as a distribution under the Plan, and (vi) any holder of a Claim against or Equity Interest in the Debtors, including all Governmental Entities, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder or entity has accepted the Plan.

13. *Revesting of Assets (11 U.S.C. § 1141(b), (c)).* In accordance with Section 4.7 of the Plan, upon the Effective Date, all property of the respective estate of each Magnatrax Debtor, together with any property of each Magnatrax Debtor that is not property of its estate and that is not specifically disposed of in the Plan, shall revest in the applicable Reorganized Magnatrax Debtor, free and clear of all Liens, Claims and Equity Interests, (and any and all other rights and claims under other laws whether arising by agreement or statute, including any Claim arising for successor liability, regardless of when such Claim arose), except as specifically provided in the Plan, this Confirmation Order, the documents contained in the Plan Supplement or any other Plan Document, the Exit Credit Facility, the New Term Loan Facility or the New Convertible Notes. From and after the Effective Date, the Reorganized Magnatrax Debtors, as applicable, may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

14. *Exemption from Stamp Taxes.* Pursuant to section 1146(c) of the Bankruptcy Code (a) the issuance, transfer, or exchange of any notes, securities, instruments, or documents, (b) the creation of any other Lien, mortgage, deed, trust, or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer from a Magnatrax Debtor to a Reorganized Magnatrax Debtor or any other person or entity under, pursuant to, in furtherance of, or in connection with the Plan or the sale of assets contemplated by Section 4.23 of the Plan including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan including, without limitation, this Confirmation Order, shall not be

subject to any stamp tax or similar tax Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or state governmental unit in which any instrument or document hereunder is to be recorded shall, pursuant to this Confirmation Order, be ordered and directed to accept such instrument or document without requiring the payment of any stamp tax or similar tax.

**\*14** 15. *Assumption of Executory Contracts and Unexpired Leases (11 U.S.C. §§ 365 and 1123(b)(2)).* Pursuant to Section 7.1 of the Plan and sections 365(a) and 1123(b)(2) of the Bankruptcy Code, any Executory Contract which (a) is not listed on the Schedule of Rejected Executory Contracts included in the Plan Supplement, (b) has not expired by its own terms on or prior to the Effective Date, (c) has not been assumed or rejected with the approval of the Bankruptcy Court on or prior to the Effective Date, or (d) is not the subject of a motion to reject the same pending as of the Effective Date, and all of the insurance policies any Magnatrax Debtor maintains with St. Paul Fire and Marine Insurance Company shall be assumed by the applicable Reorganized Magnatrax Debtor effective on the occurrence of the Effective Date. In accordance with Section 7.6 of the Plan, any other insurance policies issued to, or insurance agreements entered into by the Magnatrax Debtors prior to the Filing Date which are Executory Contracts are assumed, and no payments are required to cure any defaults of the Magnatrax Debtors existing as of the Confirmation Date with respect to each such policy or agreement.

16. *Cure Amounts in Connection with Assumption.* With respect to each such Assumed Executory Contract assumed by a Reorganized Magnatrax Debtor, any monetary amounts required as cure payments shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash as soon as practicable after and in no event later than thirty (30) days after the latest of: (a) the Effective Date; (b) the date following notice to Reorganized Magnatrax of the amount due; (c) the resolution by Final Order of any dispute between the Reorganized Magnatrax Debtor and the other party to the Assumed Executory Contract as to

such amounts due; or (d) upon such other terms as the parties to such Assumed Executory Contract may agree, or, in each case, as soon thereafter as practicable. In the event of a dispute regarding (i) the amount of any Cure Payment, (ii) the ability of the applicable Magnatrax Debtor, Reorganized Magnatrax Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Assumed Executory Contract or (iii) any other matter pertaining to assumption of the Executory Contract, the Cure Payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such dispute. The Magnatrax Debtors shall provide notice of the proposed assumption of the Executory Contracts listed in Exhibit "B" annexed hereto and proposed Cure Payment amounts (the "Assumption Notice") to the other party to the Executory Contract (the "Applicable Third Party") within seven (7) days after entry of this Order. The Applicable Third Party shall have until twenty (20) days after service of the Assumption Notice to file an objection to the proposed assumption and/or the proposed Cure Amount, absent which such Executory Contract shall automatically become an Assumed Executory Contract without further order of this Court. In the even an Applicable Third Party files an objection, no monetary amounts required as Cure Payments shall be made until resolution of the dispute by a Final Order of this Court.

**\*15** 17. *Rejection of Executory Contracts and Unexpired Leases (11 U . S.C. §§ 365(a) and 1123(b)(2)).* The applicable Reorganized Magnatrax Debtor is authorized pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code to reject, and shall be deemed to have rejected, as of the occurrence of the Effective Date, those Executory Contracts listed on the Schedule of Rejected Executory Contracts, or those Executory Contracts which are the subject of a pending motion to reject as of the Effective Date. The Reorganized Magnatrax Debtors shall have no liability under such rejected Executory Contracts except as is specifically provided in the Plan and in this Confirmation Order.

18. *Bar Date for Rejection Damage Claims.* Pursu-

ant to Section 7.4 of the Plan, if the rejection of an Executory Contract by any of the Magnatrax Debtors pursuant to Section 7.3 of the Plan or the expiration or termination of any Executory Contract prior to the Effective Date results in damages to the other party or parties to such Executory Contract, a Claim for such damages, if not heretofore evidenced by a filed Proof of Claim, shall be forever barred and shall not be enforceable against the Magnatrax Debtors or their estates, assets, properties or interests in properties or against the Reorganized Magnatrax Debtors or their estates, assets, properties or interests in properties, unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Magnatrax Debtors and their counsel within thirty (30) days after the service of the earlier of (a) notice of the occurrence of the Effective Date and (b) notice that the Executory Contract has been rejected.

19. *General Authorizations.* Pursuant to section 1142(b) of the Bankruptcy Code, (i) each of the officers of the Magnatrax Debtors and the Reorganized Magnatrax Debtors and (ii) all other necessary and appropriate parties, including, but not limited to the Exit Facility Agent and the Exit Facility Lenders, are authorized and empowered to (a) execute, deliver, file or record such contracts, documents, instruments, releases, indentures and other agreements or documents, (b) perform any act that is necessary, required, appropriate or desirable (c) comply with, effectuate and further evidence the terms and provisions of the Plan, any document contained in the Plan Supplement and any other Plan Document, and the Plan Securities and (d) consummate the Plan, whether or not specifically referred to in the Plan or any document contained the Plan Supplement or any other Plan Document, without further order of the Court. In addition, (i) the Magnatrax Debtors, (ii) the Reorganized Magnatrax Debtors and (iii) all other necessary parties are and are authorized and empowered, without limitation, to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, and other agreements or documents created in connection with the Plan.

20. *Securities Laws Exemption.* The offering, issuance, distribution and sale by Reorganized Magnatrax

and the other Reorganized Magnatrax Debtors of notes (and the guarantees thereof) or equity securities (other than the New Convertible Notes and the related guarantees) under the Plan are exempt from the provisions of section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration or qualification for the offer, issuance, distribution, or sale of a security by reason of section 1145(a) of the Bankruptcy Code. The offering, issuance and distribution and sale by Reorganized Magnatrax and the other Reorganized Magnatrax Debtors of the New Convertible Notes and the related guarantees under the Plan are exempt from the provisions of Section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration or qualification for the offer, issuance, distribution or sale of a security by reason of Section 4(2) of the Securities Act of 1933, as amended, and Regulation D promulgated thereunder. Furthermore, the offer, issuance, distribution and sale of the Class 9 Notes and the related guarantees (and such Notes and the related guarantees) are exempt from the Trust Indenture Act of 1939, as amended (the "TIA"), by virtue of Section 304(a)(9) of the TIA, and the offer, issuance, distribution and sale of the New Convertible Notes (and such Notes and the related guarantees) are exempt from the TIA by virtue of Section 304(b) of the TIA because the offer, issuance, distribution and sale of the New Convertible Notes (and the related guarantees) are being made only to "accredited investors" within the meaning of Rule 501(a) promulgated under the Securities Act of 1933, as amended.

**\*16** 21. *Substantive Consolidation.* The substantive consolidation of the Magnatrax Reorganization Cases for certain purposes related to the Plan, including, but not limited to, for purposes of voting, confirmation and distribution, is hereby approved. On and after the Effective Date: (a) no Distributions shall be made under the Plan on account of the intercompany claims among the Magnatrax Debtors; (b) all guarantees by any of the Magnatrax Debtors of the obligations of any other Magnatrax Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any Magnatrax Debtor and any guarantee thereof executed by any other Magnatrax Debtor and any joint and several

liability of any of the Magnatrax Debtors shall be deemed to be one obligation of the deemed consolidated Magnatrax Debtors; and (c) each and every Claim filed or to be filed in the Magnatrax Reorganization Cases shall be deemed filed against the consolidated Magnatrax Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Magnatrax Debtors. The foregoing consolidation of the Magnatrax Debtors, however, shall not (other than for purposes related to funding distributions under the Plan and as set forth above in this paragraph) affect: (a) the legal and organizational structure of the Reorganized Magnatrax Debtors; (b) pre- and post-Filing Date Liens, guarantees and security interests that are required to be maintained (i) in connection with Executory Contracts that were entered into during the Magnatrax Reorganization Cases or that have been or will be assumed pursuant to section 365 of the Bankruptcy Code (other than in connection with or arising under the DIP Credit Facility), (ii) pursuant to the Plan, or (iii) in connection with the Exit Credit Facility, the New Term Loan Facility, the New Term Notes and the Class 9 Notes; or (c) distributions out of any insurance policies or distributions out of proceeds of such policies. As of the Effective Date, each of the Reorganized Magnatrax Debtors shall be deemed to be properly capitalized, solvent, legally separate and distinct entities.

22. *Governmental Approvals Not Required.* This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement, any document contained in the Plan Supplement, any other Plan Document, and any documents, instruments, or agreements, and any amendments or modifications thereto. Pursuant to Article IV of the Plan, Reorganized Magnatrax is hereby authorized to execute and file the Amended Certificate of Incorporation of Reorganized Magnatrax and the Amended By–Laws of Reorganized Magnatrax with and shall be accepted by the Secretary of the State of

Delaware and recorded in accordance with section 103 of the Delaware Corporation Law and shall thereupon become effective in accordance with its terms and the provisions of the Delaware Corporation Law.

**\*17** 23. *Exit Credit Agreement.* The Exit Facility Agent and the Exit Facility Lenders are good-faith lenders under 11 U.S.C. § 364. The Liens and security interests granted to the Exit Facility Agent and the Exit Facility Lenders in the Exit Credit Agreement are hereby senior to all other Liens and security interests and perfected upon entry of the Confirmation Order and the advance of funds under the Exit Credit Agreement without the necessity of any other or further act or instrument of any kind or nature; *provided, however,* that the DIP Credit Facility Claims which are known and asserted as of the Effective Date are paid in full on the Effective Date in accordance with section 3.5 of the Plan.

24. *Acceptance and Execution of Plan Documents.* Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Plan and the documents contained in the Plan Supplement and all other Plan Documents including, without limitation, documents and instruments for recording in county and state offices where any Plan Document may need to be filed in order to effectuate the Plan.

25. *DIP Credit Facility Claims.* On the Effective Date, all DIP Credit Facility Claims under or evidenced by amounts outstanding under the DIP Credit Facility shall be indefeasibly paid in full in Cash in accordance with the Plan. On the Effective Date, all DIP Credit Facility Letters of Credit shall either be cancelled, replaced or secured in accordance with the provisions of the DIP Credit Facility. Upon the payment or satisfaction in full of all DIP Credit Facility Claims (a) all Liens and security interests granted to secure such obligations shall be deemed terminated and shall be of no further force, and (b) the lenders under the DIP Credit Facility shall, at the Debtors' expense, take all reasonable action necessary to confirm the removal of any claims and Liens on the properties of the Debtors securing the

DIP Credit Facility: *provided, however,* that paragraphs 1 through 3, 4(a), (d) and (e), 5(b)(iv), 11(c), 16(c), 23 and 24 of the DIP Order shall survive the confirmation and consummation of the Plan, *provided, further,* that all of the provisions of the DIP Order shall remain in full force and effect from and after the Confirmation Date through the occurrence of the Effective Date. To the extent any provision from the DIP Order is secured by liens or security interests, upon the Effective Date, any such liens and security interests shall be and hereby are inferior to the liens and security interests granted to the Exit Facility Agent and the Exit Facility Lenders in the Exit Credit Agreement; *provided, however,* that the DIP Credit Facility Claims which are known and asserted as of the Effective Date are paid in full on the Effective Date in accordance with section 3.5 of the Plan.

26. *Magnatrax Equity Interests.* On the Effective Date, all Magnatrax Equity Interests, including any options or other Equity Interests issued under the Existing Key Management Stock Option Plan, shall be deemed cancelled and extinguished, without the necessity of holders of Magnatrax Equity Interests to surrender their certificates or other instruments evidencing ownership of such Magnatrax Equity Interests.

**\*18** 27. *Settlement of Claims and Causes of Action.* The settlement of claims and Causes of Action with respect to the Released Parties as provided for in Section 4.22 of the Plan is hereby approved pursuant to section 1123(b)(3) of the Bankruptcy Code.

28. *Dissolution of Creditors' Committee.* The Creditors' Committee will dissolve and its members shall be released and discharged from all duties and obligations arising from or related to the Magnatrax Reorganization Cases on the Effective Date.

29. *Payment of Fees.* All fees payable by the Magnatrax Debtors on or before the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid by the Magnatrax Debtors on or before the Effective Date and all such fees payable thereafter shall be paid by the Reorganized Magnatrax Debtors. Nothing contained in this Confirmation Order shall preclude the United States Trustee from asserting entitlement to assess and collect quarterly fees from each of the Debtors until their respective chapter 11 cases are closed.

30. *Final Fee Applications.* Pursuant to Section 11.4 of the Plan, all entities employed in the Magnatrax Reorganization Cases pursuant to section 327 or 1103 of the Bankruptcy Code or otherwise, including the professionals seeking compensation or reimbursement of costs and expenses relating to services performed after the Filing Date and prior to and including the Effective Date in connection with the Magnatrax Reorganization Cases, pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code, for services rendered to the Magnatrax Debtors and the Creditors' Committee prior to the Effective Date and Claims for making a substantial contribution under section 503(b)(4) of the Bankruptcy Code must be filed and served on the Reorganized Magnatrax Debtors, their counsel, the agent under the New Term Loan Facility and its counsel not later than twenty (20) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court; such fees, expenses and claims shall be paid in full in such amounts as are allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which a Final Order relating to the allowance of any such Administrative Expense Claim is entered. The Debtors are not authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date and until the Effective Date unless such payment shall be upon application to and approved by the Bankruptcy Court.

31. *Discharge of Claims and Termination of Equity Interests.* Pursuant to Section 9.1 of the Plan, except as otherwise provided in the Plan or the DIP Credit Facility, the rights afforded in the Plan and the payments and Distributions to be made under the Plan and this Confirmation Order shall (i) completely satisfy and discharge all debts and Claims that arose at any time before the Effective Date including, but not limited to, any debt of a kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, and (ii) terminate all Magnatrax Equity Interests, of any kind, nature or description whatsoever against or in the Magnatrax Debtors or any of their assets or properties to the fullest ex-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tent permitted by section 1141(d)(1) of the Bankruptcy Code. Except as otherwise provided in the Plan or this Confirmation Order, upon the Effective Date, all existing Claims against the Magnatrax Debtors and Equity Interests in Magnatrax (including any and all avoidance claims accruing to the Magnatrax Debtors under sections 502(d), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code and any and all alter-ego or derivative claims against present or former stockholders of any Magnatrax Debtor), shall be, and shall be deemed to be, discharged, satisfied, released, terminated and extinguished in full, and all holders of Claims against the Magnatrax Debtors and Magnatrax Equity Interests shall be precluded and enjoined from asserting against the Reorganized Magnatrax Debtors, their successors and assigns, or any of their respective assets or properties, any other or further Claim or Magnatrax Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not (i) such holder has filed a Proof of Claim or proof of Equity Interest, (ii) such holders Claim or Equity Interest is allowed under Section 502 of the Bankruptcy Code, (iii) the holder of such Claim or Equity Interest has voted to accept the Plan or (iv) the facts or legal bases surrounding such holders Claim or Equity Interest were known or existed prior to the Effective Date.

**\*19** 32. *Injunction.* Each Person that is a holder of a Claim and/or an Equity Interest and any other party in interest and each of their Respective Related Persons, and the Litigation Trustee, is permanently, forever and completed stayed, restrained, prohibited and enjoined from, directly or indirectly, derivatively or otherwise, commencing or continuing any Released Action against any Released Party. Nothing herein shall prejudice any right, remedy, defense, claim, cross-claim or counter-claim or third-party claim that any Person may have against any Person other than with respect to the Released Actions against the Released Parties.

33. *Automatic Stay.* All injunctions or stays provided for in the Magnatrax Reorganization Cases under section 105 or section 362 of the Bankruptcy Code (the "Automatic Stay"), or otherwise, and in existence

on the Confirmation Date, shall remain in full force and effect until the occurrence of the Effective Date. Subject to the injunctive relief contained in the Plan and herein on the Effective Date, the Automatic Stay shall be dissolved and of no further force or effect.

34. *Survival of Corporate Indemnities.* Notwithstanding the provisions of the ninth paragraph of Section C of the Amended and Restated Certificate of Incorporation of Magnatrax Corporation, pursuant to Section 7.5 of the Plan (as modified herein), any obligations of the Magnatrax Debtors to defend, indemnify, reimburse or limit the liability of any of their respective directors, officers, agents, representatives and employees who were directors, officers, agents, representatives or employees, respectively, on or after the Filing Date, solely in their capacity as directors, officers, agents, representatives or employees of a Magnatrax Debtor, against any claims or obligations pursuant to the Magnatrax Debtors' certificates or articles of incorporation or by-laws, applicable state law or specific agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and shall not be discharged irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Filing Date and shall, on the Effective Date, become obligations of the Reorganized Magnatrax Debtors; provided that any such indemnification, defense, reimbursement or limitation shall be limited to the extent such directors, officers, agents, representatives or employees have been released pursuant to the Plan as Released Parties under Section 1.128 of the Plan.

35. *Releases and Injunctions.* The release and injunction provisions contained in Section 4.11 and 4.22 of the Plan are fair and equitable, are given for valuable consideration, and are in the best interests of the Magnatrax Debtors and their chapter 11 estates, and are necessary and essential to the Magnatrax Debtors' reorganization, and such provisions are hereby approved and shall be effective and binding upon all persons and entities except that the releases for the Debtors' and the Committee's professionals shall not apply to claims res-

ulting from gross negligence or willful misconduct. All holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employers, agents, officers, directors or principals, shall hereby be permanently and forever barred, restrained and enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the releases and injunctions contained in the Plan and this Confirmation Order (including, without limitation, those releases and injunctions contained in sections 4.11(a), 4.11(b) and 4.11(c) of the Plan and paragraphs 31 and 34 of this Confirmation Order) shall not be binding upon or have any application to Vicwest Corporation, 1269580 Ontario Inc., 1269579 Ontario Inc., Arapaho Shoshoni Enterprises Company, 745674 Ontario Limited, 153810 Canada Inc., 3081877 Canada Inc., 1466828 Ontario Inc., Dumbarton Construction Limited, 359856 Alberta Ltd., Cancom Equity Fund, CEF Limited Partnership No. 2, Westeel Limited or Black Raven Enterprises LLC or any of their successors and assigns (collectively, the "Vicwest Companies"). Accordingly, the Vicwest Companies shall not be deemed to have released, and shall not be enjoined from commencing or continuing any action against, any of the Released Parties in respect of any Released Action.

**\*20** 36. *Cancellation of Existing Securities and Agreements.* Pursuant to Section 4.13 of the Plan, except for purposes of evidencing a right to distributions under the Plan or as otherwise provided hereunder, on the Effective Date, all agreements and other documents evidencing Claims or rights of any holder of a Claim against any of the Magnatrax Debtors (other than with respect to promissory notes issued to holders of Allowed Other Secured Claims in accordance with Section 3.8 of the Plan and the ABCO Bondholder Claims), including, but not limited to, the Credit Agreement, the Subordinated Keep Well Agreements, the Subordinated Mirror Note, the Vicwest Subordinated Guaranty, the Subordinated Tranche B Credit Agreements, options under the Existing Key Management Stock Option Plan, all indentures, notes, bonds and share certificates evidencing such Claims and Equity Interests and any agree-

ments or guarantees related thereto shall be canceled and terminated and deemed null and void, satisfied and discharged and of no further force and effect as against any of the Magnatrax Debtors or the Reorganized Magnatrax Debtors, *provided, however* that the indemnity claims provided for under the Credit Agreement or the Loan Documents (as defined in the Credit Agreement) and the DIP Credit Facility, as applicable, intended to survive payment of the Obligations (as defined in the Credit Agreement), or the obligations under the DIP Credit Facility, as the case may be, shall not be affected by the Plan, the entry of this Confirmation Order or the occurrence of the Effective Date, *provided further,* that the provisions of the Credit Agreement governing the relationship of the Prepetition U.S. Agent and the Senior Lenders, and the provisions of the DIP Credit Facility governing the relationship of the DIP Agent and the DIP Lenders, including, but not limited to, those provisions relating to the Prepetition U.S. Agent's rights of indemnification from the Senior Lenders, shall not be affected by and shall survive the Plan, entry of this Confirmation Order or the occurrence of the Effective Date.

37. *Nonoccurrence of Effective Date.* In the event the Effective Date does not occur, and upon written notification submitted by the Magnatrax Debtors to the Bankruptcy Court, (a) the Confirmation Order shall be vacated; (b) no distributions under the Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan, the Disclosure Statement or the documents contained in the Plan Supplement or other Plan Documents shall be deemed to (i) constitute a waiver or release of any claims by or against the Debtors or any other entity, (ii) prejudice in any manner the rights of the Debtors, the U.S. Prepetition Agent, the Senior Lenders, the DIP Agent, the DIP Lenders, the Creditors' Committee, or any other entity in any further proceedings involving the Debtors, or (iii) constitute an admission, acknowledgment, offer or undertaking by the Magnatrax Debtors or any other Person in any Re-

spect.

**\*21** 38. *Notice of Entry of Confirmation Order.* On or before the tenth (10th) Business Day following the date of entry of this Confirmation Order, the Debtors shall serve notice of entry of this Confirmation Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and 3020(c) on all creditors and interest holders, the United States Trustee, and other parties in interest, by causing notice of entry of this Confirmation Order (the "Notice of Confirmation"), to be delivered to such parties by first-class mail, postage prepaid. The notice described herein is adequate under the particular circumstances and no other or further notice is necessary.

39. *Notice of Effective Date.* Within ten (10) Business Days following the occurrence of the Effective Date, the Reorganized Debtors shall file notice of the occurrence of the Effective Date and shall serve a copy of same on those entities listed in Bankruptcy Rule 3020(c).

40. *Administrative Expense Claim Bar Date.* All requests for payment of an Administrative Expense Claim (other than Administrative Expense Claims incurred or assumed by the Magnatrax Debtors in the ordinary course of business, Professional Fee Claims, Committee Professional Fee Claims and fees or charges assessed against the Magnatrax Debtors under section 1930 of title 28 of the United States Code) must be filed with the Bankruptcy Court and served on counsel for the Magnatrax Debtors and counsel for the Prepetition U.S. Agent not later than forty-five (45) days after the Effective Date, which shall be the Administrative Expense Claim Bar Date. Unless the Magnatrax Debtors and/or the Prepetition U.S. Agent object to an Administrative Expense Claim within forty-five (45) days after receipt of such request, such Administrative Expense Claim shall be deemed Allowed in the amount requested. In the event that the Magnatrax Debtors and/or the Prepetition U.S. Agent object to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be filed with respect to an Administrative Expense Claim which is paid or payable by a Magnatrax Debtor in the ordinary course of business.

41. *Execution of Documents and Actions in Connection with the Effective Date.* On or prior to the Effective Date, the following Persons will take the following actions and will execute the following documents, all of which documents will be come effective on the Effective Date, unless otherwise specified: (a) the Reorganized Magnatrax Debtors which are party to the Exit Credit Facility shall enter into all necessary and appropriate documentation to obtain the Exit Credit Facility, and the Exit Credit Lenders and Reorganized Magnatrax Debtors will execute the Exit Credit Facility and such other documents as are contemplated by the Exit Credit Facility; (b) the Reorganized Magnatrax Debtors and the New Term Loan Facility Agent will execute the New Term Loan Facility and such other documents as are contemplated by the New Term Loan Facility; (c) the Reorganized Magnatrax Debtors will execute the Class 9 Notes (provided however that the Class 9 Notes shall not be required to be executed and delivered until the Final Class 9 Distribution Date or if no Class 9 Notes are issued under the Plan); (d) Reorganized Magnatrax will file with the Secretary of State of Delaware the Amended Certificate of Incorporation; (e) Reorganized Magnatrax and each Person receiving shares of New Common Stock under the Plan will execute the New Stockholders Agreement, if any; (f) the indenture related to the Class 9 Notes shall be executed and delivered by the Reorganized Magnatrax Debtors (provided, however, that this indenture shall not be required to be executed and delivered until the Final Class 9 Distribution Date or if no Class 9 Notes are issued under the Plan); (g) execution of the Litigation Trust Agreement by the Litigation Trustee; and (h) Reorganized Magnatrax, Reorganized ABCO and each holder of an Allowed Secured Claim will execute a New Convertible Note and such other documents as are contemplated by the Plan. The failure of any party to execute any Plan Document shall not delay the occurrence of the Effective Date once all of the conditions to the occurrence of the Effective Date have been satisfied or waived. Nothing in this provision shall be construed to modify or otherwise affect the Conditions Precedent to the Effect-

ive Date, as set forth in paragraph 8.2 of the Plan, including, without limitation, the requirement that the Effective Date shall not occur before the initial draw has been satisfied under the Exit Credit Agreement.

**\*22** 42. *Effective Date.* On the Effective Date, Reorganized Magnatrax or Reorganized ABCO, as the case may be, will issue: (i) up to 920,000 shares of New Common Stock to the Senior Lenders; (ii) an aggregate of $35 million principal amount of New Term A Notes; (iii) an aggregate of $45 million amount of New Term B Notes; (iv) an aggregate of $20 million principal of New Convertible Notes; and (v) Cash in an amount up to $300,000 to the holders of Allowed Class 9 Claims, pursuant to section 3.10(a)(i) of the Plan. Upon the occurrence of the Effective Date, the Plan shall be deemed substantially consummated. On the Final Class 9 Distribution Date, Reorganized ABCO will issue the Class 9 Notes to the extent required by section 3.10 of the Plan.

43. *References to Plan Provisions.* The failure specifically to include or reference any particular provision of the Plan or any particular document in the Plan Supplement or any other Plan Document in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Plan be confirmed (including the documents in the Plan Supplement and any other Plan Document) in its entirely.

44. *Modification, Vacatur or Reversal of Confirmation Order.* If any provision of this Confirmation Order is hereafter modified, vacated or reversed by subsequent order of the Bankruptcy Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of any such order; nor shall such reversal, modification or vacatur hereof affect the validity or enforceability of such acts or obligations. Notwithstanding any reversal, modification or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to and in reliance on this Confirmation Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Confirmation

Order and of the Plan and the documents contained in the Plan Supplemental and all other Plan Documents, and all documents, instruments and agreements related thereto, or any amendments or modifications thereto.

45. *Conflicts Between Confirmation Order and Plan.* The provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purpose of each; *provided, however,* in the event there is any inconsistency, discrepancy or conflict between any Plan provision and any provision of this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern and control.

46. *Conflicts Between the Plan, Disclosure Statement and Plan Documents.* In the event there is any inconsistency, discrepancy or conflict between (a) the terms and provisions of the Plan and the terms and provisions of the Disclosure Statement or (b) the terms and provisions of the Plan and any document contained in the Plan Supplement or any other Plan Document, the terms and provisions of the Plan shall control and govern, *provided, however,* in the event there is any inconsistency, discrepancy or conflict between the terms and provisions of the Plan and the terms and provisions of the Exit Credit Facility, the New Term Loan Facility, the New Convertible Notes, or any other Plan Document, the terms and provisions of the Exit Credit Facility, the New Term Loan Facility, the New Convertible Notes, or such other Plan Document, as applicable, shall control and govern.

**\*23** 47. *Further Assurances.* The Magnatrax Debtors, the Reorganized Magnatrax Debtors and all holders of Claims and Equity Interests receiving Distributions under this Plan and all other parties-in-interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan, the documents contained in the Plan Supplement and all other Plan Documents.

48. *Applicable Non–Bankruptcy Law.* Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code,

the provisions of this Confirmation Order, the Plan, the documents contained in the Plan Supplement and all other Plan Documents shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

49. Ordered that in connection with the objection filed by the United States, on behalf of the Internal Revenue Service (the "IRS"), notwithstanding any provisions to the contrary in the Plan or this Confirmation Order: (i) interest to be paid to the IRS on account of its Allowed Priority Tax Claims (including Secured Tax Claims), if any (the "IRS Allowed Claims") pursuant to section 3.4 of the Plan shall accrue at the rate and method set forth in 26 U.S.C. sections 6621 and 6622; (ii) payment on the IRS Allowed Claims shall be made on a quarterly basis; (iii) nothing shall affect the rights of the IRS to assert or exercise a right of setoff, if any; (iv) nothing shall affect the rights and remedies of the IRS under 26 U.S.C. section 6672; (v) to the extent that the Debtors have not filed one or more of their post-petition tax returns, the IRS shall have until 90 days after the filing of each such respective return (together with service of a copy of such return on Keith Fogg, Esquire, Office of Chief Counsel, Internal Revenue Service, 600 East Main Street, Suite 1601, Richmond, VA 23219–2430) to file a claim asserting administrative priority under section 507(a) of the Bankruptcy Code, notwithstanding the imposition of a general bar date for administrative claims in these cases; and (vi) with respect to proofs of claim filed by the IRS prior to the date hereof, relating to certain refunds paid to the Debtors (the "Refund Claims"), the Debtors shall not commence an objection proceeding with respect to such Refund Claims in the Bankruptcy Court prior to the earlier of (1) completion of the internal review and audit process currently being undertaken by the IRS with respect to such Refund Claims and (2) January 1, 2005, and the deadline provided by Section 6.1 of the Plan for the filing of objections to claims shall not apply to any objection filed by the Debtors to such Refund Claims.

50. *Payment of Fees on Exit Facility.* To the extent any fees, costs, or expenses are incurred in connection with any commitment by the Exit Facility Agent or the Exit Facility Lenders beyond its current expiration, such fees and expenses may be paid by the Debtors without further application or approval of the Court subject only to the consent of the DIP Lenders. Any fees, costs, and expenses incurred in accordance with the Exit Credit Agreement may be paid out of the Exit Credit Facility at closing without further application or approval of the Court. Any deposits held by the Exit Facility Agent, the Exit Facility Lenders, or on their behalf may be used to offset any fees, costs, and expenses incurred under the Commitment Letter or in accordance with the Exit Credit Agreement.

**\*24** 51. *Final Order.* This Order is a final order and the period in which an appeal must be filed shall commence upon entry hereof. Notwithstanding Fed. R. Bank. P. 7062, this Order shall be effective and enforceable immediately upon entry.

## EXHIBIT A

| NAME OF DEBTOR | CASE NUMBER |
| --- | --- |
| MAGNATRAX Corporation | 03–11402 |
| American Buildings Company | 03–11403 |
| American Buildings Company International, Inc. | 03–11404 |
| AMT/Beaman Corporation | 03–11405 |
| Associated Building System, Inc. | 03–11406 |
| Jannock, Inc. | 03–11407 |

| | |
|---|---|
| Jannock U.S.B.G., Inc. | 03–11409 |
| Jannock Vinyl Group, Inc. | 03–11410 |
| Jenisys Engineered Products, Inc. | 03–11412 |
| MAGNATRAN Corporation | 03–11413 |
| MAGNATRAN Logistics, Inc. | 03–11416 |
| MAGNATRAX Finance Company | 03–11417 |
| Republic Builders Products Company | 03–11418 |
| Rescom Overhead Doors, Inc. | 03–11419 |
| Smith Door Distributing, Inc. | 03–11420 |
| U.S. Westeel, Inc. | 03–11422 |
| Windsor Door, Inc. | 03–11424 |

Bkrtcy.D.Del.,2003.
In re Magnatrax Corp.
Not Reported in B.R., 2003 WL 22807541
(Bkrtcy.D.Del.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**In re Middlebrook Pharms., Inc.**

**No. 10-11485, 2010 Bankr. LEXIS 5859 (Bankr. D. Del. Dec. 20, 2010)**



In re: MIDDLEBROOK PHARMACEUTICALS, INC., [1] Debtor.

1   The last four digits of the Debtor's taxpayer identification number are 8264. The Debtor's mailing address is 7 Village Circle, Suite 100, Westlake, Texas 76262.

**Chapter 11, Case No. 10-11485 (MFW)**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

*2010 Bankr. LEXIS 5859*

**December 30, 2010, Decided**

**COUNSEL:** [*1] For Middlebrook Pharmaceuticals, Inc., aka Advancis Pharmaceuticals Corporation, Debtor: Joel A. Waite, Kenneth J. Enos, Young, Conaway, Stargatt & Taylor, Wilmington, DE; Kathryn Zoe Merrell, Sage Sigler, Alston & Bird LLP, Atlanta, GA; Morgan L. Seward, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE.

For Official Committee of Unsecured Creditors, Creditor Committee: Evan T. Miller, GianClaudio Finizio, Bayard, P.A., Wilmington, DE; Mary Kim, Sam J. Alberts, Dickstein Shapiro LLP, Washington, DC.

**JUDGES:** HONORABLE MARY F. WALRATH, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** MARY F. WALRATH

**OPINION**

Re: Docket Nos. 429 and 545

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER APPROVING DISCLOSURE STATEMENT AND CONFIRMING THE DEBTOR'S MODIFIED PLAN OF LIQUIDATION**

This case is before the Court on a request for confirmation of the Modified Plan of Liquidation, dated December 29, 2010 [Docket No. 545] (the "Plan"), [2] proposed by MiddleBrook Pharmaceuticals, Inc. (the "Debtor"), and approval of the Disclosure Statement related thereto (the "Disclosure Statement") [Docket No. 430]. After notice, hearings were held regarding approval of the Disclosure Statement and confirmation of the Plan on December 13, 2010 and December [*2] 29, 2010.

2   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

**Procedural Background**

a. On April 30, 2010 (the "Petition Date""), the Debtor commenced a voluntary case (the "Bankruptcy Case") under Chapter *11 of the Bankruptcy Code*. *Sections 1107(a)* and *1108 of the Bankruptcy Code* authorize the Debtor to operate its business and manage its assets as a debtor in possession. No party in interest has requested the appointment of a trustee or examiner.

b. On May 11, 2010, the United States Trustee for the District of Delaware (the "United States Trustee") appointed an official committee of unsecured creditors

(the "Creditors' Committee") in the Bankruptcy Case under *Section 1102 of the Bankruptcy Code*. [Docket No. 42].

c. On June 24, 2010, the United States Trustee appointed an official committee of equity security holders (the "Equity Committee") in the Bankruptcy Case. [Docket No. 154].

d. On July 28, 2010, the Court entered an order (the "Sale Order") approving the sale ("Sale") of substantially all of the Debtor's assets to Victory Pharma Inc. ("Victory").

e. The Sale to Victory closed on July 30, 2010 (the "Closing Date").

f. On November [*3] 4, 2010, the Debtor filed its original Plan of Liquidation [Docket No. 429] (the "Original Plan") and Disclosure Statement.

g. On November 5, the Debtor, the Creditors' Committee and the Equity Committee entered into the Stipulation (the "Stipulation") with Respect to (a) the Form and Manner of Notice of Disclosure Statement and Confirmation Hearing, (b) the Record Date, and (c) the Deadline and Procedures for Filing Objections to (i) the Adequacy of the Disclosure Statement, (ii) Confirmation of the Plan, and (iii) Proposed Treatment of Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan (collectively, the "Plan Procedures"). [Docket No. 432].

h. The Stipulation was approved by this Court on November 8, 2010 [Docket No. 434].

i. Pursuant to the Stipulation:

i. November 4, 2010 at 4:00 p.m. (Eastern Time), was established as the Record Date for purposes of determining the Creditors entitled to receive notice of the Disclosure Statement and the hearing on confirmation of the Original Plan (the "Disclosure Statement and Confirmation Hearing Notice");

ii. December 6, 2010 at 4:00 p.m. (Eastern Time), was established as the deadline (the "Objection Deadline") [3] for filing [*4] any objection, comment or

response to the Disclosure Statement or to confirmation of the Original Plan; and

iii. the hearing on the adequacy of the Disclosure Statement and confirmation of the Original Plan (the "Disclosure Statement and Confirmation Hearing") was scheduled for December 13, 2010 at 11:30 a.m. (Eastern Time).

3 The Debtor extended the objection deadline for the Creditors Committee until December 8, 2010, and for the office of the United States Trustee until December 9, 2010.

j. As evidenced by the Affidavit of Service of Karen M. Wagner (the "Mailing Affidavit") [Docket No. 436], at the direction of the Debtor and commencing on November 8, 2010, Kurtzman Carson Consultants LLC ("KCC") mailed the Disclosure Statement and Confirmation Hearing Notice to parties holding unclassified Claims, Holders of Claims in Classes 1, 2 and 3, and all other known parties in interest, notifying such parties and Holders of Claims of the deadline and procedures for filing objections to the Disclosure Statement or the Original Plan and that December 13, 2010 at 11:30 a.m. was the date and time of the Disclosure Statement and Confirmation Hearing. See Disclosure Statement and Confirmation Hearing [*5] Notice, Docket No. 435.

k. The Disclosure Statement and Confirmation Hearing Notice further notified the parties of the following facts: (a) they were Unimpaired by the Original Plan and thus, were ineligible to vote on the Original Plan, (b) the proposed classification of their Claims or Interests and the estimated recovery for each Class, and (c) in bold in a separate heading entitled "Exculpation, Injunctions and Releases", notified them that, subject to an objection by a party in interest and subject to Bankruptcy Court approval, the Original Plan contained certain injunction, exculpation and release provisions and set forth each provision in bold. See Disclosure Statement and Confirmation Hearing Notice, Docket No. 435.

l. On November 10, 2010, the Debtor caused a notice of the Disclosure Statement and Confirmation Hearing, including information regarding all related deadlines and the proposed injunctions, exculpations and

releases, to be published in the New York Times (the "Publication Notice"), as evidenced by the Certification of Publication filed on November 12, 2010. [Docket No. 438].

m. On November 29, 2010, the Debtor filed the Plan Supplement, including the Plan Administrator [*6] Agreement (Exhibit 1 to the Plan Supplement) and the Plan Committee Agreement (Exhibit 2 to the Plan Supplement). [Docket No. 478].

n. On December 6, 2010, Riverside Claims, LLC ("Riverside"), filed its Objection to Disclosure Statement for the Debtor's Plan of Liquidation and the Debtor's Plan of Liquidation (the "Riverside Objection"). [Docket No. 490].

o. Also on December 6, 2010, the Equity Committee filed its Limited Objection to Confirmation of the Debtor's Plan of Liquidation (the "Equity Committee Objection"). [Docket No. 491].

p. On December 8, 2010, Seneca Meadows Corporate Center III L.L.L.P., Minkoff Development Corporation, and Seneca Meadows Corporate Center II L.L.C. (collectively, the "Seneca Entities") filed their Limited Objection to Debtor's Plan of Liquidation and Disclosure Statement for Debtor's Plan of Liquidation (the "Seneca Objection"). [Docket No. 495].

q. Also on December 8, 2010, the Creditors' Committee filed its Objection to Confirmation of the Debtor's Plan of Liquidation (the "Creditors' Committee Objection"). [Docket No. 496].

r. On December 9, 2010, the United States Trustee filed its Objection to Confirmation of the Debtor's Plan of Liquidation (the "United [*7] States Trustee Objection," together with the Riverside Objection, the Equity Committee Objection, the Seneca Objection and the Creditors' Committee Objection, the "Objections"). [Docket No. 501].

s. On December 9, 2010, the Debtor filed its Memorandum of Law and Reply in Support of Confirmation of the Debtor's Plan of Liquidation (the "Confirmation Brief") in support of confirmation of the Original Plan. [Docket No. 503].

t. On December 10, 2010, the Creditors' Committee filed its Objection to Proposed Form of Confirmation

Order With Respect to the Issue of Late-Filed Claims (the "Confirmation Order Objection"). [Docket No. 509].

u. At the Disclosure Statement and Confirmation Hearing, the Court heard the statements of counsel and evidentiary proffers of testimony by Brad Cole, Dave Carlson and Bill Pate, and the testimony of Ron Glass, and also received certain exhibits into evidence, in respect of the approval of the Disclosure Statement and confirmation of the Original Plan.

v. Subsequent to the Disclosure Statement and Confirmation Hearing held on December 13, 2010, and the continued hearing held on December 29, 2010, and based on certain rulings made by the Court at such hearings, [*8] the Debtor filed the Modified Plan of Liquidation (the "Modified Plan") on December 29, 2010. [Docket No.    ]. Hereinafter, all references to the "Plan" shall be to the Modified Plan, unless the context is a reference to the original Plan.

NOW THEREFORE, based upon the Court's review of the Plan, the Disclosure Statement, the Plan Supplement and other documents filed in connection with the Plan, the Confirmation Brief, and the Objections, and upon (i) all of the evidence proffered or adduced and arguments of counsel made at the Disclosure Statement and Confirmation Hearing and (ii) the entire record of this Bankruptcy Case, and after due deliberation thereon, discussions made on the record at the Disclosure Statement and Confirmation Hearing and good cause appearing therefore, this Court hereby makes and issues the following Findings of Fact, Conclusions of Law and Orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[4]

4    This order (the "Confirmation Order") constitutes this Court's findings of fact and conclusions of law under *Rule 52 of the Federal Rules of Civil Procedure* (the "Federal Rules"), as made applicable herein by *Bankruptcy Rules 7052* and *9014*. Findings of fact shall be construed [*9] as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See *Fed. R. Bankr. P. 7052*.

A. Exclusive Jurisdiction; Venue; Core Proceeding (*28 U.S.C. §§ 157(b)(2)* and *1334(a)*). On the Petition Date, the Debtor commenced the Bankruptcy Case by

filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor was qualified and is qualified to be a debtor under *Section 109 of the Bankruptcy Code*. The Debtor is authorized to and has been operating as a debtor-in-possession since the commencement of the Bankruptcy Case. No Trustee or examiner has been appointed in the case. Venue was proper as of the Petition Date and continues to be proper pursuant to *28 U.S.C. §§ 1408* and *1409*. This Court has jurisdiction over this Bankruptcy Case pursuant to *28 U.S.C. §§ 157* and *1334*. Confirmation of the Plan is a core proceeding pursuant to *28 U.S.C. § 157(b)(2)(L)*, and this Court has exclusive jurisdiction to determine whether the Disclosure Statement contains adequate information and should be approved, and whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed. The Court has the power [*10] to authorize and direct each of the actions contemplated by the Plan.

B. Findings Regarding the Debtor. The Debtor has been duly incorporated or formed under the laws of jurisdiction in which it was organized. MiddleBrook Pharmaceuticals, Inc. is in good standing in the Commonwealth of Delaware and is registered and/or authorized to do business in the jurisdictions in which such authorization is necessary for the implementation, effectuation and consummation of this Plan. As a debtor-in-possession, the management of the Debtor, including but not limited to its board of directors and officers are and were duly authorized and empowered to take any and all such actions contemplated by and giving rise to the Plan. Each action, agreement and transaction contemplated by the Plan and this Confirmation Order, and all related actions, agreements and transactions necessary to implement, effectuate and confirm the Plan are authorized and lawful.

The Debtor, acting by and through its officers or managers, is duly authorized and empowered to take any and all such actions as any of these may determine are necessary or appropriate to implement, effectuate and consummate any and all documents or transactions [*11] contemplated by the Plan or this Confirmation Order. The Debtor has duly authorized, or is empowered to duly authorize, each of the acts, documents, agreements and transactions contemplated in the Plan and this Confirmation Order (the "Plan Documents") to implement, effect and consummate the Plan.

C. Judicial Notice. The Court takes judicial notice of the docket in this Bankruptcy Case maintained by the clerk of the Court, including, without limitation, all pleadings and other documents filed, all orders entered, all prior hearing transcripts and evidence and argument made, proffered or adduced at the hearings held before the Court during the pendency of this Bankruptcy Case.

D. Burden of Proof. The Debtor, as proponent of the Plan, has met its burden of satisfying and proving the elements of *Sections 1125* and *1129(a)* and *(b) of the Bankruptcy Code* by a preponderance of the evidence, as further found and determined herein.

E. Appropriateness of the Plan Procedures. The Plan Procedures set forth in the Stipulation were fair and appropriate under the circumstances, provided adequate notice to all parties in interest and otherwise complied with *Section 1125* and *1126 of the Bankruptcy Code*.

F. [*12] Transmittal of Plan Materials. In satisfaction of *Sections 1125* and *1126 of the Bankruptcy Code* and *Bankruptcy Rule 2002(b)*, and in accordance with the Stipulation between the Debtor, the Creditors' Committee and the Equity Committee, on or about November 8, 2010, the Debtor, through KCC, mailed the Disclosure Statement and Confirmation Hearing Notice to parties holding unclassified Claims, Holders of Claims in Classes 1, 2 and 3, and all other known parties in interest, and published the Publication Notice, notifying such parties and Holders of Claims of the deadline and procedures for filing objections to the Disclosure Statement or the Plan and that December 13, 2010 at 11:30 a.m. was the date and time of the Disclosure Statement and Confirmation Hearing. The Disclosure Statement and Confirmation Hearing Notice and the Publication Notice put parties in interest on notice of the following: (a) that they were Unimpaired by the Plan and thus, were ineligible to vote on the Plan, (b) the proposed classification of their Claims or Interests and the estimated recovery for each Class, and (c) that the Plan contained certain injunction, exculpation and release provisions.

G. No Solicitation [*13] Required; No Requirement for Resolicitation. Because no Classes of Claims or Interests were eligible to vote on the Plan, the solicitation of votes for acceptance or rejection of the Plan was not required, as set forth in *Section 1126(f) of the Bankruptcy Code*. The Debtor's service of the Disclosure Statement and Confirmation Hearing Notice on all parties in

interest, and the publication of the Publication Notice, therefore satisfied *Sections 1125* and *1126 of the Bankruptcy Code*, *Bankruptcy Rules 3017* and *3018*, the Stipulation, and all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws and regulations. Accordingly, the Court finds no need to solicit, or resolicit, any votes.

H. Adequacy of Notice. Notice of the Disclosure Statement and Confirmation Hearing, including all deadlines established in the Stipulation, was given in compliance with the Bankruptcy Rules and the Stipulation and the materials served in conjunction therewith and the publication of the Publication Notice were good and sufficient notice in accordance with *Bankruptcy Rules 2002(b)* and *3020(b)(2)*. The Disclosure Statement contained adequate information, and otherwise complies with [*14] *Bankruptcy Code Sections 1125* and *1126* and *Bankruptcy Rules 3017* and *3018*. The Plan Supplement, and all amendments, modifications, and supplements thereto, were transmitted and served in compliance with the Bankruptcy Rules. All parties in interest had the opportunity to appear and be heard at the Disclosure Statement and Confirmation Hearing and no other or further notice is required.

I. Bar Date. On July 6, 2010, the Court entered an order (the "Bar Date Order") [Docket No. 176] establishing August 27, 2010, as the general deadline to file proofs of claim for prepetition claims against the Debtor (the "General Bar Date") and October 31, 2010, as the bar date for governmental units (the "Governmental Unit Bar Date").

J. Impaired Classes Voting to Accept the Plan. As provided in Article II of the Plan, no Classes of Claims or Interests are Impaired under the Plan.

K. Classes Deemed To Accept the Plan. Class 1--Priority Non-Tax Claims, Class 2--Secured Claims, Class 3--General Unsecured Claims and Class 4--Interests are not impaired under the Plan and are deemed to have accepted the Plan pursuant to *Section 1126(f) of the Bankruptcy Code*.

L. Classes Deemed to Reject the Plan. All Classes are [*15] receiving or retaining distributions or property under the Plan and, accordingly, there are no Classes deemed to have rejected the Plan.

M. Preservation of Causes of Action. Pursuant to the Plan and Disclosure Statement, the Debtor has provided due and sufficient notice that the Plan preserves all Causes of Action, including actions under Chapter 5 of the Bankruptcy Code, except as otherwise set forth in the Plan, the Plan Supplement, and any settlement agreements approved by this Court or this Confirmation Order.

N. *Rule 9019(a)* Settlement. Except as otherwise provided in the Plan and this Confirmation Order, the Plan is a settlement between and among the Debtor and its creditors and equity holders of all claims and litigation against the Debtor, pending or threatened, or that were or could have been commenced against the Debtor prior to the date of entry of this Confirmation Order (other than the Post-Effective Date Debtor's ability to prosecute objections to Claims and other retained Causes of Action to the extent preserved by the Plan). Such settlement, as reflected in the relative distributions and recoveries or other benefits provided to holders of Claims or Interests under the [*16] Plan, (i) will save the Debtor and its Estate the costs and expenses of prosecuting various disputes, the outcome of which is likely to consume substantial resources of the Debtor's Estate and require substantial time to adjudicate, and (ii) has facilitated the creation and implementation of the Plan and benefits the Debtor's Estate and creditors. Accordingly, such settlement is fair and reasonable.

O. Exculpation and Injunctions. Pursuant to *Section 1123(b)(3) of the Bankruptcy Code* and *Bankruptcy Rule 9019(a)*, the settlements, compromises, exculpations and injunctions set forth in Article IX of the Plan and herein, and implemented by this Confirmation Order, are fair, equitable, reasonable and in the best interests of the Debtor, its Estate, the Post-Effective Date Debtor, creditors and equity holders. Such compromises and settlements are made in exchange for adequate consideration and are in the best interests of the Holders of Claims and Interests, are fair, necessary, equitable and reasonable, and are integral elements of the resolution of this Bankruptcy Case in accordance with the Plan. The exculpation is (i) within the jurisdiction of this Court under *28 U.S.C. §§ 1334(a)*, *1334(b)* [*17] and *1334(d)*; (ii) an essential means of implementing the Plan pursuant to *Section 1123(a)(5) of the Bankruptcy Code*; (iii) an integral element of the Plan; (iv) conferring material benefit on, and is in the best interests of, the Debtor, its estate and its creditors and interest holders; (v) important to the overall objectives of the Plan to finally resolve all

Claims among or against the parties-in-interest in the Bankruptcy Case with respect to the Debtor; (vi) within the reasonable range of litigation outcomes; and (vii) consistent with *sections 105*, *1123*, *1129* and other applicable provisions of the Bankruptcy Code and with applicable law. The record of the Confirmation Hearing and this Bankruptcy Case is sufficient to support the releases, exculpations, and injunctions provided for in Article IX of the Plan and herein.

P. Assumption and Rejection of Executory Contracts and Unexpired Leases. Article VII of the Plan governing the assumption and rejection of executory contracts and unexpired leases satisfies the requirements of *Section 365 of the Bankruptcy Code*. The assumption or rejection of any executory contract or unexpired lease pursuant to Article [*18] VII of the Plan and this Confirmation Order shall be legal, valid, and binding upon the Debtor or Post-Effective Date Debtor and all parties to such executory contract or unexpired lease to the same extent as if such assumption or rejection had been effectuated pursuant to an order of the Court entered before the confirmation of the Plan.

Q. Plan's Compliance with Bankruptcy Code (*11 U.S.C. § 1129(a)(1)*). The Plan complies with the applicable provisions of the Bankruptcy Code, including, without limitation, *Sections 1122* and *1123*, thereby satisfying *Section 1129(a)(1) of the Bankruptcy Code*.

(i) *Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))*. In addition to Administrative Claims and Priority Tax Claims, which are not and do not need to be classified, the Plan designates separate Classes of Claims and Interests for and against the Debtor. The Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class. Valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between holders [*19] of Claims and Interests or the holders of such Claims and Interests have consented to such classification. Thus, the Plan satisfies *Sections 1122* and *1123(a)(1) of the Bankruptcy Code*.

(ii) *Specify Unimpaired Classes (11 U.S.C. § 1123(a)(2))*. Article II of the Plan specifies that Class 1--Priority Non-Tax Claims, Class 2--Secured Claims, Class 3 - General Unsecured Claims and Class 4--Interests are not impaired in that the legal, equitable or

contractual rights of Holders of Claims or Interests in these Classes are not altered under the Plan, which satisfies *Section 1123(a)(2) of the Bankruptcy Code*.

(iii) *Specify Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))*. Article II of the Plan provides that no classes of Claims or Interests are Impaired under the Plan, which is in compliance with *Section 1123(a)(3) of the Bankruptcy Code*.

(iv) *No Discrimination (11 U.S.C. § 1123(a)(4))*. Article III of the Plan provides for the same treatment by the Debtor for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, which satisfies *Section 1123(a)(4) of the Bankruptcy Code*.

(v) *Implementation* [*20] *of the Plan (11 U.S.C. § 1123(a)(5))*. Article V of the Plan contains numerous provisions to adequately facilitate implementation of the Plan, including, without limitation: the setting of an Administrative Expense Bar Date, preserving Causes of Action belonging to the Estate, the appointment of a Plan Administrator to liquidate the remaining assets of the Debtor, providing for the dissolution of the Debtor and the means by which objections to and allowance of Claims will occur for purposes of distribution. See Plan, Article V. All of these means are sufficient to implement the Debtor's Plan and the Plan provides adequate and proper means for its implementation, which satisfies *Section 1123(a)(5) of the Bankruptcy Code*.

(vi) *Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6))*. Section 1123(a)(6) of the Bankruptcy Code does not apply to the Plan because the Debtor does not propose to issue any non-voting equity securities under the Plan.

(vii) *Selection of Officers, Directors and the Trustee (11 U.S.C. § 1123(a)(7))*. Pursuant to Section 5.6 of the Plan and the Plan Administrator Agreement attached to the Plan Supplement as Exhibit 1, Ronald Glass of GlassRatner Advisory & Capital Group, [*21] LLC will be appointed as the Plan Administrator. As required by *Section 1123(a)(7) of the Bankruptcy Code*, the Debtor has selected Mr. Glass in a manner consistent with the interests of creditors and equity security holders and with public policy.

(viii) *Additional Provisions of the Plan (11 U.S.C. §*

1123(b)). The Plan contains additional permissive provisions, including, without limitation: (i) Section 7.1 of the Plan provides for the rejection of the Debtor's remaining executory contracts; (ii) Section 9.6 provides that all consideration exchanged under the Plan shall be in exchange for, and in complete satisfaction, settlement and release of, all Claims and Interests of any nature whatsoever against the Debtor or any of its Estate, assets, properties or interest in property; and (iii) Sections 5.4 and 5.8 of the Plan provide that the Debtor and its Estate shall retain the Causes of Action, and the Post-Effective Date Debtor and the Plan Administrator, as successors in interest to the Debtor and its Estate, may enforce, sue on settle or compromise any or all of the Causes of Action. The injunctions and stays issued pursuant to Section 9.7 of the Plan preserve and enforce the releases [*22] granted by the Plan and are narrowly tailored to achieve that purpose. Such provisions, and all other provisions of the Plan are consistent with *Section 1123(b)(6) of the Bankruptcy Code*, and not inconsistent with the applicable provisions of the Bankruptcy Code.

R. Compliance with *Bankruptcy Rule 3016*. The Plan is dated and identifies the entity submitting it, thereby satisfying *Bankruptcy Rule 3016(a)*. The filing of the Disclosure Statement with the Court satisfies *Bankruptcy Rule 3016(b)*. The Plan describes in specific and conspicuous language all acts to be enjoined under the Plan and identifies all entities that are subject to the injunctions set forth in the Plan in accordance with *Bankruptcy Rule 3016(c)*.

S. Compliance with *Bankruptcy Rule 3018*. As set forth more fully in Paragraphs F, G, and H above, no solicitation of votes to accept or reject the Plan was required as no parties were entitled to vote on the Plan. The Notice of Disclosure Statement and Confirmation Hearing was transmitted to all creditors and known parties in interest, the Publication Notice was published in the New York Times, sufficient time was prescribed for the parties in interest to object to the adequacy [*23] of the Disclosure Statement or the confirmation of the Plan, and the materials related to the Plan Procedures otherwise comply with *Section 1126 of the Bankruptcy Code*, thereby satisfying the requirements of *Bankruptcy Rule 3018*.

T. Debtor's Compliance with Bankruptcy Code (*11 U.S.C. § 1129(a)(2)*). The Debtor has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Stipulation in transmitting the Plan, the Disclosure Statement, and the Notice of Disclosure Statement and Confirmation Hearing and publishing the Publication Notice and has otherwise complied with the provisions of Title 11, thereby satisfying *Section 1129(a)(2) of the Bankruptcy Code*.

U. Plan Proposed in Good Faith (*11 U.S.C. § 1129(a)(3)*). The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying *Section 1129(a)(3) of the Bankruptcy Code*. The Plan is designed to allow the Debtor to liquidate its remaining assets in a manner that will maximize recoveries to its creditors and interest holders. Moreover, the Plan itself, the process leading to its formation, and the support for the Plan received from various parties in interest provides [*24] independent evidence of the Debtor's good faith. The Debtor, its predecessors, successors and assigns (whether by operation of law or otherwise) and its current and former equity holders, officers, directors, employees, managers, shareholders, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and professionals, or other representatives have acted in "good faith" within the meaning of *Section 1125(e) of the Bankruptcy Code*, thus satisfying the "good faith" requirement of *Section 1129(a)(3)*. Further, the Plan is the product of extensive, arm's length negotiations among the Debtor, the Creditors' Committee, the Equity Committee, certain of the Debtor's shareholders and each of their respective representatives, and reflects, where applicable, the results of these arm's length negotiations and embodies the best interests of all of the constituencies of the Debtor's Estate. In determining that the Plan has been proposed in good faith, this Court has examined the totality of the circumstances surrounding the formulation of the Plan.

V. Payments for Services or Costs and Expenses (*11 U.S.C. § 1129(a)(4)*). Any payment made or to be made by the Debtor or by [*25] any person acquiring property under the Plan, for services or for costs and expenses in or in connection with the Bankruptcy Case, or in connection with the Plan and incident to the Bankruptcy Case, has been disclosed to this Court. Any such payment made on a final basis before confirmation of the Plan is reasonable and any such payment to be fixed or approved on a final basis after confirmation of the Plan is subject to Court approval, as reasonable. The Plan therefore satisfies *Section 1129(a)(4) of the Bankruptcy Code*.

W. Directors. Officers and Insiders (*11 U.S.C. § 1129(a)(5)*). Pursuant to *Section 1129(a)(5) of the Bankruptcy Code*, the Debtor disclosed the identity of the proposed Plan Administrator in Exhibit 1 to the Plan Supplement. The appointment of the Plan Administrator is consistent with the interests of the Holders of Claims and Interests and with public policy. The provisions are consistent with the requirements of *Section 1129(a)(5)* and are in the best interests of Creditors and therefore, the Plan satisfies the requirements of *Section 1129(a)(5) of the Bankruptcy Code*.

X. No Rate Changes (*11 U.S.C. § 1129(a)(6)*). The Plan does not provide for the change of any rates [*26] subject to the oversight of a governmental regulatory commission. Thus, *Section 1129(a)(6) of the Bankruptcy Code* is inapplicable.

Y. Best Interests Test (*11 U.S.C. § 1129(a)(7)*). All Classes of Claims and Interests are Unimpaired under the Plan and thus are deemed to have accepted the Plan. *Section 1129(a)(7) of the Bankruptcy Code* is therefore inapplicable.

Z. Acceptance or Rejection by Certain Classes (*11 U.S.C. § 1129(a)(8)*). Because all Classes of Claims and Interests are Unimpaired and are deemed to accept the Plan, *Section 1129(a)(8) of the Bankruptcy Code* is satisfied and the Plan and a cram down under *Section 1129(b)* is not required.

AA. Treatment of Administrative, Priority and Tax Claims (*11 U.S.C. § 1129(a)(9)*). The Plan provides for treatment of Allowed Claims entitled to priority pursuant to *Section 507(a)(2)-(8) of the Bankruptcy Code* in the manner required by *Section 1129(a)(9) of the Bankruptcy Code*.

BB. Acceptance By Impaired Class (*11 U.S.C. § 1129(a)(10)*). *Section 1129(a)(10) of the Bankruptcy Code* is inapplicable because there is no Class of Impaired Claims or Interests.

CC. Feasibility (*11 U.S.C. § 1129(a)(11)*). The Plan is feasible as the Debtor has demonstrated, [*27] through the financial information provided in its monthly operating reports and evidence proffered or adduced at the Disclosure Statement and Confirmation Hearing, that there is a high probability the Debtor possesses sufficient funds to meet its expectations under the Plan--to satisfy in full Administrative Expenses, the Priority Tax Claims,

the Priority Non-Tax Claims, the Secured Claims and the General Unsecured Claims and distribute to Holders of Allowed Interests in Class 4 a Pro Rata share of the remaining value of the Debtor. The Plan therefore complies with *Section 1129(a)(11) of the Bankruptcy Code*.

DD. Payment of Fees (*11 U.S.C. § 1129(a)(12)*). Section 10.9 of the Plan provides that all fees payable pursuant to *Section 1930 of Title 28 of the United States Code*, shall be paid by the Debtor or the Plan Administrator. Therefore the Plan meets the requirements of *Section 1129(a)(12) of the Bankruptcy Code*.

EE. Retiree Benefits (*11 U.S.C. § 1129(a)(13)*). The Debtor has no obligation to pay for retiree benefits and therefore *Section 1129(a)(13)* is not applicable to the Plan.

FF. Payment of Domestic Support Obligations (*11 U.S.C. § 1129(a)(14)*). The Debtor is not required by any judicial [*28] or administrative order, or by statute, to pay any domestic support obligation and *Section 1129(a)(14)* is therefore inapplicable to the Plan.

GG. Certain Payments by Individual Debtors (*11 U.S.C. § 1129(a)(15)*). The Debtor is not an individual and therefore *Section 1129(a)(15)* is inapplicable to the Plan.

HH. Transfers of property of a Debtor that is not a moneyed interest (*11 U.S.C. § 1129(a)(16)*). The Debtor is a for-profit corporation and *Section 1129(a)(16)* by its terms applies only to corporations and trusts that are *not* "moneyed, business, or commercial." *Section 1129(a)(16)* is therefore inapplicable to the Plan.

II. No Unfair Discrimination; Fair and Equitable (*11 U.S.C. §1129(b)*). Because all Classes of Claims and Interests are deemed to have accepted the Plan, "cramdown" of the Plan as set forth in *Section 1129(b)(1) of the Bankruptcy Code* is not required.

JJ. Principal Purpose (*11 U.S.C. § 1129(d)*). The avoidance of *Section 5 of the Securities Act of 1933* is not the principal purpose of the Plan, nor is the avoidance of taxes or any provision of applicable tax law a principal purpose of the plan, and no governmental unit has objected to the confirmation of the Plan asserting [*29] such avoidance. The Plan, therefore, satisfies the requirements of *Section 1129(d) of the Bankruptcy Code*.

KK. Good Faith Solicitation (*11 U.S.C. § 1125(e)*). Based on the record in this Bankruptcy Case, the Debtor and its directors, officers, employees, advisors and attorneys have acted in "good faith" within the meaning of *Section 1125(e) of the Bankruptcy Code* and Bankruptcy Rules in compliance with all of their respective activities related to the Disclosure Statement and the Plan and their participation in the activities described in *Section 1125 of the Bankruptcy Code* and, accordingly, such parties are entitled to the protections afforded by *Section 1125(e) of the Bankruptcy Code* and the exculpation provisions set forth in Article IX of the Plan. Based upon the Court's review of the amendments and modifications embodied in the Plan, no solicitation is necessary.

LL. Satisfaction of Confirmation Requirements. The Plan satisfies the requirements for confirmation set forth in *Section 1129 of the Bankruptcy Code*.

MM. MEIP. The MiddleBrook Employee Incentive Plan, as adopted by the Post-Effective Date Debtor by virtue of Section 10.15 of the Plan, is reasonable and justified under the [*30] facts and circumstances of this Bankruptcy Case and is permissible under and does not violate any provision of the Bankruptcy Code including, without limitation, *Section 503(c) of the Bankruptcy Code*.

NN. Retention of Jurisdiction. Pursuant to *Sections 105(a)* and *1142 of the Bankruptcy Code*, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court, except as otherwise provided in the Plan or herein, shall retain exclusive jurisdiction over all matters arising out of, and related to, this Bankruptcy Case and the Plan to the fullest extent permitted by law, including, but not limited to, the matters set forth in Article X of the Plan.

**ORDER**

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. Objections Withdrawn or Overruled. The Objections, and all other objections and responses to the Plan, if any, not heretofore withdrawn or resolved, or otherwise resolved at the Disclosure Statement and Confirmation Hearing as announced on the record, are overruled in their entirety or deemed withdrawn with prejudice.

2. Approval of Disclosure Statement. The Disclosure Statement contains adequate information in accordance with *Sections 1125* [*31] and *1126 of the Bankruptcy Code*. Notice of the Disclosure Statement and Confirmation Hearing was provided by the Debtor in good faith and in compliance with *Sections 1125* and *1126 of the Bankruptcy Code*, *Bankruptcy Rules 3017* and *3018*, all other applicable provisions of the Bankruptcy Code and all other rules, laws and regulations, and the Stipulation and Plan Procedures are hereby approved in all respects and the Disclosure Statement is hereby deemed to contain adequate information as contemplated by *Section 1125 of the Bankruptcy Code* and is hereby approved. Because no Classes of Claims or Interests are Impaired under the Plan, the solicitation of votes on the Plan was not and is not required.

3. Confirmation of the Plan. The Plan (as deemed amended by this Confirmation Order) is approved and confirmed under *Section 1129 of the Bankruptcy Code*. The terms of each of the documents in the Plan, including the Plan Supplement and any other exhibits or annexations thereto (subject to further modifications by the Debtor, which modifications shall not be inconsistent with the Plan or this Confirmation Order), and any documents necessary in the judgment of the Post-Effective Date Debtor to [*32] implement, effectuate and finalize the Plan, whether or not specifically contemplated in the Plan and the Plan Documents, are approved, are an integral part of the Plan, and are incorporated by reference into the Plan and this Confirmation Order.

4. Plan Classification Controlling. The classifications of Claims and Interests for purposes of distributions under the Plan shall be governed solely by the terms of the Plan.

5. Severability. Should any provision of the Plan or this Confirmation Order, including the findings of fact and conclusions of law set forth herein, be determined to be unenforceable after the Effective Date such determination shall in no way limit or affect the enforceability and operative effect of any and all of the other provisions of the Plan.

6. Record Closed. The record of the Disclosure Statement and Confirmation Hearing is hereby closed.

7. Notice. As established by the Mailing Affidavit

and the Certification of Publication, and as set forth in Paragraphs F and H above, the Debtor provided good and sufficient notice of the Disclosure Statement and Confirmation Hearing and the deadline for filing and serving objections to the Plan and Disclosure Statement, which [*33] notice is hereby approved.

8. Authorization and Direction to Act. In accordance with *Section 1142 of the Bankruptcy Code*, *Section 213 of the Delaware Limited Liability Company Act*, and any other applicable law of any jurisdiction, the Debtor, the Post-Effective Date Debtor and each other appropriate party are hereby authorized and directed to take all steps and perform such acts as may be necessary, desirable or appropriate, to comply with, implement and effectuate the Plan, whether or not such action is specifically contemplated by the Plan, the Plan Documents or this Confirmation Order.

No further approval by the Bankruptcy Court shall be required for any action, transaction or agreement that the management of the Debtor determines is necessary or appropriate to implement and effectuate or consummate the Plan, whether or not such action, transaction or agreement is specifically contemplated in the Plan or the Confirmation Order. This Confirmation Order shall further constitute all approvals, consents and directions required for management of the Debtor or the Post-Effective Date Debtor to act consistent with the Plan by the laws, rules, and regulations of all states and any other governmental [*34] authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any other acts and transactions referred to in or contemplated by the Plan and the Plan Supplement.

Unless specifically directed by this Confirmation Order, no further action of the Debtor or the Post-Effective Date Debtor shall be necessary to perform any act to comply with, implement and effectuate the Plan. The approvals and authorizations specifically set forth in this Confirmation Order are nonexclusive and are not intended to limit the authority of the Debtor or the Post-Effective Date Debtor to take any and all actions necessary or appropriate to implement, effectuate and consummate any and all documents or transactions contemplated by the Plan, the Plan Documents or this Confirmation Order.

9. Corporate Action. Prior to, on, or after the Effective Date, as appropriate, all matters expressly provided for under the Plan that would otherwise require approval of the shareholders, directors or managers of the Debtor shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable general [*35] corporation or other applicable law of the jurisdictions in which the Debtor is incorporated without any requirement of further action by such shareholders, directors or managers of the Debtor.

10. Binding Effect. Except as otherwise provided in *Section 1141(d)(3) of the Bankruptcy Code* and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtor and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under this Plan and whether or not such Holder has accepted this Plan. Pursuant to *Sections 1123(a)* and *1142(a) of the Bankruptcy Code* and the provisions of this Confirmation Order, the Plan, and all documents related to the Plan shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

11. Revesting of Estate Assets. Notwithstanding *Section 1141(b) of the Bankruptcy Code*, except as otherwise provided for in the Plan or this Confirmation Order, the Estate Assets, including Causes of Action, shall not revest in the Debtor or the Post-Effective Date Debtor, but shall remain [*36] property of the Estate subject to the jurisdiction of the Bankruptcy Court, but under the exclusive control of the Plan Administrator, until liquidated and distributed to Holders of Allowed Claims and Interests in accordance with the provisions of this Plan and the Confirmation Order.

12. Cancellation of Outstanding Interests. As of the Effective Date, except for purposes of evidencing a right to a Distribution or as otherwise provided for in the Plan or herein, (a) all agreements and other documents evidencing the Claims or rights of any Holders of such Claims against the Debtor, including, but not limited to, all contracts, notes, guarantees, and mortgages, and (b) all Interests, shall be canceled. Thereafter, one share of stock in the Debtor shall be issued to the Plan Administrator.

13. Plan Administrator Agreement and Plan Committee Agreement. Prior to or on the Effective Date, the Plan Administrator Agreement and Plan Committee Agreement, substantially in the form attached as Exhibits

1 and 2 to the Plan Supplement as modified pursuant to the Court's instructions at the hearing held on December 29, 2010, shall be executed and made effective.

14. Successor Plan Administrator. Should [*37] the Plan Administrator initially appointed pursuant to the terms of the Plan become unable or unwilling to continue in such role then the Plan Committee shall select a successor. Alternatively, any party in interest may move the Bankruptcy Court to appoint a successor. Once approved by the Bankruptcy Court, such successor shall become the Plan Administrator for all purposes, and shall have all the rights and powers of the Plan Administrator as set forth in this Plan. The U.S. Trustee's Office shall have no responsibility to appoint a successor Plan Administrator.

15. Preservation and Retention of Causes of Action, Defenses of the Debtor, and Rights to Object to Claims. Except as otherwise provided expressly in the Plan, in this Confirmation Order, or in any document, instrument, settlement agreement approved by the Court, release or other agreement entered into in connection with the Plan, the Debtor, on behalf of itself and its Estate, and the Post-Effective Date Debtor has retained and reserved all rights to commence, pursue, settle or compromise, or decline to do any of the foregoing, as appropriate, any and all Causes of Action, which expressly include Chapter 5 Causes of Action, [*38] whether arising prior to or after the Petition Date, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in this Bankruptcy Case. The failure to specifically list in the Disclosure Statement or in the Plan any potential or existing Causes of Action generally or specifically does not limit the rights of the Debtor or the Post-Effective Date Debtor to pursue such action. Nothing in this Paragraph shall be deemed to affect the validity of any release or waiver by the Debtor set forth in the Plan or any Final Order.

16. Distributions and Claims Reconciliation. The provisions of Article VI of the Plan governing distributions and the resolution and treatment of disputed Claims and Interests under the Plan, unless modified in this Paragraph 16, are hereby approved in all respect and found to be fair and reasonable. Except as otherwise provided in the Plan, on and after the Effective Date, the Plan Administrator shall have sole responsibility and authority for administering, disputing, objecting to, compromising and settling, or otherwise resolving and making distributions (if any) with respect to all Claims, including all Administrative Expense Claims, [*39] without notice to any other party or approval of, or notice to the Court. Notwithstanding the preceding, if the Debtor or the Plan Administrator fail to use their best efforts to make the Initial Distribution as soon as practicable by or immediately following the Effective Date, any party in interest, upon motion for good cause shown, may seek an order from the Court compelling such distribution.

17. Interest on Distributions to Holders of Allowed Class 3 Claims. The Initial Allowed Class 3 Claim List and all subsequent Claim Lists (if any) filed by the Debtor or the Plan Administrator shall designate the applicable interest rate that the Holders of Allowed General Unsecured Claims will receive on account on their Allowed Claims, accruing from the Petition Date to the Distribution Date, in Cash. Holders of Allowed Class 3 Claims that are entitled to interest pursuant to a valid and binding contract with the Debtor and who requested the payment of interest in a proof of claim Filed by the Holder of the Allowed Claim will be paid interest on their Allowed Claim at the applicable contractual rate, and Holders of Allowed Class 3 Claims that are not entitled to interest pursuant to a valid [*40] and binding contract with the Debtor or who did not request the payment of interest in a proof of claim Filed by the Holder of the Allowed Claim will be paid interest on their Allowed Claim at the federal judgment rate applicable as of the Petition Date. To the extent a Holder of an Allowed Class 3 Claim sought default interest in its proof of claim and in fact the Debtor defaulted on the applicable contract prior to the Petition Date, and such default was not caused by the Holder of the Allowed Claim or triggered by the filing of the Bankruptcy Case (or the Holder of the Allowed Claim is otherwise entitled by non-bankruptcy law to default interest under such circumstances), the Debtor will pay to Holder of such Allowed Class 3 Claim the default rate set forth in the applicable contract for the specific charges to which default interest rate applies, and any charges to which the default interest rate does not apply will be subject to the contract rate, or if no such rate is specified, the federal judgment rate as of the Petition Date.

18. Disputes Regarding Interest on Distributions to Holders of Allowed Class 3 Claims. If the Holder of an Allowed General Unsecured Claim disputes the [*41] proposed rate of interest, such Holder shall give written notice to the Debtor and Plan Administrator of its

disagreement (a "Notice of Interest Rate Dispute") within fourteen (14) days of the filing of the applicable Claim List. If the parties are unable to resolve the dispute, within twenty-one (21) days of the receipt of the Notice of Interest Rate Dispute, such Holder of an Allowed General Unsecured Claim shall file a motion with the Court seeking the entry of an order establishing the applicable rate of interest. The Debtor and Plan Administrator fully reserve their right to dispute the interest rate sought and the application of such interest rate to the Claim. Notwithstanding a Notice of Interest Rate Dispute or a dispute concerning the appropriate rate of interest, the Debtor or Plan Administrator shall distribute the amount set forth in the applicable Claim List prior to the resolution of such dispute. Nothing herein shall modify the application of *Section 502(b)(6) of the Bankruptcy Code*.

19. Failure to Timely File Proof of Claim. Any person or entity (including, without limitation, any individual, partnership, joint venture, corporation, limited liability company, estate, [*42] trust or governmental unit) that was required to file a timely proof of claim in the form and manner specified by the Bar Date Order and failed to do so on or before the General Bar Date or the Governmental Unit Bar Date, as applicable, and failed to file an untimely proof of claim by the date set for the Disclosure Statement and Confirmation Hearing, shall be, absent further Order of the Bankruptcy Court, forever barred, estopped, and enjoined from asserting such claim against the Debtor or the Post-Effective Date Debtor and shall not receive or be entitled to receive any payment or distribution of property from the Debtor or its successors or assigns with respect to such claim. The Debtor and the Plan Administrator retain the right to object to any untimely filed proof of claim.

20. Objections to Claims. Except as provided in the Plan or this Confirmation Order, any objection to the allowance of a Claim must be Filed within sixty (60) days after the Effective Date (or, within sixty (60) days after the Filing of such Claim, whichever is later). The Bankruptcy Court may extend such deadline upon motion for good cause shown. Any objection not filed by such deadline shall be deemed waived, [*43] and the Claim shall be an Allowed Claim in the amount set forth on the proof of claim Filed by the Holder of such Claim.

21. Assumption and Rejection of Executory Contracts. Through Section 7.1 of the Plan and this

Confirmation Order, except as otherwise provided herein and in Paragraph 22 of this Confirmation Order, below, all of the Debtor's prepetition executory contracts and unexpired leases are deemed rejected, effective as of the Confirmation Date, in accordance with *Sections 365* and *1123 of the Bankruptcy Code* unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtor, (ii) previously expired or terminated pursuant to its own terms, or (iii) is subject to a pending motion to assume or reject. Entry of this Confirmation Order shall constitute approval or such rejections pursuant to *Sections 365(a)* and *1123 of the Bankruptcy Code* and each executory contract assumed shall revest in and be fully enforceable by the Post-Effective Date Debtor or its assignee in accordance with its terms, except as modified by the provisions of the Plan or any order of the Court authorizing and providing for its assumption or applicable federal law.

22. Certain [*44] Insurance Policy Matters. Notwithstanding Section 7.1 of the Plan and Paragraph 21 of this Confirmation Order, to the extent that any insurance policies to which the Debtor is a party are executory contracts entered into prior to the Petition Date, the policies shall be deemed assumed effective as of the Confirmation Date. Further, to the extent any insurance policies to which the Debtor is a party were entered into postpetition, the Plan Administrator and the Post-Effective Date Debtor shall perform all of the insured's obligations under such policies. Nothing in the Plan or this Confirmation Order, or any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing in any respect the legal, equitable or contractual rights and defenses, if any, of the insured or insurer with respect to any insurance policy to which the Debtor is a party.

23. Bar Date for Rejection Claims. Pursuant to the Bar Date Order, Claims arising out of the rejection of executory contracts or unexpired leases rejected as of the Confirmation Date pursuant to the Plan must be filed no later than thirty (30) days after the entry of the Confirmation Order effectuating [*45] the rejection.

24. Exculpation. From and after the Effective Date, (i) the Debtor, (ii) the present and former members of the Debtor's Board of Directors who were serving in such capacity on or after the Petition Date, (iii) the present and former officers and employees of the Debtor who were serving in such capacity on or after the Petition Date, (iv)

the Creditors' Committee and the Equity Committee and their respective past and present members (but only in their capacity as members of the Creditors' Committee or the Equity Committee), and (v) any attorneys, financial advisors, investment bankers, accountants, consultants, or other professionals of the parties described in clauses (i) through (iv) hereof (collectively, the "Released Parties", but provided, however, that such Released Parties shall only include those that provided services related to the Debtor, the Bankruptcy Case, the Plan, or the transactions contemplated by this Plan) shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or Interest, or any other party in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents [*46] acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Bankruptcy Case, formulating, negotiating or implementing this Plan, the solicitation of acceptances of this Plan, the pursuit of approval of the Disclosure Statement and confirmation of this Plan, the confirmation of this Plan, the Plan Documents, the consummation of this Plan or the administration of this Plan or the property to be distributed under this Plan; provided, however, that the foregoing provision shall not apply to an act or omission that is determined by a Final Order of the Bankruptcy Court to have constituted willful misconduct or gross negligence. Any of the Released Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under the Plan.

25. Injunction Related to Exculpation and Releases. All Persons that have held, hold or may hold any liabilities released or exculpated pursuant to Section 9.2 of the Plan will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released [*47] liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (v) commencing or continuing any action, in any manner, in any place that

does not comply with or is inconsistent with the provisions of the Plan or this Confirmation Order.

26. Survival of Indemnification Obligations. Except as set forth in the Plan or in this Confirmation Order, the obligations of the Debtor to indemnify any past and present directors, officers, agents, employees and representatives, pursuant to certificates or articles of incorporation, by-laws, contracts and/or applicable statutes, in respect of all actions, suits and proceedings against any of such officers, directors, agents, employees, and representatives, [*48] shall not be discharged or Impaired by, and shall survive, confirmation or consummation of the Plan to the extent, and only to the extent, that such parties filed valid proofs of claim with regard to such indemnity obligations.

27. Termination of Claims and Interests. Except as otherwise provided in the Plan or this Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement and release of, all Claims and Interests of any nature whatsoever against the Debtor or its Estate, assets, properties or interest in property, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests.

28. Injunction. Except as otherwise provided in the Plan or this Confirmation Order, from and after the Effective Date all Persons who have held, hold or may hold Claims against or Interests in the Debtor, are (i) permanently enjoined from taking any of the following actions against the Estate, or any of its property, on account of any such Claims or Interests and (ii) permanently enjoined from taking any of the following actions against any of the Debtor, the Post-Effective [*49] Date Debtor, the Plan Administrator or their property on account of such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action, or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting any right of setoff, subrogation or recoupment of any kind and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and

consistent with the terms of the Plan and this Confirmation Order. By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunctions set forth in Section 9.7 of the Plan.

29. Term of Bankruptcy Injunction or Stays. All injunctions or stays provided for in the Bankruptcy Cases under *Section 105* or *362 of the Bankruptcy Code*, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect [*50] until the Effective Date.

30. Claims Agent. Unless KCC has been previously relieved of its duties by written notice of the Debtor prior thereto, the request for the Final Decree shall provide that KCC, in its capacity as claims, noticing and balloting agent shall be relieved of such duties on the date of the entry of the Final Decree.

31. MEIP. The MiddleBrook Employee Incentive Plan and the payments thereunder, as contemplated by Section 10.15 of the Plan and determined in accordance with the provisions of the MEIP, are hereby approved.

32. Exemption from Certain Taxes. Pursuant to *Section 1146(a) of the Bankruptcy Code, (a)* the issuance, transfer or exchange of debt, notes or equity securities or other interest under or in connection with or in contemplation of the Plan; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, lien, pledge or other security interest, or the securing of additional indebtedness by such other means under or in connection with the Plan; (c) the making or assignment of any lease or sublease under or in connection with the Plan; or (d) the making or delivery of any deed or other instrument of transfer under or in connection [*51] with the Plan including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax, document recording tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FERC filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the

payment of any such tax or governmental assessment. The Debtor is hereby authorized to deliver a notice or short form of this Confirmation Order to any state recording officer to the effect that such officer must accept for filing such security interests without charging any stamp tax or other similar tax.

33. Creditors' Committee and Equity Committee. On the Effective Date, the Creditors' Committee and the Equity Committee shall be dissolved and their [*52] members shall be deemed released of any continuing duties, responsibilities and obligations in connection with this Bankruptcy Case or the Plan and its implementation, and the retention and employment of the Creditors' Committee's and Equity Committee's attorneys, accountants and other agents shall terminate, except with respect to: (i) the Final Fee Hearing; or (ii) any appeals of the Confirmation Order through the date such appeals are finally decided, settled, withdrawn or otherwise resolved.

34. No Discharge. Notwithstanding any provision of the Plan to the contrary, the Debtor is not entitled to, and shall not receive, a discharge pursuant to *Section 1141(d)(3) of the Bankruptcy Code*.

35. Bar Date for Administrative Expense Claims. Except as may otherwise be provided by separate order of the Bankruptcy Court, and other than professional fee claims, any Holder of an Administrative Expense that has not been paid, released, or otherwise settled prior to the Effective Date, must file any request for payment of the Administrative Expense on or before the date that is thirty (30) days after the Effective Date. Any request for payment of an Administrative Expense that is not timely filed [*53] as set forth herein will be forever barred and Disallowed by operation of confirmation of the Plan and this Confirmation Order and without the need for any party to file any objection or other pleading, and Holders of such Administrative Expenses shall be prohibited from asserting such Administrative Expenses in any manner against the Debtor, the Post-Effective Date Debtor or the Plan Administrator.

36. Professional Fee Claim Bar Date. Any and all applications for the final allowance of Professional Fee Claims shall be Filed and served upon counsel to the Debtor, counsel to the Creditors' Committee, counsel to the Equity Committee, the United States Trustee, and all parties entitled to notice pursuant to *Bankruptcy Rule 2002* within forty-five (45) days of the Effective Date.

37. References to Provisions of the Plan. The failure to specifically include or reference any particular provision of the Plan, including any provision in a document in the Plan Supplement, in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety and such provisions shall have the same binding effect, [*54] enforceability or legality as every other provision of the Plan. Each term and provision of the Plan, as it may have been altered or interpreted by this Court, is valid and enforceable pursuant to its terms.

38. Substantial Consummation. The substantial consummation of the Plan, within the meaning of *Section 1101(2) of the Bankruptcy Code*, shall be deemed to occur on or as of the Effective Date.

39. Notice of Entry of Confirmation Order. Pursuant to *Bankruptcy Rules 2002(f)(7)* and *3020(c)*, promptly after entry of this Confirmation Order, the Debtor shall cause a notice of the entry of this Confirmation Order to be served on all parties on whom the Notice of Disclosure Statement and Confirmation Hearing was served.

40. Reversal. If any or all of the provisions of this Confirmation Order are hereafter reversed, modified, or vacated by subsequent order of this Court of any other court of competent jurisdiction, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtor's or other applicable persons' receipt of written notice of such order. Notwithstanding any such reversal, [*55] modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order prior to the Effective Date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order or any amendments or modifications thereto.

41. Confirmation Order Controlling. If there is any inconsistency between the provisions of the Plan and this Confirmation Order, the terms and conditions contained in this Confirmation Order shall govern. However, any inconsistencies shall be interpreted so as to further the goals of and to facilitate the finalization, effectuation and implementation of the Plan.

42. Applicable Non-Bankruptcy Law. Pursuant to *Section 1123(a)* and *1142(a) of the Bankruptcy Code*, the provisions of this Confirmation Order and the Plan shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

43. Retention of Jurisdiction. Pursuant to *Sections 105(a)* and *1142 of the Bankruptcy Code*, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court, except as otherwise provided in the [*56] Plan or herein, shall retain exclusive jurisdiction over all matters arising in, arising out of, and related to, the Bankruptcy Cases and the Plan including, but not limited to, those matters set forth in Article X of the Plan.

44. Final Order, Effective Date. This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof. Notwithstanding *Bankruptcy Rules 7062* or *3020(e)*, this Confirmation Order shall be effective and enforceable immediately upon its entry.

Dated: Wilmington, Delaware

December 30, 2010

/s/ Mary F. Walrath

HONORABLE MARY F. WALRATH

UNITED STATES BANKRUPTCY JUDGE

**In re Movie Gallery, Inc.**

**No. 10-30696, 2010 Bankr. LEXIS 5778 (Bankr. E.D. Va. Oct. 29, 2010)**



In re: MOVIE GALLERY, INC., et al.,[1] Debtors.

1   The Debtors in these cases are: Movie Gallery, Inc.; Hollywood Entertainment Corporation; Movie Gallery US, LLC; MG Real Estate, LLC; and HEC Real Estate, LLC.

**Chapter 11, Case No. 10-30696 (DOT)**

**UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION**

*2010 Bankr. LEXIS 5778*

**October 29, 2010, Decided**
**October 29, 2010, Filed**

**COUNSEL:** [*1] John A. Bicks (NY 2032498), Louis A. Curcio (NY 4016267), Linda Bechutsky (NY 4642476), SNR DENTON US LLP, New York, NY; Michael A. Condyles (VA 27807), Peter J. Barrett (VA 46179), Jeremy S. Williams (VA 77469), KUTAK ROCK LLP, Richmond, Virginia, Attorneys for Debtors and Debtors in Possession.

**JUDGES:** Douglas O. Tice Jr., United States Bankruptcy Court Judge.

**OPINION BY:** Douglas O. Tice Jr.

**OPINION**

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE JOINT PLAN OF LIQUIDATION OF MOVIE GALLERY, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

The above-captioned debtors and (collectively, the "Debtors")[2] having: on February 2, 2010 (the "Commencement Date"), commenced chapter 11 cases

(collectively, the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, *11 U.S.C §§ 101-1532* (as amended, the "Bankruptcy Code"); continued to operate their businesses and manage their property as debtors in possession pursuant to *sections 1107(a)* and *1108 of the Bankruptcy Code*; Filed, on July 13, 2010, the *Joint Plan of Liquidation of Movie Gallery, Inc. and Its Affiliated Debtors and Debtors In Possession* [Docket No. 1442]; Filed, on July 21, 2010, [*2] the *Disclosure Statement for Joint Plan of Liquidation of Movie Gallery, Inc. and Its Affiliated Debtors and Debtors In Possession* [Docket No. 1502]; Filed, on September 8, 2010, the revised *Disclosure Statement for Joint Plan of Liquidation of Movie Gallery, Inc. and Its Affiliated Debtors In Possession* [Docket No. 1752] (the "Disclosure Statement"), including the revised *Joint Plan of Liquidation of Movie Gallery, Inc. and Its Affiliated Debtors and Debtors In Possession* (the "Plan") as Exhibit A thereto; obtained approval of the Disclosure Statement by that certain *Order Approving The Debtors' Disclosure Statement and Relief Related Thereto* dated September 10, 2010 [Docket No. 1769] (the "Disclosure Statement Order"), which Disclosure Statement Order also approved, among other things, solicitation procedures (the "Solicitation Procedures") and related

notices, forms and Ballots (collectively, the "Solicitation Materials"); and completed distributing solicitation materials on September 17, 2010, consistent with the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Order and the Solicitation Materials, as evidenced by the *Affidavit of Service of Kurtzman* [*3] *Carson Consultants LLC of Solicitation Packages and Non-Voting Packages,* Filed on September 29, 2010 [Docket No. 1933] (the "KCC Affidavit"); Filed, on October 15, 2010 the Exhibits to the Plan, including the Liquidating Trust Agreements and a list of insurance policies, other contracts and unexpired leases to be assigned to the First Lien Term Lenders Liquidating Trust [Docket No. 2034] (the "Exhibits"); Filed, on October 25, 2010, the *Certification of P. Joseph Morrow IV with Respect to the Tabulation of Votes on the Joint Plan of Liquidation of Movie Gallery, Inc. and Its Debtor Subsidiaries under Chapter 11 of the Bankruptcy Code* [Docket No. 2321; the "Voting Report"], detailing the results of the Plan voting process.

> 2  Unless otherwise noted, capitalized terms used but not defined in the *Findings of Fact, Conclusions of Law and Order Confirming the Joint Plan of Liquidation of Movie Gallery, Inc. and Its Affiliated Debtors and Debtors in Possession* (the "Confirmation Order") shall have the meanings ascribed to them in the *Joint Plan of Liquidation of Movie Gallery, Inc. and Its Affiliated Debtors and Debtors in Possession* [Exhibit A to Docket No. 2188] The rules of construction [*4] set forth in Article I.A of the Plan shall apply to the Confirmation Order.

The Bankruptcy Court having: entered the Disclosure Statement Order on September 10, 2010 [Docket No. 1769]; set October 28, 2010 at 2:00 p.m. prevailing Eastern Time, as the date and time for the commencement of the Confirmation Hearing pursuant to *Bankruptcy Rules 3017* and *3018* and *sections 1126*, *1128* and *1129 of the Bankruptcy Code*; reviewed the Disclosure Statement, Plan, the Voting Report and all Filed pleadings, exhibits, statements and comments in support of Confirmation, reviewed those objections, statements and reservations of rights in opposition to Confirmation, including, without limitation, Docket Nos. 1961, 1984, 1985, 1994, 1999, 2010, 2014, 2025, 2027, 2033, 2041, 2043, 2044, 2045, 2047, 2048, 2049, 2100 and 2101 (collectively, the "Objections"); heard the statements, arguments and objections made by counsel in

respect of Confirmation; considered all oral representations, testimony, documents, filings and other evidence regarding Confirmation; overruled any and all Objections and all statements and reservations of rights not consensually resolved or withdrawn; and taken judicial notice of the [*5] papers and pleadings Filed in the Chapter 11 Cases.

NOW, THEREFORE, it appearing to the Bankruptcy Court that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all entities affected or to be affected by the Plan and the transactions contemplated thereby, and that the legal and factual bases set forth in the documents Filed in support of Confirmation and presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefore, the Bankruptcy Court hereby makes and issues the following Findings of Fact, Conclusions of Law and Orders:

## I.FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED AND ORDERED THAT:

### A.Findings of Fact and Conclusions of Law

1. The findings of fact and the conclusions of law stated in the Confirmation Order shall constitute findings of fact and conclusions of law pursuant to *Bankruptcy Rule 7052*, made applicable to the proceeding by *Bankruptcy Rule 9014*. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so [*6] deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

### B.Jurisdiction and Venue

2. On the Commencement Date, the Debtors commenced the Chapter 11 Cases. Venue in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court") was proper as of the Commencement Date pursuant to *28 U.S.C. §§ 1408* and *1409* and has continued to be proper during the Chapter 11 Cases. Confirmation of the Plan is a core proceeding under *28 U.S.C. § 157(b)(2)*. The Bankruptcy Court has subject matter jurisdiction over this

matter pursuant to *28 U.S.C. § 1334*. The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

### C. Eligibility for Relief

3. The Debtors were and are entities eligible for relief under *section 109 of the Bankruptcy Code*.

### D. Joint Administration of the Chapter 11 Cases

4. By prior order of the Bankruptcy Court [Docket No. 64], the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to *Bankruptcy Rule 1015*. The Debtors have [*7] operated their businesses and managed their properties as debtors in possession pursuant to *sections 1107(a)* and *1108 of the Bankruptcy Code*. No trustee or examiner has been appointed in the Chapter 11 Cases.

### E. Judicial Notice

5. The Bankruptcy Court takes judicial notice of (and deems admitted into evidence for Confirmation) the docket of the Chapter 11 Cases, including all Filed pleadings and other documents, the KCC Affidavit, the Voting Report, the disclosures made in accordance with *section 1129(a)(5) of the Bankruptcy Code*, all orders entered, all hearing transcripts and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases. Any resolutions of objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference. All unresolved objections, statements and reservations of rights are overruled on the merits.

### F. Burden of Proof

6. The Debtors, as proponents of the Plan, (a) have met their burden of proving the elements of *section 1129(a)* and *1129(b) of the Bankruptcy Code* by the applicable evidentiary standard for the Confirmation and (b) have proven [*8] the elements of *section 1129(a)* and *1129(b) of the Bankruptcy Code* by clear and convincing evidence.

### G. Disclosure Statement Order

7. On September 10, 2010, the Bankruptcy Court entered the Disclosure Statement Order, which, among other things: (a) approved the Disclosure Statement as containing adequate information within the meaning of *section 1125 of the Bankruptcy Code* and *Bankruptcy Rule 3017*; (b) fixed September 13, 2010 at the close of business, as the Record Date (as defined in the Disclosure Statement Order); (c) fixed October 18, 2010 at 7:00 p.m. prevailing Eastern time, as the Voting Deadline for voting to accept or reject the Plan; (d) fixed October 18, 2010 at 7:00 p.m. prevailing Eastern time, as the deadline for objecting to the Plan; (e) fixed October 28, 2010 at 2:00 p.m. prevailing Eastern time, as the date and time for the commencement of the Confirmation Hearing; and (e) approved the Solicitation Procedures and the Solicitation Materials.

### H. Transmittal and Mailing of Materials; Notice

8. As evidenced by the KCC Affidavit, due, adequate and sufficient notice of the Disclosure Statement, Plan and Confirmation Hearing, together with all deadlines for voting on or objecting [*9] to the Plan, has been given to: (a) all known Holders of Claims and Interests; (b) entities that properly requested notice (and did not withdraw such request) in accordance with *Bankruptcy Rule 2002*; (c) all non-Debtor counterparties to unexpired leases and executory contracts; and (d) all known former employees of the Debtors, in compliance with the Disclosure Statement Order, the Bankruptcy Code and *Bankruptcy Rules 2002(b)*, *3017* and *3020(b)*, and no other or further notice is or shall be necessary or required.

### I. Solicitation

9. Votes for acceptance or rejection of the Plan were solicited in good faith and in compliance with *sections 1125* and *1126 of the Bankruptcy Code*, *Bankruptcy Rules 3017* and *3018*, the Disclosure Statement, the Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws and regulations. Specifically, the Solicitation Package approved by the Bankruptcy Court in the Disclosure Statement Order (including the Committee's letter to the Holders of Class 5 Claims, the Disclosure Statement, the Plan, the appropriate Ballots, and appropriate voting instructions, the Confirmation Hearing Notice (as defined in the [*10] Disclosure Statement) and the related notices) were transmitted to and served on all Holders of Claims in Classes that were entitled to vote to accept or reject the Plan and appropriate portions of such Solicitation Materials were

transmitted to and served on other parties in interest in the Chapter 11 Cases, all in compliance with *section 1125 of the Bankruptcy Code*, the Disclosure Statement Order, the Solicitation Procedures and the Bankruptcy Rules. Such transmittal and service were adequate and sufficient, and no further notice is necessary or required or shall be required. Certain Non-Voting Status Notices (as used in the Disclosure Statement Order) approved by the Bankruptcy Court and the Confirmation Hearing Notice were transmitted to and served on Holders of Claims and Holders of Interests in Classes that were not entitled to vote to accept or reject the Plan in compliance with the Disclosure Statement Order. Pursuant to the Disclosure Statement Order, the Debtors were excused from mailing Solicitation Packages to those entities to whom the Debtors attempted to transmit to and serve with a notice regarding the hearing on the Disclosure Statement and received a notice from the [*11] United States Postal Service or other carrier that such notice was undeliverable unless such entity provided the Debtors, through the Claims Agent, an accurate address no later than ten (10) Business Days prior to the Solicitation Date (as defined in the Disclosure Statement Order). If an entity changed its mailing address after the Commencement Date, the burden was on such entity, not the Debtors, to advise the Claims Agent of the new address.

10. All processes and procedures used to distribute Solicitation Materials to Holders of Claims were fair and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and all other applicable rules, laws and regulations.

## J. Voting Report

11. Prior to the Confirmation Hearing, the Debtors Filed the Voting Report. All procedures used to tabulate the Ballots were fair and conducted in accordance with the Disclosure Statement Order, the Solicitation Procedures, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws and regulations.

12. Holders of Claims in Classes 6 (Intercompany Claims) and of Interests in Class 7 (Interests) are Impaired, and shall receive [*12] no distribution under the Plan on account of their claims or interests. Therefore, Holders of Claims in Classes 6 and of Interests in Class 7 are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan (the "Rejecting

Classes").

13. As evidenced by the Voting Report, each of the Voting Classes -- Classes 4 and 5 -voted to accept the Plan (collectively, the "Impaired Accepting Classes"). In addition, Holders of Claims in Classes 1 (Non-Tax Priority Claims), 2 (Miscellaneous Secured Claims) and 3 (Revolver Secured Claims) are Unimpaired and conclusively deemed to accept the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

## K. Plan Exhibits

14. On October 15, 2010, the Debtors Filed the Exhibits. The filing and notice of such Exhibits was good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order, and no other or further notice is necessary or required or shall be required. The Debtors are authorized to modify the Exhibits, including following entry of the Confirmation Order, to make: (a) non-material modifications; (b) material modifications that have been approved by all affected [*13] parties; and (c) modifications for which Bankruptcy Court approval has been granted, all to the extent provided in the Plan.

## L. Modifications to the Plan

15. Subsequent to the Bankruptcy Court's approval of the Disclosure Statement for solicitation of votes to accept or reject the Plan, (i) but prior to the delivery of the Solicitation Materials, the Debtors made certain modifications to the Plan; and (ii) after the delivery of the Solicitation Materials as set forth in this Confirmation Order ((i) and (ii) collectively, the "Modifications"). The Modifications to the Plan are consistent with all of the provisions of the Bankruptcy Code, including, but not limited to, *sections 1122, 1123, 1125* and *1127 of the Bankruptcy Code*. Except as provided for by law, contract or prior order of the Bankruptcy Court, none of the Modifications adversely affects the treatment of any Holder of a Claim or other entity under the Plan. Accordingly, pursuant to *section 1127(a) of the Bankruptcy Code*, none of the Modifications requires additional disclosure under *section 1125 of the Bankruptcy Code* or resolicitation of votes under *section 1126 of the Bankruptcy Code*.

16. In accordance with *section 1127 of the Bankruptcy Code* [*14] and *Bankruptcy Rule 3019*, all Holders of Claims who voted to accept the Plan or who

are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified by the Modifications. No Holder of a Claim shall be permitted to change its vote as a consequence of the Modifications, unless otherwise agreed to by the Holder of the Claim and the Debtors. The Modifications to the Plan are hereby approved, pursuant to *section 1127 of the Bankruptcy Code* and *Bankruptcy Rule 3019*. The Plan as modified by the Modifications shall constitute the Plan submitted for Confirmation.

### M. *Bankruptcy Rule 3016*

17. The Plan is dated and identifies the entities submitting and filing it, thereby satisfying *Bankruptcy Rule 3016(a)*. The filing of the Disclosure Statement satisfied *Bankruptcy Rule 3016(b)*.

### N. Compliance with the Requirements of *Section 1129 of the Bankruptcy Code*

18. The Plan complies with all applicable provisions of *section 1129 of the Bankruptcy Code* as follows.

### 1. *Section 1129(a)(1)* -- Compliance of the Plan with Applicable Provisions of the Bankruptcy Code

19. The Plan complies with all applicable provisions of the Bankruptcy Code as required by *section 1129(a)(1) of the Bankruptcy Code*, [*15] including *sections 1122* and *1123 of the Bankruptcy Code*.

### (i) *Section 1122* and *1123(a)(1)* -- Proper Classification

20. The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code. Pursuant to *sections 1122(a)* and *1123(a)(1) of the Bankruptcy Code*, Article II of the Plan provides for the separate classification of Claims and Interests into seven (7) Classes, based on differences in the legal nature or priority of such Claims and Interests (other than Administrative Claims and Priority Tax Claims, which are unclassified and addressed in Article II of the Plan, and which are required not to be designated as separate Classes pursuant to *section 1123(a)(1) of the Bankruptcy Code*). Valid business, factual and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not done for any improper purpose and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or

Interests.

21. In addition, the allowance, classification and treatment of Allowed Claims take into account any Causes of Action, whether under the Bankruptcy Code or otherwise [*16] under applicable non-bankruptcy law, that may exist: (a) between the Debtors, on the one hand, and the Debtor Releasees, on the other; and (b) as between the Releasing Parties and the Third Party Releasees (to the extent set forth in the Third Party Release).

22. In accordance with *section 1122(a) of the Bankruptcy Code*, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. As a result thereof, the requirements of *sections 1122(a), 1122(b)* and *1123(a)(1) of the Bankruptcy Code* have been satisfied.

### (ii) *Section 1123(a)(2)* -- Specification of Unimpaired Classes

23. Article II of the Plan specifies that Claims in Classes 1, 2 and 3 are Unimpaired under the Plan. Additionally, Article II of the Plan specifies that Administrative Claims and Priority Tax Claims are not classified under the Plan. As a result thereof, the requirements of *section 1123(a)(2) of the Bankruptcy Code* have been satisfied.

### (iii) *Section 1123(a)(3)* ? Specification of Treatment of Impaired Classes

24. Article III of the Plan specifies the treatment of each Impaired Class under the Plan, including Classes 4, 5, 6 and 7. As a [*17] result thereof, the requirements of *section 1123(a)(3) of the Bankruptcy Code* have been satisfied.

### (iv) *Section 1123(a)(4)* ? No Discrimination

25. In accordance with *section 1123(a)(4) of the Bankruptcy Code*, Article III of the Plan provides for the same treatment of each Claim or Interest in a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest. As a result thereof, the requirements of *section 1123(a)(4) of the Bankruptcy Code* have been satisfied.

### (v) *Section 1123(a)(5)* ? Adequate Means for Plan

**Implementation**

26. Pursuant to *section 1123(a)(5) of the Bankruptcy Code*, Article V of the Plan and various other provisions of the Plan specifically provide, in sufficient detail, adequate and proper means for the implementation of the Plan, including: (a) substantive consolidation of the Debtors; (b) the approval of the Global Plan Settlement; (c) the formation of the Liquidating Trusts; (d) the transfer of the Other Assets to the First Lien Term Lenders Liquidating Trust; and (e) the transfer of the Creditor Funds to the GUC Liquidating Trust. Moreover, the Debtors will have, [*18] immediately upon the Effective Date, sufficient Cash to make all payments required to be made on the Effective Date by the Debtors or the First Lien Term Lenders Liquidating Trust pursuant to the terms of the Plan. As a result thereof, the requirements of *section 1123(a)(5) of the Bankruptcy Code* have been satisfied.

**(vi) *Section 1123(a)(6)*--Voting Power of Equity Securities**

27. The Plan provides that the Debtors shall be dissolved as of the Effective Date. As a result, the requirements of *section 1123(a)(6) of the Bankruptcy Code* are not applicable.

**(vii) *Section 1123(a)(7)*--Selection of Officers and Directors**

28. The Plan and the Exhibits describe the identity and manner of selection of the Liquidating Trustees. The manner of selection of the Liquidating Trustees is consistent with the interests of Holders of Claims and Interests and public policy. As a result, the requirements of *section 1123(a)(7) of the Bankruptcy Code* have been satisfied.

**(viii) *Section 1123(b)* ? Discretionary Contents of the Plan**

29. The Plan contains various provisions that are not required for Confirmation under the Bankruptcy Code. As set forth below, such discretionary provisions comply with *section 1123(b) of the Bankruptcy Code* [*19] and are not inconsistent with the applicable provisions of the Bankruptcy Code. As a result, *section 1123(b) of the Bankruptcy Code* is satisfied.

**a. *Section 1123(b)(1)* and *1123(b)(2)* -- Unimpaired**

**Claims and Executory Contracts and Unexpired Losses**

30. Pursuant to *section 1123(b)(1)* and *(b)(2) of the Bankruptcy Code*, respectively, Article III of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests, and Article VII of the Plan provides for the assumption and assignment or rejection of the executory contracts and unexpired leases of the Debtors not previously assumed, assumed and assigned or rejected pursuant to *section 365 of the Bankruptcy Code* and appropriate authorizing orders of the Bankruptcy Court.

**b. *Section 1123(b)(3)* ? Release, Exculpation, Injunction and Preservation of Claims and Causes of Action**

31. **Compromise and Settlement.** The Global Plan Settlement reflected in the Plan reflects a sound exercise of the Debtors' business judgment and is (a) in the best interests of the Debtors, the Estates and all Holders of Claims, (b) fair, equitable and reasonable, (c) made in good faith and (d) approved pursuant to applicable law, including *section 363 of the Bankruptcy Code* [*20] and *Bankruptcy Rule 9019*.

32. **Releases by the Debtors.** The Debtor Release set forth in Article X.C of the Plan is an essential provision of the Plan. The Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Debtor Releasees; (b) a good faith settlement and compromise of the Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or any Holder of a Claim or Interest that would have been legally entitled to assert any Cause of Action on behalf of any of the Debtors or any of the Estates from asserting any Cause of Action released by the Debtor Release against any of the Debtor Releasees. The Debtor Release provides assurance to the Debtor Releasees that they will not be subject to any liability to the Debtors, the Estates, or any party that seeks to bring a claim on behalf of the Debtors or the Estates and provides incentive for such parties to settle and consent to the Plan. Absent the Debtor Release, it is likely that the various Debtor Releasees would [*21] not commit to support the Plan because they would remain exposed to potential claims and causes of action.

33. **Releases by Holders of Claims.** The Third Party Release set forth in Article X.D of the Plan is an essential provision of the Plan. The Third Party Release is: (a) in exchange for the good and valuable consideration provided by the Third Party Releasees; (b) a good faith settlement and compromise of the Causes of Action released by the Third Party Release; (c) in the best interests of the Debtors and all Holders of Claims; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Cause of Action released by the Third Party Release against any of the Third Party Releasees. Such releases by Holders of Claims that voted in favor of the Plan, who abstained from voting, or who have otherwise consented to give a release, are consensual. The Ballots explicitly stated that a vote to accept the Plan constituted an agreement to be bound by the terms of the Plan, which includes releases, Exculpation and injunction provisions set forth in Article X of the Plan. The Ballots further advised [*22] that, whether or not a party voted to accept the Plan, if the Plan was confirmed, the terms of the Plan would bind all parties. Thus, those Holders of Claims voting to accept the Plan or abstaining from voting were given due and adequate notice that they would be granting the Third Party Release by acting in such a manner and those who voted to reject were advised that they would be bound by the Plan in any event, so long as the Plan was confirmed. The Third Party Release provides assurance to the Third Party Releasees that they will not be subject to any liability on account of claims related to the Debtors and provides incentive for such parties to settle and consent to the Plan. Absent the Third Party Release, it is likely that the various Third Party Releasees would not commit to support the Plan because they would remain exposed to potential claims and causes of action.

34. **Exculpation.** The Exculpation set forth in Article X.E of the Plan is an essential provision of the Plan. The record in these Chapter 11 Cases fully supports the Exculpation and the Exculpation provisions set forth in Article X.E of the Plan are appropriately tailored to protect the Exculpated Parties from inappropriate [*23] claims, demands or litigation. The Exculpation ensures that the Plan will have finality, and that the parties thereto will not be subject to collateral attacks through litigation against the Plan's proponents and supporters. The Exculpation shall have no effect on the liability of any entity that results from any act or omission by such entity that is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct; *provided,* that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; *provided, further,* that the foregoing Exculpation shall not limit the ability of the Debtors, the Liquidating Trusts, the Liquidating Trustees, the Pre-petition Secured Parties, Lenado, the Committee, the Studios or Warner Home Video to exercise any available right of specific performance remedies with respect to the Global Plan Settlement directly or through the Plan.

35. **Injunction.** The injunction set forth in Article X.G of the Plan is an essential provision of the Plan, is necessary to preserve and enforce the Debtor Release, the Third Party Release, and the Exculpation granted [*24] by the Plan in Article X.C, X.D, and X.E, respectively, and such injunction provisions are narrowly tailored to achieve that purpose.

36. Each of the Debtor Release, the Third Party Release, the Exculpation, and the injunction contained in Article X of the Plan: (a) is within the jurisdiction of the Bankruptcy Court under *28 U.S.C. § 1334(a), 1334(b)* and *1334(d)*; (b) is an essential means of implementing the Plan pursuant to *section 1123(a)(6) of the Bankruptcy Code* and the Global Plan Settlement; (c) is an integral element of the transactions incorporated into the Plan and the Global Plan Settlement; (d) confers material benefits on, and is in the best interests of, the Debtors, the Estates and the Holders of Claims; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; and (f) is consistent with *sections 105*, *1123* and *1129 of the Bankruptcy Code* and other applicable law, including other applicable provisions of the Bankruptcy Code. The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the Global Plan Settlement, the Debtor [*25] Release, the Third Party Release, the Exculpation and the injunction contained in Article X of the Plan.

37. **Preservation of Claims and Causes of Action.** Article V.H of the Plan appropriately provides for the preservation by the Debtors and transfer to the First Lien Term Lenders Liquidating Trust of all claims and Causes of Action (including, without limitation, claims and Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may

arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist), to the extent not waived or released as set forth in the Plan, in accordance with *section 1123(b)(3)(B) of the Bankruptcy Code*. The provisions regarding retained Causes of Action in the Plan are appropriate and are in the best interests of the Debtors, the Estates and Holders of Claims. Furthermore, preservation of the retained Causes of Action as set forth in the Plan is reasonable and in the best interests of the Debtors, the Estates and Holders of Claims. On and after the Effective Date, (a) the First Lien [*26] Term Lenders Liquidating Trustee shall be deemed to be a representative of the Debtors as the party in interest in the Chapter 11 Cases and any adversary proceeding in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal as to which any of the Debtors is a party; (b) the First Lien Term Lenders Liquidating Trust shall retain all of the Causes of Action of the Debtors and their Estates that are not waived or released under the Plan; and (c) the First Lien Term Lenders Liquidating Trustee shall be authorized to exercise and perform the rights, powers and duties of the Debtors and the Estates as a representative of the Debtors and the Estates pursuant to *section 1123(b)(3) of the Bankruptcy Code* to provide for the prosecution, settlement, adjustment, retention and enforcement of the Causes of Action.

38. In connection with the Global Plan Settlement, the Debtors, the Pre-petition Secured Parties, Lenado, the Committee, the Studios and Warner Home Video have agreed that all Avoidance Actions and Released Claims shall be waived and released as of the Effective Date and the Avoidance Actions and Released Claims shall be, and hereby are, waived and released as of the [*27] Effective Date. With respect to any Causes of Action that are not waived or released hereunder, the substantive consolidation of the Debtors and their Estates as set forth in Article V.A. of the Plan shall not, and shall not be deemed to, prejudice any of such Causes of Action, which shall survive entry of the Confirmation Order for the benefit of the Debtors and their Estates, and, upon the Effective Date, for the benefit of the First Lien Term Lenders Liquidating Trust.

## 2. *Section 1129(a)(2)* ? Compliance of the Debtors with the Applicable Provisions of the Bankruptcy Code

39. The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by *section 1129(a)(2) of the Bankruptcy Code*, including *sections 1122* through and including *1127 of the Bankruptcy Code* and *Bankruptcy Rules 3016* through and including 3019.

40. The Debtors, the Committee and their respective present and former members, officers, directors, partners, employees, representatives, advisors, attorneys, professionals, affiliates and agents did not solicit the acceptance or rejection of the Plan after the Commencement Date by any Holders of Claims or Interests prior [*28] to the approval and transmission of the Disclosure Statement. Votes to accept or reject the Plan were only solicited by the Debtors and their respective present and former members, officers, directors, partners, employees, representatives, advisors, attorneys, professionals, affiliates and agents after the Commencement Date after disclosure to Holders of Claims of adequate information as defined in *section 1125(a) of the Bankruptcy Code* in the Disclosure Statement.

41. The Debtors and their respective present and former officers, directors, partners, employees, representatives, advisors, attorneys, professionals, affiliates and agents have solicited and tabulated votes on the Plan and have participated in the activities described in *section 1125 of the Bankruptcy Code* fairly, in good faith within the meaning of *section 1125(e) of the Bankruptcy Code* and in a manner consistent with the applicable provisions of the Disclosure Statement Order, the Solicitation Procedures, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules and all other applicable rules, laws and regulations, and are entitled to the protections afforded by *section 1125(e) of the Bankruptcy Code* [*29] and the Exculpation set forth in Article X of the Plan.

42. The Debtors, the Committee, Lenado, and the Pre-petition Secured Parties and their respective present and former members, officers, directors, partners, employees, representatives, advisors, attorneys, professionals, affiliates and agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance and proposed distribution of recoveries under the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the

violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan. As a result thereof, the Exculpation is appropriate under *Section 1123(b) of the Bankruptcy Code*.

### 3. *Section 1129(a)(3)* ? **Proposal of the Plan in Good Faith**

43. The Debtors have proposed the Plan in good faith and not by any means forbidden by law. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself [*30] and the process leading to its formulation. The Debtors' good faith is evident from, among other things, the facts and records of the Chapter 11 Cases, the Disclosure Statement and the hearing thereon and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases. The Plan and the Exhibits are the product of comprehensive, arm's-length negotiations between, among other entities, the Debtors, the Pre-petition Secured Parties, the Committee and representatives of the Studios and are fair and reasonable in all respects. The Plan itself, and the process leading to its formulation, provide independent evidence of the Debtors' good faith, and that the Plan serves the public interest and assures fair treatment of Holders of Claims. Consistent with the overriding purpose of chapter 11 of the Bankruptcy Code, the Chapter 11 Cases were Filed with the legitimate purpose of allowing the Debtors to reorganize. The Plan was proposed with the legitimate purpose of completing the liquidation of the Debtors in an orderly fashion. As a result, the requirements of *section 1129(a)(3) of the Bankruptcy Code* have been satisfied.

### 4. *Section 1129(a)(4)* -- **Bankruptcy Court Approval** [*31] **of Certain Payments as Reasonable**

44. The procedures set forth in the Plan for the Bankruptcy Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, including the payment of Professional Fee Claims, comply with *section 1129(a)(4) of the Bankruptcy Code*. As a result, the requirements of *section 1129(a)(4) of the Bankruptcy Code* have been satisfied.

### 5. *Section 1129(a)(5)* ? **Disclosure of Identity of**

### **Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy**

45. The Plan complies with the requirements of *section 1129(a)(5) of the Bankruptcy Code* because, in the Plan and the Exhibits, the Debtors have disclosed (a) the identity and affiliations of each proposed Liquidating Trustee and the members of the First Lien Term Lenders Liquidating Trust Oversight Board following Confirmation and (b) the identity of and nature of any compensation for any insider who will be employed or retained by the Liquidating Trusts. The appointment of the Liquidating Trustees is consistent [*32] with the interests of Holders of Claims and Equity Interests and with public policy. As a result, the requirements of *section 1129(a)(5) of the Bankruptcy Code* have been satisfied.

### 6. *Section 1129(a)(6)* -- **Approval of Rate Changes**

46. The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and will not require governmental regulatory approval. Therefore, *section 1129(a)(6) of the Bankruptcy Code* is inapplicable to the Chapter 11 Cases.

### 7. *Section 1129(a)(7)* -- **Best Interests of Holders of Claims and Interests**

47. The liquidation analysis attached as Exhibit B to the Disclosure Statement (the "Liquidation Analysis") and the other evidence related thereto that was proffered or adduced at or prior to the Confirmation Hearing: (a) are reasonable, persuasive, credible and accurate as of the dates such analysis or evidence was prepared, presented or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that, with respect to each Impaired Class, each Holder of an Allowed Claim in such Class has voted to accept the Plan (as evidenced by the Voting [*33] Report) or will receive under the Plan on account of such Claim property of a value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. As a result, the requirements of *section 1129(a)(7) of the Bankruptcy Code* have been satisfied.

### 8. *Section 1129(a)(8)* -- **Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the**

**Plan by Each Impaired Class**

48. Classes 1, 2 and 3 are each an Unimpaired Class and are conclusively presumed to have accepted the Plan under *section 1126(f) of the Bankruptcy Code*. As set forth in the Voting Report, the Impaired Accepting Classes have voted to accept the Plan.

49. Class 7 and 8 are deemed to have rejected the Plan. Because the Plan has not been accepted by the Rejecting Classes, the Debtors sought Confirmation under *section 1129(b)*, rather than *section 1129(a)(8), of the Bankruptcy Code*. As set forth below in Section 14, although *section 1129(a)(8) of the Bankruptcy Code* has not been satisfied with respect to the Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair [*34] and equitable with respect to the Rejecting Classes. As a result, the requirements of *section 1129(b) of the Bankruptcy Code* have been satisfied.

**9. *Section 1129(a)(9)* -- Treatment of Claims Entitled to Priority Pursuant to *Section 507(a) of the Bankruptcy Code***

50. The treatment of Allowed Administrative Claims and Allowed Priority Claims under Articles III and VI the Plan complies in all respects with *section 1129(a)(9) of the Bankruptcy Code*. As a result, the requirements of *section 1129(a)(9) of the Bankruptcy Code* have been satisfied.

**10. *Section 1129(a)(10)* -- Acceptance by at Least One Impaired Class**

51. As set forth in the Voting Report, the Impaired Accepting Classes have voted to accept the Plan. As such, there is at least one Class of Claims that is Impaired under the Plan and has accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code). As a result, the requirements of *section 1129(a)(10) of the Bankruptcy Code* have been satisfied.

**11. *Section 1129(a)(11)* -- Feasibility of the Plan**

52. The Plan satisfies *section 1129(a)(11) of the Bankruptcy Code*. The evidence proffered or adduced at, or prior to the Confirmation [*35] Hearing: (a) is reasonable, persuasive, credible and accurate as of the dates such analysis or evidence was prepared, presented or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not been controverted by other evidence; (d) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by further financial reorganization of the successors to the Debtors under the Plan except as provided in the Plan; and (e) establishes that the Debtors, or the First Lien Term Lenders Liquidating Trust, as successor to the Debtors, will have sufficient funds available to meet their obligations under the Plan. As a result, the requirements of *section 1129(a)(11) of the Bankruptcy Code* have been satisfied.

**12. *Section 1129(a)(12)* -- Payment of Bankruptcy Fees**

53. Article XII.D of the Plan provides that all fees payable pursuant to *28 U.S.C. § 1930* shall be paid in accordance with Article XII.D of the Plan by the Debtors or the applicable Liquidating Trustee prior to the closing of the Chapter 11 Cases when due or as soon thereafter as practicable and the Debtors or the applicable Liquidating Trustee have adequate means to pay all [*36] such fees. As a result, the requirements of *section 1129(a)(12) of the Bankruptcy Code* have been satisfied.

**13. *Section 1129(a)(13)* -- Retiree Benefits**

54. *Section 1129(a)(13) of the Bankruptcy Code* requires a plan to provide for "retiree benefits" (as defined in *section 1114 of the Bankruptcy Code*) at levels established pursuant to *section 1114 of the Bankruptcy Code*. The Debtors do not owe any retiree benefits (as defined in *section 1114 of the Bankruptcy Code*) and therefore, *section 1129(a)(13) of the Bankruptcy Code* is inapplicable to the Chapter 11 Cases.

**14. *Section 1129(b)* -- Confirmation of the Plan Over Nonacceptance of Impaired Classes**

55. Notwithstanding the fact that the Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to *section 1129(b)(1) of the Bankruptcy Code* because: (a) the Impaired Accepting Classes have voted to accept the Plan; and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes. With respect to Class 6 (Intercompany Claims), no similar Class of Intercompany Claims exists and there is no junior Class. With respect to Class 7 (Interests), no similar Class of Interests exists and [*37] no Holders of Claims or Interests junior to the Holders in such Class will receive

or retain any property under the Plan on account of such Claims or Interests. As evidenced by the valuations and estimates contained in the Disclosure Statement, no Class of Claims senior to Classes 6 and 7 is receiving more than full payment on account of such Claims. After entry of the Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon the members of the Rejecting Classes.

56. The Plan does not unfairly discriminate because Holders of Claims receive treatment that fairly and appropriately reflects the differences in legal rights and the differences in relative value between the Claims and interests assigned to the different Classes under the Plan. As a result, the requirements of *section 1129(b) of the Bankruptcy Code* have been satisfied.

### 15. *Section 1129(c)* -- Only One Plan

57. Other than the Plan (including previous versions thereof), no other plan has been Filed in the Chapter 11 Cases. As a result, the requirements of *section 1129(c) of the Bankruptcy Code* have been satisfied.

### 16. *Section 1129(d)* -- Principal Purpose of the Plan Is Not the Avoidance of Taxes [*38] or Application of the Securities Law

58. No governmental unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of *section 5 of the Securities Act*. As evidenced by its terms, the principal purpose of the Plan is not such avoidance. As a result, the requirements of *section 1129(d) of the Bankruptcy Code* have been satisfied.

### O.Satisfaction of Confirmation Requirements

59. Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in *section 1129 of the Bankruptcy Code*.

### P.Good Faith

60. The Debtors and the First Lien Term Lenders Liquidating Trust (and all of their respective present and former members, officers, directors, partners, employees, representatives, advisors, attorneys, professionals, affiliates, agents and successors) have been, are and will continue to act in good faith if they proceed to: (a) consummate the Plan; and (b) take the actions authorized

and directed by the Confirmation Order.

### Q.Disclosure: Agreements and Other Documents

61. The Debtors have disclosed all material facts regarding: (a) the Global Plan Settlement; [*39] (b) the Liquidating Trusts and the Liquidating Trust Agreements; (c) the exemption under *section 1146(a) of the Bankruptcy Code*; and (d) the adoption, execution and delivery of all contracts, leases, instruments, releases, indentures and other agreements related to any of the foregoing.

### R.Implementation of Other Necessary Documents and Agreements

62. All documents and agreements necessary to implement the Plan and the Global Plan Settlement, including, without limitation the Term Sheet and the Liquidating Trust Agreements, are essential elements of the Plan and entry into and consummation of the transactions contemplated by such agreements is in the best interests of the Debtors, the Estates and Holders of Claims and are approved in all respects. The Debtors have exercised reasonable business judgment in determining to enter into the Global Plan Settlement, the Term Sheet, and the Liquidating Trust Agreements and have provided sufficient and adequate notice of such documents and agreements. The Debtors and their successors are authorized, without further approval of the Bankruptcy Court or any other party, to execute and deliver all agreements, documents, instruments and certificates [*40] relating to such agreements and perform their obligations thereunder, including, without limitation, pay all fees thereunder. The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's-length, are fair and reasonable in all respects and are reaffirmed and approved. The Liquidating Trust Agreements shall, upon execution, be valid, binding and enforceable and shall not be in conflict with any federal or state law.

### S.Executory Contracts and Unexpired Leases

63. The Debtors have exercised reasonable business judgment in determining whether to assume, assume and assign or reject each of their executory contracts and unexpired leases as set forth in Article VII of the Plan. Each assumption, assumption and assignment, and rejection of an executory contract or unexpired lease as provided in Article VII of the Plan shall be legal, valid

and binding upon the First Lien Term Lenders Liquidating Trust and all non-Debtor parties to each such executory contract or unexpired lease, all to the same extent as if such assumption, assumption and assignment or rejection had been effectuated pursuant to an independent order of the Bankruptcy Court pursuant to *section 365 of the Bankruptcy Code*.

### T.Adequate [*41] Assurance and Cure

64. The Debtors and the First Lien Term Lenders Liquidating Trust have provided adequate assurance of future performance for each of the assumed executory contracts and unexpired leases that are being assumed by the Debtors and assigned to the First Lien Term Lenders Liquidating Trust. The Debtors have cured or shall cure all defaults, if any, set forth on Exhibit C to the Plan relating to each of the assumed executory contracts and unexpired leases that are being assumed by the Debtors and assigned to the First Lien Term Lenders Liquidating Trust pursuant to the Plan. As a result, the requirements of *section 365 of the Bankruptcy Code* have been satisfied.

### U.Corporate Action

65. Upon the Effective Date: (a) the members of the board of directors or managers, as the case may be, of each of the Debtors shall be deemed to have resigned; (b) the Debtors' Other Assets shall be deemed to be automatically transferred to the First Lien Term Lenders Liquidating Trust without further required action by the Debtors or further approval or Order of the Bankruptcy Court, in accordance with the Plan free and clear of all liens, Claims, charges or other encumbrances; and (c) the Debtors [*42] shall transfer the Creditor Funds to the GUC Liquidating Trust in accordance with the Plan free and clear of all liens, Claims, charges or other encumbrances.

66. Except as expressly provided in the Plan, on and after the Effective Date, each Liquidating Trustee may operate its respective Liquidating Trust (subject and pursuant to the applicable Liquidating Trust Agreement) and may use, acquire or dispose of its respective Liquidating Trust's property and compromise or settle any claims asserted by against such Liquidating Trust without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Neither

the vesting of the Other Assets in the First Lien Term Lenders Liquidating Trust nor the vesting of the Creditor Funds in the GUC Trust shall constitute a voidable transfer under the Bankruptcy Code or applicable non-bankruptcy law.

67. Upon the payment of the Revolver Effective Date Cash to the Pre-petition First Lien Revolver Administrative Agent, the transfer of the Other Assets to the First Lien Term Lenders Liquidating Trust in accordance [*43] with the Plan and the transfer of the Creditor Funds to the GUC Liquidating Trust in accordance with the Plan, the Debtors shall have no further duties or responsibilities in connection with the implementation of the Plan and the Plan shall be deemed to have been substantially consummated.

### V.Conditions to Confirmation

68. All provisions, terms and conditions of the Plan are approved.

### W.Conditions Precedent to Confirmation

69. Each of the conditions to confirmation set forth in Article VIII.A of the Plan has been satisfied or waived in accordance with the terms of Article VIII.C.

### X.Retention of Jurisdiction

70. The Bankruptcy Court properly may retain jurisdiction over the matters set forth in Article XI and other applicable provisions of the Plan including, without limitation, matters related to the enforcement and implementation of the release, exculpation, indemnification and injunction provisions of Article X of the Plan.

### II.ORDER

Based on the foregoing, it is hereby ORDERED:

### A.Objections

71. To the extent that any objections, reservations of rights, statements or joinders to Confirmation have not been resolved, withdrawn, waived or settled prior to entry of the Confirmation Order or otherwise [*44] resolved as stated on the record of the Confirmation Hearing, they are hereby overruled on their merits. Any resolution of objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by

reference.

### B. Confirmation of the Plan

72. The Confirmation Order shall and does confirm the Plan. A copy of the Plan is attached hereto as Exhibit A. The Plan and the Exhibits (as such may be amended by the Confirmation Order or in accordance with the Plan) and each of their provisions, terms and conditions are approved and confirmed in each and every respect pursuant to *section 1129 of the Bankruptcy Code*. Without further order or authorization of the Bankruptcy Court, the Debtors and each Liquidating Trust are authorized and empowered to make all appropriate and necessary modifications to all documents included as part of the Plan and the Exhibits to which such Liquidating Trust is a party that are consistent with the Plan and this Confirmation Order, subject to Article XII.A of the Plan except with respect to amendments of a Liquidating Trust Agreement, which amendments shall be governed by the applicable Liquidating Trust Agreement.

73. The terms of the Plan [*45] and the Exhibits thereto are incorporated by reference into, and are an integral part of, the Confirmation Order. The terms of the Plan and the Exhibits thereto and all other relevant and necessary documents, shall be effective and binding as of the Effective Date of the Plan.

74. The failure to specifically make reference to any particular provision of the Plan or Exhibit in this Confirmation Order shall not impair or diminish the effectiveness of any such provision, it being the intent of the Bankruptcy Court that the Plan is confirmed in its entirety, and that each term and provision of the Plan (including any Exhibit), except as expressly provided in Section II.EE of this Confirmation Order, is valid and enforceable pursuant to its terms.

### C. Plan Classification Controlling

75. The terms of the Plan shall govern the classification of Claims and Interests for all purposes, including with respect to distributions to be made thereunder. The classifications set forth on the Ballots tendered to or returned by the Holders of Claims or Interests in connection with voting on the Plan: (a) were set forth on the Ballots solely for purposes of soliciting votes to accept or reject the Plan; (b) [*46] do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Interests under the Plan for any purpose; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for any purpose; and (d) shall not be binding on the Debtors except for voting purposes.

### D. Compromise and Settlement

76. The allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan take into account and conform to the relative priorities and rights of the Claims and the Interests in each Class with due regard to any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, *sections 510(b)* and *(c) of the Bankruptcy Code* or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant hereto. This Confirmation Order constitutes the Bankruptcy Court's finding and determination that the settlements reflected in the Plan, including the Global [*47] Plan Settlement, are (1) in the best interests of the Debtors, their Estates and all Holders of Claims, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved by the Bankruptcy Court pursuant to *Bankruptcy Rule 9019*.

77. In addition, the allowance, classification and treatment of Allowed Claims takes into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist: (1) between the Debtors, on the one hand, and the Debtor Releasees, on the other; and (2) as between the Releasing Parties and the Third Party Releasees (to the extent set forth in the Third Party Release); and, as of the Effective Date, any and all such Causes of Action are deemed settled, compromised and released pursuant hereto. This Confirmation Order approves and effectuates the releases by all Persons of all such contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant hereto.

78. Provided that such settlement and compromise is affected in accordance with the provisions of the Plan, and pursuant to *Bankruptcy Rule 9019(b)*, without any further notice to or action, [*48] order or approval of the Bankruptcy Court (except to the extent necessary to avoid prejudice to the other Liquidating Trust), after the Effective Date: (1) the First Lien Term Lenders

Liquidating Trustee may, in its sole and absolute discretion (but subject to the terms of the First Lien Term Lenders Liquidating Trust Agreement), compromise and settle (a) Administrative Claims, Priority Claims and Class 2 Claims and (b) Causes of Action against other Persons; and (2) the GUC Liquidating Trustee may, in its sole and absolute discretion, compromise and settle Class 5 Claims, in each case consistent with the terms of the Plan.

## E. Substantive Consolidation of the Debtors

79. Entry of this Confirmation Order shall constitute the approval, pursuant to *section 105(a) of the Bankruptcy Code*, effective as of the Effective Date, of the substantive consolidation of the Debtors, for all purposes related to the Plan, without limitation, for purposes of merging of assets and liabilities, obligations, claims, confirmation and distribution, and subject to the terms outlined in Article V.A of the Plan. On the Effective Date, in accordance with the terms of the Plan, all Claims based upon guarantees of [*49] collection, payment, or performance made by any of the Debtors as to the obligations of another Debtor shall be released and of no further force and effect. The Debtors' subsidiary, MG Canada, shall not be subject to substantive consolidation with the other Debtors and, after the Effective Date, all of the Debtors' right, title and interest in and to MG Canada shall be deemed and considered to be and constitute Other Assets; *provided, however,* that the First Lien Term Lenders Liquidating Trust shall not be liable in any way for any liabilities, obligations, or guarantees of the Debtors, whether contingent or actual, express or implied, arising from or related in any way to the Debtors' relationship with MG Canada; *provided further, however,* that the First Lien Term Lenders Liquidating Trust shall not be liable in any way for any liabilities, obligations, or guarantees of the MG Canada, whether contingent or actual, express or implied, and MG Canada shall remain solely responsible for all such liabilities, obligations and guarantees.

## F. The Release, Injunction, Exculpation and Related Provisions Under the Plan

80. The following releases, injunctions, exculpations and related provisions [*50] set forth in Article X of the Plan are essential provisions of the Plan, are fair and necessary for the successful implementation of the Plan, and, notwithstanding anything contained herein to the contrary except as expressly set forth in paragraphs 132,

133 and 139 hereof, are hereby approved and authorized in their entirety:

**1. Debtor Release**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES, INCLUDING, WITHOUT LIMITATION: (1) THE RELEASES OF LIENS AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT HERETO; (2) THE AGREEMENT OF THE PRE-PETITION SECURED PARTIES AND LENADO TO PROVIDE THE SUPPORT NECESSARY FOR CONSUMMATION OF THE PLAN; AND (3) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MEMBERS (INCLUDING EX OFFICIO MEMBERS) AND ADVISORS IN FACILITATING THE EXPEDITIOUS IMPLEMENTATION OF THE LIQUIDATION CONTEMPLATED HEREBY, EACH OF THE DEBTOR RELEASORS SHALL FULLY RELEASE (AND, AUTOMATICALLY WITHOUT FURTHER ACTION, EACH SUCH DEBTOR RELEASEE AND THIRD PARTY RELEASEE SO RELEASED [*51] SHALL BE DEEMED FULLY RELEASED BY THE DEBTOR RELEASORS) EACH DEBTOR RELEASEE AND EACH THIRD PARTY RELEASEE AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL AVOIDANCE ACTIONS AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, WHETHER ARISING PRIOR TO OR AFTER THE

COMMENCEMENT DATE, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THEIR ESTATES, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS OR THE LIQUIDATING TRUSTS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES, AND FURTHER INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES, THE PLAN, THE DISCLOSURE STATEMENT, THE SALE OR LIQUIDATION OF ANY PROPERTY OF THE ESTATES, THE CLOSING OF ANY OF THE DEBTORS' STORES, THE DEBTORS' BUSINESSES AND OPERATIONS, THE DEBTORS' INTERESTS, [*52] THE DEBTORS' DEBT OBLIGATIONS, THE DEBTORS' FINANCING AGREEMENTS, THE DEBTORS' LEASES AND OTHER CONTRACTS, THE DEBTORS' PRIOR BANKRUPTCY CASES, OR THE TRANSACTIONS CONTEMPLATED IN CONNECTION WITH THE DEBTORS' PRIOR BANKRUPTCY CASES; *PROVIDED, HOWEVER,* THAT: (1) THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CAUSES OF ACTION OF ANY DEBTOR AND/OR A LIQUIDATING TRUST AGAINST A THIRD PARTY RELEASEE (OTHER THAN: (I) ALL CURRENT AND FORMER PRE-PETITION SECURED PARTIES AND THEIR RELATED PARTIES (II) LENADO AND ITS RELATED PARTIES, AND (III) THE COMMITTEE, THE STUDIOS, AND WARNER HOME VIDEO) ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE DEBTORS AND/OR A LIQUIDATING TRUST; (2) NOTWITHSTANDING THE FOREGOING "DEBTOR RELEASE", THE DEBTORS, THE LIQUIDATING TRUSTS, THE LIQUIDATING TRUSTEES, THE PRE-PETITION SECURED PARTIES, LENADO, THE COMMITTEE, THE STUDIOS AND WARNER HOME VIDEO SHALL HAVE THE RIGHT TO SEEK SPECIFIC ENFORCEMENT OF THE GLOBAL PLAN SETTLEMENT INCLUDING THE TERM SHEET, BY ANY PARTY THERETO DIRECTLY OR THROUGH THE PLAN; AND (3) NOTWITHSTANDING THE FOREGOING "DEBTOR RELEASE", THE DEBTORS AND/OR THE APPLICABLE LIQUIDATING TRUST SHALL HAVE THE RIGHT TO [*53] SEEK THE RETURN, RECOUPMENT OR SETOFF OF ANY OVERPAYMENT MADE BY THE DEBTORS OR SUCH APPLICABLE LIQUIDATING TRUST TO A STUDIO OR WARNER HOME VIDEO AND THEIR RELATED PARTIES.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO *BANKRUPTCY RULE 9019*, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND

VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR THE LIQUIDATING TRUSTS ASSERTING ANY CLAIM RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE DEBTOR RELEASEES OR ANY OF THE THIRD PARTY RELEASEES.

**2. Third Party Release**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE [*54] AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A THIRD PARTY RELEASEE) SHALL FULLY RELEASE (AND, AUTOMATICALLY WITHOUT FURTHER ACTION, EACH ENTITY SO RELEASED SHALL BE DEEMED RELEASED BY THE RELEASING PARTIES) THE DEBTORS, THE DEBTOR RELEASEES, AND THE THIRD PARTY RELEASEES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL AVOIDANCE ACTIONS AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, WHETHER ARISING PRIOR TO OR AFTER THE COMMENCEMENT DATE, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS OR THEIR ESTATES, INCLUDING, WITHOUT LIMITATION, THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES, THE PLAN, THE SALE OR LIQUIDATION OF ANY PROPERTY OF THE ESTATES, THE CLOSING OF ANY OF THE DEBTORS' STORES, THE DEBTORS' BUSINESSES AND OPERATIONS, THE DEBTORS' INTERESTS, THE DEBTORS' DEBT OBLIGATIONS, THE DEBTORS' FINANCING AGREEMENTS, THE DEBTORS' LEASES AND OTHER CONTRACTS, THE DEBTORS' PRIOR BANKRUPTCY CASES, OR THE TRANSACTIONS [*55] CONTEMPLATED IN CONNECTION WITH THE DEBTORS' PRIOR BANKRUPTCY CASES; *PROVIDED, HOWEVER,* THAT (1) THE FOREGOING "THIRD PARTY RELEASE", SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CAUSES OF ACTION OF ANY THIRD PARTY RELEASOR AND/OR A LIQUIDATING TRUST AGAINST A THIRD PARTY RELEASEE (OTHER THAN: (I) ALL CURRENT AND FORMER PRE-PETITION SECURED PARTIES AND THEIR RELATED PARTIES, (II) LENADO AND ITS RELATED PARTIES, AND (III) THE COMMITTEE, THE STUDIOS, AND WARNER HOME VIDEO) ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE DEBTORS AND/OR A LIQUIDATING TRUST; (2) NOTWITHSTANDING THE FOREGOING "THIRD PARTY RELEASE" THE DEBTORS, THE

LIQUIDATING TRUSTS, THE LIQUIDATING TRUSTEES, THE PRE-PETITION SECURED PARTIES, LENADO, THE COMMITTEE, THE STUDIOS AND WARNER HOME VIDEO SHALL HAVE THE RIGHT TO SEEK SPECIFIC ENFORCEMENT OF THE GLOBAL PLAN SETTLEMENT, INCLUDING THE TERM SHEET, BY ANY PARTY THERETO DIRECTLY OR THROUGH THE PLAN; (3) NOTWITHSTANDING THE FOREGOING "THIRD PARTY RELEASE", THE DEBTORS AND/OR THE APPLICABLE LIQUIDATING TRUST SHALL HAVE THE RIGHT TO SEEK THE RETURN, RECOUPMENT OR SETOFF OF ANY OVERPAYMENT MADE BY THE DEBTORS OR SUCH APPLICABLE LIQUIDATING TRUST TO A STUDIO OR WARNER HOME [*56] VIDEO; AND (4) THE FOREGOING "THIRD PARTY RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR RIGHTS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR OTHER FINAL ORDER OF THE BANKRUPTCY COURT OR OTHERWISE PRECLUDE ANY PERSON FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO *BANKRUPTCY RULE 9019*, [*57] OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY

THE THIRD PARTY RELEASEES, (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED BY THE THIRD PARTY RELEASE AGAINST ANY OF THE DEBTORS, THE DEBTOR RELEASEES, AND THE THIRD PARTY RELEASEES.

### 3. Exculpation

Without limiting or restricting any other release or waiver provided in the Plan, the Confirmation Order, the Cash Collateral Order, or other Final Order of the Bankruptcy Court, the Exculpated Parties shall neither have nor incur any liability to any Person for any pre-petition or post-petition act taken or omitted to be taken during the Chapter 11 Cases or in connection with, or related to (i) the preparation, filing, [*58] or timing of the commencement of the Chapter 11 Cases, or (ii) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with or in contemplation of the closing of any of the Debtors' stores or other liquidation of the Debtors' assets; *provided, however, that*

the foregoing Exculpation shall have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct; *provided, further,* that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; *provided, still further,* that the foregoing Exculpation shall not limit the ability of the Debtors, the Liquidating Trusts, the Liquidating Trustees, the Pre-petition Secured Parties, Lenado, the Committee, the Studios or Warner [*59] Home Video to exercise any available right of specific performance remedies with respect to the Global Plan Settlement directly or through the Plan.

## 4. Indemnification

Except as otherwise provided in the Plan or any contract, instrument, release, or other agreement or document entered into in connection with the Plan, any and all pre-petition indemnification obligations that the Debtors have pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document, or applicable law shall be rejected as of the Effective Date, to the extent executory; *provided, however,* that: (i) the Debtors have acquired the Tail Coverage, which shall be available to the directors and officers of the Debtors who were directors or officers on or after the Commencement Date, (ii) all rights of such directors and officers under the Tail Coverage and the Debtors' Existing D&O Insurance Policies hereby are expressly reserved, and (iii) the Debtors, or following the Effective Date, the Liquidating Trustees, the First Lien Term Lenders Liquidating Trust Oversight

Board and the GUC Liquidating Trust shall take any action reasonably requested [*60] by any such director or officer to preserve the Debtors' Existing D&O Insurance Policies, shall take no action to amend, limit, terminate, cancel, or reduce any Existing D&O Insurance Policy, and shall otherwise cooperate with such directors and officers in connection with the maintenance of the Existing D&O Insurance Policies; provided further, that, (i) to the extent any claims released pursuant to the Debtor Release or the Third Party Release are pursued against any of the Debtor Releasees or any of the Third Party Releasees, respectively, the First Lien Term Lenders Liquidating Trust shall indemnify any such Debtor Releasees or Third Party Releasees that are Pre-petition Secured Parties, or their respective Related Parties (the "Pre-petition Secured Parties Indemnified Persons") and (ii) without in any way limiting the generality of, or reducing the scope of, the foregoing indemnities, to the extent any claims released pursuant to the Debtor Release or the Third Party Release are pursued against Lenado (in any capacity other than as a Pre-petition Secured Party) (the "Lenado Indemnified Persons"; the Pre-petition Secured Parties Indemnified Persons together with the Lenado Indemnified [*61] Persons, the "Indemnified Persons") by the First Lien Term Lenders Liquidating Trust, the First Lien Term Lenders Liquidating Trustee, any Person who at any time after the Commencement Date through the Effective Date was a Pre-petition First Lien Term Secured Party or a Related Person thereof or any Person on behalf of the foregoing, the First Lien Term Lenders Liquidating Trust shall indemnify Lenado in such other capacities, except that the First Lien Term Lenders Liquidating Trust shall not indemnify any such Person referred to in the preceding clauses (i) and (ii) with respect to any act or omission that is determined in a Final Order to have constituted fraud, gross negligence or

willful misconduct.

The First Lien Term Lenders Liquidating Trustee reserves all of its rights and remedies under the Plan, including the right to commence litigation for money damages against any Pre-petition Secured Party (or any Person that was a Prepetition Secured Party at any time from the Commencement Date through the Effective Date or any of their Related Parties) (a "Secured Party Claimant") in the event that any Secured Party Claimant pursues any Claims against any Indemnified Person which Claims [*62] were, or were deemed to be, released by the Debtor Release or the Third Party Release and which pursuit, directly or indirectly, causes or results in the First Lien Term Lenders Liquidating Trust making any payment or incurring any other liability, cost, or expense including, without limitation, under or as a result of the indemnity granted by the First Lien Term Lenders Liquidating Trust under Article X.F. of the Plan. No Pre-petition Secured Party or Related Party other than a Secured Party Claimant shall be subject to any loss, cost, expenses, or other liability under the immediately preceding sentence.

For the avoidance of doubt: (i) the Liquidating Trustees, the First Lien Term Lenders Liquidating Trust Oversight Board, and the GUC Liquidating Trust shall have no power or authority to terminate or impair benefits provided under the Tail Coverage or the Debtors' Existing D&O Insurance Policies; (ii) notwithstanding the Chapter 11 Cases, the Plan, and the Confirmation Order, all rights and benefits of any current or former director or officer of the Debtors under any of (a) the Debtors' Existing D&O Insurance Policies are expressly reserved and, after the Effective Date, shall survive [*63] and shall be fully enforceable and (b) the Debtors' other insurance policies in force on the Effective Date which name a director or officer as an additional insured or loss payee or otherwise expressly by their terms provide that a director or officer may receive payment on a claim thereunder are reserved, and, after the Effective Date, shall survive and shall be fully enforceable *provided, however,* that the First Lien Term Lenders Liquidating Trust shall retain and hereby reserves all rights that the Debtors possess under applicable law or the terms of such other insurance policy to amend or terminate any such other insurance policy if the First Lien Liquidating Trustee reasonably determines that the rights or benefits conferred to such director and officer are to the material economic detriment of the First Lien Liquidating Trust or that the rights and benefits conferred on the directors and officers under such other insurance policies, after reasonable written notice to any affected director or officer, shall have any other material adverse financial effect on, or give rise to any material liability of the First Lien Term Lenders Liquidating Trust; *provided, further,* that the First [*64] Lien Term Lenders Liquidating Trust shall be under no obligation to pay any premium or incur any other expense or liability with respect to any such other insurance policy; (iii) all post-petition indemnification obligations owed by the Debtors or the Estates to (a) the Debtors' directors, managers, or officers serving in such positions on or after the Commencement Date and (b) the Pre-petition Secured Parties, that the Debtors have pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document, or applicable law shall survive Consummation of the Plan; and (iv) nothing in the Plan shall impair the rights of the Pre-petition Secured Parties to assert indemnity rights under the Pre-petition First Lien Credit Documents and to include amounts payable to the Pre-petition Secured Parties on account of

such indemnity rights in the Pre-petition First Lien Secured Claims.

**5. Injunction**

PURSUANT TO *BANKRUPTCY CODE SECTION 1141(D)(3)*, CONFIRMATION WILL NOT DISCHARGE CLAIMS AGAINST THE DEBTORS; *PROVIDED, HOWEVER,* THAT NO CLAIMHOLDER OR INTEREST HOLDER MAY, ON ACCOUNT OF SUCH CLAIM OR INTEREST, SEEK OR RECEIVE ANY PAYMENT [*65] OR OTHER DISTRIBUTION FROM, OR SEEK RECOURSE AGAINST, ANY DEBTOR OR THE ESTATE OF ANY DEBTOR, THE LIQUIDATING TRUSTS, THE LIQUIDATING TRUSTEES, FIRST LIEN TERM LENDERS LIQUIDATING TRUST OVERSIGHT BOARD AND ITS MEMBERS, GUC LIQUIDATING TRUST AND/OR THEIR RESPECTIVE SUCCESSORS, ASSIGNS, RELATED PARTIES AND/OR PROPERTY, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN. NOTWITHSTANDING THE PRECEDING SENTENCE, THE INJUNCTIONS SET FORTH BELOW SHALL APPLY TO IMPLEMENT THE PLAN.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, INTERESTS, AVOIDANCE ACTIONS, CAUSES OF ACTION OR LIABILITIES THAT: (A) HAVE BEEN RELEASED PURSUANT TO ARTICLE X.C. OR ARTICLE X.D. OF THE PLAN; OR (B) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE X OF THE PLAN (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE X.E OF THE PLAN) ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE DEBTORS AND THE LIQUIDATING TRUSTS) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) [*66] ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, INTERESTS, AVOIDANCE ACTIONS, CAUSES OF ACTION OR LIABILITIES; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE DEBTORS AND THE LIQUIDATING TRUSTS) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, INTERESTS, AVOIDANCE ACTIONS, CAUSES OF ACTION OR LIABILITIES; (3) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM OR ENCUMBRANCE OF ANY KIND AGAINST ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE DEBTORS AND THE LIQUIDATING TRUSTS) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED

CLAIMS, INTERESTS, AVOIDANCE ACTIONS, CAUSES OF ACTION OR LIABILITIES; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM ANY ENTITY SO RELEASED, [*67] DISCHARGED OR EXCULPATED (INCLUDING THE DEBTORS AND THE LIQUIDATING TRUSTS) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, INTERESTS, AVOIDANCE ACTIONS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING AN INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO *SECTION 553 OF THE BANKRUPTCY CODE* OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE DEBTORS AND THE LIQUIDATING TRUSTS) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, INTERESTS, AVOIDANCE ACTIONS, CAUSES OF ACTION OR LIABILITIES RELEASED OR SETTLED PURSUANT TO THE PLAN.

ANY PERSON OR ENTITY INJURED BY ANY WILLFUL VIOLATION OF [*68] THIS INJUNCTION MAY SEEK TO RECOVER ACTUAL DAMAGES, INCLUDING COSTS AND ATTORNEYS' FEES, AND, IN APPROPRIATE CIRCUMSTANCES, PUNITIVE DAMAGES FROM THE WILLFUL VIOLATOR.

**G.Administrative Claims**

81. All requests for payment of an Administrative Claim arising between August 1, 2010 and the Effective Date (other than Professional Fee Claims) must be filed with the Bankruptcy Court and served on counsel for the Debtors (or if after the Effective Date, on the counsel for the First Lien Term Lenders Liquidating Trust) no later than the Final Administrative Claims Bar Date. All requests for payment of an Administrative Claim arising prior to July 31, 2010 must have been filed no later than the Initial Administrative Claims Bar Date. Holders of Administrative Claims arising between August 1, 2010 and the Effective Date that are required to File and serve a request for payment of Administrative Claims that do not File and serve such a request by the Final Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or the Liquidating Trusts or the assets of the Liquidating Trusts, and such Administrative Claims shall [*69] be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the requesting party by the Administrative Claims Objection Deadline. The Claims Agent will serve a notice of the Effective Date, which will include the date for the Final Administrative Claims Bar Date.

**H.Professional Compensation**

82. Retained Professionals asserting a Professional Fee Claim for services rendered before the Effective Date, and Committee Members with respect to their reimbursable expenses, must File and serve on the Debtors and such other entities who are designated by order of the Bankruptcy Court an application for final allowance of such Fee Claim or expense reimbursement no later than 45 days after the Effective Date. Objections, if any, to Final Fee Applications of such Professionals

must be filed and served on the First Lien Term Lenders Liquidating Trustee and its counsel, the requesting Professional and the Office of the U.S. Trustee no later than ten (10) days from the date on which each such Final Fee Application is served and filed. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy [*70] Court, the allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court. No objections to Final Fee Applications may be asserted after ten (10) days from the date on which such Final Fee Application was served and filed.

83. Except as otherwise provided for in the Plan, from and after the Effective Date, any requirement that Professionals comply with *Bankruptcy Code sections 327 through 331* or any order previously entered by the Bankruptcy Court in seeking retention or compensation for services rendered or expenses incurred after such date shall terminate.

## I.Intercompany Claims

84. The treatment of Intercompany Claims provided in Article III.C.3 of the Plan is approved in its entirety.

## J.Essential Documents and Agreements

85. The Liquidating Trust Agreements are approved in their entirety and, upon execution and delivery of the agreements relating thereto by the applicable parties, the Liquidating Trust Agreements shall be in full force and effect and valid, binding and enforceable in accordance with their terms without the need for any further notice to or action, order or approval of the Bankruptcy Court, or other act or action under applicable law, regulation, [*71] order or rule. The Debtors, and after the Effective Date, the Liquidating Trustees, are authorized, without further approval of the Bankruptcy Court or any other party, to execute and deliver all agreements, documents, instruments and certificates relating to such agreements and perform their obligations thereunder (subject to the terms thereof and to the extent a Liquidating Trust is party such agreements, documents, instruments and certificates), including, without limitation, pay all fees required to be paid by it thereunder.

## K.Release of Liens, Claims and Interests

86. Except as expressly provided in the Plan or the Confirmation Order, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with and consistent with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VI of the Plan, all Claims, Interests, mortgages, deeds of trust, liens, and encumbrances or other security interests against the property of any Estate are fully released and discharged.

87. Except as otherwise provided in the Plan, and in any contract, instrument or other agreement or document created in connection [*72] with the Plan, on the Effective Date, the Interests in the Debtors and any other promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims against or payable by the Debtors or Interests in the Debtors shall be deemed cancelled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations and liabilities of the Debtors under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be released and forever discharged; *provided, however, that* certain instruments, documents, and credit agreements related to Claims shall continue in effect solely for the purposes of allowing the applicable Liquidating Trust to make Distributions to the Holders of such Claims. The holders of or parties to such canceled notes, share certificates and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan, the Confirmation [*73] Order, the Cash Collateral Order, and the Global Plan Settlement. Notwithstanding anything in the foregoing to the contrary, the Global Plan Settlement, the Pre-petition First Lien Revolving Credit Documents, and the Pre-petition First Lien Term Credit Documents shall remain in full force and effect and shall not be cancelled until the entry of the Final Decree. In the event of any conflict between the terms of the Global Plan Settlement and the Plan, the Plan shall govern.

## L.Liquidating Trusts

## 1. Establishment of the Liquidating Trusts

88. On the Effective Date, the First Lien Term Lenders Liquidating Trust Agreement shall become effective as if executed by the Debtors and the First Lien Term Lenders Liquidating Trustee on such date and the

First Lien Term Lenders Liquidating Trust shall accept the Other Assets on behalf of and for the benefit of the beneficiaries of the First Lien Term Lenders Liquidating Trust pursuant to the First Lien Term Lenders Liquidating Trust Agreement and for the other uses provided in the Plan, and shall be authorized to obtain, liquidate, and collect all of the Other Assets of the Estates not in its possession and pursue all of the Causes of Action (except [*74] to the extent waived or released by the Plan). On the Effective Date, the First Lien Term Lenders Liquidating Trust will be deemed created and effective without any further action by the Bankruptcy Court or any other Person. All Distributions to the Holders of Allowed Administrative Claims, Allowed Priority Claims, Allowed Class 2 Claims, Allowed Class 3 Claims to the extent not paid in full in Cash on the Effective Date, and Allowed Class 4 Claims shall be from Available Cash on hand at the First Lien Term Lenders Liquidating Trust on the date any such Distribution is made. The beneficiaries and transferees of the First Lien Term Lenders Liquidating Trust, including without limitation, the Pre-petition Secured Parties and Lenado and their respective Related Parties, shall not be personally liable, or otherwise deemed to be liable, in any manner whatsoever, for any obligation, liability, action, or omission of the First Lien Term Lenders Liquidating Trust or First Lien Term Lenders Liquidating Trustee, and the sole recourse for any liabilities of the First Lien Term Lenders Liquidating Trust shall be limited to the assets of the First Lien Term Lenders Liquidating Trust.

89. On the [*75] Effective Date, the GUC Liquidating Trust Agreement shall become effective as if executed by the Debtors and the GUC Liquidating Trustee on such date. The GUC Liquidating Trust shall accept the Creditor Funds on behalf of and for the benefit of the Holders of General Unsecured Claims as beneficiaries thereof. On the Effective Date, the GUC Liquidating Trust will be deemed created and effective without any further action by the Bankruptcy Court or any other Person. All Distributions to the Holders of Allowed Class 5 Claims shall be from the GUC Liquidating Trust. The beneficiaries and transferees of the GUC Liquidating Trust shall not be personally liable, or otherwise deemed to be liable, in any manner whatsoever, for any obligation, liability, action, or omission of the GUC Liquidating Trust or GUC Liquidating Trustee, and the sole recourse for any liabilities of the GUC Liquidating Trust shall be limited to the assets of the GUC Liquidating Trust.

90. The Liquidating Trusts shall hold and administer the following assets:

(a) The First Lien Term Lenders Liquidating Trust shall hold and administer the Other Assets and the product and proceeds thereof.

(b) The GUC Liquidating Trust shall [*76] hold and administer the Creditor Funds.

91. The First Lien Term Lenders Liquidating Trust is created for the primary purpose of liquidating the Other Assets, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the First Lien Term Lenders Liquidating Trust.

92. The GUC Liquidating Trust is created for the primary purpose of liquidating the Creditor Funds, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the GUC Liquidating Trust.

**2. First Lien Term Lenders Liquidating Trustee as Successor**

93. Pursuant to *Bankruptcy Code section 1123*, the First Lien Term Lenders Liquidating Trustee shall be the successor to the Debtors for all purposes consistent with the Plan, the Global Plan Settlement and the First Lien Term Lenders Liquidating Trust Agreement; *provided, however,* that solely for purposes of objecting to the allowance of, or making Distributions with respect to, Class 5 General Unsecured Claims, the GUC Liquidating Trustee shall be deemed to be the successor to the Debtors. For the avoidance of doubt, [*77] upon the Effective Date, the First Lien Term Lenders Liquidating Trustee shall have all rights and remedies of the Debtors under the Plan and the Global Plan Settlement. The First Lien Term Lenders Liquidating Trustee is authorized to disclose information regarding beneficiaries of the Debtors' health insurance plan, including claims submitted by the beneficiaries, including, but not limited to, individually identifiable protected health information as defined at *45 C.F.R. § 160.103* ("PHI"), to Blue Cross and Blue Shield of Alabama, and Blue Cross and Blue Shield of Alabama is authorized to use, store, and disclose such information as necessary. In their uses and

disclosures of Movie Gallery plan beneficiary information, including PHI, the First Lien Term Lenders Liquidating Trustee and Blue Cross and Blue Shield of Alabama shall be considered to be engaged in uses and disclosures of such information to carry out treatment, payment, or health care operations as set forth in *45 C.F.R. § 164.506*.

### 3. Compromising Claims

94. Pursuant to *Bankruptcy Rule 9019(b)*, the Plan and the Liquidating Trust Agreements, as of the Effective Date, each of the Liquidating Trustees is authorized to approve [*78] compromises of Claims, Disputed Claims, and Liens relating to their respective Liquidating Trust and to execute necessary documents, including Lien releases and stipulations of settlement or release, without notice to any party (except, where required, to the other Liquidating Trustee or to the extent required by the Plan) and without further order or other action of the Bankruptcy Court, except as otherwise provided in the applicable Liquidating Trust Agreement; *provided, however,* that (1) the First Lien Term Lenders Liquidating Trustee shall have the sole authority to compromise and settle all Claims other than Class 5 Claims; and (2) the GUC Liquidating Trustee shall have the sole authority to compromise and settle Class 5 Claims.

### 4. Investment Powers

95. The powers of a Liquidating Trustee to invest any Cash that is held by the applicable Liquidating Trust, other than those powers reasonably necessary to maintain the value of the assets and to further such Liquidating Trust's liquidating purposes, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary liquid investments, [*79] such as treasury bills. Each Liquidating Trustee is prohibited from continuing or engaging in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the applicable Liquidating Trust.

### 5. Distributions

96. Except as otherwise provided in the Plan, each Liquidating Trustee is required to distribute as promptly as practicable following the Effective Date and at least annually thereafter to beneficiary Claimholders

qualifying for Distributions from the applicable Liquidating Trust under the Plan the applicable Liquidating Trust's Available Cash, net income and all net proceeds from the sale of any non-Cash assets held by the applicable Liquidating Trust, except that the Liquidating Trust shall retain an amount of Cash, Net Proceeds or net income reasonably necessary to satisfy Claims and contingent liabilities (including Disputed Claims) consistent with the Plan. The First Lien Term Lenders Trust shall be in compliance with the requirements of the foregoing sentence so long as it has made Adequate Provision pursuant to Article III.C.1 of the Plan. The First Lien Term Lenders Liquidating Trustee shall make continuing [*80] efforts to liquidate any non-Cash assets held by the First Lien Term Lenders Liquidating Trust.

97. Each Liquidating Trustee shall make timely Distributions and not unduly prolong the duration of the applicable Liquidating Trust. All Distributions to the Holders of Allowed Class 2 Claims, Allowed Class 3 Claims to the extent not paid in full in Cash on the Effective Date, Allowed Class 4 Claims, Allowed Administrative Claims and Allowed Priority Claims shall be from the First Lien Term Lenders Liquidating Trust. All Distributions to the Holders of Allowed Class 5 Claims shall be from the GUC Liquidating Trust and solely from the Creditor Funds.

### 6. First Lien Term Lenders Liquidating Trust Oversight Board

98. The First Lien Term Lenders Liquidating Trust Oversight Board shall have such rights, duties, obligations, indemnities and protections as set forth in the Plan and the First Lien Term Lenders Liquidating Trust Agreement.

### M. Exemptions from Taxation

99. Pursuant to *section 1146(a) of the Bankruptcy Code*, any transfer of property pursuant to the Plan including, without limitation, all documents necessary to evidence and implement the provisions of and distributions to be made under the [*81] Plan, and including the transfer of the Other Assets to the First Lien Term Lenders Liquidating Trust and the transfer of the Creditor Funds to the GUC Liquidating Trust, shall not be subject to any stamp tax or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the

collection of any such tax or governmental assessment and accept for filing and recordation instruments or other documents provided to them in connection with such transfers of property without the payment of any such tax or governmental assessment.

## N. Assumption and Rejection of Executory Contracts and Unexpired Leases

100. The executory contract and unexpired lease provisions of Article VII of the Plan are approved. Pursuant to the provisions and requirements of *sections 365* and *1123 of the Bankruptcy Code*, each executory contract or unexpired lease shall be deemed automatically rejected as of the Effective Date, unless any such executory contract or unexpired lease: (a) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court; (b) has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, [*82] which order becomes a Final Order; (c) is the subject of a motion to assume or reject pending as of the Effective Date; (d) is listed on Exhibits A or C to the Plan; (e) is an Existing D&O Insurance Policy; or (f) is otherwise assumed pursuant to the Plan. The Confirmation Order shall constitute an order approving such rejections, pursuant to *sections 365* and *1123 of the Bankruptcy Code*, as of the Effective Date.

101. All Proofs of Claim arising from the rejection of executory contracts or unexpired leases must be filed and served on the GUC Liquidating Trust and counsel for the GUC Liquidating Trustee within thirty (30) days after service of a notice of the Effective Date or such other date as is prescribed by the Bankruptcy Court. Any entity that is required to File a Proof of Claim arising from the rejection of an executory contract or an unexpired lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against any Debtor or their Estates or their respective property, and the Debtors and the Estates and their property shall be forever discharged from any and all indebtedness and liability [*83] with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.

102. Pursuant to the provisions of *sections 365* and *1123 of the Bankruptcy Code*, as of the Effective Date, the Debtors shall assume all of the executory contracts

and unexpired leases listed on Exhibit A or Exhibit C and assign such executory contract and unexpired lease to the First Lien Term Lenders Liquidating Trust. The Confirmation Order shall constitute an order approving such assumptions and assignments, pursuant to *sections 365* and *1123 of the Bankruptcy Code*, as of the Effective Date. Each of the assumed executory contracts and unexpired leases shall be assumed only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. Listing a contract or lease on Exhibits A or C to the Plan shall not constitute an admission by a Debtor that such contract or lease is an executory contract or unexpired lease or that a Debtor has any liability thereunder.

103. With respect to each executory contract and unexpired [*84] lease listed on Exhibit C to the Plan, the cure amount set forth in Exhibit C shall be paid in connection with the assumption and assignment of such executory contract and unexpired lease.

## O. Resolution of Claims

104. Except as expressly provided in the Plan or ordered by the Bankruptcy Court prior to the Effective Date, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order allowing such Claim. Any Claim that is not an Allowed Claim shall be determined, resolved or adjudicated in accordance with the terms of the Plan.

105. The Revolver Pre-Effective Date Secured Claims are hereby deemed to be Allowed Class 3 Claims in an aggregate amount equal to the sum of (i) the aggregate principal amount of $100,000,000 in "Revolving Loans" (as defined in the Pre-petition First Lien Revolving Credit Agreement), (ii) interest pursuant to the Pre-petition First Lien Revolving Credit Agreement (which interest shall be calculated at the non-default rate otherwise applicable to "Base Rate Loans", as such term is defined in the Pre-petition First Lien Revolving Credit Agreement and as provided [*85] in the Cash Collateral Order), and (iii) any and all fees, expense reimbursements, outstanding and unpaid indemnification obligations arising under, and to the extent provided in, the Pre-petition First Lien Revolving Credit Documents or the Cash Collateral Order, or other amounts owed by the Debtors under the Pre-petition First Lien Revolving Credit Facility or the Cash Collateral

Order as of the Effective Date. Without limitation of the foregoing, as of the filing of the Plan, the outstanding principal balance of the loans extended to the Debtors by the Prepetition First Lien Revolver Lenders under the Pre-petition First Lien Revolving Credit Facility is $55,000,000.

106. Subject to the First Lien Term Lenders Liquidating Trustee's right to review and object under Article III.B.3 of the Plan, the Revolver Post-Effective Date Secured Claims are hereby deemed to be Allowed Class 3 Claims. Proofs of Claim numbered 3720, 3726, 3750, 3752 and 3757 filed by Deutsche Bank Trust Company Americas, in its capacity as collateral agent shall be deemed withdrawn and the Claims Agent shall update the official claims register accordingly.

107. The Pre-petition First Lien Term Loan Secured Claims [*86] are hereby deemed to be Allowed Class 4 Claims in an aggregate amount equal to (i) $407,963,869.11 and (ii) any and all fees, expense reimbursements, outstanding and unpaid indemnification obligations arising under, and to the extent provided in, the Pre-petition First Lien Term Credit Documents or the Cash Collateral Order, or other amounts owed by the Debtors under the Pre-petition First Lien Term Credit Facility or the Cash Collateral Order as of the Effective Date. Proofs of Claim numbered 3043, 3058, 3107, 3108 and 3125 filed by Wilmington Trust Company, in its capacity as administrative agent, and Proofs of Claims numbered 3723, 3737, 3749, 3761 and 3765 filed by Deutsche Bank Trust Company Americas, in its capacity as collateral agent shall be deemed withdrawn and the Claims Agent shall update the official claims register accordingly.

108. The Pre-petition Second Lien Term Loan Claim is hereby deemed to be an Allowed Class 5 Claim in the aggregate amount of $151,623,195.20. Proofs of Claim numbered 3356, 3510, 3594, 3624 and 3717 filed by Wells Fargo Bank, N.A., in its capacity as administrative and collateral agent shall be deemed withdrawn and the Claims Agent shall update [*87] the official claims register accordingly.

109. Proofs of Claim numbered 3883, 4143, 4302, 4325 and 4385 filed by Wells Fargo Bank, N.A., in its capacity as the synthetic letter of credit agent have been paid and satisfied, and the Claims Agent shall update the official claims register accordingly.

## P. Reports

110. After the Effective Date, the Debtors have no obligation to File with the Bankruptcy Court or serve on any parties reports that the Debtors were obligated to File under the Bankruptcy Code or a Bankruptcy Court order, including, without limitation, monthly operating reports (even for those periods for which a monthly operating report was not Filed prior to the Effective Date), ordinary course professional reports or monthly or quarterly reports for Retained Professionals.

## Q. Dissolution of the Debtors and the Committee

111. Effective on the Effective Date, each of the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith. Effective on the Effective Date, the Committee shall have no further powers or duties except those set forth in Article [*88] X.H of the Plan and shall be dissolved for all purposes. Notwithstanding the foregoing, the Committee and the Professionals employed by the Debtors and the Committee shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for the preparation, filing, and prosecution of Final Fee Applications, upon the submission of invoices to the First Lien Term Lenders Liquidating Trustee. Any time or expenses incurred in the preparation, filing, and prosecution of Final Fee Applications shall be disclosed by each Professional in its Final Fee Application and shall be subject to approval of the Bankruptcy Court.

## R. Automatic Stay

112. The stay in effect in the Chapter 11 Cases pursuant to *section 362(a) of the Bankruptcy Code* shall continue in effect until the Effective Date and at that time shall be dissolved and shall be of no further force or effect, subject to the injunction contained in Article X of the Plan and to *sections 524* and *1141 of the Bankruptcy Code*; *provided, however,* that nothing herein shall bar the taking of actions by the Debtors or the Liquidating Trustee as are necessary or appropriate to effectuate the transactions specifically contemplated [*89] by the Plan or by the Confirmation Order.

## S. Binding Effect

113. Notwithstanding *Bankruptcy Rules 3020(e),*

*6004(h)* or *7062* or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Exhibits shall be immediately effective and enforceable and deemed binding upon (a) the Debtors, (b) any and all Holders of Claims and Holders of Interests (notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan), (c) all entities that are parties to or are subject to the settlements, compromises, Debtor Release, Third Party Release and injunctions described in the Plan or herein, (d) any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors, (e) any entity making an appearance in these Chapter 11 Cases and (f) any other party-in-interest.

114. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, beneficiary, successor or assignee of such entity.

### T. Governing Law

115. Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, [*90] lease, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Virginia, without giving effect to the principles of conflict of laws thereof. The Liquidating Trust Agreements shall be governed by the laws selected therein.

### U. Effectiveness of All Actions

116. Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, prior to or after the Effective Date (as appropriate) pursuant to the Confirmation Order, without the need for any further notice to or action, order or approval of the Bankruptcy Court, or other act or action by any Person under applicable law, regulation, order or rule except those expressly required pursuant to the Plan.

117. The Debtors are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, and other agreements or

documents created in connection with or described [*91] in the Plan.

### V. Approval of Consents and Authorization to Take Acts Necessary to Implement Plan

118. The Debtors may take all actions to execute, deliver, File or record such contracts, instruments, releases, leases, indentures and other agreements or documents and take such other actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, without the need for any further notice to or action, order or approval of the Bankruptcy Court, or other act or action by any Person under applicable law, regulation, order or rule except for those expressly required pursuant to the Plan. The chief restructuring officers, president, general counsel, secretary or any assistant secretary of any Debtor are authorized to certify or attest to any of the foregoing actions.

119. All matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the [*92] Debtors, or the need for any approvals, authorizations, actions or consents.

120. The Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by or taken in connection with the Plan, the Exhibits, the Disclosure Statement, and any documents, instruments or agreements and any amendments or modifications thereto.

### W. Modifications to Plan

121. Subject to certain restrictions and requirements set forth in *section 1127 of the Bankruptcy Code* and *Bankruptcy Rule 3019* and those limitations and rights contained in the Plan (including obtaining prior written consent of the Requisite Lenders under both Pre-petition

First Lien Credit Agreements), after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with *section 1127(b) of the Bankruptcy Code* or remedy any defect or omission or reconcile any [*93] inconsistency in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan. Entry of the Confirmation Order means that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to *section 1127(a) of the Bankruptcy Code* and do not require additional disclosure or resolicitation under *Bankruptcy Rule 3019*.

### X. Severability

122. The provisions of this Order and the agreements approved herein are non-severable and mutually dependant, except to the extent that any modification does not affect the legal or economic substance of the transactions contemplated by or the provisions of the Term Sheet, the Plan or the Liquidating Trust Agreements.

### Y. References to Plan Provisions

123. Captions and headings to Articles of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure specifically to include or to refer to any particular article, section or provision of the Plan or any related document in the Confirmation Order shall not diminish or impair the effectiveness of such article, section or provision, it being the intent of the Bankruptcy [*94] Court that the Plan and any related documents be confirmed in their entirety.

### Z. Effect of Conflict Between Plan and Confirmation Order

124. If there is any direct conflict between the terms of the Plan or the Exhibits and the terms of the Confirmation Order, the terms of the Confirmation Order shall control.

### AA. Authorization to Consummate

125. The Debtors are authorized to Consummate the Plan at any time after the entry of the Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article VIII of the Plan.

### BB. Effect of Non Occurrence of Conditions to Consummation

126. If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests or any other entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders of Claims or Interests or any other entity in any respect.

### CC. Retention of Jurisdiction

127. [*95] Pursuant to *sections 105(a)* and *1142 of the Bankruptcy Code*, and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction as provided in the Plan over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, without limitation, jurisdiction over those matters set forth in Article XI of the Plan.

### DD. Final Confirmation Order

128. The Confirmation Order is a Final Order and the period in which an appeal must be Filed shall commence upon the entry hereof.

129. Notwithstanding *Bankruptcy Rule 3020(e)*, this Confirmation Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Liquidating Trustees are free to perform under the Plan at any time.

### EE. Resolutions of Objections and Concerns of Non-Debtor Parties

### 1. Plan Modifications to Resolve Certain Objections

130. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, Section 1.17 of the Plan shall be deemed struck in [*96] its entirety and replaced by the following new Section 1.17: "Case Interest Rate means, (i) solely with respect to tax Claims or a tax that

is an Administrative Claim within the meaning of *Section 511 of the Bankruptcy Code*, the rate of interest determined under applicable nonbankruptcy law, and (ii) with respect to all other matters, the federal judgment rate provided in *28 U.S.C. § 1961* in effect on the Commencement Date, which is .33%."

131. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, Article X.G of the Plan shall be deemed amended by inserting at the end of (4) the following provision: "*provided, however,* that no Governmental Unit, as defined in *11 U.S.C. Section 101(27)* shall be required to file a motion requesting the right to perform a setoff on or before the Confirmation Date."

132. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, Article X, subparagraphs B [Compromise and Settlement], C [Debtor Release], D [Third Party Release], E [Exculpation], F [Indemnification], G [Injunction] of the Plan will be deemed amended to include the following provision at the end thereof: "*provided, however,* that the foregoing Article [*97] X [applicable subparagraph] shall not apply to any department, agency or instrumentality of the United States of America, New Jersey or Texas (except, with respect to Texas, to the extent of the releases set forth in the Stipulation and Order resolving the claims asserted against the Debtors by the Texas Comptroller of Public Accounts)."

## 2. Resolution of the Objections of the United States of America [Docket No. 2033]:

133. In addition to the Modifications set forth above in paragraphs 130 and 132, the following additional Modifications resolve the remaining objections filed by the United States of America:

A. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, post petition liabilities to the Internal Revenue Service, if any, shall be paid in full, with interest and penalties, if any, in the ordinary course of business. There shall be no requirement that the Internal Revenue Service file any request for payment of Administrative Expenses, nor any deadline for the filing of such requests.

B. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the first paragraph of Article XI of the Plan shall be deemed amended by inserting at the [*98] end of Article XI the following proviso: "Nothing in this Article XI is intended to expand, nor shall it be construed as expanding, the jurisdiction of the Bankruptcy Court beyond what is provided in *28 U.S.C. § 1334*, nor shall it limit the right of other courts to hear matters otherwise properly within their jurisdiction."

C. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, Article V.D.6 of the Plan shall be deemed amended by inserting at the end thereof the following new subparagraph (c): "Solely with respect to the Internal Revenue Service, nothing in this Article V.D.6 is intended to bind the Internal Revenue Service to a particular determination regarding the tax status or obligations of the Liquidating Trusts, and the Internal Revenue Service, the Debtors, and the Liquidating Trustees each reserve all of their rights to seek determinations regarding such tax status or obligations in an appropriate forum."

## 3. Resolution of Texas Ad Valorem Tax Jurisdiction [Docket No. 2014]

134. Notwithstanding anything to the contrary in the Plan or the Confirmation Order:

A. The liens securing the claims of the Texas Ad Valorem Tax Jurisdiction (as defined in Docket [*99] Number 2014), if any, shall remain in full force and effect against their collateral or the proceeds of the sale of their collateral where such collateral has been sold, whether or not that collateral or the proceeds thereof are transferred to the First Lien Term Lenders Liquidating Trust or any other entity (excluding the GUC Liquidating Trust) under the terms of this Plan to the same

extent provided in *Sections 506* or *1129(b)(2)(A) of the Bankruptcy Code* or other applicable law, subject to all rights of the Debtors and/or the First Lien Term Lenders Liquidating Trustee's rights to object to or otherwise dispute in good faith the perfection, validity or priority of such liens or to object to the claims of the Texas Ad Valorem Tax Jurisdictions. For the avoidance of doubt, notwithstanding anything to the contrary in the Plan or the Confirmation Order, none of the Creditor Funds shall include funds that are subject to the liens of the Texas Ad Valorem Tax Jurisdictions.

B. The claims of the Texas Ad Valorem Tax Jurisdictions shall be Class 2 Miscellaneous Secured Claims under the Plan and shall receive interest on account of their claims from the Commencement Date until paid in full [*100] to the extent allowed under *Section 506 of the Bankruptcy Code*, at the rate required by *Section 511 of the Bankruptcy Code*.

C. The First Lien Term Lenders Liquidating Trustee shall make Adequate Provision with respect to the claims of the Texas Ad Valorem Tax Jurisdictions by establishing a reserve in the amount of $140,000.00 from any distributions, solely for the benefit of the Texas Ad Valorem Tax Jurisdictions. These funds shall be on the order of adequate protection and shall constitute neither the allowance of these claims nor a cap on the amounts the Texas Ad Valorem Tax Jurisdictions may be entitled to receive. All rights of any party to object to the validity, priority or extent of the liens for claims of the Texas Ad Valorem Tax Jurisdictions are hereby preserved. These funds may not be distributed to any other creditor apart from consent of the Texas Ad Valorem Tax Jurisdictions or by subsequent Order of the Court properly noticed to the Texas Ad Valorem Tax Jurisdictions; *provided, however,* that funds may be released as the claims of the Texas Ad Valorem Tax

Jurisdictions are paid and/or Disallowed.

## 4. Resolution of Texas Taxing Authorities' Objection [Docket No. 2027]

135. [*101] Notwithstanding anything to the contrary in the Plan or the Confirmation Order:

A. The liens securing the claims of the Texas Taxing Authorities (as defined in Docket Number 2027), if any, shall remain in full force and effect against their collateral or the proceeds of the sale of their collateral where such collateral has been sold, whether or not that collateral or the proceeds thereof are transferred to the First Lien Term Lenders Liquidating Trust or any other entity (excluding the GUC Liquidating Trust) under the terms of this Plan to the same extent provided in *Sections 506* or *1129(b)(2)(A) of the Bankruptcy Code* or other applicable law, subject to all rights of the Debtors and/or the First Lien Term Lenders Liquidating Trustee's rights to object to or otherwise dispute in good faith the perfection, validity or priority of such liens or to object to the claims of the Texas Taxing Authorities. For the avoidance of doubt, notwithstanding anything to the contrary in the Plan or the Confirmation Order, none of the Creditor Funds shall include funds that are subject to the liens of the Texas Taxing Authorities.

B. The claims of the Texas Taxing Authorities shall be Class 2 Miscellaneous [*102] Secured Claims under the Plan and shall receive interest on account of their claims from the Commencement Date until paid in full to the extent allowed under *Section 506 of the Bankruptcy Code*, at the rate required by *Section 511 of the Bankruptcy Code*.

C. The First Lien Term Lenders Liquidating Trustee shall make Adequate Provision with respect to the claims of the Texas Taxing Authorities by establishing a

reserve in the amount of $380,000.00 from any distributions, solely for the benefit of the Texas Taxing Authorities. These funds shall be on the order of adequate protection and shall constitute neither the allowance of these claims nor a cap on the amounts the Texas Taxing Authorities may be entitled to receive. All rights of any party to object to the validity, priority or extent of the liens for claims of the Texas Taxing Authorities are hereby preserved. These funds may not be distributed to any other creditor apart from consent of the Texas Taxing Authorities or by subsequent Order of the Court properly noticed to the Texas Taxing Authorities; provided, however, that funds may be released as the claims of the Texas Taxing Authorities are paid and/or Disallowed.

## 5. Resolution [*103] of the Objections of the Garland Taxing Entities [Docket No. 2044]:

136. Notwithstanding anything to the contrary in the Plan or the Confirmation Order:

A. The liens securing the claims of the City of Garland, Garland Independent School District, Collin County and Frisco Independent School District (collectively, the "Garland Taxing Entities"), if any, shall remain in full force and effect against their collateral or the proceeds of the sale of their collateral where such collateral has been sold, whether or not that collateral or the proceeds thereof are transferred to the First Lien Term Lenders Liquidating Trust or any other entity (excluding the GUC Liquidating Trust) under the terms of this Plan to the same extent provided in *Sections 506* or *1129(b) (2)(A) of the Bankruptcy Code* or other applicable law, subject to all rights of the Debtors and/or the First Lien Term Lenders Liquidating Trustee's rights to object to or otherwise dispute in good faith the perfection, validity or priority of such liens or to object to the claims of the Garland Taxing

Entities. For the avoidance of doubt, notwithstanding anything to the contrary in the Plan or the Confirmation Order, none of the Creditor [*104] Funds shall include funds that are subject to the liens of the Garland Taxing Entities.

B. The claims of the Garland Taxing Entities shall be Class 2 Miscellaneous Secured Claims under the Plan and shall receive interest on account of their claims from the Commencement Date until paid in full to the extent allowed under *Section 506 of the Bankruptcy Code*, at the rate required by *Section 511 of the Bankruptcy Code*.

C. The First Lien Term Lenders Liquidating Trustee shall make Adequate Provision with respect to the claims of the Garland Taxing Entities by establishing a reserve in the amount of $12,000.00 from any distributions, solely for the benefit of the Garland Taxing Entities. These funds shall be on the order of adequate protection and shall constitute neither the allowance of these claims nor a cap on the amounts the Garland Taxing Entities may be entitled to receive. All rights of any party to object to the validity, priority or extent of the liens for claims of the Garland Taxing Entities are hereby preserved. These funds may not be distributed to any other creditor apart from consent of the Garland Taxing Entities or by subsequent Order of the Court properly noticed to the Garland [*105] Taxing Entities; provided, however, that funds may be released as the claims of the Garland Taxing Entities are paid and/or Disallowed.

## 6. Resolution of the Objections of the Travis County Taxing Authorities [Docket No. 2048]:

137. Notwithstanding anything to the contrary in the Plan or the Confirmation Order:

A. The liens securing the claims of

Travis County, City of Austin, City of Lago Vista, City of Pflugerville, Austin Independent School District, Lago Vista Independent School District, Leander Independent School District, Pfluggerville Independent School District, Austin Community College, Travis County Emergency Services District Number 1, Travis County Emergency Services District Number 2 and Travis County Hospital District (collectively, the "Travis County Taxing Authorities"), if any, shall remain in full force and effect against their collateral or the proceeds of the sale of their collateral where such collateral has been sold, whether or not that collateral or the proceeds thereof are transferred to any other entity or to any Liquidating Trust under the terms of this Plan to the same extent provided in *Section 506 of the Bankruptcy Code* or other applicable law, subject to [*106] all rights of the Debtors and/or the First Lien Term Lenders' rights to object to or otherwise dispute in good faith the perfection, validity or priority of such liens or to object to the claims of the Travis County Taxing Authorities.

B. The claims of the Travis County Taxing Authorities shall be Class 2 Miscellaneous Secured Claims under the Plan and shall receive interest on account of their claims to the extent allowed under *Section 506 of the Bankruptcy Code* at the rate required by *Section 511 of the Bankruptcy Code*.

**7. Resolution of Objections of Keith Cousins [Docket No. 2100] and Thomas Johnson [Docket No. 2101]:**

138. The Objections of Keith Cousins and Thomas Johnson are resolved as follows: Notwithstanding anything to the contrary provided herein, with respect to the claims asserted by Keith A. Cousins and Thomas D. Johnson, Jr. in that certain action styled Keith A. Cousins and Thomas D. Johnson, Jr. v. Movie Gallery, Inc., et al., filed in the Circuit Court of Jefferson County, Alabama, Civil Action No. CV-2009-02110, which action was removed to the United States District Court for the Northern District of Alabama, Southern Division, and is now styled Keith A. Cousins and Thomas Johnson v. Movie Gallery, Inc., Joe T. Malugen and S. Page Todd, [*107] Civil Action No. 2:10-cv-01093-HGD, the release and exculpation provisions of Article X of the Plan shall apply to directors and officers of the Debtors only to the extent that such officers or directors were serving as officers or directors of the Debtors as of, or after, the Commencement Date.

**8. Resolution of Reservation of Rights filed by Liberty Mutual [Docket No. 2353]:**

139. The reservation of rights filed by Liberty Mutual is resolved as follows: Nothing contained in the Plan, this Confirmation Order or any of the Exhibits shall in any way operate to, or have the effect of, impairing in any respect the legal, equitable or contractual rights and defenses, including but not limited to rights of setoff and recoupment, of the insureds or insurers under the insurance policies and related agreements issued by Liberty Mutual Insurance Company and its affiliates (collectively, "Liberty") to or on behalf of the Debtors (collectively, the "Liberty Policies"). Regardless of whether the Liberty Policies are considered to be executory or non-executory, the parties' obligations under the Liberty Policies shall continue [*108] to be performed in accordance with the terms thereof.

Dated: Oct 29 2010

/s/ Douglas O. Tice Jr.

United States Bankruptcy Court Judge

Entered on Docket: 10/29/2010

**In re PC Liquidation Corp.**

**No. 05-89022-288, 2006 Bankr. LEXIS 4638 (Bankr. E.D.N.Y. Nov. 13, 2006)**



In re: PC LIQUIDATION CORP. f/k/a PHOTOCIRCUITS CORPORATION,
Debtor.

Chapter 11, Case No. 05-89022-288

UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF
NEW YORK

*2006 Bankr. LEXIS 4638*

**November 13, 2006, Decided**

COUNSEL: [*1] For PC Liquidation Corp, fka Photocircuits Corporation, Debtor: Silverman Acampora LLP, Jericho, NY; Gerard R Luckman, Silverman Acampora LLP, Jericho, NY.

Trustee: Richard L Stern, Macco & Stern, LLP, Melville, NY.

For The Official Committee of Unsecured Creditors, Creditor Committee: Kristina M Wesch, Louis A Scarcella, Robert C Yan, Farrell Fritz, P.C., Uniondale, NY; Patrick Collins, Ted A Berkowitz, Farrell Fritz, Uniondale, NY.

U.S. Trustee: Diana G. Adams, Office of the United States Trustee, Central Islip, NY.

JUDGES: STAN BERNSTEIN, UNITED STATES BANKRUPTCY JUDGE.

OPINION BY: STAN BERNSTEIN

**OPINION**

**ORDER (A) APPROVING THE THIRD AMENDED DISCLOSURE STATEMENT IN RESPECT TO THE DEBTOR'S THIRD AMENDED PLAN OF LIQUIDATION, AND (B) CONFIRMING**

**DEBTOR'S THIRD AMENDED PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PC Liquidation Corp. f/k/a Photocircuits Corporation (the "Debtor"), as debtor and debtor in possession, having filed the Debtor's Third Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, dated as of August 21, 2006 (such Plan of Liquidation under Chapter 11 of the Bankruptcy Code, together with all of the exhibits thereto, collectively, the "Plan"), annexed hereto as Exhibit "A", having [*2] been presented to the Court for confirmation in the Chapter 11 Case; [1] the Third Amended Disclosure Statement in respect to Debtor's Plan (the "Disclosure Statement") having been presented simultaneously with the Plan to the Court for entry of an order finding that the Disclosure Statement contains "adequate information" within the meaning of *section 1125 of the Bankruptcy Code*; and in compliance with the Order Scheduling and Providing Notice of Consolidated Hearing to Consider Approval of the Disclosure Statement and Confirmation of the Debtor's Plan of Liquidation; Approving Dissemination of Disclosure Statement; and Granting Other Relief Relating to Plan Solicitation and Such Consolidated Disclosure Statement Approval and Confirmation Hearing (the "Scheduling Order"), the Debtor having caused to be transmitted by first class mail, postage prepaid, on or before September 28, 2006, to all known creditors at their last known addresses, the Office of the United States Trustee for the

Eastern District of New York and all other parties having filed notices of appearance in the Chapter 11 Case, (a) the Scheduling Order and Notice of Hearing on approval of the Disclosure Statement and Confirmation, [*3] (b) the Disclosure Statement and all exhibits thereto, including, the Plan annexed thereto as Exhibit "A" the Liquidation Analysis annexed thereto as Exhibits "B" respectively, (c) a ballot for each creditor, and (d) a pre-addressed and stamped return envelope for each such ballot (collectively, a "Solicitation Package"); the Scheduling Order having established (i) October 20, 2006 at 4:00 p.m. as the date and time (the "Voting Deadline") by which all ballots must be received by Silverman Perlstein & Acampora LLP, counsel for the Debtor, in order to be counted as acceptances or rejections of the Plan; (ii) October 20, 2006 as the date (the "Objection Deadline") for filing objections to the Plan; and (iii) October 26, 2006, at 10:00 a.m. as the date and time to consider approval of the Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing"); and the Confirmation Hearing having been held on October 26, 2006; the affidavit of mailing of the Solicitation Packages (the "Affidavit of Mailing") having been duly filed with the Court; the certification of votes having been tabulated by Debtor's counsel, as the entity authorized by the Court pursuant to the Disclosure [*4] Statement Order to tabulate votes accepting or rejecting the Plan (the "Ballot Tabulation Certification") and such Ballot Tabulation Certification having been duly filed with the Court; and any objections to the confirmation of the Plan having been withdrawn, rendered moot or overruled by the Court; the Court having conducted the Confirmation Hearing to consider confirmation of the Plan, and having reviewed and considered the Disclosure Statement, the Scheduling Order, the Plan, documents related to the Plan, the Affidavits of Mailing with respect to the Plan and Disclosure Statement, the Ballot Tabulation Certification, and the entire record of the Confirmation Hearing; the Court being familiar with the Plan and other relevant factors affecting the Debtor's Chapter 11 Case; the Court having taken judicial notice of the entire record of the Chapter 11 Case; and the appearance of all interested parties having been noted in the record of the Confirmation Hearing; and after due deliberation and sufficient cause appearing therefor;

> 1  Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

IT IS HEREBY FOUND, CONCLUDED, ORDERED, ADJUDGED, AND DECREED, [*5] AS FOLLOWS:

**FINDINGS OF FACT**

2

> 2  The Findings of Fact and Conclusions of Law contained herein constitute the findings of fact and conclusions of law required to be entered by this Court pursuant to *Rule 52 of the Federal Rules of Civil Procedure*, as made applicable herein by *Rules 7052* and *9014 of the Federal Rules of Bankruptcy Procedure* (the "Bankruptcy Rules").

Exclusive Jurisdiction; Venue; Core Proceeding; Judicial Notice; Burden of Proof

1. Pursuant to *sections 157* and *1334 of Title 28 of the United States Code*, this Court has jurisdiction over this Chapter 11 Case. Venue is proper pursuant to *sections 1408* and *1409 of Title 28 of the United States Code*. Confirmation of the Plan is a core proceeding pursuant to *28 U.S.C. § 157(b)(2)(L)*, and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

2. This Court takes judicial notice of the docket of the Chapter 11 Case maintained by the Clerk of the Court including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings held before the Court [*6] during the pendency of the Chapter 11 Case, including, but not limited to, the hearing to consider adequacy of the Disclosure Statement and confirmation of the Plan.

3. The Debtor has the burden of proving the elements of *section 1129(a)* and *(b) of the Bankruptcy Code* by a preponderance of evidence.

Plan Proponent; Disclosure Statement and Solicitation

4. The Debtor is an entity qualified to be a debtor under *section 109 of the Bankruptcy Code*, and the Debtor is a proper proponent of the Plan under *section 1121(a) of the Bankruptcy Code*.

5. The Disclosure Statement contains "adequate information" as required by *section 1125(a) of the*

*Bankruptcy Code.*

6. All persons required to receive notice of the Confirmation Hearing have received proper, timely and adequate notice in accordance with the Scheduling Order and the Affidavit of Service on file with the Court and have had an opportunity to appear and be heard with respect thereto.

7. The Debtor has solicited and tabulated votes with respect to the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Scheduling Order.

8. The Plan was voted on by all Classes of impaired Claims and Interests that [*7] were entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Scheduling Order.

"Best Interest" Test

9. The "best interests" test set forth in *section 1129(a)(7)* requires a plan proponent to demonstrate that with respect to each impaired class of claims or interests, the holder of each claim or interest has either accepted the plan or will retain or receive under the plan property of a value as of the effective date of the plan that is not less than the amount that such holder would so receive or retain if the debtor was to be liquidated under chapter 7 of the Bankruptcy Code.

10. Under the Plan, Claims or Interests in Class 5 (Unsecured Claims) and Class 6 (Interests) are impaired. (Plan, Art. IV). Consequently, each holder of a Claim or Interest in such Classes must either accept the Plan or receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. *11 U.S.C. § 1129(a)(7).*

11. The Claims in Class 1 through 4 are not impaired under the Plan. (Plan, Art. III). Hence, each holder of a Claim in each of such classes [*8] is conclusively deemed to have accepted the Plan pursuant to *section 1126(f) of the Bankruptcy Code*. *11 U.S.C. § 1126(f).* The "best interest" test is, accordingly, not applicable to such Classes.

12. The holders of Interests in Class 6 will not receive or retain any property under the Plan and,

therefore, are deemed to have rejected the Plan. *11 U.S.C § 1126(g).*

13. The holders of Claims in Classes 5 of the Plan that voted on the Plan overwhelmingly voted to accept the Plan. According to the Liquidation Analysis annexed as Exhibit "C" to the Disclosure Statement, such holders, under the Plan will receive value in excess of that which they are likely to receive upon a liquidation of the Debtor. (Ballot Tabulation Certification). Accordingly, the "best interest" test is satisfied as to the holders of Claims in such Classes.

14. Based upon the Liquidation Analysis and the discussion of the "best interest" test in the Disclosure Statement, each entity that voted to reject the Plan, or that is deemed to have rejected the Plan, will receive at least as much under the Plan as it would receive in a chapter 7 liquidation. (Disclosure Statement and Exhibit "C" thereto).

Feasibility of the Plan

15. [*9] The Plan is feasible because the Debtor has determined that the conditions precedent to confirmation have been or will be satisfied, and the estate otherwise will have sufficient funds to meet the obligations under the Plan with respect to the payment of Allowed Claims pursuant to the terms of the Plan. Further, the Plan is a plan of liquidation so feasibility is not at issue (Disclosure Statement, Record of Confirmation Hearing). Thus, the Plan meets the feasibility test of *section 1129(a)(11) of the Bankruptcy Code*.

The Voting Results

16. Article IV of the Plan identifies each of the following Classes as not impaired under the Plan: Class 1 (Secured Claims) Class 2 (Priority Non-Tax Claims) Class 3 Stairway Claim) and Class 4 (CMK Parties Claims). Pursuant to *section 1126(f) of the Bankruptcy Code*, the holders of Claims in these Classes are unimpaired, and therefore, this Class is conclusively presumed to have accepted the Plan and their votes need not be solicited. *11 U.S.C. § 1126(f).*

17. The Debtor's counsel, as the entity authorized pursuant to the Disclosure Statement Order to tabulate ballots submitted by creditors, has made a final determination of the validity of, and tabulation [*10] respecting, all acceptances and rejections of the Plan by

the impaired Classes of Claims entitled to vote on the Plan, and the Ballot Tabulation Certification sets forth such results, including the amount and number of Claims of each Class voting to accept or reject the Plan. As set forth in the Ballot Tabulation Certification Class 5 has accepted the Plan by at least two-thirds in amount and a majority in number of the Claims in each such Class actually voting. (Ballot Tabulation Certification, Record of Confirmation Hearing).

18. The determination of Debtor's counsel, as ballot tabulation agent with respect to the voting on the Plan, has validly and correctly set forth the tabulation of votes as required by the Bankruptcy Code, the Bankruptcy Rules, and the Scheduling Order. (Record of Confirmation Hearing).

19. To the extent any of the foregoing findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law delineated below constitute findings of fact, they are adopted as such.

**CONCLUSIONS OF LAW**

The Disclosure Statement Satisfies *Section 1125(a) of the Bankruptcy Code*.

20. *Section 1125(a) of the Bankruptcy Code* requires that a disclosure [*11] statement contain "adequate information." This Court finds and concludes that the Disclosure Statement contains such "adequate information" and, therefore, satisfies *section 1125(a) of the Bankruptcy Code*.

The Plan Satisfies *Section 1129(a)(1) of the Bankruptcy Code*

21. *Section 1129(a)(1) of the Bankruptcy Code* requires that a plan comply with the applicable provisions of the Bankruptcy Code. This Court finds and concludes that the Plan satisfies all the applicable provisions of the Bankruptcy Code, and, as required by *Bankruptcy Rule 3016(b)*, the Plan is dated and identifies the Debtor as the proponent of the Plan.

Due and Proper Notice of the Disclosure Statement Hearing and the Confirmation Hearing was Given to all Parties in Interest

22. This Court has taken judicial notice of the affidavits of service filed in the Chapter 11 Case and

finds and concludes that the Debtor has complied in all material respects in providing notices of the hearing to consider approval of the Disclosure Statement and confirmation of the Plan in accordance with the Scheduling Order. All entities (as defined in *section 101(15) of the Bankruptcy Code*) entitled to receive notices of the hearings with respect [*12] to the approval of the Disclosure Statement and confirmation of the Plan pursuant to the Bankruptcy Code, applicable non-bankruptcy law, and the Scheduling Order, have received due, proper, timely and adequate notices of such hearing and modifications, and have had an opportunity to appear at and be heard at such hearing. *Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1957).*

The Plan Satisfies the Requirements of *Section 1123(a)(1) of the Bankruptcy Code*

23. *Section 1123(a)(1) of the Bankruptcy Code* provides that a plan must designate classes of claims and interests. The Plan adequately and properly classifies all Claims and Interests required to be so classified, and, accordingly, satisfies *section 1123(a)(1) of the Bankruptcy Code*. Classes of Administrative Expenses and Priority Tax Claims are not required to be designated pursuant to *section 1123(a)(1) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *section 1122 of the Bankruptcy Code*

24. *Section 1122(a) of the Bankruptcy Code* provides that a plan may place a claim or interest in a particular class if such claim or interest is substantially similar to the other claims or interests of such class. A classification [*13] structure satisfies *section 1122 of the Bankruptcy Code* when a reasonable basis exists for the structure, and the claims or interests within each particular class are substantially similar. See *In re Jersey City Medical Center, 817 F.2d 1055, 1060-61 (3d Cir. 1987); In re U.S. Truck Co., 800 F.2d 581, 586 (6th Cir. 1986); In re LeBlanc, 622 F.2d 872, 879 (5th Cir. 1986).*

25. In accordance with *section 1122(a) of the Bankruptcy Code*, Article III of the Plan separately classifies Claims against and Interests in the Debtor together with Claims against or Interests that are substantially similar to the other Claims or Interests of such Class. The Plan, therefore, satisfies *section 1122(a) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *Section 1123(a)(2) of the Bankruptcy Code*

26. *Section 1123(a)(2) of the Bankruptcy Code* provides that a plan must specify any class of claims or interests that is not impaired under the Plan. Pursuant to Article IV of the Plan, each of Classes 5 and 6 are identified as impaired, and Classes 1, 2, 3 and 4 are identified as not impaired. Accordingly, the Plan satisfies *section 1123(a)(2) of the Bankruptcy Code*.

The Plan Satisfies the Requirements [*14] of *Section 1123(a)(3) of the Bankruptcy Code*

27. *Section 1123(a)(3) of the Bankruptcy Code* provides that a plan must specify the treatment of each impaired class of claims and Interests. Article III of the Plan specifies the treatment of each impaired class of Claims and Interests. Accordingly, the Plan satisfies *section 1123(a)(3) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *Section 1123(a)(4) of the Bankruptcy Code*

28. *Section 1123(a)(4) of the Bankruptcy Code* requires a plan to provide the same treatment for each claim or interest of a particular class, unless the holder of the claim or interest agrees to less favorable treatment of such particular claim or interest. The Plan provides the same treatment for each Claim or Interest in each Class unless the holder thereof agrees to a less favorable treatment. Accordingly, the Plan satisfies *section 1123(a)(4) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *Section 1123(a)(5) of the Bankruptcy Code*

29. *Section 1123(a)(5) of the Bankruptcy Code* provides that a plan must provide adequate means of implementation of the plan. Articles V and VII of the Plan set forth the means for implementation and execution [*15] of the Plan. In particular, Articles V and VII of the Plan provide for, among other things the (i) appointment of a Liquidation Trustee, (ii) creation of a Liquidation Trust, (iii) effectuation of the transactions contemplated by the terms and conditions of the Plan. On the Effective Date, (i) all of the Causes of Action shall be deemed to be transferred to, and shall vest in, the Liquidation Trust, free and clear of all Liens, Claims and Interests, of any kind or nature, irrevocably and unconditionally for the ultimate benefit of the holders of

Allowed Claims in Class 5 in accordance with the terms and conditions of the Plan; and (ii) all Cash and other assets transferred from the Debtor (and its professionals) to the Liquidation Trustee and all proceeds remaining from the liquidation of the Debtor's assets shall be so transferred to the Liquidation Trustee free and clear of all Liens, Claims and Interests, of any kind or nature, for the benefit of the holders of Allowed Administrative Expenses and classes of Claims, in accordance with the terms and conditions of the Plan.

30. In addition, Article V of the Plan provides for the continuation of a Post-Confirmation Committee to monitor [*16] the Debtor's and the Liquidation Trustee's implementation of the Plan. Accordingly, the Plan satisfies *section 1123(a)(5) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *Section 1123(a)(6) of the Bankruptcy Code*

31. *Section 1123(a)(6) of the Bankruptcy Code* requires a plan to provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation to which the debtor transfers all or any part of the debtor's estate or with which the debtor has merged or consolidated, a provision prohibiting the issuance of non-voting equity securities. Consistent with *section 1123(a)(6)*, the Debtor is liquidating and will not issue any non-voting equity securities. Accordingly, the Plan satisfies *section 1123(a)(6) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *Section 1123(a)(7) of the Bankruptcy Code*

32. *Section 1123(a)(7) of the Bankruptcy Code* requires that a plan provide for the manner of selection of any director, officer or trustee of the reorganized debtor, or any successor to such officer, director or trustee, and such selection be consistent with the interests of creditors and equity security holders and with public policy. The [*17] Plan provides for a Liquidation Trustee to implement the Plan. The Liquidation Trustee is a member of the panel of Trustees and is familiar with his responsibilities under the plan.

33. On the Effective Date, Richard Stern, Esq. is hereby appointed the Liquidation Trustee with all of the rights, powers and duties set forth in this Order, the Plan and the Liquidation Trust Agreement. The Liquidation Trust Agreement, substantially annexed hereto as Exhibit "B", is approved and authorized, and the Debtor and the

Post-Confirmation Committee are hereby authorized to execute and deliver the Liquidation Trust Agreement.

34. Accordingly, the Plan fully satisfies *section 1123(a)(7) of the Bankruptcy Code*.

**The Transfers of Properties Under the Plan Are Governed by the Exemptions Provided in *Section 1146(c) of the Bankruptcy Code***

35. The Plan does not contemplate the sale of any real property but does contemplate the transfer of all of the Debtor's assets including the remaining sale proceeds to the Liquidation Trust. Pursuant to *section 1146(c)*, the issuance or transfer of security, or the making or delivery of an instrument of transfer under the Plan, will not be subject to taxation under any law [*18] imposing a stamp, transfer or similar tax. *In re 995 Fifth Ave. Assocs., 963 F.2d 503 (2d Cir. 1992)*.

**The Debtor Has Satisfied *section 1129(a)(2) of the Bankruptcy Code*.**

36. *Section 1129(a)(2) of the Bankruptcy Code* requires the proponent of a plan to comply with all of the applicable provisions of the Bankruptcy Code. The Debtor, as proponent of the Plan, has complied with all of the provisions of the Bankruptcy Code and the Bankruptcy Rules governing notice, disclosure and solicitation in connection with the Plan, the Disclosure Statement and all other matters considered by this Court in connection with this Chapter *11 Case. In re Johns-Manville Corp., 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986)*, aff'd, *78 B.R. 407 (S.D.N.Y. 1987)*.

37. The Debtor has substantially complied with the operating guidelines and financial reporting requirements enacted by the United States Trustee.

38. The Plan provides that the Debtor shall pay all statutory fees required to be paid during the Chapter 11 Case and file all fee statements required to be filed.

39. The Debtor has timely filed with the Court all schedules, lists of executory contracts, and statements of financial affairs.

40. Sufficient and timely [*19] notice of the Disclosure Statement and Confirmation Hearing and all other hearings in this Chapter 11 Case has been given to holders of Claims and Interests and other parties in interest pursuant to the Scheduling Order.

41. The solicitation of votes was made following dissemination of the Disclosure Statement to holders of Claims in Classes that are impaired and entitled to vote, and such solicitation was made in good faith and in compliance with the provisions of the Bankruptcy Code and the Bankruptcy Rules. The ballots of holders of Claims were properly solicited and tabulated.

42. The Debtor has complied with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and all orders of this Court and has fulfilled all of the obligations and duties owed to its estate and creditors. Accordingly, the Debtor has satisfied *section 1129(a)(2) of the Bankruptcy Code*.

**The Plan Satisfies the Requirements of *Section 1129(a)(3) of the Bankruptcy Code***

43. *Section 1129(a)(3) of the Bankruptcy Code* requires that a plan be proposed in good faith and not by any means forbidden by law. See *Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988)*, citing *Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d Cir. 1984)* [*20] (quoting *Manati Sugar Co. v. Mock, 75 F.2d 284 (2d Cir. 1935))*; *In re Texaco Inc., 84 B.R. 893, 899 (Bankr. S.D.N.Y.)*, appeal dismissed, *92 B.R. 38 (S.D.N.Y. 1988)*.

44. This Court has examined the totality of circumstances surrounding the formulation of the Plan. The Plan is based on good faith and arms-length negotiations among the Debtor and the Committee and with input from the Office of the United States Trustee. The Plan and the Disclosure Statement reflect the culmination of such efforts. Moreover, as evidenced by the overwhelming acceptance of the Plan by creditors, the Plan achieves the goal of consensual reorganization, in this case liquidation, embodied in the Bankruptcy Code. Thus, the Debtor has complied with the "good faith and not by any means forbidden by law" requirement of *section 1129(a)(3) of the Bankruptcy Code*.

**The Plan Satisfies the Requirements of *Section 1129(a)(4) of the Bankruptcy Code***

45. *Section 1129(a)(4) of the Bankruptcy Code* requires that all payments made or to be made by the Debtor or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the [*21] plan and incident to the case,

have been approved by, or are subject to the approval of, the court as reasonable.

46. All payments made by the Debtor or to be made to professionals retained by orders of the Court will be, as set forth in the Plan, subject to review and approval by this Court upon final application under *section 330, 331 or 503(b) or 506(b) of the Bankruptcy Code*. Accordingly, the Plan satisfies *section 1129(a)(4) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *Section 1129(a)(5) of the Bankruptcy Code*

47. *Section 1129(a)(5) of the Bankruptcy Code* requires the proponent of a plan to disclose the identity and affiliations of any individual proposed to serve, after confirmation, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and to show that the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy. *Section 1129(a)(5)* also requires disclosure of the identity of any insider that will be employed by the reorganized debtor, and [*22] the nature of any compensation for such insider.

48. The Debtor is no longer operating and will continue to liquidate under the Plan. In addition, this Order discloses the identity of the Liquidation Trustee, and the Liquidation Trust Agreement, annexed hereto as Exhibit C describes the terms and conditions governing the retention of this professional.

49. Pursuant to the terms and conditions set forth in the Plan, the appointment of such professional is consistent with the interests of creditors and with public policy. Accordingly, the Plan fully satisfies *section 1129(a)(5) of the Bankruptcy Code*.

*Section 1129(a)(6) of the Bankruptcy Code* Is Not Applicable to the Plan

50. *Section 1129(a)(6) of the Bankruptcy Code* requires a debtor to obtain the approval of any governmental regulatory commission, with jurisdiction over the debtor, with respect to any rate changes provided for in the debtor's plan of reorganization. There are no government agencies that have jurisdiction of the Debtor

with respect to rate changes and the Plan does not provide for any changes in rates that require regulatory approval of any governmental agency. Thus, *section 1129(a)(6) of the Bankruptcy Code* is [*23] inapplicable.

The Plan Satisfies the Requirements of *Section 1129(a)(7) of the Bankruptcy Code*

51. *Section 1129(a)(7) of the Bankruptcy Code* requires each creditor or equity interest holder in an impaired class to accept the plan of reorganization or receive or retain under such plan on account of such claim or interest property of a value, as of the effective date of such plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. *In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990)*.

52. Based upon the Findings of Fact contained in this Confirmation Order, the Liquidation Analysis set forth in Exhibit C to the Disclosure Statement and the related discussions set forth in the Disclosure Statement, this Court concludes that the Plan satisfies the "best interest" test under *section 1129(a)(7) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *Section 1129(a)(8) of the Bankruptcy Code*

53. *Section 1129(a)(8) of the Bankruptcy Code* requires that, with respect to each class of claims or interests under a plan, such class has either accepted the plan or is not impaired [*24] under the plan. According to the Ballot Tabulation Certification, the Class of impaired Claims that is entitled to vote on the Plan (Class 5) voted to accept the Plan. Accordingly, the Plan complies with *section 1129(a)(8) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *Section 1129(a)(9) of the Bankruptcy Code*

54. *Section 1129(a)(9) of the Bankruptcy Code* provides for certain mandatory treatment of claims entitled to priority under the Bankruptcy Code.

55. As required by *section 1129(a)(9)(A) of the Bankruptcy Code*, Article IV of the Plan provides that, except as otherwise agreed to by a holder of an Allowed Administrative Expense Claim, such holder shall be paid on account of such Allowed Claim, in full, in cash, on the

Effective Date. In addition, pursuant to the Plan, all payments made or to be made (as Administrative Expenses) to professionals will be subject to review and approval by this Court upon final application under *section 330, 331, 503(b)* or *506(b) of the Bankruptcy Code*.

56. Consistent with *section 1129(a)(9)(B) of the Bankruptcy Code*, Article IV of the Plan provides that, except as otherwise agreed to by a holder of an Allowed Priority Non-Tax Claim, such [*25] holder shall be paid on account of such Allowed Claim, in full, in cash, as soon as practicable after the Effective Date of the Plan.

57. Accordingly, the Plan satisfies the requirements of *section 1129(a)(9) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *Section 1129(a)(10) of the Bankruptcy Code*

58. *Section 1129(a)(10) of the Bankruptcy Code* provides that at least one impaired class of claims must accept a plan of reorganization, determined without including any acceptance of such plan by any insider.

59. The Plan satisfies *section 1129(a)(10) of the Bankruptcy Code* because Class 5, which is the only impaired non-insider class, has voted to accept the Plan by the requisite majorities. Although such Class contains insiders, all impaired Classes entitled to vote on the Plan have voted to accept the Plan by the requisite majorities, determined without including any acceptance of the Plan by such insiders.

The Plan Satisfies the Requirements of *Section 1129(a)(11) of the Bankruptcy Code*

60. *Section 1129(a)(11) of the Bankruptcy Code* requires that a plan be feasible and that the debtor or its successor under such plan likely would not require liquidation or further financial [*26] reorganization, except as provided under such plan. *In re Clarkson, 767 F.2d 417, 420 (8th Cir. 1985)* (citing *Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman), 585 F.2d 1171, 1179 (2d Cir. 1978)*); *In re Texaco, Inc., 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988)* (citing *In re Johns-Manville Corp., 68 B.R. 618, 635 (Bankr. S.D.N.Y. 1986)*, aff'd, *78 B.R. 407 (S.D.N.Y. 1987)*).

61. The Plan is a liquidating plan. Accordingly, this Court concludes that the Plan satisfies *section 1129(a)(11) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *Section 1129(a)(12) of the Bankruptcy Code*

62. *Section 1129(a)(12) of the Bankruptcy Code* requires that all fees payable under *section 1930, title 28, United States Code*, as determined by the court at the hearing on confirmation of the plan, either have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

63. The Plan provides for the payment on the Effective Date (or as soon as practicable thereafter) of all fees payable under *section 1930, Title 28, United States Code*. All post-confirmation fees that are payable will be paid by the Liquidation Trustee pursuant to the terms of the Plan [*27] until the Chapter 11 Case is closed. Accordingly, the Plan satisfies *section 1129(a)(12) of the Bankruptcy Code*.

The Plan Satisfies the Requirements of *Section 1129(a)(13) of the Bankruptcy Code*

64. *Section 1129(a)(13) of the Bankruptcy Code* requires the continuation of payment of all retiree benefits, at the level established pursuant to *section 1114 of the Bankruptcy Code* at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

65. The Debtor has no retirees or retiree benefits plan. Accordingly, *section 1129(a)(13) of the Bankruptcy Code* is inapplicable.

*Section 1129(b) of the Bankruptcy Code* Is Satisfied

66. *Section 1129(b)(1) of the Bankruptcy Code* requires that a plan of reorganization not discriminate unfairly against classes of claims or interests that have rejected or are deemed to have rejected the plan.

67. There is no Class of creditors that has rejected the Plan. (class 6) is deemed to have rejected the Plan. The Plan is a Plan of liquidation and does not discriminate against the Class of Interests. Accordingly, this Court concludes that the Plan satisfies *section 1129(b) of the Bankruptcy Code*.

The [*28] Plan Satisfies the Requirements of *Section 1129(d) of the Bankruptcy Code*

68. *Section 1129(d) of the Bankruptcy Code* provides that, on request of a governmental unit, the court may not confirm a plan if its principal purpose is the avoidance of taxes or the avoidance of the application of *section 5* of the Securities Act of 1933, as amended.

69. The purpose of the Plan is not avoidance of taxes or avoidance of the requirements of *section 5* of the Securities Act of 1933, as amended, and there has been no objection to the Plan by any governmental unit alleging any such avoidance. Accordingly, the Plan satisfies *section 1129(d) of the Bankruptcy Code*.

**DECRETAL PROVISIONS**

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1. The Disclosure Statement is hereby approved in all respects.

2. The Plan attached hereto as Exhibit "A," and incorporated herein by reference, is hereby confirmed.

3. The record of the Confirmation Hearing is hereby closed.

4. The Effective Date of the Plan shall be as set forth in the Plan.

5. In accordance with *section 1141(a) of the Bankruptcy Code* and Article XIII of the Plan, upon entry of this Order, the Plan shall be binding upon, and inure to the benefit of the Debtor [*29] and its successors and assigns, the holders of Claims (whether they voted to accept the Plan, whether they are impaired under the Plan, and whether any such holder has filed or is deemed to have filed a proof of Claim). Except as otherwise provided in the Plan, on the Effective Date, all persons (as defined in *section 101(41) of the Bankruptcy Code*) and entities (as defined in *section 101(15) of the Bankruptcy Code*) shall be precluded from asserting against the Debtor, its estate, assets or properties or the Liquidation Trust, any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

6. In accordance with *sections 524* and *1141(d) of the Bankruptcy Code*, and except as otherwise set forth in the Plan and in this Order, on and after the Effective Date, all persons (as defined in *section 101(41) of the*

*Bankruptcy Code*) and entities (as defined in *section 101(15) of the Bankruptcy Code*) that held, hold, or may hold Claims against or Interests in the Debtor that arose or arise at any time prior to the Effective Date shall be permanently enjoined from (a) commencing or continuing [*30] in any manner any action or other proceeding of any kind against the Debtor with respect to any such Claim or Interest, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtor with respect to any such Claim or Interest, and (c) creating, perfecting or enforcing any Lien of any kind against the Debtor or against any property or interest in property of the Debtor with respect to any such Claim or Interest. All holders of Claims shall look solely to the rights provided to them under the Plan for the satisfaction of such Claims.

7. Except as otherwise set forth in the Plan, all injunctions or stays provided for in this Chapter 11 Case pursuant to *sections 105* or *362 of the Bankruptcy Code* shall remain in full force and effect until the closing of the Chapter 11 Case. Holders of Claims shall be enjoined from instituting any suit or proceeding in any court or taking any other action to enforce any other Liens, if any, upon the Debtor, except as otherwise set forth in the Plan.

8. Property of the estate of the Debtor shall vest in the Liquidation Trust pursuant to the applicable provisions of the Plan. Except [*31] as otherwise expressly provided in the Plan and this Order, all assets and property of the Debtor shall be vested free and clear of all Liens, security interests, Claims and Interests of any kind or nature and all such Liens, security interests, Claims and Interests shall be extinguished on the Effective Date.

9. In accordance with *section 1142 of the Bankruptcy Code*, following entry of this Order, the Debtor (and its counsel), and the Liquidation Trustee, as the case may be, are authorized and directed to enter into all transactions described in the Plan, and are authorized and empowered to take all actions to issue, execute, deliver, file, and record all documents appropriate or necessary to implement or effectuate the transactions contemplated thereunder, including, without limitation, transferring cash to the Liquidation Trustee pursuant to Section 7.03 of the Plan.

10. In accordance with *section 1142 of the Bankruptcy Code*, upon entry of this Order and subject to

the occurrence of the Effective Date, the provisions for implementation of the Plan contained in Articles V and VII shall be deemed authorized and approved in all respects.

11. Notwithstanding the *res judicata* effect of [*32] confirmation of the Plan, nothing contained in this Order shall be deemed to bar any objection to any Claim or the prosecution, continuation or commencement of any Cause of Action by the Liquidation Trustee under the Plan.

12. The provisions in Article IX of the Plan governing the procedures for resolving Disputed Claims, establishing the Disputed Claims Reserve and making distributions to holders of Allowed Claims are hereby approved and found to be fair and reasonable. Pursuant to Article IX of the Plan, unless otherwise ordered by the Court, following the Effective Date, the Liquidation Trustee shall have the right to file objections to Claims and shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than 180 days after the Effective Date. From and after the Confirmation Date, all objections shall be litigated to a Final Order except to the extent the Liquidation Trustee elects to withdraw any such objection or the Liquidation Trustee and the claimant elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed [*33] Claim with approval of the Court.

13. Pursuant to *section 365 of the Bankruptcy Code* and Article VIII of the Plan, all executory contracts and unexpired leases that exist between the Debtor and any Person, whether or not previously listed by the Debtor on its Schedules of Assets and Liabilities, shall be deemed rejected as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed or rejected pursuant to an order of the Court entered prior to the Confirmation Date, or (b) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed and served prior to the Effective Date.

14. Pursuant to *section 1146(c) of the Bankruptcy Code*, the issuance, transfer, or exchange of a security under the Plan, or the making or delivery of any deed or instrument of transfer under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or similar tax.

15. The Debtor, all holders of Claims against, or Interests in the Debtor, and the Liquidation Trustee are hereby directed to execute, deliver, file or record any document, and to take any action necessary to implement and effectuate the Plan [*34] in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan.

16. The Debtor, with the prior written consent of the Post-Confirmation Committee and subject to further order of this Court, is hereby authorized to amend or modify the Plan at any time after entry of this Order, but only in accordance with *section 1127(b) of the Bankruptcy Code* and section 14.04 of the Plan.

17. Until the entry of a Final Order concluding the Debtor's Chapter 11 Case, and except as otherwise ordered by this Court, this Court shall retain jurisdiction over the Debtor and its property pursuant to Section 12.01 of the Plan. On and after the Effective Date, in accordance with *sections 105(a)* and *1142 of the Bankruptcy Code*, this Court retains jurisdiction over, and if this Court exercises its retained jurisdiction, shall have exclusive jurisdiction over, all matters arising out of or related to this case and the Plan, or which otherwise are enumerated in Article XII of the Plan.

18. Any person or entity seeking an allowance of final compensation or reimbursement of expenses for professional services rendered [*35] to the Debtor or in relation to this Case pursuant to *sections 327*, *328*, *330*, *331*, *503(b)* and *1103 of the Bankruptcy Code* shall serve a notice of such application for allowance of final compensation for services rendered and reimbursement of related expenses incurred on or before the Confirmation Date (each, an "Application"), on the Debtor's creditors, the Office of the United States Trustee, all entities who or which filed a notice of appearance and on each of the following entities not later than **November 21**, 2006, or by such later date as may be established by further order of the Court:

Ted A. Berkowitz, Esq.

Farrell Fritz, P.C.

Counsel to the Committee and the Post-Confirmation Committee

Rectson Plaza

Uniondale, New York 11556-1320

Gerard R. Luckman, Esq.

Silverman Perlstein & Acampora LLP

Counsel to the Debtor

100 Jericho Quadrangle, Suite 300

Jericho, New York 11753

Office of the United States Trustee

Long Island Federal Courthouse

560 Federal Plaza

Central Islip, New York 11722

Att: Terese A. Cavanagh, Esq.

19. Upon written request made to the applicable applicant, a party in interest may obtain a copy of the Application of such applicant. Any objection to any Application shall be in writing, [*36] shall set forth with specificity the basis of the objection, and shall be served on the applicant whose Application is the subject of the objection and on each of the entities listed above, and shall be filed with the Court, with a copy to Chambers, on or before *December 7*, 2006.

20. A hearing to consider the Applications so served and filed shall be held before the Court on *December 14*, 2006, at *10: 30* .m., or as soon thereafter as counsel may be heard, before the Judge Stan Bernstein, United States Bankruptcy Judge, in his Courtroom at the United States Bankruptcy Court for the Eastern District of New York, 290 Federal Plaza, Courtroom 860, Central Islip, New York (the "Final Fee Hearing"), or on such adjourned date and time as may be announced at the Final Fee Hearing.

21. Each Application shall comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and the Guidelines for Fees and Disbursements for Professionals in the Eastern District of New York, and shall set forth in reasonable detail, (i) the name and address of the applicant; (ii) the nature of the professional services rendered and expenses for which reimbursement is requested [*37] for all periods from the date the particular applicant was retained through the Confirmation Date, including the nature of services contemplated to be rendered by the applicant from the date of the Application to and including the Confirmation Date; (iii) the amount of compensation and reimbursement of expenses requested; (iv) whether any payments have been received on account and, if so, the amount thereof; and (v) the amounts of compensation and reimbursement of expenses previously allowed by the Court, if any.

22. Pursuant to Article VII of the Plan and unless otherwise ordered by the Court, on the Final Distribution Date, the Post-Confirmation Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Case, and the retention or employment of the Committee's attorneys, accountants, and other agents, shall terminate.

23. The Liquidation Trustee shall, pursuant to Section 10.02 of the Plan and the Liquidation Trust Agreement, out of the assets held by the Liquidation Trustee, subject to the requirements for Court approval [*38] contained in the Liquidation Trust Agreement, pay the reasonable fees and expenses of the professionals employed by the Committee or the Post-Confirmation Committee, as the case may be, the Debtor and the Liquidation Trustee, in connection with the implementation and consummation of the Plan, the claims reconciliation process and any other matters as to which such professionals may be engaged.

24. Pursuant to the Plan, all fees payable pursuant to *section 1930 of title 28, United States Code*, as determined by the Court, shall be paid on the Effective Date or as soon as practicable thereafter. All post-confirmation fees that are due and payable shall be paid until the Chapter 11 Case are closed pursuant to *section 350(a) of the Bankruptcy Code*.

25. On or before the tenth (10th) Business Day following the date of entry of this Order, the Debtor shall serve notice of this Order pursuant to *Bankruptcy Rule 2002(f)(7), 2002(k)* and *3020(c)* on all creditors and interest holders, the United States Trustee, and other parties in interest, by causing notice of entry of this Order (the "Notice of Confirmation") to be delivered to such parties by first-class mail, postage prepaid. The notice described [*39] herein is adequate under the particular

circumstances and no other or further notice is necessary.

26. Within five (5) Business Days following the occurrence of the Effective Date, the Debtor shall file notice of the occurrence of the Effective Date with the Court and serve a copy thereof on the parties listed on the Debtor's master service list maintained pursuant to *Bankruptcy Rule 2002*.

27. In the event of any inconsistency between the Plan, any agreement, instrument or document intended to implement the Plan, and this Order, the provisions of this Order shall govern and shall supersede any such document or order of this Court issued prior to the Effective Date.

28. The provisions of this Order are integrated with each other and are non-severable and mutually dependent.

29. The failure specifically to include any particular provision of the Plan in this Order shall not diminish or impair the efficacy of such provision, it being understood that it is the intent of this Court that the Plan be confirmed and approved in its entirety.

30. Notwithstanding anything to the contrary contained in the Plan or Confirmation Order, nothing contained in the Plan or Confirmation Order shall enlarge, [*40] reduce, modify, impair or affect in any way the parties' rights, defenses and exclusions under applicable law or under any policies of insurance or related agreements (individually or collectively, the "Insurance Agreements") entered into by the Continental Casualty Company, Transportation Insurance Company, Continental Casualty Company, American Casualty Company of Reading, Pennsylvania, CNA ClaimPlus, Inc., as successor-in-interest to RSKCo Services, Inc. for certain limited purposes, and their American insurance affiliates (collectively, the "CNA Companies") on the one hand, and the Debtor on the other hand. In particular, (i) the terms of the Plan shall have no effect whatsoever on the scope of coverage and related duties under the Insurance Agreements, (ii) the CNA Companies shall not

be barred, enjoined or restricted in any way from litigating, settling, adjusting, paying or otherwise handling workers compensation and employers liability claims in accordance with the terms of the Insurance Agreements, and (iii) the CNA Companies shall retain all of their respective rights of setoff and/or recoupment under the Insurance Agreements and applicable law, if any, provided, however, [*41] the Debtor shall retain all of its rights to object to any and all claims asserted now or in the future against the Debtor by or on behalf of the CNA Companies in connection with the Insurance Agreements, whether directly or through subrogation, on any reasonable grounds under all applicable law.

31. This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

Dated: Central Islip, New York

*November 13*, 2006

/s/ *Stan Bernstein*

STAN BERNSTEIN

UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

The Debtor's Third Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, dated as of August 21, 2006, is approved by this Order, and can be found through the Court's ECF system as Docket No. 405 in Case No. 05-89022

**EXHIBIT B**

The Liquidation Trust Agreement, as annexed to the Plan of Liquidation as Exhibit 1 thereto, is approved by this Order, and can be found through the Court's ECF system as Docket No. 405, Attachment # 1, in Case No. 05-89022

**In re WorldCom, Inc.**

**No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003)**



Not Reported in B.R., 2003 WL 23861928 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2003 WL 23861928 (Bkrtcy.S.D.N.Y.))**

▷

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
S.D. New York.
In re: WORLDCOM, INC., et al., Debtors.

No. 02–13533(AJG).
Oct. 31, 2003.

Marc E. Albert, Darrell W. Clark, Carrie McGuire, Stinson Morrison Hecker, LLP, David A. Handzo, Jenner & Block, Eric R. Markus, Wilmer, Cutler & Pickering, Adam P. Strochak, Weil, Gotshal & Manges, LLP, Washington, DC, Sylvia Mayer Baker, Alfredo R. Perez, Weil, Gotshal & Manges, LLP, Houston, TX, Kristen Bancroft, Orrick, Herrington & Sutcliffe, LLP, Martin J. Bienenstock, Lori R. Fife, Marcia L. Goldstein, Weil, Gotshal & Manges LLP, Thomas R. Califano, Piper Marbury Rudnick & Wolfe LLP, Alice B. Eaton, Simpson Thacher & Bartlett, Carren B. Shulman, Heller Ehrman White & McAuliffe LLP, Timothy W. Walsh, Piper Rudnick, LLP, New York, NY, Darryl M. Bradford, Megan Fahey, R. Douglas Rees, Jennifer B. Salvatore, Jenner & Block, LLC, Chicago, IL, Mark S. Carder, Teresa L. Clark, W. Anthony Feiock, Patricia A. Konopka, Lori O. Locke, Greta A. McMorris, Amy R. Miller, Mark A. Shaiken, Stewart M. Stein, Stinson Morrison Hecker, LLP, Kansas City, MO, Sam Della Fera, Jr., Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., Newark, NJ, Mark G. Ledwin, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY, Stephen D. Lerner, Squire Sanders & Dempsey LLP, Cincinnati, OH, Andrew C. McElmeel, Stinson Morrison Hecker, LLP, Omaha, NE, Sharon L. Stolte, Stinston Morrison Hecker LLP, Overland Park, KS, Bruce H. White, Patton Boggs LLP, Stephen A. Youngman, Weil, Gotshal & Manges, LLP, Dallas, TX, for Debtors.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (1) APPROVING (i) SUBSTANTIVE CONSOLIDATION AND (ii) THE SETTLEMENTS UNDER DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION, DATED OCTOBER 21, 2003, AND (2) CONFIRMNG DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION, DATED OCTOBER 21, 2003

GONZALEZ, Bankruptcy J.

**\*1** On September 8, 9, 12, 15, 16, 17 and 19, 2003 and October 14, 15, 21 and 30 2003, this Court held FN1 a confirmation hearing (the "Confirmation Hearing") to consider a plan of reorganization under chapter 11 of the Bankruptcy Code jointly proposed by WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"). During the course of the Confirmation Hearing, the Debtors filed Debtors' Second Amended Joint Plan of Reorganization, dated September 12, 2003, which was subsequently modified. Debtors thereafter filed Debtors' Modified Second Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code, dated October 21, 2003 ("Modified Second Amended Plan"). FN2

> FN1. This Court has subject matter jurisdiction over these cases under 28 U.S.C. §§ 157(a) and 1334(b) and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(L). This Memorandum of Decision constitutes findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable by Fed. R. Bankr.P. 7052 and Fed. R. Bankr.P. 9014. To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law

constitute findings of fact, they are adopted as such.

FN2. Capitalized terms used in this Memorandum of Decision that are not otherwise defined herein shall have the same meanings ascribed to them in the Modified Second Amended Plan.

The Court has reviewed and considered the Modified Second Amended Plan, all affidavits submitted, as well as the testimony proffered and adduced, the exhibits admitted into evidence at the Confirmation Hearing and the arguments of counsel presented at the Confirmation Hearing. The Court has also considered all objections to confirmation of the Plan. This Court is cognizant of the compromises and settlements of the parties, and other relevant factors affecting these Chapter 11 Cases, and takes judicial notice of the entire record. Based upon the following findings of fact and conclusions of law, the Court will approve substantive consolidation, approve the settlements under the Modified Second Amended Plan and confirm the Modified Second Amended Plan and herein disposes of all objections to confirmation not otherwise previously resolved or withdrawn.

I. FINDINGS OF FACT
A. BACKGROUND, THE PLAN, AND SOLICITATION AND NOTICE

(i) Background

The Debtors current corporate structure results from a series of prepetition mergers and acquisitions including that involving WorldCom, Inc. and MCI Communications Corporation ("MCIC" and the merger with WorldCom Inc., sometimes referred to as the "Merger").

On July 21, 2002 (the "Commencement Date") and November 8, 2002, WorldCom, Inc. and 221 of its direct and indirect subsidiaries commenced voluntary cases under the Bankruptcy Code. By Orders, dated July 22, 2002 and November 12, 2002,

the Debtors' Chapter 11 Cases were consolidated for procedural purposes and are being jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 29, 2002, the United States Trustee for the Southern District of New York (the "United States Trustee") appointed the statutory committee of unsecured creditors (the "Creditors' Committee"). No trustee has been appointed in these Chapter 11 Cases.

On October 29, 2002 this Court entered an Order Pursuant to Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Certain Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Order"). (Docket No. 1780.) The Bar Date Order established 5:00 p.m. (Eastern Time) on January 23, 2003 (the "Bar Date") as the deadline for filing proofs of claims in the Debtors' cases, subject to specified exceptions.

(ii) The Plan
**\*2** On May 23, 2003, the Debtors filed with this Court the proposed Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (the "Disclosure Statement") and Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "May 23 Plan"). (Debtors' Ex. 274.)

On May 28, 2003, after due notice and a hearing held on May 19, 2003 and May 22, 2003, this Court entered an order (the "May 28 Disclosure Statement Order"), which, among other things, approved the Disclosure Statement, finding that it contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and established procedures for the Debtors' solicitation of votes on the May 23 Plan. (Docket No. 6110.) In accordance with the May 28 Disclosure Statement Order, on June 12, 2003 the Debtors commenced the solicitation of votes on the May 23 Plan. (Debtors' Ex. 301, June 18, 2003 Sullivan Aff.)

On July 9, 2003, the Debtors filed with this

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2003 WL 23861928 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2003 WL 23861928 (Bkrtcy.S.D.N.Y.))**

Court the proposed Supplement to Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (the "First Supplement") and Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated July 9, 2003 (the "July 9 Plan"). (Debtors' Ex. 273.) The modifications to the May 23 Plan embodied in the July 9 Plan related to the incorporation of the Bank Settlement (described below) and the creation of the corresponding Class 3A, a revision to the SEC Settlement, and the clarification of certain implementation provisions. The First Supplement provided disclosure with respect thereto.

On July 11, 2003, after due notice and a hearing held on July 9, 2003, this Court entered an order (the "First Supplemental Disclosure Statement Order"), which, among other things, approved the First Supplement, finding that the First Supplement, together with the Disclosure Statement, contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code, established procedures for the Debtors' solicitation of votes by holders of Claims in Class 3A and the distribution of the First Supplement and the July 9 Plan to parties in interest, authorized any creditor to change its vote previously cast on the May 23 Plan, and extended the deadline for filing objections to confirmation based upon the Bank Settlement from July 28, 2003 to August 4, 2003. (Docket No. 7297.) In accordance with the First Supplemental Disclosure Statement Order, on July 11, 2003 the Debtors commenced the solicitation of votes of holders of Claims in Class 3A on the July 9 Plan (which amended the May 23 Plan), and commenced the distribution of the First Supplement and July 9 Plan to parties in interest. (Debtors' Ex. 301, July 25, 2003 Sullivan Aff.)

On July 31, 2003, the Court entered an Order: (1) Directing Debtors to File a Second Supplement to Debtors' Disclosure Statement; (2) Setting Objection Deadline Related Thereto; and (3) Extending Voting Deadlines and Adjourning Date for Commencement of Confirmation Hearing (the "July 31 Order"). Pursuant to the July 31 Order, the Court directed the Debtors to file a second supplement to the Disclosure Statement in respect of certain newly commenced governmental investigations and actions, extended the deadline for casting votes on the Amended Plan to August 26, 2003 and adjourned the hearing to consider confirmation of the Amended Plan to September 8, 2003. (Docket No. 7961.)

**\*3** On August 6, 2003, pursuant to the July 31 Order, the Debtors filed with the Court the proposed Second Supplement to Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (the "Second Supplement"), which notified parties of the voting and objection deadlines established by the July 31 Order, provided disclosure in respect of then-recent investigations and actions by certain governmental agencies and departments, and set forth the Debtors' position with respect to the allegations raised thereby, the potential impact, if any, on the Debtors' estates, and other related information. (Debtors' Ex. 272.)

On August 7, 2003, after due notice and a hearing held on August 6, 2003, this Court entered an order (the "Second Supplemental Disclosure Statement Order"), which, among other things, approved the Second Supplement, finding that the Second Supplement, together with the Disclosure Statement and the First Supplement, contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code, established procedures for the Debtors' distribution of the Second Supplement to parties in interest, authorized any creditor to change its vote previously cast on the May 23 Plan or the Amended Plan, and extended the deadline for filing objections to confirmation based upon the Bank Settlement from July 28, 2003 to August 4, 2003. (Docket No. 8128.) In accordance with the Second Supplemental Disclosure Statement Order, on August 9, 2003 the Debtors commenced the distribution of the Second Supplement to parties in in-

terest. (Debtors' Ex. 301, August 22, 2003 Sullivan Aff.)

On August 29, 2003, the Certification of Jane Sullivan with Respect to the Tabulation of Votes on the Plan of Reorganization, sworn to on August 29, 2003 (the "Initial Vote Certification") was filed with the Court on behalf of the Debtors' voting and tabulation agent, Innisfree M & A Incorporated. (Debtors' Ex. 302, Docket No. 8603.) The July 9 Plan was accepted by holders of more than two-thirds in amount and more than one-half in number of Claims voted in each Class entitled to vote. (Debtors' Ex. 302.)

The hearing to consider confirmation of the July 9 Plan commenced on September 8, 2003. Among the parties that had interposed objections to confirmation were the Ad Hoc MCI Trade Claims Committee, the Ad Hoc Committee of Dissenting Bondholders, Platinum Partners Value Arbitrage Fund, L.P. ("Platinum"), Deutsche Bank Securities, Inc. ("Deutsche"), and HSBC Bank USA ("HSBC"). (Docket Nos. 8033, 7938, 7939, 8038, 7707, 8011.) On September 9, 2003, the Debtors informed the Court that agreements had been reached with the Ad Hoc MCI Trade Claims Committee and the Ad Hoc Committee of Dissenting Bondholders, as well as with other objectors such as Platinum, Deutsche, and HSBC, pursuant to which, among other things, the Debtors would further amend the July 9 Plan and such objections would be withdrawn.

On September 12, 2003, the Debtors filed with this Court proposed Third Supplement to Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (as thereafter modified, the "Third Supplement") and Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated September 12, 2003 (the "September 12 Plan"). (Debtors' Ex. 335.) The modifications to the July 9 Plan embodied in the September 12 Plan reflect the resolution of issues with the Ad Hoc MCI Trade Claims Committee, the Ad Hoc Committee

of Dissenting Bondholders, HSBC, and other objectors such as Platinum and Deutsche that had asserted unique reliance arguments based upon their pre-merger trade claims, and include a settlement regarding the treatment of MCIC Subordinated Debt Claims, a reduction to the recovery by the holders of MCIC Senior Debt Claims, a contribution of plan consideration by the holders of MCIC Senior Debt Claims and MCIC Subordinated Debt Claims, and provision for additional recoveries to Class 6 creditors that can establish that their Claims qualify as MCI Pre-merger Claims. The Third Supplement provided disclosure with respect thereto and related provisions and addressed the extent to which (if at all) the modifications would affect creditor recoveries.

**\*4** On September 12, 2003, after due notice by announcement of the Court on the record on September 9, 2003 and a hearing held on September 11, 2003 and September 12, 2003, this Court entered an order (the "Third Supplemental Disclosure Statement Order," and collectively with the Disclosure Statement Order, the First Supplemental Disclosure Statement Order, and the Second Supplemental Disclosure Statement Order, the "Disclosure Statement Orders"), which, among other things, approved the Third Supplement, finding that the Third Supplement, together with the Disclosure Statement, the First Supplement, and the Second Supplement, contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code, established procedures for the Debtors' distribution of the Third Supplement and the September 12 Plan to parties in interest, authorized any creditor to change its vote previously cast on the May 23 Plan or the July 9 Plan and established October 8, 2003 as the deadline therefor, and established September 30, 2003 as the deadline for filing objections to confirmation based upon the modifications reflected in the September 12 Plan. (Docket No. 8893.) In accordance with the Third Supplemental Disclosure Statement Order, on September 15, 2003 the Debtors commenced the distribution of the Third Supplement and September

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

12 Plan to parties in interest. (Debtors' Ex. 301, September 19, 2003 Sullivan Aff.) FN3

> FN3. On September 19, 2003, the September 12 Plan was modified to incorporate a settlement among the Debtors, the Committee, and an Ad Hoc Committee of Intermedia Preferred Stockholders (the "Intermedia Preferred Settlement"). Notice of such modification was filed on September 24, 2003.

On October 10, 2003, the Supplemental Certification of Jane Sullivan with Respect to the Tabulation of Votes on the Plan of Reorganization, sworn to on October 10, 2003 (the "Supplemental Vote Certification," and together with the Initial Vote Certification, the "Vote Certifications") was filed with the Court on behalf of the Debtors' voting and tabulation agent, Innisfree M & A Incorporated. (Debtors' Ex. 338; Docket No. 9355.) The September 12 Plan was accepted by holders of more than two-thirds in amount and more than one-half in number of Claims voted in each Class entitled to vote. (Debtors' Ex. 338.)

At the October 15, 2003, the Court heard evidence and oral argument in respect of the remaining objections to the September 12 Plan. The objectors raised various arguments in opposition to the September 12 Plan, including that the classification of WorldCom General Unsecured Claims, MCI Premerger Claims, and Ad Hoc MCI Trade Claims Committee Claims together in one Class violated section 1123(a)(4) of the Bankruptcy Code.

On October 20, 2003, the Court ruled concerning the objections based on section 1123(a)(4) of the Bankruptcy Code (the "October 20 Ruling"). In the October 20 Ruling, the Court held that Class 6 of the September 12 Plan did not comply with the requirements of section 1123(a)(4) of the Bankruptcy Code. The Court directed the Debtors to separately classify WorldCom General Unsecured Claims, the MCI Pre-merger Claims, and the members of the Ad Hoc MCI Trade Claims Committee.

Although the class of Ad Hoc Trade Claims receives the same treatment as the WorldCom General Unsecured Claims under the September 12 Plan, the Court preferred separate classification of those classes for voting purposes because of the Court's concern that the members of the Ad Hoc Trade Claims Committee could, arguably, unduly influence the outcome of the vote if the two groups were merged into one class. The Court also directed that the constituency of the MCI Pre-merger Claim class would be determined by a creditor election to opt into that class. Finally, the Court directed the Debtors to advise the Court as to whether the Debtors intended to re-solicit the holders of the newly separately-classified claims or whether the Debtors would seek to confirm the September 12 Plan, as modified, under section 1129(b) of the Bankruptcy Code with respect to these Classes.

**\*5** In compliance with the October 20 Ruling, on October 21, 2003, the Debtors advised the Court that they would seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code. At such time, the Court scheduled a hearing to consider confirmation of the Plan under section 1129(b) of the Bankruptcy Code for October 30, 2003.

On October 21, 2003 the Debtors filed the Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated October 21, 2003 (the "Modified Second Amended Plan"), which modifies the September 12 Plan by, *inter alia,* reclassifying the Claims in former Class 6 (WorldCom General Unsecured Claims) into Classes 6, 6A, and 6B. The Modified Second Amended Plan, thus, separately classifies (i) into Class 6A, MCI Pre-merger Claims, which are Claims arising solely from an individual transaction or series of transactions that was fully completed on or before September 13, 1998, the holders of which relied on the separate credit of MCIC or any subsidiary of MCIC as of that date, (ii) into Class 6B, solely for voting purposes, Ad Hoc MCI Trade Claims Committee Claims, which are the General Unsecured Claims of

the Ad Hoc MCI Trade Claim Committee and (iii) into Class 6, all other General Unsecured Claims against the WorldCom Debtors.[FN4]

> [FN4]. As set forth by the Debtors on the record at the October 21, 2003 hearing, the other modifications include a modification to the Exculpation Provision, which was agreed to by the Debtors, the Committee and the United States Trustee, and conforming changes relating to the Intermedia Preferred Settlement, none of which implicates or adversely impacts creditor recoveries.

Each holder of an Allowed Class 6 WorldCom General Unsecured Claim will receive the same treatment under the Plan consisting of (i) 7.14 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed WorldCom General Unsecured Claim and (ii) Cash in an amount equal to .1785 multiplied by the Allowed amount of such WorldCom General Unsecured Claim. Each holder of an Allowed Class 6A MCI Pre-merger Claim will receive the same treatment under the Plan consisting of (i) 7.14 shares of New Common Stock for each one thousand ($1,000) dollars of such holder's Allowed MCI Pre-merger Claim and (ii) Cash in an amount equal to .4215 multiplied by the Allowed amount of such MCI Pre-merger Claim. The Claims of the Ad Hoc MCI Trade Claims Committee Claims are separately classified in Class 6B solely for voting purposes and not for treatment purposes. Holders of Claims in Class 6B will receive the same treatment as Class 6 creditors. They will also receive additional value from the contributions from the holders of Claims in Classes 9 and 10.

Although the original Class 6 (which included Class 6A Claims) overwhelmingly accepted the plan, Classes 6 and 6A are deemed to have voted to reject for purposes of seeking confirmation of the Modified Second Amended Plan pursuant to section 1129(b) of the Bankruptcy Code. The Class 6B Ad Hoc MCI Trade Claims Committee Claims are

deemed to be an "accepting" Class because the members of the Ad Hoc MCI Trade Claims Committee have agreed to the treatment and to support the Modified Second Amended Plan pursuant to the Integrated Settlement and related stipulations.

The Modified Second Amended Plan constitutes the "Plan."

(iii) Solicitation And Notice

**\*6** The Disclosure Statement (Debtors' Ex. 274), the First Supplement (Debtors' Ex. 273), the Second Supplement (Debtors' Ex. 272), the Third Supplement (Debtors' Ex. 335), the Plan (Debtors' Ex. 335; Docket No. 9004), the Ballots (Docket Nos. 6110, 7297, 8893), the notice of the Confirmation Hearing (Docket No. 6110), and the Disclosure Statement Orders (Docket Nos. 6110, 7297, 8128, 8893) (as applicable, the "Solicitation Materials") were transmitted and served in compliance with the Bankruptcy Rules and the Disclosure Statement Orders. As described in the Affidavits of Service of Innisfree M & A Incorporated, sworn to by Jane Sullivan on June 18, 2003, July 8, 2003, July 25, 2003, July 30, 2003, August 22, 2003, September 19, 2003 and September 26, 2003 (each a "Sullivan Affidavit" and collectively, the "Sullivan Affidavits") (Debtors' Ex. 301), (i) the transmittal and service of the Solicitation Materials were adequate and sufficient under the circumstances of these Chapter 11 Cases, and (ii) adequate and sufficient notice of the Confirmation Hearing (including the July 28, 2003, August 4, 2003, August 19, 2003, September 30, 2003 and October 27, 2003 deadlines for filing and serving objections to confirmation) and other requirements, deadlines, hearings and matters described in the Disclosure Statement Orders were provided in compliance with the Bankruptcy Rules and the Disclosure Statement Orders, and no other or further notice is required.

In addition, Debtors appropriately served Notice of Modifications to Debtors' Second Amended Plan of Reorganization dated September 19, 2003, which among other things, revealed that Debtors agreed to provide a 5% recovery to the holders of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2003 WL 23861928 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2003 WL 23861928 (Bkrtcy.S.D.N.Y.))**

Intermedia Preferred Stock and that such modification did not have an adverse effect upon the recovery of any class of creditors. (Docket No. 9066)

The Objectors at the October 15, 2003 hearing on confirmation included America West Airlines, Inc. ("America West"), CIT Lending Services Corporation ("CIT"), Next Factors, Inc.[FN5] ("Next Factors"), the United States Trustee for the Southern District of New York ("United States Trustee"), and Wells Fargo Bank, N.A. ("Wells Fargo").[FN6] The Objector at the October 30, 2003 hearing on confirmation was Liquidity Solutions Inc ("LSI").[FN7]

> **FN5.** Next Factors' denial of receipt of the Third Supplement is insufficient to rebut the presumption of its receipt of same. There is a rebuttable presumption that the addressee of a properly addressed and mailed notice receives that notice. *Hagner v. United States,* 285 U.S. 427, 430, 52 S.Ct. 417, 76 L.Ed. 861 (1932). A party must do more than merely deny receipt of the mailing; its testimony or affidavit of non-receipt is insufficient, standing alone, to rebut the presumption. *In re Ms. Interpret,* 222 B.R. 409, 413 (Bankr.S.D.N.Y.1998); *In re Adler, Coleman Clearing Corp.,* 204 B.R. 99, 105 (Bankr.S.D.N.Y.1997). The Court has reviewed certain Assignment of Claims filed in this case and the address used by Next Factors therein is identical to the address used by the Debtors to serve Next Factors. Indeed, Next Factor's counsel has used that same address in his submissions with this Court. Because Next Factors was provided with proper notification of the deadline to file objections to the Plan and failed to file its objection by such objection deadline and because Next Factors has failed to provide sufficient justification or excuse for such failure, Next Factors is barred from objecting to the Second Amended

Plan. In any event, the Court believes that the Court's conclusions, as set forth in the text, are sufficient to overrule Next Factors objections on the merits.

> **FN6.** The America West and CIT objections to confirmation of the Plan were later withdrawn pursuant to stipulations and agreed orders between the Debtors and America West and between the Debtors and CIT.

> **FN7.** For the reasons set forth more fully at the hearing, LSI offered no convincing excuse or evidence for its failure to abide by the objection deadline. Moreover, the Court finds that allowing LSI to file an untimely objection that, inter alia, sought a continuance of the hearing would prejudice the Debtors at this stage of the case. The Court therefore did not have to consider its objection. Nevertheless, the Court believes that the Court's conclusions, as set forth in the text, are sufficient to overrule LSI's objections on the merits.

The Disclosure Statement, the First Supplement, the Second Supplement, and the Third Supplement provide to holders of Claims against and Equity Interests in the Debtors "adequate information" within the meaning of section 1125 of the Bankruptcy Code. Votes on the Plan were solicited after disclosure to holders of Claims against and Equity Interests in the Debtors of "adequate information" as defined in section 1125 of the Bankruptcy Code. The procedures used to distribute and tabulate the Ballots were fair, properly conducted, and in accordance with the Disclosure Statement Orders and all applicable Bankruptcy Rules.

B. SUBSTANTIVE CONSOLIDATION

The Plan provides for the substantive consolidation of the WorldCom Debtors and the separate substantive consolidation of the Intermedia Debtors. (Plan §§ 5.01, 5.02.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(i) The Debtors' Operations

**\*7** The WorldCom enterprise is comprised of over 400 legal entities. (Debtors' Ex. 268.) Of these, 222 are debtors in these Chapter 11 Cases.

Historically, all the Debtors operated under common senior management. This has continued during the Chapter 11 Cases, with the appointment of Michael Capellas as Chairman of the Board of Directors and Chief Executive Officer for all of the Debtors. (Debtors' Ex. 202.) Debtors never prepared separate legal entity financial statements for public financial reporting purposes. (9/15/03 Tr. at 100.) The Debtors historically have done all public financial reporting on a consolidated basis. (*See, e.g.,* Debtors' Ex. 226.) The Debtors likewise filed consolidated federal income tax returns. (*See, e.g.,* Debtors' Ex. 271.)

(ii) Transfer Of Assets From WorldCom, Inc. to MCIC

After the 1998 acquisition of, and merger with, MCIC, WorldCom substantially restructured its corporate organization.

Through a series of restructuring transactions in December 1998, June 1999 and September 1999, the Debtors transferred significant assets from WorldCom, Inc. to MCIC and its subsidiaries, including the following:

• WorldCom, Inc. transferred all shares of Management Company to MCIC.

• WorldCom, Inc. transferred several of its direct subsidiaries into UUNET, an indirect legacy WorldCom subsidiary. As a result of this transfer, UUNET Technologies, Inc. ("UUNET") held all of the internet operations of the Company and UUNET's direct subsidiary held all of the value-added assets and operations.

• IDB WorldCom, Inc. ("IDBWC"), a direct subsidiary of WorldCom, Inc., and a direct subsidiary of IDBWC Inc. were merged with and into MCIC.

• MCIC conveyed most of the assets and employees of the former IDBWC and its subsidiary to other subsidiaries of MCIC.

• MFS Communications Company ("MFSCC"), a legacy WorldCom subsidiary, was merged with and into MCIC.

• MCIC conveyed all assets of the former MFSCC to Network Services but did not transfer any liabilities. This transfer resulted in legacy WorldCom subsidiaries that were former subsidiaries of MFSCC, such as UUNET, becoming indirect subsidiaries of Network Services.

• WorldCom conveyed its interest in WorldCom Pacific LLC to MCIC, and MCIC merged Pacific into MCIWC Communications.

• Network Services conveyed its sales-related assets and employees as well as the interconnection agreements of the former MFSCC to MCIWC Communications.

• WorldCom Network Services, Inc. ("WNS"), a legacy WorldCom subsidiary, was merged with and into Network Services.

(*See* Debtors' Exs. 33–95, 113–22, 144–65 and 331 and Creditors' Committee's Ex. 2.)

(iii) Operational Integration of the Debtors

In furtherance of the post-merger corporate restructuring efforts, the Debtors continued and expanded operational integration of the various legal entities. Although each of the Debtors exists as a separate legal entity, WorldCom's business, both before and after the MCI merger, was and is organized along operational and functional lines rather than by legal entities. (9/15/03 Tr. at 29–30.)

**\*8** Debtors are comprised of two general types of business units—sales units and operating units. (9/15/03 Tr. at 28–29.) The Debtors' sales and marketing functions are organized along three major sales channels—International, Business and Consumer. International is everything outside the

Not Reported in B.R., 2003 WL 23861928 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2003 WL 23861928 (Bkrtcy.S.D.N.Y.))**

United States. Business markets covers everything from small- and medium-sized businesses to the largest global account customers. Consumer, or mass markets, covers residential customers and very small businesses. (Deposition of Fred M. Briggs ("Briggs Dep.") at 80.)

The Debtors' operating units provide services and support to the sales units. The operating units include: Operations and Technology, Finance, Human Resources, Purchasing, Legal, and Marketing. (9/15/03 Tr. at 29; Declaration of Matthew Johnson ("Johnson Decl.") ¶ 1.)

Although the operations of all the Debtors are integrated, the finances of the 17 Intermedia Debtors are not integrated with those of the remaining Debtors. After the 2001 acquisition of Intermedia by WorldCom, the Intermedia Debtors continued to prepare separate financial statements, annual reports and other filings with the Securities and Exchange Commission. Those filings, however, are done on a consolidated basis for all of the Intermedia entities. (Debtors' Exs. 319, 320, 327.)

(iv) Network Operations Are Integrated

The Debtors operate a fully-integrated telecommunications network. The Debtors' Operations and Technology unit builds, maintains, supports, operates and acquires network capacity on behalf of the entire enterprise without regard to separate legal entities. The only notable exception is the Skytel paging business, which operates a separate network. (Briggs Dep. at 24–25, 34–37, 91.)

The integrated network platforms, products and services provided by the Operations and Technology unit support all three of the major sales channels and provide network services to the entire enterprise. (Briggs Dep. at 80, 91–92; Debtors' Exs. 121–22.) The costs of building, operating and maintaining the Debtors' telecommunications network are allocated to the major sales channels for management reporting purposes. (Briggs Dep. at 82–83.)

(v) Procurement Operations Are Integrated

The Debtors operate a centralized procurement department. The purchasing department purchased the vast majority of all capital and non-capital items that were acquired by any of the Debtors. (Johnson Decl. ¶ 3.)

The Debtors' centralized purchasing department performs, among others, the following primary functions: (a) determines that certain goods or services are needed for the Debtors' family of companies or receives an internal request for goods or services; (b) identifies potential vendors that could supply the good or services; (c) negotiates with those vendors; (d) awards contracts to the winning vendors; and (e) actually buys, through the centralized procurement department's purchase order, the goods or services needed within the Debtors' organization. (Johnson Decl. ¶ 4.)

**\*9** The centralized purchasing department does not send the purchase orders on behalf of any particular legal entity. The Debtors' standard purchase order provides that, "This purchase is made by WorldCom Purchasing, LLC as agent for the Subsidiaries of MCI WORLDCOM, Inc." Purchase orders did not reference the particular legal entity with which the vendor was transacting business. (Johnson Decl. ¶ 5 & Ex. A; Debtors' Exs. 249–64.)

The centralized procurement department does not know what legal entity will receive or use the goods or services that it purchases. As a result, the Debtors' centralized procurement department does not communicate to the vendors that any particular legal entity is acquiring the goods or services or will be financially responsible for the vendor's invoice for the goods or services. (Johnson Decl. ¶ 6; Briggs Dep. at 44.)

The invoices vendors submit for goods or services they sold to the Debtors under a purchase order are paid by the Debtors' centralized accounts payable department—not by any particular legal entity. The checks paying these invoices identify only the ultimate parent corporation (that is, WorldCom,

Inc.). (Johnson Decl. ¶ 7.)

Numerous trade creditors have filed exactly the same claim against multiple Debtors. This has resulted from the creditors' inability to determine which particular Debtor is the proper entity against which a proof of claim should be filed. Many creditors have filed the same claim against all 222 Debtors. (Johnson Decl. ¶ 8; Debtors' Ex. 248.)

(vi) Cash Management Functions Are Integrated

The Debtors operate a centralized cash management system which handles substantially all cash received by, and paid by, all of the Debtors. The Debtors' treasury department does not manage the enterprise's cash on a legal entity basis. Rather, it tracks to bank accounts. (Deposition of Mary Chastka at 15 hereafter "Chastka Dep.")

The Debtors have several hundred bank accounts. (Chastka Dep. at 16.) There is no correlation between legal entities and bank accounts. (*Id.* at 18.)

Customer payments generally are made to lockbox accounts. The lockbox accounts are swept on a daily basis and all funds therein are transferred to the Debtors' single cash concentration account. (Chastka Dep. at 16–17, 22.)

The funds in the concentration account are then sent out to cover drafts on the Debtors' various disbursement accounts, which pay payroll expenses, vendor invoices, employee benefits and all other operational expenses of the enterprise. (Chastka Dep. at 22–23.)

Any surplus of cash in the concentration account is invested overnight in one of several money market accounts. (Chastka Dep. at 23.)

External sources of cash, such as bank borrowing, are deposited directly into the concentration account. (Chastka Dep. at 79–80.)

(vii) Actions During the Chapter 11 Cases

The Debtors and their major creditor constitu-

encies, including the Creditors' Committee, appear to have recognized from the start of these Chapter 11 Cases that the ability to create separate legal entity financial statements, as well as the existence of substantial intercompany claims, were important issues in connection with evaluating the need for substantive consolidation of the estates. (9/15/03 Tr. at 217–19.)

**\*10** The Creditors' Committee retained FTI Consulting Inc. ("FTI") as its forensic accountant and charged FTI with investigating intercompany accounts, among other things. (9/15/03 Tr. at 95–96.) The Debtors cooperated with this effort, providing documents, access to the company's accounting systems, and access to key accounting and financial personnel. (9/15/03 Tr. at 223–25.) FTI served as a fact-finder, sharing the results of its investigations with the Creditors' Committee, as well as the Debtors, in a series of reports. (Creditors' Committee's Exs. 2–4; 9/15/03 Tr. at 95, 224.)

In addition, the Debtors provided all major creditor constituencies with equal access to financial data, establishing a data room in their Washington, DC offices where documents and access to the Essbase financial system (described below) were available. (9/15/03 Tr. at 223–24.)

As a result of the substantial investigations that have taken place, the Debtors' historical accounting systems are well understood and there is an extensive record demonstrating the many historical deficiencies that make it impossible for the Debtors to prepare accurate and reliable separate legal entity financial statements on a historical basis.

(viii) The Debtors' Complex Accounting System

The Debtors' accounting systems are very complex and not well integrated. (9/15/03 Tr. at 30.) The Debtors have multiple ledger systems, the largest of which is SAP (a general ledger system). There are two SAP systems—one for domestic operations and one for international operations. (9/15/03 Tr. at 30–31.) These two systems, however, did not effectively communicate. (9/15/03

Tr. at 102–03.)

In addition, some of the Debtors business units operate on a Lawson system, while still others operate on an Oracle system. (9/15/03 Tr. at 31.) These various systems are aggregated in a system referred to as Essbase which consolidates all of the financial data into one system. (9/15/03 Tr. at 31.)

There are multiple accounting systems that feed these general ledgers, including approximately sixty-five billing systems that feed the general ledger system through a variety of processes, both automated and manual. (9/15/03 Tr. at 31–32.)

There are also twenty-three accounts receivable systems that feed the billing systems. The accounts receivable systems also have hundreds of front-end systems (such as order entry, provisioning, call record tracking and rating). (9/15/03 Tr. at 32.) None of the accounts are reconciled to the general ledger. For example, the sixty-five billing systems and the twenty-three AR systems were never reconciled at the sub ledger. (9/15/03 Tr. at 45.)

There are approximately 20,000 general ledger accounts and sub accounts that are used to capture transactions for specific items such as service, general and administrative and balance sheets. (9/15/03 Tr. at 32.)

There is no specific accounting for legal entities in SAP; instead accounting is by company code. There are more than 1,100 company codes notwithstanding that there are only approximately 400 legal entities. (9/15/03 Tr. at 33.)

**\*11** Debtors maintained their financial books on a general ledger company code basis, not on a legal entity basis. (9/15/03 Tr. at 99.) Each company code does not represent a separate legal entity as there are multiple company codes for each legal entity. In addition, there are company codes that do not represent legal entities. (9/15/03 Tr. at 33.) There exists no current accurate or complete map which ties these company codes to legal entities.

(9/15/03 Tr. at 33.)

The ownership of assets, the receipt of revenues and the incurrence of expenses are accounted for in this complex accounting system. The Debtors, however, do not have records of the assets that are owned by each of the separate legal entities. (9/15/03 Tr. at 78–79.) The Debtors are unable to determine the ownership of the assets on a separate entity separate debtor basis. (9/15/03 Tr. at 138.)

(ix) Intercompany Accounting

Intercompany accounts are used to track transactions between related companies. There are approximately 1,400 intercompany accounts and various sub general ledger systems. The Debtors actively use approximately 300 to 320 of these accounts. (9/15/03 Tr. at 55.) Millions of transactions have flowed through these intercompany accounts and there are aggregate balances of approximately $1,000,000,000,000 (one trillion) in these accounts. (9/15/03 Tr. at 55.)

For the month of November 2002, there were over six hundred thousand transactions alone. This equates to over seven million transactions per year. (9/15/03 Tr. at 104.)

W–100 is an account counterparty in the SAP system. When the SAP system was interacting with another general ledger company code that did not have an SAP company code, the system would record the transaction in the W–100 account. The transaction in W–100 reflects the transaction that should be booked in another general ledger system, such as Lawson. (9/15/03 Tr. at 112–13.)

W–100 does not represent a distinct legal entity, and where such an account was listed as the counterparty it does not provide any relevant information concerning the actual identity of the counterparty. (9/15/03 Tr. at 113.)

The Debtors never checked to see that W–100 entries were actually made in the Lawson ledgers because such a control never existed. (9/15/03 Tr.

at 114.)

As of March 12, 2003, FTI, was able to identify counterparties for only about two thirds of the $1,000,000,000,000 or so of intercompany accounts. (9/15/03 Tr. at 114–15.)

From a consolidated standpoint, intercompany accounts should offset to zero in a properly functioning accounting system. The Debtors, however, never systematically balanced their intercompany accounts and the accounts therefore have a significant net out-of-balance. (9/15/03 Tr. at 55–56.)

As a basic accounting principle, the total amount of intercompany payables should equal the total amount of intercompany receivables. However, as of the Commencement Date, the sum of the receivables and payables for all of the entities did not equal zero but was out of balance by approximately $233,000,000. (9/15/03 Tr. at 108.)

**\*12** At the end of 2000, the intercompany accounts, on an consolidated basis, were out of balance by a receivable amount of approximately $115,000,000. By the end of 2001, that out-of-balance had flipped and the accounts were out of balance by a payable amount of about $175,000,000. And then in June of 2002, the out-of-balance had flipped again and the accounts were out of balance by a receivable of approximately $275,000,000. (9/15/03 Tr. at 56–57.)

These are net figures in which out-of-balances on the receivables side are offset against out-of-balances on the payables side. The actual aggregate out of balance is in the billions of dollars. (9/15/03 Tr. at 57–58.) Therefore, the intercompany account balances between legal entities cannot be accurately determined. (9/15/03 Tr. at 128.) Without internal controls in place, the likelihood of material errors occurring is significant. As a result, there is no way to rely on the systems to generate accurate legal entity information or accurate intercompany transactions information by legal entity. (9/15/03 Tr. at 130.)

Intercompany transactions were recorded without regard for the proper general ledger and the Debtors often failed to record significant entries in their intercompany accounts. (9/15/03 Tr. at 132–33.) For example, FTI found the following three large errors: (i) an entry for $4,300,000,000 where cash was improperly stated in a legal entity as well as an intercompany account; (ii) an error in excess of $8,000,000,000 involving transfer pricing entries; and (iii) an error in excess of $5,000,000,000 in which transfer pricing charges were incorrectly recorded as an intercompany liability. (9/15/03 Tr. at 132; Creditors' Committee's Ex. 36 at 12.) In addition, FTI also found that a billion dollar correcting entry was never made relating to intercompany transfer pricing and that interest was not charged on all intercompany accounts. (9/15/03 Tr. at 133; Creditors' Committee's Ex. 36 at 13.)

Without knowing the intercompany receivables and the intercompany payables, the Debtors cannot prepare accurate separate legal entity financial statements as of the bankruptcy filing. (9/15/03 Tr. at 135–36.) The Debtors cannot review the accuracy of each of the underlying intercompany transactions to determine if they were appropriately entered and charged to the correct legal entities because of a lack of documentation, lack of personnel with institutional knowledge and improper historic controls. (9/15/03 Tr. at 60.)

As the Debtors acquired entities, performed restructurings and consolidated their ledgers, the integrity of the intercompany accounts was impaired. (9/15/03 Tr. at 80–81.) While lack of information regarding intercompany accounts is not a significant issue on a consolidated basis, on a legal entity basis they could not simply be written-off because there has to be an intercompany payable and receivable attached to specific legal entities. (9/15/03 Tr. at 82–83.)

(x) The Debtors Are Unable to Create Accurate or Reliable Historical Separate Legal Entity Financial Statements

**\*13** Accurate and reliable separate entity historical financial statements cannot be created and the data in the Debtors' financial system are an unreliable base from which to prepare accurate separate legal entity financial statements. (9/15/03 Tr. at 135–38, 140–42.)

All of the Debtors' current restatement efforts are focused on generating restated financials on a consolidated basis, not on an entity-by-entity basis. (9/15/03 Tr. at 35, 41.) Virtually the entire accounting staff of the Debtors has turned over since June 2002. Approximately 400 new professionals have been hired. (9/15/03 Tr. at 44.)

Debtors have established that it would not be possible to restate results for each legal entity because the Debtors did not manage their business by legal entity, there was never a review of financial statements by legal entity on a timely basis, there was a lack of controls or policies in place by legal entity, no intercompany reconciliations were performed and the work force was not trained on the importance of doing legal entity accounting. (9/15/03 Tr. at 36, 41.) Reconstruction of legal entity books and records is further impossible due to the lack of documentation for some transactions and the loss of individuals with institutional knowledge. (9/15/03 Tr. at 60.)

(xi) Lack of Historic Internal Controls

KPMG conducted an exhaustive and detailed analysis of the Debtors' internal accounting controls in preparation of its audit of the Debtors' 2000, 2001 and 2002 restated consolidated financial statements. (9/15/03 Tr. at 40–41; Debtors' Ex. 195.)

As a result of that analysis KPMG identified ten "material weaknesses" in the Debtors' internal financial controls and operations which it formalized in its June 3, 2003 letter to management and which was filed by the Debtors as part of a Form 8–K on or about June 9, 2003:

1.1 The Company needs to increase the experience and depth of its financial management and accounting personnel. The Company has several key financial management and numerous other accounting positions that remain vacant. These positions are critical to record, process, summarize and report financial data consistent with assertions of management in the financial statements and internal management reports.

1.2 The Company needs to implement procedures and controls to review, monitor and maintain general ledger accounts. Significant efforts will be required to implement procedures and controls to ensure the maintenance and integrity of the general ledger. All general ledger accounts should be assigned to individuals who would be responsible for documenting the composition of ending balances and for determining that activity in those accounts is appropriate. Those individuals would also be responsible for reconciling account balances to underlying ledgers.

1.3 The Company must implement procedures to ensure that reconciliations between subsidiary ledgers and the general ledger are performed. During our review of a substantial number of general ledger accounts, including accounts receivable, various liability accounts and property, plant and equipment, we noted that the Company has not historically consistently reconciled the subsidiary ledgers to the general ledger. We also noted that the Company has not consistently reconciled numerous cash accounts.

**\*14** 1.4 The Company's consolidation process is highly automated and extremely complex. We have found that the process is largely undocumented, and only a few individuals have a limited understanding of only certain parts of the process.

1.5 Significant improvement needs to be made in segregation of duties, responsibilities and management review controls. We noted certain accounting personnel have had the ability and responsibility to post and reconcile accounts under their control without an independent review. This

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

lack of segregation of duties allowed accounting personnel to manipulate financial information that went undetected. Additionally, procedures need to be implemented to ensure that management personnel with appropriate knowledge and understanding review reconciliations and other financial information.

1.6 Policies, procedures and standardization of internal controls need to be implemented. There is a severe lack of policies, procedures and standardization of operating and financial controls and a general lack of documentation related to existing controls. These basic control weaknesses allowed journal entries to be posted without adequate support and documentation. Management should develop Company-wide standards of internal control to document its commitment to compliance with applicable laws and regulations, reliable operational and financial reporting and integrity of business activities and records. Good internal controls are fundamental to the Company achieving its key initiatives and goals. Such Company-wide standards of internal control should be applicable to all subsidiaries, units, groups and departments worldwide. The standards generally should reflect control objectives and not attempt to describe specific procedures required in each business.

1.7 The Company's operating management must be provided with appropriate financial information and appropriate procedures must be in place such that operating management is confident that financial information being used to manage their businesses is ultimately included in the Company's externally reported financial information. In the past, the Company's process for management reporting and review limited operating management's access to financial information. This was particularly noted in revenue, line costs and property, plant and equipment. Through well defined management reporting supported by strong budget to actual analysis, together with confidence in the financial reporting process, op-

erating management can be assured that externally reported results are consistent with actual operating results.

1.8 Review, monitoring and oversight of the global business units needs to be increased.

1.9 Sufficient analysis and documentation of non-routine transactions needs to occur. Examples of non-routine transactions are derivatives and Indefeasible Rights of Use (IRUs). In a number of cases we noted that non-routine transactions were not identified or otherwise brought to the attention of and reviewed by accounting personnel with the appropriate level of expertise to properly analyze and account for these transactions. In addition, in some cases inappropriate accounting decisions were reached such as in the accounting for Avantel, Embratel and certain capitalized costs. We are also informed that management had not performed an impairment analysis of its long-lived assets nor could we find documentation as to where impairment was considered or analysis performed.

**\*15** 1.10 The items identified in Section 4 *Accounting Matters* require the attention of appropriate levels of financial management and must be addressed in the Company's preparation of its restated financial statements.

(Debtors' Ex. 195.)

KPMG identified specific areas of concern under each of these broad topics which relate to the inability of the Debtors to generate accurate and reliable separate financial statements by legal entity. For example, KPMG found that:

1.3.1 Reconciliations throughout the revenue generating process were not performed, documented or analyzed in a timely manner to ensure that the accounting records are complete and accurate.

1.3.3 A formal process had not been established to ensure that cash transfers between accounts re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ceivable platforms were properly reconciled in both the accounts receivable subledgers and the general ledger.

1.3.12 The unapplied cash account was inappropriately used to record unreconciled differences between accounts receivable platforms and the general ledger regardless of the nature of the differences. Policies and procedures to monitor and reconcile the unapplied cash general ledger account to accounts receivable platforms and subsidiary ledgers should be developed and implemented.

1.4.2 Organizational and account structures in the general ledger system (SAP) do not match the structural configuration of the consolidation tool (Essbase). Therefore, SAP and Essbase do not necessarily match the Company's operational legal structure as old and non-operating or non-consolidating companies still exist in SAP and Essbase.

1.4.3 The legal entity structure documented by the Company does not currently match the operational legal structure within SAP and Essbase.

1.4.4 The Company does not appear to have established or documented policies and procedures to ensure the proper recording of elimination journal entries.

In addition to KPMG's findings, in its Report of Investigation dated March 31, 2003, the Special Investigative Committee of the Board of Directors of WorldCom, Inc. found that many of the accounting records were in disarray or non-existent and that Arthur Andersen, the Debtors' predecessor auditors, did not perform any testing to justify reliance on WorldCom's internal controls. (Debtors' Ex. 267, at 26.)

(xii) Remediation of Internal Controls and Accounting Restatement
The Debtors have established teams and developed plans to remediate the internal control

weaknesses identified by KPMG on a going-forward basis and have retained a significant team of professionals from Deloitte & Touche to conduct a complete assessment of the Debtors' internal control environment, remediate the internal control weaknesses identified in the KPMG letter, and develop remediation plans for any other weaknesses that may be discovered. (9/15/03 Tr. at 52.)

Developing appropriate controls on a going-forward basis, however, will not enable the Debtors to recreate accurate and reliable separate legal entity financial statements on a historical basis for each of the Debtors. (9/15/03 Tr. at 53.) The Debtors do, however, intend to produce reliable, restated financial results on a consolidated basis for the 2000 through 2002 time period and have devoted significant resources toward that end. (9/15/03 Tr. at 38–40 .) The Debtors have made substantial progress on the restatement project. Most of the project teams have detailed action plans and are very close to completing their tasks. (9/15/03 Tr. at 61.) KPMG has been auditing each area of the restatement as it has been concluded. (9/15/03 Tr. at 38, 61.)

(xiii) Benefits of Substantive Consolidation
**\*16** In addition to the fact that the Debtors simply are not able to produce accurate and reliable separate legal entity financial statements on a historical basis, substantive consolidation provides significant benefits to the creditor constituency as a whole.

WorldCom operates in a highly competitive industry. (9/15/03 Tr. at 215–16.) There was substantial consensus among major creditor constituencies that a speedy emergence from chapter 11 was in the best interest of the Debtors and all creditors, a view shared by the Debtor's senior management and professionals. (9/15/03 Tr. at 215–16, 242, 249.)

Absent substantive consolidation, there likely would be massive intercreditor litigation regarding the validity and enforceability of intercompany claims, as well as litigation under chapter 5 of the Bankruptcy Code regarding intercompany pay-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ments and transfers of billion of dollars in assets that occurred in the various restructuring transactions. (9/15/03 Tr. at 225, 254–46.) The costs attendant to litigation of these intercreditor disputes, both in terms of out of pocket transactional costs and the diminution of enterprise value that likely would result from a prolonged stay in chapter 11, would have a material adverse effect on all creditor recoveries and the chances of a successful reorganization. (Transcript of Hearing held on September 16, 2003 ("9/16/03 Tr.") at 74–87.)

C. THE SETTLEMENTS

The Plan incorporates and provides for three compromises and settlements (the "Settlements") under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule(s)") referred to as The Intermedia Settlement, The Bank Settlement and The MCIC Settlement:

• *Intermedia Settlement.* This settlement resolves all issues relating to (a) the validity, enforceability and priority of the Intermedia Intercompany Note (as defined below), including certain claims and causes of action that WorldCom, Inc. may have to avoid the Intermedia Intercompany Note as a fraudulent transfer or to recover payments of principal and interest thereon as preferential transfers and (b) the transfer of certain assets of Intermedia to the WorldCom Debtors (the "Intermedia Settlement"). (9/16/03 Tr. at 81–87; Plan § 5.06; Disclosure Statement at 41–49.) Under the Intermedia Settlement, WorldCom, Inc. will transfer $1,029,000,000 in value,FN8 in the form of notes and stock (the "Intermedia Settlement Consideration"), to Intermedia in complete satisfaction of any claims related to the Intermedia Intercompany Note. (9/16/03 Tr. at 82; Notice of Amendment to Debtors' Second Amended Plan of Reorganization, Docket No. 9004.) Pursuant to the Plan, the Intermedia Settlement Consideration will be distributed to holders of Intermedia Senior Debt Claims (for an estimated recovery of 93.5%), and Intermedia Subordinated Debt Claims (for an estimated recovery of 46.4%).

(Disclosure Statement at 43; Plan §§ 4.11–4.15; Notice of Amendments to Debtors' Second Amended Plan of Reorganization, Docket No. 9004.) In addition, the WorldCom Debtors will fund the distributions under the Plan to holders of allowed Intermedia General Unsecured Claims (for an estimated recovery of 83 .2%). (9/16/03 Tr. at 90, 96.)

FN8. On September 15, 2003, the Debtors announced that, based upon negotiations among representatives of the Intermedia Preferred Stock Interests, the Creditors' Committee and the Debtors, an additional $29 million in cash would be transferred to Intermedia to provide a 5 percent recovery to holders of Intermedia Preferred Stock Interests. As a result, the objection filed by OZ Management, L.L.C. and OZF Management L.P. (together, "Och–Ziff")—a holder of Intermedia Preferred Interests—was withdrawn.

**\*17** • *Bank Settlement.* This is a settlement with the Ad Hoc Bank Committee of all issues relating to (i) the claims of twenty-five institutional lendersFN9 (the "Banks") arising under (a) the $2.65 billion 364–day revolving credit facility dated as of June 8, 2001 (the "364–Day Facility"), between WorldCom, Inc., as borrower, and the Banks, as lenders and (b) the $1.6 billion revolving credit facility (the "Revolving Credit Facility"), dated as of June 8, 2001, between WorldCom, Inc., as borrower and certain of the Banks, as lenders and (ii) any and all causes of action that the Banks have against the Debtors, the Reorganized Debtors, or any of their respective current or former officers or directors relating to or arising from the 364–Day Facility and the Revolving Credit Facility, including without limitation, the Constructive Trust Action and the Maryland Action (as defined below) (the "Bank Settlement"). Pursuant to the Bank Settlement, under the Plan, the Banks (whose claims are classified in Class 3A) will receive a pro rata share of New

Notes of the reorganized Debtors in the aggregate principal amount of $75,000,000. Distribution of the New Notes pursuant to the Bank Settlement is contingent upon the Banks dismissing the Constructive Trust Action and obtaining from the Banks party to the Maryland Action (the "MD Banks") a dismissal with prejudice of the Maryland Action.FN10

> FN9. The institutional lenders include ABN Amro Bank, N.V., Allfirst Bank, Arab Bank PLC, Banca de Roma S.P.A., Banco Bilbao Vizcaya Argentaria, S.A., The Bank of Nova Scotia, The Bank of Tokyo–Mitsubishi, Ltd., New York Branch, Bank One, NA, Bayerische Landesbank, New York Branch, BNP Paribas, Deutsche Bank AG, New York Branch, Fleet National Bank, Fortis Capital Corp., The Governor & Company of the Bank of Scotland, Lloyds TSB Bank PLC, Mizuho Corporate Bank, Ltd., Norddeutsche Landesbank Girozentrale, New York Branch, The Royal Bank of Scotland PLC, New York Branch, UFJ Bank Limited, New York Branch, Wells Fargo Bank, National Association, Westdeutsche Landesbank Girozentrale, New York Branch and Westpac Banking Corporation.

> FN10. The Banks have agreed to pay to the MD Banks approximately $15 million in order to obtain the dismissal of the Maryland Action. First Supplement at 2.

• *MCIC Settlement.* This is a settlement with the Ad Hoc Committee of MCIC Noteholders of all issues relating to the defenses of the holders of Senior MCIC Notes to the substantive consolidation of the WorldCom Debtors (the "MCIC Settlement"). Pursuant to the MCIC Settlement, the holders of MCIC Senior Debt Claims will receive a recovery under the Plan on the principal amount of their outstanding claims equal to 80 cents on the dollar, (9/15/03 Tr. at 216–27; Plan § 5.06(c)), which recovery is reduced to 79.2%

after giving effect to additional proposed settlements reached in these cases. (Second Amended Plan, Docket No. 8900.)

(9/15/03 Tr. at 213–15; Disclosure Statement, at 41–49; Supplement to Disclosure Statement, at 1–4.)

The Settlements embodied in the Plan reflect the culmination of extensive, good faith arm's length negotiations with the Covered Parties, the major economic parties in interest, and are based upon analyses of the issues undertaken by the Debtors' and the Creditors' Committee's professionals and analysts, and by the professionals for other parties in interest. (9/15/03 Tr., testimony of Frank Savage.)

(i) The Intermedia Settlement

On July 1, 2001, WorldCom, Inc. consummated the acquisition (the "Intermedia Merger") of Intermedia Communications, Inc. ("Intermedia"). ( *See* Debtors' Exs. 304–06.) WorldCom, Inc. acquired Intermedia for approximately $12 billion in value, including cash, a note, stock and the assumption of long-term debt, pursuant to the merger of a wholly-owned subsidiary of WorldCom, Inc. with and into Intermedia. (*See* Debtors' Exs. 304–06 and 318.)

**\*18** In connection with the Intermedia Merger, stockholders of Intermedia received one share of WorldCom group stock (57.1 million WorldCom group shares in the aggregate) and 1/25th of a share of MCI group stock (or 2.3 million MCI group shares in the aggregate) for each share of Intermedia common stock they owned. Holders of Intermedia preferred stock, other than Intermedia's 13.5% Series B Redeemable Exchangeable Preferred Stock due 2009, received in exchange for their Series B securities one share of a class or series of WorldCom, Inc. preferred stock, having terms substantially identical to the exchanged Series B securities. (*See* Debtors' Exs. 304–06 and 318.)

To consummate the Intermedia Merger, WorldCom, Inc. created and capitalized Wildcat Acquisi-

tion Corp. ("Wildcat"), a wholly-owned subsidiary of WorldCom, Inc. Specifically, WorldCom, Inc. issued to WildCat a note, due June 15, 2009 in the aggregate principal amount of $7,074,929,250, bearing interest at the rate of 7.69% per annum, payable semiannually (the "Intermedia Intercompany Note") and paid to Wildcat $70,750 in cash in exchange for shares of Wildcat Junior Preferred Stock, par value $1.00 per share, having an aggregate liquidation preference of $7,075,000,000. Pursuant to the merger agreement, Wildcat was then merged with and into Intermedia, resulting in (i) the shares of Wildcat Junior Preferred Stock becoming shares of Intermedia Junior Preferred Stock and (ii) the transfer of the cash and Intermedia Intercompany Note to Intermedia. (*See* Debtors' Exs. 304–06 and 309.)

The issuance and transfer of the Intermedia Intercompany Note enabled Intermedia to remain in compliance with the indenture covenants contained in its outstanding bond debt, including certain capitalization requirements (Creditors' Committee's Ex. 4.)

Following the Intermedia Merger and until the Commencement Date, WorldCom, Inc. recorded up to $1,390,000,000 in prepayments on the Intermedia Intercompany Note and Intermedia recorded approximately $434,592,000 in interest payments. (Transcript of hearing held on September 16, 2003 ("9/16/03 Tr.") at 75–77; Creditors' Committee's Ex. 4.) These payments were allocated to various debt redemptions of Intermedia and for general corporate purposes, including funding of the Digex, Inc. business plan. Most of these payments were made in installments within the one year preceding the Commencement Date. (Creditors' Committee's Ex. 4.)

As of the Commencement Date, approximately $5.6 billion was outstanding under the Intermedia Intercompany Note. (Creditors' Committee's Ex. 4; 9/16/03 Tr. at 81.) During the Chapter 11 Cases, the Debtors reviewed the Intermedia Intercompany Note, the circumstances under which it arose, and

the prepetition payments recorded. Based upon this review, the Debtors determined that WorldCom, Inc. may be able to assert fraudulent conveyance or preference theories to void the Intermedia Intercompany Note, recover the prepetition payments, or reduce the amounts owed by WorldCom, Inc. to Intermedia thereunder. (9/16/03 Tr. at 81, 87.)

**\*19** When the Debtors shared their views with the interested constituents, the Ad Hoc Committee of WorldCom Noteholders supported the Debtors' arguments. Certain significant Intermedia investors—the Ad Hoc Committee of Intermedia Noteholders and the Matlin Patterson Investors—disputed these contentions as well as the amount of the prepayments by WorldCom, Inc., whether the prepayments in fact were made, and if made, the purposes for which they were used. (9/16/03 Tr. at 84–86.)

The Intermedia Intercompany Note is an asset of the Intermedia estate. The validity and enforceability of the Intermedia Intercompany Note would greatly impact the recovery to Intermedia creditors as the remaining assets of Intermedia do not have significant value. (*See* Ex. C to Disclosure Statement.)

Litigation of the issues surrounding the Intermedia Note—including fraudulent transfer and preference theories, would require complex factual and legal determinations of, among other things, solvency, valuation and the proper application of section 502(d) of the Bankruptcy Code, implicating extensive discovery, expert witness investigations, and a lengthy multifaceted trial, with a risk for the Debtors of a potential for a loss on all issues. (9/16/03 Tr. at 74–87.)

Although the Debtors' restated consolidated balance sheets for year-end 2001 show that the WorldCom Debtors were insolvent based on book values calculated on a GAAP basis, given the ongoing financial restatement process, the Debtors did not during the Chapter 11 Cases, and were not in a position to, undertake a traditional fraudulent trans-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

fer solvency analysis or even determine solvency on a book value basis with respect to WorldCom, Inc. as of July 1, 2001. (9/16/03 Tr. at 209–13.)

Although Intermedia's restated financial consolidated statements for year-end 2002 show that the Intermedia Debtors were insolvent on a consolidated basis based on book values calculated on a GAAP basis, they do not resolve the question of Intermedia's insolvency on the date of the Intermedia Merger. (9/16/03 Tr. at 213–15.)

In the absence of a consensual resolution of the Intermedia Intercompany Note issues, the Debtors' ability to propose a consensual chapter 11 plan would have been diminished significantly. Protracted litigation and the delay in the reorganization process would adversely affect asset values and the amounts available for distribution to all creditors. (9/16/03 Tr. at 74–87.)

The present benefits of settling these issues for an amount less than the full face amount of the Intermedia Intercompany Note far out weigh any benefit that may accrue from an extended and protracted litigation. By settling all issues surrounding the Intermedia Intercompany Note, the Debtors weighed their relative risks of litigation and the benefits of settling, including, but not limited to, their ability to emerge from chapter 11 quickly and the benefit to their chapter 11 estates. (9/16/03 Tr. at 86–92.)

The Debtors and the Creditors' Committee, with the assistance of their respective counsel and financial advisors, have carefully evaluated all aspects of the Intermedia Settlement (including exploration of alternatives to the settlement) and determined that the Intermedia Settlement is fair and reasonable. (9/16/03 Tr. at 89–91.)

**\*20** The $1,029,000,000 to be distributed in satisfaction of the Intermedia Note is a fair compromise of the issues surrounding the Intermedia Intercompany Note.[FN11] It represents approximately one-half of the recovery that would have been

realized by the Intermedia estate if the validity and enforceability of the Intermedia Intercompany Note were entirely upheld by a final judicial determination of the issues. (9/16/03 Tr. at 89.) Such an analysis does not even take into account potential recoveries of alleged preferential transfers. (9/16/03 Tr. at 81, 82.)

> FN11. The total consideration was increased by $29,000,000 as a consequence of the Intermedia Preferred Settlement.

The Intermedia Settlement is the result of extensive, good-faith arm's length negotiations among the Covered Parties over a period of forty-five to sixty days. (9/16/03 Tr. at 77–80, 87, 92.) Absent the Intermedia Settlement, it is likely that the Ad Hoc Committee of Intermedia Noteholders and the Intermedia Preferred Shareholders would oppose the Plan. Such a result would likely unduly delay confirmation of the Plan, and reduce recoveries to creditors.

Pursuant to the Objection to Confirmation of WorldCom's Plan of Reorganization, dated July 30, 2003, filed by Dr. Seymour Licht, as supplemented (the "Licht Objection"), Dr. Licht has interposed an objection to the Intermedia Settlement. Philip S. Braunstein joined in Dr. Licht's objection. Dr. Licht and Mr. Braunstein assert claims against WorldCom, Inc. (Licht Obj. at 1; Braunstein Obj. at 1.) Dr. Licht and Mr. Braunstein's claims are classified in Class 5 (WorldCom Senior Note Claims) under the Plan. Dr. Licht and Mr. Braunstein do not assert any claims against any Intermedia Debtors.

The Intermedia Settlement is supported by the Creditors' Committee. (Memorandum of Law of Creditors' Committee in Support of Confirmation, Docket No. 8648.) Class 5, which includes Dr. Licht's and Mr. Braunstein's WorldCom Senior Note Claims voted overwhelmingly in amount and number to accept the Plan. (Debtors' Ex. 302.)

(ii) The Bank Settlement
On May 16, 2002, WorldCom, Inc. drew on its

revolving credit facility (the "Credit Facility") in advance of its expiration and converted the $2.65 billion borrowing into a term loan, thereby extending the repayment period to June 7, 2003. (*See* Debtors' Ex. 276 ¶¶ 39–51.) On June 25, 2002, the Company issued a press release stating that certain of its historical transactions were not made in accordance GAAP, requiring a restatement of its earnings. (*See* Debtors' Ex. 276 ¶ 57.)

On July 12, 2002, the Banks commenced an action against WorldCom, Inc. in the Supreme Court for the State of New York, County of New York (the "Constructive Trust Action"), seeking damages of approximately $2,500,000,000. (*See* Debtors' Ex. 276.) The Constructive Trust Action relates to the 364–Day Facility, pursuant to which twenty-seven lenders (including the Banks) established the Credit Facility to enable WorldCom, Inc. to borrow, repay and reborrow monies up to a maximum amount outstanding of $2.65 billion. (*See* Debtors' Ex. 276 ¶ 32.)

**\*21** Each lender's obligation to lend its portion of the total amount of the Credit Facility was subject to WorldCom, Inc.'s making and abiding by certain terms, conditions, representations, warranties and covenants contained in the governing credit agreement and in compliance certificates and other documents to be provided by WorldCom, Inc. to the lenders pursuant to the credit agreement. (*See* Debtors' Ex. 276 ¶ 33.)

The Banks alleged that WorldCom, Inc. procured funding under the Credit Facility based upon fraudulent representations concerning, *inter alia,* the accuracy of WorldCom, Inc.'s financial statements. Specifically, the Banks alleged that WorldCom, Inc. represented that its then-current financials were prepared in accordance with GAAP, and that on this basis, the Banks and the other lenders funded the Credit Facility. (Debtors' Ex. 276.)

The Banks' complaint in the Constructive Trust Action requested the imposition of a constructive trust over, and payment of damages equal to, the

proceeds of the Credit Facility, that is, approximately $2,650,000,000. The Banks immediately sought a temporary restraining order, preventing WorldCom, Inc. from "transferring, using, concealing or otherwise dissipating" the approximately $2,650,000,000 drawn down by WorldCom, Inc. thereunder. (*See* Debtors' Ex. 276.)

The New York Supreme Court rejected the Banks' request for a temporary restraining order, stating that the Banks, as creditors, were not entitled to priority over other creditors, and expressing concern that the cash lent to WorldCom, Inc. under the Credit Facility may have been "commingled" with other cash proceeds. However, that court made no final determination. (Debtors' Ex. 278.)

The Constructive Trust Action was removed to the United States District Court for the Southern District of New York, after which the Debtors and the Banks entered into a stipulation, which provided that the parties would not take any steps to prosecute or defend the Constructive Trust Action for a period of 70 days from July 18, 2002. In addition, WorldCom, Inc. agreed not to transfer or dissipate any stock of its subsidiaries, or any claims it may have against its subsidiaries for a period of 80 days from July 18, 2002. (*See* Debtors' Ex. 281.)

The Constructive Trust Action was thereafter stayed as a result of the commencement of World-Com's chapter 11 case. 11 U.S.C. § 362(a). The Banks did not move this Court to modify the stay to proceed with the Constructive Trust Action. However, on August 7, 2002, certain Banks filed a Complaint in the Circuit Court for Montgomery County, Maryland (the "Maryland Action") against WorldCom, Inc.'s then-Senior Vice President and Treasurer, seeking $2,150,000,000 in damages for alleged acts of negligence and negligent misrepresentation allegedly committed in her capacity as an officer of WorldCom, Inc. The Banks alleged that the truthfulness, accuracy, and correctness of the representations made in connection with the draw-down of the Credit Facility were affirmed by the

treasurer. The Debtors sought and received a stay of the Maryland Action from this Court. (*See* Debtors' Ex. 277.)

**\*22** Beginning prior to April 19, 2003 and continuing extensively thereafter, the Debtors conducted negotiations with the Banks in an effort to settle the Constructive Trust Action and the Maryland Action, and to resolve all causes of action against the Debtors, or any of their respective current or former officers or directors relating to or arising from the 364–Day Facility and the Credit Facility, and the funding of any amounts thereunder. (9/15/03 Tr. at 227–31.)

The Banks contended that the lowest intermediate balance to which its trust could attach was between $150,000,000 and $250,000,000, while the Debtors asserted that a constructive trust would be denied. The agreement to resolve the Constructive Trust Action and the Maryland Action for $75 million in New Notes (an incremental recovery to the Banks of $48 million) was the result of a negotiation between those two positions. It represents less than half the amount the Banks would receive if they succeeded in the Constructive Trust Action. (9/15/03 Tr. at 227–31.)

The distribution of New Notes pursuant to the Bank Settlement will reduce, dollar for dollar, the unsecured portion of the aggregate amount of any claims by the Banks. As a result, the Banks' overall recovery under the Plan is increased by approximately $48 million. (Plan §§ 1.12, 1.13, 4.04.) No party in interest objected to the Bank Settlement. FN12

FN12. Wells Fargo Bank has filed an objection to the Plan. The Debtors and Wells Fargo have stipulated to adjudicate that objection in the context of the claims objection process Wells Fargo, however, preserved its right to, and in fact did, object to Debtors' settlement with the Intermedia Preferred Shareholders.

The Bank Settlement is the result of extensive, good-faith arm's-length negotiations. (9/15/03 Tr. at 229–30.) Absent the Bank Settlement, the complexity, cost and delay of litigation to address the issues resolved by the Bank Settlement would be substantial. The Debtors and the Creditors' Committee, with the assistance of their respective counsel and financial advisors, have carefully evaluated all aspects of the Bank Settlement (including exploration of alternatives to the settlement) and determined that the Bank Settlement is fair and reasonable. (9/15/03 Tr. at 230–31.)

Absent the Bank Settlement, it is likely that the Banks would oppose the Plan. Such a result would likely unduly delay confirmation of the Plan and reduce recoveries to creditors.

(iii) The MCIC Settlement

In September 1998, WorldCom, Inc. completed a $40 billion acquisition of MCIC and its affiliates (collectively with MCIC, "MCI") pursuant to the merger of MCIC with and into a wholly-owned subsidiary of WorldCom, Inc. (Debtors' Exs. 235, 226.)

Several series of public notes issued by MCIC prior to the merger (the MCIC Senior Notes and the MCIC Subordinated Notes) were unaffected by the Merger. The MCIC Senior Notes represent MCIC Senior Debt Claims (Class 9 under the Plan) arising under the (i) senior debt indenture, dated October 15, 1989, between MCIC and the MCIC Senior Notes Indenture Trustee, which provided for the issuance of the 7–1/2% Senior Notes due August 20, 2004; 8–1/4% Senior Debentures dues January 20, 2023; 7–3/4% Senior Debentures due March 15, 2024; and 7–3/4% Senior Debentures due March 23, 2025 and (ii) the senior debt indenture, dated February 17, 1995, between MCIC and the MCIC Senior Notes Indenture Trustee, which provided for the issuance of the 6.95% Senior Notes due August 15, 2006; 6–1/2% Senior Notes due April 15, 2010; and 7.125% Debentures due June 15, 2027. (*See* Plan §§ 1.64, 1.65.)

**\*23** At the inception of the Debtors' Chapter 11 Cases, an informal committee of holders of MCIC Senior Notes (the "Ad Hoc Committee of MCIC Senior Noteholders") contended that the WorldCom Debtors should not be substantively consolidated with the MCI Debtors. (9/15/03 Tr. at 216–28.)

During the course of the cases, the Debtors determined that a settlement with the MCI Senior Noteholders was appropriate and of benefit to the estate in light of their particular arguments with respect to substantive consolidation and the Debtors' objective to achieve a consensus among major classes of creditors. The MCIC Settlement enabled the Debtors to propose a plan of reorganization supported by the Creditors' Committee and the representatives of 90% of the debt of the consolidated enterprise. (9/15/03 Tr. at 220–25.)

After extensive negotiation, the Debtors, the Creditors' Committee, the Ad Hoc Committee of WorldCom Noteholders, the Matlin Patterson Investors and the Ad Hoc Committee of MCIC Senior Noteholders agreed to the MCIC Settlement, pursuant to which holders of MCIC Senior Debt Claims would receive a recovery, in New Notes, of 80% of the principal amount of their debt.[FN13] (9/15/03 Tr. at 216–27.)

FN13. As a result of the subsequent settlement with the Ad Hoc MCI Trade Claims Committee, this recovery is reduced to 79.2%.

In agreeing to the settlement, the Debtors considered the effect of the contractual subordination provision contained in the governing indentures and the resulting "roll-up" to the holders of the MCIC Senior Debt Claims of any recovery that holders of MCIC Subordinated Debt Claims would receive. Analytically, the MCIC Settlement represented a distribution pursuant to the Plan to all MCIC bondholders (including the holders of MCIC Subordinated Debt Claims) of approximately 62 cents per dollar on account of their claims, with the holders of the MCIC Senior Debt Claims receiving the be-

nefit of the distribution that would have been payable to the holders of the MCIC Subordinated Debt Claims, absent their indentures' governing subordination provisions. (Disclosure Statement at 47.)[FN14]

FN14. Since the initial settlement, the parties agreed to a recovery to holders of MCIC Subordinated Debt Claims of approximately 44%.

The holders of the MCIC Senior Debt Claims asserted that absent substantive consolidation, they were entitled to payment in full of their claims, including pre- and post-petition interest, equaling roughly 113% of their principal amount due. The Debtors and the Ad Hoc Committee of WorldCom Noteholders asserted that under a substantive consolidation plan, the MCIC Senior Debt Claims were only entitled to a 35% recovery. (Disclosure Statement at 47.)

The MCIC Settlement was the result of extensive, good faith arm's-length negotiations among the Covered Parties that took place over four or five months. (9/15/03 Tr. at 217, 221.) The MCIC Senior Debt Claims are an entire class under the Plan. (Plan § 4.10.) Absent the MCIC Settlement, the complexity, cost and delay of litigation to address the issues resolved by such settlement would be substantial.

The Debtors and the Creditors' Committee, with the assistance of their respective counsel and financial advisors, have carefully evaluated all aspects of the MCIC Settlement (including exploration of alternatives to the settlement) and determined that the MCIC Settlement is fair and reasonable. (9/15/03 Tr. at 223–26.) Absent the MCIC Settlement, there would not have been a consensual plan. The MCIC Senior Noteholders asserted that they would have rejected the Plan and would have opposed it. Such a result would have significantly complicated and delayed any confirmation hearing and potentially reduced recoveries to creditors.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

## D. SECTION 1129 OF THE BANKRUPTCY CODE

(i) 1129(a)(1)

**\*24** The Debtors are the proponents of the Plan. (Debtors' Ex. 335.)

The reliance by creditors upon the creditworthiness of MCIC or any of its subsidiaries in extending credit to an MCIC entity prior to the Merger is distinct from the reliance by creditors upon the creditworthiness of the Debtors (including MCIC and its subsidiaries after the Merger) in extending credit to a Debtor following the Merger. The Plan separately classifies WorldCom General Unsecured Claims and MCI Pre-merger Claims based upon the unique reliance and prejudice arguments that have been asserted by holders of MCI Pre-merger Claims that extended credit to an MCIC entity prior to the Merger. The Claims of the Ad Hoc MCI Trade Claims Committee Claims in Class 6B are separately classified solely for voting purposes and not for treatment purposes. Claims in Class 6B will receive the same treatment as Claims in Class 6.

The Debtors separately classified the MCIC Senior Debt Claims and MCIC Subordinated Debt Claims based upon the contractual subordination provisions in the MCIC Subordinated Notes Indenture.

Pursuant to the Plan, the subordination provisions in the MCIC Subordinated Notes Indenture will be cancelled on the Effective Date. The cancellation of the subordination provisions on the Effective Date is necessary to protect the holders of MCIC Subordinated Debt Claims from the risk that holders of MCIC Senior Debt Claims would seek to enforce subordination with respect to their recoveries under the Second Amended Plan.

Article II of the Plan provides for the treatment of Administrative Expense Claims and Priority Tax Claims, and Article III of the Plan designates Classes of Claims and Classes of Equity Interests.

Article III of the Plan specifies Class 1 and Class 3 as unimpaired and Classes 2, 3A, 4, 5, 6, 6A, 6B, 7, 8, 9, 10, 11, 12, 13, 14 and 15 as impaired.

Article IV of the Plan specifies the treatment of each impaired Class of Claims and Equity Interests.

The Plan provides the same treatment for each Claim or Equity Interest in a Class.

Pursuant to the July 9 Plan, each holder of an MCIC Senior Debt Claim was entitled to receive New Notes in an amount equal to .80 multiplied by the Allowed principal amount of such holder's MCIC Senior Debt Claim. (Debtors' Ex. 273.) Prior o its modification, holders of Class 9 MCIC Senior Debt Claims voted to accept the July 9 Plan. (Debtors' Ex. 302.) Pursuant to the Plan, each holder of an MCIC Senior Debt Claim is entitled to receive New Notes in an amount equal to .792 multiplied by the Allowed principal amount of such holder's MCIC Senior Debt Claim as a result of their contribution to the Ad Hoc MCI Trade Claims Committee (the "MCI Senior Contribution"). Such reduced recovery was subject to Class 9 having an opportunity to reconsider its prior vote. As set forth in the Sullivan Vote Certification, Class 9 voted overwhelmingly to accept the Plan and make the MCI Senior Contribution. It is, therefore, apparent that the MCI Senior Contribution is not coming from or diminishing the estate, but rather, is coming from and diminishing the previously accepted recovery of the holders of MCIC Senior Debt Claims.

**\*25** Pursuant to the Plan, the Debtors cannot compel the holders of MCIC Subordinated Debt Claims to contribute any of their recovery to the Ad Hoc MCI Trade Claims Committee. Rather, the contribution by the holders of MCIC Subordinated Debt Claims to the Ad Hoc MCI Trade Claims Committee (the "MCI Subordinated Contribution," and together with the MCI Senior Contribution, the "Contributions") was expressly contingent upon the

acceptance of the Plan by Class 10. (Debtors' Exs. 335, 339.) If Class 10 had voted to reject the Plan and the Debtors had crammed down the Plan on the holders of Class 10 Claims, no contribution from Class 10 would have been made or could have been compelled. Class 10 has overwhelmingly voted to accept to the Plan, and thus, to make the MCI Subordinated Contribution to the Ad Hoc MCI Trade Claims Committee. It is, therefore, apparent that the MCI Subordinated Contribution is not coming from or diminishing the estate, but rather, is coming from and diminishing the recovery of the holders of MCIC Subordinated Debt Claims.

If the Contributions were not made, the amounts represented thereby would not inure to the benefit of any WorldCom General Unsecured Claim, but rather would be paid under the Plan and remain available to the Classes contributing the respective amounts. The Contributions do not in any way implicate or diminish the recoveries of Classes 6, 6A and 6B creditors.

Absent the Contributions, the Ad Hoc MCI Trade Claims Committee could pursue its objection to the Plan. Although the Plan contains a condition to effectiveness that the Contributions be made, such condition can be waived.

The Plan provides adequate means for its implementation.

Section 9.03 of the Plan provides that the Certificates of Incorporation and Bylaws for each of the Reorganized Debtors that are corporations shall prohibit the issuance of nonvoting equity securities.

Article IX of the Plan contains provisions with respect to the manner of selection of officers and directors of the Reorganized Debtors that are consistent with the interests of creditors, equity security holders, and public policy.

(ii) 1129(a)(2)

Pursuant to the Disclosure Statement Orders entered after due notice and hearings, the Court ap-

proved the Disclosure Statement, First Supplement, Second Supplement and Third Supplement pursuant to section 1125 of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan. On August 29, 2003 and October 10, 2003, the Vote Certifications were filed on behalf of the Debtors' Court-appointed voting and tabulation agent.

As set forth in the Vote Certifications, the Disclosure Statement and May 23 Plan, the First Supplement and July 9 Plan, the Second Supplement and the Third Supplement and the Plan, together with the additional solicitation materials approved by the Court in the Disclosure Statement Orders, were transmitted to each creditor that was entitled to vote, as well as to other parties in interest in this case. The Debtors did not solicit the acceptance or rejection of the Plan by any creditor prior to the transmission of the Disclosure Statement.

**\*26** Creditors that were not entitled to vote to accept or reject the Plan and equity interest holders (who are deemed to reject the Plan) were provided with certain non-voting materials approved by the Court in compliance with the Disclosure Statement Orders.

Because the Debtors have determined to pay holders of Allowed Secured Tax Claims in Class 2 in cash, in full, plus interest required under section 506(b), Class 2 is unimpaired and Claims in Class 2 are conclusively presumed to have accepted the Plan.

Classes 3A, 4, 5, 9, 10, 11, 12 and 13 of the Plan are impaired and were entitled to vote to accept or reject the Plan. Classes 6 and 6A are impaired and are deemed to have voted to reject the Plan. Class 6B is impaired, however, because the members of the Ad Hoc MCI Trade Claims Committee has already agreed to support the Plan by virtue of a stipulation with the Debtors, among oth-

ers, Class 6B is conclusively presumed to have voted to accept the Plan. (Docket No. 9132.)

The Debtors solicited acceptances or rejections of the Plan from the holders of all Allowed Claims in each Class of impaired claims that are to receive distributions under the Plan and that are otherwise not deemed to reject the Plan.[FN15] Classes 7, 8 and 15 of the Plan will not receive any distributions under the Plan, and therefore, Claims and Equity Interests in such Classes are deemed to have rejected the Plan. Class 14, which is impaired but will receive a distribution under the plan, is deemed to reject the Plan. The Plan has been accepted by creditors holding in excess of two-thirds in amount and one-half in number of the Allowed Claims voted in each of Classes 3A, 4, 5, 9, 10, 11, 12 and 13 of the Plan.

> [FN15.] Prior to the Court's October 20 Ruling requiring the separate classification of the various Class 6 groups, the former Class 6 was solicited as an impaired class and voted to accept the Plan.

(iii) 1129(a)(3)

On June 13, 2003, the Ad Hoc MCI Trade Claims Committee filed a notice of appeal from the Order, dated June 4, 2003, Authorizing the Debtors to Assume as Amended Certain Executory Contracts with Electronic Data Systems Corporation and EDS Information Services LLC (the "EDS Appeal"). (Docket No. 6524.) On July 31, 2003, the Ad Hoc Committee of Dissenting Bondholders filed an objection to the July 9 Plan and a memorandum of law in support thereof (together, the "Dissenting Bondholder Objection"). (Docket Nos. 7938, 7939.) On August 4, 2003, the Ad Hoc MCI Trade Claims Committee filed an objection to the July 9 Plan (the "Trade Claims Committee Objection"). (Docket No. 8033.) The issues raised in the Dissenting Bondholder Objection and the Trade Claims Committee Objection were vigorously disputed by the Debtors. (Docket No. 8650.)

On August 18, 2003, the Ad Hoc Committee of

Dissenting Bondholders and the Ad Hoc MCI Trade Claims Committee each filed a notice of appeal from the Order of the Court, dated August 6, 2003, Approving the Settlement with the Securities and Exchange Commission. (Docket Nos. 8305, 8287.) On September 5, 2003, HSBC Bank USA ("HSBC"), the indenture trustee under the MCIC Subordinated Notes Indenture, also filed a Notice of Appeal from the Final Judgment of the United States District Court for the Southern District of New York approving the settlement with the Securities and Exchange Commission (collectively, the "SEC Appeals," and together with the EDS Appeal, the "Appeals").

**\*27** Prior to the September 8, 2003 Confirmation Hearing, Platinum, Deutsche, and certain other objectors (collectively, the "Pre-merger Objectors") filed objections to the July 9 Plan asserting that they were pre-Merger creditors whose reliance arguments deserved recognition on a basis similar to the MCIC Senior Debt Claims. Prior to the Confirmation Hearing, the Debtors and, among other parties, the Ad Hoc Committee of Dissenting Bondholders, the Ad Hoc MCI Trade Claims Committee and the Pre-merger Objectors engaged in substantial discovery in preparation for such hearing.

The Confirmation Hearing commenced on September 8, 2003 at which time the Court was informed that the Debtors, the Committee, the Ad Hoc Committee of Dissenting Bondholders and the Ad Hoc MCI Trade Claims Committee had been engaged in negotiations and that an opportunity for further discussions could enable the parties to resolve the issues raised in the Dissenting Bondholder Objection and the Trade Claims Committee Objection. (Confirmation Hearing Transcript ("Tr.") at 40 (Sept. 8).) Based upon these representations, the Court adjourned the remainder of the day's hearing to allow the parties to continue negotiations. (9/8/03 Tr. at 41.)

On September 9, 2003, the Court was informed that, following extensive arm's-length, good faith negotiations, agreements had been reached with the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Ad Hoc Committee of Dissenting Bondholders and the Ad Hoc MCI Trade Claims Committee. The Debtors also announced resolutions with the Premerger Objectors on September 9 and 12, 2003. Pursuant to such agreements, (i) the Debtors would further amend the July 9 Plan to embody the Integrated Settlement (as defined in the Debtors' Memorandum Of Law In Support Of Confirmation Of Debtors' Second Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code, Dated September 12, 2003 And In Response To Certain Objections Thereto, dated October 13, 2003), (ii) stipulations with the Ad Hoc Committee of Dissenting Bondholders and Ad Hoc MCI Trade Claims Committee would be entered into by the Debtors, the Committee, and other creditor representatives, and (iii) the Ad Hoc Committee of Dissenting Bondholders and Ad Hoc MCI Trade Claims Committee would withdraw their objections. In addition, (i) the Ad Hoc Committee of Dissenting Bondholders, the Ad Hoc MCI Trade Claims Committee, and HSBC would abate their respective SEC Appeals and (ii) the Ad Hoc MCI Trade Claims Committee would abate the EDS Appeal. (Debtors' Exs. 339, 340.)

The Debtors' prompt emergence from chapter 11 is crucial to the continuing viability of the Debtors' businesses. The modifications to the July 9 Plan eliminate significant litigation surrounding confirmation and eliminate the Appeals, paving the way for the Debtors' expeditious emergence from chapter 11. The agreements embodied in the Plan are effectuated by modifications to the July 9 Plan. The Contributions to the Ad Hoc MCI Trade Claims Committee are outside the scope of the administration of the estates.

**\*28** The Plan is the product of extensive, arm's-length negotiations among the Debtors, the Committee and significant creditor constituencies in an effort to obtain a resolution of the issues in these cases and enable the Debtors to formulate and propose a plan of reorganization that would provide the most value to the Debtors' creditors. (9/15/03

Tr. at 214–58.) The provisions of the Plan were derived based upon analyses of the issues undertaken by the Debtors' and the Committee's professionals and analysts, and by the professionals for other parties in interest. (9/15/03 Tr. testimony of Frank Savage.) The Covered Parties have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code.

The inclusion of the Exculpation Provision and the Obligation to Defend Provision in the Plan was an essential element of the Plan formulation process and negotiations with respect to each of the settlements contained in the Plan. (Docket Nos. 9409, Declaration of Mark A. Neporent ("Neporent Decl.") ¶ 5.) The settlements, in turn, are key components of the nearly fully consensual Plan. (Docket No. 9409, Neporent Decl. ¶ 5.) The inclusion of the Exculpation Provision and the Obligation to Defend Provision in the Plan were vital to the successful negotiation of the terms of the Plan in that without such provisions, the Covered Parties would have been less likely to negotiate the terms of the settlements and the Plan. (Docket No. 9409, Neporent Decl. ¶ 5.)

Each of the Covered Parties bargained for its respective inclusion in the Exculpation Provision and the Obligation to Defend Provision as part of the various compromises that form the basis of the Plan. (Docket No. 9409, Neporent Decl. ¶ 5.) The Covered Parties relied upon the benefits proposed to be provided in the Exculpation Provision and the Obligation to Defend Provision in deciding to support the Plan. (Docket No. 9409, Neporent Decl. ¶ 5 .)

The Debtors do not believe that the Obligation to Defend provision creates material liability or adversely impacts their "fresh start." Entering into the Obligation to Defend provision is a reasonable exercise of the Debtors' business judgment.

(iv) 1129(a)(4)
All payments made or to be made by the Debtors, or by a person issuing securities or acquiring

property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of the Court as reasonable.

(v) 1129(a)(5)

On August 29, 2003 the Debtors disclosed that Michael D. Capellas, Dennis R. Beresford, W. Grant Gregory, Judith Haberkorn, Laurence Harris, Eric Holder, Nicholas deB. Katzenbach, David Matlin and C.B. Rogers, Jr. will comprise the initial Board of Directors of Reorganized WorldCom. The Debtors, in consultation with the Committee, will add up to three additional directors to the Board of Directors of Reorganized WorldCom prior to the Effective Date. The Debtors also disclosed the affiliations of each of the foregoing members of the initial Board of Directors of Reorganized WorldCom. (Debtors' Ex. 303.)

**\*29** On September 5, 2003, the Debtors disclosed that Robert Blakely and Richard R. Roscitt will comprise the initial Board of Directors of each of the other Reorganized Debtors. The Debtors also disclosed the affiliations of each of the foregoing members of the initial Boards of Directors of each of the other Reorganized Debtors. (Docket No. 8650.)

(vi) 1129(a)(6)

The Plan does not provide for rate changes by any of the Reorganized Debtors.

(vii) 1129(a)(7)

In a hypothetical liquidation of the WorldCom Debtors under chapter 7 of the Bankruptcy Code, the estimated liquidation proceeds realized would approximate $6.5 billion. (9/15/03 Tr. at 202; Debtors' Ex. 333.) In that case, general unsecured creditors of the WorldCom Debtors would receive no recovery on account of their Claims and holders of administrative and priority claims would receive approximately a 92 percent recovery on account of their Claims. (9/15/03 Tr. at 203.)

In a hypothetical liquidation of the Intermedia Debtors under chapter 7 of the Bankruptcy Code, the estimated liquidation proceeds realized would approximate $140 million. (9/15/03 Tr. at 203; Debtors Ex. 333.) In that case, general unsecured creditors of the Intermedia Debtors would receive no recovery on account of their Claims and holders of administrative and priority claims would receive approximately a 48.5 percent recovery on account of their Claims. (9/15/03 Tr. at 203.)

In light of the factors established by the Debtors as to substantive consolidation of the WorldCom Debtors and the Intermedia Debtors, the Debtors are not able to provide a separate liquidation analysis for each Debtor.

(viii) 1129(a)(8)

The Plan has been accepted by creditors holding in excess of two-thirds in amount and one-half in number of the Allowed Claims in Classes 3A, 4, 5, 9, 10, 11, 12, and 13 of the Plan. (Debtors' Ex. 338.)

Of the $1,714,120,000 in dollar amount of Ballots received from holders of Bank Settlement Claims eligible to vote in Class 3A, $1,614,120,000 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 94.17% in dollar amount of Bank Settlement Claims voting. Of the 16 Ballots received from holders of Bank Settlement Claims eligible to vote in Class 3A, 15 Ballots were cast to accept the Plan, representing acceptance of the Plan by 93.75% in number of Bank Settlement Claims voting. (Debtors' Ex. 338.)

Of the $24,565,091.14 in dollar amount of Ballots received from holders of Convenience Claims eligible to vote in Class 4, $19,301,067.08 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 78.57% in dollar amount of Convenience Claims voting. Of the 3,413 Ballots received from holders of Convenience Claims eligible to vote in Class 4, 2,748 Ballots were cast to accept the Plan, representing ac-

ceptance of the Plan by 80.52% in number of Convenience Claims voting. (Debtors' Ex. 338.)

**\*30** Of the $18,604,112,613.76 in dollar amount of Ballots received from holders of WorldCom Senior Debt Claims eligible to vote in Class 5, $18,422,495,649.56 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.02% in dollar amount of WorldCom Senior Debt Claims voting. Of the 9,589 Ballots received from holders of WorldCom Senior Debt Claims eligible to vote in Class 5, 9,023 Ballots were cast to accept the Plan, representing acceptance of the Plan by 94.10% in number of WorldCom Senior Debt Claims voting. (Debtors' Ex. 338.)

Of the $1,709,080,191 in dollar amount of Ballots received from holders of MCIC Senior Debt Claims eligible to vote in Class 9, $1,681,044,191 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 98.36% in dollar amount of MCIC Senior Debt Claims voting. Of the 2,017 Ballots received from holders of MCIC Senior Debt Claims eligible to vote in Class 9, 1,914 Ballots were cast to accept the Plan, representing acceptance of the Plan by 94.89% in number of MCIC Senior Debt Claims voting. (Debtors' Ex. 338.)

Of the $398,294,100 in dollar amount of Ballots received from holders of MCIC Subordinated Debt Claims eligible to vote in Class 10, $395,877,925 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.39% in dollar amount of MCIC Subordinated Debt Claims voting. Of the 5,065 Ballots received from holders of MCIC Subordinated Debt Claims eligible to vote in Class 10, 4,900 Ballots were cast to accept the Plan, representing acceptance of the Plan by 96.74% in number of MCIC Subordinated Debt Claims voting. (Debtors' Ex. 338.)

Of the $602,307,815 in dollar amount of Ballots received from holders of Intermedia Senior Debt Claims eligible to vote in Class 11, $599,297,815 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.50% in dollar amount of Intermedia Senior Debt Claims voting. Of the 368 Ballots received from holders of Intermedia Senior Debt Claims eligible to vote in Class 11, 366 Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.46% in number of Intermedia Senior Debt Claims voting. (Debtors' Ex. 338.)

Of the $24,438,900.82 in dollar amount of Ballots received from holders of Intermedia General Unsecured Claims eligible to vote in Class 12, $24,397,826.26 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 99.83% in dollar amount of Intermedia General Unsecured Claims voting. Of the 20 Ballots received from holders of Intermedia General Unsecured Claims eligible to vote in Class 12, 19 Ballots were cast to accept the Plan, representing acceptance of the Plan by 95.00% in number of Intermedia General Unsecured Claims voting. (Debtors' Ex. 338.)

Of the $164,300,000 in dollar amount of Ballots received from holders of Intermedia Subordinated Debt Claims eligible to vote in Class 13, $164,300,000 in dollar amount of Ballots were cast to accept the Plan, representing acceptance of the Plan by 100% in dollar amount of Intermedia Subordinated Debt Claims voting. Of the 35 Ballots received from holders of Intermedia Subordinated Debt Claims eligible to vote in Class 13, 35 Ballots were cast to accept the Plan, representing acceptance of the Plan by 100% in number of Intermedia Subordinated Debt Claims voting. (Debtors' Ex. 338.)[FN16]

FN16. Prior to the October 20 Ruling requiring separate classification of the former Class 6, of the $642,039,986.96 in dollar amount of Ballots received from holders of WorldCom General Unsecured Claims eligible to vote in Class 6, $544,663,538.61 in dollar amount of Bal-

lots were cast to accept the Plan, representing acceptance of the Plan by 84.83% in dollar amount of WorldCom General Unsecured Claims voting. Of the 773 Ballots received from holders of WorldCom General Unsecured Claims eligible to vote in Class 6, 620 Ballots were cast to accept the Plan, representing acceptance of the Plan by 80.21% in number of WorldCom General Unsecured Claims voting. (Debtors' Ex. 338). Pursuant to the Court's October 20 Ruling, separate classes were formed for the former members of Class 6 and the Debtors elected not to re-solicit votes. Rather, the newly constituted Classes 6, and 6A are deemed to reject the Plan and the Debtors are seeking confirmation of the Plan pursuant to section 1129(b)(1) of the Bankruptcy Code. Class 6B is deemed to accept the Plan in connection with a stipulation reached with Debtors, among others, to support the Plan.

(ix) 1129(a)(9)

**\*31** Except to the extent that the holder of an Allowed Claim of a kind specified in section 507(a)(1) of the Bankruptcy Code has agreed to less favorable treatment, the Plan provides that on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable, the holder of such Claim will receive on account of such Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided, however,* that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, or liabilities arising under loans or advances to or other obligations incurred by the Debtors, shall be paid in full and performed by the Reorganized Debtors in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Section 4.01 of the Plan provides that on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable, each holder of an Allowed Other Priority Claim will receive on account of such Claim Cash in the Allowed amount of such Claim.

Except to the extent that the holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or has agreed to a different treatment of such Claim, the Plan provides that each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable or upon such other terms agreed to by the parties or determined by the Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

(x) 1129(a)(11)

The Debtors have prepared a three-year business plan and a consolidated financial forecast for the three-year period ending December 31, 2005. (Debtors' Ex. 273.) The Debtors' financial forecast reflects the anticipated financial performance of the Debtors with a properly capitalized balance sheet. (9/15/03 Tr. at 188–94.) The Debtors' financial forecast projects earnings before interest, taxes, depreciation, and amortization ranging from $2.67 billion in 2003 to $4.07 billion in 2005. The forecast further projects total net income ranging from $535 million in 2003 to $1.19 billion in 2005. (9/15/03 Tr. at 192; Debtors Ex. 332.) The Debtors' financial projections appear reasonable and achievable. (9/15/03 Tr. at 192.)

The Debtors will emerge from chapter 11 with no more than approximately $5.665 billion in debt. (Debtors' Ex. 335.) Based upon the Debtors' financial forecast, the Reorganized Debtors will be able

to service this debt level. (9/15/03 Tr. at 192.)

**\*32** No parties in interest have questioned the Debtors' three-year business plan or consolidated financial forecast, or challenged the feasibility of the Plan. No creditor has prosecuted an objection to the Plan on the basis that the Plan is likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors.

(xi) 1129(b)

Acknowledgement of intercreditor contractual subordination provisions and prejudice to holders of (i) MCIC Senior Debt Claims, (ii) MCIC Subordinated Debt Claims, and (iii) MCI Pre-merger Claims resulting from the substantive consolidation of the WorldCom Debtors is a valid business justification and reasonable basis for the disparate treatment of MCIC Senior Debt Claims, MCIC Subordinated Debt Claims, MCI Pre-merger Claims (to the extent treatment of MCI Pre-merger Claims would be deemed disparate from WorldCom General Unsecured Claims), and WorldCom General Unsecured Claims (all of which are unsecured claims against the substantively consolidated WorldCom Debtors).

The holders of Class 6 WorldCom General Unsecured Claims hold Claims against the WorldCom Debtors generally arising from transactions with WorldCom Debtors following the Merger or from transactions with WorldCom, Inc. or its subsidiaries prior to the Merger.

None of the Claims classified in Class 5 or Class 6 arises from a transaction with an MCIC entity that both predated the Merger and evidenced the reliance by the holder of such Claim on the independent creditworthiness of a pre-Merger MCIC entity.

Classes 5 and 6 are similarly situated both legally, as general unsecured Claims against the Debtors' estates, and equitably, as Claims that do not represent the holders' reliance on a pre-Merger MCIC entity.

In extending credit to the Debtors, holders of Claims in Classes 6A, 9 and 10 relied on the credit of an MCI entity prior to the Merger and, in the case of MCIC Senior Debt Claims and MCIC Subordinated Debt Claims, relied on offering memoranda and prospectuses issued by MCIC.

In formulating the Plan, the Debtors, the Committee, and various creditor constituencies negotiated a series of formal and informal settlements resulting in the structure of the proposed plan of reorganization—a structure already overwhelmingly approved by creditors voting in favor of the September 12 Plan—which provides for distribution premiums for pre-Merger MCI creditors in respect of the asserted prejudice relating to the substantive consolidation of the WorldCom Debtors.

The Plan is premised upon the substantive consolidation of the Debtors' estates and a series of settlements, including the MCIC Senior Debt Claims settlement and the Integrated Settlement, that address the asserted prejudices to pre-merger creditors of MCIC entities that would result therefrom.

As the record in these Chapter 11 Cases shows, the Debtors would be mired in litigation for an indefinite period of time if substantive consolidation were contested and, undoubtedly, appealed. Resolution of these disputes by virtue of the differing treatment of differently situated classes of unsecured creditors, as provided in the Plan, avoids potentially massive and protracted litigation over the following issues: the precise allocation of assets and liabilities among entities; the enforceability or validity of different types of intercompany claims; the amount of intercompany claims; which Debtor is liable on each of the thousands of claims for which proofs of claim were filed against multiple Debtors; and whether there were fraudulent or otherwise voidable transfers made.

**\*33** Resolution of such disputes also eliminates the need for a complex solvency analyses of multiple Debtors, which cannot produce reliable separate financial statements.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The delay caused by such protracted litigation of multiple issues would undoubtedly require the Debtors to remain in chapter 11 for an indeterminable amount of time, causing irreparable harm and threatening the very reorganization of the Debtors that chapter 11 is designed to promote.

The degree of discrimination regarding Class 6 is in direct proportion to its rationale.

The Debtors' evidence has demonstrated the reasonableness and good faith of the 80.0% recovery by Class 9 MCIC Senior Debt Claims represented by the MCIC Senior Debt Clams settlement. (9/15/03 Tr. at 217, 221, 223–26.) The treatments afforded Class 6A MCI Pre-merger Claims and Class 10 MCIC Subordinated Claims are based upon the relative and similar reliance and prejudice arguments of the holders of such Claims.

The Debtors' determination to provide additional recovery to the holders of Class 6A Claims compared to Class 6 Claims is consistent with the distributions afforded holders of Class 9 MCIC Senior Debt Claims and Class 10 MCIC Subordinated Debt Claims and the rationale therefore.

Holders of Class 6A MCI Pre-merger Claims hold General Unsecured Claims arising from pre-Merger transactions or series of transactions in which they relied on the separate creditworthiness of a pre-Merger MCIC entity.

The enhanced recovery provided to the holders of Class 6A MCI Pre-merger Claims is a component of the Integrated Settlement among the Debtors, the Committee, the Ad Hoc Committee of Dissenting Bondholders, and the Ad Hoc MCI Trade Claims Committee.

Prior to the formulation of the Integrated Settlement, various parties asserted that providing pre-Merger trade creditors and post-Merger trade creditors with the same distribution ignored the reliance and prejudice arguments of the holders of MCI Pre-merger Claims and was inconsistent with the prin-

ciples underlying the settlement with the holders of MCIC Senior Debt Claims. (Docket No. 8038 Platinum Partners Value Arbitrage Fund L.P.'s Objection to Confirmation of the Debtors' Amended Joint Plan of Reorganization and Joinder in the Ad Hoc MCI Trade Claims Committee's Objection to Debtors' Joint Plan of Reorganization; Docket No. 7709 Objection of Deutsche Bank Securities Inc. to Confirmation of the Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code). The enhanced treatment afforded holders of Class 6A MCI Pre-merger Claims resulted from the Debtors' good-faith negotiations with these holders, the recognition of the merits of their arguments, and consideration of the relativity of their recoveries to the recoveries by the holders of Class 9 and Class 10 Claims.

Recognizing the reasonableness of the distribution of 80% to the holders of MCIC Senior Debt Claims, the parties who negotiated the Integrated Settlement agreed that the respective recoveries of 60% and approximately 47% by Classes 6A and 10, respectively, reflected the relative legal rights of such holders compared to Class 9 MCIC Senior Debt Claims as well as the other Classes of unsecured claims.

**\*34** By virtue of the different contractual rights and reliance and prejudice arguments of the holders of MCIC Senior Debt Claims and MCIC Subordinated Debt Claims, discrimination among pre-Merger creditors is warranted.

The degree of discrimination regarding Class 6A is in direct proportion to its rationale.

All classes of preferred Equity Interests in the Intermedia Debtors are receiving the same treatment under the Plan.

All classes of common Equity Interests in the WorldCom Debtors are receiving the same treatment under the Plan.

All classes of common Equity Interests in the

Intermedia Debtors are receiving the same treatment under the Plan.

No holder of a Claim or Equity Interest that is junior to MCIC Subordinated Debt Claims will receive or retain any property under the Plan on account of such junior Claim or Equity Interest.

Under the Plan, the only Claims against, and Equity Interests in, the Debtors that are junior to the Claims in Classes 6 and 6A are the Claims in Class 7 (WorldCom Subordinated Claims) and the Equity Interests in Class 8 (WorldCom Equity Interests).

No holder of a Claim or Equity Interest that is junior to WorldCom General Unsecured Claims will receive or retain any property under the Plan on account of such junior Claim or Equity Interest.

No holder of a Claim or Equity Interest that is junior to MCI Pre-merger Claims will receive or retain any property under the Plan on account of such junior Claim or Equity Interest

No holder of a Claim or Equity Interest that is junior to WorldCom Subordinated Claims will receive or retain any property on account of such junior Claim or Equity Interest.

No holder of an Equity Interest that is junior to Intermedia Preferred Stock will receive or retain any property under the Plan on account of such junior Equity Interest.

No holder of an Equity Interest that is junior to WorldCom Equity Interests will receive or retain any property under the Plan on account of such junior Equity Interest.

No holder of an Equity Interest that is junior to Intermedia Equity Interests will receive or retain any property under the Plan on account of such junior Equity Interest.

## II. CONCLUSIONS OF LAW
## A. SUBSTANTIVE CONSOLIDATION

Bankruptcy courts have the general equitable power to order substantive consolidation. *See, e.g., Fed. Deposit Ins. Corp. v. Colonial Realty Co.,* 966 F.2d 57, 59 (2d Cir.1992) (authority for substantive consolidation comes from the bankruptcy court's general equitable powers under § 105 of the Bankruptcy Code); *In re Continental Vending Mach. Corp.,* 517 F.2d 997, 1000 (2d Cir.1975) (noting power to consolidate comes from equity); *In re Leslie Fay Cos.,* 207 B.R. 764, 779 (Bankr.S.D.N.Y.1997) ("Substantive consolidation derives from the bankruptcy court's general equitable powers provided in section 105(a) of the Bankruptcy Code."); *Moran v. Hong Kong & Shanghai Banking Corp. ( In re Deltacorp, Inc.),* 179 B.R. 773, 777 (Bankr.S.D.N.Y.1995) (same); *In re Richton Int'l Corp.,* 12 B.R. 555, 557 (Bankr.S.D.N.Y.1981) (same), 2 COLLIER ON BANKRUPTCY ¶ 105.09[1][6], at 105–85 (L. King 15th rev. ed.2002) ("the authority of a bankruptcy court to order substantive consolidation derives from its general discretionary equitable powers").

**\*35** The Bankruptcy Code itself contemplates that substantive consolidation may be used to effectuate a plan of reorganization. Section 1123(a) provides, in relevant part:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall -

....

(5) provide adequate means for the plan's implementation, such as -

....

(C) merger or consolidation of the debtor with one or more persons....

11 U.S.C. § 1123(a)(5)(C); *In re Stone & Webster, Inc.,* 286 B.R. 532, 540–41 (Bankr.D.Del.2002) (noting that substantive consolidation is contemplated by section 1123(a)(5) of the Bankruptcy Code); 11 U.S.C. § 105(a) ("The court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

Substantive consolidation has the effect of consolidating the assets and liabilities of multiple debtors and treating them as if the liabilities were owed by, and the assets held by, a single legal entity. *Colonial Realty Co.,* 966 F.2d at 58; *Leslie Fay,* 207 B.R. at 779. In the course of satisfying the liabilities of the consolidated debtors from the common pool of assets, intercompany claims are eliminated and guaranties from co-debtors are disregarded. *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.),* 860 F.2d 515, 518 (2d Cir.1988); *Deltacorp,* 179 B.R. at 777 (multiple claims against consolidated debtors eliminated; creditor receives only one recovery).

As an equitable remedy, substantive consolidation is to be used to afford creditors equitable treatment and thus may be ordered when the benefits to creditors therefrom exceed the harm suffered. *Augie/Restivo,* 860 F.2d at 518–19; *see also Stone v. Eacho (In re Tip Top Tailors, Inc.),* 127 F.2d 284, 288 (4th Cir.1942).

Traditionally, bankruptcy courts have considered the following factors in determining whether to approve substantive consolidation:

• The presence or absence of consolidated financial statements;

• The unity of interest and ownership among various corporate entities;

• The degree of difficulty in segregating and ascertaining individual assets and liabilities;

• The transfers of assets without formal observance of corporate formalities;

• The commingling of assets and business functions;

• The profitability of consolidation at a single physical location;

• The disregard of legal formalities.

*See, e.g., Augie/Restivo,* 860 F.2d at 518; *Soveriero v. Franklin Nat'l Bank,* 328 F.2d 446, 447–48 (2d Cir.1964); *In re Food Fair, Inc.,* 10 B.R. 123, 126 (Bankr.S.D.N.Y.1981). As shown by each decision granting substantive consolidation, a decision to substantively consolidate affiliated debtors need not be supported by the presence of all such factors.

In *Augie/Restivo,* the Second Circuit synthesized the foregoing factors into two, and ruled that the existence of even one such factor may justify substantive consolidation. Specifically, the Second Circuit held that substantive consolidation is required if it is demonstrated

**\*36** (i) that the operational and financial affairs of the debtors are so entangled that the accurate identification and allocation of assets and liabilities cannot be achieved;

*or*

(ii) that creditors dealt with the debtors as a single economic unit and did not rely on the separate identity of a debtor in extending credit.

*Augie/Restivo,* 860 F.2d at 518; *see also In re 599 Consumer Elec., Inc.,* 195 B.R. 244 (S.D.N.Y.1996) ("the Second Circuit's use of the conjunction 'or' [in *Augie/Restivo* ] suggests that the two cited factors are alternatively sufficient criteria.").

When deciding whether to order substantive consolidation, the courts in this circuit also use a balancing test to determine whether the relief achieves the best results for all creditors. *Colonial Realty,* 966 F.2d at 60 ("The propriety of [substantive consolidation] must, then, be determined solely in light of the principles and rules of equity"); *see also In re Affiliated Foods, Inc.,* 249 B.R. 770, 780 (Bankr.W.D.Mo.2000) (ordering

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

substantive consolidation because "in the final ana-
lysis the benefits of consolidation substantially out-
weigh the harm to creditors"); *White v. Creditors
Serv. Corp. (In re Creditors Serv. Corp.),* 195 B.R.
680, 690 (Bankr.S.D.Ohio 1996) ("the ultimate in-
quiry [for a court deciding substantive consolida-
tion] involves a balancing of the equities based on
the bankruptcy court's inherent powers pursuant to
§ 105").

Courts have "a good deal of discretion" in de-
termining whether substantive consolidation is ap-
propriate. *Deltacorp,* 179 B.R. at 777. Using that
discretion, numerous courts in the Second Circuit
have ordered substantive consolidation in circum-
stances similar to those of the MCI/WorldCom
Debtors and the Intermedia Debtors, including *In re
I.R.C.C., Inc.,* 105 B.R. 237 (Bankr.S.D.N.Y.1989);
*In re Richton Int'l Corp.,* 12 B.R. 555
(Bankr.S.D.N.Y.1981), *In re Food Fair, Inc.,* 10
B.R. 123, 127–28 (Bankr.S.D.N.Y.1981), and *In re
D.H. Overmyer Co., Inc.,* 1976 WL 168421
(S.D.N.Y.1976). Additionally, the case of *In re Af-
filiated Foods, Inc.,* 249 B.R. 770
(Bankr.W.D.Mo.2000),* provides a model for sub-
stantively consolidating debtors in a fact pattern
similar to this case.

To prevail on substantive consolidation, the
Debtors are not required to prove that an allocation
of assets and liabilities to the various legal entities
cannot be achieved under any circumstances.
Rather, it is sufficient to demonstrate that it would
be so costly and difficult to untangle the Debtors'
financial affairs, such that doing so is a "practical
impossibility," making substantive consolidation
appropriate. *Chemical Bank New York Trust Co. v.
Kheel (In re Seatrade Corp.),* 369 F.2d 845, 848
(2d Cir.1966) (ordering substantive consolidation
because of "expense and difficulty amounting to
*practical impossibility* of reconstructing the finan-
cial records of the debtors to determine intercorpor-
ate claims, liabilities and ownership of assets")
(emphasis added); *see also In re Bonham,* 229 F.3d
750, 766–67 (9th Cir.2000) (adopting *Augie/Restivo*

test and stating that entanglement factor is satisfied
if disentangling the debtors' affairs would be
"needlessly expensive and possibly futile"); *In re
Affiliated Foods, Inc.,* 249 B.R. at 780 (ordering
substantive consolidation when separating the debt-
ors' accounts "would be 'a real nightmare' " and
achieving a separate allocation "probably would not
be possible"). Alternatively, the Debtors must show
that it is not possible to create *accurate* financial
data for each legal entity. *Augie/Restivo,* 860 F.2d
at 519.

**\*37** The Court concludes that the substantive
consolidation proposed in the Plan is necessary and
appropriate and satisfies both prongs of the *Augie/
Restivo* test.

The facts amply demonstrate that the Debtors'
operational and financial affairs are so entangled
that the accurate identification and allocation of as-
sets and liabilities either could never be accom-
plished, or, even if it could be accomplished, would
take so long and be so costly such that creditors as
a whole would be substantially harmed by the ef-
fort. Thus, disentangling the financial affairs of the
Debtors is a practical impossibility. The factors that
led to this conclusion are set forth in in the Court's
Findings of Fact, above, but include:

• common management and control of the Debt-
ors;

• the substantial operational integration and en-
tanglement of the Debtors' business operations,
including the creation of a unified telecommunic-
ations network that serves substantially all of the
Debtor entities, the existence of centralized ad-
ministrative functions, such as cash management,
purchasing, human resources, and finance, and
presentation of products and services to the mar-
ketplace on an integrated basis;

• public financial reporting on a consolidated
basis;

• financial entanglement resulting from internal

financial management being conducted on a business line and functional basis, rather than legal entity basis;

• inability to account accurately and reliably for intercompany claims, resulting from, among other things, a lack of proper internal controls;

• the Debtors' present inability to create accurate and reliable historical financial statements on a separate legal entity basis; and

• acute lack of institutional knowledge and documentation making reconstruction of historical financial information on a separate legal entity basis exceedingly difficult and perhaps impossible.

The cost of disentangling the estates, if it ever could be accomplished, is not simply the out-of-pocket expenses to pay the accountants, lawyers, and other professionals, who would have to reconstruct years of financial data and litigate significant intercreditor disputes regarding the validity of intercompany claims. It also includes the enormous employee resources that would have to be devoted to the effort, detracting from business operations, as well and the incalculable diminution of enterprise value that likely would result from a protracted chapter 11 case.

The Court further concludes that a substantial portion of creditors dealt with the Debtors as a single economic unit and did not rely on the separate identity of any particular Debtor entity in extending credit. Accordingly, both prongs of the *Augie/Restivo* test have been satisfied in these cases, with respect to both the WorldCom Debtors and the Intermedia Debtors.

In the final analysis here, the benefits of substantive consolidation far outweigh any possible harm to creditors. Accordingly, use of substantive consolidation as an equitable remedy is appropriate in this case.

B. THE SETTLEMENTS
**\*38** The Plan's provision for each of the Settle-

ments is authorized by 11 U.S.C. § 1123(b)(3) and is appropriate. Due notice of the Settlements and the hearing to be held thereon has been given and all parties in interest have had an opportunity to appear and be heard with respect thereto.

This Court is required to make an independent determination of the fairness to the Debtors and their estates of each of the settlements embodied in the Plan. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *In re W.T. Grant Co.,* 699 F.2d 599, 605–06 (2d Cir.1983).

In approving each of the Settlements, this Court has considered, among other things:

• the balance of the likelihood of success of claims asserted by the claimants against the likelihood of success of the defenses or counterclaims possessed by the Debtors;

• the balance of the likelihood of success of claims asserted by the Debtors against the likelihood of success of the defenses or counterclaims possessed by the claimants;

• the complexity, cost, and delay of litigation that would result in the absence of settlements;

• whether any creditor of the Debtors or other party in interest has objected to the settlement and the acceptance of the Plan by a substantial majority of the holders of claims; and

• the fact that the Plan, which gives effect to the settlements, is the product of extensive arm's-length and good faith negotiations between and among the Debtors and the claimants.

*See, e. g., W.T. Grant Co.,* 699 F.2d at 608; *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 493 (Bankr.S.D.N.Y.1991); *In re Texaco Inc.,* 84 B.R. 893, 902 (Bankr.S.D.N.Y.1988).

Approval of a settlement does not require a

Not Reported in B.R., 2003 WL 23861928 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2003 WL 23861928 (Bkrtcy.S.D.N.Y.))**

"mini-trial" on the merits. *See also In re Purofied Down Products Corp.,* 150 B.R. 519, 522 (S.D.N.Y.1993) ( "the court need not conduct a 'mini-trial' to determine the merits of the underlying litigation"). In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather, should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness." ' *W.T. Grant Co.,* 699 F.2d at 608 (quoting *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972)).

In assessing the fairness of a compromise or settlement embodied in a plan of reorganization, the court does not have to be convinced that the compromise or settlement is the best possible agreement or that the parties have maximized their recovery. *Nellis v. Shugrue,* 165 B.R. 115, 123 (S.D.N.Y.1994). Further, the Court is not required to assess the minutia of each and every claim being compromised. *Id.*

(i) The Intermedia Settlement

Intermedia is a Debtor and an affiliate and insider of WorldCom, Inc. *See* 11 U.S.C. § 101(2)(B), 101(31)(E).

Because under the Plan, the estates of the Intermedia Debtors are not substantively consolidated with the estates of the WorldCom Debtors, assets of the Intermedia Debtors' estates are not available for distribution to satisfy allowed claims against WorldCom Debtors.

**\*39** Pursuant to the Bar Date Order, unless otherwise ordered by the Court, Intermedia is not required to file a proof of claim in the Debtors' cases. Bar Date Order, at 3–4 ("ORDERED that the following persons or entities are *not* required to file a proof of claim on or before the Bar Date: ... any Debtor having a claim against another Debtor ..."); *id.* at 8 ("ORDERED that entry of this Order is without prejudice to the right of the Debtors to seek a further order of this Court fixing the date by which holders of claims *not* subject to the Bar Date

established herein must file such claims against one or more of the Debtors or be forever barred from ... receiving any payment or distribution of property from the Debtors, the Debtors' estates, or their successors or assigns with respect to such claims...."). Accordingly, Intermedia's claim for amounts under the Intermedia Intercompany Notes is unaffected by the Bar Date Order.[FN17]

> FN17. While the language of the Bar Date Order could be read, as set forth in the Licht Objection, as merely affecting the timing of the filing of a claim by Intermedia, it is clear from the entire document that the intent of the Bar Date Order was that Intermedia would not be subject to the requirement to file a proof of claim, while preserving the Debtors' ability to seek a further order requiring the filing of such claim if subsequently determined to be necessary. According to the Debtors, as the claim related to the Intercompany Note was settled, the Debtors did not consider the filing of a proof of claim necessary and did not seek to have a date certain set for the filing of such claim. Under the circumstances, the filing of a proof of claim would serve no meaningful purpose.

As of the date hereof, the claim held by Intermedia against WorldCom, Inc. for amounts under the Intermedia Intercompany Note has not been either disallowed or allowed in these cases. Accordingly, the claim in respect of the Intermedia Intercompany Note may be compromised and settled pursuant to Bankruptcy Rule 9019.

Moreover, as the Debtors noticed the Intermedia Settlement, pursuant to 11 U.S.C. § 1123(b)(3)(A) and Bankruptcy Rule 9019, for consideration by the Court in the context of the confirmation of the Plan and as the Intermedia Settlement was subject to objection in that context, the absence of a filed proof of claim relating to the claim based on the Intercompany Note did not impair the ability of any party in interest to object to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the proposed treatment of the Intercompany Note or the ability of the Court to review such treatment. Indeed, Dr. Licht, who filed an objection to the procedural posture of the proceeding as well as the substantive basis for the Intermedia Settlement, participated in the Confirmation Hearing and voiced his concerns related to the treatment of the Intercompany Note under the Intermedia Settlement and the Plan.

Inasmuch as an opportunity was afforded to parties in interest to object to the proposed treatment of the Intercompany Note and for the Court to review such treatment in the context of the proposed Intermedia Settlement under the Plan, Intermedia was not required to file a proof of claim before it could receive a distribution or before the dispute concerning the Intermedia Note could be settled. Upon confirmation of the Plan, which includes the Intermedia Settlement, all proceedings with respect to Intermedia's claim will be completed, thereby obviating the need to require Intermedia to submit a proof of claim by any future date.

Section 544(b) of the Bankruptcy Code, authorizes a debtor in possession to avoid any transfer of an interest of the debtor that is "voidable under applicable law." 11 U.S.C. § 544(b)(1); *see, e.g., Traina v. Whitney Nat'l Bank,* 109 F.3d 244, 246 (5th Cir.1997) ("Applicable law" means state law).

**\*40** In considering the Debtors' potential fraudulent transfer claims with respect to the Intermedia Intercompany Note, a conflict of law analysis must first be undertaken to determine which state's substantive law is applicable under section 544. In determining the choice of law issue, the federal common law choice-of-law rules would likely apply. *See, e.g., In re Best Products,* 168 B.R. 35, 51 (Bankr.S.D.N.Y.1994), *aff'd,* 68 F.3d 26 (2d Cir.1995). The federal common law approach is to employ the law of the jurisdiction with the most significant relationship to the transaction and to the parties. *Id.* (choice of law test for torts under § 145 of the Restatement (Second) of Conflicts of Laws (the "Restatement") is applicable to fraudulent con-

veyances). Under section 145 of the Restatement, contacts to be taken into account include the place where the injury occurred, the place where the conduct causing the injury occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship, if any, between the parties is centered. Restatement, § 145. Thus, under this analysis, "applicable law" could be the law of the state in which the debtor is incorporated, the transferee's principal place of business is located, the merger was negotiated and consummated, the state where the creditors are located, or the state whose law would provide the most benefit to the creditors as a group. *See Best Products,* 168 B.R. at 52 (stating that the law where the majority of the creditors were located and where the transaction was negotiated and consummated would probably apply).

Although Intermedia creditors may have argued otherwise,[FN18] New York Debtor and Creditor Law ("DCL"), §§ 273, 274, may be the law applicable in such an action. Under that statute, a transfer or obligation can be avoided if the debtor did not receive fair consideration therefor and (i) the debtor was rendered insolvent by the transfer, (ii) the transfer left the debtor with unreasonably small capital, or (iii) the debtor believed when it made the transfer and incurred its obligations that it would incur debts beyond its ability to pay as they mature. An avoidance action must be commenced within six years of the date of the transfer. DCL §§ 273, 274.

> FN18. Georgia law, for example, would require proof of actual intent to defraud.

The burden of proof of all elements of a fraudulent transfer action under section 544(b) of the Bankruptcy Code, would be on WorldCom, Inc., as the party seeking to avoid the transfer. *See, e .g., Lippe v. Bairnco Corp.,* 249 F.Supp.2d 357, 376 n. 6 (S.D.N.Y.2003); *America Investment Bank v. Marine Midland Bank,* 191 A.D.2d 690, 595 N.Y.S.2d 537 (N.Y.App.Div.1993). In that regard, WorldCom, Inc. would need to establish each ele-

ment of the fraudulent transfer action by a preponderance of the evidence. *See, e.g., Lippe,* 249 F.Supp.2d at 376 n. 6.

Section 271 of the DCL provides that an entity is insolvent when "the present fair salable value of [its] assets is less than the amount that will be required to pay [its] probable liability on [its] existing debts as they become absolute and matured." There are various tests used to determine insolvency under the DCL, none of which is generally accepted as the correct test. *In re Best Products,* 168 B.R. at 52. These tests include the balance sheet approach and the going concern approach. *Id.* In deciding whether the debtor was insolvent at the time of the alleged fraudulent transfer, New York courts value the debtor's assets at the time of the challenged transfer, not at some later time. *See In re Le Café Crème, Ltd.,* 244 B.R. 221 (Bankr.S.D.N.Y.2000).

**\*41** Whether a company is insolvent for fraudulent transfer purposes requires a "fair valuation" of its assets and liabilities. The determination of fair valuation is an inexact science, and there is no precise formula to determine solvency. *Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573, 577 (1st Cir.1980); *Briden,* 776 at 382. A determination of insolvency should be based on appraisals and expert testimony, but appraisals are neither the exclusive nor dispositive means to make the determination. *See Lawson v. Ford Motor Company ( In re Roblin Industries, Inc.),* 78 F.3d 30, 34 (2d Cir.1996).

Thus, to make a prima facie showing of a fraudulent transfer under section 544 of the Bankruptcy Code, the Debtors would be required to prove that WorldCom, Inc. was insolvent on the date of the transfer of the Intermedia Intercompany Note.

Fair consideration has two prongs—the adequacy of the consideration and good faith. DCL § 272; *see also Ede v. Ede,* 193 A.D.2d 940, 598 N.Y.S.2d 90 (N.Y.App.Div.1993) (holding that fair consideration for fraudulent transfer purposes under

New York law requires that the exchange be for equivalent value and be made in good faith).

The existence of reasonably equivalent value for a transfer or obligation is a question of fact. *See Branch v. Federal Deposit Insurance Corp.,* 825 F.Supp. 384, 399 (D.Mass.1993); *In re Lawrence Paperboard, Co.,* 76 B.R. 866, 873 (Bankr.D.Mass.1987).* "Reasonable equivalence" requires a comparison of the value of what went out with the value of what was received. *Heritage Bank Tinley Park v. Steinberg ( In re Grabill Corp.),* 121 B.R. 983, 994 (Bankr.N.D.Ill.1990); *see also In re Suburban Motor Freight, Inc.,* 124 B.R. 984, 997 (Bankr.S.D.Ohio 1990) (the focus is placed on adequacy of consideration received by a debtor under the measurement test in which all aspects of the transaction are examined to calculate economic value of all the benefits and burdens to the debtor, direct or indirect; collapsing the transaction in question to look at the net effect of the overall transfer).

Courts generally find reasonably equivalent value for a transfer from a parent to its wholly owned subsidiary, because the parent, as the sole stockholder of the subsidiary corporation, receives a benefit in the form of increased stock value resulting from the increased financial strength of the parent. *See Branch v. Federal Deposit Insurance Corporation,* 825 F.Supp. 384, 399–400 (D.Mass.1993).

Courts have found a parent's transfer of assets to a subsidiary to be less than reasonably equivalent value when the subsidiary was insolvent at the time of transfer. *See In re Duque Rodriguez,* 77 B.R. 939, 941–42 (Bankr.S.D.Fla.1987), *aff'd,* 895 F.2d 725 (11th Cir.1990); *In re Chase & Sanborn Corp.,* 68 B.R. 530 (Bankr.S.D.Fla.1986), *aff'd,* 848 F.2d 1196 (11th Cir.1988); *see also In re First City Bancorporation of Texas, Inc.* 1995 WL 710912 \*18 (Bankr.N.D.Tex.1995).

**\*42** However, courts will also collapse multiple transactions into one to view the overall considera-

tion received. *In re Suburban Motor Freight, Inc.,* 124 B.R. 984 (Bankr.S.D.Ohio 1990) (*citing Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988)); *see also HBE Leasing Corp. v. Frank,* 48 F.3d 623 (2d Cir.1994)

In order to avoid the Intermedia Intercompany Note as a fraudulent transfer pursuant to section 544(b) of the Bankruptcy Code and the DCL, the Debtors would have to show, among other things, that it did not receive fair consideration in return for the Intermedia Intercompany Note. This, in turn, would require a valuation of the assets received by WorldCom in exchange therefor.

To qualify as a voidable preference, a transfer must (1) benefit a creditor, (2) be on account of an antecedent debt, (3) be made while the debtor was insolvent, (4) be made within ninety days preceding the filing of the bankruptcy petition, and (5) enable the creditor to receive a larger share of the estate than if the transfer had not been made. 11 U.S.C. § 547(b); *see also Union Bank v. Wolas,* 502 U.S. 151, 112 S.Ct. 527, 529–30, 116 L.Ed.2d 514 (1991). Where the transfer was to an insider of the debtor, the ninety-day period is extended to one year preceding the filing of the bankruptcy petition. 11 U.S.C. § 547(b)(5)(C). The debtor in possession has the burden of proving the avoidability of a transfer under section 547(b) by a preponderance of the evidence. *Id.* § 547(g); *Lawson v. Ford Motor Company ( In re Roblin Industries, Inc.),* 78 F.3d at 34.

Whether the principal prepayments and interest payments made during the one-year period prior to the chapter 11 filing on account of the Intermedia Intercompany Note satisfy the requirements for a preferential transfer set forth in section 547 of the Bankruptcy Code would require determinations of WorldCom, Inc.'s solvency at each point in time that a payment was made.

There are multiple statutory defenses that also could be raised in defense of potentially preferential transfers under section 547(c) of the Bankruptcy Code. Moreover, even if the Debtors were to prevail on their preference theory, complex issues attendant to the repayment of amounts by Intermedia to WorldCom, Inc. under section 502(d) of the Bankruptcy Code would require resolution.

Wells Fargo filed an objection to the modification of the Second Amended Plan of Reorganization as it relates to the increase of $29,000,000 over the $1,000,000,000 to be paid by the WorldCom estates to the Intermedia Debtors under the proposed settlement as set forth in the Plan. The $29,000,000 increase was agreed to as a resolution of the objection filed by certain preferred shareholders of Intermedia to the Intermedia Settlement. WellsFargo's objection is limited to the modification. Wells Fargo argues among other things,[FN19] that the WorldCom creditors should not be burdened with the obligation to pay equity of Intermedia Debtors As the Court found at the hearing on the Intermedia Settlement when it was advised of the $29,000,000 increase, such amount was not significant in the context of a $1,000,000,000 amount to be paid by the World Com Debtors to Intermedia and therefore not a materially adverse change. As subsequently detailed, the Intermedia Settlement, including the $29,000,000 modification satisfies the standards for a Bankruptcy Rule 9019 settlement.

> FN19. As previously noted, pursuant to stipulation, the balance of Wells Fargo's objections will be addressed when the Debtors' objection to Wells Fargo's claims are considered in the context of the claims resolution process.

**\*43** Further, the issue of a payment to equity of Intermedia is an issue for the Intermedia creditors, not the WorldCom Debtors' creditors. The $29,000,000 was agreed to by the AdHoc Committee of Intermedia Noteholders and such increase was noticed to all creditors. Pursuant to the Notice of Modifications to Debtors' Second Amended Plan of Reorganization, dated September 19, 2003, Intermedia creditors in Classes 11, 12 and 13 were informed of the 5% recovery that holders of Intermedia Preferred Stock would receive. Thus, prior to

the October 8, 2003 deadline to determine whether to amend their vote, such classes were given sufficient notice of the modification providing for recovery to Class 14. Following, the October 8, 2003 deadline, the tabulation of the Intermedia creditor classes continued to show overwhelming support for confirmation. Thus, taking into consideration the notice provided Classes 11, 12 and 13 prior to the October 8, 2003 voting deadline to amend their vote, and the fact that even with the disclosure, the tabulation of votes reflecting the votes cast prior to the October 8, 2003 deadline continued to show overwhelming support to confirm the Plan, and in light of the *de minimis* amount of money at issue in comparison to the $1,000,000.00 available for distribution to those classes under the Intermedia Settlement, the Court deems Classes 11, 12 and 13 as having accepted the treatment of the Intermedia Preferred Shareholders and supported confirmation of the Plan, which included the modifications. There is no challenge to the validity of the vote. Thus, with respect to the Intermedia creditors, the absolute priority rule does not apply. Wells Fargo's objection is overruled.

The Intermedia Settlement is reasonable, fair and equitable and in the best interests of the Debtors, their estates and their creditors.

The Intermedia Settlement falls within the range of reasonableness, provides for the resolution of complex litigation that would likely implicate multiple appeals, and is fair and equitable and in the best interests of the Debtors, their estates, and their creditors and equity interest holders. The Intermedia Settlement has been negotiated at arm's-length and has been entered into in good faith. It is in the best interests of the Debtors to reach consensus with the major creditor groups. The Intermedia Settlement avoids costly and time-consuming litigation, paving the way toward achieving a successful reorganization of the Debtors. The avoidance of long and complicated litigation is one of the principal rationales for debtors entering into settlements with creditors. *See In re*

*Baldwin United Corp.,* 43 B.R. 888 (Bankr.S.D.Ohio 1984).

The Intermedia Settlement removes substantial impediments to a successful restructuring and reorganization of the Debtors, furthers the Debtors' reorganization and prompt emergence from chapter 11 and reflects a reasonable balance of the risk and expense of litigation against the benefits of early resolution of the disputes and issues. *In re Teltronics Servs., Inc.,* 762 F.2d 185, 188–89 (2d Cir.1985); *In re W.T. Grant Co.,* 699 F.2d at 608; *In re Int'l Distrib. Ctrs., Inc.,* 103 B.R. at 423. Furthermore, the Intermedia Settlement is above the lowest point in the range of reasonableness and is an exercise of the Debtors' sound business judgment.

**\*44** Accordingly, the Licht Objection and Wells Fargo's objection are overruled.

(ii) The Bank Settlement

The elements of a claim for constructive trust are (i) a confidential or fiduciary relationship, (ii) a promise, express or implied, (iii) a transfer in reliance on the promise, and (iv) unjust enrichment. *See Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 353 (2d Cir.1992). However, courts use these elements merely as guideposts, not as rigid requirements. Because the doctrine of constructive trust is equitable in nature, courts focus on the fairness of the transaction. *See Simonds v. Simonds,* 45 N.Y.2d 233, 243, 380 N.E.2d 189, 408 N.Y.S.2d 359 (1978).

Litigation of the Constructive Trust Action would require a determination of complex factual and legal issues, including the Banks' ability to demonstrate each of the elements of their claim, their ability to trace the property to which such constructive trust could attach, *see United States v. Benitez,* 779 F.2d 135, 140 (2d Cir.1985), the amount that would be subject to the trust, where funds have been commingled, *see In re Drexel Burnham Lambert Group, Inc.,* 142 B.R. 633 (S.D.N.Y.1992), and the Debtors' ability to invoke

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

their avoiding powers under section 544(a) of the Bankruptcy Code to avoid any constructive trust that would be imposed in the event the Banks were to prevail on their theory.

In the event that the Banks succeeded in the Maryland Action, Ms. Mayer would have a claim for indemnification against the Debtors. The allowance of that claim could be the subject of further litigation.

The Bank Settlement is reasonable, fair and equitable and in the best interests of the Debtors, their estates and their creditors.

The Bank Settlement falls within the range of reasonableness and provides for the resolution of complex litigation that would likely implicate multiple appeals. The Bank Settlement has been negotiated at arm's-length and has been entered into in good faith. It is in the best interests of the Debtors to reach consensus with the major creditor groups. The Bank Settlement avoids costly and time-consuming litigation, paving the way toward achieving a successful reorganization of the Debtors. The avoidance of long and complicated litigation is one of the principal rationales for debtors entering into settlements with creditors. *See In re Baldwin United Corp.,* 43 B.R. 888 (Bankr.S.D.Ohio 1984).

The Bank Settlement removes substantial impediments to a successful restructuring and reorganization of the Debtors, furthers the Debtors' reorganization and prompt emergence from chapter 11 and reflects a reasonable balance of the risk and expense of litigation against the benefits of early resolution of the disputes and issues. *In re Teltronics Servs., Inc.,* 762 F.2d 185, 188–89 (2d Cir.1985); *In re W.T. Grant Co.,* 699 F.2d at 608; *In re Int'l Distrib. Ctrs., Inc.,* 103 B.R. at 423. Furthermore, the Bank Settlement is above the lowest point in the range of reasonableness and is an exercise of the Debtors' sound business judgment.

(iii) The MCIC Settlement

*45 Courts have the general equitable power to order substantive consolidation. *See, e.g., Fed. Deposit Ins. Corp. v. Colonial Realty Co.,* 966 F.2d at 59 (authority for substantive consolidation comes from the bankruptcy court's general equitable powers under section 105 of the Bankruptcy Code); *In re Continental Vending Mach. Corp.,* 517 F.2d 997, 1000 (2d Cir.1975).

Substantive consolidation is appropriate if the debtors demonstrate: (i) that the operational and financial affairs of the debtors are so entangled that the accurate identification and allocation of assets and liabilities cannot be achieved *or* (ii) that creditors dealt with the debtors as a single economic unit and did not rely on the separate identity of a debtor in extending credit. *Augie/Restivo,* 860 F.2d at 518; *see In re 599 Consumer Elec., Inc.,* 195 B.R. 244 (S.D.N.Y.1996).

Litigation of the issues resolved by the MCIC Settlement would be highly fact-intensive, complex and protracted, involving expert analyses and detailed testimony regarding the extent of the World-Com Debtors' accounting and operational entanglement, including complex issues attendant to millions of intercompany claims aggregating more than a trillion dollars, (Disclosure Statement at 41), as well as evidence of the extent to which each holder of an MCIC Senior Debt Claim that opposes substantive consolidation relied upon the separate legal identity of MCIC when it extended credit, *see, e.g., In re Bonham,* 229 F.3d 750, 767 (9th Cir.2000) (under *Augie/Restivo,* the burden is on the creditors opposed to substantive consolidation to overcome presumption that they did not rely on separate credit of debtors). While the Debtors believe that even if particular creditors are able to demonstrate that they did rely on the separate credit of a particular debtor, substantive consolidation is warranted if the debtors satisfy the entanglement factor, *id.; In re 599 Consumer Elec., Inc.,* 195 B.R. 244 (S.D.N.Y.1996) ("the Second Circuit's use of the conjunction 'or' [in *Augie/Restivo* ] suggests that the two cited factors are alternatively sufficient cri-

Not Reported in B.R., 2003 WL 23861928 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2003 WL 23861928 (Bkrtcy.S.D.N.Y.))**

teria"), the Ad Hoc Committee of MCIC Senior Noteholders could argue that, based upon the strength of their reliance defense, denial of substantive consolidation would yield the most equitable result for creditors.

The MCIC Settlement represents a resolution of issues with an entire class of creditors, and therefore, with the support of the Ad Hoc Committee of MCIC Senior Noteholders eliminated the risk that the Debtors would have to cramdown a plan of reorganization over the dissent of that class. *See* 11 U.S.C. § 1129(b)(1).

The MCIC Settlement is reasonable, fair and equitable and in the best interests of the Debtors, their estates and their creditors.

The MCIC Settlement falls within the range of reasonableness, provides for the resolution of complex litigation that would likely implicate multiple appeals, and is in the best interests of the Debtors, their estates and creditors. The MCIC Settlement has been negotiated at arm's-length and has been entered into in good faith. It is in the best interests of the Debtors to reach consensus with the major creditor groups. The MCIC Settlement avoids costly and time-consuming litigation, paving the way toward achieving a successful reorganization of the Debtors. The avoidance of long and complicated litigation is one of the principal rationales for debtors entering into settlements with creditors. *See In re Baldwin United Corp.,* 43 B.R. 888 (Bankr.S.D.Ohio 1984) (approving a compromise and finding that the value of a settlement was significantly enhanced and the debtors received additional value by eliminating the possibility of costly litigation).

**\*46** The MCIC Settlement removes substantial impediments to a successful restructuring and reorganization of the Debtors, furthers the Debtors' reorganization and prompt emergence from chapter 11 and reflects a reasonable balance of the risk and expense of litigation against the benefits of early resolution of the disputes and issues. *In re Teltron-*

*ics Servs., Inc.,* 762 F.2d 185, 188–89 (2d Cir.1985) ; *In re W.T. Grant Co.,* 699 F.2d at 608; *In re Int'l Distrib. Ctrs., Inc.,* 103 B.R. at 423. Furthermore, the MCIC Settlement is above the lowest point in the range of reasonableness and is an exercise of the Debtors' sound business judgment.

**C. SECTION 1129 OF THE BANKRUPTCY CODE**

A debtor, as the proponent of the Plan, bears the burden of proof under section 1129 of the Bankruptcy Code. A debtor must meet this burden by a preponderance of the evidence. *See Heartland Federal Savings & Loan Ass'n v. Briscoe Enterprises, Ltd. II (In re Briscoe Enterprises, Ltd. II),* 994 F.2d 1160, 1165 (5th Cir.1993)* ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof under both § 1129(a) and in a cramdown").

The Debtors have demonstrated, by a preponderance of the evidence, that all of the subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

(i) 1129(a)(1)

Pursuant to section 1129(a)(1) of the Bankruptcy Code, a plan must "compl [y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 governing classification of claims and contents of a plan, respectively. H.R.Rep. No. 95–595, at 412 (1977); S.Rep. No. 95–989, at 126 (1978); *In re Johns–Manville Corp.,* 68 B.R. 618, 629 (Bankr.S.D.N.Y.1986), *aff'd in part, rev'd in part on other grounds,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd, Kane v. Johns–Manville Corp.* 843 F.2d 636 (2d Cir.1988); *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984). As demonstrated below the Plan complies fully with the requirements of sections 1122 and 1123, as well as other applicable provisions of the Bankruptcy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Code. *See* 11 U.S.C. § 1127(a), (c).

>Section 1122

Pursuant to section 1122(a), a plan may provide for multiple classes of claims or interests as long as each claim or interest within a class is substantially similar to other claims or interests in that class. *See* 11 U.S.C. § 1122(a). The Plan adequately and properly classifies all Claims and Equity Interests. A reasonable basis exists for the classification of Claims and Equity Interests in the Plan. Claims and Equity Interests within each particular Class are substantially similar and the classification of Claims and Equity Interests in the Plan is reasonable and necessary to implement the Plan.

***47** Consistent with the October 20 Ruling and the requirements of section 1122, the Plan provides for the separate classification of WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims. Each of the Claims in each particular Class is substantially similar to the other Claims in such Class. Such classification is proper.

Even if the Court were to determine that WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims are "substantially similar" to each other, section 1122(a) would not require that all such substantially similar claims be classified together. Rather, section 1122(a) requires that, if claims are classified together, then they must be substantially similar. *See In re One Times Square Associates Ltd. Partnership,* 159 B.R. 695, 703 (Bankr.S.D.N.Y.1993); *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 760 (Bankr.S.D.N.Y.1992) A debtor need not place all substantially similar claims in the same class as long as the debtor has a reasonable basis for the separate classification. *See Times Square Associates,* 159 B.R. at 703.

Based upon the existence of the subordination provisions of the MCIC Subordinated Notes Indenture and the unique prejudice and reliance arguments of holders of pre-Merger Claims, the WorldCom Debt Claims, WorldCom General Unsecured Claims, MCI Pre-merger Claims, MCIC Senior Debt Claims, and MCIC Subordinated Debt Claims are dissimilar in their legal nature and their equitable rights. The separate classification of the WorldCom Debt Claims, WorldCom General Unsecured Claims, MCI Pre-merger Claims, MCIC Senior Debt Claims, and MCIC Subordinated Debt Claims under the Plan is appropriate.

Section 1122(b) of the Bankruptcy Code provides: "A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b). Consistent with section 1122(b), for administrative convenience, general unsecured claims against the Debtors in an amount of $40,000 or less have been classified together in Class 4.

Accordingly, the classification of claims and equity interests in the Plan complies with section 1122 of the Bankruptcy Code.

>Section 1123(a)

Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which every chapter 11 plan must comply. *See* 11 U.S.C. § 1123(a). The Plan fully complies with each such requirement.

Article II of the Plan provides for the treatment of Administrative Expense Claims and Priority Tax Claims and Article III of the Plan designates Classes of claims and Classes of equity interests as required by section 1123(a)(1). Articles III and IV of the Plan specify whether each Class of claims and equity interests is impaired under the Plan and the treatment of each such Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively.

***48** The Plan also complies with the requirements of section 1123(a)(4) and the October 20 Ruling. Section 1123(a)(4) provides that a plan shall "provide the same treatment for each claim or

interest of a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest." Each Claim in Classes 6, 6A and 6B will receive the same treatment as other Claims in each of these Classes, unless such holder agreed to less favorable treatment.[FN20] As the holders of WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims have been separately classified in Classes 6, 6A, and 6B, respectively, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code and addresses the Court's October 20 Ruling.

> FN20. Pursuant to section 4.08(b) of the Plan, if a holder of an MCI Pre-merger Claim is a member of the Ad Hoc MCI Trade Claims Committee, then such holder's recovery will be reduced by the amount received by such holder on account of such Claim pursuant to the contributions from the holders of MCIC Senior Debt Claims and MCIC Subordinated Debt Claims set forth in Sections 4.12 and 4.13 of the Plan. The members of the Ad Hoc MCI Trade Claims Committee have consented to such treatment.

Articles V, VI, VIII, and IX and various other provisions of the Plan set forth the means for implementation of the Plan as required by section 1123(a)(5). For example, the substantive consolidation provisions set forth in Sections 5.01 and 5.02 of the Plan are authorized by section 1123(a)(5). *See In re Stone & Webster, Inc.,* 286 B.R. 532, 540–41 (Bankr.D.Del.2002).

Section 9.03 of the Plan provides for the prohibition of the issuance of nonvoting equity securities in the Certificates of Incorporation and the By-laws of Reorganized WorldCom and each of the other Reorganized Debtors to ensure compliance with section 1123(a)(6).

Finally, Article IX of the Plan contains provisions with respect to the manner of selection of of-

ficers and directors of Reorganized WorldCom and each of the other Reorganized Debtors that are consistent with the interests of creditors, equity security holders, and public policy in accordance with section 1123(a)(7).

> Section 1123(b)

Section 1123(b) of the Bankruptcy Code sets forth the permissive provisions that may be incorporated into a chapter 11 plan. The Plan is consistent with section 1123(b). Specifically, pursuant to Article IV of the Plan, Classes 1 and 3 are rendered unimpaired and Class 2 and Classes 3A through 15 are impaired, as contemplated by section 1123(b)(1). As contemplated by section 1123(b)(2), Article VIII of the Plan provides for the assumption or rejection of the executory contracts and unexpired leases of the Debtors not previously assumed or rejected (or subject to pending requests for assumption or rejection) under section 365 of the Bankruptcy Code. Section 5.06 of the Plan provides for the approval, pursuant to Bankruptcy Rule 9019, of the Intermedia Settlement, the MCIC Settlement, and the Bank Settlement, as contemplated by section 1123(b)(3). Each of the Settlements is discussed in greater detail in section I.B. above.

Based upon the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code, and thus, satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

(ii) 1129(a)(2)

**\*49** Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. *See In re Johns–Manville Corp.,* 68 B.R. 618, 630 (Bankr.S.D.N.Y.1986), *aff'd in part, rev'd in part on other grounds,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd, Kane v. Johns–Manville Corp.* 843 F.2d 636 (2d Cir.1988); *In re Toy &*

*Sports Warehouse, Inc.,* 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984); H.R.Rep. No. 95–595, at 412 (1977); S.Rep. No. 95–989, at 126 (1978) ( "Paragraph (2) [of section 1129(a) ] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."). The Debtors have complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126, regarding disclosure and Plan solicitation.

>Section 1125

Section 1125 of the Bankruptcy Code provides in pertinent part:

(b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary or the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information....

(c) The same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class, but there may be transmitted different disclosure statements, differing in amount, detail, or kind of information, as between classes.

11 U.S.C. § 1125(b), (c).

As set forth more fully above, the Debtors did not solicit the acceptance or rejection of the Plan by any creditor prior to the transmission of the Disclosure Statement. Debtors transmitted the Disclosure Statement to each creditor that was entitled to vote to accept or reject the Plan, as well as to other parties in interest in this case, in compliance with section 1125 and this Court's Orders. In addition, creditors that were not entitled to vote to accept or reject the Plan and equity interest holders (who are deemed to reject the Plan) were provided with certain non-voting materials approved by the Court in compliance with the Court's orders.

Additionally, the Debtors have complied with section 1125 with respect to the Third Supplement and the Plan. In connection with soliciting votes on the September 12 Plan, the Court has already determined that the Third Supplement contains "adequate information" of the kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject either the September 12 Plan. The Third Supplement includes a detailed discussion of the relative rights, reliance arguments, and bases for different treatment among WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade Claims Committee Claims. The September 12 Plan was solicited in accordance with the Court's prior orders and received overwhelming support from all Classes.

**\*50** The Debtors are not required to re-solicit votes of holders of Claims in Classes 6, 6A, or 6B based upon the modifications to the September 12 Plan embodied in the Plan. Classes 6 and 6A are deemed to reject the Plan. Class 6B is conclusively presumed to accept the Plan.

Accordingly, Debtors complied with section 1125 of the Bankruptcy Code.

>Section 1126

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization. Under section 1126, only holders of allowed claims and allowed equity interests in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan. *See* 11 U.S.C. § 1126. As set forth in section 1126:

(a) The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan....

(f) Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g) Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

11 U.S.C. § 1126(a), (f), (g).

In accordance with section 1126 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the holders of all Allowed claims in each Class of impaired claims that are to receive distributions under the Plan and that are not otherwise deemed to reject the Plan. Classes 1 and 3 of the Plan are unimpaired. As a result, pursuant to section 1126(f), holders of claims in those Classes are conclusively presumed to have accepted the Plan. Pursuant to Section 4.02 of the Plan, the Debtors have determined to pay holders of Allowed Secured Tax Claims in Class 2 in cash, in full, plus interest required under section 506(b), thereby rendering Class 2 unimpaired. As a result, Class 2 now is also conclusively presumed to have accepted the Plan. See 11 U.S .C. §§ 1124, 1126(f).

Classes 3A, 4, 5, 6, 6A, 6B, 9, 10, 11, 12, 13 and 14 of the Plan are impaired. As a result, pursuant to section 1126(a), holders of Claims in such Classes that were not deemed to reject the Plan were entitled to vote to accept or reject the Plan. FN21 Classes 7, 8, and 15 of the Plan will not receive any distributions under the Plan. As a result, pursuant to section 1126(g), holders of claims and equity interests in such Classes are deemed to have rejected the Plan.

FN21. Classes 6, 6A and 14 were deemed to reject the Plan. Class 6B was deemed to accept the Plan, pursuant to their agreement to support the Plan in a stipulation entered with the Debtors, among others.

As to impaired classes entitled to vote to accept or reject a plan, sections 1126(c) and 1126(d) specify the requirements for acceptance of a plan by classes of claims and classes of equity interests, respectively:

**\*51** (c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected the plan.

(d) A class of interests has accepted the plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c), (d).

The Plan has been accepted by creditors holding in excess of two-thirds in amount and one-half in number of the Allowed claims entitled to vote in each class.

As set forth above, Class 6 (WorldCom General Unsecured Claims) and Class 6A (MCI Premerger Claims) are deemed to reject the Plan. In addition, Class 7 (WorldCom Subordinated Claims), Class 8 (WorldCom Equity Interests), and Class 15 (Intermedia Equity Interests) will receive no recoveries under, and thus are deemed to have

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

rejected, the Plan. Nevertheless, as set forth below, pursuant to section 1129(b) of the Bankruptcy Code, the Plan may be confirmed over the deemed rejections because the Plan does not discriminate unfairly and is fair and equitable with respect to each such Class. *See* 11 U.S.C. § 1129(b).

The Debtors have complied with the applicable provisions of the Bankruptcy Code, including, without limitation, the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. 11 U.S.C. §§ 1125, 1126, 1127(a). Based upon the foregoing, the requirements of section 1129(a)(2) have been satisfied.

(iii) 1129(a)(3)

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). In the context of a chapter 11 plan, courts have held that "a plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." *In re Leslie Fay Cos.,* 207 B.R. 764, 781 (Bankr.S.D.N.Y.1997) (quoting *In re Texaco Inc.,* 84 B.R. 893, 907 (Bankr.S.D.N.Y.), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y.1988)). "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan." *Leslie Fay,* 207 B.R. at 781 (citations omitted). The primary goal of chapter 11 is to promote the rehabilitation of the debtor. Congress has recognized that the continuation of the operation of a debtor's business as a viable entity benefits the national economy through the preservation of jobs and continued production of goods and services. The Supreme Court similarly has recognized that "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *see also In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 760 (Bankr.S.D.N.Y.1992) (quoting *Bildisco* ). In addition, courts have stressed the importance of payment of creditors in Chapter 11 Cases. *See In re Ngan Gung Restaurant,* 254 B.R. 566, 571 (Bankr.S.D.N.Y.2000).

**\*52** The Plan proposed by the Debtors accomplishes these rehabilitative goals by restructuring the Debtors' obligations and providing the means through which the Debtors may continue to operate as a viable enterprise. The Plan is the result of extensive good faith, arm's-length negotiations among the Debtors, the Committee, the Ad Hoc Committee of Intermedia Noteholders, the Ad Hoc Committee of MCIC Senior Noteholders, the Ad Hoc Committee of WorldCom Noteholders, the Ad Hoc Bank Committee, the MatlinPatterson Investors and other economic parties in interest. The Plan is overwhelmingly supported by creditors and other parties in interest in this case. The support of the Plan by each of these key constituencies with divergent interests and the Committee reflects their acknowledgment that the Plan provides fundamental fairness to creditors and equity interest holders. It is indisputable that the Plan promotes the rehabilitative objectives and purposes of the Bankruptcy Code.

Nevertheless, on October 9, 2003, the United States Trustee filed an objection that, *inter alia,* objected to the "Obligation to Defend" provision in the Plan. The United States Trustee argues that the provision is one not typically found in plans, violates the basic principle of a "fresh start" and potentially saddles the estate with unlimited liability.

The United States Trustee argues that the provision is onerous for the Debtors because it requires the Debtors to pay legal, settlement and judgment costs of the Covered Parties. The United States Trustee views this obligation as potentially impacting on the Debtors' "fresh start" because the Debtors will be responsible for an indeterminate amount of legal fees in connection with litigation involving the conduct of other parties with respect to the plan process. As a practical matter, the United States

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Trustee contends Debtors will be responsible for the Covered Parties gross negligence and willful misconduct because most matters are resolved prior to the entry of a final judgment. The United States Trustee also adds that the Obligation to Defend provision was incorporated after the Covered Parties had reached an agreement.

In addressing the United States Trustee's objection, the Court is mindful that the Bankruptcy Code does not prohibit the inclusion of the Obligation to Defend. Stated differently, the Bankruptcy Code does not require that this Court substitute its judgment for the judgment of the debtor in possession or other stakeholders in this case. Indeed, parties with an economic stake in the outcome of this case and the continued viability in the Reorganized Debtors have not objected to its inclusion. The issue thus appears to be whether the Court should sustain the objection to the Obligation to Defend in light of what the United States Trustee views as a provision which would undermine the integrity of the reorganization process.

As a threshold matter, the Court holds that the record amply demonstrates that not only was the Plan proposed in good faith but that the inclusion of the Obligation to Defend Provision in the Plan was an essential element of the Plan formulation process and negotiations with respect to each of the settlements contained in the Plan. (*See* Neporent Decl. ¶ 5.) To the extent that the United States Trustee challenges the sufficiency of the record, the Court notes that the United States Trustee could have cross-examined Mark A. Neporent. On behalf of the Covered Parties, Mark A. Neporent provided in a declaration that the Obligation to Defend Provision in the Plan was vital to the successful negotiation of the Plan and that without such provision the Covered Parties would have been less likely to negotiate the terms of the settlement and Plan. The United States Trustee did not cross-examine Mr. Neporent. The uncontradicted evidence, therefore, supports the conclusion that the Obligation to Defend Provision facilitated the plan process and ulti-

mately facilitated Debtors' reorganization and rehabilitation. The Court can find nothing untoward or indicative of a lack of good faith to sustain the United States Trustee's objection.

**\*53** Concerning the United States Trustee's argument that the Obligation to Defend Provision violates the basic principle of a "fresh start" and potentially saddles the estate with unlimited liability, the Court finds that the United States Trustee's argument is more appropriately suited to questioning the feasibility of the Plan and not to questioning Debtors' good faith. As will be discussed further below, the feasibility of the Plan has been established in accordance with the prevailing legal standard.

Moreover, if the Court were to sustain the United States Trustee's objection, the Court would effectively be endorsing the proposition that the inclusion of the Obligation to Defend Provision somehow transformed an otherwise arm's-length plan negotiated after many months with the participation of a representative cross-section of creditor constituencies, into a plan not proposed in good faith for purposes of section 1129(a)(3). Nothing that the United States Trustee relies upon supports this conclusion. Although the United States Trustee (in fulfilling her duties) is understandably concerned with the integrity of the chapter 11 reorganization process, WorldCom's case has been under the scrutiny of, among others, an active creditor body, the District Court through its appointed corporate monitor and a number of governmental entities, as well as this Court. Despite the fact that parties in interest were cognizant of the Obligation to Defend Provision, no one, other than the United States Trustee, objected or even questioned the propriety of the provision. This is not a chapter 11 case where because of its size and/or lack of creditor interest that a debtor is attempting to impose an onerous term and thereby take advantage of the lack of constituent participation. In such a situation, it is clear that the United States Trustee's scrutiny is essential. In sum, in the Court's view, the integrity of

WorldCom's reorganization process was protected in this case and was not put at risk by the Obligation to Defend Provision.

Further, the Court recognizes that there are certain issues that warrant aggressive scrutiny from the United States Trustee (e.g., conflicts of interest, creditor committee member conduct, etc.) notwithstanding the level of creditor participation; however, the Court does not view the Obligation to Defend, under the circumstances of this case, as one of those instances.

Accordingly, the Court overrules the objection of the United States Trustee. The Plan has been proposed in good faith and not by any means forbidden by law.

Based upon the foregoing, the requirements of section 1129(a)(3) have been satisfied.

(iv) 1129(a)(4)

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable. Specifically, section 1129(a)(4) requires that:

**\*54** Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).

Section 1129(a)(4) has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the Court. *See In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 760 (Bankr.S.D.N.Y.1992); *In re Johns–Manville Corp.,* 68 B.R. 618, 632

(Bankr.S.D.N.Y.1986), *aff'd in part, rev'd in part on other grounds,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd, Kane v. Johns–Manville Corp.* 843 F.2d 636 (2d Cir.1988).

Pursuant to the interim application procedures established under section 331 of the Bankruptcy Code, the Court authorized and approved the payment of certain fees and expenses of professionals retained in this case. All such fees and expenses, as well as all other accrued fees and expenses of professionals through the Effective Date, remain subject to final review for reasonableness by the Court under section 330 of the Bankruptcy Code. 11 U.S.C. § 330. In addition, pursuant to sections 503(b)(3) and (4), the Court must review any applications for substantial contribution to ensure compliance with the statutory requirements and that the fees requested are reasonable. Further, all payments to be made in connection with the Effective Date or which relate to the success of the reorganization or which otherwise are required to be disclosed, including any amounts to be paid to officers and directors, have been disclosed previously. Finally, the Plan provides a mechanism for the Court to approve certain payments of fees and expenses to certain indenture trustees.

The foregoing procedures for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors satisfy the objectives of section 1129(a)(4). *See In re Elsinore Shore Assos.,* 91 B.R. 238, 268 (Bankr.D.N.J.1988) (requirements of section 1129(a)(4) satisfied where plan provided for payment of only "allowed" administrative expenses); *In re Future Energy Corp.,* 83 B.R. 470, 488 (Bankr.S.D.Ohio 1988) ("Court approval of payments for services and expenses is governed by various Code provisions—e.g., §§ 328, 329, 330, 331 and 503(b)—and need not be explicitly provided for in a Chapter 11 plan.").

Based upon the foregoing, the Plan complies with the requirements of section 1129(a)(4).

(v) 1129(a)(5)

Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtors. 11 U.S.C. § 1129(a)(5).

**\*55** The employment of officers and directors by the Reorganized Debtors, is consistent with the interests of creditors and is essential to the ongoing viability of the Debtors' business. The individuals associated with the prior wrongdoings of the Debtors have either resigned or have been discharged by the Debtors. The current directors have exemplary reputations, and distinguished credentials. The current officers of the Debtors are intimately familiar with the Debtors' business and are needed to maintain critical business relationships with lenders, suppliers, customers, and other parties. *See In re Apex Oil Co.,* 118 B.R. 683, 704–05 (Bankr.E.D.Mo.1990); *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149–50 (Bankr.S.D.N.Y.1984).

Based upon the foregoing, the Debtors have satisfied the requirements of section 1129(a)(5).

(vi) 1129(a)(6)

Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by the reorganized debtor in the operation of its businesses approve any rate change provided for in the plan. 11 U.S.C. § 1129(a)(6).

The foregoing provision appears inapplicable in the instant cases. The Plan does not provide for rate changes by Reorganized WorldCom or any of the other Reorganized Debtors. Accordingly, such regulatory approval is unnecessary under the terms of the statute, and the requirements of section 1129(a)(6) are met.

(vii) 1129(a)(7)

Section 1129(a)(7) of the Bankruptcy Code provides, in relevant part:

With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date ...

11 U.S.C. § 1129(a)(7)(A).

This section, referred to as the "best interests" test, focuses on individual dissenting creditors rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle St. Partnership,* 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). Under the best interests test, the court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated." *203 North LaSalle,* 526 U.S. at 440; *United States v. Reorganized CF & I Fabricators, Inc.,* 518 U.S. 213, 228, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996). As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting impaired claims or equity interests.

In the instant case, the best interests test is satisfied as to each unimpaired Class of claims. Pursuant to section 1126(f) of the Bankruptcy Code, each holder of a claim in Classes 1 and 3 is deemed to have accepted the Plan. Moreover, because the Debtors have determined to pay claimants in Class 2, in full, in cash, plus interest required under section 506(b), such Class also is rendered unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the best interests test is satisfied with respect to Classes 1, 2 and 3.

**\*56** Debtors' liquidation analysis demonstrates that the values that may be realized by the holders of claims and equity interests in the respective Classes of claims and equity interests upon disposition of the Debtors' assets pursuant to a chapter 7 liquidation are significantly less than the value of the recoveries to such Classes provided for under the Plan. Specifically, the liquidation analysis demonstrates that holders of claims and equity interests in Classes 3A through 15 would not receive any distributions in a chapter 7 liquidation as there would be no funds for distribution after payment of claims having priority over general unsecured claims. The distributions to these Classes under the Plan, therefore, far exceed the distributions under a chapter 7 liquidation.

The Debtors do not have the ability to produce separate legal entity liquidation analyses, which is why the Debtors are seeking to substantively consolidate. In addition, the Bankruptcy Code and applicable case law make clear that the Debtors need not provide non-consolidated financial information in a disclosure statement relating to a substantive consolidation plan. *See In re Stone & Webster, Inc.,* 286 B.R. 532, 544–46 (Bankr.D.Del.2002); *In re Affiliated Foods, Inc.,* 249 B.R. 770, 789 (Bankr.W.D.Mo.2000). In fact, the Debtors are not obligated to provide information regarding any other possible or proposed plan of reorganization. *See* 11 U.S.C. § 1125(a)(1); *see also Kirk v. Texaco Inc.,* 82 B.R. 678, 684 (S.D.N.Y.1988); *In re Aspen Limousine Service, Inc.,* 193 B.R. 325, 334 (D.Colo.1996).

Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(7).

(viii) 1129(a)(8)

Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accepts the plan, as follows:

With respect to each class of claims or interests -

    (A) such class has accepted the plan; or

    (B) such class is not impaired under the plan.

11 U.S.C. § 1129(a)(8).

Classes 1 and 3 are unimpaired under the Plan and are conclusively presumed pursuant to section 1126(f) to have accepted the Plan. Moreover, as a result of the Debtors' determination to pay creditors in Class 2 of the Plan, in full, in cash, plus interest required under section 506(b), Class 2 also is unimpaired and conclusively presumed pursuant to section 1126(f) to have accepted the Plan.

Classes 3A, 4, 5, 9, 10, 11, 12, 13, which are impaired Classes of Claims, have affirmatively voted to accept the Plan. Class 6B is impaired and is deemed to have accepted the Plan because of the stipulation entered into with the Debtors, among others, to support the Plan.

Thus, as to these (i) unimpaired and (ii) impaired and accepting Classes, the requirements of section 1129(a)(8) have been satisfied.

Classes 6, 6A, 7, 8, 14, and 15 are deemed to have rejected the Plan. Nonetheless, as set forth below, the Plan may be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

(ix) 1129(a)(9)

**\*57** Unless the holder of a particular claim agrees to different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims entitled to priority under section 507(a) receive specified cash payments under the plan. *See* 11 U.S.C. § 1129(a)(9). The Plan provides for payment of Claims of a kind specified in sections 507(a)(1) through 507(a)(8) of the Bankruptcy Code in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. 11 U.S.C. § 1129(a)(9).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

(x) 1129(a)(10)

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one Class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The Plan satisfies this requirement because more than one class of impaired claims have accepted the Plan, without including the acceptance of the Plan by insiders, if any, in any such Classes.

(xi) 1129(a)(11)

Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition precedent to confirmation, the Court determine that the Plan is feasible. Specifically, the Court must determine that:

Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

As described below, the Plan is feasible within the meaning of this provision. The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Plan is workable and has a reasonable likelihood of success. See, e.g., In re The Leslie Fay Cos., 207 B.R. 764, 788 (Bankr.S.D.N.Y.1997). The Second Circuit has provided that "the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." Johns–Manville Corp., 843 F.2d 636, 649 (2d Cir.1988); see also In re U.S. Truck Co., 47 B.R. 932, 944 (E.D.Mich.1985), aff'd, 800 F.2d 581 (6th Cir.1986); In re One Times Square Assocs. Ltd. Partnership, 159 B.R. 695, 709 (Bankr.S.D.N.Y.1993); In re Texaco Inc., 84 B.R.

893, 910 (Bankr.S.D.N.Y.), appeal dismissed, 92 B.R. 38 (S.D.N.Y.1988); In re Prudential Energy Co., 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986). The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan can be performed. The purpose of the feasibility test is to protect against speculative plans. As noted by the United States Court of Appeals for the Ninth Circuit:

The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

**\*58** Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.), 761 F.2d 1374, 1382 (9th Cir.1985). However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. See U.S. Truck, 47 B.R. at 944.

Applying the foregoing standards of feasibility, courts have identified the following factors as probative:

(1) the adequacy of the capital structure;

(2) the earning power of the business;

(3) economic conditions;

(4) the ability of management;

(5) the probability of the continuation of the same management; and

(6) any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

Leslie Fay, 207 B.R. at 789; see also Texaco Inc., 84 B.R. at 910; Prudential Energy, 58 B.R. at

862–63. The foregoing list is neither exhaustive nor exclusive. *Drexel Burnham,* 138 B.R. at 763; *cf. In re U.S. Truck Co.,* 800 F.2d 581, 589 (6th Cir.1986).

For purposes of determining whether the Plan satisfies the feasibility standard, the Debtors have analyzed their ability to fulfill their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of their financial performance for each of the three fiscal years for the period ending December 31, 2005 (the "Projections"). The Projections establish that the Debtors will have sufficient cash to meet all of their obligations under the Plan.

Based upon information contained in the record before this Court, after making all payments required pursuant to the Plan, the Reorganized Debtors appear to be a competitive viable operating entity. Significantly, Reorganized WorldCom will have a little more than $5.5 billion of debt as compared to approximately $32 billion prior to the Commencement Date. Accordingly, the Debtors established at the Confirmation Hearing that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

Based upon the foregoing, the Plan satisfies the feasibility standard of section 1129(a)(11).

(xii) 1129(a)(12)

Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 [of title 28 of the United States Code], as determined by the court at the hearing on confirmation of the plan." 11 U.S.C. § 1129(a)(12). Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507(a)(1). In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, the Plan provides that all such fees and charges, to the extent not previously paid, will be paid in cash on the Effective Date or as soon thereafter as is practicable. *See* Plan §§ 13.05,

13.06. Thus, the Plan satisfies the requirements of section 1129(a)(12).

(xiii) 1129(a)(13)

**\*59** Section 1129(a)(13) requires a plan to provide for retiree benefits at levels established pursuant to section 1114 of the Bankruptcy Code. The Plan provides that the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors, if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtors had obligated themselves to provide such benefits. *See* Plan, § 8.10. Accordingly, the Plan satisfies the requirements of section 1129(a)(13).

(xiv) 1129(b)

Section 1129(b) allows for confirmation of a plan where the plan has not been accepted by all impaired classes of claims. Section 1129 of the Bankruptcy Code provides, in relevant part:

Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1). This procedure is known as "cram down" as it allows the Court—in cases where all requirements of section 1129(a) are met, other than 1129(a)(8)—to cram down the plan notwithstanding objections as long as the Court determines that the plan is "fair and equitable" and does not "discriminate unfairly" with respect to the dissenting classes.FN22

FN22. The holders of Class 14 Intermedia Preferred Stock are receiving a distribution

from the estates of Intermedia and, thus, Class 14 is not junior to Class 6A.

Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment. *See In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 63 (Bankr.S.D.N.Y.1990); *In re Johns–Manville Corp.,* 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986), *aff'd in part, rev'd in part on other grounds,* 78 B.R. 407 (S.D.N.Y.1986), *aff'd,* 843 F.2d 636 (2d Cir.1988). Thus, if under the facts and circumstances of a particular case, there is a reasonable basis for disparate treatment of two similarly situated classes of claims or two similarly situated classes of equity interests, there is no unfair discrimination. *See, e.g. Buttonwood Partners,* 111 B.R. at 63.

To determine whether a plan discriminates unfairly, courts consider whether (1) there is a reasonable basis for discriminating, (2) the debtor cannot consummate the plan without the discrimination, (3) the discrimination is proposed in good faith, and (4) the degree of discrimination is in direct proportion to its rationale. *See Buttonwood,* 111 B.R. at 63; *In re Ambanc La Mesa Ltd. Partnership,* 115 F.3d 650 (9th Cir.1997), *cert. denied,* 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998), *In re Rochem, Ltd.,* 58 B.R. 641 (Bankr.D.N.J.1985).

A mechanism that enables the Debtors to recognize the unique reliance and prejudice arguments of the holders of (i) MCIC Senior Debt Claims, (ii) MCIC Subordinated Debt Claims, and (iii) MCI Pre-merger Claims, which those creditors, as parties that extended credit to an MCIC entity prior to the Merger, possess in relation to the substantive consolidation of the WorldCom Debtors, is a valid business justification and reasonable basis for the disparate treatment of WorldCom General Unsecured Claims, MCI Pre-merger Claims, MCIC Senior Debt Claims, and MCIC Subordinated Debt Claims.

**\*60** Because the recoveries by holders of Class 5 Claims and Class 6 Claims are equivalent, the treatment of Class 5 does not unfairly discriminate against Class 6. *See In re Johns–Manville Corp.,* 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986).

It is appropriate for the Debtors to consider the relative prejudice to creditors that may have relied upon the separate credit of MCIC or its subsidiaries prior to the Merger in order to formulate a fundamentally fair chapter 11 plan. *See, e.g., Moran v. Hong Kong & Shanghai Banking Corp. ( In re Deltacorp, Inc.),* 179 B.R. 773, 777 & n. 5 (Bankr.S.D.N.Y.1995).

Class 6 WorldCom General Unsecured Claims are not similarly situated to Class 6A MCI Pre-merger Claims, Class 9 MCIC Senior Debt Claims and Class 10 MCIC Subordinated Debt Claims and there is a reasonable basis for the Plan's differentiation of them. *See In re Rochem, Ltd.,* 58 B.R. 641, 643–44 (Bankr.D.N.J.1985).

The discrimination among Classes 6, 6A, 9 and 10 under the Plan is not unfair because it is appropriate, reasonably proportional to the issues of the case and necessary to the reorganization. *See In re Kliegl Bros. Universal Electric Stage Lighting Co.,* 149 B.R. 306, 309 (Bankr.E.D.N.Y.1992)

The Debtors have demonstrated that the disparity of treatment between Classes 5 and 6 on the one hand, and Classes 6A, 9 and 10 on the other hand, which is based primarily upon the relative prejudice and reliance arguments of pre-Merger creditors, is not only warranted, but necessary to achieve fundamental fairness. *See In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 62 (Bankr.S.D.N.Y.1990).

The Debtors have acted in good faith in determining to provide additional recoveries to the holders of Class 6A Claims compared to recoveries Class 6 Claims.

The 35.7% distribution provided on account of Class 6 WorldCom General Unsecured Claims is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

both meaningful and consistent with the legal and equitable rights of similarly situated creditors and the Plan's overall distribution scheme.

The treatment afforded Class 6A does not unfairly discriminate against Class 6 and the distribution of a pre-Merger premium is "equitable for the unsecured creditors as a whole." *In re Pattni Holdings,* 151 B.R. 628, 631 (Bankr.N.D.Ga.1992).

The Plan's provision for differing treatment among Classes 6A, 9 and 10 is reasonable because it appropriately reflects the complexities of the priorities of the Claims in these Classes *inter se. See Buttonwood Partners,* 111 B.R. at 62.

The record demonstrates that the Debtors have continuously sought to ensure that the Plan treats all creditors fairly and that the discrimination among Classes was proposed in good faith. *See Federal Deposit Insurance Corp. v. Colonial Realty Co.,* 966 F.2d 57, 61 (2d Cir.1992).

Any enhanced value received by holders of Class 6B Claims on account of contributions from other Classes is not a treatment of these Claims under the plan and does not constitute unfair discrimination. *See In re Genesis Health Ventures, Inc.,* 266 B.R. 612 (Bankr.D.Del.2001), (citing *In re SPM Mfg. Corp.,* 984 F.2d 1305 (1st Cir.1993)); *In re McCorp Financial Inc.,* 160 B.R. 941 (Bankr.S.D.Tex.1993).

**\*61** The greater value received by the members of the Ad Hoc MCI Trade Claims Committee as a result of the Contributions does not violate the Bankruptcy Code, because the Contributions are the result of other creditors (holders of MCI Senior Debt Claims and MCI Subordinated Debt Claims) voluntarily sharing their recoveries under the Plan with the members of the Ad Hoc MCI Trade Claims Committee. (Debtors' Exs. 335 and 339.) The greater value received by the members of the Ad Hoc MCI Trade Claims Committee is not the result of the Debtors' distribution of estate property to such creditors. Creditors are generally free to do

whatever they wish with the bankruptcy dividends they receive, including sharing them with other creditors, so long as recoveries received under the Plan by other creditors are not impacted. *See Official Comm. of Unsecured Creditors v. Stern ( In re SPM Mfg. Corp.),* 984 F.2d 1305, 1313 (1st Cir.1993); *In re MCorp Fin., Inc.,* 160 B.R. 941 (S.D.Tex.1993); *In re Teligent, Inc.,* 282 B.R. 765 (Bankr.S.D.N.Y.2002); *In re Nuclear Imaging,* 270 B.R. 365 (Bankr.E.D.Pa.2001); *In re Genesis Health Ventures, Inc.,* 266 B.R. 591 (Bankr.D.Del.2001); *In re White Glove, Inc.,* 1998 WL 731611 (Bankr.E.D.Pa.1998); *In re Parke Imperial Canton, Ltd.,* 1994 WL 842777 (Bankr.N.D.Ohio 1994).

The Plan does not discriminate unfairly against Class 6 or Class 6A.

A plan is considered fair and equitable with respect to a class of unsecured claims where:

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).

No Class of Claims or Equity Interests that is junior to WorldCom General Unsecured Claims and MCI Pre-merger Claims will receive any property under the Plan on account of such Claims or Equity Interests.

The absolute priority rule is inapplicable to contributions of Plan recoveries made by certain creditors to other creditors. *See In re SPM,* 984 F.2d at 1313; *In re MCorp,* 160 B.R. 941. Agreements by creditors to share their recoveries under a plan of reorganization with other creditors need not

benefit an entire class. *See, In re White Glove, Inc.,* 1998 WL 7311611; *In re Parke Imperial Center,* 1994 WL 842777. Moreover, the contributing creditor need not be a secured creditor. *See In re MCorp.,* 160 B.R. at 960. The holding of *Official Comm. of Unsecured Creditors v. Stern ( In re SPM Mfg. Corp.*), 984 F.2d 1305, 1313 (1st Cir.1993) and its progeny affirming the propriety of contributions by certain creditors to other creditors under the Bankruptcy Code is applicable to the Contributions, which are in furtherance of a consensual plan of reorganization.

**\*62** The Plan is fair and equitable with respect to Class 6 and Class 6A.

With respect to each of Classes 7, 8, 14 and 15 under the Plan, the Plan (i) does not discriminate unfairly and (ii) is fair and equitable within the meaning of 1129(b) of the Bankruptcy Code. 11 U .S.C. § 1129(b).

The Plan meets all of the requirements for confirmation under sections 1127 and 1129 of the Bankruptcy Code.

The Integrated Settlement embodied in the Plan need not be approved under Bankruptcy Rule 9019.

The increase by $29,000,000,000 to the Intermedia Settlement (which will be distributed *pro rata* to the holders of Intermedia Preferred Stock) is not a material change to the Intermedia Settlement and does not adversely impact recoveries to any Class of creditors under the Plan.

Each of the objections to the July 9 Plan, September 12 Plan or the Plan not heretofore withdrawn or resolved by written or oral agreement stated and made a part of the record of the Confirmation Hearing, is overruled and denied.

### III. SUMMARY

Substantive consolidation is warranted and approved. Each of the Settlements is approved. The Plan is confirmed.

An appropriate Order will be entered.

Bkrtcy.S.D.N.Y.,2003.
In re Worldcom, Inc.
Not Reported in B.R., 2003 WL 23861928 (Bkrtcy.S.D.N.Y.)

END OF DOCUMENT